**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

Valerie Kline                              \*
83 E Street                                \*
Lothian, MD 20711                          \*
                                           \*
                              Plaintiff \*
                                           \*
              v.                           \*        Case No. 1:07-cv-451 (JR)
                                           \*        **RECEIVED**
Linda M. Springer, Director                \*
U. S. Office of Personnel Management       \*        SEP  7 2007
1900 E Street, N.W.                        \*
Washington, D.C.  20415                    \*        NANCY MAYER WHITTINGTON, CLERK
                              Defendant \*                U.S. DISTRICT COURT
                                           \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SECOND
**AMENDED COMPLAINT**

**NATURE OF THE ACTION**

1.    Plaintiff, Valerie Kline, is a white female over the age of 40 and a federal employee

        working at the U. S. Office of Personnel Management (OPM) as a Management

        Analyst in the Publications Management Group (PMG).

2.    The PMG is one of those "unusual employers that discriminate against the majority"

        by practicing an unlawful minority and white male preference policy where white

        females are disproportionately represented (approx. 3%) compared to the percentage of

        white females residing in the Nation's Capital (approx. 17%) or employed by the

        Federal Civilian Workforce (approx. 27.5%).

3.    PMG employs proportionately more white males and minorities than white females

        compared to the average number of those groups residing in the Nation's Capital as

RECEIVED
SEP - 7 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Plaintiff was the only white female out of approximately 32 employees in PMG during the time period of the acts described in this Complaint.

4.  Plaintiff brings this reverse discrimination action where plaintiff has been subjected to numerous adverse personnel actions as a result of PMG's managers' unlawful reverse discrimination preferences, sexual harassment and/or retaliation practices.

5.  Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 USCS § 1981, to remedy the acts of employment discrimination, sexual harassment, and retaliation.

## JURISDICTION AND VENUE

6.  Jurisdiction is conferred on this Court by 42 U.S.C. § 2000e et seq. Equitable and other just relief are sought pursuant to 42 U.S.C. Section 2000e-5 (f) through (k) and 2000e-16.

7.  This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 2000e-5(f) and 2000e-16.

8.  Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the inherent equitable powers of this Court.

9.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) & (e) and 42 U.S.C. § 2000e-5(f) because (1) the OPM is within this judicial district, (2) the events or omissions giving rise to Plaintiff's claim for relief occurred in this judicial district, (3) the unlawful acts are alleged to have been committed in this judicial district, and (4) the records relevant to such acts are maintained and administered in this judicial district.

10.  Plaintiff has fulfilled all conditions precedent under Title VII prior to instituting this lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## PARTIES

11.  Plaintiff, Valerie Kline, is a citizen of the United States, is a civil servant of approximately eighteen years, currently lives in Maryland and is a member of a protected class under Title VII.

12.  Defendant Linda M. Springer is the Director of OPM and as such heads the OPM, a department within the Legislative Branch of the Government of the United States. As the Director of OPM, Ms. Springer is responsible for the personnel actions, omissions and practices there.  She is sued in her official capacity.

13.  The discriminatory and retaliatory acts were done by the managers of the PMG, Mr. William M. Davis and Mr. Claudio Benedi, who are agents of the Defendant.

14.  Defendant is vicariously liable for the discriminatory and retaliatory acts practiced by its agents Davis and Benedi.

## FACTUAL ALLEGATIONS

15.  On October 7, 2002, Plaintiff began working for OPM as a Management Analyst in the PMG, formerly known as the Publishing Management Branch (PMB).

16.  Plaintiff applied for the position sometime between June 18, 2002, and July 9, 2002, in response to Vacancy Announcement Number 02-171-CJR that was seeking someone to be responsible for executing the regulatory processing components of OPM's Regulatory Issuances System.

17.  Plaintiff is a Certified Paralegal Specialist, has a Bachelor of Science degree in Journalism with honors from the University of Maryland, University College and is currently enrolled in law school.

18.  Plaintiff interviewed for the position with her former supervisor, Mr. Davis, Chief (retired), Publishing Services Branch, a white male, and Mr. Davis' supervisor, Mr. Benedi, Director, Publications Management Group, an Hispanic male.

19.  During the interview, Mr. Benedi explained to Plaintiff that she would be working with Ms. Jacquline Carter, a black female, who worked strictly on regulatory matters in the Regulatory Issuances System.

20.  Plaintiff was also told by Mr. Benedi that Ms. Carter is allowed to telecommute (or "telework") approximately 2-3 days a week because her husband had several strokes and telecommuting enabled her to care for her husband so that she would not need to retire from her position.

21.  Mr. Benedi told Plaintiff that should Ms. Carter's husband have another stroke whereupon his condition worsened, it was Ms. Carter's intention to retire. Thus, they were hiring someone to work with Ms. Carter and assume responsibility for the Regulatory Issuances System in the event she suddenly retired.

22.  During the interview, Mr. Davis informed Plaintiff that if she were hired, she too would be able to telecommute 2-3 days per week like Ms. Carter does "after you get to know the people" involved in the regulatory work.

23.  Around the same time, Plaintiff interviewed for a management analyst position with the U.S. Department of Interior (DOI) who was interested in hiring Plaintiff as a GS-13/1 but plaintiff opted to work at OPM at a GS-12/3 instead of for DOI as a

GS-13/1 because of the representation made by Mr. Davis that she would be allowed to telecommute 2-3 days per week like Ms. Carter.

24.   Plaintiff cares for her elderly mother who has failing health and the opportunity to telecommute was a major factor in deciding to work for OPM since telecommuting would enable Plaintiff to have more time to care for her mother.

