**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
VALERIE KLINE                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
          v.                                     )        Civil Action No. 07-0451 (JR)
                                                 )
LINDA M. SPRINGER, Director,                     )
U.S. Office of Personnel Management              )
                                                 )
                    Defendant.                   )
———————————————————— )

## LARGE ADDITIONAL ATTACHMENT

          Defendant hereby submits to the Court Attachment 1 as cited to in Defendant's Motion to

Dismiss or for Summary Judgment Or, in the Alternative, for a More Definite Statement (which

itself is an attachment to Defendant's Motion for Leave to File Dispositive Motion out of Time

and for Hearing on Said Motion) filed on February 1, 2008 (Docket # 22) .  The filing of the

attachment was attempted, but technical difficulties prevented it from being included with the

pleading simultaneously.

                                        Respectfully submitted,


                                        _____/s/_____
                                        JEFFREY A. TAYLOR , D.C. Bar # 498610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, Bar # 434122
                                        Assistant United States Attorney


                                        _____/s/_____
                                        CLAIRE WHITAKER, D.C. Bar # 354530
                                        Assistant United States Attorney
                                        United States Attorneys Office
                                        555 4th Street, N.W., Room E-4204
                                        Washington, D.C. 20530
                                        (202) 514-7137

# Attachment 1

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 1 of 127

Part 1 of 2



United States
# Office of
# Personnel Management  Washington, DC 20415-1000

February 22, 2006

**By e-mail**

Valerie.Kline@opm.gov

> RE: Amended OPM Acceptance Letter in EEO Complaint of Valerie Kline
> OPM EEO Case No. 2006008

Dear Ms. Kline:

Upon consideration of your February 21, 2006 clarification of your complaint, I am issuing this letter to amend the acceptance letter previously issued in the above referenced matter on January 31, 2006. On January 5, 2006, my office acknowledged receipt of the above-referenced EEO complaint, filed on January 25, 2006. My office has carefully reviewed your objections and the report from the EEO Counselor. Based upon that review and the criteria established by the Equal Employment Opportunity Commission (EEOC) regulations at 29 CFR § 1614.107 (2004), I am accepting the following claims in the complaint for processing:

**Was Complainant discriminated against on the bases of her race (White), sex (female) and in retaliation for previous EEO activity, and sexually harassed when allegedly:**

1. **on October 19, 2005, she received a "Fully Successful" performance appraisal for Fiscal Year 2005;**

2. **from December 3, 2003 to present, she was denied the opportunity to telework; and**

3. **on approximately December 12, 2005, her supervisor sent individuals an e-mail and expressed displeasure over a visitor received by the Complainant?**

An investigation of the complaint will now be conducted and completed within 180 days from the filing of your complaint. When the investigation is completed, my office will provide Complainant with a copy of the report of investigation. At that time, Complainant will be notified of the right to choose one of the following courses of action: (1) request a Final Agency Decision by OPM; (2) request a hearing before an EEOC administrative judge; or (3) file a civil action in an appropriate U.S. District Court. If Complainant request a hearing, the administrative judge will process your complaint pursuant to 29 CFR § 1614 and EEO MD-110, which are available at www.eeoc.gov.

Please note that, anytime after 180 days have elapsed from the filing of the complaint, Complainant has the right to request a hearing before an EEOC administrative judge by

submitting a written request for a hearing directly to the EEOC office indicated in the acknowledgement letter previously issued by my office.

If Complainant has any objections to the claim(s) accepted above, the Complainant must respond in writing to the Center for EEO with 7 days or receipt of this letter. If you have any questions, please contact Lead EEO Specialist Lorna Lewis on my staff. She may be contacted by telephone at (202) 606-2460.

Sincerely,

Stephen T. Shih, Esq.
Chief
Center for Equal Employment Opportunity

cc: (by e-mail)

Julie Ferguson Queen
Deputy Assistant General Counsel
Office of General Counsel
U.S. Office of Personnel Management

Claudio Benedi, Director
Management Services Division
Publications Management Group
U.S. Office of Personnel Management

William Davis, Chief
Management Services Division
Publishing Services Branch
U.S. Office of Personnel Management

*EEOC Case No. 2006008*

*Hand Delivered*
*22. 5 25 april 06*

## OPM FORMAL EEO COMPLAINT FORM

| Part A. Complainant's Information | | | | |
|---|---|---|---|---|
| 1. Name (Last, first, middle)<br>Valerie Kline | | | 2. work telephone number<br>202-606-1411 | |
| 3. Home Address<br><br>P. O. Box 321 | | | 4. . Home telephone number 301.574.4326 | |
| | | | 5. Facsimile Telephone number 202.606.0909 | |
| 6. City<br>Lothian | 7. State<br>MD | 8. Zip Code<br>20711 | 9. Email address<br>valerie.kline@opm.gov | |
| 10. Current employer<br>OPM | 11. Office<br>PMG | | 12. Position<br>Management Analyst | 13. Grade<br>GS 12.5 |
| 14. Names(s) of alleged discriminating OPM Offices<br>Publications Management Group | | | 14. Names(s) of alleged discriminating OPM<br>Individuals:<br>William M. Davis<br>Claudio A. Benedi | |

| Part B. Claims Information |
|---|

(additional information or clarification may be included on next page)
For the Basis of Discrimination please indicate any of the following that apply:

| Age<br>Color<br>Disability<br>National Origin | Race<br>Religion<br>Retaliation<br>Sex |
|---|---|

| Type of Discriminatory Event | Date(s) of Discrimination | | Basis of Discrimination |
|---|---|---|---|
| | Began | Ended | |
| 1.   Performance Appraisal | 10/19/05 | present | Race, sex, sexual harassment, retaliation |
| 2.   Telecommuting | 12/03/05 | present | Race, sex, sexual harassment, retaliation |
| 3.   Office Visitor | 12/21/05 | present | Race, sex, sexual harassment, retaliation |
| | | | |
| | | | |

Relief sought:

EEO Complaint No. 1: Complainant requests that her performance appraisals be amended to at least *Exceeds Fully Successful* if not *Outstanding* and award complainant $300,000 in compensatory damages.
EEO Complaint No. 2: Complainant requests that she be allowed to telework at least 2 days a week plus an award of $300,000 in compensatory damages.
EEO Complaint No. 3: Complainant requests an award of $300,000 in compensatory damages.

Additional Information or Clarification of Claims

## EEO COMPLAINT NO. 1 – PERFORMANCE APPRAISAL

SUMMARY: Ms. Kline only received a *Fully Satisfactory* performance appraisal although she met the criteria for *Outstanding*. While discussing the appraisal with Mr. Davis, Mr. Davis kept looking at her breasts, which suggested to Ms. Kline that if she wanted to receive a higher appraisal she would have to have more than a professional relationship with Mr. Davis. (See Attachment 1 for full details concerning this complaint.)

## EEO COMPLAINT NO. 2 – TELECOMMUTING

SUMMARY: When Ms. Kline interviewed for the position as Management Analyst in the Regulatory Section of PMG, she was told she would be able to telework. Ms. Kline's mother became ill and couldn't walk or take care of herself, which required Ms. Kline to take FMLA leave to care for her mother. A Union representative met with Mssrs. Davis and Benedi to request that Ms. Kline be allowed to telework but they denied the request. Ms. Jackie Carter, a black female, who works in the Regulatory Section of PMG was allowed to telework after her husband suffered several strokes. Lara Rivera-Lopez, a Hispanic woman detailed to PMG for approximately one year, was also allowed to telework in order to take college courses. (See Attachment 2 for full details concerning this complaint.)

## EEO COMPLAINT NO. 3 – OFFICE VISITORS

SUMMARY: Ms. Kline was visited by Arlene Taylor of CIS&CIO concerning the Federal Register Management System. After her visit, Mr. Davis sent an email to Ms. Taylor and her supervisor that accused Ms. Taylor of making a social call and expressed his displeasure over her visit. Ms. Taylor has visited Ms. Jackie Carter, a black female, on numerous occasions and even remarked to Ms. Kline that Mr. Davis has never expressed any concerns over those visits. (See Attachment 3 for full details concerning this complaint.)

### PRIVACY ACT STATEMENT

The information on this form is collected pursuant to 29 U.S.C. §§ 206(d), 633(a), 791 and 194a; 42 U.S.C. § 2000e-16; E.O. 11478, 3 CFR, 1969 Comp., p. 133, E.O. 12106, 3 CFR, 1978 Comp., p. 263; and 29 CFR part 1614. The information is used primarily in the processing of Equal Employment Opportunity (EEO) complaints. The information may be disclosed to appropriate Federal, State, or local agencies when relevant to civil, criminal, or regulatory investigations or prosecutions; in judicial or administrative proceedings, to congressional offices; and to authorized officials involved in investigation or settlement of EEO grievances, complaints, and appeals. The information is given voluntarily. Failure to provide the information may delay or prevent the processing of the complaint.

| Have you filed a Merit Systems Protection Board Appeal in this matter? | Have you filed a grievance on this matter? |
|---|---|
| ☐ Yes    ☒ No | ☐ Yes    ☒ No |
| If yes, what is the date of the appeal? | If yes, what is the date of the grievance? |
| Signature *Valerie Kline* | Date 12/28/05 |

*Complaints consolidated per the instruction of EEO counselor on Kline v. Springer exception reserved.*

EEOC Case No.
2006008
07-0451
Page 5 of 127
OPM Form 1580
Revised December 2004



United States
# Office of
# Personnel Management    Washington, DC  20415-1000

January 31, 2006

**By e-mail**

Valerie.Kline@opm.gov

RE:    EEO Complaint of Valerie Kline
OPM EEO Case No. 2006008

Dear Ms. Kline:

On, January 5, 2006, my office acknowledged receipt of your EEO complaint dated December 28, 2005, and filed on January 25, 2006. My office has carefully reviewed your complaint and the report from the EEO Counselor. Based upon that review and the criteria established by the Equal Employment Opportunity Commission (EEOC) regulations at 29 CFR § 1614.107 (2004), I am accepting the following claims in your complaint for processing:

**Was Complainant discriminated against on the bases of her race (White), sex (female) and in retaliation for previous EEO activity, and also sexually harassed when:**

1.    **on November 28, 2005, she received a "Fully Successful" performance appraisal for Fiscal Year 2005;**

2.    **from December 3, 2005 through December 28, 2005, she was denied the opportunity to telework; and**

3.    **on December 21, 2005, her supervisor sent her an e-mail and expressed his displeasure over a visitor received by Complainant?**

An investigation of the complaint will now be conducted and completed within 180 days from the filing of the complaint. When the investigation is completed, my office will provide Complainant with a copy of the report of investigation. At that time, Complainant will be notified of the right to choose one of the following courses of action: (1) request a Final Agency Decision by OPM; (2) request a hearing before an EEOC administrative judge; or (3) file a civil action in an appropriate U.S. District Court. If Complainant requests a hearing, the administrative judge will process your complaint pursuant to 29 C.F.R. § 1614 and EEO MD-110, which are available at www.eeoc.gov.

Please note that, anytime after 180 days have elapsed from the filing of the complaint, Complainant has the right to request a hearing before an EEOC administrative judge by submitting a written request for a hearing directly to the EEOC office indicated in the

## OPM FORMAL EEO COMPLAINT FORM

| Part A. Complainant's Information | | | |
|---|---|---|---|
| 1. Name (Last, first, middle)<br>Valerie Kline | | 2. work telephone number<br>202-606-1411 | |
| 3. Home Address<br><br>P. O. Box 321 | | 4. . Home telephone number 301.574.4326 | |
| | | 5. Facsimile Telephone number 202.606.0909 | |
| 6. City<br>Lothian | 7. State<br>MD | 8. Zip Code<br>20711 | 9. Email address<br>valerie.kline@opm.gov |
| 10. Current employer<br>OPM | 11.Office<br>PMG | 12. Position<br>Management Analyst | 13. Grade<br>GS 12/5 |
| 14. Names(s) of alleged discriminating OPM Offices<br>Publications Management Group | | 14. Names(s) of alleged discriminating OPM<br>Individuals:<br>William M. Davis<br>Claudio A. Benedi | |

| Part B. Claims Information | | | |
|---|---|---|---|

(additional information or clarification may be included on next page)

For the Basis of Discrimination please indicate any of the following that apply:

| Age | Race |
|---|---|
| Color | Religion |
| Disability | Retaliation |
| National Origin | Sex |

| Type of Discriminatory Event | Date(s) of Discrimination | | Basis of Discrimination |
|---|---|---|---|
| | Began | Ended | |
| 1.   Performance Appraisal | 10/19/05 | present | Race, sex, sexual harassment, retaliation |
| 2.   Telecommuting | 12/03/03 | present | Race, sex, sexual harassment, retaliation |
| 3.   Office Visitor | 12/21/05 | present | Race, sex, sexual harassment, retaliation |
| | | | |
| | | | |

Reliief sought:

EEO Complaint No. 1: Complainant requests that her performance appraisals be amended to at least *Exceeds Fully Successful* if not *Outstanding* and award complainant $300,000 in compensatory damages.

EEO Complaint No. 2: Complainant requests that she be allowed to telework at least 2 days a week plus an award of $300,000 in compensatory damages.

EEO Complaint No. 3: Complainant requests an award of $300,000 in compensatory damages.



United States
# Office of
# Personnel Management

Washington, DC 20415

February 21, 2006

Stephen T. Shih, Esq.
Chief for the Center For Equal Employment Opportunity

Re:    EEO Complaint of Valerie Kline
       OPM EEO Case No. 2006008

Dear Mr. Shih:

I received your January 31, 2006 letter today via email from LaShonn Woodland
accepting my December 28, 2005 EEO complaint. Your letter states that if I have any
objections to the claims as stated in the letter, I must respond in writing to the Center for
EEO within 7 days.

In reading the claims, I disagree with the way the claims are stated and believe they
should be revised as follows.

The date of the first claim concerning the performance appraisal should be October 19,
2005, as shown on the EEO Complaint Form.

In the second claim, the dates should be from December 3, 2003 – to present. I stated it
incorrectly on the EEO Complaint Form by putting down 2005 instead of 2003. I am
attaching an amended page 1 of the EEO Complaint Form to reflect this correction. If
there is no way to reflect that the discrimination is still ongoing, then the date of the
discrimination should be indicated, which was October 27, 2005, as stated in the
"Additional Information and Clarification of Claims" section.

The third claim should be revised as follows:

> "on approximately December ~~21~~ 12, 2005, her supervisor sent ~~her~~ individuals an
> email and expressed his displeasure over a visitor received by Complainant"

He did not send me an email but sent one to Margaret McElrath and Arlene Taylor
concerning Taylor's visit to my office. Here is what the EEO Complaint Form states:

> "After her visit, Mr. Davis sent an email to Ms. Taylor and her supervisor that
> accused Ms. Taylor of making a social call and expressed his displeasure over her
> visit"

The visitor came to my off on Dec. 12, 2005, and the email was sent shortly thereafter. I
did not learn about it until Dec. 21, 2005.

Stephen T. Shih, Esq.
February 21, 2006
Page 2


I hope this clarifies the claims.  If you have any questions, please let me know.

Respectfully,

Valerie Kline
Management Analyst
Publication Management Group

## EEO COMPLAINT NO. 1 – PERFORMANCE APPRAISAL

1. Complainant incorporates paragraphs 1 through 45 of EEO Action No. 2 and paragraphs 1 through 20 of EEO Action No. 3 herein.

2. Complainant is a white female employed with the Office of Personnel Management (OPM) since October 7, 2002, as a GS-12/5 management analyst.

3. After working a year at OPM. complainant received a performance appraisal on approximately November of 2003 that rated her performance as *Exceeds Fully Successful* rather than an *Outstanding* even though she had received 2 awards from the Director's office and even though she had no performance standards.

4. After the creation of performance standards in approximately May of 2004 and following the filing of several grievances by AFGE Local 32 (the Union) around May and June of 2004. complainant received a performance appraisal in November 2004 that dropped to *Fully Successful.*

5. The Union filed a grievance over the appraisal alleging that complainants rating had been lowered due to retaliation for fling grievances especially since complainant met the criteria for receiving an *Outstanding* rating based on the criteria of the new standards.

6. When the grievance was not resolved at the informal level, the Union filed formal grievance but to the dismay of complainant the grievance was not pursued by the Union.[1]

7. On October 19, 2005, complainant received another performance appraisal again with a rating of *Fully Successful.*

8. Complainant believes that the appraisal is arbitrary and unfair because Davis made many comments about her performance that were false.

9. Complainant also believes that the performance appraisal was less than what she deserved due to sexual harassment.

---

[1] On June 1, 2005, the Union and complainant met with Ronald Flom over the Performance Appraisal. On approximately November 16, 2005, complainant received an email from Brathwaite informing her that there had been no follow through on the grievance and the deadline for taking it to the next level had expired. Complainant believes that her Union representative neglected his duties in representing complainant after he had several deaths in the family and due to other personal issues.

10. With regard to her performance, on OPM Form 1459-B Performance Appraisal Form for OPM Employees (attached), Davis wrote the following handwritten comments under item no. 14:

> "Valerie's performance in Federal Register work & in assisting our senior analyst is <u>acceptable</u>. She needs to be more self-starting & to direct more attention to her duties assisting in the senior analyst & supporting this office's mission" [Emphasis Added]

11. Contrary to this statement, her rating on the performance element pertaining to regulatory actions (see p. 4 of OPM Form 1460-B attached) was *Exceeds Fully Successful.*

12. Complainant received this rating even though she had met the criteria for receiving an *Outstanding* under this element. To achieve an *Outstanding*, complainant only needed to receive commendations from OPM offices and agencies. Complainant did in fact receive commendations from other OPM offices and other agencies but was not given an *Outstanding.*

13. Even though complainant believes that others in the office have made significant mistakes whereas complainant has only made incidental ones, such as by not catching others' mistakes, complainant believes that minority and male personnel received an *Outstanding* ratings on their appraisals.

14. Complainant was hired to do regulatory work and to assume the position of Ms. Jacquline Carter (a black female) upon her retirement. Most of complainant's work is in the regulatory area. It is estimated that approximately 75-95% of her work is performed in the regulatory area yet her overall rating was based on the 5-25% that relates to the other performance elements.

15. Although the comments stated that complainant needed to direct more attention assisting the Senior Analyst, complainant was never informed at any time that she had not sufficiently assisted the senior analyst. Complainant assisted the senior analyst whenever assistance was needed, requested or required.

16. Oddly, when complainant first began working at OPM, she was given multiple projects in the publishing area. Management changed her Position Description to include more publishing responsibilities but the enormous amount of publishing responsibilities

prevented her from doing regulatory work. After complaints by Carter that complainant needed more time to do regulatory work, and after the hiring of graphics personnel, complainant was given less publishing work whereby she was able to focus more on regulatory actions. Now management criticizes complainant for not doing more publishing work but fails to give complainant publishing projects and fails to allow complainant to work with customers on publishing projects.

17. Under the Performance Element  pertaining to assisting the senior management analyst (see p. 2 of OPM Form 1460-B attached), Davis wrote the following handwritten comments under item no. 15:

> "Publications in box not kept up it was necessary to remind Valerie on several occasions. Publications database was not kept up except for a brief period."

18. On 11/29/05, complainant arrived at work at 7 am. Complainant was told by Davis at 8 am that there were 5 emails in the publications mailbox.[2] Complainant believes that reminding her of emails after only being at work for 1 hour after she had been off work since November 23, 2005 (5 work days), is not grounds for giving her a poor rating considering that she needed to catch up on various projects, read email pertaining to the regulatory work, and review the status of regulatory actions, etc. This is typical of the micro-managing Davis imposes on complainant but does not impose on others.

19. As far as the publications database not being kept up, there were no instances when a publication was brought to the attention of complainant that it was not promptly added to the database after it had been approved. Shortly after receiving the appraisal, complainant asked the senior management analyst, Robert Coco, if he recalled any instances when the database had not been updated and he said "no I don't recall any."

20. Complainant recalls one incident on March 8, 2005, when she was working on the Semiannual Regulatory Agenda that had a strict deadline. Davis interrupted complainant and asked her to update the publications database following the approval of a publication

---

[2] There were actually only 4 emails in the mailbox that morning or during the night and 3 of those were duplicates that did not require a response but were notifications of a publication that had been approved by the Office of Communications (OC). Only one email required action, which was forwarded to *General Inquires* for a response.

by OC. Complainant informed Davis that she was working on the agenda and would do it

as soon as she was finished.  Davis retorted that he wanted it done by c.o.b. Davis left

the office at 4pm and shortly before 5pm, Claudio Benedi was leaving the office.

Complainant asked Benedi if she should stop working on the Agenda in order to update

the publications database and Benedi instructed complainant to wait until the next

morning to update database and finish the Agenda. This is the only instance that

complainant recalls where updating the publications database was an issue.

21. In order to obtain an *Exceeds Fully Successful* rating under this element, complainant

    was required to

> "assist in annual survey (publications database) and works with OPM offices to
> make sure that publication information is correct and is proactive in
> maintaining.(sic)"

Coco informed complainant that the annual survey was not conducted this past year.

Therefore, it was not possible for complainant to have assisted with this activity.

22. In order to receive an *Outstanding* under this performance element, complainant was

    required to:

> "continuously searches through the OPM Web site to find links to OMB
> publications and then works with OPM office to add, revise, or delete publication
> information as appropriate".

It is impractical and unreasonable to expect anyone to perform a function "continuously"

because it would then be impossible to perform any other duties.  By using the term

"continuously", which means "marked by uninterrupted extension in space, time, or

sequence", Davis has imposed a standard on complainant, which complainant did not

agree to, that is impossible to attain and therefore set her up for failure.

23. Complainant did regularly perform this function and made numerous entries in the

    database. Complainant believes that <u>at no time</u> was the Publications database not "kept

    up"

24. Complainant even suggested to Coco procedures for ensuring that new publications are

    entered in the database.  Complainant requested that she receive a copy of any

    publications that have been approved for printing so that she can enter them into the

publications database. By doing so, complainant satisfied the rating of *Exceeds Fully Successful* under the Performance Element on p. 1 of OPM For 1460-B.

25. Upon requesting that procedures be developed for ensuring that new publications be added to the publications database, complainant was instrumental in persuading Coco to implement a procedure for notifying PMG via email of publications approved by the Office of Communications (OC).

26. The performance element on p. 1 of OPM Form 1460-B states:

> "Performs a variety of special purpose studies/staff reviews in support of the Publications Management Group"

In order to receive *Exceeds Fully Successful* under this element, complainant was required to:

> "Incumbent takes initiative to perform staff studies/analysis of group procedures/operation. Makes recommendations, after careful analysis, to supervisor for improvement in areas where incumbent has no direct responsibility."

27. Consistent with this element, while teleworking on a "trial period" complainant initiated a study on March 25, 2005, of the "old and cold" regulations in ROCIS for submission to OMB. Complainant found a regulation that had been finalized in 1992 but was still being reported in the Semiannual Unified Agenda and Regulatory Plan. This means that since 1992, this regulation had been published in the Federal Register twice a year as an item that OPM was working on. Rather than praise complainant for this finding, complainant was chastised by Carter who told Davis that it was not something that she would have done. Complainant believes that Davis used this against complainant when informing Ronald Flom about the trial telework period (See EEO Complaint No. 2).

28. Furthermore, the rating complainant received under this performance element was *Fully Successful* even though this element states:

> "Systems are kept up-to-date. Correct information is provided to the customer."
>
> {Emphasis Added]

If complainant's rating under this element states that the systems are kept up to date, how can Davis then report that they are not kept up to date?

29. Complainant believes that her performance rating should have been at least *Exceeds Fully Successful* if not *Outstanding* since complainant met the criteria for receiving a rating at these higher levels.

30. To receive Outstanding, complainant's was required to:

> "At stated above and recommendations support major changes which are implemented within the Group."

31. Complainant also recommended that PMG switch from using Westlaw's online legal retrieval system to using Lexis-Nexis legal retrieval. This recommendation was implemented and resulted in a savings of approximately $10,000/year to the PMG.

32. Performance Element on p. 3 of OPM Form 1460-B states:

> "Develops and maintains responsible working relationships with supervisors, mangers, fellow employees, customers, peers and the general public"

Complainant was only given a rating of *Minimally Successful*.

33. Under the Item no. 15, Davis wrote:

> "working relationship within our office has deteriorated with co-workers & supervisors."

34. Complainant believes that this is untrue. During the informal complaint process, complainant was informed by the EEO counsellor that Davis said that co-workers do not want to communicate with complainant on a personal level but only on a professional level. Davis also stated this to complainant when rendering the mid-year review.

35. Complainant has regular conversations with co-workers who, for example, ask her how her mother's health is doing. If co-workers did not want to communicate with complainant on a personal level they would not ask personal questions about her family.

36. Complainant nevertheless does have good communication with co-workers on a professional level—the level that matters for performing efficiently and effectively in the work place.

37. Ironically, when complainant was visited by Ms. Arlene Taylor from another office over a professional matter, Davis fired an email at her and her supervisor accusing her and objecting to her making a social call. (See EEO Action #3.)

38. If anything, Davis and Benedi are instrumental in turning people against complainant.

39. For example. PMG hired a new mailroom supervisor named Ms. Rosalind Wright. Shortly after her employment began, Wright stopped by complainant's desk and was chatting with her on a personal level and invited her to go with her to the farmer's market that Saturday. After this conversation, she went into a meeting with Benedi over a union issue. The Union representative later informed complainant that Benedi told the mailroom supervisor that he has a problem griever in his office referring to complainant.

40. After that meeting, the Wright informed complainant that she would not be able to make it to the farmer's market and thereafter avoided complainant.

