# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

Valerie Kline                                         *
83 E Street                                           *
Lothian, MD 20711                                     *
                                                      *
                                      Plaintiff *
                                                      *
                        v.                            *        Case No. 1:07-cv-451 (JR)
                                                      *
Linda M. Springer, Director                           *
U. S. Office of Personnel Management                  *
1900 E Street, N.W.                                   *
Washington, D.C.  20415                               *
                                      Defendant *
                                                      *

* * * * * * * * * * * * * * * * * * * * * * * *   * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S OPPOSITION TO DEFENDANT SPRINGER'S
## MOTION FOR LEAVE TO FILE A DISPOSITIVE MOTION
## OUT OF TIME AND FOR HEARING ON SAID MOTION

The plaintiff Valerie Kline hereby files this *Opposition to Defendant Springer's*

*Motion for Leave to File a Dispositive Motion Out of Time and for Hearing on Said*

*Motion (the "Motion")* because:

1.    The Court has already ruled on Defendant's request to file an untimely
      dispositive motion.

2.    Defendant's reasons for not filing a timely dispositive motion are due to
      inexcusable neglect.

3.    Defendant has no justifiable grounds for filing a Motion to Dismiss out of
      time.

4.    Defendant attempts to argue the merits of the Motion to Dismiss rather
      than show cause for its neglect to timely file a dispositive motion.

5.    Plaintiff will be prejudiced if the Motion is granted.

6.    Defendant will not be prejudiced by denying the Motion.

7.    Defendant failed to confer with Plaintiff prior to filing the Motion.

8.    Defendant has failed to provide documents requested by Plaintiff.

9.    Denying Defendant's Motion will promote settlement of the case.

In support thereof, Ms. Kline attaches a supporting *Memorandum of Points and Authorities in Opposition to Defendant Springer's Motion to Dismiss.*

WHEREFORE, the plaintiff, Valerie Kline, respectfully requests that this Honorable Court:

A.  Deny defendant's Motion without a hearing, and

B.  Grant the plaintiff such further relief as may be required by these circumstances and the interests of justice.

Respectfully Submitted,

VALERIE KLINE, *PRO SE*
(301) 509-2684

Date: February 8, 2008

**U.S. DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 (JR) |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C.  20415 | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION
FOR LEAVE TO FILE DISPOSITIVE MOTION OUT OF TIME
AND REQUEST FOR A HEARING ON SAID MOTION**

On February 1 and February 4, 2008, defendant Springer filed a dispositive

motion titled, *Motion For Leave To File Dispositive Motion Out Of Time And Request*

*For A Hearing On Said Motion* (the "Motion").  That Motion is opposed *ut infra.*

**I.     The Court has already ruled on Springer's request to file an untimely
dispositive motion.**

At the November 15, 2007 status conference, Springer requested leave to file a

dispositive motion without discovery.  The Court granted Springer's request and ordered

Springer to file any dispositive motions within 30 days, or by approximately

December 15, 2007.

On December 14, 2007, Springer requested an extension of time to file a dispositive motion under Rule 6(b) Federal Rules of Civil Procedure (FRCP), which the Court granted thereby extending the time to January 3, 2008.  Then on December 31, 2007, Springer requested another extension pursuant to Rule 6(b).  In its January 3, 2008 minute order, the Court granted the request thereby extending the time to January 9, 2008, but the Court added that, "No further extensions will be granted."

In spite of the Court's mandate, on January 9, 2008, Springer proceeded to file yet a third request for a Rule 6(b) extension, which the Court denied on January 10, 2008. Following the Court's denial of its request, Springer has now filed a fourth request for a Rule 6(b) extension nearly a month later by filing it under subparagraph (1)(B) and rewording it as a request to file "out of time".

Rule 6(b) FRCP is titled "Extending Time", where subparagraph (1)(A) pertains to requests made *before* the expiration of the specified period and subparagraph (1)(B) pertains to requests made *after* the expiration of the specified period but both subparagraphs pertain to requests to file <u>after the specified period</u>:

Rule 6.  Computing and Extending Time; Time for Motion Papers

\* \* \* \* \*

(b) EXTENDING TIME
   (1) *In General*.  When an act may or must be done within a specified time, the court may, for good cause, extend the time:
      (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or
      (B) on motion made after the time has expires if the party failed to act because of excusable neglect.

Since this Court has already ruled on and denied Springer's Rule 6(b) request for an extension to file <u>after the specified period of January 9, 2008</u>, Springer should be barred from making another request under Rule 6(b).   Nevertheless, should the Court consider the Motion, under Rule 6(b)(1)(B) FRCP Springer is required <u>to show cause that its failure to file a timely motion is due to "excusable neglect"</u>.

II.   **<u>Springer's reasons for not filing a timely dispositive motion are due to inexcusable neglect.</u>**

Springer's request to file its disposition motions out of time is inexcusable.  Under Rule 6(b)(1)(B) FRCP, the movant is required to show "excusable neglect" for not filing a timely motion.  In *D.A. v. District of Columbia*, *id*., "excusable neglect" is addressed:

> "b. Excusable Neglect
>
>      "Even if the court were to deem plaintiffs' Response a motion to enlarge pursuant to Rule 6(b)(1)(B) of the *Federal Rules of Civil Procedure*, plaintiffs <u>must still demonstrate that the delay was the result of excusable neglect</u>.  The Supreme Court has designated four factors for determining when a late filing may constitute "excusable neglect." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993).  These factors include: "(1) <u>the danger of prejudice to the [opposing party]</u>, (2) <u>the length of delay</u> and its potential impact on judicial proceedings, (3) the <u>reason for the delay</u>, including <u>whether [the delay] was within the reasonable control of the movant</u>, and (4) <u>whether the movant acted in good faith</u>." *In re Vitamins Antitrust Class Actions*, 356 U.S. App. D.C. 70, 327 F.3d 1207, 1209 (D.C. Cir. 2003) (citing *Pioneer*, 507 U.S. at 395).  The determination of whether a party's neglect is excusable 'is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.'  *Pioneer*, 507 U.S. at 395." [Emphasis added.]  *D.A. v. District of Columbia*, 2007 U.S. Dist. LEXIS 90640 (D.C.D.C. 2007)

Springer's counsel claims that its negligence in failing to file a timely dispositive motion is excusable due to the illness of her family and the resulting stress caused by her

family's illness along with her own illness.  However, in order to show "excusable

neglect" on the basis of illness, Springer's counsel would have to show that <u>at the time</u>

<u>the motion was due, she was totally unable to prepare or file the motion because of her</u>

<u>illness</u>.  However, Springer did not submit an affidavit in support of the claim that she

suffered illness nor did she append a doctor's certificate in support of a claim that she was

ill prior to and at the time the motion was due and that because of such illness she was

totally unable to prepare the motion.  To the contrary, Springer's counsel states that she

and her family were ill "during the last two weeks in December" but because she didn't

receive results from medical tests until *after* the dispositive motion was due on January 9,

she claims she was "distracted".  Therefore, Springer's counsel was not negligent due to

illness but rather due to being distracted.  Being distracted is not a defense for negligence.

Moreover, Springer's counsel did not claim illness or stress as the reason for

requesting the third extension of time.  Instead, the proffered reason in pertinent part was,

> "Undersigned counsel primarily assigned to the case has been unable to
> finalize Defendant's Motion to Dismiss or In the Alternative, for Summary
> Judgment, by the due date for the following reasons:  Defendant and Agency
> counsel have been unable to confer concerning the final draft motion before the
> due date for filing such motion.  Defendant's counsel believes that a declaration
> by an agency official or other supporting document may be necessary to augment
> the existing record and support Defendant's defense that plaintiff cannot establish
> a *prima facie* case.  Agency Counsel is responsible for obtaining such
> declaration."

Springer's counsel does not mention anything here about illness or stress at the

time the motion was due.  Thus, Springer did not act in good faith by claiming that illness

and/or stress as the reason for not filing a timely dispositive motion since this was <u>not</u> the

proffered reason given by Springer's counsel in requesting a third extension of time.

In Springer's first, second and third requests for extensions, she stated that a draft motion had been prepared. The proffered reason for the third extension was to enable Springer's counsel to confer with agency counsel so that "a declaration by an agency official or other supporting document" could be obtained "to augment the existing record". This shows that the delay *was* in the control of the Springer since Springer had a draft that could have been finalized albeit without the declaration or other supporting documentation and filed by the specified time. Therefore, Springer's proffered reason for not filing the dispositive motion by <u>the specified period</u>, i.e., January 9, 2008, is not excusable on the basis of illness or stress or from being distracted.

Furthermore, Springer has had the assistance of agency counsel in defending this case. In the third request for an extension of time, Springer's counsel indicated that an extension of time was necessary because <u>agency counsel was responsible for obtaining a declaration from an agency official</u>. This shows the actual reason why the dispositive motion was not timely filed—Springer was waiting for counsel to prepare a declaration, which wasn't ready by the January 9, 2008 deadline. At the November 15, 2007 status conference, Springer's counsel stated that <u>agency counsel had performed research pertaining to whether Kline's stated claims constituted adverse actions</u>. As a result, Springer claimed that they might file a motion for summary judgment. Thus, even if Springer's counsel was unable to file a timely motion due to illness, Springer's agency counsel could have filed the dispositive motion on behalf of Springer's counsel.

An example of an instance where a court might find excusable neglect is when a party has neither knowledge nor notice of the pending legal action. In this case, Springer's counsel admits to receiving the Court's minute order stating that *no further*

5

*extensions would be granted* but that she "<u>overlooked the Court's direction</u>" in the minute

<u>order</u>.  This does not constitute "excusable neglect".  See *Advanced Estimating Sys., Inc.*

*v. Riney*, 130 F.3d 996, 998 (11th Cir. 1997) ("an attorney's misunderstanding of the plain

language of a rule cannot constitute excusable neglect such that a party is relieved of the

consequences of failing to comply with a statutory deadline") cited by *D.A.*  The *D.A.*

court further stated,

> "If a simple mistake made by counsel were to excuse an untimely filing, "it
> [would be] hard to fathom the kind of neglect that we would not deem excusable."
> *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 464 (8th Cir. 2000) (holding
> that failure to accurately calculate the thirty-day appeal period is not excusable
> neglect). See also *Spears v. City of Indianapolis*, 74 F.3d 153, 158 (7th Cir. 1996)
> ("<u>If the court allows litigants to continually ignore deadlines and seek never
> ending extensions without consequence, soon the  court's scheduling orders would
> become meaningless.</u>')" *Id.* at 10. [Emphasis added.]

In *D.A.*, the court gave numerous examples of untimely filings that were rejected

due to mistakes made by counsel:

> "Moreover, the case law from this court is replete with examples of untimely
> filings being rejected <u>where the only triggering *Pioneer* factor was a mistake
> made by counsel.</u> See, e.g., *Casanova*, 499 F. Supp. 2d at 34 ("mere
> characterization of prior counsel's failure [to timely file answer to counterclaim]
> as an oversight is insufficient"); *Moore v. District of Columbia*, No. 05-2020
> (D.D.C. filed Feb. 15, 2007) ("the holidays and the press of other business, and
> the absence of undue prejudice to Plaintiff, fall far short of a showing of
> excusable neglect); *Halmon*, 355 F. Supp. 2d at 242 (describing as "lame"
> counsel's excuse that she "did not place the due date on her calendar"); *Webster*,
> 270 F. Supp. 2d at 12 (mistaken belief that court's order was not a final judgment
> triggering time to appeal "does not amount to excusable neglect"); *Cobell*, 213
> F.R.D. at 42-43 ("inadvertent miscalculation of the date by which [plaintiffs] were
> required to respond to defendants' filings" not excusable neglect); *Ramseur v.
> Barreto*, 216 F.R.D. 180, 182 (D.D.C. 2003) ("inadvertently overlook[ing] a filing
> deadline [and later] to be reminded of it only by a show cause order some three
> weeks later [does not] constitute[] excusable neglect") (internal quotations
> omitted); *Wilson & Co. v. Ward*, 1 F.R.D. 691, 691 (D.D.C. 1941) (no excusable
> neglect where demand for jury trial was "inadvertently overlooked" by counsel,
> even where opposing party consented to enlargement)." *Id.* at 12.