25.   Plaintiff spends approximately 2 ½ - 3 hours a day commuting to and from work.

26.   Plaintiff was offered and accepted the position to work for PMG's Regulatory Issuances System and began working at OPM approximately October 7, 2002.

27.   When initially hired, Plaintiff's Position Description was strictly limited to work related to the Regulatory Issuances System.

28.   On approximately May 9, 2003, Plaintiff sent Mr. Davis a Request to Telecommute.

29.   On approximately May 12, 2003, Mr. Davis denied the request and noted on the Telecommute Request form that it was OPM's policy not to allow new employees to telecommute but that Plaintiff could reapply for telecommuting after one year of employment at OPM.

30.   The one-year condition is discretionary because other offices within OPM have permitted new employees to telecommute almost immediately after they have begun working for OPM without requiring a one-year wait period before telecommuting.

31.   After submitting the request to telecommute, Mr. Davis submitted paperwork to Mr. Benedi on approximately May 12, 2003, to change Plaintiff's Position Description to include non-regulatory duties, such as visual information duties and publication database responsibilities that was activated on approximately June 10, 2003.

32.    Plaintiff's duties were changed to add non regulatory responsibilities for the purpose of denying Plaintiff's request to telecommute and to diminish her material responsibilities.

33.    Shortly thereafter, Plaintiff met with an AFGE Local 32 (the "Union") representative who arranged a meeting with Mr. Davis where an agreement was reached to allow Plaintiff to telecommute after she had been employed with OPM for one year.

34.    After approximately one year on September 23, 2003, Plaintiff filed another request to telecommute.

35.    On approximately September 24, 2003, Mr. Davis denied the request on the ground that "Employee is needed to assist with walk-in customers" even though Plaintiff was not allowed to work with PMG's customers but was told to direct the customers to Mr. Coco, Mr. Davis or Mr. Benedi for assistance with their publishing needs.

36.    On approximately September 30, 2003, plaintiff filed an appeal with Mr. Benedi but he failed to respond to the appeal. On approximately October 17, 2003, and November 7, 2003 Plaintiff sent e-mails to Mr. Benedi requesting a response to her appeal but he failed to respond.

37.    Plaintiff then spoke with Mr. Benedi in person and explained to him how Mr. Davis had told her when she interviewed for the position that she would be able to telecommute but his reply was, "I didn't tell you that".

38.    Telecommuting is a tangible, material benefit afforded to similarly situated employees in PMG.

39.    Mr. Davis and/or Mr. Benedi allowed similarly situated minority employees to telecommute but denied Plaintiff the opportunity to telecommute.

40.    Shortly after denying Plaintiff's request, the Union initiated an informal grievance
       procedure and obtained an agreement from Mr. Davis to allow Plaintiff to
       telecommute.

41.    On approximately January 7, 2004, Mr. Davis sent Plaintiff an e-mail stating, "[j]ust to
       be sure you understand, we must finalize your rating standards before we can complete
       your Telecommute Agreement".

42.    At the time, Plaintiff had been working at OPM since October 7, 2002, without
       Performance Standards.

43.    On approximately May 17, 2004, four (4) months later, Performance Standards were
       finally issued to Plaintiff.

44.    After the Performance Standards were issued, Plaintiff inquired about her
       Telecommute Request and was told by the Union's representative that Mr. Davis had
       changed his mind because he said Plaintiff was needed in the office "to answer
       telephones and greet customers", which duties were not indicated as a responsibility in
       her Position Description or Performance Standards.

45.    Mr. Davis assigned Plaintiff significantly diminished material responsibilities not
       encompassed by her Position Description and used the change in duties to justify not
       allowing Plaintiff to telecommute.

46.    The Union then initiated a formal grievance process that resulted in a decision by Mr.
       Ronald Flom, Associate Director for the Management Services Division, to allow
       Plaintiff to telecommute one day per pay period (once every two weeks) on a 90-day
       trial basis that was supposed to begin on January 23, 2005.

47.  Plaintiff was not allowed to begin telecommuting on January 23, 2005, because Mr. Davis said that she did not have an executed telework agreement.

48.  Based on knowledge and belief, Ms. Carter did not have an executed agreement when she initially began teleworking.

49.  On approximately January 26, 2005, Mr. Davis executed the Telecommute Request Agreement with Plaintiff.

50.  Plaintiff began the telework trial period on or about February 22, 2005, and encountered no problems during the trial period.

51.  Neither Mr. Davis nor Mr. Benedi made the Union or Plaintiff aware of any problems encountered during the 90-day trial period.

52.  At the end of the telework trial period, Mr. Flom denied Plaintiff's request to continue telecommuting based on recommendations received from Mr. Davis and Mr. Benedi concerning alleged "coordination" problems encountered during the trial period.

53.  Around August 7, 2005, Plaintiff's mother, who lives with Plaintiff, became critically ill.

54.  The Union met with Mr. Davis and/or Mr. Benedi to request that he allow Plaintiff to telecommute so that she could better care for her mother the same way that they allowed Ms. Carter to telecommute when her husband became ill.

55.  Ms. Carter is similarly situated to Plaintiff because they both performed regulatory work for the PMG.

56.  On approximately October 27, 2005, Mr. Davis denied the request and stated that telecommuting "is not appropriate in this situation".

57.  As a result, Plaintiff was required to take leave under the Family Medical Leave Act
     (FMLA) and leave without pay in order to care for her mother.