41. Complainant discussed some of her concerns about the appraisal with Davis while he was standing at her cubicle door and she was sitting in her chair.

42. During the discussion. Davis kept looking down at complainant's breasts, which made complainant extremely uncomfortable.

43. Complainant was informed by another woman who had contact with Davis that she had a similar experience where he would look at her breasts while they were talking and that it made her extremely uncomfortable.

44. Complainant believes that in frequently looking down at her breasts while discussing her performance appraisal. Davis was sending complainant a message that if she wants a better performance rating. it is not her performance that needs improving but that she needs to develop a relationship with Davis other than a professional one.

45. Davis frequently stares at complainant's breasts when talking to her. Around December of 2004, Coco (a white male) sent complainant as well as others in the office including Davis and Benedi, an animated cartoon of some crows that were on an electrical wire. When the electricity passed through them, they opened up their garments and flashed their breasts. Complainant forwarded this cartoon to a long-term male friend.

46. Davis was informed that complainant had forwarded the cartoon and gave her a letter of counseling that warned her about sending sexual material to people. When discussing the matter with complainant, Davis kept looking at her breasts during the counseling meeting. To the contrary, Coco did not receive a similar letter even though he was the

one who originated the cartoon and had sent it not only to complainant but to Davis and Benedi as well. Accordingly, Davis engaged in sexual harassment and discriminated against complainant by only issuing her a letter of counseling.

47. Complainant used to go to lunch with Davis, Benedi and Coco from 12:30-1:30pm shortly after she began working for OPM. While having lunch with them, Davis, who is on his third marriage, frequently made remarks about women, such as "man she looks good" or about their legs, etc. and conducted himself in a manner that suggested he was available for a relationship other than a professional one.

48. Even though PMG closed the office during the lunch hour, Davis suddenly changed the office practice by expecting complainant to take lunch from 11:30am-12:30pm so that she would cover the office while everyone else when to lunch. Complainant was the only one in the office that was required to take a specific lunch time and Davis would get on complainant's case if she didn't leave for lunch at the specific time. Carter (black female), Coco (white male), and Isaac Evans (black male) are allowed to go to lunch whenever it's convenient for them.

49. Davis also keeps photographs of scantily clad females on his desk and complainant believes that because she did not respond to Davis' overtures, he turned on her and began creating a hostile work environment.

50. On December 6, 2005, complainant met with an EEO adviser concerning the performance appraisal and was issued her final interview on December 14, 2005.

### RELIEF SOUGHT

Accordingly, respondent has engaged in unlawful intentional discrimination based on race, sex, and sexual harassment by creating a hostile work environment, and in retaliation for filing grievances against him. Complainant requests that her performance appraisals be amended to at least *Exceeds Fully Successful* if not *Outstanding* and award complainant $300,000 in compensatory damages for discrimination based on race, sex, sexual harassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## EEO COMPLAINT NO. 2 – TELECOMMUTING

1. Complainant incorporates the paragraphs 1 through 50 of EEO Action No. 1 and paragraphs 1 through 20 of EEO Action No. 3 herein.

2. When interviewing for the position as management analyst for Regulatory Issuances under the Publications Management Group at OPM, Mr. William M. Davis informed complainant that if she was selected for the position and accepted the position, complainant would be allowed to telework "once you get to know the people".

3. This offer was used as an incentive for enticing complainant to accept the position.[1]

4. Complainant accepted the position believing that she would be able to telework and around May of 2003, complainant filed a request to begin teleworking.

5. Based on information and belief, Davis discussed the matter with Mr. Claudio A. Benedi, Chief of the Publications Management Group, who ultimately made the decision to deny the request.

6. Also around May 2003, Davis began harassing complainant and quibbling over various matters involving credit hours, lunch hour, work assignments and flex time, etc., that resulted in her contacting AFGE Local 32 (the Union), who filed several informal grievances that were resolved in complainant's favor at the informal level.

7. The Union also initiated a grievance over the denial of the request to telework, which was not resolved informally.

8. The Union and complainant met with Davis and Human Resources (HR) on approximately June 2003.

9. HR said that it was OPM's policy not to allow employees to telework until they had been employed with OPM for one year and to resubmit request after complainant's had been employed with OPM for a year.

---

[1] Complainant was hired to replace Ms. Jackie Carter, in the Regulatory Section, upon her possible imminent retirement. At the time, Carter was teleworking 3 days a week and presently teleworks 2 days a week. Approximately a year after complainant began working for OPM, Davis revised her PD to include some 'publishing' responsibilities and used this as a reason to prevent complainant from teleworking.

10. After a year had lapsed, complainant submitted another request to telework, which was denied by Davis.

11. At the advice of the Union, complainant filed an appeal with Benedi, which was also denied.

12. In November 2003 following several informal meetings, the Union and Davis reached an agreement to allow complainant to start telecommuting in December 2003.

13. In December, 2003, Complainant submitted the request to telework but it was denied because management said that complainant needed performance standards. Therefore, the Union agreed to delay the start of complainant's telework until standards were in place.

14. Complainant also received a January 7, 2004 email from Davis that stated, "Just to be sure you understand, we must finalize your rating standards before we can complete your Telework agreement."

15. Davis delayed in issuing the standards but they were finally issued on May 17, 2004.

16. Complainant expected to begin teleworking but was not allowed. Therefore, an informal grievance process was initiated in July 2004 but negotiations did not begin until September 2004 because Davis was on leave recovering from an operation.

17. Upon his return, Davis and Benedi denied the telework request at the informal level in October 2004.

18. On November 1, 2005, the Union issued a first step grievance process based on retaliation, disparate treatment and reneging on an agreement to allow complainant to telework.

19. On December 22, 2004, Mr. Ron Flom, Deputy Associate Director for CFAS, issued a decision to "allow [complainant] to telework on a trial basis and would make a decision if it would continue at the end of a 90-day trial period." [Emphasis Added.]

20. Complainant was only allowed to telework one day a pay period.[2]

---

[2] Carter was working 2 days a week or 4 days per pay period and was in the office on the days that complainant teleworked.

21. During the 90-day trial period where complainant worked 1 day per pay period, no problems were raised or brought to the attention of complainant other than Davis told complainant that the work she performed could have been performed in the office.[3]

22. The Union representative informed complainant that they were not informed of any problems either that resulted from complainant's telework.

23. At the end of the trial period, Flom decided on June 23, 2005, to discontinue complainant's telework agreement effective pay period beginning July 10, 2005, because of alleged problems with

> "day-to-day work assignments, coordination and assistance with other staff, and availability to customers are more conducive to be performed on-site. This was validated during the trial period and the lack of coverage in the office during Ms. Kline's telework days demonstrate that it is not in the best interest of this office to continue to offer teleworking for this position."

24. In a June 27, 2005 email dated from the Union to Ms. Christine Bero of the HR office, the Union stated,

> "During this ninety day period, we were never informed of this lack of coverage in the office concerns nor were we ever notified of a problem with the day to day coordination of work and assistance with other staff, and availability to customers. AFGE has concerns that this office allows other employees to telework several days a week and these problems don't arise, and Ms. Kline teleworks one day a pay period and it's a problem. We agreed that Ms. Kline could only telework on days the other employees were scheduled to be in the office. Am I to believe that these problems only arise when Ms. Kline is teleworking and out of the office? I don't think so. I can clearly see we have a disparate treatment situation going on here."

25. The June 27, 2005, email also stated that, "AFGE Local 32 disagrees with this decision [to terminate the telework agreement] and will continue this grievance through the negotiated process at the second step."

26. Since complainant began working for PMG, Benedi has allowed another minority employee working under him, Rivera-Lopez (a Hispanic woman), to perform some telework and have a flexible schedule so that she could take some college courses.

---

[3] The intention behind telework is that if it is not necessary for the work to be performed in the office and can be performed at home, an employee should be allowed to telework.

27. Benedi also allows Carter (a black female) to telework in order to care for husband who suffered from several strokes but refuses to allow complainant to telework when her mother's health failed.

28. Approximately 95% of complainant's work is regulatory work and she has been trained to take the position of Carter when Carter retires.

29. Flom indicated that telework was not in the best interest of the office due to "day-to-day work assignments, coordination and assistance with other staff" yet to complainant's knowledge and belief, Carter did not encounter any problems coordinating the regulatory work with complainant.

30. Complainant also performed non regulatory work while teleworking consisting of perusing the OPM website for publications as required by her performance standards and in updating the publications database that were done online and did not require complainant to be in the office.

31. Flom also stated there were problems with the "availability to customers". The only customers that complainant works with directly are regulatory customers. The days that complainant teleworked. Carter was in the office to meet with the regulatory customers. Therefore, it is not known what "customers" Flom is referring to.

32. Davis and Benedi do not allow complainant to work with customers in the publications section except to a very limited extent, such as by referring walk-in customers to one of them or to Robert Coco, to receive packages from couriers or to assist with answering the telephones because PMG has no receptionist to perform these duties.

33. Complainant believes that making an issue over not having office coverage for one day a pay period, even though it is not an issue when complainant takes her AWS and even though Carter was in the office on the day that complainant teleworked is nonsensical, unreasonable and discriminatory.

34. Unfortunately, the Union representative had several deaths in the family and other personal issues that complainant believes resulted in his letting the deadlines for responding to a number grievances expire to the chagrin of complainant.

35. Around August 2005, the health of complainant's mother took a turn for the worse and complainant invoked her rights under the Family Medical Leave Act (FMLA) in order to care for her mother.

36. Complainant submitted the required medical documentation in order to justify the need to take leave under the FMLA and OPM's doctor determined that the leave was justified.

37. Complainant began taking 1 hour a day of leave under FMLA in order to care for her mother.

38. Davis initially told complainant that she would have to give up her AWS in order to take leave under FMLA.[4]

39. Davis finally consented to the FMLA leave without requiring complainant to give up her AWS after he was told by the Union representative that requiring her to give up her AWS as a condition of invoking her entitlement to FMLA was a "Violation of Law".

40. In an email dated October 5, 2005, Davis informed complainant that she could only take 4 weeks of leave under FMLA.

41. In an email dated October 19, 2005, Ms.Caprice Miller of the HR office informed complainant and notified Davis that she was entitled to 12 weeks of leave under FMLA.

42. Around October of 2005, the Union representative met informally with Davis and Benedi and requested that complainant be allowed to telework in order to better care for her mother since Carter was allowed to telework to take care of her husband after he had had several strokes.[5]

43. On October 27, 2005, Davis denied the Union's request and the Union representative advised complainant to seek redress under the EEO process.

---

[4] Davis told complainant that if she wanted to take an hour of leave every day, she would have to come off AWS. She told him she wanted to discuss it with the union and remarked, "see why do you have to be difficult when we are trying to work with you? You can come in at 6:30a as long as you come off AWS."

[5] Carter's husband had had 3 strokes and if he had another one, Carter would need to retire to stay home to take care of her husband. Both Benedi and Carter told complainant that Cartr was allowed to telework so that she could be home to take care of her husband following his strokes, otherwise Carter would have retired and the reason she did not retire was because she was permitted to telework.

44. To the best of complainant's knowledge and belief, Benedi refused to meet with the Union representative on the matter.

45. On November 30, 2005, complainant met with an EEO adviser over this issue, was issued her final interview on December 14, 2005.

## RELIEF SOUGHT

As demonstrated above, respondents have engaged in unlawful intentional discrimination based on race, sex, sexual harassment, creating a hostile work environment, and retaliation. Complainant requests that she be allowed to telework at least 2 days a week plus an award of $300,000 in compensatory damages for discrimination based on race, sex, sexual harassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## EEO COMPLAINT NO. 3 – OFFICE VISITORS

1. Complainant incorporates paragraphs 1 through 50 of EEO Action No. 1 and paragraphs 1 through 45 of EEO Action No. 2 herein.

2. On approximately December 12, 2005, complainant received a visit from Ms. Arlene Taylor of the Program Office Support Branch, Center for Information Services and Chief Information Officer (CISCIS). Taylor and complainant had been working together on the Federal Register Management System (FRMS) for OPM since approximately June of 2003. After making a conversion to an upgraded system, Taylor stopped by complainant's desk to show her how to navigate some of the new features in the FRMS.

3. Following this meeting, William M Davis asked complainant for the name of Taylor's supervisor.

4. Complainant learned from Taylor that she received a nasty email from Davis that was also sent to her supervisor, Ms. Margaret McElrath, that essentially asked what she was doing in my office.

5. Based on information and belief, Davis stated that he didn't appreciate her 'lollygagging' or making social visits to complainant.[1]

6. Occasionally Taylor pays visits to Jackie Carter (a black female) when Carter has questions or concerns about the FRMS. Taylor, who expressed to complainant that she was very disturbed by Davis' email, stated that that Davis never complained about her visits to Carter.

7. Several emails ensued between Davis, Taylor and McElrath. Complainant believes that McElrath explained that they had made a conversion of the FRMS to an upgraded software program and that Taylor was not socializing but showing complainant how to use the new features in the FRMS.

---

[1] When discussing complainant's performance appraisal, Davis informed the EEO counselor that fellow workers do not want to communicate with complainant on a personal level. The irony of this statement is clearly obvious in light of the fact that Davis apparently sends emails to people and their supervisors overtly discouraging them when he thinks people are socializing with complainant.

8. Davis responded by saying that he was not aware of any changes that were being made to the FRMS, that complainant had not kept him informed and that he knew nothing about the conversion of the database.

9. Contrary to Davis' claims, complainant informed Davis of the work being done to the FRMS and the conversation of the database in the Weekly Activity Reports furnished to Davis on 11/04/05, 11/10/05, 11/25/05, 12/02/05 and 12/09/05.

10. On December 22, 2005, Davis called complainant into his office and again accused her of not keeping him informed even though complainant sent him an email on 12/15/05 stating that she had kept him informed and attached the Weekly Activity Reports showing him where she had kept him informed.

11. Davis stated that the FRMS is owned by PMG and that he and Claudio Benedi make all the decisions concerning the FRMS and nothing gets done or changed to it unless they authorize it.

12. Davis made no mention that the changes to the FRMS were inappropriate or not warranted. His only concern was that complainant inform him of every single effort she intends to make or take and obtain approval beforehand thus hindering her work and making it very difficult for complainant to perform her job.

13. Davis proceeded to forbid complainant from having any further contact with Taylor concerning the FRMS without his or Benedi's permission and/or approval, including meetings, telephone calls, emails, etc., even though it is written in complainant's performance standards that she is to: (1) "develop and maintain responsible working relationships with OPM offices..."; (2) "performs a variety of special purpose studies/staff reviews in support of the Publications Management Group"; and, (3) to "take initiative to perform staff studies/analysis of group procedures/operation (sic)".

14. Although the FRMS was conceived, initiated and designed by complainant and although the FRMS was implemented due to the efforts of complainant working in conjunction with CISCIS, Davis stated that complainant cannot even perform simple tasks such as

correcting a minor problem that may have resulted from the database conversion without first obtaining authorization from him or Benedi.

15. Complainant explained that she has been working on and making improvements since its inception in October 2003 and has had administrative rights to the program. Davis said he was going to discuss this with Benedi.

16. After discussing the matter with Benedi, Davis sent an email On December 22, 2005, to Taylor that stated:

> "Please recind Valerie's administrative rights to FRMS."

and cc'd complainant. The administrative rights were suspended for no valid reason and without cause or explanation other than in retaliation against complainant.

17. . Complainant sent an email to Davis for clarification but Davis verbally responded by saying that all FRMS questions/matters should be directed to him.

18. Davis discriminates against complainant by not making objections to other members of his staff that are either male or minorities when they have visitors whether social or professional.

19. Furthermore, Davis displays a belligerent attitude toward complainant and in light of his sexual innuendos (see EEO Complaint No. 1) and the grievances complainant has initiated against him (see EEO Complaint Nos. 1 & 2), complainant believes Davis is sexually harassing her and retaliating against her for filing grievances and/or EEO complaints.

20. On December 22, 2005, Complainant met with an EEO adviser over this issue and was informed to combine it with her other actions since she had already been counseled and issued her final interview on December 14, 2005.

## RELIEF SOUGHT

As shown above, respondent has engaged in unlawful intentional discrimination based on race, sex, sexual harassment, creating a hostile work environment and retaliation. Therefore,

# AFFIDAVIT FOR VALERIE KLINE

Prior to making the following statement Melba D. Vaughn provided me a Letter of Authority identifying her as an EEO Investigator, assigned by the US Office of Personnel Management, Chief, Center for Equal Employment Opportunity. I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is confidential but may be shown to any party who must have access to this information in order to carry out his or her official duties in this matter.

This statement is given in relation to a complaint of discrimination I filed.

*I am aware that the accepted issues in this complaint are, I claim that I was discriminated against on the basis of my race (White), sex (female), in retaliation for previous EEO /FLSA activity, and/or sexual harassment when allegedly:*

1. *on October 19, 2005, I received a "Fully Successful" performance appraisal for Fiscal Year 2005;*
2. *from December 2003 to present, I was denied the opportunity to telework; and*
3. *on approximately December 12, 2005, my supervisor sent individuals an e-mail and expressed displeasure over a visitor I received.*

My full name is Valerie Kline and I am a Caucasian female. I am a Management Analyst, GS-0343-12, Step 5 in the Publications Management Group (PMG), successor to the Publications Management Branch with the Office of Personnel Management. I have been in this position since October 7, 2002, and I have been in the federal government for approximately 17 years. To the best of my knowledge and recollection, this is the first formal EEO Complaint I have filed, the first time I have provided testimony to an EEO Investigator, or otherwise formally participated in or formally opposed discrimination. I did initiate an informal EEO process on June 9, 2005, that was resolved informally. To date, I have not designated a representative in connection with this complaint.

On December 7, 2005, my supervisor, Mr. William E. Davis, Chief, Publishing Services Branch, issued me a performance rating of "Fully Successful," based on performance standards issued November 4, 2004. I believe I met the criteria for receiving an "Outstanding" rating based on the four critical elements contained in my performance standards (Tab A).

Performance element No. 1 (page 1 of 4) is a critical element that reads, *"Performs a variety of special purpose studies/staff reviews in support of the Publications Management Group."* I received a 'Fully Successful' rating under this element. In order to receive an "Exceeds Fully Successful" rating under this element, I was required to "[take] initiative to perform staff studies/analysis of group procedures/operation. [Make] recommendations, after careful analysis, to my supervisor for improvement in areas

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

Initial NK   G
EXHIBIT
PAGE / OF 85

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 27 of 127

where [I have] no direct responsibility." While telecommuting on a trial basis on March 25, 2005, I sought and obtained permission from Ms. Jacquline Carter, Publishing Management Branch, to initiate a study of the "old and cold" regulations in the RISC/OIRA Consolidated Information System (ROCIS). As a result, I found a regulation that had been finalized in 1992 but was still being reported as a pending regulation in the Semiannual Unified Agenda and Regulatory Plan (the 'Agenda'). This means that since 1992, this regulation had been reported in the Agenda, which was published in the *Federal Register*, twice a year as a regulation that OPM was working on even though it had been finalized (Tab B). Because I have some responsibility for Agenda items and preparing the Agenda executive correspondence package, I corrected the problem and advised Carter of the matter.[1] I also recommended that a review of the "old and cold" regulations be performed on a regular basis. Although my suggestion was not implemented, I believe it should have been implemented based on the favorable results it produced. Therefore, I believe I should have at least received an "Exceeds Fully Successful" for this element rather than "Fully Successful."

In order to receive an "Outstanding" rating under performance element No. 1, I was required to make "recommendations [that] support major changes which are implemented within Group". I recommended that PMG use the LEXIS online legal retrieval system as an alternative to the Westlaw service. After performing research and making the recommendation, the LEXIS service was reviewed by Mr. Leon Brody of the Resource Center and Mr. Robert Coco, Senior Management Analyst of the Publications Management Branch. Following their review, my recommendation was implemented, which resulted in a savings of approximately $9,400+/- a year to the PMG. I also recommended to Mr. Coco that a procedure be developed for ensuring that new publications are added to the publications database. As a result, Mr. Coco made arrangements with the Office of Communications & Public Liaison (OC&PL) to notify Publications via email of publications they approve. Now, instead of searching the OPM website on a 'hit or miss' basis for new publications, PMG is made aware of them upon approval by OC&PL, who approves all publications issued by OPM. Based on these recommendations, I believe I met the criteria for receiving and therefore should have received an "Outstanding" rating under this element instead of "Fully Successful".

Performance element No. 2 (page 2 of 4) is a critical element that reads: "*Assist the senior management analyst (PMG) in working with the Office of Communications and other OPM offices in managing, coordinating, reviewing, analyzing, and updating the OPM publications database, Visual Information System, Publications Inbox and FACA database.*" I received a 'Fully Successful' rating under this element. In order to receive an "Exceeds Fully Successful" rating, I had to "assist in annual survey (publications database) and work with OPM offices to make sure that publication information is correct and [be] proactive in maintaining publications."[2] Mr. Coco

---

[1] Ms. Carter said this was not something she would have done and told Mr. Davis this, who I believed used it against me when advising Mr. Ronald Flom, Associate Director for the Management Services Division, of the results of my telecommuting trial period.

[2] I believe that this criterion is strictly related to the publications database since I have been given no guidance or instructions on how to ensure publication information is correct given that I am rarely if ever

**AFFIDAVIT Valerie Kline**
**OPM EEO Case No. 2006008**

2



informed me that the annual survey of the publications database was not conducted during the subject appraisal period. Therefore I could not be rated under this item since it was not possible to assist him with an activity that was not performed. Therefore, I believe I should have at least received a rating of 'Exceeds Fully Successful' since I was proactive in maintaining the publications database by making sure the database was updated whenever I learned of a new publication and by being instrumental in having a procedure implemented for notifying PMG of newly approved publications.

The criterion for receiving an "Outstanding" under performance element No. 2 is, "continuously searches through the OPM Web site to find links to OMB publications and then work with OPM offices to add, revise, or delete publication information as appropriate". I do not believe it is reasonable or practical to expect someone to perform a function "continuously" because it would then be impossible to perform any other duties. By using the term "continuously," which means "marked by uninterrupted extension in space, time, or sequence", *Merriam-Webster Online Dictionary*, Mr. Davis and Mr. Claudio Benedi, Director, Publications Management Group, imposed a standard on me, which I did not agree to, that is impossible to attain and therefore, unachievable. Nevertheless, I did regularly perform this function and made numerous entries in the database. For this reason, I believe I should have received an "Outstanding." At no time, was the Publications database not "kept up" as Mr. Davis alleges. Since I believe I met the criteria for receiving an "Outstanding" rating, I believe I should have received an "Outstanding" rating. I also believe the wording of this element should be changed to a more practical, doable and achievable function.

Performance element No. 3 (page 3 of 4) is a critical element that reads *"Develops and maintains responsible working relationships with supervisors, managers, fellow employees, customers, peers and the general public."* I received a 'Minimally Successful' rating under this element. In order to receive 'Fully Successful' under this element, I had to establish and maintain good working relationships with OPM offices, co-workers, supervisors, managers, and the public. I had to contribute to a positive working environment and work cooperatively in 'group' situations. I had to exhibit openness and objectivity to others' views and treat co-workers with tact. I had to offer assistance and support to co-workers and solicit peer feedback to improve service to the office and to improve own job performance. To receive 'Exceeds Fully Successful', I had to have effective working relations within and outside office that enhance the office's ability to achieve its goal.

In order to receive an "Outstanding" for this element I was required to have highly effective working relations within and outside office that enhance the office's ability to achieve its goal as well as to often 'go the extra mile' in support of staff members or outside staff to help achieve organizational goals. I had to be highly effective in dealing with and helping to resolve conflict within the office, and as needed

---

assigned to work with customers on their publications (other than regulations, which is addressed in element no. 3) or how to maintain publications outside of the publications database. Prior to the hiring of Mr. Evans, a graphic artist, I was assigned 'publication' projects mainly involving graphics work but since his hiring, I have not been assigned any work in this area to my recollection.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

**3**

EXHIBIT  G
PAGE 101 30F 85

outside of the office to help accomplish necessary work. I had to deal very effectively with external stakeholders, in particular those who are very difficult to deal with. I had to be proactive in sharing information with others inside and outside of the office to enhance mutual understanding of work progress and goals.

I believe that I have highly effective working relations with people inside as well as outside the office. It is my belief that I have highly effective working relationships with Mr. Carter and Mr. Coco as well as others within PMG. As far as offices outside of PMG, the Division of Strategic Human Resources Policy (SHRP), requested a detail for me to work in their office but Mr. Benedi denied the request. It is unlikely that another office would have wanted me to work for them if I did not have a highly effective working relationship with them. To my knowledge there have been no complaints with "external stakeholders" so it stands to reason that I must have been highly effective in dealing with any stakeholders including those very difficult to deal with.

I have also been "proactive in sharing information with others inside and outside of the office for enhancing mutual understanding of work progress and goals" since I was instrumental in developing, implementing, and maintaining the Federal Register Management System (FRMS), an electronic tracking system of OPM's regulations that is accessible to people within and outside of our office via the internet. This system enables other offices to track their regulations, which was not done electronically prior to development of this system, and it is my understanding that tracking regulations is an element in regulation writers' performance standards.[3] Therefore, I believe I met the criteria for receiving an "Outstanding" rating under this element. Much to my chagrin, Mr. Benedi prohibited me from working with SHRP in having them utilize the FRMS system to its fullest potential and took measures to have a contractor, who was hired to develop a correspondence tracking system for the agency as part of its organizational goals, include a tracking system for regulations that essentially duplicated the FRMS.