The *D.A.* court went on to give examples where courts outside our jurisdiction routinely come to similar conclusions concerning excusable neglect and mistake:

> "***Putnam v. Morris*, 833 F.2d 903, 905 (10th Cir. 1987) ("simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice" as excusable neglect); *Winters v. Teledyne Movible Offshore, Inc.*, 776 F.2d 1304, 1306 (5th Cir. 1985) ("[S]imple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice for excusable neglect.")*; Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir. 1984) (upholding district court's refusal to accept untimely opposition to motion to dismiss where proffered excuse was "inadvertence or oversight of counsel"); *Hegmann v. U.S.*, 745 F. Supp. 886, 890-91 (E.D.N.Y. 1990) ("inadvertence, oversight or neglect of counsel . . . does not constitute good cause or excusable neglect"). *Id.* at 13.

Kline submits that Springer's reason for failing to timely file the Motion is <u>not</u> due to "excusable neglect" because Springer's counsel simply neglected to read the Court's mandate. Therefore, the Motion should be denied.

**III.    <u>Springer has no justifiable grounds for filing a Motion to Dismiss out of time.</u>**

The standard for granting post-deadline extension is found in *Smith v. District of Columbia*, 368 U.S. App. D.C. 361:

> "In *Lujan v. National Wildlife Federation*, the Supreme Court noted the distinction between this provision and Rule 6(b)(1), which allows a court to grant an extension if a "request" is made before the time for filing expires. 497 U.S. 871, 896 n.5, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). By contrast, the Court emphasized that post-deadline extensions may be granted <u>only "for cause shown"</u> and "upon motion." *Id.* at 896.

Springer's claim that her counsel underestimated the time required to draft a dispositive motion based on the "sheer volume of the complaint and the allegations made" is without merit. Springer answered Kline's second Amended Complaint and,

therefore, was well aware of the facts, claims and the issues involved in the case prior to its estimation of the amount of time it would take to prepare a dispositive motion. Kline submits that it is disingenuous to imply that Kline's complaint is overly burdensome as grounds for failing to file its dispositive motion in a timely manner, especially in light of the resources available to Springer, such as the availability of agency counsel. Furthermore, Springer is a well-seasoned, knowledgeable attorney in Title VII cases and should not be overwhelmed by Kline's case simply because it is factually intense.

Springer further accuses Kline of not working in the interest of judicial economy because Kline filed a default motion but fails to reflect the fact that Kline filed for a default because Kline did not receive Springer's answer to her original complaint. This claim is irrelevant for purposes of showing cause for not filing a timely motion. But, in actuality, Springer is not promoting judicial economy by filing the Motion after the Court has already ruled on and denied Springer's request for filing out of time

## IV.    **Springer attempts to argue the merits of the Motion to Dismiss rather than show cause for its neglect to timely file a dispositive motion.**

The merits of the Motion to Dismiss are not grounds for showing cause why a dispositive motion was not timely filed. However, if the Court considers the merits, Springer's claims fall short. Springer alleges that Kline's claims are based on "petty slights", such as Kline's claim concerning lunch hours. Kline disagrees that the claims are based on "petty slights" since the Supreme Court in *Burlington, infra,* stated that in determining whether an action is sufficiently adverse depends on the <u>totality of the circumstances</u>. For example, although most people may not be affected by a schedule change, a young mother with school age children might be greatly affected by a schedule

change.  See *Burlington N. and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006).  In that Kline was rapidly depleting her leave under the Family Medical Leave Act in order to care for her ailing mother, Kline was seeking to conserve leave wherever possible so that she would have leave available when necessary because her mother needed three surgeries, two of which occurred this past year.  Therefore, requiring Kline to take leave rather than allowing Kline to use her lunch break outside the core hours for an appointment was significant and discriminatory since the facts show that Kline's supervisor allowed other employees to take lunch breaks outside the core hours without using leave.  See *Supplemental Affidavit of William M. Davis*, Attachment 2.

Springer further claims that Kline filed untimely claims dating back to 2003. Kline presented facts from 2003 in the second Amended Complaint <u>not for the purpose of establishing the discrimination or retaliation</u> but in order to establish that <u>Springer's *reasons* for the discrimination and retaliation were not legitimate</u>.

No less important, the facts contained in the Complaint pertaining to prior telework denials are allegations that are "'like or reasonably related to' those claims in the administrative complaint".

" In actions brought under Title VII and the ADEA, a court has authority over only those claims that are (1) contained in the plaintiff's administrative complaint or <u>claims "like or reasonably related to" those claims in the administrative complaint</u> and (2) claims for which the plaintiff exhausted administrative remedies. *Park v. Howard Univ.*, 315 U.S. App. D.C. 196, 71 F.3d 904, 907 (D.C. Cir. 1995); *Caldwell v. Serv. Master Corp.*, 966 F. Supp. 33, 49 (D.D.C. 1997)." *Dobbs v. Roche*, 329 F. Supp. 2d 33 (D.C.D.C. 2004). [Emphasis added.]

In cases where a hostile work environment exists, facts falling outside the limitations period are permissible.  See *AMTRAK v. Morgan,* 536 U.S. 101.   In *Hopps v. Wash. Metro. Area Transit Auth.*, 480 F. Supp. 2d 243, the Court stated:

> "Because a hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice, <u>a plaintiff's claim of hostile work environment is not time-barred</u> if some of the alleged acts fall outside of the limitations period so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."

Although Kline did not make a separate hostile work environment claim, Kline did allege that she was subjected to a hostile work environment.  <u>See</u> ¶¶ 96 & 98, Amended Complaint.  Because the facts indicate that Kline was subjected to a hostile work environment, the Court has jurisdiction over the alleged acts falling outside the limitations period.  Thus, Springer's claim that Kline failed to exhaust her administrative remedies is without merit.

**V.     <u>Kline will be prejudiced if Springer's motion is granted.</u>**

One of the factors designated by the Supreme Court for determining whether a late filing constitutes "excusable neglect" is <u>the danger of prejudice to the opposing party</u>. *Pioneer*, 507 U.S. at 395.  Although it has been shown *supra* that Springer's late filing is <u>not</u> the result of "excusable neglect", granting the Motion will nevertheless prejudice Kline.

**a.  <u>Kline has been working on discovery and has not been focused on responding to an anticipated dispositive motion.</u>**

When the Court denied Springer's request for an extension of time, Kline relied on the Court's minute order by ceasing from working on a response to an anticipated dispositive motion after affording Springer ample time to respond to the Court's minute order and began working on discovery.  See *Fed. R. App. P.* 4 advisory committee's note to 1991 amendment: ("Prejudice might arise, for example, if the appellee <u>had taken some action in reliance on the expiration of the normal time period for filing</u> a notice of appeal.") [Emphasis added.]

When the Court denied Springer's third request for an extension and ordered that the case proceed with discovery, this implied that the stay on discovery had been lifted contrary to Springer's claim.  The Court scheduled a pre-trial status conference for March 26, 2008.  Thus, Kline began working on discovery by scheduling depositions for February 20, 21 and 22, 2008, submitting deposition subpoenas to the Court for processing on January 31, 2008, incurring the cost of having subpoenas issued, developing and issuing interrogatories on January 30, 2008, and conferring with counsel on the case.  Kline has thus expended a lot of valuable time and resources in moving forward with discovery that may be lost if the Motion is granted.

Because Kline has expended a lot of time and expense proceeding with discovery after the Court denied Springer's request for an extension of time, allowing Springer to file out of time will give Springer an unfair advantage because Kline ceased from working on a response to the anticipated dispositive motion nearly a month ago and will have lost valuable time from working on a response to the anticipated dispositive motion.

Thus, granting Springer's request will prejudice Kline's case because Springer will have had the advantage of continuing to work on its dispositive motion for the past several weeks while Kline has been busy working on discovery under an aggressive timeframe imposed by the Court, and has not been working on a response to the anticipated dispositive motions.

### b.  **<u>Granting Springer's Motion will cause undue delay.</u>**

Granting Springer's motion will prejudice Kline's case by causing unnecessary and undue delay, cost and briefing.  Springer has delayed in filing its Motion long after the Court's denial of its third request for an extension of time to file the dispositive motions.

It is clearly in Springer's interest to drag the case out as long as possible so that witnesses will forget the facts and details, delete files and email from computers, and thus cause the evidence to spoil.

Springer first caused delay by requesting back to back extensions of time, and then yet another request for an extension of time after the Court specifically stated that it would not grant any more extensions after the specified period.  Ordinarily, a motion for reconsideration of a Court's ruling must be filed within ten (10) days.  Here, Springer has waited several weeks before making yet another request to file the untimely motion even though the Court has already denied Springer's request for an extension of the specified period.

Granting Springer's motion <u>will cause undue delay</u> by setting this case back by months since the initial date for filing a dispositive motion was December 15, 2007, and it is now well into February 2008.   If the Court grants Springer's request for a hearing, the hearing may not occur before March, and then if the Court grants Springer's Motion, Kline will have 30 days to respond to the Motion to Dismiss, which will be sometime in April or May.  Then another hearing will be necessary on the Motion to Dismiss and the opposition thereto so that the time for resolving the issues could well run into May or June and put the discovery period ending sometime in September—seven (7) months from now.  This will prejudice Kline's case as the evidence spoils and witnesses' memories fade.

**c.  <u>Granting Springer's motion will prejudice Kline by robbing her of valuable time for working on the case.</u>**

All of the time, expense and energy expended thus far on discovery might be lost if the Motion is granted since Kline will have to begin again in scheduling conference rooms, court reporters, processing and issuing subpoenas, etc., once the dispositive motion stage has ended.  This will prejudice Kline since Kline has already expended valuable time and resources in pursuing discovery, conferring with counsel, which time and expense may be lost to the disadvantage of Kline.

As a *pro se* plaintiff who works full time, commutes 3+/- hours a day round trip to work, cares for her ailing 82 year old mother, and is in law school, time for working on this case comes at a premium.  Presently, Kline has time to work on the case at her job due to having light duty because she has been relieved of many of her responsibilities. However, Kline's supervisors are currently planning to detail Kline to the Office of

Personnel Management (OPM) Contracting Group, which is an extremely busy office where there are allegedly 8 vacancies and an inordinate amount of backlogged work.

The paperwork for the detail has already been signed by Kline's supervisors (see Attachment 1), which Kline submits is in violation of 5 U.S.C. § 3341 because § 3341 states that only the "head of an Executive department" may order details of its employees and Director Springer has not signed off on Kline's detail.

> Sec. 3341. Details; within Executive or military departments
>
> (a) The head of an Executive department or military department may detail employees among the bureaus and offices of his department, except employees who are required by law to be exclusively engaged on some specific work.
> (b)(1) Details under subsection (a) of this section may be made <u>only by written order of the head of the department,</u> and may be for not more than 120 days. These details may be renewed by written order of the head of the department, in each particular case, for periods not exceeding 120 days.

Should Kline be detailed to the Contracting Group, which is imminent, Kline will not have as much time to work on this case as she would have in her present position. Depriving Kline of time to work on this case might be part of Springer's strategy and the reason for the undue delays in not filing a timely dispositive motion as she awaits Kline's detail so that Kline will not have as much time to respond to the Motion to Dismiss.

**d.  <u>Granting Springer's motion will cause unreasonable and unnecessary hardship on Kline.</u>**

In denying Springer's request for extension of time, the Court established that it has jurisdiction in this case whereby Kline has proceeded forward with discovery through identifying witnesses, scheduling and preparing for depositions, issuing subpoenas,

developing and issuing interrogatories and conferring with counsel.  Granting Springer's motion will cause a hardship on Kline because <u>it is disruptive to the case</u> since Kline will have to cease from moving forward on this case and require her to reverse gears by returning to working on matters from nearly a month ago as a result of Springer's inexcusable neglect in filing a timely dispositive motion.

If Springer is not required to abide by the Court's schedule but is permitted to file motions for extension *ad infinitum* and *ad nauseam*, Kline will be prevented from working on this case in an orderly, efficient and effective manner, which is overall unfair. Constantly changing the schedule will work a hardship on Kline by complicating the case at the risk of causing confusion since there has been no scheduling order *per se* but rather a schedule set in open court and changes to the schedule by minute orders.

Therefore, Springer should be required to abide by the schedule and her Motion denied.

## VI.    <u>Springer will not be prejudiced by denying the Motion.</u>

Springer's claim that denying the motion to dismiss will severely prejudice its case is without merit.  Springer gives no valid reasons how denying the motion to dismiss out of time will prejudice her case.  The only reason given by Springer is that permitting Kline to go forward with the present complaint will severely prejudice her <u>understanding of the dimensions of the law suit *vis a vis* Kline's other pending claims that are not currently before the Court.</u>  See Motion, p. 6.  The other Title VII claims pending before the Equal Employment Opportunity Commission (EEOC) are severable from the present claims pending before this Court and will not affect the outcome of this case.  The claims

pending at the EEOC are based on different facts and different evidence that is not before this Court.  Thus, without providing reasons how or why her case will be prejudiced by the denial of the Motion, Springer's claim that it will be prejudiced is unsubstantiated.