58.  The Union representative then advised Plaintiff to file an EEO action rather than file
     another grievance.

59.  Ms. Lara Rivera-Lopez, an Hispanic female, was detailed to the PMG for
     approximately one year and performed non regulatory work, such as visual information
     duties, and was allowed to telecommute by Mr. Benedi in order to accommodate her
     school schedule.

60.  Ms. Rivera-Lopez did not have an executed telework agreement with PMG before she
     was allowed to telework nor was she required to telework on a trial basis.

61.  Ms. Rivera-Lopez was similarly situated to Plaintiff because she was a GS-12 and
     performed non regulatory work similar to what Plaintiff was performing following the
     change in her duties.

62.  When Plaintiff initially began working at OPM, she would go to lunch with Mr. Davis,
     Mr. Benedi, and Mr. Coco, a white male employed in PMG, whereupon Mr. Davis
     would frequently make offhand comments about women, their legs, the way they
     dressed and/or how they looked, etc., which were inappropriate.

63.  Mr. Davis made a habit of staring at Plaintiff's breasts when speaking to her but
     Plaintiff rebuffed the advances by ignoring his conduct.

64.  After slighting Mr. Davis' advances, he began to engage in reprisals against Plaintiff
     by harassing her, treating her with contempt, retaliating against her, discriminating
     against her and taking other adverse employment actions against her.

65.  Plaintiff initiated several informal grievances against Mr. Davis due to his reprisals, which consisted of arbitrary denials of flex time and credit hours as well denying Plaintiff a full hour for lunch, which were all resolved in Plaintiff's favor.

66.  Around May of 2002, Mr. Davis requested Plaintiff to change the time she went to lunch from 12:30 p.m. to 11:30 a.m.

67.  Mr. Davis told Plaintiff that the reason she had to go to lunch at 11:30 am was so that there would be someone to cover the office while the other members of PMG went to lunch.  Prior to this, PMG would close its office by locking its door and posting a sign that stated it was closed and would reopen shortly.

68.  The reason given for changing Plaintiff's lunch hour was a pretext since Mr. Benedi, Mr. Davis and Mr. Coco frequently went to lunch around 12 noon or 12:15 pm before Plaintiff returned from her lunch break and would lock the door to the PMG as they had done before Plaintiff's lunch hour was changed.

69.  During this time, plaintiff was the only one in the PMG that was required to go to lunch at a specific time while minority and white male employees were allowed to go any time they wished.

70.  Ms. Carter informed Plaintiff that she went to lunch "whenever [she] want[ed]".

71.  Changing Plaintiff's lunch hour and requiring Plaintiff to go to lunch at the same specified time every day deprived Plaintiff the benefit of flexibility in the time she went to lunch that was afforded to other similarly situated employees in PMG.

72.  Around this same time, Mr. Davis began requiring Plaintiff to perform menial tasks of a clerical nature not covered by her Position Description.  He also began chastising her for acts that persons of the opposite sex were not chastised for.

73.    On approximately December 15, 2003, Mr. Davis sexually harassed Plaintiff by deliberately and intently staring at her breasts while issuing her a Counseling Memorandum.

74.    Mr. Davis issued Plaintiff the Counseling Memorandum based on an e-mail that she had received from Mr. Robert Coco, a white male, Management Analyst, working in PMG, which she had forwarded to a friend sometime between May 4, 2003, and May 10, 2003.

75.    Mr. Davis said the e-mail was inappropriate and unacceptable because it contained nudity, yet the e-mail was merely an animated cartoon of crows sitting on a live wire.

76.    Mr. Coco had sent the same e-mail to numerous people within PMG, including Ms. Carter, Mr. Davis and Mr. Benedi but he was not issued a Counseling Memorandum.

77.    Plaintiff and Mr. Coco are similarly situated because neither of them are supervisors, they both work in PMG and both perform work related to publications.

78.    The Counseling Memorandum may have been placed in Plaintiff's personnel file, which could hinder her ability to obtain promotions or alternative employment.

79.    On approximately December 7, 2005, Mr. Davis sexually harassed Plaintiff by deliberately and intently staring at Plaintiff's breasts when issuing her the 2005 Performance Appraisal that conveyed the message that if she wanted a better rating, she would need to have more than a professional relationship with him.

80.    Mr. Davis rated Plaintiff's performance mainly on the non professional, menial, clerical tasks not covered under her Position Description rather than base her rating on the elements contained in her Performance Standards.

81.  Although Plaintiff met the criteria for receiving an "Outstanding" rating based on the four critical elements contained in her Performance Standards, Mr. Davis only gave her an overall rating for 2005 of "Fully Successful" based on the diminished duties and placed derogatory remarks on her performance appraisal.

82.  Plaintiff's overall performance rating for 2003 was only "Exceeds Fully Successful" even though she received a Certificate of Appreciation, a Certificate of Recognition and a Director's Award for Excellence from the Director's Office that year.

83.  Plaintiff's overall performance rating for 2004 was an "Exceeds Fully Successful" but she was only rated "Fully Successful" in 2005 based on her reduced job responsibilities and opportunities.

84.  Plaintiff discussed the Performance Appraisal with Mr. Davis but he refused to change the rating. Plaintiff then filed a grievance against Mr. Davis over her Performance Appraisal but Mr. Davis still refused to change the rating.

85.  Giving Plaintiff a lower performance rating than she had earned or deserved based on the elements contained in her Performance Standards and placing derogatory comments on her appraisal combined with reducing her responsibilities was an adverse employment action that deprived Plaintiff from receiving monetary bonuses, hindered her ability to seek alternative employment and hindered her career opportunities.