I also received 2 recognition awards from the Director's office in 2003, i.e. a Certificate of Appreciation and a Certificate of Recognition (see Tab E), which is indicative of my highly effective working relations and also indicative of work that I performed that was not part of my regular duties or work that I was rated under and therefore work where I went the 'extra mile'. I received these awards as a result of several committees that I worked on. Ms. Claire Dorell, of the Office of the Director, requested that I serve on more committees, such as the Public Service Recognition Week and USS TR committees, but Messrs. Davis and Benedi refused to allow me to do so[4].

Another example of how I have been proactive occurred on May 4, 2005. Mr. Coco was having difficulty removing a watermark from a "Word" file. Issac Evans,

---

[3] Ironically, my Performance Standards do not include my work on the FRMS and I am not rated or evaluated for my work on the FRMS.
[4] I am unable to obtain evidence of Ms. Dorell's requests since I was placed on administrative leave by Mr. Davis on April 5, 2006, and am now unable to access my email files. On April 6, 2006, I made a request for him to give me approval to access my email. If he approves my request, I should be able to acquire the emails as long as they are still in the system.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

4

EXHIBIT ___  G
PAGE ___ OF ___ 85

Graphics Artist, in our office attempted but could not remove the image. I offered to help him but Mr. Benedi said "no" and attempted to remove the watermark himself. He tried but was unable to remove the image. Again I asked if they would send me the file and let me try but Mr. Benedi said "no" and decided that the file would have to be redone. After Mr. Benedi met in his office with Mr. Evans and Mr. Coco, he yelled at me from his office to go ahead and try to fix the file. Mr. Coco sent me the file and I was able to fix the problem within a few minutes. The only thanks I received, was that Mr. Benedi said I would have to show them how I corrected the document. Since I believe I met the criteria for receiving an "Outstanding" rating, I believe I should have received an "Outstanding" rating.

Performance element No. 4 (page 4 of 4) is a critical element that reads *"Assists in coordinating and preparing OPM's regulatory actions."* I received an "Exceeds Fully Successful" rating under this element. In order to receive an "Outstanding" under this element, I also needed "commendations received from OPM offices and other agencies". I received commendations from the Pay and Leave Administration Group, Pay and Performance Policy Group, the Publishing Management Branch, and other agencies (Tab C). In spite of these commendations, I was not given an "Outstanding" rating.

Mr. Joe Lackey, formerly OPM's Desk Officer at the Office of Management and Budget (OMB), commended me and requested that I visit his agency to deliver a package but Mr. Davis and Mr. Benedi did not permit to me. I was also invited to his retirement party at OMB but was not allowed to attend[5]. Mr. Lackey had a reputation for being difficult to deal with. I've also received commendations from people outside this office. Jo Ann Perrini of SHRP, as well as others, has frequently sent emails to Ms. Carter and I commending us for our help to them. Susan Beveridge (Caucasian), GS-14, also frequently commended me for my assistance to SHRP. Since I met the criteria for receiving an "Outstanding" rating, I believe I should have received an "Outstanding" rating.

I believe Mr. Davis made false comments about my performance. Under Item no. 14 of OPM Form 1459-B, Performance Appraisal, Mr. Davis stated that I needed to direct more attention to assisting the Senior Analyst. I believe this is a false statement since I was never informed during the rating period that I needed to do this or that I had not sufficiently assisted the senior analyst. I assisted the senior analyst whenever assistance was needed, requested, or required.

Under performance element no. 2 (page 2 of 4), Mr. Davis wrote the following comment in block no. 15: "Publications in box not kept up it was necessary to remind Valerie on several occasions. Publications database was not kept up except for a brief period." I believe these statements are false because I do not believe it was "necessary" to remind me on several occasions. For instance, Mr. Coco has primary responsibility for keeping up the "Publications inbox". I was instructed to back him up on days when he is not in the office. On November 29, 2005, I arrived at work at approximately 7 am.

---

[5] This is an example of how Messrs. Davis and Benedi have not developed me as an employee but have hindered my professional development.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

5

EXHIBIT G
PAGE 5 OF 85

Mr. Coco does not arrive in the office until 9 am. At 8 am, Mr. Davis informed me that there were 5 emails in the publications mailbox. (There were actually only four emails in the mailbox and 3 of them were duplicates that did not require a response but were notifications of a publication that had been approved by the OC&PL.) Only one email required a response, which I forwarded to *General Inquiries*. While it may have been a nice gesture, I believe that reminding me of emails in the "Publications Inbox" after only being at work for one hour, after I had been off work for 5 days, and may not have been aware that Mr. Coco was planning to be off until 9 am, was not "necessary" and certainly not grounds for giving me a poor rating considering that I had a lot of catching up to do on various projects, such as the status of regulatory actions, and a lot of email to read pertaining to the regulatory work, etc.

As far as the publications database not being kept up, there were no instances when a publication was brought to my attention that it was not promptly added to the database after it had been approved. Shortly after receiving the appraisal, I asked Mr. Coco if he recalled any instances when the database had not been updated and he said, "No, I don't recall any."

Mr. Davis wrote in block no. 15 on page 3 of 4, "working relationship within our office has deteriorated with co-workers & supervisors." I believe this statement is untrue. During the informal complaint process, Ms. LaShonn Woodland informed me that Mr. Davis said that co-workers do not want to communicate with me on a personal level but only on a professional level. Mr. Davis also stated this to me when rendering the mid-year review. I believe I have good communication with co-workers on a professional level--the level that matters for performing efficiently and effectively in the work place. Mr. Coco and Ms. Carter frequently ask me personal questions as well, such as how my mother is doing.

In actuality, Messrs. Davis and Benedi have attempted to turn people against me. For example, when I was visited by Ms. Arlene Taylor of the Program Office Support Branch, Center for Information Services and Chief, Information Officer (CISCIS) over an issue concerning the FRMS, Davis sent an email to her and her supervisor accusing her of making a social call and objecting to the visit. Another example is when PMG hired a new mailroom supervisor named Ms. Rosalind Wright. Shortly after her employment began, Ms. Wright stopped by my desk to chat while she was waiting to go into a meeting with Mr. Benedi. She was very friendly and invited me to go with her to the farmer's market that Saturday. After the meeting with Mr. Benedi and the Union, the Union representative informed me that Mr. Benedi said in the meeting that he has a "problem griever" in his office, referring to me. Not long after that meeting, Wright informed me that she would not be able to make it to the farmer's market and thereafter avoided me.

The rating I received under performance element 2 (page 2 of 4) was "Fully Successful." In order to receive this rating I had to meet the following criteria: "Systems are kept up-to-date. Correct information is provided to the customer." [Emphasis Added] By receiving a "Fully Successful" rating under this element means that I had to have kept

the systems up-to-date. Therefore, it is inconsistent and contradictory for Mr. Davis to later state that "Publications in box and Publications database (2 of the 4 systems listed under this element) are not kept up-to-date".

In block 14 of the OPM Form 1459-B, Performance Appraisal Form, Mr. Davis wrote, "Valerie's performance in *Federal Register* work…is acceptable." It is contradictory for Davis to state that my *Federal Register* work is acceptable when he gave me a rating of "Exceeds Fully Successful" under element no. 4 pertaining to regulatory work. In other words, it is contradictory for Mr. Davis to say my performance is only "Acceptable" in this area when he rated me as "Exceeds Fully Successful." There is correlation between these two items because the "regulatory work is work that is related to the *Federal Register.*

Regarding element no. 2 (page 2 of 4), I believe the term "systems," which is a plural term, does not refer to one single system in particular but is referring to the four systems outlined in the element, including the "Publications Inbox" and the "Publications (FACA) database. In other words, the Publications Inbox is one of PMG's "systems" and the "Publications (FACA)" is another PMG system.

I believe Mr. Davis sexually harassed me when issuing to me my performance appraisal because he kept looking at my breasts which conveyed the message that if I wanted to receive a higher performance rating, I would need to have more than a professional relationship with him. There were no witnesses present. I responded by trying to discuss the merits of my performance rating but then commented that I realized there was no use in discussing the merits of "my performance." I did not report the incident to an up-line supervisor but I did speak to an Employee's Assistance Program (EAP) counselor about the incident. I did not say anything to him about his behavior. The impact of Mr. Davis' unwanted sexual, as well as discriminating behavior, has had a negative psychological impact on me in terms of my morale and ability to perform my duties and responsibilities efficiently and effectively. His behavior has caused me to fear that he is abusing his power in order to either make me condone his improprieties or to cause me to fail in my job so that he can eliminate me as an employee. Subjecting me to an unlawful hostile working environment has caused and is causing me a lot of stress and anxiety. I feel like I am "walking on egg shells" and that he is watching my every move and waiting for me to make a mistake so that he can criticize or penalize me. I obtained Employee Assistance Program (EAP) counseling in order to help me cope with the situation.

I believe Mr. Coco, Senior Management Analyst, GS-13, under Mr. Davis' supervision, received an award for Outstanding Performance even though one of the elements that I was only rated "Fully Successful" under was one where I was supposed to assist him in conducting a survey. However, Mr. Coco did not conduct a survey that year. I also believe Ms. Carter, Management Analyst, GS-13, under Mr. Davis' supervision, may have received an "Outstanding" even though she committed a number of errors whereas I did not commit any errors during this rating period but only failed to detect all of the errors made by others in reviewing regulations. For example, on

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

7

EXHIBIT __
IMAGE __ __ OF __

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 33 of 127

January 25, 2005, Ms. Carter gave me three packages that had been signed by the Director and asked me to send them to the *Federal Register*. Two of them were regulations that needed to be approved by OMB before they could be published in *the Federal Register*. Again, on April 1, 2005, she brought me a regulation and instructed me to send it to the *Federal Register* but it had not been cleared by OMB. On March 30, 2005, she gave me a regulation that had been cleared by OMB and told me to send it to OMB (Tab D) whereas it was supposed to be sent to the *Federal Register*, not OMB. When I asked her about it, she said I was correct. Carter does not catch all of the errors all the time either and there are times when I find things that she overlooks and vice versa.

It is my belief that race was a factor since Ms. Carter, GS-13, a Black female staff member received an "Outstanding" performance appraisal even though she committed errors whereas I did not "make errors" during the rating period and was only given a "Fully Successful" rating.

I believe sex was a factor because Robert Coco, Gs-13, a male staff member received an "Outstanding" performance appraisal even though he did not perform one of the duties he was supposed to perform, a duty that I was supposed to be rated under as part of my performance standards.

As I stated on my EEO Complaint form, I believe that my supervisor, Mr. Davis retaliated against me and sexually harassed me by giving me a poor performance rating based on several Fair Labor Standards Act (FLSA) complaints that I filed against him. I filed an FLSA complaint instead of an EEO action although the grievance had discriminatory elements, i.e. disparate treatment. In the present actions, I decided to pursue the EEO process instead of the grievance process based on the advice and recommendation of my Union representative.

I believe Mr. Benedi was one of the OPM discriminating individuals because he signed the performance standards if not the performance appraisal as well.

The psychological impact this discrimination has had on me is that by subjecting me to an unlawful hostile work environment, my mental frame of mind has suffered. I have become cynical and pessimistic about my performance since I believe that no matter how well I perform, I will not be rated properly or fairly. This is causing me to lose the incentive to produce. It has also had a negative monetary impact on me since I have not received monetary rewards for my performance. This discrimination has also caused me to have: (1) anxiety over the security of my job, (2) stress resulting in problems with my health, and (3) mental/emotional pain and suffering. Additionally, removing work duties and responsibilities from me, even though I performed well on those duties and responsibilities, has caused me to have idle time on my hands, which has made me feel like they are attempting to shut me out, eliminate me or to force me to find things to do that they can then criticize or condemn because whenever I found a project, I have been discouraged from pursuing it. For example, I recommended that we have LEXIS Co. scan our historical documents for electronic access. Mr. Davis told me to give him a full

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

8

EXHIBIT ~~H~~ G
PAGE ~~H~~ 8 OF 85

report on this matter but then prevented me from having any contact with the LEXIS representative in order to evaluate how we would execute the process.

In regards to accepted issue # 2, I filed a request to begin telecommuting on May 9, 2003 (Tab F), and I filed another request on September 23, 2003 (Tab G). Mr. Davis denied both of the requests. I filed an appeal with Mr. Benedi on September 30, 2003 (Tab H); a request for a response to my appeal on October 17, 2003 (Tab I); and another request for a response to my appeal on November 7, 2005 (Tab J). I filed another formal telecommute request on January 26, 2005 (Tab K).

To the best of my recollection, the circumstances pertaining to my telecommuting request are as follows: Around November 2003, the AFGE local 32 met with Mr. Davis and reached an agreement to allow me to telecommute after one year of working for OPM because I was told that it was OPM's policy for employees to wait one year before telecommuting.[6] On September 23, 2003 (Tab G), I filed another request to begin telecommuting. I was told I would not be allowed to telecommute because I was needed to assist with customers.[7] After the Union initiated the grievance procedure, Mr. Davis agreed to allow me to telecommute but stated that I needed performance standards before I could begin telecommuting (Tab L). Mr. Davis took four months to create performance standards. After obtaining performance standards, I filed another request but it was denied by Mr. Davis because he said I was needed in the office to "greet customers", which I believe means to act as a receptionist since I don't work directly with people coming to the office with their publication matters. The only people that I work directly with are those coming to the office with regulatory matters.

After initiating a formal grievance process, Mr. Flom decided to allow me to telecommute on a 90-day trial basis that was supposed to begin on January 23, 2005. I was not allowed to begin on this date because Mr. Davis said that I did not have an executed agreement.[8] An agreement was finally executed and I began the trial period on February 22, 2005.

At the end of the trial basis, Mr. Flom decided not to allow me to continue to telecommute based on the reports he received from Messrs. Davis and Benedi. Mr. Benedi had been on leave and Mr. Flom said in a meeting that he wanted to wait for Mr. Benedi to return from vacation before deciding on whether to continue the telecommuting agreement. After Mr. Benedi returned, I was informed that I would not be able to continue telecommuting.

My mother lives with me and became ill around August 2005. The Union met with Mr. Davis and made a request to allow me to telecommute so that I could better care

---

[6] Although I was told that it was OPM's policy that an employee work for one year before being allowed to telecommute, I learned that Ms. Woodland, a black female, EEO Counselor was allowed to telecommute even though she's been employed at OPM for less than one year.

[7] I believe there are ways to assist with customers via telephone or email and that it is not always necessary to be in the office to assist with customers.

[8] It is my understanding that Ms. Carter began telecommuting even though she did not have an executed agreement.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

9

EXHIBIT *G*
PAGE *4* OF *85*

for my mother. On October 27, 2005, Mr. Davis denied the request (Tab M). The only reason given by Mr. Davis was that telecommuting "is not appropriate in this situation." Since I am unaware of what he is referring to, I cannot comment on whether it is true or false. I believe there was no reasonable basis for denying my telecommute request. I also believe that I should have been allowed to telecommute when my mother became ill since Ms. Carter was allowed to telecommute when her husband became ill. Furthermore, we both do the same type of work, i.e. regulatory work.

I believe that Mr. Benedi discriminated against me since he did not grant my telecommuting request when I appealed Mr. Davis' decision denying my request. In addition, Mr. Davis told me on numerous occasions concerning various issues that he will check with Mr. Benedi and get back to me. Mr. Flom also stated that he wanted to wait for Mr. Benedi to return from vacation before deciding whether to allow me to telecommute following the 90-day trial period. I also believe it was Mr. Benedi who ultimately decided whether to grant Ms. Carter's request to telecommute. Therefore, I believe it was Mr. Benedi who ultimately decided whether to grant or not to grant my telecommuting request, especially since Mr. Davis told me when I applied for the position that I would be able to telecommute if hired for the position[9]. When I raised this fact with Mr. Benedi, he told me that he did not tell me I would be able to telecommute. Mr. Benedi did not tell me that I would not be able to telecommute either. This leads me to believe that Mr. Benedi is the one who ultimately made the decision to deny my request.

Not allowing me to telecommute has had a major impact on me. When my mother became ill, I initially had to adjust my schedule to arrive to work earlier so that I could leave early to take my mom to the doctor. This caused a great deal of stress on me since I was getting up an hour earlier every day at 4:15 am and not getting home until 7 pm. Taking leave to care for my mom also caused me to use up all of my sick leave. Initially my mother needed to see the doctor every day but now she only needs to see the doctor about once or twice a week. To alleviate the stress from getting up early and arriving home late, I am now taking LWOP under FMLA one day a week in order to take my mother to the doctor rather than deplete my leave, which I might need in the event of a medical emergency. This has caused me a financial burden since I am not being paid for the LWOP.

I believe that I did speak with one other OPM employee who was telecommuting in order to care for a family member but I cannot remember who that person was at this time.

Ms. Carter, GS-13, Black, who has had no EEO activity to my knowledge, was allowed by Mr. Benedi to telecommute after her husband had several strokes is a witness to this issue. Also, Lara Rivera-Lopez, a former OPM employee, Hispanic female,

---

[9] When interviewing for the position, I was told by Messrs. Davis and Benedi that I would only be assisting Ms. Carter in performing regulatory work as reflected in my initial position description. After hiring me, Mr. Davis changed my position description to include management analyst duties and other types of 'publication' work, such as assisting Mr. Coco with the annual survey.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

*10*

EXHIBIT ___G___
PAGE ___37 OF 85___

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 36 of 127

GS-12, informed me that she was allowed by Mr. Benedi to telecommute during her detail to our office to accommodate her schedule while she was attending school.

I believe that race is a factor since Mr. Benedi, a Hispanic male, allowed Black and Hispanic females to telecommute but refused to allow me to telecommute.

I believe my sex may be a factor since Mr. Benedi presumably approved Mr. Davis, a white male, for telecommuting.

I believe that retaliation is a factor since I initiated negotiated grievance processes against Mr. Davis. I believe that Mr. Davis is retaliating against me by not supporting me in my requests to telecommute and by creating an unlawful hostile work environment to punish me for not having had more than a "professional relationship" with him.

Additionally, I would like to add that Mr. Davis creates hostile work environment by frequently whistling in his office. My office is just outside his office and he likes to whistle, hum and/or sing in his office, which is disturbing to me, but when I ask him to close his door, he refuses. Whenever he walks by my office, he tends to whistle, hum, or sing. Mr. Davis' whistling is extremely annoying and breaks my concentration. When Mr. Davis whistles as he passes by my workspace, it appears to be an attempt to draw attention to him. He also issued me a "Counseling Memorandum" on December 15, 2003, based on an email that I transmitted between May 4, 2003, and May 10, 2003 that he said contained inappropriate and unacceptable material. This was an email that Mr. Coco sent not only to me but to Mr. Davis and Mr. Benedi as well, but Mr. Coco was not issued a Memorandum of Counseling nor was I told that the email was inappropriate (Tab N).

When I first started working at OPM, I would go to lunch with Mr. Davis, Mr. Benedi, and Mr. Coco. Mr. Davis would frequently make comments about women, the way they dressed or how they looked, which made me feel uncomfortable. When Mr. Davis issued me a Letter of Counseling concerning the cartoon that Mr. Coco distributed throughout the office, Mr. Davis was looking at my breasts during that counseling session. I tried to ignore the comments and the gestures. As a result, I believe this is the reason I was asked to change my lunch period and cover the office while they went to lunch. I did not report the lunch incidents or the incident concerning the Letter of Counseling although I did discuss the letter and seek to have it removed through the Union process. Mr. Benedi and Mr. Coco might have witnessed his comments about other women, but there were no witnesses when he issued the Letter of Counseling or the Performance Appraisal.

I became aware of Mr. Davis' displeasure over a visitor I received in my office immediately after Arlene Taylor left my office because Mr. Davis asked me for Ms. Taylor's name. The next day I asked Taylor if she had any communication from Mr. Davis. Ms. Taylor informed me that she and her supervisor, Ms. Margaret McElrath, received emails from Mr. Davis concerning Ms. Taylor's visits to my office.

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008                    11

EXHIBIT
PAGE

Kline v. Springer                    EEOC Case No.
07-0451                              2006008                    Page 37 of 127

I received a visit from Ms. Taylor on approximate December 12, 2005. Ms. Taylor and I had been working together on the FRMS for OPM since approximately June of 2003. After making a conversion to an upgraded system, Ms. Taylor stopped by my desk to show me how to navigate some of the new features in the FRMS. She made two visits, one for about 20 minutes and the second for about 10 minutes. During the first visit, we encountered a problem with the FRMS so Taylor left to fix the problem. Then she returned and finished the demonstration.

Ms. Taylor informed me that the emails sent to her and her supervisor said that Mr. Davis did not appreciate her making social visits to my office. First, Ms. Taylor's visit was not a social visit but was business related. Second, Mr. Davis did not inquire of me as the purpose of Ms. Taylor's visit and assumed that it was social. Third, Ms. Taylor mentioned to me that she has visited with Ms. Carter both socially and professionally and Mr. Davis has never complained to her about those visits.

Mr. Davis' emails to Taylor and her supervisor has had a negative impact on me in that it is causing me a great deal of stress and anxiety in that I feel that he is looking over my shoulder at my every move and waiting for me to make a mistake so that he can attack me or criticize me. It also negatively affects my working relationships with others such as Ms. Taylor and Ms. Wright. Subjecting me to an unlawful hostile work environment has hindered my attitude and mental frame of mind has suffered. It also discourages me from building report with people and therefore hinders my ability to be proactive in finding projects to work on pursuant to element no. 1 in my performance standards. I have become cynical and pessimistic about my performance since I believe that no matter how well I perform, I will not be rated properly or fairly. This is not only causing me to lose the incentive to produce, but it is also having a negative impact on my performance, which has been recently causing me to make more mistakes than I normally would make. It has also caused me to have stress and anxiety, which has caused problems to my health. Subjecting me to an unlawful hostile work environment has also caused a great deal of emotional pan and suffering.

I believe that race is a factor because Ms. Carter, a Black female, receives personal visitors without having Mr. Davis issue emails to them expressing his disapproval. I believe sex is a factor because Mr. Coco, a White male, can receive personal visitors without having Mr. Davis issue emails to them expressing his disapproval. I believe my prior EEO activity is a factor because this incident occurred after the EEO Counselor met with Mr. Davis concerning this complaint. Ms. Taylor, Ms. McElrath and possibly OPM email records or archives from OPM Outlook are the only witnesses I can think of for this issue.

The following comments pertain to the relief I am seeking for the accepted issues:

I believe the acts of discrimination have caused me a great deal of stress, anxiety, worry, and mental/emotional pain and suffering. I feel that my rights have been violated. I feel that OPM through its agents Mr. Davis and Mr. Benedi have knowingly and willfully engaged in conduct that constitutes bad faith, mismanagement, negligence,

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

/2.

EXHIBIT
PAGE

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 38 of 127

malfeasance, and abuse of authority and the public trust. They have subjected me to a hostile work environment. Their inequitable treatment and belligerent behavior towards me has lowered my resistance to colds and flu as I came down with the flu several months ago and still have some symptoms. Prior to this I have not had the flu or a cold for a number of years. I believe it has also triggered some other health problems that I am being treated for.

I have not computed the exact amount of compensatory damages but had requested $10,000 in compensatory in the telecommuting grievance (Tab O). I am presently claiming the statutory cap of $300,000 in compensatory and punitive damages for each act of discrimination, which amounts to a total of $900,000. I also believe compensation for all of the LWOP I have used and continue use until this matter is resolved is appropriate.

At the present time, I do not have a formal medical report for the conditions described listed above but I should be able to acquire one from my doctor, if necessary. I believe the tension and turmoil caused by my supervisors has weakened my resistance to disease and may have triggered some physical conditions and/or ailments. I received a consultation for my physical aliments on February 28, 2006, by my general physician. I do not have a written medical report but was diagnosed with and treated for a medical condition that may have been triggered by stress. Moreover, I have obtained counseling from Ms. Angele Moss-Baker from the EAP office due to the stress, anxiety, mental/emotional pain and suffering and follow-up mental health counseling for anxiety and stress. I initially obtained EAP counseling in 2003 or 2004. I don't remember the exact dates or the counselor's name. I recently obtained counseling and spoke with Ms. Debbie Harding on December 22, 2005, and then I spoke with Ms. Moss-Baker on December 27, and December 28, 2005, and again on several other dates.

I have read and agree to this statement consisting of four pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the following statement is true, correct, and complete to the best of my knowledge and belief.

Complainant's Signature: _Valerie Kline_     Date: _4-5-06_
                         Valerie Kline

Investigator's Signature: _Melba D. Vaughn_     Date _4/5/06_
                          Melba D. Vaughn

AFFIDAVIT Valerie Kline
OPM EEO Case No. 2006008

13

EXHIBIT 6
PAGE 13 OF 85

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 39 of 127



United States
# Office of
# Personnel Management



Washington, DC 20415

MEMORANDUM FOR:    MELBA VAUGHN

FROM:    VALERIE KLINE

SUBJECT:    RESPONSE TO INTERROGATORIES

DATE:    MARCH 9, 2006

In response to your February 24, 2006 email concerning interrogatories, please find the responses to my Interrogatories attached. I am unable to email the attachments but please let me know if you would like for me to at least email you the electronic document of the responses. Also, some of the attachments are highlighted and/or in color that would be lost in a facsimile. Therefore, I am hand delivering the response to you.

EXHIBIT
PAGE __14__ OF __85__

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 40 of 127

CON 114243
FEBRUARY 2004

## KLINE'S RESPONSE TO 2/24/06 INTERROGATORIES

1. My position is a Management Analyst in the Publications Management Group
   (PMG) (successor to the Publications Management Branch). I am a GS-12
   Step 5 in the 0343 series.