Springer will not be prejudiced by denying the Motion since she will be able to defend this suit by proffering legitimate, nondiscriminatory reasons for the adverse actions contained in its claims as outlined in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. at 253 (holding that the presumption that intentional discrimination occurred raised by plaintiff's *prima facie* case may be rebutted by the employer's articulation of a legitimate, nondiscriminatory reason for its adverse employment action).

Springer will also have an opportunity to file a motion to dismiss based on new evidence uncovered during discovery and/or will be able to file a motion for summary judgment based on any new information obtained during discovery prior to trial.

Accordingly, good cause has not been shown for the late filing and Springer's claim that its case will be prejudiced barring the granting of its motion is without merit.

**VII.    <u>Springer failed to confer with Kline prior to filing its motion to file dispositive motion out of time.</u>**

According to the Local Rules, Springer was required "to confer with opposing [parties] about procedural issues that arise during the course of litigation, such as requests for extensions of time, discovery matters, pre-trial matters, and the scheduling of meetings, depositions, hearings, and trial."  Springer's counsel did not confer with Kline on this Motion.  If Springer's counsel had conferred with Kline, Kline would have told Springer's counsel that filing the Motion would be prejudicial to Kline.  But instead, Springer falsely claims that Kline will not be prejudiced.

On January 25, 2008, Springer sought to find out if Kline would be available for a "status conference" during the week of January 28 through February 1, 2008, but would not tell Kline why it wanted to have a status conference. (*See* Attachment 3.)  Kline objected to the status conference because Kline believed that Springer wanted to have a hearing on a request for leave to file a dispositive motion under the guise of a status conference.

Equally important, Kline notified Springer's counsel on January 30, 2008, of her intent to take depositions on Feb. 20-22, 2008, but Springer failed to respond to Kline's communication.  Accordingly, Springer has not been above board in conferring with Kline as required by the Local Rules.

**VIII.   Springer has failed to provide any documents in response to Kline's request for production of documents.**

At the November 15, 2007 status conference, Kline requested permission for limited discovery to obtain documents because Springer would not agree to a production of documents prior to issuance of a scheduling order.  In response, the Court ordered discovery pursuant to rule 26(a)(1) within 15 days, i.e. November 30, 2007.  Kline therefore submitted a document request to the government at the status conference.  On November 30, 2007, the government did not provide any documents in response to the request.  Kline then submitted another request on December 3, 2007, and yet another request on December 28, 2007.  Kline pared down the number of documents requested to approximately 30 items but to date, the government has still failed to produce any of the documents.  These documents are necessary for establishing and/or refuting the disputed material facts in this case and would also be necessary to oppose a motion to dismiss.

17

Kline also corresponded with Springer's counsel on January 17, 2008, and on January 25, 2008, concerning when Kline could expect to receive the requested documents but Springer has yet to give Kline an answer.

Kline has not filed a motion to compel because Kline made another request for production of the documents along with its issuance of interrogatories on January 30, 2008, which are due on Feb. 19, 2008. If Springer fails to respond to Kline's interrogatories by the requested date, Kline intends to file a motion to compel along with sanctions for both the document production requests and response to interrogatories instead of burdening the Court with two (2) separate motions.

Because the government did not file its dispositive motions pursuant to the Court's order of January 9, 2008, and because the government has not responded to Kline's request for production of documents pursuant to the FRCP and pursuant to the Court's order of November 30, 2007, it appears that the Executive Department has no respect for the Judiciary's authority and wants to practice law based on its own rules.

## IX.    Denying Springer's motion will promote settlement of the case.

The most compelling reason for denying Springer's request to file out of time is that it will encourage Springer to settle this case. Springer indicated in the Joint LCvR 16.3(c) Report that she believes that "settlement negotiations might be more productive after a ruling on his [sic] dispositive motion". Denying Springer's motion may therefore bring about justice since Springer will be inclined to settle this case rather than litigate.

18

## CONCLUSION

For the foregoing reasons, the Court should deny Springer's Motion.  However, if this Court grants Springer's Motion, Kline hereby requests leave to amend its second Amended Complaint to add a specific claim for a hostile work environment.  Kline would also like to revise the way the claims are stated by making separate claims for the retaliation, discrimination and retaliatory harassment, which might aid Springer's counsel in understanding the allegations and dimensions of this case.  A copy of the proposed Third Amended Complaint is attached.

Respectfully Submitted,

VALERIE KLINE, *PRO SE*
(301) 509-2684

## CONCLUSION

For the foregoing reasons, the Court should deny Springer's Motion.  However, if this Court grants Springer's Motion, Kline hereby requests leave to amend its second Amended Complaint to add a specific claim for a hostile work environment.  Kline would also like to revise the way the claims are stated by making separate claims for the retaliation, discrimination and retaliatory harassment, which might aid Springer's counsel in understanding the allegations and dimensions of this case.  A copy of the proposed Third Amended Complaint is attached.

Respectfully Submitted,

VALERIE KLINE, *PRO SE*
(301) 509-2684

Certificate of Service

I certify that I sent via first class regular mail or hand carried on February 8, 2008, a copy of the *Plaintiff's Opposition To Defendant Springer's Motion For Leave To File A Dispositive Motion Out Of Time And For Hearing On Said Motion, Memorandum Of Points And Authorities In Opposition To Defendant's Motion For Leave To File Dispositive Motion Out Of Time And Request For A Hearing On Said Motion* and proposed *Third Amended Complain andt Motion To Strike Defendant's Motion To Dismiss Or For Summary Judgment Or, In The Alternative, For A More Definite Statement And Statement Of Material Facts In Dispute* to:

> Jeffrey A. Taylor
> U.S. Attorney
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001
>
> Clara M. Whittaker
> Assistant U.S. Attorney
> Judiciary Center Building
> 555 Fourth Street, NW.
> Washington, D.C. 20530
>
> Robin Richardson, Esq.
> Office of the General Counsel
> U.S. Office of Personnel Management
> 1900 E Street, NW.
> Washington, D.C. 20415

> Respectfully submitted,

> Valerie Kline
> 83 E Street
> Lothian, MD  20711
> (301) 509-2684

*Benedi* 12/10/07
*TBMcGuire* 12/11/07

Standard Form 52
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39.)*

| 1. Actions Requested | 2. Request Number |
|---|---|
| Detail Assignment for 120 days | CG-07-025 |
| | 4. Proposed Effective Date |
| 3. For Additional Information Call *(Name and Telephone Number)* | 12/23/2007 |
| Denise Haizlip-Harrod 606-4116 | |

| 5. Action Requested By *(Typed Name, Title, Signature, and Request Date)* | 6. Action Authorized by *(Typed Name, Title, Signature, and Concurrence Date)* |
|---|---|
| R. F. Danbeck | Ronald F. Flom  12/19/07 |
| Deputy Associate Dir. | Associate Director |

**PART B - For Preparation of SF 50** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name *(Last, First, Middle)* | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Kline, Valerie | | 02/14/1951 | |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Management Analyst | PManagement Analyst |
| GS-0343-12 | GS-0343-12 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Management Services Division | Management Services Division |
| Center for Contracting, Facilities | Center for Contracting, Facilities |
| and Administrative Services | and Administrative Services |
| Publishing Group | Contracting Group |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|
| 1 - None    3 - 10-Point/Disability    5 - 10-Point/Other<br>2 - 5-Point    4 - 10-Point/Compensable    6 - 10-Point/Compensable/30% | 0 - None    2 - Conditional<br>1 - Permanent    3 - Indefinite | | YES    NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service    3 - SES General<br>2 - Excepted Service    4 - SES Career | E - Exempt<br>N - Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station *(City - County - State or Overseas Location)* |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 - USA  8 - Other | | |

**PART C - Reviews and Approvals** *(Not to be used by requesting office.)*

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature — Approval Date

CONTINUED ON REVERSE SIDE
52-118

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

# POSITION DESCRIPTION (please read the instructions on the back)

| 1 Reason for Submission | PD# of Position Being Replaced (if applicable): | 2. Bargaining Unit Position? | 15. Duty Station Washington, DC | 16. Agency Position Number 6A06054 |
|---|---|---|---|---|
| ☐ Redescription ☐ Reestablishment ☒ New | ☐ Other | ☒ YES ☐ NO | 17. Subject to IA Action? ☒ YES ☐ NO | 18. Employment/Financial Stmt. Required ☐ YES ☒ NO |

| 3. Organizational Title Contract Specialist | 19. Official Title Contract Specialist |
|---|---|
| 4. Recommended Pay Plan, Series and Grade GS-1102-12 | 20. Official Pay Plan, Series and Grade GS-1102-12 |

| 5. Sensitivity | 6. Supervisory/Management Responsibility | 21 Standards Used in Classifying/Grading Position and Dates of Standards Used |
|---|---|---|
| ☐ Critical Sensitive (X) 3 ☒ Non-critical Sensitive (2) ☐ Nonsensitive (X) 1 | ☐ Supervisor (SGEG) ☐ Manager (SGEG) ☐ Supervisor (5 USC 7103) ☐ Management Official (5 USC 7103) ☒ None of the Above | PCS for Contract Specialist series GS-1102 DTD 12/83 TS-71 |
| 7. Fair Labor Standards Act ☒ Exempt ☐ Non-Exempt | | |

| 8. Organization Location (Show up to five subdivisions) | Classification/Job Grading Certification. I certify that this position has been classified/graded as required by title 5, U.S. Code, in conformance with standards published by the OPM or, if no published standards apply directly, consistently with the most applicable published standards. |
|---|---|
| **U.S. Office of Personnel Management.** Office of Contracting & Admin. Services Contracting Division | 22. Signature of Official Taking Action *Eleanor Therrien* — Date Signed (Month, Day, Year) 4/11/96 |
| | 23. Typed Name and Title of Official Taking Action Eleanor Therrien, Personnel Staffing & Class Spec. |

| 9. If position is other than full performance level, indicate grade of full performance position and PD#, if one has been assigned. PD#: | 10. Expected Duration of Position ☐ Less than one year ☒ Indefinite | 24. If Position Was Reviewed at Agency Level, Show Title, Series, and Grade Approved |
|---|---|---|
| Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violation of such statutes or their implementing regulations. | | 25. Signature of Agency Official Taking Action — Date Signed (Month, Day, Year) |
| 11. Signature of Supervisor *signature* | Date Signed (Month, Day, Year) 3-11-96 | 26. Typed Name and Title of Agency Official |
| 12. Typed Name and Title of Supervisor Alfred F. Chatterton, III Supv. Contract Specialist | | 27. Remarks |
| 13. Signature of Reviewing Official *signature* | Date Signed (Month, Day, Year) 3/11/96 | Information for Employees. The standards and information on their application are available in the personnel office. The classification for the position may be reviewed and corrected by the agency or the Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the Office of Personnel Management. |
| 14. Typed Name and Title of Reviewing Official Lynn L. Furman Director, OCAS | | 28. Employee certification of accuracy of the duties in this Position Description (optional) EMPLOYEE'S SIGNATURE — Date Signed (Month, Day, Year) |
| | | 29. Typed Name of Employee |

| 30. Position Review | Init. | Date | Init. | Date | Init. | Date | Init. | Date | Init. | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

## 31. TO BE COMPLETED BY THE PERSONNEL OFFICE

| Organization Code | Position Number | Target Gr. | Spvy. Code | Ten. | Pay Plan | Series | Funct. Cd | Grade | Reserved |
|---|---|---|---|---|---|---|---|---|---|
| 0 8 B A A A | 0 6 0 5 4 | 1 2 | N | P | G S | 0 1 1 0 2 | | 1 2 | |

| Position Title | | | | | | Reserved |
|---|---|---|---|---|---|---|
| C O N T R A C T   S P E C I A L I S T | | | | | | |

| Competitive Level | FLSA | Sens. | Bldg. Cd. | Pos. Act. | Date | Union Data | Room Number |
|---|---|---|---|---|---|---|---|
| A A 0 0 | E | 1 | T R A | | 9 5 0 4 | U A F G E 3 2 N | |

U.S. Office of Personnel Management

OPM Form 1479 (8-85)

OFFICE OF CONTRACTING AND ADMINISTRATIVE SERVICES
CONTRACTING DIVISION
CONTRACT SPECIALIST GS-1102-12

## Nature and Purpose of Work

This position serves as a Contract Specialist in the
Contracting Division, Office of Contracting and
Administrative Services.  Work assignments will encompass
any and all functions performed by the Contracting
Division including developing policy, assisting in the
development and conduct of training, compiling procurement
data information, responding to correspondence from other
agencies and Congress, and purchasing supplies and
services using either formal contracting or simplified
acquisition procedures, and any and all procurement
support activities.