86.  Around May of 2003, at Plaintiff's own initiative, she obtained permission from Mr. Benedi to develop an online electronic tracking system of OPM's regulations.

87.  Plaintiff contacted and worked with OPM's Applications Systems Group (ASG) in developing the Federal Register Management System (FRMS) and had administrative rights to the FRMS, which went into production in October 2003.

88.  On approximately December 8, 2005, Ms. Arlene Taylor, of the ASG who worked with Plaintiff in developing the FRMS, stopped by Plaintiff's office to show her some new features following a conversion of the FRMS software to an upgraded version.

89.  Following Ms. Taylor's visits, Mr. Davis asked Plaintiff who had been visiting with her and Plaintiff informed him that it was Ms. Taylor.

90.  Mr. Davis did not ask Plaintiff the purpose of Ms. Taylor's visit but instead sent an offensive e-mail to Ms. Taylor and/or her supervisor, Ms. Margaret McElrath, which falsely accused Plaintiff of not informing him of revisions being made to the FRMS.

91.  Plaintiff had informed Mr. Davis and Mr. Benedi at least 6 times during the period from 9/16/05 to12/9/05 in a weekly report that the FRMS was undergoing a conversion to an updated version of the program.

92.  Ms. Taylor said that she visited Ms. Carter on numerous occasions and Mr. Davis never complained about those visits.

93.  Mr. Davis' disparate treatment toward Plaintiff in sending demeaning e-mails to Ms. Taylor and Ms. McElrath about her was highly embarrassing to Plaintiff, caused Plaintiff to suffer mental and emotional anguish as well as a great deal of stress.

94.  On approximately December 22, 2005, Mr. Davis, after consulting with Mr. Benedi, instructed Ms. Taylor to rescind Plaintiff's administrative rights to the FRMS for no apparent reason or justification.

95.  Rescinding Plaintiff's administrative rights to the FRMS further diminished Plaintiff's material responsibilities.

96.  Mr. Davis engaged in further reprisals by heavily scrutinizing and micro-managing Plaintiff's work by continually finding fault with Plaintiff or her work, subjecting her

to criticisms, and creating a hostile working environment, which made it difficult for Plaintiff to concentrate and perform her work.

97.    Mr. Davis frequently whistled, hummed, sang in his office and/or beat his hands on his desk to make rhythmic sounds that would disturb Plaintiff while she was working as Mr. Davis' office was located immediately in front of Plaintiff's work station but Mr. Davis refused to close his door to keep from disturbing Plaintiff.

98.    Due to Mr. Davis' sexual harassment, hostile work environment and disparate treatment of her, Plaintiff has suffered enormous stress and mental anguish that has affected her health and emotional well being.

99.    Mr. Benedi deliberately attempted to turn people against Plaintiff, which Mr. Davis used to give Plaintiff a poor performance rating, and subjected Plaintiff to disparate treatment by denying Plaintiff opportunities that he grants to minority employees.

100.    By subjecting Plaintiff to demeaning, disparate and unfair treatment, Mr. Benedi has intentionally caused her to suffer emotional stress and mental anguish that has affected her health and emotional well being.

101.    Plaintiff obtained counseling from an OPM's Employee Assistance Program counselor and follow-up counseling from a mental health care professional in order to help her cope with Mr. Benedi's and Mr. Davis' demeaning and abusive treatment.

102.    On approximately November 30, 2006, Plaintiff initiated an informal EEO action against Mr. Benedi and Mr. Davis that was not resolved at the informal stage.

103.    On approximately December 28, 2006, Plaintiff filed a formal EEO complaint against Mr. Benedi and Mr. Davis on the basis of reverse race discrimination, sex

discrimination, sexual harassment, and retaliation but following an investigation, Defendant took no action to correct the harassment, retaliation and/or discrimination.

104. On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC).

105. Plaintiff thereby exhausted her administrative remedies on the issues of telework, the Performance Appraisal and the rescinding of her administrative rights to the FRMS.

106. Plaintiff's work space is approximately an 8' x 8' cubicle and has no room for a table to meet with customers when discussing regulations and/or explaining revisions needed to the regulations before submitting them to the U.S. President's Office of Management and Budget or publishing them in the *Federal Register*.

107. Plaintiff's existing work space is more appropriate for a receptionist as it is located in the busiest area of PMG, is extremely noisy and distracting with printers and reproduction equipment, customers inquiring about and/or seeking publishing and printing services and telephone calls mostly for Mr. Davis, Mr. Benedi and Mr. Coco.

108. Plaintiff's workspace is not conducive for carefully reviewing OPM's regulations and legal documents for publication in the *Federal Register*, which was Plaintiff's primary responsibility.

109. On approximately October 20, 2004, Plaintiff sent an e-mail to Mr. Davis requesting office space more conducive to reviewing regulations and informed him that her current space was not conducive to reviewing regulations and/or meeting with regulatory customers because of the distractions of the telephones, visitors, noise and lack of space to meet and go over their documents.

110. Mr. Davis failed to respond to the request for more appropriate office space.

111.    The office space of Ms. Carter, who also reviews regulations, was approximately 10' x 14' with a table area and chairs that is conducive to meeting with customers and is at a far end of PMG's office and away from the busy and noisy area of PMG.

112.    At around this same time, other lower grade minority employees in PMG had larger office spaces that were away from the main hustle and bustle of PMG and were not required to assist with PMG telephone calls.

113.    Around November 2004, PMG acquired two office spaces across the hall from the PMG that is approximately the same size as Ms. Carter's office as well as some of the other lower grade minority employees, and is away from the hustle and bustle of PMG.