2. I have been a Management Analyst in this office since 10/7/2002.

3. I have been employed by the Federal Government for approximately 16 years.

4. My race is Caucasian.

5. My sex if female.

6. To the best of my knowledge and recollection, this is the first EEO Complaint
   I have filed, the first time I have provided testimony to an EEO investigator,
   or otherwise participated in or opposed discrimination.

7. N/A

8. I do not have anyone representing me at this point in time.

9. I received the performance rating on November 7, 2005, based on
   performance standards issued on October 19, 2005.

10. The name of the supervisor who rated me was Mr. William E. Davis, Chief of
    the Publishing Services Branch in the Management Services Division.

11. I believe that I met the criteria for receiving an 'Outstanding' rating based on
    the 4 performance elements contained in my performance standards (see
    Tab A) as follows:

    <u>Performance Element No. 1 (page 1 of 4) – Performs a variety of special
    purpose studies/staff reviews in support of the Publications Management
    Group.</u>

EXHIBIT ___9___
PAGE _15_ OF _85_

I only received a 'Fully Successful' rating under this element. In order to receive an 'Exceeds Fully Successful' rating under this element, I was required to perform the following:

> "Incumbent takes initiative to perform staff studies/analysis of group procedures/operation. Makes recommendations, after careful analysis, to supervisor for improvement in areas where incumbent has no direct responsibility."

On March 25, 2005, while telecommuting on a trial basis and after obtaining permission from Jackie Carter, I performed a study of the "old and cold" regulations in ROCIS on my own initiative. As a result, I found a regulation that had been finalized in 1992 but was still being reported as a pending regulation in the Semiannual Unified Agenda and Regulatory Plan (the 'Agenda'). This means that since 1992, this regulation had been published in the *Federal Register* twice a year in the Agenda as an item that OPM was working on even though it had been finalized (See Tab B). Because I have some responsibility for Agenda items and preparing the Agenda executive correspondence package, I corrected the problem and advised Carter of the matter[1]. Therefore, I believe I should have at least received an 'Exceeds Fully Successful' for this recommendation.

In order to receive an 'Outstanding' under this element, I was required to:

> 'As stated above and recommendations support major changes which are implemented within the Group."

---

[1] Carter said this was not something she would have done and told Davis this, who I believe used it against me when informing Mr. Ronald Flom, Associate Director for the Management Services Division, of the status of my telecommuting trial period.

EXHIBIT ___G___
PAGE ___16 OF 85___

I suggested that this type of study be performed on a regular basis. Although it was rejected, I believe it should have been accepted and implemented based on the favorable results it produced.

I also recommended that PMG use LEXIS-NEXIS online legal retrieval system instead of Westlaw's online legal retrieval system. After performing some research and making the recommendation, my recommendation was implemented, which resulted in a savings of approximately $10,000/year to the PMG.

I also recommended to Robert Coco, the senior management analyst, a procedure for ensuring that new publications are added to the publications database. In doing so, I believe I was instrumental in having the procedure implemented for notifying PMG via email of publications approved by the Office of Communications & Public Liaison (OC&PL).

Since I believe I met the criteria for receiving an 'Outstanding' rating under this element, I believe I should have received an 'Outstanding' rating instead of 'Fully Successful'.

<u>Performance Element No. 2 (page 2 of 4) – Assists the senior management analyst (PMG) in working with the Office of Communications and other OPM offices in managing, coordinating, reviewing, analyzing, and updating the OPM publications database, Visual Information System, Publications Inbox and FACA database.</u>

I only received a Fully Successful rating under this element. In order to receive 'Exceeds Fully Successful' I was required to:

"assist in annual survey (publications database) and works with OPM offices to make sure that publication information is correct and is proactive in maintaining.(sic)"

EXHIBIT 6
PAGE 17 OF 85

Coco informed me that the annual survey was not conducted this past year.

Therefore, it was impossible for me to have assisted him with this activity

since it was not done yet I was rated under this item.

In order to receive an 'Outstanding' under this performance element, I was

required to perform the following:

"continuously searches through the OPM Web site to find links to
OMB publications and then works with OPM office to add, revise, or
delete publication information as appropriate".

It is neither reasonable nor practical to expect someone to perform a function

"continuously" because it would then be impossible to perform any other

duties.  By using the term "continuously", which means "marked by

uninterrupted extension in space, time, or sequence", *Merriam-Webster*

*Online Dictionary*, Davis and Mr. Claudio Benedi, Director of the

Publications Management Group,  imposed a standard on me, which I did not

agree to, that is impossible to attain and therefore, unachievable.

Nevertheless, I did regularly perform this function and made numerous entries

in the database. For this reason, I believe I should have received an

'Outstanding'. At no time was the Publications database not "kept up" as

Davis alleges (see response under No. 12).

Since I believe I met the criteria for receiving an 'Outstanding' rating

under this element, I believe I should have received an 'Outstanding' rating. I

also believe the wording of this element should be changed to a more

practical, doable function.

EXHIBIT G
PAGE 18 OF 85

<u>Performance Element No. 3 (page 3 of 4) – Develops and maintains</u>
<u>responsible working relationships with supervisors, managers, fellow</u>
<u>employees, customers, peers and the general public.</u>

I only received a 'Minimally Successful' rating under this element. In order

to receive 'Exceeds Fully Successful' I was required to perform the following:

"In addition to Fully Successful, has <u>effective</u> working relations within
and outside office that enhance the office's ability to achieve its goal."
[Emphasis Added.]

And to achieve an 'Outstanding' I was required to perform the following:

"In addition to Exceeds fully Successful, has <u>highly effective</u> working
relations within and outside office that enhance the office's ability to
achieve its goal. Often goes the extra mile in support of staff members or
outside staff to help achieve organizational goals. Is <u>highly effective</u> in
dealing with and helping to resolve conflict within office, and as needed
outside of office to help accomplish necessary work. Deals very
effectively with external stakeholders, in particular those who are very
difficult to deal with. Is pro-active in sharing information with others
inside and outside of office to enhance mutual understanding of work
progress and goals." [Emphasis Added.]

I believe that I have highly effective working relations with people inside

as well as outside the office. It is my view that I have highly effective

working relationships with Carter and Coco as well as others within PMG. As

far as offices outside of PMG, the Division of Strategic Human Resources

Policy (SHRP), for example, requested a detail for me to work in their office

but Benedi denied the request. It is unlikely that another office would have

wanted me to work for them if I did not have a highly effective working

relationship with them. To my knowledge there have been no complaints with

'external stakeholders' so that I must have been highly effective in dealing

with them including those very difficult to deal with. I have also been

"proactive in sharing information with others inside and outside of the office

EXHIBIT _____ G
PAGE ___ 14 __ OF __ 85

for enhancing mutual understanding of work progress and goals" since I was

instrumental in developing, implementing and maintaining the Federal

Register Management System (FRMS), an online electronic tracking system

of OPM's regulations that is accessible to people within and outside of our

office via the internet. This system enables other offices to track their

regulations, which was not done electronically prior to development of this

system, and tracking regulations is a requirement in regulation writers'

performance standards[2]. Therefore, I believe l that I met the criteria for

receiving an 'Outstanding' rating under this element. Much to my chagrin,

Benedi prohibited me from working with SHRP in having them utilize the

system to its fullest potential and took measures to have a contractor, who was

working on a correspondence tracking system for the agency, develop a

tracking system for OPM regulations that essentially duplicated my tracking

system.

   Another example of how I have been proactive occurred on May 4, 2005.

Coco was having difficulty removing a watermark from a Word file. Issac

Evans, a graphics artist in our office attempted but could not remove the

image. I offered to help him but Benedi said "no" and attempted to remove

the watermark himself. He tried but was also unable to remove the image.

Again I asked if they would send me the file and let me try but Benedi said

"no" and decided that the file would have to be redone. Finally, after meeting

in his office with Evans and Coco, Benedi yelled at me from in his office to

---

[2] Ironically, my Performance Standards do not include my work on the FRMS and I am not rated or
evaluated for my work on the FRMS.

EXHIBIT ___G___
PAGE __20 OF 85__

6

go ahead and try to fix the file. Coco sent me the file and I was able to fix the problem within a few minutes. The only thanks I received, was that Benedi said I was going to have to show them how I did that.

Since I believe I met the criteria for receiving an 'Outstanding' rating under this element, I believe I should have received an 'Outstanding' rating.

<u>Performance Element No. 4 (page 4 of 4) – Assists in coordinating and preparing OPM's regulatory Actions.</u>

I received a rating of 'Exceeds Fully Successful' under this element. In order to receive 'Outstanding' I was required to perform the following:

"As stated above with commendations received from OPM offices and other agencies."

I received commendations from several other OPM offices (see Tab C) and other agencies. However, I was not given an 'Outstanding' rating.

Mr. Joe Lackey at the Office of Management and Budget (OMB) commended me and requested that I visit his agency to deliver a package but I was not permitted to by Davis and Benedi. I was also invited to his retirement party at OMB but was not allowed to attend. Mr. Lackey had a reputation for being difficult to deal with.

I've also received commendations from people outside the office. Jo Ann Perini of SHRP as well as others has frequently sent emails to me and Carter commending us for our help to them. Susan Beveridge also frequently commends me for my assistance to SHRP.

Since I met the criteria for receiving an 'Outstanding' rating under this element, I believe I should have received an 'Outstanding' rating.

EXHIBIT G
PAGE 47 OF 85

12. Under Item no. 14 of OPM Form 1459-B (see Tab A), Davis stated that I

needed to direct more attention to assisting the Senior Analyst. I believe this

was false since I was never informed at any time during the rating period that

I needed to do this or that I had not sufficiently assisted the senior analyst. I

assisted the senior analyst whenever assistance was needed, requested or

required.

Under the Performance Element pertaining to assisting the senior

management analyst (see p. 2 of 4, Tab A), Davis wrote the following

handwritten comment under item no. 15:

"Publications in box not kept up it was necessary to remind Valerie on
several occasions. Publications database was not kept up except for a brief
period."

I believe this statement is false because I do not believe it was "necessary" to

remind me on several occasions. For instance, on 11/29/05, I arrived at work

at approx. 7 am. I was told by Davis at 8 am that there were 5 emails in the

publications mailbox. There were actually only 4 emails in the mailbox and 3

of those were duplicates that did not require a response but were notifications

of a publication that had been approved by the OC&PL. Only one email

required a response, which I forwarded to *General Inquires*. While it may

have been a nice gesture, I believe that reminding me of emails in the

Publications Inbox after only being at work for 1 hour when I had been off

work for 5 days was not "necessary" and certainly not grounds for giving me a

poor rating considering that I had a lot of catching up to do on various

EXHIBIT _____G_____
PAGE ___23 OF___85___

projects, such as the status of regulatory actions, and a lot of email to read pertaining to the regulatory work, etc.

As far as the publications database not being kept up, there were no instances when a publication was brought to my attention that it was not promptly added to the database after it had been approved. Shortly after receiving the appraisal, I asked Coco if he recalled any instances when the database had not been updated and he said "no, I don't recall any."

Under the item no. 15, Davis wrote:

"working relationship within our office has deteriorated with co-workers & supervisors."

I believe this statement is untrue. During the informal complaint process, I was informed by the EEO counselor that Davis said that co-workers do not want to communicate with me on a personal level but only on a professional level. Davis also stated this to me when rendering the mid-year review. I believe I have good communication with co-workers on a professional level—the level that matters for performing efficiently and effectively in the work place. In actuality, Davis and Benedi are instrumental in turning people against me. For example, when I was visited by Ms. Arlene Taylor of the Program Office Support Branch, Center for Information Services and Chief Information Officer (CISCIS) over an issue concerning the FRMS, Davis sent an email to her and her supervisor accusing her of making a social call and objecting to the visit.

Another example is when PMG hired a new mailroom supervisor named Ms. Rosalind Wright. Shortly after her employment began, Wright stopped

EXHIBIT ___G___
PAGE __23_ OF _85_

by my desk to chat while she was waiting to go into a meeting with Benedi. She was very friendly and even invited me to go with her to the farmer's market that Saturday. After the meeting with Benedi and the Union, the Union representative later informed me that Benedi said in the meeting that he has a "problem griever" in his office referring to me. Not long after that meeting, Wright informed me that she would not be able to make it to the farmer's market and thereafter avoided me.

The rating I received under performance element on p. 2 was 'Fully Successful'. In order to receive this rating I had to meet the following criteria:

"Systems are kept up-to-date. Correct information is provided to the customer." [Emphasis Added]

If my rating under this element states that the "systems are kept up to date", it is inconsistent and contradictory for Davis to then say that Publications in box and Publications database (2 of the 4 systems listed under this element) are not kept up to date.

13. In item 14 of the OPM Form 1459-B, Performance Appraisal Form for OPM Employees (see Tab A), Davis wrote

"Valerie's performance in Federal Register work ... is acceptable."

It is contradictory to state that my *Federal Register* work is 'acceptable' when I have been given a rating of 'Exceeds Fully Successful' under the element pertaining to regulatory work (see p. 4 of 4, Tab A). In other words, it is contradictory to say my performance is only 'Acceptable' in this area when the element rates me as 'Exceeds Fully Successful'. There is a correlation

EXHIBIT G
PAGE 24 OF 85

between these two items because the "regulatory" work is work that is related

to the *Federal Register*.

14. The performance element on p. 2 of 4 (see Tab A) states:

> "Assists the senior management analyst (PMG) in working with Office of Communications and other OPM offices in managing, coordinating, reviewing, analyzing and updating the OPM publications database, Visual Information System, Publications Inbox and FACA database."

I believe the term "systems", which is a plural term and does not referring to

one single system in particular, is referring to the 4 systems outlined in the

above-stated performance element, including the "Publications Inbox" and the

"Publications (FACA) database". In other words, the Publications Inbox is

one of PMG's "systems" and the "Publications (FACA) database" is another

PMG system.

15. I believe that Davis sexually harassed me when issuing to me my performance

appraisal.

   a. When issuing to me my performance appraisal, Davis kept looking at

   my breasts which conveyed the message that if I wanted to receive a

   higher performance rating, I would need to have more than a

   professional relationship with him.

   b. There were no witnesses present when Davis issued the performance

   appraisal.

   c. I responded by trying to discuss the merits of my performance rating

   but then commented that I realized there was no use in discussing the

   merits of "my performance".

EXHIBIT ___G___
PAGE ___25___ OF ___85___

   d.  I didn't report the incident to an up-line supervisor but did speak to an

       Employee's Assistance Program (EAP) counselor about the incident.

16. I did not say anything to him about his behavior.

17. The impact of Davis' unwanted sexual as well as discriminating behavior has

    had a negative psychological impact on me in terms of my morale and ability

    to perform my duties and responsibilities efficiently and effectively.  His

    behavior has caused me to fear that he is abusing his power in order to either

    make me condone his improprieties or to cause me to fail in my job so that he

    can eliminate me as an employee. Subjecting me to an unlawful hostile

    working environment has caused and is causing a lot of stress and anxiety. I

    feel like I am "walking on egg shells" and that he is watching my every move

    and looking for me to make a mistake so that he can criticize me. I obtained

    EAP counseling in order to help me cope with the situation.

18. I did not report the incident to anyone else in my chain of command but hoped

    that bringing this EEO action would be a way of bringing it to the attention of

    the agency.

19. I believe Robert Coco, management analyst, GS-13, under Davis' supervision,

    received an award for Outstanding Performance even though one of the

    elements that I was only rated 'Fully Successful' under was one where I was

    supposed to assist him in conducting a survey.  However, Coco did not

    conduct a survey that year.  I also believe Jackie Carter, management analyst,

    GS-13, under Davis' supervision, may have received an 'Outstanding' even

    though she committed a number of errors whereas I did not commit any errors

EXHIBIT ___G___
PAGE _26_ OF _35_

but only failed to detect all of the errors made by others in reviewing

regulations. For example, on 1/25/05, Carter gave me 3 pages that had been

signed by the Director and asked me to send them to the *Federal Register*.

Two of them were regulations that needed to be approved by OMB before

publishing in the *Federal Register*. Again, on 4/1/05, she brought me a

regulation and said to send it to the Federal Register but it had not been

cleared by OMG. On 3/30/05, she gave me a regulation that had been cleared

by OMB and told me to send it to OMB (see Tab D). Carter does not catch all

of the errors all the time either and there are times when I find things that she

overlooks and vice versa.

20. I would like to have the wording in my Performance Standards revised to

reflect more achievable and doable duties and responsibilities. I would also

like my performance appraisals for 2003[3], 2004 and 2005 amended to

'Outstanding' along with receiving the accompanying monetary awards; and

$300,000 in compensatory and punitive damages as permitted by statute (42

U.S.C. § 1981a(b)(3)) for this discrimination and for subjecting me to an

unlawful hostile work environment.

21. I believe race is a factor since it is my belief that a minority staff member

received an 'Outstanding' performance appraisal even though they committed

errors whereas I did not "make errors" during the rating period and was only

given a 'Fully Successful' rating.

---

[3] I would like my Performance Appraisal for 2003 amended from "Exceeds Fully Successful" to "Outstanding" since I received 2 recognitions from the Director's office in 2003, i.e. a Certificate of Appreciation and a Certificate of Recognition (see Tab E).

EXHIBIT_____ G
PAGE _27_ OF _85_

22. I believe sex was a factor since it is my belief that a male staff member received an 'Outstanding' performance appraisal even though they did not perform one of the duties they were supposed to perform, which duty I was required to assist with and was rated under.

23. As I claimed on my EEO Complaint form, I believe that my supervisor retaliated against me in giving me a poor performance rating based on several Fair Labor Standards Act (FLSA) complaints that I filed against him. I filed an FSLA complaint instead of an EEO action although the grievance had discriminatory elements, i.e. disparate treatment based on race. In the present actions, I decided to pursue the EEO process instead of the grievance process based on the advice and recommendation of my Union representative.

24. I believe Benedi was one of the OPM discriminating individuals because he signed the performance standards if not the performance appraisal as well.

25. The psychological impact this discrimination has had on me is that by subjecting me an unlawful hostile work environment, my mental frame of mind has suffered. I have become cynical and pessimistic about my performance since I believe that no matter how well I perform, I will not be rated properly or fairly. This is causing me to lose the incentive to produce. It has also had a negative monetary impact on me since I have not received monetary rewards for my performance. This discrimination has also caused me to have: (1) anxiety over the security of my job, (2) stress resulting in problems with my health, and (3) mental/emotional pain and suffering.

EXHIBIT G
PAGE 28 OF 85

26. This question is the same as question no. 20. My answer is the same as my answer under question no. 20.

27. There were no witnesses to the sexual harassment.

28. I cannot think of any at this point in time.

29. I submitted official requests to telecommute to Davis and Benedi.

30. On May 9, 2003, I filed a request to begin telecommuting (see Tab F). I filed another request on September 23, 2003 (see Tab G).

31. Davis denied the requests.

32. Davis denied my telecommute requests.

33. I filed an appeal with Benedi on September 30, 2003 (see Tab H); a request for a response to my appeal on October 17, 2003 (see Tab I); and another request for a response to my appeal on November 7, 2005 (see Tab J). I filed another formal telecommute request on January 26, 2005 (see Tab K).

34. To the best of my recollection, the circumstances pertaining to my telecommuting requests are as follows:

Around November 2003, the AFGE local 32 met with Davis and reached an agreement to allow me to telecommute after one year of working for OPM. On September 23, 2003 (see Tab G), I filed another request to begin telecommuting. I was told I would not be allowed to telecommute because I was needed to assist with customers. The Union started the grievance procedure and Davis agreed to allow me to telecommute but stated that I needed performance standards before I could begin telecommuting (See Tab L). The agency took 4 months to create performance standards. After

EXHIBIT ___ G ___
PAGE _29_ OF _95_

obtaining performance standards, I filed another request but it was denied by

Davis because he said I was needed in the office to "greet customers". After

initiating a formal grievance process,   Flom decided to allow me to

telecommute on a 90-day trial basis that was supposed to begin on January 23,

2005. I was not allowed to begin on this date because Davis said that I did not

have an executed agreement[4]. An agreement was finally executed and I began

the trial period on February 22, 2005.

35. At the end of the trial basis, Flom decided not to allow me to continue to

telecommute based on the reports he received from Benedi.  Benedi had been

on leave and Flom said in a meeting that that he wanted to wait for Benedi to

return from vacation before deciding on whether to continue the

telecommuting agreement.  After Benedi returned, I was informed that I

would not be able to continue telecommuting.

My mother lives with me and became ill around August 2005. The Union

met with Davis and made a request to allow me to telecommute so that I could

better care for my mother. On October 27, 2005, Davis denied the request

(see Tab M).

36. The only reason given by Davis was that telecommuting "is not appropriate in

this situation." Since I am unaware of what he is referring to, I cannot

comment on whether it is true or false.

37. I believe there was no reasonable basis for denying my telecommute request.

I also believe that I should have been allowed to telecommute when my

---

[4] It is my understanding that Carter began telecommuting even though she did not have an executed
agreement

mother became ill since Carter was allowed to telecommute when her husband became ill.

38. I appealed my telecommute request to Benedi who did not grant my request. In addition, Davis told me on numerous occasions concerning various issues that he will check with Benedi and get back to me. Flom also stated that he wanted to wait for Benedi to return from vacation before deciding whether to allow me to telecommute following the 90-day trial period. I also believe it was Benedi who ultimately approved Carter's request to telecommute. Therefore, I believe it was Benedi who ultimately decided whether to approve or not to approve my telecommuting request, especially since Davis told me when I applied for the position that I would be able to telecommute if hired. When I raised this fact with Benedi, Benedi made it a point to tell me that he did not tell me I would be able to telecommute. This led me to believe that he was the one who ultimately made the decision to deny my request.

39. Not allowing me to telecommute has had a major impact on me. When my mother became ill, I initially had to adjust my schedule to arrive to work earlier so that I could leave early to take my mom to the doctor. This caused a great deal of stress on me since I was getting up an hour earlier every day at 4:15 am and not getting home until 7 pm. Taking leave to care for my mom also caused me to use up all of my sick leave. To alleviate the stress, I am now taking LWOP one day a week in order to care for my mom rather than deplete my leave, which I might need in the event of a medical emergency.

EXHIBIT _G_
PAGE _31_ OP _85_

This has caused me a financial burden since I am not being paid for the LWOP.

40. I believe that I did speak with one other OPM employee who was telecommuting in order to care for a family member but I cannot remember at this time who that person was. Although I was told that it was OPM's policy that an employee work for 1 year before being allowed to telecommute, I learned that LaShonn Woodland, a black female, EEO counselor was allowed to telecommute even though employed at OPM for less than one year.

41. One witness is Jacquline Carter, GS-13, female, black, no EEO activity to my knowledge, who was allowed by Benedi to telecommute after her husband became ill from several strokes. Also, Lara Rivera-Lopez, a former OPM employee, Hispanic female, GS-12 was allowed by Benedi to telecommute when detailed to our office to accommodate her schedule while she was attending college.

42. I believe that race is a factor since Benedi, a Hispanic male, allowed black and Hispanic females to telecommute but refused to allow me to telecommute.

43. I believe sex may be a factor since Benedi approved Davis, a white male, for telecommuting but refused to approve me for telecommuting.

44. I believe that retaliation is a factor since I initiated negotiated grievance processes against Davis. I believe that Davis now does not want me to telecommute since I believe he is retaliating against me and creating an unlawful hostile work environment to punish me for not having had more than a 'professional relationship' with him.

EXHIBIT ___G___
PAGE __32__ OF __95__

45. Davis also creates a hostile work environment by frequently whistling in his office. My office is just outside his office and he likes to hum and/or sing in his office, which is disturbing to me but when I ask him to close his door, he refuses. Whenever he walks by my office, he tends to whistle, hum or sing. He also issued me a "Counseling Memorandum" on 12-15-2003 based on an email that I transmitted sometime between 5/4/03-5/10/03 that he said contained inappropriate and unacceptable material. This was an email that Coco sent to me as well as to Davis and Benedi but Coco was not issued a Memorandum of Counseling nor were we told that the email was inappropriate (see Tab N).

46. Immediately after Taylor left my office, Davis asked me for Taylor's name. The next day I asked Taylor if she had any communications from Davis. Taylor informed me that she and her supervisor, Margaret McElrath, received emails from Davis concerning Taylor's visit to my office.

47. I received a visit from Taylor on approximately December 12, 2005. Taylor and I had been working together on the FRMS for OPM since approximately June of 2003. After making a conversion to an upgraded system, Taylor stopped by my desk to show me how to navigate some of the new features in the FRMS. She made two visits, one for about 20 minutes and the second for about 10 minutes. During the first visit, we encountered a problem with the FRMS so Taylor left to fix the problem. Then she returned and finished the demonstration.

EXHIBIT ____ G
PAGE ____ 33 ____ OF ____ 85

48. Taylor informed me that the emails said that Davis did not appreciate her making social visits to my office and also sent the email to Taylor's supervisor, McElrath.

49. Davis expressed his dissatisfaction either that day or the next day following Taylor's visit to my office.

50. First, Taylor's visit was not a social visit but was business related. Second, Davis did not inquire of me as to the purpose of Taylor's visit and assumed that it was social. Third, Taylor mentioned to me that she has visited with Carter both socially and professionally and Davis has never complained to her about those visits.

51. This action by Davis has had a negative impact on me in that it is causing me a great deal of stress and anxiety in that I feel that he is looking over my shoulder at my every move and waiting for me to make a mistake so that he can attack me or criticize me. It also negatively affects my working relationships with others such as Taylor and Wright. Subjecting me an unlawful hostile work environment has hindered my attitude and my mental frame of mind has suffered. I have become cynical and pessimistic about my performance since I believe that no matter how well I perform, I will not be rated properly or fairly. This is not only causing me to lose the incentive to produce, but it is also having a negative impact on my performance, which hs been recently causing me to make more mistakes than I normally would make. It has also caused me to have stress and anxiety, which has caused problems

EXHIBIT G
PAGE 34 OF 85

to my health.  Subjecting me to an unlawful hostile work environment has also

caused a great deal of emotional pain and suffering.