## Major Duties/Work Assignments

Duties/work assignment include but are not limited to:

- All procedures associated with making purchases using
simplified acquisition procedures.  This duty includes but
is not limited to reviewing requisitions for adequacy of
the statement of work, the justification to support the
purchase, and any justification to support limiting
competition, determining if what is being requested is an
allowable expenditure of appropriated funds, checking
mandatory sources of supply, soliciting price quotations
orally, in writing or through the Federal Acquisition
Computer Network (FACNET) for purchases under the
simplified acquisition threshold, awarding purchase orders
and preparing necessary documentation to support award
decisions, and resolving any contractor performance
problems and any other actions necessary to process any
and all purchases using simplified acquisition procedures.

- All procedures associated with making purchases using formal contract procedures.  This duty includes but is not limited to assisting OPM program offices in planning their procurements and developing statements of work and strategies for the conduct of the procurement, reviewing statements of work and associated justifications to determine their adequacy, performing market analyses to determine small business set aside decisions, preparing and issuing Commerce Business Daily synopses (either for information, to determine sources, or to announce the issuance of solicitations, determination of appropriate contract types and purchase methods, preparing procurement plans, preparing and issuing solicitation documents, participate in and advise program office personnel in the evaluation of technical and cost proposals and or bids (including performing cost and price analyses), advise the contracting officer as to offerors that should be considered to be within the competitive range, preparation and conduct of negotiations, participate and advise program offices in the evaluation of best and final offers, make recommendations to the contracting officer as to contract awardees, prepare any and all documentation to support contract award decisions, prepare contract award documents and set up contract files and respond to Freedom of Information Act requests and Congressional letters. Incumbent also provides technical advice, training and guidance to lower graded contract specialists.  Incumbent may also be required to serve as a contracting officer within the specified warrant dollar amount and provide assistance/guidance to OPM personnel with delegated procurement authority

- All procedures associated with administering contracts and purchase orders - Includes but not limited to tracking a contractors performance to insure compliance with contract/purchase order terms and conditions, oversight of contracting officer's representatives contract administration duties, developing and making recommendations to the contracting officer solutions to

contractor performance problems, conducting market analyses and documentation to support exercising contract options, and closing out contracts after completion of the work.

- All procedures related to policy development/quality assurance activities - Includes but not limited to participating in the research and development of procurement policy and procurement alert bulletins, development of office procedures and job aids, participate in procurement data collection activities, participate in the development/conduct of procurement training, conduct small business set aside decisions, conduct cost and price analyses, small business program activities, assisting in the administration of OPM's credit card and contracting officer warrant programs, and assisting in activities associated with oversight of delegated procurement authority.

## Knowledge Required by the Position

The incumbent of this position must have knowledge of the procurement procedures specified in the Federal Acquisition Regulation, the Federal Information Resource Management Regulation, the Federal Property Management Regulation and all other regulatory, statutory, and directives related to the Federal procurement process. The incumbent must have knowledge of the industry which manufactures assigned commodities to include knowledge of potential sources of supply, industrial developments and practices, stability of current markets, economic factors affecting purchase and supply, transportation costs, production capacity, and anticipated requirements of Federal agencies; Ability to perform a variety of computations relative to item costs, packing, packaging, specification requirements, etc., to determine the best buy; and the ability to apply required knowledge to complex procurement transactions. Additional knowledge/skills required include written and oral

communication skills, analytical/problem solving skills,
ability to use computers and associated procurement
automated tools such as the ADPICS automated purchasing
system, the FARA document preparation software, various
on-line procurement data bases, and word processing and
spreadsheet software.  The incumbent is required to apply
creative solutions to work problems which result in legal,
timely, and effective solutions to any problems
encountered in performing assigned tasks.

## Supervisory Controls

The incumbent of this position receives guidance and
direction from the Chief of the Contracting Division.
Assignment of tasks are made by the Chief of the
Contracting Division.  The incumbent is responsible for
preparing plans and for carrying out assignments
independently.  Refers to the supervisor only the very
most unusual problems or problems of a policy nature which
may lead to precedent-setting decisions.  The incumbent is
responsible for planning and performing all assigned
activities including developing and executing workable
solutions to problems encountered which are in accord with
all applicable procurement regulations and statutes for
any and all assigned tasks.  The review of work is minimal
to assure compliance with legal and regulatory
requirements.  Technical decisions of the incumbent are
generally accepted.

## Guidelines

Guidelines include applicable laws, Federal Acquisition
Regulations and implementing internal OPM procurement
policy issuances, the Federal Information Resource
Management Regulations, the Federal Property Management
Regulation, OMB Circulars, Comptroller General and GSA
Board of Contract Appeal decisions, and OFPP Policy
Letters.  The incumbent of this position is expected to
have full knowledge of these guidelines to perform

assigned work and advise program officials of procurement options/procedures.  Most of the applicable guidelines are broad in nature and require the exercise of significant judgement.  Frequently, guidelines do not cover the situation encountered and require the incumbent to make a best judgement based on information at hand.

**Complexity**

Assignments involve developing and implementing contracting plans.  Difficulty stems from desired changes and developments in equipment, new operational needs of the agency an the fact that items may require negotiations with a single company.  Transactions may be characterized by commodity shortages and lack of competition among vendors.  Consideration must be given to a wide variety of constantly changing conditions including coordination with broad Government policies designed to influence Federal procurement.

**Scope and Effect**

The purpose of all assigned tasks is to contract on a timely basis for goods and services and assure compliance with contract provisions and to accomplish any and all functions in the Contract Division necessary for OPM to maintain an effective and efficient contracting program.

The work performed must be of a quality that reflects the best interest of the Office of Personnel Management and insures that prompt ordering, delivery and follow-up will continue the uninterrupted work of OPM.  The incumbent will strive to provide all customers of procurement services with outstanding service.

**Personal Contacts**

Contacts include all high level Office of Personnel
Management program office personnel, contractors, and
representatives of other Federal Agencies. The incumbent
may be called upon to represent OPM before contractors and
other agencies.

**Purpose of Contacts**

The purpose of contacts is to:

- Negotiate complex contractual matters during face-to-
face negotiations with industry representatives who have
different objectives. The negotiator must convince the
offerors of their viewpoint or arrive at compromise
solutions or suitable alternatives;

- Persuade suppliers to comply with contract provisions
requirements which require the incumbent to convince
suppliers of their viewpoints or arrive at acceptable
compromise solutions;

- Represent OPM at small business conferences or other
agency gatherings. Incumbent could be called upon to make
formal presentations, participate in panels, or
participate in meetings with contractors or other
agencies;

- Provide advice and guidance or resolve problems with
contractors and or OPM or other Federal officials; and,

- Obtain information, develop concepts, and provide
coordination and data about Federal Procurement Policy and
OPM's goals and objectives.

## SUPPLEMENTAL AFFIDAVIT FOR WILLIAM M. DAVIS

I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties. This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

1. What actions do you have in place for someone who takes lunch outside of the core hours?

I do not have any specific actions that I take against a person for taking lunch outside of the core hours. I will remind the employee of his or her lunch hour and ask them to notify me if they have a need to adjust their lunch hour prior to missing their assigned lunch hour.

2. Do you require employees who take outside of the core hours to take leave?

No, I do not.

3. Have you ever told Ms. Kline that she would have to take leave for the time she takes outside of the core hours? If yes, when and why?

No, I have not.

4. Does any other employees within the PSB besides Ms. Kline have a specific lunch hour assigned to them? If not, why?

Yes, everyone located on the 5th floor.

5. To your recollection, do you recall Ms. Carter taking lunch outside of the core hours on December 16 & 17, 2005, January 24 & 26, 2006, or February 8, 2006? If yes, did you approve the lunch hour to be taken outside of the core hours? If yes, why.

I do not recall what happened on those specific dates. However, there are occasions where Ms. Carter has taken lunch outside of the core hours because she needs to do something during her assigned hour, but she usually will let me know in advance. The times that she has not let me know in advance and has taken lunch outside of the core hours I have reminded her like I do everyone else of how important it is to take lunch at the assigned hour.

6. To your recollection, do you recall Mr. Coco taking lunch outside of the core hours on February 23, 2006? If yes, did you approve the lunch hour to be taken outside of the core hours? If yes, why.

I cannot recall what happened on February 23, 2005. Mr. Coco will sometimes accompany Mr. Benedi to lunch. As Mr. Benedi is my boss I do not dispute with him about when Mr. Coco takes his lunch as he ensures that the office is covered.

7. You stated the facts of the Letter of Reprimand were valid; do you have any supporting documentation?

I used the swipe records obtained from Human Resources.

8. On September 22, 2005, Ms. Kline states Mr. Coco authorized her to leave early because she worked through lunch on the National Security Personnel Regulations; did Mr. Coco inform you of this authorization.

Mr. Coco did not inform me. Additionally, does not have the authority to grant Ms. Kline an hour because she worked through lunch, no one has this authority. The AFGE master agreement requires that employees take their lunch between 11:30 and 1:30. I believe Ms. Kline attempted to take advantage of Mr. Coco because I was not here. Ms. Kline has been told numerous times, prior to this date, that she is to take lunch at the assigned hour.

9. Ms. Kline stated there are occasions where she worked late? Are you aware of those times? Did you require her to work late? Did you consider those times before issuing the Letter of Reprimand?

Per the card scan reports Ms. Kline was in the office a couple of times in excess of her 9 hour day. No, I did not require her to work late. This additional time was not considered as Ms. Kline has a 9 hour workday and each day is measured individually.

I have read and agree to this statement consisting of one page. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _William M. Davis_    Date: _7-6-2006_
                    William M. Davis

Investigators Signature: _Melba D. Vaughn_    Date: _7-6-2006_
                          Melba D. Vaughn

# Kline, Valerie

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Sunday, January 27, 2008 6:17 PM |
| **To:** | Whitaker, Claire (USADC) |
| **Subject:** | Status conference |

Ms. Whitaker,

This is to inform you that I am against having a status conference. You have not told me why you want a status conference and I see no need for one. I suspect that you want to have a motions hearing under the guise of a status conference in an attempt to try to get the court to let you file your dispositive motion(s). You missed the deadline for filing dispositive motions and have therefore waived your right to file them based on the issues pertaining to the court's jurisdiciton, i.e. failure to exhaust admin remedies, failure to state a claim and/or failure to claim an adverse action that affects a term, benefit or condition of employment.

The court denied your request for an extension of time to file your dispositive motion(s). Therefore, your only option, as I see it, is to defend the case based on your client;s proffered reasons for the adverse actions. Or, if you find some new information during discovery, you might be able to file a summary judgment motion prior to trial based on the new information. But you cannot now file a motion to dismiss. You have foreclosed that option by missing the deadline and you have no grounds for reconsideration or to try to beg the court at this late date.

I insist that you provide me with the documents in my request for production of documents as I am in the process of scheduling depositions and need the documents immediately. I already have the notices of depositions prepared and the subpoenas prepared and will be issuing them this week. Therefore, I need the documents immediately.

Regards,

Valerie Kline

---

**From:** Whitaker, Claire (USADC) [mailto:Claire.Whitaker@usdoj.gov]
**Sent:** Fri 1/25/2008 4:04 PM
**To:** Kline, Valerie
**Subject:** RE: Kline v. Springer

I understand that, but would you be available next Tuesday, Thursday or Friday? Please respond.

**From:** Kline, Valerie [mailto:Valerie.Kline@opm.gov]
**Sent:** Friday, January 25, 2008 3:14 PM
**To:** Whitaker, Claire (USADC)
**Subject:** RE: Kline v. Springer

Ms. Whitaker,

The Court scheduled:

**Status Conference set for 3/26/2008 09:30 AM in Courtroom 23A before Judge James Robertson.**

2/5/2008

Are you going to request an earlier conference or one in addition to this one?   What is the reason for having an additional one?  I would be against an earlier one in lieu of the 3/26/08 one.