114.    Around November 2004, PMG hired a GS-12/1 visual information specialist, Mr. Issac Evans, a black male, to work on publications and gave him the office space across the hall that Plaintiff had requested. A quiet environment or table to meet with customers was not as necessary or as critical for performing visual information work as it was for performing the legal, regulatory work that Plaintiff performed.

115.    On approximately January 24, 2005, Plaintiff sent Mr. Benedi a written request to occupy the office space across the hall.

116.    On approximately February 1, 2005, Mr. Benedi denied Plaintiff's request and stated that the space was only temporary and that he determined that "there is currently no reason to support changing your work facility."

117.    Around this same time, Mr. Benedi offered the other available space across the hall to Jose Velaquez, who was approximately a GS-7 that was detailed to PMG to perform visual information work after Ms. Rivera-Lopez' detail ended.

118. Mr. Velaquez declined the offer and the space was then acquired by another organization in OPM.

119. On approximately December 21, 2005, Plaintiff made another request for the office space across the hall that was still being occupied by Mr. Evans.

120. When Plaintiff made the request for the space, Plaintiff had seniority over Mr. Evans who was a GS-12 step 1 whereas Plaintiff was a GS-12 step 5.

121. Prior to Mr. Evans employment at OPM, Plaintiff was doing visual information work in addition to the regulatory work but after Mr. Evans was hired, Plaintiff was no longer assigned visual information duties even though her Position Description and Performance Standards still contained visual information duties and responsibilities.

122. Instead of allowing Plaintiff to occupy the quieter and larger office space, Mr. Benedi quietly promoted Mr. Evans to a GS-13 around November-December 2005 but didn't promote Plaintiff who had been doing the same type of work as Mr. Evans as well as still doing the same type of work as Ms. Carter, a GS-13, and the same type of work as Mr. Coco, a GS-13, as his "back up".

123. Mr. Benedi treated Plaintiff less favorably than similarly situated employees of a different race and sex by failing to give Plaintiff work space that would have materially aided her in performing her work and diminishing Plaintiff's duties while promoting minorities and/or male employees.

124. When Plaintiff asked Mr. Benedi about the availability of space across the hall, Mr. Benedi averred that he did not have any office space to give, but that if he did have available space, he would give it to an employee with seniority (rather than give it to Plaintiff).

125.  Mr. Benedi discriminated against Plaintiff by giving and/or offering Mr. Evans and/or Mr. Velaquez superior office space over Plaintiff who at the time had seniority over both of them and had a greater requirement for the space in order to perform her work.

126.  Mr. Davis and Mr. Benedi required Plaintiff to perform regulatory work under adverse working conditions and made changes to her responsibilities and working conditions that resulted in a materially significant disadvantage to the Plaintiff.

127.  During the details of Mr. Velaquez and Ms. Rivera-Lopez, they had been assisting Mr. Coco with PMG's telephone lines. When their details ended, instead of asking Mr. Evans to primarily back up Mr. Coco with the PMG lines, Mr. Davis instructed Plaintiff to primarily back up the PMG telephone lines.

128.  On approximately February 2, 2006, Plaintiff was extremely busy working on the Unified Agenda of Regulatory Actions that was due to the Defendant's office on February 3, 2006. Mr. Coco and Ms. Carter were out of the office that day and Plaintiff was expected to cover both the PMG and the regulatory telephone lines.

129.  Mr. Evans was in the office along with another visual information specialist, Ms. Annette Frye-Gunter, a black female, who had begun working for PMG that same week under a detail from another office.

130.  Because Plaintiff was under pressure due to the short deadline for completing the Unified Agenda, Plaintiff asked Mr. Davis if he would find someone to help cover the telephones while Plaintiff worked on the Unified Agenda but he refused by stating that "no one is available".

131.  Plaintiff asked him if Ms. Frye-Gunter could assist with the telephone calls but he replied, "No, she is busy working on something" but Ms. Frye-Gunter informed

Plaintiff that her computer was broken and that she was unable to perform any work on it that day.

132.  Mr. Davis denied Plaintiff's request for assistance, which unreasonably interfered with Plaintiff's work performance and nearly frustrated Plaintiff's ability to meet her deadline.

133.  Mr. Davis and Mr. Benedi have not developed Plaintiff as an employee but have hindered her professional development by curtailing her responsibilities without justification, by no longer allowing her to work on special projects and by treating her less favorably that minority and/or male employees.

134.  The OPM Director's Office decided to develop a document management system (DMS) and contracted with Booze Allen Hamilton to develop the system.

135.  Booze Allen Hamilton requested that Plaintiff to attend various meetings and participate in the development of the DMS correspondence tracking system because of her experience in developing the FRMS, but Mr. Davis and/or Mr. Benedi refused to allow Plaintiff to participate in the project.

136.  Instead, Mr. Davis and/or Mr. Benedi assigned Ms. Carter to work with Booze Allen Hamilton in developing the regulatory aspects of the correspondence tracking system even though Ms. Carter had less experience in developing tracking systems than Plaintiff.

137.  The DMS was activated on approximately February 2006, but the regulatory tracking components of the DMS are not being utilized by the agency.

138.  By refusing to allow Plaintiff to work with Booze Allen Hamilton when they requested her assistance hindered Plaintiff from being able to advance in her career and further diminished Plaintiff's material responsibilities and opportunities.

139.  Mr. Davis and Mr. Benedi arbitrarily denied Plaintiff opportunities to work on projects, which fell under the scope of her Position Description, and was damaging to Plaintiff's career.