52. The only witnesses I can think of at the moment are Taylor, McElrath and

possibly the email records or archives from OPM Outlook.

53. None that I can think of at the moment.

54. I believe that it is discrimination based on race because Carter, a black female,

receives personal visitors without having Davis issue emails to them

expressing his disapproval.

55. I believe that it is discrimination based on sex because Coco, a white male,

can receive personal visitors without having Davis issue emails to them

expressing his disapproval.

56. This incident occurred after the EEO counselor met with Davis concerning

this complaint.

57. I can't think of anything at the moment.

58. I believe the acts of discrimination have caused me a great deal of stress,

anxiety, worry, and mental/emotional pain and suffering.  I feel that my rights

have been violated.  I feel that OPM through its agents Davis and Benedi have

knowingly and willfully engaged in conduct that constitutes bad faith,

mismanagement, negligence, malfeasance, and abuse of authority and the

public trust.  They have subjected me to a hostile work environment.  Their

inequitable treatment and belligerent behavior towards me has lowered my

resistance to colds and flu as I came down with the flu several months ago and

still have some symptoms. Prior to this I have not had the flu or a cold for a

EXHIBIT G
PAGE 35 OF 85

number of years. I believe it has also triggered some other health problems for which I am being treated for.

59. I have not computed the exact amount of compensatory damages but I believe $10,000 in compensatory damages is warranted as requested in the telecommuting grievance (see Tab O). I also believe compensation for all of the LWOP I have used and continue use until this matter is resolved is appropriate. Finally, I am claiming the statutory cap of $300,000 in compensatory and punitive damages for each act of discrimination, which amounts to a total of $900,000.

60. At the present time, I do not have a formal written medical report for the conditions described under Item No. 58 but I should be able to acquire one from my doctor, if necessary.

61. I believe that the tension and turmoil caused by my supervisors has weakened my resistance to disease and may have triggered some physical conditions and/or ailments.

62. I was treated on February 28, 2006, by my general physician. I do not have a written medical report but was diagnosed with and treated for a medical condition that may have been triggered by stress. Moreover, I have obtained counseling from the EAP due to the stress, anxiety, mental/emotional pain and suffering and follow-up mental health counseling for anxiety and stress.

EXHIBIT ___G___
PAGE __36_ OF_ 85_



**United States**

# Office of
# Personnel Management

RECEIVED
MAR 3 1 2005
BY: _SS_

Washington, DC 20415

MEMORANDUM TO:     MELBA VAUGHN

FROM:              VALERIE KLINE

SUBJECT:           EEO INVESTIGATION

DATE:              March 21, 2006

    Attached are the Responses To Additional Questions that you requested.  Let me know if you need any further information.

EXHIBIT ___G___
PAGE ___37___ OF ___85___

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 63 of 127

CON 114243
FEBRUARY 2004

### Responses to Additional Questions

1. Do you have a middle name? If yes, what is it?

No

2. If known, please state Mr. Joe Lackey's title and grade.

I do not know Mr. Lackey's grade or official title. I was told that he was the OPM's desk officer at OMB before retiring from that position.

3. If known, please state Susan Beveridge's grade, title, race, sex.

I believe Ms. Beveridge's grade is GS-14, I do not know her title, her race is Caucasian and her sex is female.

4. You stated you spoke with an EAP counselor regarding the incident in which you alleged Mr. Davis kept looking at your breast while issuing you your performance appraisal; what is the EAP counselor's name?

Ms. Angele Moss-Baker

5. When date did you first speak with the EAP counselor you named in question #1?

I initially obtained EAP counseling back in 2003 or 2004. I don't remember the exact dates or the counselor's name. I recently obtained counseling and spoke with Debbie Harding on Dec. 22, 2005, and then spoke with Angele Moss-Baker on Dec. 27 and met with her on Dec. 28, 2006, and several times afterwards.

6. You stated Mr. Davis frequently whistles in his office, describe the impact his whistling has on you and why you believe his whistling creates a hostile work environment.

When whistling in his office, it is extremely annoying and breaks my concentration. When Davis passes by my workspace, he frequently whistles, which distracts me from my work and appears to be an attempt to draw attention to him.

7. Are there any other instances in which you believe Mr. Davis sexually harassed you? If yes, please provide the following information for each instance:

- What behaviors or comments were made towards you that caused you to believe you were being sexually harassed?

When I first started working at OPM, I would go to lunch with Davis, Benedi and Coco. Davis would frequently make comments about women, the way they dressed or how they looked, which made me feel uncomfortable. When Davis issued me a Letter of

EXHIBIT G
PAGE 38 OF 85

Counseling concerning the cartoon that Coco distributed throughout the office, Davis was looking at my breasts during that counseling session.

- State specifically when each behavior or comment was made, who acted?

I don't have the exact dates that he made the comments during the lunch sessions. I believe the date of the counseling session was December 9, 2006.

- State if there were witnesses present when each of the specific comments or behaviors were made

Coco and Benedi were present when he made comments about other women but there were no witnesses when he issued the Letter of Counseling or the Performance Appraisal.

- How did you respond?

I tried to ignore the comments and the gestures. As a result, I believe this is the reason I was asked to change my lunch period and cover the office while they went to lunch.

- Did you report? If yes, when and to whom?

I didn't report the lunch incidents or the incident concerning the Letter of Counseling but did report the Performance Appraisal to my EAP counselor and by filing this EEO action.

8. You stated your race was a factor because a minority member received an "outstanding." What is his or her name, and if known, include his or her grade, title, race, sex, and prior EEO activity?

Jacquline Carter, GS-13, black female.

9. You stated your sex was a factor because a male member received an "outstanding." What is his name, and if known, include his grade, title, race, sex, and prior EEO activity?

Robert Coco, GS-13, white male.

NOTE: Medical documentation is necessary. Please include receipts for any expenses associated with the conditions documented.

EXHIBIT G
PAGE 79 OF 85

# Attachment 1

## PERFORMANCE APPRAISAL FORM FOR OPM EMPLOYEES

| 1 Employee's Name (*Last, First, MI*) | 2. Social Security No. | 3. Purpose of Rating | | 4. Appraisal Period | |
|---|---|---|---|---|---|
| ~~ ~~ne, Valerie, NMN | 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 | ☒ Annual  ☐ WGI | | From | To |
| | | ☐ Interim  ☐ Other | | 11/4/2004 | 9/30/2005 |

| ...sition Title, Series and Grade | 6. Position Description Number | 7. Name of Organization (*Group/Office, Division, Branch*) and Location |
|---|---|---|
| Management Analyst, GS-343 | | CCFAS, PMG |

### I COMMUNICATION AND REVIEW OF PERFORMANCE PLAN

| 8. Supervisor's Signature and Date Signed (*Month, Day, Year*) | 9. Employee's Signature and Date (*Month, Day, Year*) |
|---|---|
| *William M Davis  11-4-2004* | *Employee refused to sign  11-4-2004* |

10. Signature of Higher Level Supervisor and Date Signed (*Month, Day, Year*)
*J. Kennedy 11/9/04*

### II PROGRESS REVIEW CERTIFICATION

| 11. Supervisor's Signature and Date Signed (*Month, Day, Year*) | 12. Employee's Signature and Date (*Month, Day, Year*) |
|---|---|
| | *Employee refused to sign  5-12-2005* |

### III RATING

13. Summary Rating (*See instructions*)

| ☐ Outstanding | ☐ Exceeds Fully Successful | ☒ Fully Successful | ☐ Minimally Successful | ☐ Unacceptable | ☐ Not Rated |
|---|---|---|---|---|---|

14. Supervisory Comments

Valerie's performance in Federal Register work & in assisting our senior analyst is acceptable. She needs to be more self-starting & to direct more attention to her duties assisting the senior analyst + supporting this office's mission.

| 15. Supervisor's Signature | Date Signed (*Month, Day, Year*) |
|---|---|
| *William M Davis* | |

16. Higher Management Level Review (*Comments*)

| 17. Signature of Higher Level Supervisor | Date Signed (*Month, Day, Year*) |
|---|---|

18. Employee's Comments

| ...loyee's Signature | Date Signed (*Month, Day, Year*) |
|---|---|

*For GS employees, a summary rating of Fully Successful is required to meet the acceptable level of competence for within-grade increases.

OPM Form 1159-B

**Performance Standards Form for OPM Employees**

| 1. Employee's Name (Last, First, MI) | 2. Effective Date of Standards | 3. |
|---|---|---|
| Kline, Valerie, NMI | May 17, 2004 | Page    1    of 4 |

| 4. Position Title, Series, and Grade | 5. Name of Organization | |
|---|---|---|
| Management Analyst, GS-343-12 | CFAS, PMG | |

**I. PERFORMANCE STANDARDS**

| Performance Element | Is this a critical element? | X YES | NO | 6a. Check One |
|---|---|---|---|---|
| Performs a variety of special purpose studies/staff reviews in support of the Publications Management Group. | | | | ☐ Proposed First Draft  ☒ Final |

| STANDARDS | 12. RATING |
|---|---|
| ████████████████████████ | ☐ Unacceptable |
| **8. Minimally Successful**  Assignments are performed in a routine manner with appropriate fact gathering. Conclusions/recommendations occasionally need review by supervisor. Work generally performed in a timely manner. | ☐ Minimally Successful |
| **9. Fully Successful**  Studies and reviews are performed in a fully professional manner with careful research, prper documentation and appropriate conclusions. Incumbent works closely with staff office personnel in presenting analysis/recommendations and completes assignments in a timely manner. | ☒ Fully Successful |
| **10. Exceeds Fully Successful**  Incumbent takes initiative to perform staff studies/analysis of group procedures/operation. Makes recommendations, after careful analysis, to supervisor for improvement in areas where incumbent has no direct responsibility. | ☐ Exceeds Fully Successful |
| **11. Outstanding**  As stated above and recommendations support major changes which are implemented within the Group.. | ☐ Outstanding |

| 13. Supervisor's Signature and Date Signed (Month, Day, Year) | 14. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| *William M. Davis*    11-29-2005 | |

**II. SUPERVISORY COMMENTS**

15. Supervisory Comments On Performance

| 16. Sup'r's Signature and Date Signed (Month, Day, Year) | 17. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| *Ellen M. Davis*  11-4-2004 | *Employee refused to sign*    11-4-2004 |

2/88) Page 1 of 2

OPM Form 1460-B(WP) (Rev. *11-5-04*)

Performance Standard Form for OPM Employees

| 1. Employee's Name (Last, First, MI) | 2. Effective Date of Standards | 3. |
| Kline, Valerie, NMI | May, 17, 2004 | Page:    2    of 4 |

| 4. Position Title, Series, and Grade | 5. Name of Organization |
| Management Analyst, GS-343-12 | CFAS, PMG |

## I. PERFORMANCE STANDARDS

| 6. Performance Element          Is this a critical element?   [X] YES   [ ] NO | 6a. Check One |
| Assists the senior management analyst (PMG) in working with the Office of Communications and other OPM offices in managing, coordinating, reviewing, analyzing, and updating the OPM publications database, Visual Information System, Publications Inbox and FACA database. | [ ] Proposed First Draft  [X] Final |

| STANDARDS | 12. RATING |
| --- | --- |
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | Unacceptable |
| **8. Minimally Successful** <br><br> In most instances systems are kept up-to-date and complaints about incorrect information being provided to the customer are rarely received. | Minimally Successful |
| **9. Fully Successful** <br><br> Systems are kept up-to-date.  Correct information is provided to the customer. | [X] Fully Successful |
| **10. Exceeds Fully Successful** <br><br> In addition to the above, assist in annual survey (publications database) and works with OPM offices to make sure that publication information is correct and is proactive in maintaining. | Exceeds Fully Successful |
| **11. Outstanding** <br><br> In addition to the above, continuously searches through the OPM Web site to find links to OPM publications and then works with OPM offices to add, revise, or delete publication information, as appropriate. | Outstanding |

| 13. Supervisor's Signature and Date Signed (Month, Day, Year) | 14. Employee's Signature and Date Signed (Month, Day, Year) |
| *William M. Davis* 11-29-2005 | |

## II. SUPERVISORY COMMENTS

15. Supervisory Comments On Performance

*Publications in box not kept up it was necessary to remind Valerie on several occasions. Publications data base it was not kept up except for a brief period.*

| 3. Supervisor's Signature and Date Signed (Month, Day, Year) | 17. Employee's Signature and Date Signed (Month, Day, Year) |
| *William M. Davis* 11-4-2004 | *Employee refuse to sign* 11-4-2004 |

OPM Form 1460-B(WP) (Rev.  *WD 11-5-04* )

2/88) Page 1 of 2

Performance Standards Form for OPM Employees

| 1. Employee's Name (Last, First, MI) | | 2. Effective Date of Standards | 3. |
|---|---|---|---|
| Kline, Valerie, NMI | | May 17, 2004 | Page 3 of 4 |
| 1. Position Title, Series, and Grade | | 5. Name of Organization | |
| Management Analyst, GS-343-12 | | CFAS, PMG | |

## I. PERFORMANCE STANDARDS

Performance Element    Is this a critical element?    [X] YES    [ ] NO    6a. Check One

Develops and maintains responsible working relationships with supervisors, managers, fellow employees, customers, peers and the general public.

[ ] Proposed First Draft
[X] Final

**STANDARDS**                                                     12. RATING

[ ] Unacceptable

**8. Minimally Successful**

Generally maintains good working relationships with OPM offices, co-workers, supervisors, managers, and the public.

[X] Minimally Successful

**9. Fully Successful**

Establishes and maintains good working relationships with OPM offices, co-workers, supervisors, managers, and the public. Contributes to positive working environment. Works cooperatively in group situations. Exhibits openness and objectivity to others' views. Treats co-workers with tact. Offers assistance and support to co-workers. Solicits peer feedback to improve service to the office and to improve own job performance.

[ ] Fully Successful

**10. Exceeds Fully Successful**

In addition to Fully Successful, has effective working relations within and outside office that enhance the office's ability to achieve its goal.

[ ] Exceeds Fully Successful

**11. Outstanding**

In addition to Exceeds Fully Successful, has highly effective working relations within and outside office that enhance the office's ability to achieve its goal. Often goes the extra mile in support of staff members or outside staff to help achieve organizational goals. Is highly effective in dealing with and helping to resolve conflict within office, and as needed outside of office to help accomplish necessary work. Deals very effectively with external stakeholders, in particular those who are very difficult to deal with. Is pro-active in sharing information with others inside and outside of office to enhance mutual understanding of work progress and goals.

[ ] Outstanding

| 13. Supervisor's Signature and Date Signed (Month, Day, Year) | 14. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| William M. Rain  11-28-2005 | |

## II. SUPERVISORY COMMENTS

15. Supervisory Comments On Performance

Working relationship within our office has deteriorated with co-workers + supervisors.

| 18. Supervisor's Signature and Date Signed (Month, Day, Year) | 19. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| William M. Rain  11-4-2004 | Employee refused to sign  11-4-2004 |

2/88) Page 1 of 2                                    OPM Form 1460-B(WP) (Rev.  11-5-04

**Performance Standards Form for OPM Employees**

| 1. Employee's Name (Last, First, MI) | 2. Effective Date of Standards | 3. |
|---|---|---|
| Kline, Valerie, NMI | May 17, 2004 | Page    4    of 4 |

| 4. ...m Title, Series, and Grade | 5. Name of Organization |
|---|---|
| I...ment Analyst, GS343-12 | CFAS, PMG |

## I. PERFORMANCE STANDARDS

| ... ...formance Element        Is this a critical element? [X] YES  [ ] NO | 6a. Check One |
|---|---|
| Assists in coordinating and preparing OPM's regulatory actions. | [ ] Proposed First Draft  [X] Final |

| STANDARDS | 12. RATING |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | [ ] Unacceptable |
| **8. Minimally Successful**  In most instances, reviews draft and final regulatory actions in a timely manner | [ ] Minimally Successful |
| **9. Fully Successful**  In accordance with due dates reviews draft and final regulatory actions for compliance to GSA, OMB, and Federal Register requirements.  Recommends appropriate actions to ensure completion by due dates. | [ ] Fully Successful |
| **10. Exceeds Fully Successful**  As stated above with no complaints.  Additionally, regulatory actions are prepared and submitted prior to the re~~red time. | [X] Exceeds Fully Successful |
| **11. Outstanding**  As stated above with commendations received from OPM offices and other agencies. | [ ] Outstanding |

| 13. Supervisor's Signature and Date Signed (Month, Day, Year) | 14. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| *William M. Davis* 11-28-2005 | |

## II. SUPERVISORY COMMENTS

15. Supervisory Comments On Performance

*Still learning ~~that~~ progress has been made but errors are still occurring*

| ...visor's Signature and Date Signed (Month, Day, Year) | 17. Employee's Signature and Date Signed (Month, Day, Year) |
|---|---|
| *William M. Davis* 11-4-2004 | *Employee refused to sign* 11-4-2004 |

2/88) Page 1 of 2

OPM Form 1460-B (WP) (Rev.

11-5-04

Center for Equal Employment Opportunity
_____

# EEO COUNSELOR'S REPORT

**I.**   **Required Elements**
   **A. Aggrieved person:**

| | |
|---|---|
| Name: | **Valerie Kline** |
| Job Title | **Management Analyst** |
| Place of Employment: | **OPM** |
| Work Telephone: | **606-1411** |
| Home Address: | **83 E Street** |
| | **Lothian, Maryland 20711** |

Home Telephone: **301-574-4326**

**B.  Chronology of EEO Counseling:**

| | |
|---|---|
| Date of Initial Contact: | **11/17/05** |
| Date of Initial Interview: | **11/30/05** |
| Date of Alleged Discriminatory Event: | **October 27, 2005 and November 30, 2005** |
| 45th Day after Event: | |
| Reason for delayed contact beyond 45 days: | |
| Date of Final Interview | **December 14, 2005** |
| Date Counseling Report Requested: | |
| Date Counseling Report Submitted: | **December 19, 2005** |

**C.  Basis(es) for Alleged Discrimination:**

| | |
|---|---|
| ☒ Race (specify) | White |
| ☐ Color (specify) | |
| ☐ National Origin (specify) | |
| ☒ Sex (specify) | Female |
| ☐ Age (date of birth) | |
| ☐ Mental Disability (specify) | |
| ☐ Physical Disability (specify) | |
| ☐ Religion (specify) | |
| ☒ Reprisal (identify earlier event and/or opposed practice, give date) | July 2005 |

**Aggrieved Issue(s):** Ms. Kline states that she received a "Fully Successful" Performance Appraisal, denied the opportunity to telework and she was sexually harassed by her Supervisor William Davis and she believes it is based on her sex (female), race (Caucasian) and her previous EEO activity. She states that she was sexually harassed on November 28, 2005 by her Supervisor. She further states that she believes she should have been rated higher on her Performance Appraisal she received on November 28, 2005.

**D. Remedy Requested:**

Complainant is requesting to telework, and an "Exceeds Fully Successful" Performance rating.

## F. EEO Counselor Checklist:

Was the aggrieved person advised in writing of the rights and responsibilities contained in the EEO Counselor's checklist?     X     Yes     _____No

Was the aggrieved advised of OPM's ADR Program?     X     Yes     _____No

Did employee elect ADR?     _____ Yes     X     No

## II.    Informal Fact Gathering:

1.  Detailed summary of interview with aggrieved person:

I met with Ms. Valerie Kline on November 30, 2005 and she states that her Supervisor Mr. William Davis (male) denied her to telework. She states that she was allowed to telework for a 90 day trial period based on an agreement made by the union in "2004" when she filed her grievance. Ms. Kline states that after the 90 day trial period management was to inform her of whether she could continue to telework. She states that William Davis informed her that he was not going to approve her to telework and he did not provide her with a reason for the denial. Ms. Kline further states that she could perform the essentials of her job from home and she states that her co-worker Ms. Jackie Carter (Black) works from home. She states that she performs the same job functions as Ms. Carter. Ms. Kline states that she is using Family Medical Leave at present to take care of her ill mother and she has to use leave without pay. Ms. Kline states that she can't understand why she is denied the opportunity to work from home and Management approved Ms. Carter to work from home to take care of her ill husband. She states that she believes the denial to work from home is based on her sex, race and her previous EEO activity.

Center for Equal Employment Opportunity                                                    Page 4

Ms. Kline states that she is dissatisfied with her Performance Appraisal she received on November 28, 2005. She states that she should have been rated as "Fully or Exceeds" and not "Minimally Satisfactory" in the elements of "Systems kept up-to-date and Working relationships". Ms. Kline also states that when she received her Performance Appraisal her Supervisor Mr. William Davis (White) stared at her breast and she believes that she was sexually harassed. She states that she has a witness but she did not want to release the name of the individual.

2.  Detailed summary of interview with Management Officials:

### William Davis, (Chief, Publishing Services Center, (Male), (White)

### Interview date: December 8, 2005

I met with Mr. William Davis on December 8, 2005 in regards to Ms. Kline. Mr. Davis states that he denied Ms. Kline to work from home because she was not completing her assignments. Mr. Davis states that Ms. Kline is assigned to assist Mr. Coco. He states that she was not answering the phones, assisting customers, publishing products, printing procurement and working with print shops when she worked from home. He states that these tasks were not getting done and this was his reason for the denial of telecommuting. Mr. Davis states that Ms. Carter is allowed to telecommute because she can perform the essentials of her job from home. He states that he did not approve Ms. Carter to work from home to take care of her ill husband because that would be against the telecommute policy. Mr. Davis states that he rated Ms. Kline correctly with regards to her Performance Appraisal. He states that in the elements of "Systems kept up-to-date and Working relationships" He states with regards to "Systems kept up-to-date", he would have to remind her about the publications in the in-box and she did not keep the publications database current. He states with regards to "Working Relationships", her working relationship had deteriorated with co-workers and supervisors. He states that the co-workers in the office are afraid to talk with her and he has received complaints about Ms. Kline from the Print shop. Mr. Davis states with regards to the sexual harassment allegation he is denying the accusation. He states that he is not discriminating against Ms. Kline.

Detailed summary of interview with witnesses:

    N/A

2.  Documents reviewed:
**Performance Appraisal dated November 28, 2005**

3.  List of documents attached:
**TAB 1 - Performance Appraisal dated November 28, 2005**

## AFFIDAVIT FOR WILLIAM M. DAVIS

Prior to making the following statement Melba D. Vaughn provided me a Letter of Authority identifying her as an EEO Investigator, assigned by the US Office of Personnel Management (OPM), Chief, Center for Equal Employment Opportunity. I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

*I am aware that the accepted issues in this complaint are Ms. Kline claims that, on the bases of her race (White), sex (Female), and in retaliation for previous EEO activity, and sexual harassment the agency discriminated against her when allegedly:*

*1. on October 19, 2005, she received a "Fully Successful" performance appraisal for Fiscal Year 2005;*

*2. from approximately December 2003 to present, she was denied the opportunity to telework; and*

*3. on approximately December 12, 2005, her supervisor sent individuals an email and expressed displeasure over a visitor she received.*

My full name is William M. Davis. I am a White male. My position at the Office of Personnel Management is Support Services Supervisor, GS-0342-14 and I have been in that position since November 5, 2000. However, I have been employed with the Federal Government since January 21, 1971. My supervisor is a White male. His name is Claudio A. Benedi, Program Manager, GS-0340-15. I was made aware of my right to representation, but because I was acting within my job duties, I expect to be represented by someone in OPM's Office of General Counsel.

I have known Ms. Valerie Kline since I hired her in November 2002. I am aware of the fact that Ms. Kline has prior EEO activity because Ms. Laura George met with me to discuss some of Ms. Kline's concerns.

Ms. Kline's overall (average) work performance was at the "Fully Successful" level. Her work on regulatory issuances "Exceeds Fully Successful" but in her other three standards she was either "Fully or Minimally Successful". On numerous occasions from November 4, 2004 through September 30, 2005, I informed Ms. Kline via discussion or email of unacceptable performance. I did conduct a mid-year review. Ms. Kline insisted that I furnish her with a copy so she could review it and discuss at a later time. I provided her a copy of the mid-year review on April 26, 2005. On May 12, I asked her if she was ready to discuss or sign and she said "no" she would not sign. Ms.

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials _C.D.__    EXHIBIT __H__
PAGE __1__ OF __126__

Kline v. Springer          EEOC Case No.
07-0451                        2006008          Page 75 of 127

Kline insisted that it would do no good to discuss the evaluation as I would not change anything. I told her that was not true, if she could convince me that I was wrong I would change her rating.

In the "supervisory comments" section of the performance appraisal I stated Ms. Kline needed to be more self-starting. I said this because I have to continually remind her to attend to the phones, Publications In-Box, and unsolicited faxes. Ms. Kline misses deadlines. Some of the deadlines missed were: spreadsheet for salaries; available space evaluation for OPM Form 4150; review/analysis of current regulations and laws pertaining to printing; Federal Register survey of paper copy users; updating of publications database; and Federal Register articles and Federal Register deliveries combined to save cost. Additionally, Ms. Kline is supposed to assist Mr. Robert T. Coco, GS-13, Senior Analyst, but she rarely offers her assistance. I also stated in the "supervisory comments" section that Ms. Kline needed to direct more attention to her duties assisting the senior analyst. I made that statement because half of her duties are to assist Mr. Coco. She does assist him when he request help. Ms. Kline rarely, if ever voluntarily offers any assistance to Mr. Coco. I also commented in the "supervisory comments" section of the appraisal that Ms. Kline needed to support the office's mission. Much of our office's work is through walk in customers and phone calls. Ms. Kline feels that she should not have to answer the phone and rarely offers assistance to walk in customers. When the phone is answered, she merely passes the call along not offering to render any assistance. If she were more involved in assisting Mr. Coco much of the work he handles would gravitate to her. When I say, would gravitate by assisting Mr. Coco I mean the actual work, Ms. Kline has stated several times that Mr. Coco is extremely busy and needs help. Ms. Kline has failed to assist Mr. Coco. In actively assisting Mr. Coco, the customers would become aware of Ms. Kline and would eventually get to know that she can/does assist them. In this, the customers would move/gravitate more to Ms. Kline.