Valerie

-----Original Message-----
**From:** Whitaker, Claire (USADC) [mailto:Claire.Whitaker@usdoj.gov]
**Sent:** Friday, January 25, 2008 3:07 PM
**To:** Kline, Valerie
**Subject:** RE: Kline v. Springer

Thank you for your email.  I would like to request a status conference with the Court.  When are you available next week?

**From:** Kline, Valerie [mailto:Valerie.Kline@opm.gov]
**Sent:** Friday, January 25, 2008 2:27 PM
**To:** Whitaker, Claire (USADC)
**Subject:** Kline v. Springer

Dear Ms. Whitaker,

I called you this morning and left a message for you to return my call but I have yet to hear from you.  I would like to discuss with you:

1.      When I can expect to receive the documents requested in my Request for Production of Documents.
2.      When we can confer on the remaining issues pertaining to the *reasons* proffered for the adverse actions.
3.      Preparation of a new LCvR 16.3 report.
4.      A schedule for taking depositions.
5.      Whether Springer is interested in settling this case.

I would appreciate it if you would call me to discuss these matters as soon as possible.

Regards,

Valerie Kline
202.606.1411

# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 JR |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C.  20415 | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

For good cause shown Defendant's Motion For Leave To File A Dispositive Motion Out Of Time And For Hearing On Said Motion and Request for a Hearing on Said Motion, is hereby DENIED.

FURTHER, Plaintiff's Motion To Strike Defendant's Motion To Dismiss Or For Summary Judgment Or, In The Alternative, For A More Definite Statement And Statement Of Material Facts In Dispute is hereby GRANTED.

_____
James Robertson
United States District Judge

## U.S. DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 JR |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C.  20415 | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## ORDER

For the reasons stated in the Memorandum of Points and Authorities In

Opposition To Defendant's Motion to for Leave to File Dispositive Motion Out of Time

and Request for a Hearing on Said Motion, Plaintiff's request to amend the second

Amended Complaint is GRANTED.


_____
James Robertson
United States District Judge

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

Valerie Kline                                          *
83 E Street                                            *
Lothian, MD 20711                                      *
                                                       *
                                      Plaintiff *
                                                       *
                      v.                               *        Case No. 1:07-cv-451 (JR)
                                                       *
Linda M. Springer, Director                            *
U. S. Office of Personnel Management                   *
1900 E Street, N.W.                                    *
Washington, D.C.  20415                                *
                                      Defendant *
                                                       *

* * * * * * * * * * * * * * * * * * * * * * * * *   * * * * * * * * * * * * * * * * * * * *


**THIRD AMENDED COMPLAINT**

**NATURE OF THE ACTION**

1.    Plaintiff, Valerie Kline, is a white female over the age of 40 and a federal employee

      working at the U. S. Office of Personnel Management (OPM) as a Management

      Analyst in the Publications Management Group (PMG).

2.    The PMG is one of those "unusual employers that discriminate against the majority"

      by practicing an unlawful minority and white male preference policy where white

      females are disproportionately represented (approx. 3%) compared to the percentage of

      white females residing in the Nation's Capital (approx. 17%) or employed by the

      Federal Civilian Workforce (approx. 27.5%).

3.    PMG employs proportionately more white males and minorities than white females

      compared to the average number of those groups residing in the Nation's Capital as

4.     Plaintiff was the only white female out of approximately 32 employees in PMG during the time period of the acts described in this Complaint.

5.     Plaintiff brings this reverse discrimination action where plaintiff has been subjected to numerous adverse personnel actions as a result of PMG's managers' unlawful reverse discrimination preferences, sexual harassment and/or retaliation practices.

6.     Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 USCS § 1981, to remedy the acts of employment discrimination, sexual harassment, and retaliation.

**JURISDICTION AND VENUE**

7.     Jurisdiction is conferred on this Court by 42 U.S.C. § 2000e et seq.  Equitable and other just relief are sought pursuant to 42 U.S.C. Section 2000e-5 (f) through (k) and 2000e-16.

8.     This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 2000e-5(f) and 2000e-16.

9.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the inherent equitable powers of this Court.

10.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) & (e) and 42 U.S.C. § 2000e-5(f) because (1) the OPM is within this judicial district, (2) the events or omissions giving rise to Plaintiff's claim for relief occurred in this judicial district, (3) the unlawful acts are alleged to have been committed in this judicial district, and (4) the records relevant to such acts are maintained and administered in this judicial district.

11.    Plaintiff has fulfilled all conditions precedent under Title VII prior to instituting this

lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## PARTIES

12.    Plaintiff, Valerie Kline, is a citizen of the United States, is a civil servant of

approximately eighteen years, currently lives in Maryland and is a member of a

protected class under Title VII.

13.    Defendant Linda M. Springer is the Director of OPM and as such heads the OPM, a

department within the Legislative Branch of the Government of the United States. As

the Director of OPM, Ms. Springer is responsible for the personnel actions, omissions

and practices there.  She is sued in her official capacity.

14.    The discriminatory and retaliatory acts were done by the managers of the PMG, Mr.

William M. Davis and Mr. Claudio Benedi, who are agents of the Defendant.

15.    Defendant is vicariously liable for the discriminatory and retaliatory acts practiced by

its agents Davis and Benedi.

## FACTUAL ALLEGATIONS

16.    On October 7, 2002, Plaintiff began working for OPM as a Management Analyst in the

PMG, formerly known as the Publishing Management Branch (PMB).

17.    Plaintiff applied for the position sometime between June 18, 2002, and July 9, 2002, in

response to Vacancy Announcement Number 02-171-CJR that was seeking someone to

be responsible for executing the regulatory processing components of OPM's

Regulatory Issuances System.

18.     Plaintiff is a Certified Paralegal Specialist, has a Bachelor of Science degree in

        Journalism with honors from the University of Maryland, University College and is

        currently enrolled in law school.

19.     Plaintiff interviewed for the position with her former supervisor, Mr. Davis, Chief

        (retired), Publishing Services Branch, a white male, and Mr. Davis' supervisor, Mr.

        Benedi, Director, Publications Management Group, an Hispanic male.

20.      During the interview, Mr. Benedi explained to Plaintiff that she would be working

        with Ms. Jacquline Carter, a black female, who worked strictly on regulatory matters in

        the Regulatory Issuances System.

21.     Plaintiff was also told by Mr. Benedi that Ms. Carter is allowed to telecommute (or

        "telework") approximately 2-3 days a week because her husband had several strokes

        and telecommuting enabled her to care for her husband so that she would not need to

        retire from her position.

22.     Mr. Benedi told Plaintiff that should Ms. Carter's husband have another stroke

        whereupon his condition worsened, it was Ms. Carter's intention to retire.  Thus, they

        were hiring someone to work with Ms. Carter and assume responsibility for the

        Regulatory Issuances System in the event she suddenly retired.

23.     During the interview, Mr. Davis informed Plaintiff that if she were hired, she too

        would be able to telecommute 2-3 days per week like Ms. Carter does "after you get to

        know the people" involved in the regulatory work.

24.     Around the same time, Plaintiff interviewed for a management analyst position with

        the U.S. Department of Interior (DOI) who was interested in hiring Plaintiff as a

        GS-13/1 but plaintiff opted to work at OPM at a GS-12/3 instead of for DOI as a

GS-13/1 because of the representation made by Mr. Davis that she would be allowed to telecommute 2-3 days per week like Ms. Carter.

25.    Plaintiff cares for her elderly mother who has failing health and the opportunity to telecommute was a major factor in deciding to work for OPM since telecommuting would enable Plaintiff to have more time to care for her mother.

26.    Plaintiff spends approximately 2 ½ - 3 hours a day commuting to and from work.

27.    Plaintiff was offered and accepted the position to work for PMG's Regulatory Issuances System and began working at OPM approximately October 7, 2002.

28.    When initially hired, Plaintiff's Position Description was strictly limited to work related to the Regulatory Issuances System.

29.    On approximately May 9, 2003, Plaintiff sent Mr. Davis a Request to Telecommute.

30.    On approximately May 12, 2003, Mr. Davis denied the request and noted on the Telecommute Request form that it was OPM's policy not to allow new employees to telecommute but that Plaintiff could reapply for telecommuting after one year of employment at OPM.

31.    The one-year condition is discretionary because other offices within OPM have permitted new employees to telecommute almost immediately after they have begun working for OPM without requiring a one-year wait period before telecommuting.

32.    After submitting the request to telecommute, Mr. Davis submitted paperwork to Mr. Benedi on approximately May 12, 2003, to change Plaintiff's Position Description to include non-regulatory duties, such as visual information duties and publication database responsibilities that was activated on approximately June 10, 2003.

33.  Plaintiff's duties were changed to add non regulatory responsibilities for the purpose of denying Plaintiff's request to telecommute and to diminish her material responsibilities.

34.  Shortly thereafter, Plaintiff met with an AFGE Local 32 (the "Union") representative who arranged a meeting with Mr. Davis where an agreement was reached to allow Plaintiff to telecommute after she had been employed with OPM for one year.

35.  After approximately one year on September 23, 2003, Plaintiff filed another request to telecommute.

36.  On approximately September 24, 2003, Mr. Davis denied the request on the ground that "Employee is needed to assist with walk-in customers" even though Plaintiff was not allowed to work with PMG's customers but was told to direct the customers to Mr. Coco, Mr. Davis or Mr. Benedi for assistance with their publishing needs.

37.  On approximately September 30, 2003, plaintiff filed an appeal with Mr. Benedi but he failed to respond to the appeal.  On approximately October 17, 2003, and November 7, 2003 Plaintiff sent e-mails to Mr. Benedi requesting a response to her appeal but he failed to respond.

38.  Plaintiff then spoke with Mr. Benedi in person and explained to him how Mr. Davis had told her when she interviewed for the position that she would be able to telecommute but his reply was, "I didn't tell you that".

39.  Telecommuting is a tangible, material benefit afforded to similarly situated employees in PMG.

40.  Mr. Davis and/or Mr. Benedi allowed similarly situated minority employees to telecommute but denied Plaintiff the opportunity to telecommute.

41.    Shortly after denying Plaintiff's request, the Union initiated an informal grievance procedure and obtained an agreement from Mr. Davis to allow Plaintiff to telecommute.

42.    On approximately January 7, 2004, Mr. Davis sent Plaintiff an e-mail stating, "[j]ust to be sure you understand, we must finalize your rating standards before we can complete your Telecommute Agreement".

43.    At the time, Plaintiff had been working at OPM since October 7, 2002, without Performance Standards.

44.    On approximately May 17, 2004, four (4) months later, Performance Standards were finally issued to Plaintiff.

45.    After the Performance Standards were issued, Plaintiff inquired about her Telecommute Request and was told by the Union's representative that Mr. Davis had changed his mind because he said Plaintiff was needed in the office "to answer telephones and greet customers", which duties were not indicated as a responsibility in her Position Description or Performance Standards.

46.    Mr. Davis assigned Plaintiff significantly diminished material responsibilities not encompassed by her Position Description and used the change in duties to justify not allowing Plaintiff to telecommute.

47.    The Union then initiated a formal grievance process that resulted in a decision by Mr. Ronald Flom, Associate Director for the Management Services Division, to allow Plaintiff to telecommute one day per pay period (once every two weeks) on a 90-day trial basis that was supposed to begin on January 23, 2005.

48. Plaintiff was not allowed to begin telecommuting on January 23, 2005, because Mr. Davis said that she did not have an executed telework agreement.

49. Based on knowledge and belief, Ms. Carter did not have an executed agreement when she initially began teleworking.

50. On approximately January 26, 2005, Mr. Davis executed the Telecommute Request Agreement with Plaintiff.

51. Plaintiff began the telework trial period on or about February 22, 2005, and encountered no problems during the trial period.

52. Neither Mr. Davis nor Mr. Benedi made the Union or Plaintiff aware of any problems encountered during the 90-day trial period.

53. At the end of the telework trial period, Mr. Flom denied Plaintiff's request to continue telecommuting based on recommendations received from Mr. Davis and Mr. Benedi concerning alleged "coordination" problems encountered during the trial period.

54. Around August 7, 2005, Plaintiff's mother, who lives with Plaintiff, became critically ill.

55. The Union met with Mr. Davis and/or Mr. Benedi to request that he allow Plaintiff to telecommute so that she could better care for her mother the same way that they allowed Ms. Carter to telecommute when her husband became ill.