140.  Mr. Davis' and Mr. Benedi's arbitrary denial of opportunities in furtherance of her career caused Plaintiff to suffer mental anguish, physical harm due to stress from emotional pain and suffering and has been overall psychologically damaging to her.

141.  On approximately January 25, 2006, Plaintiff initiated another informal EEO action against OPM that was not resolved at the informal level.

142.  On approximately February 21, 2006, Plaintiff filed a second formal EEO complaint based on discrimination due to race and sex and in retaliation for her filing the previous EEO complaint but following an investigation, Defendant took no action to correct the harassment, retaliation or discrimination.

143.  On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC) on the second formal complaint but the EEOC did not schedule a hearing within the 180-day time frame.

144.  Plaintiff thereby exhausted her administrative remedies on the issues pertaining to the denial of office space, refusing to provide Plaintiff with assistance when needed and for denying Plaintiff the opportunity to work on the DMS project and she is therefore entitled to seek relief from this Court.

145. On approximately January 31, 2006, Plaintiff asked Mr. Benedi if she could take a lunch break outside the core hours, which are from 11:30 am to 1:30 pm, because she needed to run an errand but Mr. Benedi denied her request after stating that he checked with "Human Resource" and was advised that employees "must" take their lunch break during the core hours.

146. Although Mr. Davis was out of the office on that date, when he returned he told Plaintiff that she had to use her leave for the time that she was absent from the office outside the core lunch hours.

147. Requiring employees to strictly adhere to the core lunch hours is discretionary because minority and male employees within PMG are allowed to take lunch breaks outside the core lunch hours without using leave.

148. Ms. Carter frequently took lunch breaks outside the core hours and was not required to use leave and even went to lunch after the core hours following the denial of Plaintiff's request yet Mr. Benedi or Mr. Davis did not object to Ms. Carter taking her lunch outside the core hours.

149. Mr. Coco was allowed to take lunch breaks outside the core hours without using leave even after the denial of Plaintiff's request.

150. Mr. Davis and Mr. Benedi denied Plaintiff material benefits afforded to minority and white male employees in retaliation for engaging in and to deter Plaintiff from engaging in protected activity.

151. On approximately February 1, 2006, Mr. Davis issued Plaintiff a Letter of Reprimand for failing to accurately report her time and attendance.

152.  Mr. Davis obtained Plaintiff's building "swipe" records showing what times Plaintiff entered and exited the building for the period July 29, 2005, through November 1, 2005.

153.  Mr. Davis had been on sick leave recovering from surgery during this time period between July 29, 2005, through November 1, 2005, and Mr. Coco was acting in his stead.

154.  The time period covered under the "swipe" records was around the same time that Plaintiff's elderly mother became critically ill and it was an extremely stressful time for Plaintiff because her schedule had become erratic and changed on a daily basis due to the need to leave work early in order to take her mother to the doctor.

155.  Whenever Plaintiff left early to take her mother to the doctor, she either orally informed Mr. Coco or sent e-mails to him informing him of her leave because he was keeping track of her time while Mr. Davis was recovering from surgery.

156.  On approximately September 23, 2005, Plaintiff informed Mr. Coco that she was leaving for the day but he failed to report Plaintiff's time.

157.  Mr. Coco did not receive a reprimand for failing to accurately report the time.

158.  Mr. Davis did not obtain "swipe" records of other PMG employees and informed Plaintiff that there was "no need to obtain the swipe records of other employees".

159.  Mr. Davis had not complained or commented to Plaintiff about her arrival and departure times prior to the audit of the "swipe" records and had no reason to scrutinize her records.

160.  Based on the "swipe" records, Mr. Davis stated in the reprimand that Plaintiff had not reported 5 hours and 5 minutes of leave that she used.

161. Plaintiff explained and documented how she had accurately reported her leave and/or made up any time used where the "swipe" records indicated that there was a shortfall but Mr. Davis refused to retract the reprimand.

162. Plaintiff also showed him that on approximately September 15 and 16, Plaintiff was charged with 3 hours of SL for each day when she should have only been charged with one hour of SL for each of those days that resulted in Plaintiff being charged 4 hours of SL that she had not used.

163. On approximately February 2, 2006, and March 16, 2006, Mr. Davis tampered with or authorized the tampering of Plaintiff's annual and sick leave without Plaintiff's knowledge and/or authorization that adversely resulted in a loss of benefits, namely a loss of 36 hours of "Use or Lose" (U/L) Annual Leave (AL) and a loss of 98.5 hours of accrued Sick Leave (SL).

164. As a result of the leave tampering, on approximately February 21, 2006, and March 16, 2006, Plaintiff was denied the use of SL that she had earned but which leave was not reflected in her leave statement due to the altering of her leave.

165. On approximately February 2, 2006, Plaintiff notified Mr. Davis about the discrepancies but Mr. Davis failed to correct all of the discrepancies until after Plaintiff filed a formal EEO complaint on approximately May 27, 2006.

166. Mr. Davis was not issued a reprimand for failing to accurately report Plaintiff's leave.

167. Plaintiff initiated an informal EEO action on or about March 7, 2006, which was not resolved at the informal level and then on approximately March 21, 2006, Plaintiff filed a third formal EEO complaint due to discrimination on the basis of race, sex and

retaliation for filing EEO complaints but following an investigation, Defendant took no action to correct the harassment, retaliation or discrimination.

168.    On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC) on the third formal complaint but the EEOC did not schedule a hearing within the 180-day time frame.

169.    Plaintiff thereby exhausted her administrative remedies on the issues pertaining to leave tampering, the Letter of Reprimand and lunch breaks.