Performance element #1 (page 1 of 4) reads "Performs a variety of special purpose studies/staff reviews in support of the Publications Management Group." I did not rate Ms. Kline above "Fully Successful" because she would have had to initiate studies/analysis and or have recommended changes that would have had to support major changes in the Publications Management Group. This needs to be a continuing effort, not just one or two items in a years time. Ms. Kline did not recommend a regular review of the "old and cold" regulations. This review was implemented in January 2003 due to two specific requests/notifications from Donna Bland of OMB. I was not aware that Ms. Kline was not following these documents. I did consider Ms. Kline's recommendation to use LEXIS-NEXIS online retrieval system. This is a good example of the type of studies and projects Ms. Kline needs to perform, on a continuous basis, to receive an exceeds or outstanding performance rating. Vivian Mackey of the Office of Communications and Public Liaison implemented the procedure developed to ensure new publications are added to the publications database. Therefore Ms. Kline's recommendation was not considered but this had no impact on Ms. Kline's rating under element #1. The fact that Ms. Kline studied the "old and cold" regulations and found a regulation that had been finalized in 1992 was not considered under this element because it falls under element #4.

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials _JS_   **EXHIBIT**  _H_
            **PAGE**  _I_ OF _124_

Kline v. Springer
07-0451                    EEOC Case No.
                           _2006008_                    Page 76 of 127

Performance element #2 (page 2 of 4) reads "Assist the senior management analyst (PMG) in working with the Office of Communications and other OPM offices in managing, coordinating, reviewing, analyzing, and updating the OPM publications database, Visual Information System, Publications Inbox and FACA database." In this performance element, the term "publications" and the term "systems" is used. For clarification, the Publications In-Box is an email box used by the general public to make inquiries concerning OPM Publications. The Systems mentioned on the Performance Standards are data bases residing on OPM's computer system and one stand alone PC that feeds files to TV monitors in OPM's main lobbies. I did not rate Ms. Kline as "Exceeds Fully Successful" or "Outstanding" because her performance did not meet the standards for these ratings. The Publications in box was ignored on numerous occasions, telephones were unanswered, the publications database was not kept up to date and Ms. Kline failed to perform any duties related to the Federal Advisory Committee Act (FACA) database. The lack of the annual survey had no impact on Ms. Kline's rating. This task is the responsibility of another PMG employee. Ms. Kline only reviewed the publications database site while teleworking for approximately three months; however she failed to follow through on changes that were needed on the database. The notification procedure for notifying PMG of newly approved publications was initiated by the Office of Communications and Public Liaison. On April 7, 2005, Ms. Kline detected several publications that possibly should be included in the publications database. On April 18, 2005, she notified Mr. Coco that she needed to talk to him about those titles. As of May 19, 2005, she still had not talked to Mr. Coco about those titles. I can see Ms. Kline's point when she says it is inconsistent and contradictory of me to state "that the Publications in box and Publications database are not kept up to date," because I rated her as "Fully successful." I should have rated her lower than "Fully Successful."

Performance element #3 (page 3 of 4) reads "Develops and maintains responsible working relationships with supervisors, managers, fellow employees, customers, peers, and the general public." I did rate Ms. Kline as "Fully Successful" or above for this element because I continually receive calls from offices within the Publications Management Group asking that I keep Ms. Kline out of their work areas. Additionally, we have been asked by the Office of the Director to keep her out of the Director's suite. These requests are based upon Ms. Kline's habit of attempting to exceed her level of authority. I am aware of the incident that occurred in May 2005, in which Ms. Kline removed a water mark from a "Word" file; however ratings are based upon performance during the entire rating cycle. Although it would be considered during the review process, this incident would not impact an entire rating cycle. Under this element I considered the fact that the Division of Strategic Human Resources Policy (SHRP) requested her for a detail as well as Ms. Kline's deplorable working relationship within the PMG. Some of Ms. Kline's co-workers from the mail room, the print shop, and the printing procurement section have asked that Ms. Kline be kept out of their respective sections. Ms. Kline did assist Mrs. Arlene Taylor, the developer of the FRMS, by providing the data fields that were required. This listing of data fields was compiled by conferring with Mrs. Jackie Carter since Ms. Kline was in her first year at OPM. The FRMS was designed by Mrs. Taylor in Fiscal Year 2003 and was implemented in Fiscal year 2004, and as such would have been evaluated during those rating periods. Work

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials _____ / PAGE    3   OF    EXHIBIT H

Kline v. Springer .
07-0451

EEOC Case No.
__2006008__

Page 77 of 127

within the FRMS is considered under element #4, and has no impact of Ms. Kline's rating of "Minimally Successful" under element three.

Performance element #4 (page 4 of 4) reads "Assists in coordinating and preparing OPM's regulatory actions." I did not rate Ms. Kline as "Outstanding" for this element because I received input from Mrs. Jackie Carter, she is OPM's expert on the Federal Register and this input was taken into consideration. Additionally, I have found errors in her regulatory package preparation. Mrs. Carter has full responsibility for OPM's regulatory work and works on it full time. Ms. Kline acts as her assistant for regulatory work fifty percent of the time, and acts as Mr. Coco's assistant for all Publications Management work fifty percent of the time. I am not aware of the commendations Ms. Kline says she received from Mr. Joe Lackey of the Pay and Leave Administrative Group, OMB nor am I aware of the commendations Ms. Kline says she received from the Publishing Management Branch. Without actually viewing and evaluating these commendations I cannot say how they may have affected Ms. Kline's evaluation. I am not aware of the commendations Ms. Kline says she received from Jo Ann Perrini and Susan Beveridge of SHRP; either way they would most likely have had no impact on this rating. My main input under element #4 is received from Mrs. Jackie Carter. Mrs. Carter reviews every regulatory action that Ms. Kline handles, she is therefore, very aware of Ms. Kline's capabilities and shortcomings. Mrs. Carter continues to detect errors that Ms. Kline continues to make on regulations and fully supports the rating of "Exceeds Fully Successful."

To my knowledge, none of the other seven employees that I supervise have had any EEO activity. Robert Coco (White male), GS-13, Management Analyst, received an "Outstanding" on his FY2005 appraisal. I rated Jacqueline Carter (Black female), GS-13, Management Analyst, "Outstanding" for FY2005. Issac Evans (Black male), GS-13, Visual Information Specialist, was rated "Outstanding". Leon Brody (White male), GS-12, Librarian, was rated "Successful". I rated Miriam Johnson (Black female), GS-12, Lead Printing Services Specialist, "Outstanding". Shirley Sewell (Black female), Printing and Visual Arts Specialist, GS-11, was rated "Exceeds Fully Successful". Cassandra Thompson (Black female) was also rated as "Outstanding". Ms. Thompson is an XP08, Bindery Machine Operator.

On November 22, 2005, I provided Ms. Kline a copy of her performance appraisal while she was at her desk. She insisted on receiving a copy to review in order to be able to discuss with me at a later time. I told Ms. Kline here is a copy of this year's evaluation. Look it over and come and see me when you are ready to discuss. Ms. Kline came to my office door and said what good would it do to discuss as I would not change anything. I said to her that is not true. I was willing to listen to anything she had to say concerning her evaluation and would consider changing. Ms. Kline did not meet with me.

I was standing when I gave her the evaluation and she was sitting down, but I never looked down at her breast. This allegation is in no way true. It never happened and never will. I have never made any sexual advances towards Ms. Kline and never

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials W. D.    EXHIBIT H
PAGE 4 OF 26

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 78 of 127

will. Ms. Kline's race, sex, and prior EEO activity were not factors in my decision to rate Ms. Kline as "Fully Successful." And since I did not make any sexual advances towards Ms. Kline, this could not have been a factor in my decision, only her performance. I used to whistle in my office. I did this because and only because I was in a good/happy mood. I had to stop whistling as Ms. Kline complained that I was disturbing her work. I now, will occasionally hum or sing at a very low level to myself in place of the whistling. The humming and singing are merely a replacement for the whistling, when I am in a good/happy mood. It in no way is to attract attention to myself from Ms. Kline.

Ms. Kline submitted two requests to telecommute beginning in 2003. I do not remember the specific dates. I was the deciding official for these requests. I did not approve any of Ms. Kline's requests to telework. I did not approve Ms. Kline's request to telework because her position does not lend itself to telework as she needs to be in the office to assist Mr. Coco with the telephone and walk in customers. I do not recall Ms. Kline indicating the impact of my decision on her for not approving her request to telecommute.

Jacqueline Carter (Black female), GS-13, Management Analyst, with no prior EEO activity to my knowledge is approved to telecommute. Mr. Benedi approved Mrs. Carter's request to telework prior to my arrival at OPM. On January 6, 2004, I approved a renewal of Mrs. Carter's request to telecommute, this is an ongoing agreement. I allowed Mrs. Carter to continue to telework but reduced the number of days that she did telework. Mrs. Carter's request to telecommute was approved because her position lends itself to telework not due to sickness of her spouse. During our interview with Ms. Kline for her position, it was indicated that telework was a possibility. However, circumstances changed in the office and Ms. Kline's position description was revised to include duties other than the Federal Register. These duties require Ms. Kline to be in the office to perform them. No other employees have requested to telecommute. It has been made clear to all staff that our positions do not lend themselves to telework. No one else has requested to telework.

Ms. Kline's race, sex, or prior EEO activity were not factors in my decision to disapprove her request to telecommute. Ms. Kline's alleged rejections of my alleged sexual advances were not a factor in disapproving telework. In addition, I did not make any sexual advances towards Ms. Kline.

My employees are allowed to have personal and professional visitors with no restrictions. Arlene Taylor and I have a professional relationship. Our relationship is surrounding the development and execution of the Federal Register Management System. I do recall Ms. Taylor visiting with Ms. Kline on December 8, 2005. I saw Ms. Taylor talking to Ms. Kline on two separate occasions on December 8, 2005 for what seemed to be a long period of time. The full body of the email I sent to Mrs. Taylor is contained below.

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials ⟨⟩. ⟨⟩. EXHIBIT H
PAGE 5 OF 126

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 79 of 127

——Original Message——
From: Davis, William M
Sent: Thursday, December 08, 2005 4:04 PM
To: Taylor, Arlene L
Cc: Benedi, Claudio A; McElrath, Margaret A
Subject: Modifications to FRMS

Arlene:

Good afternoon!!!

I happened to notice that you were in our office twice today for a good amount of time. I then discovered that there are changes being made to FRMS. What changes?

The FRMS is the responsibility of PMG and as such no changes, other than technical should be made without explicit authorization from Claudio or me. Please let me know what the current issue is and how it will affect this office.

Thank you,

Bill Davis

I sent the above email to Mrs. Taylor, her supervisor, and my supervisor. I sent the email as I needed to know what was being done to the Federal Register Management System, why and under whose authority, as I am the responsible supervisor for this system. Mrs. Taylor has been allowed to visit with other employees under my supervision. Mrs. Taylor has visited with Mrs. Carter on several occasions to assist in navigation of the Federal Register Management System. These visits were allowed because Mrs. Carter kept me informed of the visits and their nature. Ms. Kline's statement that she told me that the visit on December 8, 2005, was not of a social nature, but that Ms. Taylor was showing her how to use an updated feature on the Federal Register Management System and that I accused her of not keeping me up to date regarding the conversion of the database is not correct. She did not keep me or Mr. Benedi informed. I did not forbid Ms. Kline from having future contact with Mrs. Taylor. I told Ms. McElrath that any future modifications to Team Track, the new software for the Federal Register Management System, must be requested by me or Mr. Benedi only. As to Ms. Kline having dealings with Mrs. Taylor, I told Ms. Kline that when having any further meetings with Mrs. Taylor on the update of Team Track that I and Mr. Benedi need to be informed prior to the meeting. Because I did not forbid Ms. Kline from having contact with Mrs. Taylor her ability to develop and maintain responsible working relationships with OPM offices; to perform a variety of special studies/staff reviews in support of the Publications Management Group; and to take initiative to perform staff studies/analysis of group procedures/operations has not been impacted.

I am at wits end with the constant accusations and harassment I am forced to endure from this employee. I look to your office for relief. I have nothing else to add to this statement.

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials _cd_ / EXHIBIT _H_
PAGE _6_ OF _126_

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 80 of 127

I have read and agree to this statement consisting of seven pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _William M. Davis_    Date: _6-15-2006_
                        William M. Davis

Investigators Signature: _Melba D. Vaughn_    Date: _6-15-2006_
                        Melba D. Vaughn

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Kline v. Springer
07-0451

EEOC Case No.
2006008

Initials _W._    EXHIBIT
                 PAGE ___ OF ___

Page 81 of 127

**ISSUE # 1 - on November 28, 2005, she received a "Fully Successful" performance appraisal for Fiscal Year 2005**

1. Noted her initiative in studying the "old and cold" regulations in ROCIS and found a regulation that had been finalized since 1992; was this fact considered when rating Ms. Kline under performance element No. 1 (page 1 of 4)? If not, what impact does this fact have on her rating of "fully successful?"

No, it was not considered under element No.1 as it falls under element number 4. This has no effect on her rating of fully successful for element 1.

2. Ms. Kline stated she recommended a review of the "old and cold" regulations be performed on a regular basis, and that although her suggestion yielded a favorable result it was not implemented, how do you respond to this statement?

This was not Ms. Kline's recommendation. This review was implemented in January 2003 due to 2 specific requests/notifications from Donna Bland of OMB. I was not aware that Ms. Kline was not following these documents.

3. Ms. Kline states her recommendation to use LEXIS-NEXIS online retrieval system was implemented and results in approximately $9,400 a year to the PMG; was this fact considered when rating Ms. Kline under performance element No. 1 (page 1 of 4)? If not, what impact does this fact have on her rating of "fully successful?"

Yes, this was considered. This is a good example of the type of studies and projects that Ms. Kline needs to perform, on a continuous basis, to receive an exceeds or outstanding.

4. Ms. Kline states she also recommended that a procedure be developed for ensuring that new publications are added to the publications database, which was implemented (email notifications from Office of Communications & Public Liaison); was this fact considered when rating Ms. Kline under performance element No. 1 (page 1 of 4)? If not, what impact does this fact have on her rating of "fully successful?"

No, this recommendation was not considered. It was not considered as this was actually a procedure developed and implemented by Vivian Mackey of the Office of Communications and Public Liaison. This has no impact on Ms. Kline's rating under element 1.

5. Specifically state why you did not rate Ms. Kline as "exceeds fully successful" or "outstanding" for element #1.

EXHIBIT ___H___
PAGE ___8___ OF ___136___

To be rated as exceeds fully or outstanding Ms. Kline would have had to initiate studies/analysis and/or have recommended changes that would have had to support major changes in the Publications Management Group. This needs to be a continuing effort, not just one or two items in a years time.

6.  Ms. Kline stated the annual survey was not conducted this past year; what impact did the annual survey have on your rating of "fully successful" under element No. 2 (page 2 of 4)?

The lack of the annual survey had no impact on Ms. Kline's rating. This task is the responsibility of another PMG employee.

7.  Ms. Kline states she was proactive in maintaining the publications database by making sure the database was updated whenever she learned of a new publication and by being instrumental in having a procedure implemented for notifying PMG of newly approved publications; what impact does this statement have on your rating of "fully successful" under element No. 2 (page 2 of 4)?

Ms. Kline only reviewed the site while teleworking for approximately three months; however she failed to follow through on changes that were needed on the database. The notification procedure was initiated by the Office of Communications and Public Liaison.

8.  Regarding element No. 2, Ms. Kline states that there was not a time that the Publications database was not kept up; how do you respond to this statement?

On April 7, 2005, Ms. Kline detected several publications that possibly should be included in the publications database. On April 18 she notified Bob Coco that she needed to talk to him about those titles. As on May 19, she still had not talked to Mr. Coco about those titles.

9.  Ms. Kline states it is inconsistent and contradictory of you to state "that the Publications in box and Publications database are not kept up to date," because she received a "fully successful" rating under this element; how do you respond to this statement?

I can see Ms. Kline's point concerning this issue. She should have been rated lower than fully successful.

10.  Specifically state why you did not rate Ms. Kline as "exceeds fully successful" or "outstanding" for element #2.

The Publications in box was ignored on numerous occasions, telephones were unanswered, the publications database was not kept up to date and Ms. Kline failed to perform any duties related to the FACA database.

EXHIBIT _____
PAGE ___9___ OF ___76___

11.  Pertaining to element 3, Ms. Kline states the fact that she was requested for a detail to SHRP (Mr. Benedi denied) is evidence of her having highly effective working relationships with external offices; was this fact considered when rating Ms. Kline under performance element No. 3 (page 3 of 4)?  If not, what impact does this fact have on her rating of "minimally successful?"

Yes, it was considered as well as Ms. Kline's deplorable working relationship within PMG.

12.  Also regarding element 3, Ms. Kline stated she was instrumental in developing, implementing, and maintaining the FRMS and her work on the FRMS should have been considered for this element; how do you respond to this allegation? What impact does this fact have on her rating of "minimally successful?"

Element 3 concerns working relationships and I see no clearcut way to evaluate this work under that element.  However, Ms. Kline did assist Mrs. Arlene Taylor, the developer of the FRMS, by providing the data fields that were required.  This listing of data fields was compiled by conferring with Mrs. Jackie Carter since Ms. Kline was in her first year here at OPM.  This system was designed by Mrs. Taylor in Fiscal Year 2003 and was implemented in Fiscal Year 2004, and as such would have been evaluated during those rating periods.  It is more correctly under element number 4 which is where I consider her work within the FRMS database.  This has no impact on Ms. Kline's rating of minimally successful.

13.  Are you aware of an incident in May 2005, in which Ms. Kline removed a water mark from a "Word" file that Issac Evans and Mr. Coco could not remove? Ms. Kline states this incident is evidence of her being proactive; what impact does this fact have on her rating of "minimally successful?" #3

Yes, I am aware of that incident.  Ratings are based upon performance during the entire rating cycle.  Although it would be considered during the review process, this incident would not impact an entire rating cycle.

14.  Specifically state why you did not rate Ms. Kline as "fully successful, "exceeds fully successful," or "outstanding" for element #3.

I continually receive calls from offices within the Publications Management Group asking that I keep Ms. Kline out of their work areas.  Additionally, we have been asked by the Office of the Director to keep her out of the Director's suite.  These requests are based upon Ms. Kline's habit of attempting to exceed her level of authority.

15.  Ms. Kline is alleging she received emails commending her from the Pay and Leave Administration Group, OMB (Mr. Joe Lackey), and the Publishing Management Branch; are you aware of these commendations?  If yes, was this

EXHIBIT
PAGE ___10___ OF ___126___

fact considered when rating Ms. Kline under performance element No. 4 (page 4 of 4)? If not, what impact does this fact have on her rating of "Exceeds Fully Successful?"

I am not aware of these commendations specifically. Without actually viewing and evaluating, I cannot say how they may have affected Ms. Kline's evaluation.

16. Ms. Kline is alleging she received commendations from Jo Ann Perrini and Susan Beveridge of SHRP; are you aware of these commendations? If yes, was this fact considered when rating Ms. Kline under performance element No. 4 (page 4 of 4)? If not, what impact does this fact have on her rating of "Exceeds Fully Successful?"

No, I am not aware of these commendations. Either way they would most likely have no impact. My main input under element number 4 is received from Mrs. Jackie Carter. Mrs. Carter reviews every regulatory action that Ms. Kline handles, she is therefore, very aware of her capabilities and shortcomings. Mrs. Carter continues to detect errors that Ms. Kline continues to make on regulations and fully supports the rating of Exceeds Fully.

17. Specifically state why you did not rate Ms. Kline as "outstanding" for element #4.

I received input under element number 4 from Mrs. Jackie Carter, she is OPM's expert on the Federal Register and this input was taken in to consideration. Mrs. Carter reviews every regulatory action that Ms. Kline handles, she is therefore, very aware of her capabilities and shortcomings. Mrs. Carter continues to detect errors that Ms. Kline continues to make on regulations and fully supports the rating of Exceeds Fully. Additionally, I have found errors in her regulatory package preparation.

18. Your response to question #12, only states the rating you gave Ms. Kline for each standard. Please explain why you rated her as you did for each standard. (Respond as if you were trying to convince a judge that you rated her fairly. Bearing in mind, a judge may not know anything about what you are talking about.)

To be rated as exceeds fully or outstanding for element 1, Ms. Kline would have had to initiate studies/analysis and have recommended changes that would have had to support major changes in the Publications Management Group this needs to be a continuing effort, not just one or two items in a years time. Pertaining to element 2, the Publications in box was ignored on numerous occasions, telephones were unanswered, the publications database was not kept up to date and Ms. Kline failed to perform any duties related to the FACA database. Pertaining to element 3, I continually receive calls from offices within the Publications Management Group asking that I keep Ms. Kline out of their work

EXHIBIT H
PAGE 11 OF 156

areas. Additionally, we have been asked by the Office of the Director to keep her out of the Director's suite. These requests are based upon Ms. Kline's habit of attempting to exceed her level of authority. I received input under element 4 from Mrs. Jackie Carter, she is OPM's expert on the Federal Register, and this input was taken into consideration. Mrs. Carter reviews every regulatory action that Ms. Kline handles, she is therefore, very aware of her capabilities and shortcomings. Mrs. Carter still detects errors that Ms. Kline continues to make on regulations and fully supports the rating of Exceeds Fully. Additionally, I continue to find errors in her package preparation.

19.  You made the statement, if Ms. Kline were more involved in assisting Mr. Coco much of the work he handles would gravitate her, describe what you meant by "would gravitate her (#17)." Element #1

Ms. Kline has stated several times that Bob is extremely busy and needs help. Ms. Kline has failed to assist Mr. Coco. In actively assisting Mr. Coco, the customers would become aware of Ms. Kline and would eventually get to know that she can/does assist them. In this, the customers would eventually start calling Ms. Kline directly and therefore the work would move/gravitate more to her.

20.  Specifically state why you did not rate Ms. Kline as "fully successful" or "outstanding" for element #1.

To be rated as exceeds fully or outstanding Ms. Kline would have had to initiate studies/analysis and/or recommended changes would have had to support major changes in the Publications Management Group this needs to be a continuing effort, not just one or two items in a years time.

21.  In comparing positions, please state the similarities and differences between Ms. Carters' and Ms. Kline's positions.

Mrs. Carter has full responsibility for OPM's regulatory work and works on it full time, Ms. Kline acts as her assistant for regulatory work (50%) and also acts as Mr. Coco's assistant for all Publications Management work (50%).

22.  Regarding the mid-year review, you said you provided Ms. Kline a copy of the review to discuss at a later date. Did you discuss the mid-year review, even though Ms. Kline would not sign it? If so, describe the content of the discussion.

I provided Ms. Kline a copy of the mid-year and told her to come and see me after she has had a chance to review. I attempted to discuss the evaluation with Ms. Kline but she insisted that it would do no good to discuss as I would not change anything. I told her that was not true, if she could convince me that I was wrong I would change her rating.

EXHIBIT H
PAGE 12 OF 126

23. What deadlines did she miss?

Some of the deadlines missed were: spreadsheet for salaries; available space evaluation for OPM Form 4150; review/analysis of current regulations and laws pertaining to printing; Federal Register survey of paper copy users; updating of publications database; and, Federal Register articles and Federal Register deliveries combined to save cost.

24. What is Mr. Coco's full name, title, grade, sex, and if known, state if he has prior EEO activity?

Robert T. Coco
Management Analyst
GS-343-13
Mr. Coco is a male
No EEO activity

25. Ms. Kline states that you frequently whistle, hum, or sing in your office and when passing her cubicle as an attempt to draw attention to your self; how do you respond to that statement?

I used to whistle in my office. I did this because and only because I was in a good/happy mood. I had to stop whistling as Ms. Kline complained that I was disturbing her work. I now, will occasionally hum or sing at a very low level to myself in place of the whistling. I can see no possible way Ms. Kline could hear this from my office. The humming and singing are merely a replacement for the whistling, when I am in a good/happy mood. It in no way is to attract attention to myself from Ms. Kline.

**ISSUE # 2 – from December 2003 to present, she was denied the opportunity go telework**

26. At any time from May 9, 2003, December 2003 to present, did Ms. Kline submit a request to telecommute? If yes, how many, when and were you the deciding manager for each request?

Yes, Ms. Kline did submit, I believe 2 requests. I do not remember the dates. I was the deciding official for these requests.

27. Ms. Kline alleges you were the deciding manager for each request, if this is correct did you approve Ms. Kline's request to telecommute?

Yes, I was the deciding manager and I did not approve Ms. Kline's request to telework.

EXHIBIT H
PAGE 73 OF 126

28. If you did not approve her request to telecommute, please explain your reason(s) for denying each request.

Ms. Kline's position does not lend itself to telework as she needs to be in the office to assist Mr. Coco with the telephone and walk in customers.