56. Ms. Carter is similarly situated to Plaintiff because they both performed regulatory work for the PMG.

57. On approximately October 27, 2005, Mr. Davis denied the request and stated that telecommuting "is not appropriate in this situation".

58.     As a result, Plaintiff was required to take leave under the Family Medical Leave Act (FMLA) and leave without pay in order to care for her mother.

59.     The Union representative then advised Plaintiff to file an EEO action rather than file another grievance.

60.     Ms. Lara Rivera-Lopez, an Hispanic female, was detailed to the PMG for approximately one year and performed non regulatory work, such as visual information duties, and was allowed to telecommute by Mr. Benedi in order to accommodate her school schedule.

61.     Ms. Rivera-Lopez did not have an executed telework agreement with PMG before she was allowed to telework nor was she required to telework on a trial basis.

62.     Ms. Rivera-Lopez was similarly situated to Plaintiff because she was a GS-12 and performed non regulatory work similar to what Plaintiff was performing following the change in her duties.

63.     When Plaintiff initially began working at OPM, she would go to lunch with Mr. Davis, Mr. Benedi, and Mr. Coco, a white male employed in PMG, whereupon Mr. Davis would frequently make offhand comments about women, their legs, the way they dressed and/or how they looked, etc., which were inappropriate.

64.     Mr. Davis made a habit of staring at Plaintiff's breasts when speaking to her but Plaintiff rebuffed the advances by ignoring his conduct.

65.     After slighting Mr. Davis' advances, he began to engage in reprisals against Plaintiff by harassing her, treating her with contempt, retaliating against her, discriminating against her and taking other adverse employment actions against her.

66.   Plaintiff initiated several informal grievances against Mr. Davis due to his reprisals, which consisted of arbitrary denials of flex time and credit hours as well denying Plaintiff a full hour for lunch, which were all resolved in Plaintiff's favor.

67.   Around May of 2002, Mr. Davis requested Plaintiff to change the time she went to lunch from 12:30 p.m. to 11:30 a.m.

68.   Mr. Davis told Plaintiff that the reason she had to go to lunch at 11:30 am was so that there would be someone to cover the office while the other members of PMG went to lunch.  Prior to this, PMG would close its office by locking its door and posting a sign that stated it was closed and would reopen shortly.

69.   The reason given for changing Plaintiff's lunch hour was a pretext since Mr. Benedi, Mr. Davis and Mr. Coco frequently went to lunch around 12 noon or 12:15 pm before Plaintiff returned from her lunch break and would lock the door to the PMG as they had done before Plaintiff's lunch hour was changed.

70.   During this time, plaintiff was the only one in the PMG that was required to go to lunch at a specific time while minority and white male employees were allowed to go any time they wished.

71.   Ms. Carter informed Plaintiff that she went to lunch "whenever [she] want[ed]".

72.   Changing Plaintiff's lunch hour and requiring Plaintiff to go to lunch at the same specified time every day deprived Plaintiff the benefit of flexibility in the time she went to lunch that was afforded to other similarly situated employees in PMG.

73.   Around this same time, Mr. Davis began requiring Plaintiff to perform menial tasks of a clerical nature not covered by her Position Description.  He also began chastising her for acts that persons of the opposite sex were not chastised for.

74.     On approximately December 15, 2003, Mr. Davis sexually harassed Plaintiff by deliberately and intently staring at her breasts while issuing her a Counseling Memorandum.

75.     Mr. Davis issued Plaintiff the Counseling Memorandum based on an e-mail that she had received from Mr. Robert Coco, a white male, Management Analyst, working in PMG, which she had forwarded to a friend sometime between May 4, 2003, and May 10, 2003.

76.     Mr. Davis said the e-mail was inappropriate and unacceptable because it contained nudity, yet the e-mail was merely an animated cartoon of crows sitting on a live wire.

77.     Mr. Coco had sent the same e-mail to numerous people within PMG, including Ms. Carter, Mr. Davis and Mr. Benedi but he was not issued a Counseling Memorandum.

78.     Plaintiff and Mr. Coco are similarly situated because neither of them are supervisors, they both work in PMG and both perform work related to publications.

79.     The Counseling Memorandum may have been placed in Plaintiff's personnel file, which could hinder her ability to obtain promotions or alternative employment.

80.     On approximately December 7, 2005, Mr. Davis sexually harassed Plaintiff by deliberately and intently staring at Plaintiff's breasts when issuing her the 2005 Performance Appraisal that conveyed the message that if she wanted a better rating, she would need to have more than a professional relationship with him.

81.     Mr. Davis rated Plaintiff's performance mainly on the non professional, menial, clerical tasks not covered under her Position Description rather than base her rating on the elements contained in her Performance Standards.

82.  Although Plaintiff met the criteria for receiving an "Outstanding" rating based on the four critical elements contained in her Performance Standards, Mr. Davis only gave her an overall rating for 2005 of "Fully Successful" based on the diminished duties and placed derogatory remarks on her performance appraisal.

83.  Plaintiff's overall performance rating for 2003 was only "Exceeds Fully Successful" even though she received a Certificate of Appreciation, a Certificate of Recognition and a Director's Award for Excellence from the Director's Office that year.

84.  Plaintiff's overall performance rating for 2004 was an "Exceeds Fully Successful" but she was only rated "Fully Successful" in 2005 based on her reduced job responsibilities and opportunities.

85.  Plaintiff discussed the Performance Appraisal with Mr. Davis but he refused to change the rating.  Plaintiff then filed a grievance against Mr. Davis over her Performance Appraisal but Mr. Davis still refused to change the rating.

86.  Giving Plaintiff a lower performance rating than she had earned or deserved based on the elements contained in her Performance Standards and placing derogatory comments on her appraisal combined with reducing her responsibilities was an adverse employment action that deprived Plaintiff from receiving monetary bonuses, hindered her ability to seek alternative employment and hindered her career opportunities.

87.  Around May of 2003, at Plaintiff's own initiative, she obtained permission from Mr. Benedi to develop an online electronic tracking system of OPM's regulations.

88.  Plaintiff contacted and worked with OPM's Applications Systems Group (ASG) in developing the Federal Register Management System (FRMS) and had administrative rights to the FRMS, which went into production in October 2003.

89.     On approximately December 8, 2005, Ms. Arlene Taylor, of the ASG who worked with Plaintiff in developing the FRMS, stopped by Plaintiff's office to show her some new features following a conversion of the FRMS software to an upgraded version.

90.     Following Ms. Taylor's visits, Mr. Davis asked Plaintiff who had been visiting with her and Plaintiff informed him that it was Ms. Taylor.

91.     Mr. Davis did not ask Plaintiff the purpose of Ms. Taylor's visit but instead sent an offensive e-mail to Ms. Taylor and/or her supervisor, Ms. Margaret McElrath, which falsely accused Plaintiff of not informing him of revisions being made to the FRMS.

92.     Plaintiff had informed Mr. Davis and Mr. Benedi at least 6 times during the period from 9/16/05 to12/9/05 in a weekly report that the FRMS was undergoing a conversion to an updated version of the program.

93.     Ms. Taylor said that she visited Ms. Carter on numerous occasions and Mr. Davis never complained about those visits.

94.     Mr. Davis' disparate treatment toward Plaintiff in sending demeaning e-mails to Ms. Taylor and Ms. McElrath about her was highly embarrassing to Plaintiff, caused Plaintiff to suffer mental and emotional anguish as well as a great deal of stress.

95.     On approximately December 22, 2005, Mr. Davis, after consulting with Mr. Benedi, instructed Ms. Taylor to rescind Plaintiff's administrative rights to the FRMS for no apparent reason or justification.

96.     Rescinding Plaintiff's administrative rights to the FRMS further diminished Plaintiff's material responsibilities.

97.     Mr. Davis engaged in further reprisals by heavily scrutinizing and micro-managing Plaintiff's work by continually finding fault with Plaintiff or her work, subjecting her

to criticisms, and creating a hostile working environment, which made it difficult for Plaintiff to concentrate and perform her work.

98.    Mr. Davis frequently whistled, hummed, sang in his office and/or beat his hands on his desk to make rhythmic sounds that would disturb Plaintiff while she was working as Mr. Davis' office was located immediately in front of Plaintiff's work station but Mr. Davis refused to close his door to keep from disturbing Plaintiff.

99.    Due to Mr. Davis' sexual harassment, hostile work environment and disparate treatment of her, Plaintiff has suffered enormous stress and mental anguish that has affected her health and emotional well being.

100.    Mr. Benedi deliberately attempted to turn people against Plaintiff, which Mr. Davis used to give Plaintiff a poor performance rating, and subjected Plaintiff to disparate treatment by denying Plaintiff opportunities that he grants to minority employees.

101.    By subjecting Plaintiff to demeaning, disparate and unfair treatment, Mr. Benedi has intentionally caused her to suffer emotional stress and mental anguish that has affected her health and emotional well being.

102.    Plaintiff obtained counseling from an OPM's Employee Assistance Program counselor and follow-up counseling from a mental health care professional in order to help her cope with Mr. Benedi's and Mr. Davis' demeaning and abusive treatment.

103.    On approximately November 30, 2006, Plaintiff initiated an informal EEO action against Mr. Benedi and Mr. Davis that was not resolved at the informal stage.

104.    On approximately December 28, 2006, Plaintiff filed a formal EEO complaint against Mr. Benedi and Mr. Davis on the basis of reverse race discrimination, sex

discrimination, sexual harassment, and retaliation but following an investigation, Defendant took no action to correct the harassment, retaliation and/or discrimination.

105.   On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC).

106.   Plaintiff thereby exhausted her administrative remedies on the issues of telework, the Performance Appraisal and the rescinding of her administrative rights to the FRMS.

107.   Plaintiff's work space is approximately an 8' x 8' cubicle and has no room for a table to meet with customers when discussing regulations and/or explaining revisions needed to the regulations before submitting them to the U.S. President's Office of Management and Budget or publishing them in the *Federal Register*.

108.   Plaintiff's existing work space is more appropriate for a receptionist as it is located in the busiest area of PMG, is extremely noisy and distracting with printers and reproduction equipment, customers inquiring about and/or seeking publishing and printing services and telephone calls mostly for Mr. Davis, Mr. Benedi and Mr. Coco.

109.   Plaintiff's workspace is not conducive for carefully reviewing OPM's regulations and legal documents for publication in the *Federal Register*, which was Plaintiff's primary responsibility.

110.   On approximately October 20, 2004, Plaintiff sent an e-mail to Mr. Davis requesting office space more conducive to reviewing regulations and informed him that her current space was not conducive to reviewing regulations and/or meeting with regulatory customers because of the distractions of the telephones, visitors, noise and lack of space to meet and go over their documents.

111.   Mr. Davis failed to respond to the request for more appropriate office space.

112.    The office space of Ms. Carter, who also reviews regulations, was approximately 10' x 14' with a table area and chairs that is conducive to meeting with customers and is at a far end of PMG's office and away from the busy and noisy area of PMG.

113.    At around this same time, other lower grade minority employees in PMG had larger office spaces that were away from the main hustle and bustle of PMG and were not required to assist with PMG telephone calls.

114.    Around November 2004, PMG acquired two office spaces across the hall from the PMG that is approximately the same size as Ms. Carter's office as well as some of the other lower grade minority employees, and is away from the hustle and bustle of PMG.

115.    Around November 2004, PMG hired a GS-12/1 visual information specialist, Mr. Issac Evans, a black male, to work on publications and gave him the office space across the hall that Plaintiff had requested.  A quiet environment or table to meet with customers was not as necessary or as critical for performing visual information work as it was for performing the legal, regulatory work that Plaintiff performed.

116.    On approximately January 24, 2005, Plaintiff sent Mr. Benedi a written request to occupy the office space across the hall.

117.    On approximately February 1, 2005, Mr. Benedi denied Plaintiff's request and stated that the space was only temporary and that he determined that "there is currently no reason to support changing your work facility."

118.    Around this same time, Mr. Benedi offered the other available space across the hall to Jose Velaquez, who was approximately a GS-7 that was detailed to PMG to perform visual information work after Ms. Rivera-Lopez' detail ended.

119.    Mr. Velaquez declined the offer and the space was then acquired by another

organization in OPM.

120.    On approximately December 21, 2005, Plaintiff made another request for the office

space across the hall that was still being occupied by Mr. Evans.

121.    When Plaintiff made the request for the space, Plaintiff had seniority over Mr. Evans

who was a GS-12 step 1 whereas Plaintiff was a GS-12 step 5.