170.    The acts of discrimination, sexual harassment and retaliation have caused Plaintiff a great deal of stress, anxiety, worry, and mental and emotional anguish that has had a negative impact on her health, her ability to seek alternative employment and her ability to advance in her career.

171.    Plaintiff's rights have been violated and OPM, through its agents Mr. Davis and Mr. Benedi, have knowingly and willfully engaged in conduct that constitutes bad faith, mismanagement, negligence, malfeasance, and abuse of authority and the public trust.

## COUNT I

### ("Reverse" Race Discrimination)

172.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

173.    OPM, by and through its agents Mr. Benedi and Mr. Davis, has discriminated against Plaintiff on the basis of race by allowing Hispanic and Black minority females to telework, telework without a trial period and/or without initially requiring an executed agreement but denying Plaintiff telework even after undergoing a trial period where no *bona fide* problems were encountered during the trial period.

174.    OPM, by and through its agents Mr. Benedi and Mr. Davis, has discriminated against
        Plaintiff on the basis of race by allowing a Black minority female to telecommute in
        order to better care for a family member who had become ill but denying Plaintiff the
        opportunity to telework when her family member had become critically ill.

175.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated
        Plaintiff less favorably than its minority or white male employees.

176.    These acts constituted adverse employment actions and/or questionable practices that
        give rise to an inference of discrimination and/or retaliation in light of Defendant's
        PMG's propensity to discriminate against white females.

177.    For all of the reasons described in this Complaint, Defendant's actions by and through
        its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

178.    Defendant's actions by and through its agents were done with either malice or with
        reckless indifference to Plaintiff's rights under law.

179.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has
        suffered, and will continue to suffer, both economic and non-economic losses,
        emotional distress and other compensable damages.


### COUNT II

#### (Sexual Harassment, Reverse Race and
#### Sex Discrimination, and Retaliation)

180.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

181.    OPM, by and through its agent Mr. Davis, sexually harassed Plaintiff by intently and
        deliberately staring at her breasts when issuing to her the 2005 Performance Appraisal
        and giving her a poor performance rating based on duties not covered by her

Performance Standards that suggested that if she wanted to receive a higher rating, she would need to have more than a "professional relationship" with him.

182.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff by taking reprisals against Plaintiff in order to punish and/or retaliate against her for not having more than a "professional relationship" with him and/or for filing Fair Labor Standards Act (FLSA) grievances against same.

183.    OPM, by and through its agent Mr. Davis, discriminated against Plaintiff by giving her a poor performance rating even though Plaintiff did not commit errors and/or omissions in performing regulatory work and where other employees were given a higher rating that did commit errors and/or omissions in the regulatory work.

184.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

185.    OPM, by and through its agent Mr. Davis, discriminated and retaliated against Plaintiff by materially altering and eliminating her professional responsibilities, by assigning her menial tasks and clerical duties, and by poorly rating her on the diminished responsibilities rather than on the elements contained in her Performance Standards.

186.    The unwanted sexual harassment, discriminatory and retaliatory acts constitute adverse employment actions.

187.    OPM, by and through its agent Mr. Davis, has abused its power by subjecting Plaintiff to unreasonable working conditions, imposing unreasonable performance standards on her and/or by unfairly rating her for not responding to his sexual innuendos and/or advances in an attempt to cause Plaintiff to fail in her job and/or to discourage her from exercising her rights.

188.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

189.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

190.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT III

### ("Reverse" Race Discrimination and Retaliation)

191.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

192.    OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of race by willfully and maliciously sending offensive e-mails to Plaintiff's professional working contacts when Mr. Davis did not object to the same or other people meeting with its minority or white male employees.

193.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously sending offensive e-mails to Plaintiff's professional working contacts for the purpose of discouraging them from working with Plaintiff in order to justify giving her a poor performance rating.

194.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

195.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

196.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

197.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

198.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

### COUNT IV

### (Sexual Harassment, Sex Discrimination and Retaliation)

199.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

200.    OMP, by and through its agent Mr. Davis, sexually harassed Plaintiff by intently and deliberately staring at her breasts while issuing her a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend.

201.    OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of sex by willfully and maliciously issuing to Plaintiff a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend but by not issuing a Counseling Memorandum to a white male member of PMG who had originally sent the same inappropriate e-mail to both Plaintiff and to Mr. Davis as well as other members of PMG.

202.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously issuing to Plaintiff a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend but by not issuing a Counseling Memorandum to a white male member of PMG who had originally sent the

same inappropriate e-mail to both Plaintiff and to Mr. Davis as well as other members of PMG.

203. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

204. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

205. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

206. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

207. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT V

### ("Reverse" Race and Sex Discrimination and Retaliation)

208. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

209. OPM, by and through its agents Mr. Davis and Mr. Benedi, has discriminated against Plaintiff by willfully and maliciously offering and/or furnishing superior office space to minority and/or male employees with less tenure, less seniority and/or less need for the space than Plaintiff while denying Plaintiff adequate and/or appropriate office space for properly performing her work.

210. OPM, by and through its agents Mr. Davis and Mr. Benedi, has retaliated against Plaintiff for exercising her rights by willfully and maliciously offering and/or furnishing superior office space to minority and/or male employees with less tenure, less seniority and/or less need for the space than Plaintiff while denying Plaintiff adequate and/or appropriate office space for properly performing her work.

211. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

212. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

213. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

214. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

215. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT VI

### ("Reverse" Race and Sex Discrimination and Retaliation)

216. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

217. OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of race and sex by willfully and maliciously requiring her to cover the office telephones on approximately February 2, 2006, even though she was working on a high

priority matter under a strict deadline but failed to require minority and/or male employee(s) to cover the telephones who were not working on high priority matters.

218. OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously requiring her to cover the office telephones on approximately February 2, 2006, even though she was working on a high priority matter under a strict deadline but failed to required minority and/or male employee(s) to cover the telephones who were not working on high priority matters.

219. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

220. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

221. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

222. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

223. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT VII

### ("Reverse" Race and Sex Discrimination and Retaliation)

224. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

225. OPM, by and through its agents Mr. Davis and Mr. Benedi, has discriminated against Plaintiff by willfully and maliciously rescinding her administrative rights to the FRMS without justification; by forbidding her from working with OPM's contractor in the development of a correspondence tracking system for OPM; and assigning the task to minority and/or male employees with less experience in developing tracking systems.

226. OPM, by and through its agents Mr. Davis and Mr. Benedi, has retaliated against Plaintiff for exercising her rights by willfully and maliciously rescinding her administrative rights to the FRMS without good cause; by forbidding her from working with OPM's contractor in the development of a correspondence tracking system for OPM but by assigning the task to minority and/or male employees with less experience in developing tracking systems.

227. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

228. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

229. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

230. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

231. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT VIII

### ("Reverse" Race and Sex Discrimination and Retaliation)

232.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

233.    OPM, by and through its agent Mr. Davis and Mr. Benedi, has discriminated against
        Plaintiff on the basis of sex by willfully and maliciously denying Plaintiff the benefit of
        taking a lunch break outside the core hour but at the same time allowing minority
        and/or male employees to take a lunch break outside the core hours; and/or by
        requiring Plaintiff to take her lunch break at a specific time but not requiring minority
        and/or male employees to take their lunch break at a specific time.

234.    OPM, by and through its agent Mr. Davis and Mr. Benedi, has retaliated against
        Plaintiff for exercising her rights by willfully and maliciously denying Plaintiff the
        benefit of taking a lunch break outside the core hour but at the same time allowing
        male and/or minority employees to take a lunch break outside the core hours; and/or by
        requiring Plaintiff to take her lunch break at a specific time but not requiring minority
        and/or male employees to take their lunch break at a specific time.

235.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated
        Plaintiff less favorably than its minority or white male employees

236.    These acts constituted adverse employment actions and/or questionable practices that
        give rise to an inference of discrimination and/or retaliation in light of PMG's
        propensity to discriminate against white females.

237.    For all of the reasons described in this Complaint, Defendant's actions by and through
        its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

238.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

239.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

### COUNT IX

### ("Reverse" Race and Sex Discrimination and Retaliation)

240.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

241.    OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of race and sex by willfully and maliciously auditing her "swipe" records and issuing her a Letter of Reprimand for failing to accurately report her time based on the audit but failing to audit the "swipe" records of other PMG minority and/or male employees and by failing to issue a Letter of Reprimand to employees who failed to accurately report the time.

242.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously auditing her "swipe" records for no justifiable reason while minority and/or white male employees were not audited; and issuing to Plaintiff a Letter of Reprimand for failing to accurately report her time based on the audit but failing to issue Letter of Reprimand to employees who failed to accurately report the time.

243.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

244.   These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

245.   For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

246.   Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

247.   As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT X

### (Retaliation)

248.   Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

249.   OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously tampering with and/or causing to be tampered with Plaintiff's earned annual and sick leave and by failing to properly amend the leave for nearly three (3) months that caused Plaintiff to be unable to use her sick leave when needed and requested and constituted persistent harassment by Mr. Davis that was calculated to encourage Plaintiff's resignation

250.   These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

251.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

252.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

253.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant. Plaintiff requests a jury trial and that she be awarded the following relief:

a.    Declaratory relief, including but not limited to a declaration that Defendant's actions have violated Title VII;

b.    Appropriate injunctive relief, including but not limited to an order restraining Defendant from engaging in further discriminatory and retaliatory conduct of the types of which Plaintiff complains herein;

c.    Disciplinary action against Mr. Davis and/or Mr. Benedi;

d.    Removal of the Letter of Reprimand and Counseling Memorandum from Plaintiff's official personnel file;

e.    A promotion to a GS-14/1;

f.    Revise Plaintiff's Performance Standards to eliminate subjective elements, such as those pertaining to Plaintiff's "relationships" and other elements that are unattainable;

g.  Issue Plaintiff a Performance Appraisal rating of "Outstanding" for 2004 and 2005, remove all derogatory comments from the appraisals and pay respective bonuses;

h.  $100,000 in liquidated damages;

i.  $100,000 in back pay;

j.  $300,000 in statutory damages for each Count of discrimination, sexual harassment and retaliation;

k.  Ability to telecommute full time performing the work that Plaintiff is currently performing for PMG and provide Plaintiff with a laptop computer, printer and Blackberry for teleworking;

l.  Pre-judgment and post-judgment interest at the highest lawful rate;

m.  Attorneys' fees and costs of this action; and

n.  Other such further relief as justice allows.

Respectfully submitted,

Valerie Kline, *pro se*
83 E Street
Lothian, MD  20711
(301) 509-2684

Certificate of Service

I certify that I sent via first class regular mail on Septebmer 7, 2007, a copy of the Amended Complaint to:

Jeffrey A. Taylor
U.S. Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Clara M. Whittaker
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, NW.
Washington, D.C. 20530

Robin Richardson, Esq.
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street, NW.
Washington, D.C. 20415

Respectfully submitted,

Valerie Kline
83 E Street
Lothian, MD  20711
(301) 509-2684