29. Do have any employees under your supervision that you approved for telecommuting from December 2003 to present? If yes, please provide the following information for each employee:

> Name, grade, title
> Sex
> Race
> Whether or not he or she has prior EEO activity
> Date of Approval

Jacquline D. Carter, GS-343-13, Management Analyst
Female
Black
No prior EEO activity
Approved January 6, 2004

30. Have you declined any other employee the opportunity to telecommute from December 2003 to present? If yes, please provide the following information for each employee:

> Name, grade, title
> Sex
> Race
> Whether or not he or she has prior EEO activity
> Date of Denial
> Reasons for Denial

No one else has requested to telework.

31. Has Ms. Kline described the impact of your decision to disapprove each of her telecommute request? If yes, please state specifically what she told you and your response.

Ms. Kline has not indicated any impact that I can remember.

32. Why is Ms. Carter allowed to telecommute?

Her position lends itself well to telework.

EXHIBIT H
PAGE 14 OF 121

33. Does Jackie Carter telecommute? Does she have an executed agreement? If yes, why was she allowed to telecommute? She alleges it was because of her husband became ill? How do you respond to that allegation?

Ms. Carter does telework and has an executed agreement in place. This was allowed as her duties lend themselves well to telework. Mr. Benedi approved Ms. Carter's telework prior to my arrival at OPM. I did allow her to continue to telework but reduced the number of days that she did telework. The telework was NOT approved due to sickness of her spouse but because her duties lend themselves to telework.

34. Did you tell her she would be able to telecommute if hired?

During our interview with Ms. Kline, it was indicated that telework was a possibility. However, circumstances changed in the office and Ms. Kline's position description was revised to include duties other than Federal Register. These duties require that Ms. Kline be in the office to perform them.

35. Was Ms. Kline's race a factor in your decision to disapprove each of her request to telecommute?

No, Ms. Kline's race was not a factor in disapproving telework.

36. Was Ms. Kline's sex a factor in your decision to disapprove each of her request to telecommute?

No, Ms. Kline's sex was not a factor in disapproving telework.

37. Was Ms. Kline's prior EEO activity a factor in your decision to disapprove each of her request to telecommute?

No, Ms. Kline's prior EEO activity was not a factor in disapproving telework.

38. Was Ms. Kline's alleged rejection of your alleged sexual advances a factor in your decision to disapprove each of her request to telecommute?

NO, Ms. Kline's alleged rejections of my alleged sexual advances were not a factor in disapproving telework. In addition, I did not make any sexual advances towards Ms. Kline.

**ISSUE 3: on approximately December 12, 2005, my supervisor sent individuals an email and expressed displeasure over a visitor I received.**

39. Are employees you supervise, allowed to have visitors for personal reasons?

EXHIBIT
PAGE 15 OF 12

Yes, my employees are allowed to have personal visitors.

40. Are employees you supervise, allowed to have visitors for professional reasons?

Yes, my employees are allowed to have visitors for professional reasons.

41. Do you know Arlene Taylor? If yes, describe your relationship with her?

Yes, I do know Arlene Taylor. My relationship is for professional reasons surrounding the development and execution of the Federal Register Management System.

42. Do you recall witnessing a visit from Ms. Taylor to Ms. Kline on or about December 12, 2005? If so, describe in detail how you responded to the visit.

Yes, I do recall the visit Mrs. Taylor made to our office on December 8, 2005. I saw Mrs. Taylor talking to Ms. Kline on 2 separate occasions December 8 for what seemed to be a long period of time. The full body of the email I sent to Mrs. Taylor is contained below.

-----Original Message-----
From: Davis, William M
Sent: Thursday, December 08, 2005 4:04 PM
To: Taylor, Arlene L
Cc: Benedi, Claudio A; McElrath, Margaret A
Subject: Modifications to FRMS

Arlene:

Good afternoon!!!

I happened to notice that you were in our office twice today for a good amount of time. I then discovered that there are changes being made to FRMS. What changes?

The FRMS is the responsibility of PMG and as such no changes, other than technical should be made without explicit authorization from Claudio or myself. Please let me know what the current issue is and how it will affect this office.

Thank you,

Bill Davis

43. Did you send emails to Margaret McElrath, Arlene Taylor's supervisor, and Ms. Taylor regarding that visit? If yes, state why and the contents of that email.

Yes, I sent the above email to Mrs. Taylor, her supervisor and my supervisor. I sent the email as I needed to know what was being done to the Federal Register Management System, why and under whose authority, as I am the responsible supervisor for this system.

EXHIBIT
PAGE 16 OF 26

44. Has Ms. Taylor been allowed, to visit with other employees under your supervision? If so, and for what reasons did you allow the visit?

Yes, Mrs. Taylor has been allowed to visit with other employees under my supervision. Mrs. Taylor has visited with Mrs. Carter on several occasions to assist in navigation of the Federal Register Management System. These were allowed because Mrs. Carter kept me informed of the visits and their nature.

45. Ms. Kline stated when she told you that the visit was not of a social nature, but that Ms. Taylor was showing her how to use an updated feature on the FRMS, you accused her of not keeping you up to date regarding the conversion of the database. How do you respond to this allegation?

Ms. Kline is not correct she did not keep me nor Mr. Benedi informed.

46. Ms. Kline alleges you forbade her to have any future contact with Arlene Taylor, without prior permission from him or Mr. Benedi. How do you respond to this allegation?

This is not true. I told Mrs. McElrath that any future modifications to Team Track, the new software for the Federal Register Management System, must be requested by me or Mr. Benedi only. As to Ms. Kline having dealings with Mrs. Taylor, I told Ms. Kline that when having any further meetings with Mrs. Taylor on the update of Team Track that I and Claudio need to be informed prior to the meeting.

47. If the above statement is true, how does this affect Ms. Kline's ability to 1) develop and maintain responsible working relationships with OPM offices; 2) perform a variety of special purpose studies/staff reviews in support of the Publications Management Group; and 3) to take initiative to perform staff studies/analysis of group procedures/operations (sic)?

The statement was not true.

48. Are employees under your supervisor, allowed to receive visitors? If yes, please describe any restrictions that may apply to office visitors.

Yes, all employees under my supervision are allowed to have visitors with no restrictions.

49. Do you have any additional comments?

I have no additional comments.

EXHIBIT H
PAGE 17 OF 24

# PROGRESS REVIEW CERTIFICATION

A progress review will be held for each employee midway through the performance cycle. At that time, employees shall be informed of their level of performance by comparison with the performance elements and standards established for their positions.

*Valerie Kline*      *Management Analyst*
**Employee's Name, Position Title**

*GS-343-12*      *CCFAS/PMG/PSB*
**Series, Grade, Organization**

| ☐ Review indicates performance above the Fully Successful level. | ☒ Review indicates performance at the Fully Successful level. | ☐ Review indicates performance below the Fully Successful level. |

**Supervisor's Comments:** *Valerie needs to work on being a team player, improving her attitude, have better attention to detail and follow through on assigned projects. Working relationships need to improve as they appear to be deteriorating. Federal Register work is good but some errors are still present you are learning at an acceptable rate.*

*William W. Rain*
**Supervisor's Signature**

*4-26-2005*
**Date Signed**

**Employee's Comments:**

*Employee refused to sign*
**Employee's Signature**
*WD.*
*5-12-2005*

**Date Signed**

**NOTE:** *Supervisors and employees must also sign block II of OPM Form 1459-B at the time this document is signed to certify that the review took place.*

**REPRODUCE LOCALLY  OPM Form 1618**
**July 1992**

EXHIBIT H
PAGE 60 OF 134

# PROGRESS REVIEW CERTIFICATION

A progress review will be held for each employee midway through the performance cycle. At that time, employees shall be informed of their level of performance by comparison with the performance elements and standards established for their positions.

*Valerie Kline*                    *Management Analyst*
**Employee's Name,  Position Title**

*GS-343-12*                        *CCFAS/PMG/PSB*
**Series,  Grade,  Organization**

☐  **Review indicates**        ☒  **Review indicates**        ☐  **Review indicates**
    performance above               performance at the             performance below
    the Fully Successful level.     Fully Successful level.        the Fully Successful level.

**Supervisor's Comments:** *Valerie needs to work on being a team player, improving her attitude, have better attention to detail and follow through on assigned projects. Working relationships need to improve as they appear to be deteriorating. Federal Register work is good but some errors are still present you are learning at an acceptable rate.*

*/William W. Davis*                         *4-26-2005*
**Supervisor's Signature**                  **Date Signed**

**Employee's Comments:**

*Employee refused to sign*
**Employee's Signature**                    **Date Signed**
                    *WD.*
                    *5-12-2005*

*NOTE:  Supervisors and employees must also sign block II of OPM Form 1459-B at the time this document is signed to certify that the review took place.*

REPRODUCE LOCALLY  OPM Form 1618
July  1992

*Supports #14*

Kline v. Springer                EEOC Case No.
07-0451                          2006008

**Davis, William M**

From: Davis, William M
Sent: Tuesday, July 26, 2005 7:28 AM
To:    Kline, Valerie

Since you are here so early clear the Publications in box as you should be doing every day.

started at 7:00 sitting doing nothing
with 3 e mails in the Publications
in - box.
Had to remind again.

Supports question 15

EXHIBIT
PAGE 093 OF 126

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 94 of 127

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Tuesday, May 24, 2005 8:37 AM |
| **To:** | Kline, Valerie |
| **Cc:** | Fowlkes, Malcolm F |
| **Subject:** | Federal Register |

Valerie:

I am still seeing stacks of Federal Registers in the trash bins. What is the status of our change?

Bill

*Failed to follow through.*

5/24/2005
Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 95 of 127

EXHIBIT
PAGE 63 OF 126



**United States**
# Office of
## Personnel Management

Washington, DC 20415-0001

In Reply Refer To: **MAY 2 4 2005** Your Reference:

MEMORANDUM FOR VALERIE KLINE
       Management Analyst
       Publishing Services Branch

FROM:    **WILLIAM DAVIS**
       Branch Chief
       Publishing Services Branch

SUBJECT:   Memorandum of Instruction

The Publishing Services Branch (PSB) is responsible for providing a wide range of services pertaining to printing and publication for the entire agency. In doing so, we all are responsible for developing and maintaining a good working relationship with our customers. Providing good customer service is vital in carrying out the mission of this office. For the PSB staff, it is imperative that we provide timely and accurate assistance to all callers. This ensures that this office achieves its mission of providing a wide range of publications/publishing services to our customers. To carry out this mission, you are tasked with ensuring that calls on the main office line are answered and adequate assistance is provided to all of our customers. In addition, you are to regularly check the office voice mail and provide assistance to the caller when possible or forward the customer to the appropriate specialist.

If you have any questions concerning these assignments please discuss them with me.

Please sign and date this memorandum. Your signature acknowledges your receipt.

*Valerie Kline*       5-24-05  8:30am
Signature          Date

EXHIBIT H
PAGE 64 OF 127 CON 114-24-3
          July 1995

For the record
May 20, 2005

As I left the room at 8:30 am the main line (1822) started to ring. Valerie was the only one left in the office. I returned within 1 minute and there was a message on the answering machine. The message was left at 8:30. Valerie did not answer the phone. This is the 2nd time I have witnessed this.

Kline v. Springer
07-0451

EEOC Case No.
2006008

EXHIBIT   H
PAGE 65   OF 126

Page 97 of 127

Memo to the file
May 20, 2005

Just spoke to Valerie concerning the message that was left on the answering machine and her failure to answer the phone. She says she is not answering the phone anymore as it is not in her PD.

*This performance is unacceptable.*

*verbatto Valerie + copy*

*5-24-2005*

Kline v. Springer
07-0451

EEOC Case No.
2006008

EXHIBIT       H
PAGE  66  OF  126

Page 98 of 127

Davis, William M

| | |
|---|---|
| **From:** | Coco, Robert T |
| **Sent:** | Thursday, May 19, 2005 5:14 PM |
| **To:** | Davis, William M |
| **Subject:** | FW: Publications Database |

FYI – Obviously, Valerie did send me this but we haven't talked directly about it since. I guess we both sort of forgot about it. Oh, well. Anyway, I'll make a point of discussing them with her in the next couple of days or so and decide whether they should go in the Database or not.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Monday, April 18, 2005 10:19 AM
**To:** Davis, William M; Coco, Robert T
**Subject:** Publications Database

Bill,

These are some other items I found that we might want to include in the publications database. I mentioned to Bob that I wanted to meet with him concerning these items. He was very busy last week but hopefully we will have a moment to this week.

Personal Property Management Handbook

Public Space and Room Reservations Guidelines

Accounting for Internal Use Software

Offset of Health Benefit Premiums

OPM's Management Control Program

Collection and Payment Advances

Financial Policy Issuances

Labor Cost System

Financial Information Bulletin

Role of Special Counsel (do we want Financial Policy Directives in our Pubs database?)

~~Family Emergency Guide~~ (done)

Veterans Employment

EXHIBIT  H
PAGE  101  OF  126

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Thursday, May 12, 2005 8:17 AM |
| **To:** | Davis, William M |
| **Cc:** | Benedi, Claudio A; Benton, Sherman W |
| **Subject:** | RE: Salaries for 2005 updated |

Bill,

I'm sorry you have had to wait for 2 days. As you know, Jackie was out on Tuesday and it was extremely busy. I was not even able to leave the office or a lunch break and had to eat at my desk because of urgent regulatory items. Then yesterday I didn't receive your email until a few minutes before you walked out the door.

I wish you wouldn't exhibit such a poor attitude. I am right next to your office. You can call me into your office <u>any time you want</u>. I really feel that you are <u>looking</u> for things to complain about, especially when it's something petty like this. You asked to see me 1 hr 15 min before I was scheduled to arrive for work; you have been very busy in meetings as well. You said before the budget isn't due but you just wanted to have it ready for the next budget call so I really don't see what the problem is.

I actually don't even see a need to respond to your email since I told you "I am available any time it's convenient for you." However, I am responding because I want to say that this type of attitude makes it difficult to work since it creates a hostile environment.

Valerie

> ——Original Message——
> **From:** Davis, William M
> **Sent:** Thursday, May 12, 2005 6:29 AM
> **To:** Kline, Valerie
> **Subject:** RE: Salaries for 2005 updated
>
> Now, I have been waiting for 2 days.
>
> ——Original Message——
> **From:** Kline, Valerie
> **Sent:** Wednesday, May 11, 2005 3:56 PM
> **To:** Davis, William M
> **Subject:** RE: Salaries for 2005 updated
>
> OK I just now received this email…I am available any time its convenient for you.
>
> ——Original Message——
> **From:** Davis, William M
> **Sent:** Wednesday, May 11, 2005 2:35 PM
> **To:** Kline, Valerie
> **Subject:** FW: Salaries for 2005 updated

EXHIBIT H
PAGE 68 OF 126

5/12/2005

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 100 of 127

**Davis, William M**

From:     Kline, Valerie
Sent:     Friday, April 22, 2005 10:18 AM
To:       Davis, William M
Subject:  WG tables

I don't see them on OPM's Pay and Leave site.

*Valerie should have pursued as she did 5-2 and inserted the WG salary*

5/11/2005  Kline v. Springer
07-0451

EEOC Case No.
2006008

EXHIBIT
PAGE ___ OF ___

Page 101 of 127

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Friday, April 22, 2005 2:57 PM |
| **To:** | Davis, William M |
| **Subject:** | Salaries for 2005 updated |

I have updated the subject chart as you requested with exception to the WG rate for Calvin.  I sent you a note this morning informing you that I couldn't find the table for the WG rates but since I didn't hear back from you, I could not revise this field.  I would be happy to insert the information once you furnish it to me when I return to the office on May 2.

EXHIBIT H
PAGE 70 OF 126

5/11/2005
Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 102 of 127

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Wednesday, April 06, 2005 9:44 AM |
| **To:** | Davis, William M |
| **Subject:** | RE: miriam is holding on #22 |

Why don't you cut me some slack. She wanted to hold. You were on the phone. As soon as you were off the phone I notified you that she was holding. You told me you had already talked to her so obviously you saw my email and called her. You need to get off my case. Answering the phone is not one of my main duties. I do it to help out. If you find my help is inadequate, perhaps we need to hire a secretary.

————Original Message————
**From:** Davis, William M
**Sent:** Wednesday, April 06, 2005 9:41 AM
**To:** Kline, Valerie
**Subject:** RE: miriam is holding on #22

Just saw your email. As I have told you before this is not an acceptable method of telling anyone they have a phone call.

————Original Message————
**From:** Kline, Valerie
**Sent:** Wednesday, April 06, 2005 9:26 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

## Davis, William M

**From:** Kline, Valerie
**Sent:** Tuesday, January 18, 2005 8:53 AM
**To:** Davis, William M
**Subject:** RE:

Actually you're incorrect as I have been reading some email pertaining to the regulatory work—back and forth comments from OMB to the program office. But I will take a look at the mailbox. Is Bob coming in today?

-----Original Message-----
**From:** Davis, William M
**Sent:** Tuesday, January 18, 2005 8:51 AM
**To:** Kline, Valerie
**Subject:**

You appear to not be busy.  Take care of the Publications inbox.

1 ½ Hours ?

Arrived @ 7:30. Had to remind Valerie again.

## Davis, William M

**From:**    Kline, Valerie
**Sent:**    Monday, January 10, 2005 8:59 AM
**To:**    Davis, William M
**Subject:**  RE: Federal Register

I sent a note to her asking about it, forwarded your email as well, and she hasn't responded.  I will ask her again.

> ——Original Message——
> **From:** Davis, William M
> **Sent:** Monday, January 10, 2005 8:58 AM
> **To:** Kline, Valerie
> **Subject:** FW: Federal Register
>
> I am still waiting for the progress report.  Status?
>
> Thank you,
>
> Bill
>
> ——Original Message——
> **From:** Davis, William M
> **Sent:** Tuesday, December 21, 2004 8:48 AM
> **To:** Kline, Valerie
> **Subject:** Federal Register
>
> Valerie:
>
> Please check on the status of Sheila's survey and approximate completion date.
>
> Thanks,
>
> Bill

*11 work days*
*x to follow-up and I asked*
*no initiative no concern for completion date.*

1/10/2005  Springer
07-0451

EEOC Case No.
2006008

EXHIBIT
PAGE  73 OF 126
Page 105 of 127

**Davis, William M**

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Tuesday, December 28, 2004 6:21 AM |
| **To:** | Kline, Valerie |
| **Cc:** | Benedi, Claudio A |
| **Subject:** | Publications Inbox |

Please direct your attention to the Publications Inbox. It has several emails dating back to December 23 that have not been replied to. I accidently caused 2 to show as read they are contained within the group of 9 that still show as unread. Handle asap.

This mail box, as I have stated previously, must be kept up to date.

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Thursday, February 10, 2005 8:37 AM |
| **To:** | Kline, Valerie |
| **Subject:** | RE: miriam is holding on #22 |

This is no way to let me know that someone is holding on the phone.  Either call me or pop your head in the ofice.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Thursday, February 10, 2005 8:32 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

2/10/2005
Wendy J Springer
07-0451

EEOC Case No.
2006008

EXHIBIT H
PAGE 75 OF 127

Page 107 of 127

For the record

December 6, 2004

Claudio informed me that the day I was off December 1, 2004, Valerie asked to meet with him. She wanted to discuss with him an assignment I had given her on November 29 or 30.

The assignment was to reduce the number of Federal Register hard copies we receive in OPM on a daily basis and wind up in the trash. Valerie asked if possible we could not combine delivery of FR articles with the pickup of the printed FR thus saving time and money.

I told her to gather the facts and talk with Sheila about combining the 2 pickups and deliveries and report her findings to me.

As of today she has not discussed her findings with me nor provided any report on progress even though she has met with Claudio who was not even aware of the assignment.

Case 1:07-cv-00451-JR     Document 23-3     Filed 02/04/2008     Page 45 of 69.

Page 1 of 1

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Friday, April 08, 2005 12:43 PM |
| **To:** | Evans, Issac S.; Carter, Jacquline D; Kline, Valerie; Coco, Robert T |
| **Subject:** | Lunch time |

We seem to be miscommunicating. We all have our lunch slots and should be adhereing to them as closely as possible. The room was empty today when I returned from lunch early.

With 4 of us here this should not happen.

I appreciate your cooperation in ensuring that the office is covered. If your assigned lunch time is a problem lets talk otherwise please stick to the schedule we have established.

Thank you,

Bill

Valerie went at 12:30 instead of
11:30. Issac I have no idea.
Bob + Bill went 5-10 mins. early
and Jackie went on time.
Sent to all as a reminder especially
Valerie as this is a continuing problem.

Supports question 17

EXHIBIT H
PAGE 77 OF 10k

4/8/2005
Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 109 of 127

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Wednesday, May 25, 2005 2:32 PM |
| **To:** | Davis, William M; Benedi, Claudio A |
| **Cc:** | Benton, Sherman W |
| **Subject:** | Memo to the file |

With regard to your Memo to the File dated May 20, 2005, that you gave to me on May 24, 2005, I believe the date is a typo since I was telecommuting on 5/20/05. You asked me about a telephone call that that was left on the main telephone line on the morning of May 24, 2005. In response to your question, "why didn't you answer the telephone?" I asked you if you had read my Memo to the File re: *Comments on Progress Review Certification* dated May 17, /2005. You stated that you did not read it and I informed you that I addressed in that memo my intentions concerning answering the main telephone number. Your response to me was, "You will answer the telephone!" In response, I did not state that I would not answer the telephone but only that the responsibility was not in my position description or in my performance standards. You said that if we needed to, you would take it to task so I said "ok" and that I thought it was an issue that needed to be addressed. Following this discussion, I received your Memorandum of Instruction and I have been answering the telephones as you instructed.

EXHIBIT ___H___
PAGE ___78___ OF ___126___

**Davis, William M**

**From:** Davis, William M
**Sent:** Tuesday, July 26, 2005 7:28 AM
**To:** Kline, Valerie

Since you are here so early clear the Publications in box as you should be doing every day.

*started at 7:00 sitting doing nothing with 3 e mails in the Publications in - box.*
*Had to remind again.*

Kline v. Springer
07-0451

EEOC Case No.
2006008

EXHIBIT H
PAGE 137 OF 151

Page 111 of 127



**United States
Office of
Personnel Management**    Washington, DC 20415-0001

In Reply Refer To:    **MAY 2 4 2005**    Your Reference

MEMORANDUM FOR VALERIE KLINE
                Management Analyst
                Publishing Services Branch

FROM:           WILLIAM DAVIS
                Branch Chief
                Publishing Services Branch

SUBJECT:        Memorandum of Instruction

The Publishing Services Branch (PSB) is responsible for providing a wide range of services pertaining to printing and publication for the entire agency. In doing so, we all are responsible for developing and maintaining a good working relationship with our customers. Providing good customer service is vital in carrying out the mission of this office. For the PSB staff, it is imperative that we provide timely and accurate assistance to all callers. This ensures that this office achieves its mission of providing a wide range of publications/publishing services to our customers. To carry out this mission, you are tasked with ensuring that calls on the main office line are answered and adequate assistance is provided to all of our customers. In addition, you are to regularly check the office voice mail and provide assistance to the caller when possible or forward the customer to the appropriate specialist.

If you have any questions concerning these assignments please discuss them with me.

Please sign and date this memorandum. Your signature acknowledges your receipt.

_Valerie Kline_                    _5-24-05_    _8:30am_
Signature                          Date

EXHIBIT
PAGE   80  OF  126   OPM 114-24-3
                          July 1996

For the record
May 20, 2005

As I left the room at 8:30 am the main line (1822) started to ring.  Valerie was the only one left in the office.  I returned within 1 minute and there was a message on the answering machine.  The message was left at 8:30.  Valerie did not answer the phone.  This is the 2nd time I have witnessed this.

Kline v. Springer
07-0451

EEOC Case No.
2006008

EXHIBIT        H
PAGE    81   OF  126

Page 113 of 127

Memo to the file
May 20, 2005

Just spoke to Valerie concerning the message that was left on the answering machine and her failure to answer the phone. She says she is not answering the phone anymore as it is not in her PD.

*This performance is unacceptable.*

*verbatto Valerie copy*
*5-24-2005*

EXHIBIT
PAGE 82 OF 126

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 114 of 127

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Wednesday, April 06, 2005 9:44 AM |
| **To:** | Davis, William M |
| **Subject:** | RE: miriam is holding on #22 |

Why don't you cut me some slack. She wanted to hold. You were on the phone. As soon as you were off the phone I notified you that she was holding. You told me you had already talked to her so obviously you saw my email and called her. You need to get off my case. Answering the phone is not one of my main duties. I do it to help out. If you find my help is inadequate, perhaps we need to hire a secretary.

———Original Message———
**From:** Davis, William M
**Sent:** Wednesday, April 06, 2005 9:41 AM
**To:** Kline, Valerie
**Subject:** RE: miriam is holding on #22

Just saw your email. As I have told you before this is not an acceptable method of telling anyone they have a phone call.

———Original Message———
**From:** Kline, Valerie
**Sent:** Wednesday, April 06, 2005 9:26 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

EXHIBIT
PAGE ___83___ OF ___126___

Page 1 of 1

Davis, William M

**From:** Kline, Valerie
**Sent:** Tuesday, January 18, 2005 8:53 AM
**To:** Davis, William M
**Subject:** RE:

Actually you're incorrect as I have been reading some email pertaining to the regulatory work—back and forth comments from OMB to the program office. But I will take a look at the mailbox. Is Bob coming in today?

1 1/2 Hours ?

————Original Message————
**From:** Davis, William M
**Sent:** Tuesday, January 18, 2005 8:51 AM
**To:** Kline, Valerie
**Subject:**

You appear to not be busy. Take care of the Publications inbox.