122.    Prior to Mr. Evans employment at OPM, Plaintiff was doing visual information work

in addition to the regulatory work but after Mr. Evans was hired, Plaintiff was no

longer assigned visual information duties even though her Position Description and

Performance Standards still contained visual information duties and responsibilities.

123.    Instead of allowing Plaintiff to occupy the quieter and larger office space, Mr. Benedi

quietly promoted Mr. Evans to a GS-13 around November-December 2005 but didn't

promote Plaintiff who had been doing the same type of work as Mr. Evans as well as

still doing the same type of work as Ms. Carter, a GS-13, and the same type of work as

Mr. Coco, a GS-13, as his "back up".

124.    Mr. Benedi treated Plaintiff less favorably than similarly situated employees of a

different race and sex by failing to give Plaintiff work space that would have materially

aided her in performing her work and diminishing Plaintiff's duties while promoting

minorities and/or male employees.

125.    When Plaintiff asked Mr. Benedi about the availability of space across the hall, Mr.

Benedi averred that he did not have any office space to give, but that if he did have

available space, he would give it to an employee with seniority (rather than give it to

Plaintiff).

126.    Mr. Benedi discriminated against Plaintiff by giving and/or offering Mr. Evans and/or

Mr. Velaquez superior office space over Plaintiff who at the time had seniority over

both of them and had a greater requirement for the space in order to perform her work.

127.    Mr. Davis and Mr. Benedi required Plaintiff to perform regulatory work under adverse

working conditions and made changes to her responsibilities and working conditions

that resulted in a materially significant disadvantage to the Plaintiff.

128.    During the details of Mr. Velaquez and Ms. Rivera-Lopez, they had been assisting Mr.

Coco with PMG's telephone lines.  When their details ended, instead of asking Mr.

Evans to primarily back up Mr. Coco with the PMG lines, Mr. Davis instructed

Plaintiff to primarily back up the PMG telephone lines.

129.    On approximately February 2, 2006, Plaintiff was extremely busy working on the

Unified Agenda of Regulatory Actions that was due to the Defendant's office on

February 3, 2006.  Mr. Coco and Ms. Carter were out of the office that day and

Plaintiff was expected to cover both the PMG and the regulatory telephone lines.

130.    Mr. Evans was in the office along with another visual information specialist, Ms.

Annette Frye-Gunter, a black female, who had begun working for PMG that same

week under a detail from another office.

131.    Because Plaintiff was under pressure due to the short deadline for completing the

Unified Agenda, Plaintiff asked Mr. Davis if he would find someone to help cover the

telephones while Plaintiff worked on the Unified Agenda but he refused by stating that

"no one is available".

132.    Plaintiff asked him if Ms. Frye-Gunter could assist with the telephone calls but he

replied, "No, she is busy working on something" but Ms. Frye-Gunter informed

Plaintiff that her computer was broken and that she was unable to perform any work on it that day.

133.  Mr. Davis denied Plaintiff's request for assistance, which unreasonably interfered with Plaintiff's work performance and nearly frustrated Plaintiff's ability to meet her deadline.

134.  Mr. Davis and Mr. Benedi have not developed Plaintiff as an employee but have hindered her professional development by curtailing her responsibilities without justification, by no longer allowing her to work on special projects and by treating her less favorably that minority and/or male employees.

135.  The OPM Director's Office decided to develop a document management system (DMS) and contracted with Booze Allen Hamilton to develop the system.

136.  Booze Allen Hamilton requested that Plaintiff to attend various meetings and participate in the development of the DMS correspondence tracking system because of her experience in developing the FRMS, but Mr. Davis and/or Mr. Benedi refused to allow Plaintiff to participate in the project.

137.  Instead, Mr. Davis and/or Mr. Benedi assigned Ms. Carter to work with Booze Allen Hamilton in developing the regulatory aspects of the correspondence tracking system even though Ms. Carter had less experience in developing tracking systems than Plaintiff.

138.  The DMS was activated on approximately February 2006, but the regulatory tracking components of the DMS are not being utilized by the agency.

139.    By refusing to allow Plaintiff to work with Booze Allen Hamilton when they requested her assistance hindered Plaintiff from being able to advance in her career and further diminished Plaintiff's material responsibilities and opportunities.

140.    Mr. Davis and Mr. Benedi arbitrarily denied Plaintiff opportunities to work on projects, which fell under the scope of her Position Description, and was damaging to Plaintiff's career.

141.    Mr. Davis' and Mr. Benedi's arbitrary denial of opportunities in furtherance of her career caused Plaintiff to suffer mental anguish, physical harm due to stress from emotional pain and suffering and has been overall psychologically damaging to her.

142.    On approximately January 25, 2006, Plaintiff initiated another informal EEO action against OPM that was not resolved at the informal level.

143.    On approximately February 21, 2006, Plaintiff filed a second formal EEO complaint based on discrimination due to race and sex and in retaliation for her filing the previous EEO complaint but following an investigation, Defendant took no action to correct the harassment, retaliation or discrimination.

144.    On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC) on the second formal complaint but the EEOC did not schedule a hearing within the 180-day time frame.

145.    Plaintiff thereby exhausted her administrative remedies on the issues pertaining to the denial of office space, refusing to provide Plaintiff with assistance when needed and for denying Plaintiff the opportunity to work on the DMS project and she is therefore entitled to seek relief from this Court.

146.    On approximately January 31, 2006, Plaintiff asked Mr. Benedi if she could take a lunch break outside the core hours, which are from 11:30 am to 1:30 pm, because she needed to run an errand but Mr. Benedi denied her request after stating that he checked with "Human Resources" and was advised that employees "must" take their lunch break during the core hours.

147.    Although Mr. Davis was out of the office on that date, when he returned he told Plaintiff that she had to use her leave for the time that she was absent from the office outside the core lunch hours.

148.    Requiring employees to strictly adhere to the core lunch hours is discretionary because minority and male employees within PMG are allowed to take lunch breaks outside the core lunch hours without using leave.

149.    Ms. Carter frequently took lunch breaks outside the core hours and was not required to use leave and even went to lunch after the core hours following the denial of Plaintiff's request yet Mr. Benedi or Mr. Davis did not object to Ms. Carter taking her lunch outside the core hours.

150.    Mr. Coco was allowed to take lunch breaks outside the core hours without using leave even after the denial of Plaintiff's request.

151.    Mr. Davis and Mr. Benedi denied Plaintiff material benefits afforded to minority and white male employees in retaliation for engaging in and to deter Plaintiff from engaging in protected activity.

152.    On approximately February 1, 2006, Mr. Davis issued Plaintiff a Letter of Reprimand for failing to accurately report her time and attendance.

153.  Mr. Davis obtained Plaintiff's building "swipe" records showing what times Plaintiff entered and exited the building for the period July 29, 2005, through November 1, 2005.

154.  Mr. Davis had been on sick leave recovering from surgery during this time period between July 29, 2005, through November 1, 2005, and Mr. Coco was acting in his stead.

155.  The time period covered under the "swipe" records was around the same time that Plaintiff's elderly mother became critically ill and it was an extremely stressful time for Plaintiff because her schedule had become erratic and changed on a daily basis due to the need to leave work early in order to take her mother to the doctor.

156.  Whenever Plaintiff left early to take her mother to the doctor, she either orally informed Mr. Coco or sent e-mails to him informing him of her leave because he was keeping track of her time while Mr. Davis was recovering from surgery.

157.  On approximately September 23, 2005, Plaintiff informed Mr. Coco that she was leaving for the day but he failed to report Plaintiff's time.

158.  Mr. Coco did not receive a reprimand for failing to accurately report the time.

159.  Mr. Davis did not obtain "swipe" records of other PMG employees and informed Plaintiff that there was "no need to obtain the swipe records of other employees".

160.  Mr. Davis had not complained or commented to Plaintiff about her arrival and departure times prior to the audit of the "swipe" records and had no reason to scrutinize her records.

161.  Based on the "swipe" records, Mr. Davis stated in the reprimand that Plaintiff had not reported 5 hours and 5 minutes of leave that she used.

162.   Plaintiff explained and documented how she had accurately reported her leave and/or made up any time used where the "swipe" records indicated that there was a shortfall but Mr. Davis refused to retract the reprimand.

163.   Plaintiff also showed him that on approximately September 15 and 16, Plaintiff was charged with 3 hours of SL for each day when she should have only been charged with one hour of SL for each of those days that resulted in Plaintiff being charged 4 hours of SL that she had not used.

164.   On approximately February 2, 2006, and March 16, 2006, Mr. Davis tampered with or authorized the tampering of Plaintiff's annual and sick leave without Plaintiff's knowledge and/or authorization that adversely resulted in a loss of benefits, namely a loss of 36 hours of "Use or Lose" (U/L) Annual Leave (AL) and a loss of 98.5 hours of accrued Sick Leave (SL).

165.   As a result of the leave tampering, on approximately February 21, 2006, and March 16, 2006, Plaintiff was denied the use of SL that she had earned but which leave was not reflected in her leave statement due to the altering of her leave.

166.   On approximately February 2, 2006, Plaintiff notified Mr. Davis about the discrepancies but Mr. Davis failed to correct all of the discrepancies until after Plaintiff filed a formal EEO complaint on approximately May 27, 2006.

167.   Mr. Davis was not issued a reprimand for failing to accurately report Plaintiff's leave.

168.   Plaintiff initiated an informal EEO action on or about March 7, 2006, which was not resolved at the informal level and then on approximately March 21, 2006, Plaintiff filed a third formal EEO complaint due to discrimination on the basis of race, sex and

retaliation for filing EEO complaints but following an investigation, Defendant took no action to correct the harassment, retaliation or discrimination.

169.    On approximately August 19, 2006, Plaintiff filed a request for a hearing at the Equal Employment Opportunity Commission (EEOC) on the third formal complaint but the EEOC did not schedule a hearing within the 180-day time frame.

170.    Plaintiff thereby exhausted her administrative remedies on the issues pertaining to leave tampering, the Letter of Reprimand and lunch breaks.

171.    The acts of discrimination, sexual harassment and retaliation have caused Plaintiff a great deal of stress, anxiety, worry, and mental and emotional anguish that has had a negative impact on her health, her ability to seek alternative employment and her ability to advance in her career.

172.    Plaintiff's rights have been violated and OPM, through its agents Mr. Davis and Mr. Benedi, have knowingly and willfully engaged in conduct that constitutes bad faith, mismanagement, negligence, malfeasance, and abuse of authority and the public trust.

## COUNT I

### ("Reverse" Race Discrimination)

173.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

174.    OPM, by and through its agents Mr. Benedi and Mr. Davis, has discriminated against Plaintiff on the basis of race by allowing Hispanic and Black minority females to telework, telework without a trial period and/or without initially requiring an executed agreement but denying Plaintiff telework even after undergoing a trial period where no *bona fide* problems were encountered during the trial period.

175.    OPM, by and through its agents Mr. Benedi and Mr. Davis, has discriminated against

Plaintiff on the basis of race by allowing a Black minority female to telecommute in

order to better care for a family member who had become ill but denying Plaintiff the

opportunity to telework when her family member had become critically ill.

176.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated

Plaintiff less favorably than its minority or white male employees.

177.    These acts constituted adverse employment actions and/or questionable practices that

give rise to an inference of discrimination and/or retaliation in light of Defendant's

PMG's propensity to discriminate against white females.

178.    For all of the reasons described in this Complaint, Defendant's actions by and through

its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

179.    Defendant's actions by and through its agents were done with either malice or with

reckless indifference to Plaintiff's rights under law.

180.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has

suffered, and will continue to suffer, both economic and non-economic losses,

emotional distress and other compensable damages.


**COUNT II**

**(Sexual Harassment, Reverse Race and
Sex Discrimination, and Retaliation)**

181.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

182.    OPM, by and through its agent Mr. Davis, sexually harassed Plaintiff by intently and

deliberately staring at her breasts when issuing to her the 2005 Performance Appraisal

and giving her a poor performance rating based on duties not covered by her

Performance Standards that suggested that if she wanted to receive a higher rating, she would need to have more than a "professional relationship" with him.

## COUNT III

### (Sexual Harassment, Reverse Race and Sex Discrimination, and Retaliation)

183.  Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

184.  OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff by taking reprisals against Plaintiff in order to punish and/or retaliate against her for not having more than a "professional relationship" with him and/or for filing Fair Labor Standards Act (FLSA) grievances against same.