*Arrived at 7:30. Had to remind Valerie again.*

EXHIBIT
PAGE ___ OF ___

## Davis, William M

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Monday, January 10, 2005 8:59 AM |
| **To:** | Davis, William M |
| **Subject:** | RE: Federal Register |

I sent a note to her asking about it, forwarded your email as well, and she hasn't responded.  I will ask her again.

———Original Message———
**From:** Davis, William M
**Sent:** Monday, January 10, 2005 8:58 AM
**To:** Kline, Valerie
**Subject:** FW: Federal Register

I am still waiting for the progress report.  Status?

Thank you,

Bill

———Original Message———
**From:** Davis, William M
**Sent:** Tuesday, December 21, 2004 8:48 AM
**To:** Kline, Valerie
**Subject:** Federal Register

Valerie:

Please check on the status of Shella's survey and approximate completion date.

Thanks,

Bill

*11 work days*
*X1c follow-up and I asked*
*no initiative no concern for completion date.*

EXHIBIT H
PAGE 85 OF 126

**Davis, William M**

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Tuesday, December 28, 2004 6:21 AM |
| **To:** | Kline, Valerie |
| **Cc:** | Benedi, Claudio A |
| **Subject:** | Publications Inbox |

Please direct your attention to the Publications Inbox. It has several emails dating back to December 23 that have not been replied to. I accidently caused 2 to show as read they are contained within the group of 9 that still show as unread. Handle asap.

This mail box, as I have stated previously, must be kept up to date.

EEOC Case No.
2006008

EXHIBIT
PAGE   86   OF   126

Page 118 of 127

## Davis, William M

**From:** Davis, William M
**Sent:** Thursday, February 10, 2005 8:37 AM
**To:** Kline, Valerie
**Subject:** RE: miriam is holding on #22

This is no way to let me know that someone is holding on the phone.  Either call me or pop your head in the office.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Thursday, February 10, 2005 8:32 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

EXHIBIT
PAGE___87_ OF _126

2/10/2005 Springer
07-0451

EEOC Case No.
2006008

Page 119 of 127

## SUPPLEMENTAL AFFIDAVIT FOR WILLIAM M. DAVIS

I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties. This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

1. Please explain why Jacqueline Carter's position lends itself to telework and why Valerie Kline's does not.

Ms. Kline's position has multiple tasks. Half or less of her 9 hour workday is spent working on Regulatory Issuances, and the other half or more is spent assisting Robert Coco, answering telephones, and assisting walk-in customers. Ms. Carter's sole duty is to work on the Regulatory Issuances and associated duties. Because Ms. Kline is needed to assist Mr. Coco, assist walk-in customers and answer telephones these duties cannot be performed while on telework.

I have read and agree to this statement consisting of one page. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _William M. Davis_ Date: _7-17-2006_
William M. Davis

Investigators Signature: _Melba D. Vaughn_ Date: _7/17/2006_
Melba D. Vaughn

AFFIDAVIT William Davis
OPM EEO Case No. 2006008

Initials _____ EXHIBIT PAGE _127_ OF _127_

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 120 of 127



United States
# Office of
# Personnel Management

Washington, DC 20415-0001

In Reply Refer To:                                    Your Reference:

Memo to Bill Davis                                              May 9, 2003

From: Valerie Kline *Valerie Kline*

Subject: Telecommute Request

When I interviewed for the position in the Publishing Management Branch, as a selling point for getting me to accept the position, you indicated that I would be able to telecommute after I grew "know the people". I then informed you on or around March 19, 2003, that I now believe I "know the people" I need to know in order to perform my work. Therefore, I thought it would be best to make an official request.

Attachment

EXHIBIT  G
PAGE  64  OF  85          CON 114-24-3
July 1995

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page 121 of 127

## APPENDIX D

| REQUEST TO TELECOMMUTE |
|---|

**Employee's Name:** Valerie Kline | **Date of Request** 5/9/03

**Employee's First Line Supervisor:** William E. Davis

**Employee's Organization:** Contracting Facilities and Administrative Services Group

**I certify that my current work performance is at least Fully Successful (initial):** _vk_

| **Proposed Start Date** 6/01/03 | **No of Days at Alternate Worksite:** 3 days per pay period | **Alternate Worksite (circle one)** Telecenter Or **Home** |
|---|---|---|

| **Address of Alternate Worksite:** 83 E Street, Lothian MD 20711 | **Phone # of alternate worksite** 301.574.4326 | **Fax # of alternate worksite** 301.574.5463 |
|---|---|---|
| | **Circle days in office:** M T **W** Th **F** | **E-mail of alternate worksite** klinevalerie@aol.com |

**Work assignment, communication methods, and work reporting:**

Perform regulatory work including but not limited to review of Federal Register notices, rules, and regulations; input of data into ROCIS; preparation of spring and fall agendas, etc.

Communications will be done via telephone and/or one or more of the following: home computer, blackberry; and/or cell phone.

I will be available at all times during working hours for reporting to my supervisor and communicating with others via blackberry and/or cell phone.

I understand that if approved this agreement is subject to all guidelines, rules and regulations identified in Chapter 368, Telecommuting, of the Human Resources Handbook.

**Employee's Signature:** _Valerie Kline_     **Date:** 5/9/03

☐ Approved ☒ Disapprove (If disapprove, indicate reason below.)

**Supervisor's Signature: Date:** _William M. Davis_     5-12-2003

EXHIBIT __G__
PAGE __65__ OF __85__

Disapproved per Subchapter 2 CPM Policy Telework.
Paragraph 2-3 (b). Copy attached.
Employee started ~~08·16~~ early.
Additionally, employee is needed to assist with 4 week-in customers
Employee may submit another request after Sept. 2003 if desired.

**Request to Terminate Agreement**

| Name of individual requesting termination of agreement: | Reason for termination of agreement - attach additional sheet if needed (2 weeks notice must be given when terminating an agreement) |
|---|---|
| | |
| Circle one : Supervisor or Telecommuter | Effective Date of Termination: |

EXHIBIT _G_
PAGE _66_ OF _85_

# SUBCHAPTER 2. OPM POLICY

### 2-1. Policy

a. The Office of Personnel Management supports the full range of telecommuting options. All organizations will be covered by the provisions of this policy. OPM's telecommuting program is voluntary. It is an option that may be used to assist in the effective and efficient accomplishment of agency business.

—b. Telecommuting as used in this chapter allows OPM employees to work at alternative worksites as part of their regular tour of duty, either at home or at a telecenter.

c. Telecommuting should not be confused with home-based, employee owned businesses or independent contracting or consulting arrangements in the home. In most cases, the employee's official duty station remains the telecommuters current traditional Federal office regardless of where the work is actually performed.

d. Employees approved to telecommute as a reasonable accommodation are not necessarily subject to all provisions of this chapter. The employee's "Alternative Worksite Work Agreement" will note the provisions of this chapter to which the employee must adhere.

### 2-2. Benefits

OPM believes the telecommuting program provides benefits for all parties.

♦ Telecommuting helps OPM to recruit and retain skilled and valuable employees.

♦ Telecommuting helps employees reduce commuting time, increase their flexibility to balance work and family needs and reduce their expenses for transportation, food and clothing.

♦ Telecommuting helps the community by reducing traffic congestion and air pollution.

♦ Telecommuting may help reduce the costs associated with office space.

### 2-3. Guidance for Approving Requests to Telecommute

a. Under OPM's telecommuting program supervisors will approve, disapprove or discontinue telecommuting arrangements on a case-by-case basis. The form, Request to Telecommute, is in Appendix D of this Chapter. This form must be used to request telecommuting arrangements. Approval or disapproval of telecommuting requests must also be documented on this form.

OPM Human Resources Handbook                                    January 2001

EXHIBIT     G
PAGE  67  OF  85

368-4

Employees must complete the form and submit it to the supervisor. The supervisor will return the form to the employee within five (5) business days, whenever possible.

b. Employees who are approved for telecommuting should be able to manage workloads with minimum supervision. Telecommuting is not appropriate for employees who are performing at less than the "fully successful" level. Generally, telecommuting will not be appropriate for new employees, e.g., employees who need to be in the office to learn the organization, employees who require on-the-job training, etc.

*1 year emp. 5-12-2003*

c. Telecommuters should have work assignments that require minimum personal interface with co-workers and customers. The work should be measurable in terms of results and outcomes. The employees' current performance standards will be used to govern all telecommuting assignments as well as those in the telecommuters current traditional Federal office. All government records, which may include files, references and databases, should be transferable to the alternative worksite or available through some form of technology. The telecommuting agreement must identify specific items (phone, computer, fax, data, etc) needed to complete assignments at the alternate worksite. In addition, the agreement must include types of work assignments to be accomplished and means of communication with the employee when telecommuting (phone, fax, email, etc). *[NOTE: Classified data may not be taken to alternative worksites. Privacy Act and sensitive non-classified data may be taken to alternative worksites if necessary precautions are taken to protect the data.]*

d. Employees who regularly telecommute should be scheduled to come into the office for at least one day a week or as required by the supervisor. However, there are exceptions to this guideline which include, but are not limited to, when an employee is injured or has a disability that temporarily limits mobility.

e. Supervisors should consider the effect of telecommuting on all employees in the work unit, especially if it means there are fewer employees in the office to handle customer requests. Supervisors and telecommuters must be able to establish effective lines of communication. The supervisor and/or employee may terminate the telecommuting agreement at anytime. In the event that a telecommuting agreement is terminated, employees should be given one pay period to transition back to the current traditional Federal office.

f. The Partnership and Employee Services Division of the Office of Human Resources and EEO is available to assist supervisors with any disputes which arise from the termination of a telecommuting agreement. Employees may contact the agency telecommuting coordinator in the Office of Human Resources and EEO if there are any concerns regarding a telecommuting request or agreement.

In addition, bargaining unit employees may contact their respective union officials regarding disputes which arise from the denial of a telecommuting request or the termination of a telecommuting agreement. Bargaining unit employees may also discuss concerns regarding a

OPM Human Resources Handbook                          January 2001

EXHIBIT **G**
PAGE **68** OF **85**

# APPENDIX D

| REQUEST TO TELECOMMUTE | |
|---|---|
| Employee's Name:  Valerie Kline | Date of Request  09/23/03 |

**Employee's First Line Supervisor:**  William K. Davis
*M.*

**Employee's Organization:**  Contracting Facilities and Administrative Services Group

I certify that my current work performance is at least Fully Successful (initial):  *VK*

| Proposed Start Date

10/06/03 | No of Days at Alternate Worksite:

3 days per week | Alternate Worksite (circle one)

Telecenter     Or     (Home) |
|---|---|---|
| Address of Alternate Worksite:

83 E Street, Lothian MD 20711 | Phone # of alternate worksite

To be determined | Fax # of alternate worksite

To be determined |
| | Circle days in office:

M  (T)  (W)  Th  F | E-mail of alternate worksite

vzkline@opm.gov |

**Work assignment, communication methods, and work reporting:**

Perform regulatory work including but not limited to reviewing Federal Register notices, rules, and regulations; administering and maintaining the FRMS; inputting data into ROCIS and obtaining RIN numbers; preparing spring and fall agendas, etc. Also perform publication work as assigned.

Communications will be done via telephone and/or one or more of the following:  computer, blackberry; and/or cell phone.

I will be available at all times during working hours for performing work, reporting to my supervisor and/or communicating with others via email, blackberry and/or cell phone.

NOTE:  I am requesting the benefit of telecommuting because I need the time that I spend commuting (3+ hours/day RT) to take care of my 78-year-old mother, who is in poor health.

I understand that if approved this agreement is subject to all guidelines, rules and regulations identified in Chapter 368, Telecommuting, of the Human Resources Handbook.

Employee's Signature:  *Valerie Kline*          Date:  *9-23-03*

EXHIBIT
PAGE  *69*  OF  *85*

☐ Approve ☐ Disapprove (If disapprove, indicate reason below.)

Supervisor's Signature: Date: *William M. Adam*            9-24-2003

Reason request was not approved (attach additional sheet if needed):

*Employee is needed to assist with walk-in customers. Agency needs for small item design (laminate) have increased over the past year and have an expected to increase further.*

|  |
|---|
| **Request to Terminate Agreement** |

| Name of individual requesting termination of agreement: | Reason for termination of agreement - attach additional sheet if needed (2 weeks notice must be given when terminating an agreement) |
|---|---|
| | |
| Circle one : Supervisor or Telecommuter | Effective Date of Termination: |

EXHIBIT ___G___
PAGE __70_ OF __85__

# AFFIDAVIT FOR CLAUDIO A. BENEDI

Prior to making the following statement Melba D. Vaughn provided me a Letter of Authority identifying her as an EEO Investigator, assigned by the US Office of Personnel Management, Chief, Center for Equal Employment Opportunity. I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

*I am aware that the accepted issues in this complaint are Ms. Kline claims that, on the bases of her race (White), sex (Female), and in retaliation for previous EEO activity when allegedly:*

*1. from December 21, 2005 to February 21, 2006, she was denied a private office space;*

*2. from December 22, 2005 to February 21, 2006, the agency eliminated one of her job responsibilities by rescinding her administrative rights to the Federal Register Management System; and*

*3. from February 2, 2006 to February 21, 2006, she was required to cover the office telephone.*

My full name is Claudio A. Benedi. I am a White male. My position at the Office of Personnel Management is Director, Publications Management Group, GS-301-15. I have been in that position for about eight or nine years. However, I have been employed with the Federal Government for 34 years. Up until about three weeks ago, Ronald C. Flom, Deputy Associate Director, Center for Contracting Facilities and Administrative Services was my supervisor. Kay Ely is my current supervisor. Mr. Flom and Ms. Ely appear to be Caucasian, Senior Executive Servants. I was made aware of my right to representation.

I have known Ms. Valerie Kline for about two or three years. We have a good working relationship. My relationship with Ms. Kline is not personal in the sense that we are social friends. I have been her second level supervisor since she was hired. I am aware of the fact that Ms. Kline has prior EEO activity because Ms. Laura George met with me to discuss some of Ms. Kline's concerns.

I do not recall whether or not Ms. Kline asked me for private office space. I do recall Ms. Kline making a sly remark about the fact that she did not get a private office. Ms. Kline also wrote a letter to Mr. Davis after she received her performance appraisal saying she was unable to do something because she did not have private space. I can't recall specifically what she was unable to do. I told Ms. Kline that I did not have any

AFFIDAVIT Claudio A. Benedi
Kline v. OPM EEOC Case No. 2006015    EEOC Case No.    Initial
07-0451                              2006008

EXHIBIT    I
PAGE    I  OF  7

Page (continued)
128

office space to give and if I did others would have gotten it first. At one point I had two vacancies to fill in the Graphics unit. The Graphics unit work worked out of the basement. I borrowed two offices from the OPM, Director so the new hires could be in the office to better learn how we operate. The offices I borrowed were only vacant because they were scheduled to be remodeled. I only filled one of the positions and when the Director's office found out, they asked for the office back. If the offices I borrowed had belonged to me, I would have offered them to someone else with more seniority. Ms. Kline would have been the third person in line to receive a private office. William Davis (White), Support Services Supervisor and Issac Evans (Black) are the only two employees with private space. The remaining 22 employees all work in an open space. Mr. Evans occupies space in the borrowed office because I had no other place to put him. To my knowledge, neither Mr. Davis nor Mr. Evans have any prior EEO activity. Subsequent to having lost the office, Annette Frye-Gunter was assigned to me on detail. She worked out of a cubicle. No other employee has asked for private office space.

I had Ms. Kline's administrative rights to the Federal Register Management System (FRMS) rescinded because she should not have had those rights. Ms. Kline gave herself administrative rights after I specifically told her that I was to be the only administrator of the FRMS. A year later after the system was implemented, Mr. Davis and I found out that decisions were being made regarding the system that we were not aware of. We used to track our publications manually. Based on my experience, I knew there was some sort of system out there that could electronically do our tracking. I asked Maggie Elgambry, who was a contractor to look into developing a tracking system for our use. I also spoke to Margaret McElrath from the Center for Information Services (CIS) about a tracking system. After speaking to Ms. McElrath I decided that I did not want to use the system she recommended because of its complexity. I instructed Ms. Kline to work with Maggie Elgambry on developing a tracking system. After some time had gone by, I ran into Ms. Elgambry and asked her how the development of the tracking system was going. Ms. Elgambry was surprised and asked me what I was talking about. I reminded her of the tracking system she and Ms. Kline was supposed to be working on. Ms. Elgambry told me she was not working with Ms. Kline on a tracking system. When I told Ms. Kline that "Maggie" said she had not been working work with her on the tracking system, Ms. Kline said, "yes, she has." Ms. Kline then informed me that she had been working with Margaret McElrath versus Maggie Elgambry. Ms. Elrath does not go by the name "Maggie," and to my knowledge Ms. Kline is the only person that calls her Maggie. I told Ms. Kline that I told her to work with Maggie Elgambry and that I did not want the system offered by Ms. McElrath from CIS. Because of the time and money expended towards the system offered by CIS I decided to use the FRMS. I told Ms. Kline that she and Jackie Carter (Black), could work with the system but I was to be the "Administrator," and no changes to the system could be made without my permission. Ms. Kline assigned herself "Administrator" rights. I don't believe anyone working with the system questioned her level of authority because she was working with Ms. McElrath from the beginning. Ms. Kline has promoted the FRMS tracking system to other offices, such as the Office of General Counsel, and marketed herself as the expert on the system. It is not Ms. Kline's job to interject herself into the affairs of other offices. Having administrative rights to the FRMS means she could make major changes and alterations

AFFIDAVIT Claudio A. Benedi
OPM EEO Case No. 2006015

Kline v. Springer                    EEOC Case No.        Initials _____        EXHIBIT ___I___
07-0451                                  2006008                                  PAGE ___22_ OF _9_

Page (continued)
129

to the system that could be negative. Mr. Davis and I are the only employees with full administrative rights. Ms. Kline and Ms. Carter have limited rights to the FRMS system. Ms. Kline did not describe the impact of not having administrative rights on her, but rescinding those rights has no impact on Ms. Kline's ability to do her job.

Since I have been in this position I require all employees to answer the office telephone. No employee, including Ms. Kline is required to answer anyone else's private line. Publications has two rotary phones that have to be answered. I don't recall specifically asking Ms. Kline to answer the office phones from From February 2, 2006 to February 21, 2006. Ms. Kline did not describe the impact of having to answer the office phones to me.

Ms. Kline's race, sex, or prior EEO activity were not factors in my decision not to provide her with a private office space, to rescind her FRMS administrative rights, or to require her to answer the office telephone.

I have read and agree to this statement consisting of three pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _Claudio A. Benedi_  Date: 7/06/06

Investigators Signature: _Melba D. Vaughn_  Date: 7/6/06

AFFIDAVIT Claudio A. Benedi
OPM EEO Case No. 2006015
Kline v. Springer
07-0451

EEOC Case No.
2006008    Initials

EXHIBIT
PAGE

Page (continued)
130

# UNITED STATES
# OFFICE OF PERSONNEL MANAGEMENT
# CENTER FOR EQUAL EMPLOYMENT OPPORTUNITY

## REPORT OF INVESTIGATION
## EEO COMPLAINT NUMBER 2006008

### I.    COMPLAINT IDENTIFICATION:

**DATE FILED:**                          December 28, 2005

**COMPLAINANT/ JOB TITLE:**    Kline, Valerie, GS-0343-12
Management Analyst
P.O. Box 321
Lothian, MD 20711

**REPRESENTATIVE INFORMATION:**    Not Represented

**Date(s) of Alleged Discrimination:**    October 19, 2005; December 3, 2003 to present; and December 12, 2005

### II.    ACCEPTED ISSUE(S) OF COMPLAINT:

The acceptance letter to the Complainant dated February 22, 2006, states that the following issues were accepted for investigation:  (Exhibit D)

Was Complainant discriminated against on the bases of her race (White), sex (female) and in retaliation for prior EEO activity, and sexually harassed when allegedly:

1. on October 19, 2005, she received a "Fully Successful" performance appraisal for Fiscal Year 2005;

2. from December 3, 2003 to present, she was denied the opportunity to telework; and

3. on approximately December 12, 2005, her supervisor sent individuals an e-mail and expressed displeasure over a visitor received by the Complainant?

---

Valerie Kline
OPM EEO Case No. 2006008

Investigative Summary
Page 2 of 17

Kline v. Springer
07-0451

EEOC Case No.
2006008

Page (continued)
131

7pm caused her a great deal of stress. She said having to take LWOP caused her a financial burden. The Complainant stated that Lara Rivera Lopez telecommuted while detailed to the PMG. She also said Mr. Davis telecommutes. (Exhibit G)

### Witness Testimony – William M. Davis, Support Services Supervisor (White male)

According to Mr. Davis, the Complainant submitted two telecommute requests. He said he disapproved both of them because the Complainant's position does not lend itself to telework. When Mr. Davis interviewed the Complainant for the position he said he indicated telework was a possibility. Mr. Davis said circumstances changed in the office and the Complainant's position description was revised to include duties other than the Federal Register. He said those duties required the Complainant's presence in the office. Additionally, the Complainant needs to be in the office to assist Mr. Coco with telephone and walk in customers. The Complainant did not tell Mr. Davis the impact of his decision. (Exhibit H)

Mr. Davis stated Jacqueline Carter is approved to telecommute. Mr. Benedi approved Ms. Carter's request to telecommute prior to Mr. Davis' arrival at OPM. On January 6, 2004, Mr. Davis approved an on-going telecommute agreement for Ms. Carter but reduced the number of days allowed. He said he approved Ms. Carter's request to telecommute because she works solely on the Federal Register, which lends itself to telework – not due to her husband's sickness. Mr. Davis confirmed Lara Rivera-Lopez telecommuted while assigned to the PMG. Ms. Rivera-Lopez's supervisor approved her telecommute request and telecommuting was part of the agreement made prior to accepting the detail. According to Mr. Davis the Complainant has multiple tasks, and because Ms. Kline is needed to assist Mr. Coco, assist walk-in customers and answer telephones these duties cannot be performed while on telework. He made it clear to all staff that their positions were not suitable for telework, and no other employees asked to telecommute. He said he worked home once a couple of years ago to complete a project. Mr. Davis testified the Complainant's race, sex, prior EEO activity, or her alleged rejections of his alleged sexual advances were not factors in his decision not to approve her telecommute request. (Exhibit H, page 127)

### Witness Testimony – Claudio Benedi, Director, Publications Management Group (White, male)

According to Mr. Benedi, the Complainant first submitted a telecommute request sometime in 2003. He was not the approving official for any of the Complainant's telecommute requests but he did agree with Mr. Davis' decisions. Mr. Benedi said the Complainant did not follow instructions and was doing things that did not directly pertain to her work assignments. He stated the Complainant asked to

Valerie Kline
OPM EEO Case No. 2006008

Kline v. Springer
07-0451

EEOC Case No.
2006008

Investigative Summary
Page _14_ of _17_

Page (continued)
132

telecommute to care for her ill mother, and alleged Ms. Carter telecommutes to care for her sick husband. Mr. Benedi said Ms. Carter is allowed to telecommute because she can do the work at home, not to take care of her sick husband. He said Mr. Flom allowed the Complainant to telecommute for 120 days on a trial basis. Mr. Benedi testified the Complainant did not inform him of the impact of not telecommuting would have on her. He stated Mary Moore (Black, Retired, female) and Doritha Elmore (Black, Retired, female) were not allowed to telecommute. (Exhibit I)

Mr. Benedi stated his concurrence with Mr. Davis' decision not to allow the Complainant to telecommute was not based on the Complainant's race, sex, or prior EEO activity. (Exhibit I)

### *Record Evidence*

The Complainant offered Jacqueline Carter (Black, female) Lara Rivera-Lopez (Hispanic, former OPM employee), and William Davis (White, male) as comparators. Both the Complainant and Ms. Carter are Management Analysts. Ms. Carter is a GS-12 and the Complainant is a GS-13. Ms. Carter oversees the Complainant's work. Lara-Rivera Lopez (Hispanic, female) was detailed to the PMG. Mr. Davis is the Complainant's supervisor. (Exhibits G & H)

The Complainant's supervisor, William (Bill) Davis disapproved her Telecommute Requests dated May 9, 2003 and September 23, 2003. (Exhibit G, Tabs 6 & 7)

The Complainant's telecommute request dated January 27, 2005 was approved with an expiration date of April 28, 2005.[1] (Exhibit G, Tab 11)

On October 27, 2005, William M. Davis emailed Sherman W. Benton, Chief Union Steward, AFGE Local 32 stating he disapproved the Complainant's telework request.[2] (Exhibit G, Tab 13)

The Complainant's position description, dated June 10, 2003, states she serves as a management analyst providing consultative, analytical and evaluative duties to the management of OPM's publishing management program. The Complainant's performance elements state she assist the senior management analyst in working with the Office of Communications and other OPM offices. (Exhibit G, Tab 1 page 51 & Exhibit L)

Jacqueline Carter's position description, dated September 18, 2002, states she serves as the Federal Register Liaison Officer in the Publication Management Branch. As such she manages the Regulatory Issuance System, responsible for

---

[1] The telecommute request was signed by William M. Davis on February 11, 2005. The Complainant, William Davis, and Claudio Benedi testified the telecommute request was approved by Ronald Flom.
[2] Neither the Complainant nor Mr. Davis provided a telecommute request. However, this email indicates the Complainant submitted another request.

Valerie Kline
OPM EEO Case No. 2006008

Kline v. Springer          EEOC Case No.
07-0451                    2006008

Investigative Summary
Page _15_ of _17_

Page (continued)
133