185.  OPM, by and through its agent Mr. Davis, took reprisals against Plaintiff by issuing Plaintiff a poor Performance Appraisal and issuing Kline a Counseling Memorandum materially altering and eliminating her professional responsibilities, by assigning her menial tasks and clerical duties, and by poorly rating her on the diminished responsibilities rather than on the elements contained in her Performance Standards.

186.  OPM, by and through its agent Mr. Davis, has abused its power by subjecting Plaintiff to unreasonable working conditions, imposing unreasonable performance standards on her and/or by unfairly rating her for not responding to his sexual innuendos and/or advances in an attempt to cause Plaintiff to fail in her job and/or to discourage her from exercising her rights.

187.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

188.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

189.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

### COUNT IV

### (Reverse Race and Sex Discrimination,)

190.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

191.    OPM, by and through its agent Mr. Davis, discriminated against Plaintiff by giving her a poor performance rating even though Plaintiff did not commit errors and/or omissions in performing regulatory work and where other employees were given a higher rating that did commit errors and/or omissions in the regulatory work.

192.    OPM, by and through its agent Mr. Davis, discriminated against Plaintiff by materially altering and eliminating her professional responsibilities, by assigning her menial tasks and clerical duties, and by poorly rating her on the diminished responsibilities rather than on the elements contained in her Performance Standards.

193.    OPM, by and through its agents Mr. Benedi and Mr. Davis have treated Plaintiff less favorably than its minority or white male employees.

194.    OPM, by and through its agent Mr. Davis, has abused its power by subjecting Plaintiff to unreasonable working conditions, imposing unreasonable performance standards on her and/or by unfairly rating her in an attempt to cause Plaintiff to fail in her job and/or to discourage her from exercising her rights.

195.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

196.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

197.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT V

### (Retaliation)

198.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

199.    OPM, by and through its agent Mr. Davis, retaliated against Plaintiff by giving her a poor performance rating even though Plaintiff did not commit errors and/or omissions in performing regulatory work and where other employees were given a higher rating that did commit errors and/or omissions in the regulatory work.

200.    OPM, by and through its agent Mr. Davis, retaliated against Plaintiff by materially altering and eliminating her professional responsibilities, by assigning her menial tasks and clerical duties, and by poorly rating her on the diminished responsibilities rather than on the elements contained in her Performance Standards.

201.    OPM, by and through its agents Mr. Benedi and Mr. Davis have treated Plaintiff less favorably than its minority or white male employees.

202.    OPM, by and through its agent Mr. Davis, has abused its power by subjecting Plaintiff to unreasonable working conditions, imposing unreasonable performance standards on

her and/or by unfairly rating her in an attempt to cause Plaintiff to fail in her job and/or to discourage her from exercising her rights in retaliation for exercising her rights.

203.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

204.  Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

205.  As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

**COUNT VI**

**("Reverse" Race Discrimination and Retaliation)**

206.  Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

207.  OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of race by willfully and maliciously sending offensive e-mails to Plaintiff's professional working contacts when Mr. Davis did not object to the same or other people meeting with its minority or white male employees.

208.  OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously sending offensive e-mails to Plaintiff's professional working contacts for the purpose of discouraging them from working with Plaintiff in order to justify giving her a poor performance rating.

209.  OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

210. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

211. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

212. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

213. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT VII

## (Retaliation)

214. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

215. OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously sending offensive e-mails to Plaintiff's professional working contacts for the purpose of discouraging them from working with Plaintiff in order to justify giving her a poor performance rating.

216. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

217. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

218.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

219.  Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

220.  As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT VIII

### (Sexual Harassment)

221.  Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

222.  OMP, by and through its agent Mr. Davis, sexually harassed Plaintiff by intently and deliberately staring at her breasts while issuing her a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend.

223.  OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

224.  These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

225.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

226.  Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

227.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT IX

### (Sex Discrimination)

228.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

229.    OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of sex by willfully and maliciously issuing to Plaintiff a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend but by not issuing a Counseling Memorandum to a white male member of PMG who had originally sent the same inappropriate e-mail to both Plaintiff and to Mr. Davis as well as other members of PMG.

230.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

231.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

232.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

233.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

234.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT X

### (Retaliation)

235.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

236.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously issuing to Plaintiff a Counseling Memorandum for sending an inappropriate e-mail outside the agency to a friend but by not issuing a Counseling Memorandum to a white male member of PMG who had originally sent the same inappropriate e-mail to both Plaintiff and to Mr. Davis as well as other members of PMG.

237.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

238.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

239.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

240.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

241.   As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XI

### ("Reverse" Race and Sex Discrimination)

242.   Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

243.   OPM, by and through its agents Mr. Davis and Mr. Benedi, has discriminated against Plaintiff by willfully and maliciously offering and/or furnishing superior office space to minority and/or male employees with less tenure, less seniority and/or less need for the space than Plaintiff while denying Plaintiff adequate and/or appropriate office space for properly performing her work.

244.   OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

245.   These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

246.   For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

247.   Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

248.   As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XII

### (**"Reverse" Race and Sex Discrimination and Retaliation**)

249.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

250.    OPM, by and through its agents Mr. Davis and Mr. Benedi, has retaliated against

Plaintiff for exercising her rights by willfully and maliciously offering and/or

furnishing superior office space to minority and/or male employees with less tenure,

less seniority and/or less need for the space than Plaintiff while denying Plaintiff

adequate and/or appropriate office space for properly performing her work.

251.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated

Plaintiff less favorably than its minority or white male employees.

252.    These acts constituted adverse employment actions and/or questionable practices that

give rise to an inference of discrimination and/or retaliation in light of PMG's

propensity to discriminate against white females.

253.    For all of the reasons described in this Complaint, Defendant's actions by and through

its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

254.    Defendant's actions by and through its agent(s) were done with either malice or with

reckless indifference to Plaintiff's rights under law.

255.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has

suffered, and will continue to suffer, both economic and non-economic losses,

emotional distress and other compensable damages.

## COUNT XIII

### (**"Reverse" Race and Sex Discrimination**)

256.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

257.    OPM, by and through its agent Mr. Davis, has discriminated against Plaintiff on the basis of race and sex by willfully and maliciously requiring her to cover the office telephones on approximately February 2, 2006, even though she was working on a high priority matter under a strict deadline but failed to require minority and/or male employee(s) to cover the telephones who were not working on high priority matters.

258.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

259.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

260.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

261.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

262.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XIV

### (Retaliation)

263.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

264.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously requiring her to cover the office telephones on approximately February 2, 2006, even though she was working on a high priority

matter under a strict deadline but failed to required minority and/or male employee(s) to cover the telephones who were not working on high priority matters.

265.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

266.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

267.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

268.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

269.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XV

### ("Reverse" Race and Sex Discrimination)

270.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

271.    OPM, by and through its agents Mr. Davis and Mr. Benedi, has discriminated against Plaintiff by willfully and maliciously rescinding her administrative rights to the FRMS without justification; by forbidding her from working with OPM's contractor in the development of a correspondence tracking system for OPM; and assigning the task to minority and/or male employees with less experience in developing tracking systems.

272.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

273.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

274.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

275.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

276.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XVI

### (Retaliation)

277.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

278.    OPM, by and through its agents Mr. Davis and Mr. Benedi, has retaliated against Plaintiff for exercising her rights by willfully and maliciously rescinding her administrative rights to the FRMS without good cause; by forbidding her from working with OPM's contractor in the development of a correspondence tracking system for OPM but by assigning the task to minority and/or male employees with less experience in developing tracking systems.

279.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

280. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

281. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

282. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

283. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XVII

### ("Reverse" Race and Sex Discrimination)

284. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

285. OPM, by and through its agent Mr. Davis and Mr. Benedi, has discriminated against Plaintiff on the basis of sex by willfully and maliciously denying Plaintiff the benefit of taking a lunch break outside the core hour but at the same time allowing minority and/or male employees to take a lunch break outside the core hours; and/or by requiring Plaintiff to take her lunch break at a specific time but not requiring minority and/or male employees to take their lunch break at a specific time.

286. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees

287. These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

288. For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

289. Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

290. As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XVIII

### (Retaliation)

291. Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

292. OPM, by and through its agent Mr. Davis and Mr. Benedi, has retaliated against Plaintiff for exercising her rights by willfully and maliciously denying Plaintiff the benefit of taking a lunch break outside the core hour but at the same time allowing male and/or minority employees to take a lunch break outside the core hours; and/or requiring Plaintiff to take her lunch break at a specific time but not requiring minority and/or male employees to take their lunch break at a specific time.

293. OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees

294.    These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

295.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

296.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

297.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XIX

### (Retaliation)

298.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

299.    OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously auditing her "swipe" records for no justifiable reason while minority and/or white male employees were not audited; and issuing to Plaintiff a Letter of Reprimand for failing to accurately report her time based on the audit but failing to issue Letter of Reprimand to employees who failed to accurately report the time.

300.    OPM, by and through its agents Mr. Benedi and Mr. Davis have thereby treated Plaintiff less favorably than its minority or white male employees.

301.  These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of discrimination and/or retaliation in light of PMG's propensity to discriminate against white females.

302.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

303.  Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

304.  As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XX

### (Retaliation)

305.  Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

306.  OPM, by and through its agent Mr. Davis, has retaliated against Plaintiff for exercising her rights by willfully and maliciously tampering with and/or causing to be tampered with Plaintiff's earned annual and sick leave and by failing to properly amend the leave for nearly three (3) months that caused Plaintiff to be unable to use her sick leave when needed and requested.

307.  These acts constituted adverse employment actions and/or questionable practices that give rise to an inference of retaliation in light of PMG's propensity to discriminate against white females.

308.  For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

309.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

310.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XXI

### (Retaliatory Harassment)

311.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

312.    Mr. Davis and Mr. Benedi have engaged in pervasive and persistent harassment of Plaintiff in retaliation for exercising her rights.

313.    For all of the reasons described in this Complaint, Defendant's actions by and through its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

314.    Defendant's actions by and through its agent(s) were done with either malice or with reckless indifference to Plaintiff's rights under law.

315.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress and other compensable damages.

## COUNT XXII

### (Hostile Work Environment)

316.    Plaintiff incorporates paragraphs 1 through 171 as fully stated herein.

317.    Due to the persistent and pervasive retaliatory and discriminatory acts of Mr. Davis and Mr. Benedi, Plaintiff has been subjected to a hostile work environment.

318.    For all of the reasons described in this Complaint, Defendant's actions by and through

its agent(s), violated Title VII of the Civil Rights Act of 1964 and the No Fear Act.

319.    Defendant's actions by and through its agent(s) were done with either malice or with

reckless indifference to Plaintiff's rights under law.

320.    As a result of the Defendant's actions by and through its agent(s), Plaintiff has

suffered, and will continue to suffer, both economic and non-economic losses,

emotional distress and other compensable damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her

favor and against Defendant.  Plaintiff requests a jury trial and that she be awarded the

following relief:

a.    Declaratory relief, including but not limited to a declaration that Defendant's

actions have violated Title VII;

b.    Appropriate injunctive relief, including but not limited to an order restraining

Defendant from engaging in further discriminatory and retaliatory conduct of the

types of which Plaintiff complains herein;

c.    Disciplinary action against Mr. Davis and/or Mr. Benedi;

d.    Removal of the Letter of Reprimand and Counseling Memorandum from Plaintiff's

official personnel file;

e.    A promotion to a GS-14/1;

f.  Revise Plaintiff's Performance Standards to eliminate subjective elements, such as those pertaining to Plaintiff's "relationships" and other elements that are unattainable;

g.  Issue Plaintiff a Performance Appraisal rating of "Outstanding" for 2004 and 2005, remove all derogatory comments from the appraisals and pay respective bonuses;

h.  $100,000 in back pay;

i.  $300,000 in statutory damages for each Count;

j.  Ability to telecommute full time performing the work that Plaintiff is currently performing except for answering PMG telephone lines and provide Plaintiff with a laptop computer, printer and Blackberry for teleworking;

k.  Allow Plaintiff to occasionally use her lunch break outside the core hours if necessary with prior approval;

l.  Give Plaintiff administrative rights to the FRMS;

m.  Pay Kline and give employment credit for leave without pay that she used in lieu of being allowed to telework (approximately 160 hours);

n.  Pre-judgment and post-judgment interest at the highest lawful rate;

o.  Attorneys' fees and costs of this action; and

p.  Other such further relief as justice allows.

Respectfully submitted,

VALERIE KLINE, *PRO SE*
83 E Street
Lothian, MD  20711
(301) 509-2684