**U.S. DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

Valerie Kline                                          *
83 E Street                                            *
Lothian, MD 20711                                      *
                                                       *
                                      Plaintiff *
                                                       *
                    v.                                 *      Case No. 1:07-cv-451 (JR)
                                                       *
Linda M. Springer, Director                            *
U. S. Office of Personnel Management                   *
1900 E Street, N.W.                                    *
Washington, D.C.  20415                                *
                                      Defendant *
                                                       *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## REQUEST FOR RULE 56(f) AND/OR RULE 32 SANCTIONS

At the March 12, 2008, "emergency" motions hearing, the Court <u>ordered</u> Springer

to deliver requested documents and respond to interrogatories within 10 days, i.e.

March 22, 2008.  See *Plaintiff's First Set of Interrogatories and Repeat of Request for

Production of documents (revised),* Ex. 1.  The Court ordered Kline to respond to

Springer's Motion to Dismiss 30 days after receipt of the documents.  Springer responded

to the Request for Interrogatories on March 22, 2008, but <u>failed to provide *any* of the

requested documents</u>.  The responses to the interrogatories were also deficient.

Springer objected to the documents on the grounds of relevancy, privacy and

security.  Kline sent letters to Springer's counsel explaining (1) how the documents were

relevant and; (2) how the requested information was exempt under the Privacy Act; and

(3) how Kline has been fully investigated and given security clearance by OPM.  Kline

insisted that Springer provide the requested documents and adequately respond to the

interrogatories.  See Ex. 2.  In response, Springer produced only token documents on

April 11, 2008, consisting of five (5) Position Descriptions requested under No. 4 but

failed to produce the Vacancy Announcements and Performance Standards requested and

also failed to produce the additional 29 documents requested by Kline.   Moreover,

Springer failed adequately answer the interrogatories.

      The Court informed Kline at the March 12 hearing that if Springer did not

produce the documents, Kline could file an action pursuant to Fed. Rules Civ. P. 56(f).

      Rule 56(f) provides:

> (f) WHEN AFFIDAVITS ARE UNAVAILABLE.  If a party opposing the
> motion shows by affidavit that, for specified reasons, it cannot
> present facts essential to justify its opposition, the court may:
>    (1) deny the motion;
>    (2) order a continuance to enable affidavits to be obtained,
>    depositions to be taken, or other discovery to be undertaken; or
>    (3) issue any other just order.

      Pursuant to the attached Affidavit of Valerie Kline, Ex. 3, Kline submits the

documents that Springer failed to supply and where Springer failed to indicate that there

were no documents are essential to justify her opposition.

      Because Springer has substantially failed to provide the requested documents,

failed to indicate there are no documents in response to the request and substantially

failed to respond to the interrogatories, plaintiff requests that the Court deny *Defendant's*

*Motion to Dismiss or for Summary Judgment or, in the Alternative, for a More Definite*

*Statement* (the "Motion") pursuant to Rule 56(f) and find that Plaintiff has established a

*prima facie* case.

Alternatively, plaintiff requests the following relief. Because the Court initially directed that the documents be produced pursuant to Rule 26(a), Rule 37(a)(2)(A) of the Fed. Rules of Civ. Prod. provides for sanctions in the event that a party fails to make a disclosure required by Rule 26(a). Since Springer has failed to supply most of the requested documents, Kline requests that the Court impose the following sanctions pursuant to Rule 37(c)(1) and 37(b)(2)(A), (B), (C):

That the Court issue: (A) the proposed order that the matters regarding which the order is made and the designated facts therein shall be taken to be established for the purposes of establishing the facts in this case in accordance with Kline's claims in obtaining the order; and (B) the proposed order refusing to allow Springer to support or oppose the designated claims or defenses, or prohibiting Springer from introducing designated matters in evidence with regard to the following:

1.    A finding that Jacquline Carter began teleworking on a regular basis after her husband suffered several strokes.

2.    A finding that PMG allowed Rivera-Lopez telework without an executed telework request agreement.

3.    A finding that no problems were encountered during Kline's trial telework period.

4.    A finding that Kline was similarly-situated to Carter and Rivera-Lopez, who were allowed to telework.

5.    A finding that Lara Rivera-Lopez and Jose Velaquez answered PMG telephones and assisted with walk-in customers.

6.    A finding that when an employee is detailed to a new office, the detail action is initiated by an SF-52, Request for Personnel Action, accompanied by a position

description that assigns the employee to a new position for a specified period of time.

7.    A finding that as a GS-9 and/or below, Shirley Sewell was tasked with performing the clerical duties for PMG that Kline, as a GS-12, was tasked with performing when Kline's Position Description was changed on 6-10-2003.

8.    A finding that Kline did not fail to cover PMG telephones after being tasked with the primary responsibility for them on August 24, 2005.

9.    A finding that Kline did not fail to perform duties related to the FACA database.

10.   A finding that Kline never exceeded her authority during October 7, 2002 to January 1, 2007.

11.   A finding that Kline never failed to respond to the Publications Inbox after being tasked with primary responsibility for this duty.

12.   A finding that Kline never failed to update or maintain the Publications database.

13.   A finding that Coco was primarily responsible for the Publications Inbox.

14.   A finding that Kline never made mistakes or errors when performing regulatory work.

15.   A finding that Kline never missed deadlines on any of her work projects.

16.   A finding that Kline is the only employee in PMG that has a Performance Standard based on the ability to have good relationships with other employees.

17.   A finding that Kline reviewed OPM's pending "old and cold" regulations at her own initiative.

18.   A finding that Kline suggested a procedure for having the Office of Communications and Public Liaison notify PMG of any publications it approves for inclusion into the Publications database.

19.   A finding that no complaints were ever made against Kline by any PMG office or Director Springer's office.

20.   A finding that Davis generated additional defamatory email to Margaret McElrath and Arlene Taylor.

21.   A finding that Kline was responsible for initiating and directing the development of the FRMS.

22.   A finding that Kline was the only one on the 5th floor assigned a specific time for going to lunch and other PMG employees could go to lunch anytime they wanted.

23.   A finding that Kline never failed to properly report her leave.

24.   A finding that PMG has no instructions on how PMG employees are to properly report their leave.

25.   A finding that Kline reported her leave more accurately than white male and/or minority employees whose "swipe" records were not scrutinized during the timeframe of Letter of Reprimand to Kline.

26.   A finding that Kline never instructed Davis to make amendments to her annual and sick leave that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave on pay period ending 11-26-2005 and that Davis made these amendments without Kline's knowledge and/or authorization.

27.   A finding that Davis did not instruct Sewell to amend Kline's leave for pay period ending 11-26-2005 that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave but that Davis is the one who made the amendments to Kline's leave.

28.   A finding that Issac Evans, Shirley Sewell, Miriam Heard-Johnson and Stephen Hickman have or had superior office space to Kline even though they had or have less seniority and less tenure than Kline.

29.   A finding that Kline performed the same type and kind of regulatory work as Jacquline Carter but PMG failed to promote Kline.

30.   A finding that Kline was the only PMG employee formally tasked with primarily answering PMG telephone lines.

31.   A finding that Shirley Sewell could have continued performing or assumed the clerical duties that were assigned to Kline.

32.   A finding that Lara Rivera-Lopez answered telephones and assisted with walk-in customers and was allowed to telework without an executed telework agreement.

33.   A finding that Kline acquired administrative rights to the Federal Register Management system as a result of being the one who initiated and directed the development of the system.

34.   A finding that sending an email to Arlene Taylor and her supervisor, Margaret McElrath was unreasonable and constituted an overbearing surveillance of Kline.

35.   A finding that Kline performed the duties of responding to the publications Inbox and answered the PMG telephone lines without issue once she was assigned primary responsibility for the duties.

36.    A finding that Kline was not allowed to assist walk-in customers other than in a clerical capacity.

37.    A finding that no formal or informal complaints from offices within or outside PMG have ever been made against Kline during October 7, 2002 to January 1, 2007.

38.    A finding that Kline needed support staff while working on the Semiannual Unified Agenda of Regulatory Actions.

39.    A finding that Annette Gunter-Frye could have provided backup telephone support to Kline while she was working on the Semiannual Unified Agenda of Regulatory Actions.

40.    A finding that PMG did not scrutinize any employees swipe records other than Kline's during the period from October 7, 2002 to January 1, 2007.

41.    A Court Order pursuant to 5 U.S.C.§ 552a(b)(11) that the addresses for Isaac Evans, Annette Gunter-Frye, Lara Rivera-Lopez, Jose Velaquez, Margaret McElrath and Arlene L. Taylor be provided to Kline.

42.    A finding that during the time frame from October 7, 2002 to January 1, 2007, PMG awarded a monetary performance bonus to employees who received an Exceeds Fully Successful rating or above on their performance ratings

Respectfully submitted,

Valerie Kline, *Pro Se*

# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Valerie Kline | * |
| 83 E Street | * |
| Lothian, MD 20711 | * |
| | * |
| Plaintiff | * |
| | * |
| v. | *    Case No. 1:07-cv-451 (JR) |
| | * |
| Linda M. Springer, Director | * |
| U. S. Office of Personnel | * |
| Management | * |
| 1900 E Street, N.W. | * |
| Washington, D.C.  20415 | * |
| Defendant | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REPEAT OF REQUEST FOR PRODUCTION OF DOCUMENTS (revised)

Comes the plaintiff Valerie Kline, acting *pro se*, and propounds her first set of interrogatories and request for production of documents pursuant to LCvR 26.2 and Rules 30 and 33, Federal Rules of Civil Produre. The Plaintiff asks that the Defendants answer the interrogatories and document requests within twenty (20) calendar days of service, and appending the requested documents to those Answers.

## INSTRUCTIONS

The following instructions apply to these interrogatories and request for production of documents:

1. Pursuant to Civil Rule 26(e), these interrogatories are continuing so as to require the filing of subsequent answers promptly in the event that Defendants, by or through any of their agents, counsels or other representatives, learn additional facts relevant to any answers not set forth in their answers to these Interrogatories or discover that any information given in an answer or answers is erroneous.

2. Each interrogatory is to be answered separately and as completely as possible. The fact that investigation is continuing or that discovery is not complete does not excuse failure to answer each interrogatory as fully as possible. The omission of any name, fact, or other item of information from an answer shall be deemed a representation that such name, fact, or other item is not known to Defendant, his agents, counsel, or other representatives at the time the answers to these Interrogatories are served upon Plaintiff.

3. For each and every answer to these Interrogatories:

a. Identify each and every person who participated in supplying information and/or drafting your response or any part thereof;

b. If the answer to any of these Interrogatories was made by referring to or reviewing any documents, identify each and every document referred to or reviewed and the Interrogatory or Interrogatories in connection with which they were used.

4. As used in these Interrogatories the singular shall be deemed to include the plural, the plural to include the singular, and words in the masculine, feminine, or neuter shall include each of the other genders as necessary to make the Interrogatory inclusive rather than exclusive.

5. Where an Interrogatory contains a general question or questions, followed by a specific question or questions, the specific question or questions are to be read and interpreted as requesting additional information, not as limiting the general question or questions.

6. With respect to each Interrogatory, identify each and every document prepared by, or in the possession, custody, or control of you or any of your officers, agents, or employees that relates to or refers to the subject matter of the Interrogatory in question.

7. Whenever information is requested in one of the following Interrogatories or subparts thereof that you previously furnished in answer to another Interrogatory herein, such information need not be restated. It will be sufficient for you to identify the previous answer containing the information requested.

8. Whenever an Interrogatory calls for information that is not available to you in the form requested but which is available in another form or can be obtained at least in part from other data in your possession, so state and either (i) supply the information requested in the form in which it is available or (ii) supply the data from which the information requested can be obtained.

9. If you claim a privilege with respect to information pertaining to any document that you are asked to identify or describe in these Interrogatories, furnish a list signed by counsel giving the following information with respect to each such document:

   a. The title of the document;

   b. The nature of the document, e.g., interoffice memorandum, correspondence, report, etc.

   c. The identity of the sender and the identity of the recipient(s) of the document;

   d. A statement of the basis upon which the privilege is claimed and a summary of the subject matter of the document in sufficient detail to permit the Court to rule on the propriety of the claim of privilege; and

   e. The paragraph number of the Interrogatory to which the document is responsive or otherwise pertains.

10. Interrogatories calling for numerical or chronological information shall be deemed, to the extent that precise figures or dates are not known, to call for estimates. In each instance that an estimate is given, identify it as such together with the source of information upon which you base the estimate.

11. In answering these Interrogatories every source of information to which you have access should be consulted, regardless of whether the source is within your immediate possession or control. All documents or other information in the possession of experts or consultants should be consulted.

12. All interrogatories relate to the time frame between October 7, 2002 to January 1, 2007.

## INTERROGATORIES

1.    Identify who was assigned responsibility for the regulatory work that Carter performed after her retirement, their grade and how the position was filled.

2.    Identify any and all person(s) in PMG that was qualified to fill the position that Carter occupied?

3.    Identify when Carter begin teleworking and how many days per week that she teleworked?

4.    Identify the function of the Resource Center, its locations and dates of the locations approximately how many customers per day the Resource Center had, when it officially closed and any other information related to the closing of the Resource Center, such as studies, memoranda, etc.

5.    Identify when Lara Rivera-Lopez worked for PMG, and whether she teleworked and how often, what her grade and duties were, including whether she primarily covered PMG's telephones or assisted walk-in customers.

6.    Identify the grade and duties of Robert Coco, and whether he primarily covered PMG telephone lines, the individual whose telephone that the PMG line audibly rings assisted on, whether he assists and the extent of his assistance to walk-in customers?

7.    Identify how the development of the Federal Register Management System (FRMS) came about, when it was put into production and all persons in PMG who were involved in the development of the FRMS and the extent of their involvement.

8.    Identify how long had Kline been with working with Arlene Taylor on the FRMS before Davis sent Taylor an email complaining about Taylor's visit to Kline?

9.    Identify when Kline was assigned primary responsibility for answering PMG telephone lines and responding to the Publication inbox?

10.    Identify the manner or ways that Kline assisted non-regulatory PMG walk-in customers, including whether she was allowed to

sign off on the 4150 Printing Request Form, allowed to assist customers with their graphic design projects, make covers for customers' reports or documents?

11.  Identify the kind of graphics work that Kline performed, how long she performed graphics work, and when and why she stopped performing graphics work?

12.  Identify when Kline was assigned responsibility for attending to unsolicited faxes and what that duty entailed?

13.  Identify any formal or informal complaints made against Kline, who made them, when they were made and why they were made that were used when giving her a performance rating.

14.  Identify any offices outside of PMG that expressed an interest in having Kline work for them on a detail and the outcome of that requests.

15.  Identify the level of authority Kline had/has and whether she ever exceeded her level authority and how and when she exceeded it.

16.  Identify the grades/step and approximate size of the offices or work spaces of Issac Evans, Shirley Sewell, Stephen Hickman, Robert Coco, Jacquline Carter,Valerie Kline and Miriam Heard?

17.  Describe in detail the Semiannual Unified Agenda of Regulatory Actions, its process, deadlines and strictness of the deadlines?

18.  Identify the PMG telephone system and approximately how long would it take to train someone on the system?

19.  Identify all persons that have had their swipe records reviewed by PMG management, how often the swipe records are reviewed, and why the swipe records are reviewed.

20.  Identify all persons who acted for Davis when he was absent from the office and who was acting for him when he was recovering from surgery?

21.  Identify the race and gender of all the employees working for PMG and the dates they were hired.

22.  Please supply the addresses that Issac Evans, Annette Gunter-Frye, Lara Rivera-Lopez, Shirley Sewell, Robert Coco, Jacquline Carter, Jose Velaquez and Arlene L. Taylor, Miriam Heard Johnson, Leo Brody and Sherman Benton0 may be subpoenaed.

23.  Is it the practice of PMG or was it the practice of PMG for the years 2002-2007 to issue monetary performance bonuses to employees who received an Exceeds Fully Successful rating on their Performance Appraisal?

## REQUEST FOR DOCUMENTS

You are hereby requested again to produce the following documents:

1.  Copy of the Federal Register training manual developed by Jacquline Carter while working as a reemployed annuitant from approximately November 6, 2006, to February 20, 2007.

2.  Documentation showing or indicating the sex, age, race, grade and number of federal employees working in PMG, including the mailroom.

3.  Executed Telework Agreement(s) for Jacquline Carter, Lara Rivera-Lopez, Stephen Hickman and any other PMG employees authorized to telework.

4.  Copies of the Position Description(s), Performance Standards and Vacancy Announcements for the following personnel while employed in PMG:  Stephen Hickman, Jacquline Carter, Robert Coco, Issac Evans, Shirley Sewell, Miriam Heard-Johnson, Lara Rivera-Lopez and Jose Velaquez.

5.  Copy of the Vacancy Announcement, Position Description and Performance Standards used to fill the position and/or slot occupied by Jacquline Carter.

6.  Swipe records for Issac Evans, Robert Coco, Jacquline Carter, Shirley Sewell, Miriam Heard-Johnson, Cassandra Thompson, Anne Dixon and Philip Watson during the time period of 7/29/05 through 11/1/05.

7.  Documentation of any and all communications between Davis and Margaret McElrath and/or Arlene Taylor.

8.  Documentation showing the floor plans of PMG work areas for the period from 10/2002-1/2007.

9.  Documents indicating where other members of PMG have been tasked to cover PMG telephone lines.

10. Documentation of instances when Kline failed to assist walk-in customers and/or telephone calls.

11. Documentation indicating when Kline was charged with primary responsibility for assisting walk-in customers of PMG.

12. Documentation from Dona Bland of OMB requesting that PMG review the "old and cold" regulations.

13. Documentation indicating when Kline was charged with primary responsibility for responding to the Publications database, working on the Visual Information System, Publications Inbox and FACA database.

14. Documentation informing Kline that Robert T. Coco was going to be on leave and to respond to the Publications database while Coco was on leave.

15. Documentation showing or indicating times when Kline failed to make or follow through on making changes to the Publications database or FACA database.

16. Documentation of communications to William M. Davis and/or Claudio A. Benedi concerning instances where  people from the mailroom, print shop, and/or printing procurement section asked Davis and/or Benedi to keep Kline out of their work areas.

17. Documentation concerning any request(s) to keep Kline out of the Director's suite or other OPM offices.

18. Documentation showing times when Kline exceeded her authority.

19. Documentation of any errors or mistakes Kline made in reviewing or preparing regulatory packages.

20.  Documentation showing or indicating any problems encountered by Davis and/or Benedi as a result of and during Kline's trial telework period.

21.  Documentation between Benedi, Davis and Ronald Flom related to Kline's trial teleworking period.

22.  Documentation showing or indicating the times PMG employees were assigned to go to lunch.

23.  Documentation related to the development of the Federal Register Management System (FRMS) online regulatory tracking system showing who initiated it, how it came about, and instructions to Kline concerning the FRMS.

24.  Documentation showing the reasons for rescinding Kline's administrative rights to the FRMS.

25.  Documentation showing the implementation of procedures for notifying PMG of publications approved by Office of Communications and Public Liaison for inclusion in the Publications Database.

26.  Documentation showing any instances when Kline failed to assist Robert Coco.

27.  Documentation showing where Kline failed to properly report her leave for the pay period ending September 31, 2005.

28.  Documentation showing instructions to PMG employees by Davis for reporting their leave or the proper procedure for employees to report their leave.

29.  Documentation showing where Davis requested amendments or changes to Kline's leave during September 30, 2005 through June 30, 2006.

30.  During the depositions, the issue of performance bonuses came up. Shirley Sewell stated that she received a monetary bonus based on a "Special Act of Service Awards". Mr. Hanes, attorney from the Dept. of Justice, requested copies from Ms Sewell of her "Special Act of Service Awards" and/or certificates or other documentation of the awards.  Jacquline Carter and Robert Coco

stated that they received monetary awards based on their performances as well.  Therefore, please provide copies of all awards, certificates or other documentation of the accompanying monetary bonuses received by Sewell, Carter, Coco and any other PMG employees for the years 2002 through 2007.

Respectfully submitted,


Valerie Kline, *pro se*
(301) 509-2684

Date:  March 12, 2008

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

```
                              *
Valerie Kline                 *
                              *
                   Plaintiff  *
              v.              *    Case No. 1:07-cv-451 (JR)
                              *
Linda M. Springer, Director   *
                   Defendant  *
                              *
```
* * * * * * * * * * * * * * * * * * * * * *  * * * * * * * * * * * * * * * * *

**Additional Document Request**

During the deposition of Robert Coco, he testified that he has responsibility for ordering

all of equipment for the Publishing Management Group that is under $2500-3000 and that he

keeps track of all of the credit card purchases and records of all supplies and items that he orders.

Please provide documentation of all the equipment ordered for Jacquline Carter for her

teleworking.

During the deposition of Jacquline Carter, she testified that she had a laptop, printer,

facsimile machine and telephone line installed in her house for teleworking. Please provide

documentation indicating (1) when the telephone line was installed, (2) bills for the telephone

line and (3) when she received the equipment for teleworking.

Please provide electronic access to Jacquline Carter's laptop that she used while

teleworking and OPM email and electronic access to William Davis' computer and OPM email

and electronic access to Claudio Benedi's computer and OPM email.

Respectfully submitted,

/S/

Valerie Kline, *pro se*
(301) 509-2684

# Certificate of Service

I certify that I sent via first class regular mail or hand carried on March 13, 2008, a copy of *Additional Document Request* and *Plaintiff's First Set Of Interrogatories And Repeat Of Request For Production Of Documents (Revised)* to:

Jeffrey A. Taylor
U.S. Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Claire M. Whittaker
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, NW.
Washington, D.C. 20530

Robin Richardson, Esq.
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street, NW.
Washington, D.C. 20415

Respectfully submitted,


Valerie Kline
83 E Street
Lothian, MD  20711
(301) 509-2684

Exhibit 2

March 26, 2008

**VIA FACSIMILE AND EMAIL**

Claire M. Whitaker
Assistant U.S. Attorney
555 Fourth Street, NW.
Washington, D.C. 20530

      Re: *Kline v. Springer*

Dear Ms. Whitaker:

I have reviewed your response to the first set of interrogatories. Based on my review, I insist that you provide me with the requested documents by the end of this week. If I do not receive them, or if I do not hear from you, I will file a Motion to Compel and for Rule 32 Sanctions on Monday since I believe the documents are relevant and should be provided for the following reasons:

*1. Copy of the Federal Register training manual developed by Jacqueline Carter while working as a re-employed annuitant from approximately November 6, 2006, to February 20, 2007.*
      *Response: OBJECTION: This request is for information that is outside of the relevant time period. Moreover, it is not relevant to this case and is not likely to lead the discovery of information that is relevant to this case.*

This manual will show the duties performed by Carter, which is relevant to Count I (Telework) because I claim that I performed the same duties as Carter. By looking at the procedures, I will be able to show that I performed all of the duties and/or functions described in this manual. If no manual exists, please state so.

*2. Documentation showing or indicating the sex, age, race, grade and number of Federal employees working in PMG, including the mailroom.*
      *Response: OBJECTION: To the request for documentation about mail room employees because it is not relevant and is not likely to lead to the discovery of relevant information. With regard to the first part of the request, see ROT, Investigative Summary, OPM EEO Case No. 2006008, page 12.*

The sex, age, race, grade and number of Federal employees working in the Mail room employees is relevant because the mail room was a part of PMG during the relevant time period and relevant for purposes of showing that PMG employs members of my class at rates far below the numbers in the applicant pool, which is relevant for showing "reverse" race discrimination, as claimed.

*3. Executed telework agreement(s) for Jacqueline Carter, Lara Rivera-Lopez, Stephen Hickman and any other PMG employees authorized to telework.*

*Response: OBJECTION: This document request is not relevant and is not likely to lead to the discovery of relevant information. In addition, it is objected to on the basis of privacy. To the extent that an answer is required, Jacqueline Carter is the only PMG employee besides the plaintiff that teleworked during the relevant time period. Stephen Hickman became employed after the relevant time period. Therefore, information concerning Mr. Hickman is not relevant. Lara Riviera-Lopez was detailed to the PMG from another office. Therefore, information concerning her is not relevant. With regard to Ms. Carter's telework, see Deposition of Jacqueline Carter, p. 15-18; 22-27.*

Since I am not seeking privacy information, any privacy information can be redacted. The executed telework agreements for Carter, Hickman and Rivera-Lopez are relevant because: Carter's will show exactly when she began teleworking following the "pilot" telework period and whether it coincided with her husband's failing health; Hickman's will show whether he was allowed to telework when working less than one year for OPM; and if PMG has no executed telework agreement for Rivera-Lopez, please state that there is none because this will show that she was allowed to telework without an executed telework agreement. This information is relevant to Count I because Kline was told that she could not telework based on 1) when her mother's health failed; 2) that she had no executed telework agreement; and 3) that it is OPM policy for employees to work for one year prior to teleworking.

Springer denies that Jacquline Carter was allowed to telework because her husband had suffered several strokes but an executed Telework Request agreement for Carter that would show the date Carter began teleworking, and whether the date was around the same time her husband suffered several strokes and would therefore be evidence that Carter was allowed to telework because her husband suffered several strokes.

*4. Copies of the Position Description(s), Performance Standards and Vacancy Announcements for the following personnel while employed in PMG.*
    *Response: OBJECTION: to the request for the documents concerning Stephen Hickman, Lara Rivera-Lopez and Jose Velaquez on the grounds of relevancy. Hickman became employed after the relevant time period, and Rivera-Lopez and Velaquez were detailed to PMG from other offices. With regard to the remaining employees, see the ROT, Exhibit L, p. 1-4,6; Exhibit M, p. 1-13, 15; Exhibit N, p. 1.*

Where are the *Position Description(s)* (PD), *Performance Standards and Vacancy Announcements for* Robert Coco, Issac Evans, Shirley Sewell, & Miriam Heard-Johnson that you do not object to? These are relevant to show that they were either higher grades performing the same duties or lower grades than Kline but where Kline was performing the clerical duties that Sewell performed, or that Evans was lower grade than Kline but Kline was tasked with performing the clerical duties of answering the telephone, and that Kline is the <u>only</u> employee that has a requirement based on the ability to have good relationships with other employees, etc. Also please include the accompanying SF-52s to the PD's. These documents are also need to show that Kline is or is not similarly situation to these employees.

The position descriptions with their accompanying SF-52 for Velequez and Rivera-Lopez are relevant because it will show when Velaquez and Lopez worked for PMG and what duties they performed so that Kline can show that she did or did not perform the same or similar duties; the Performance Standards show what criteria they were rated under so that Kline can show that she was rated under similar criteria, which relates to Counts I & II, the vacancy announcements for Hickman will show the duties of the position being advertised, which is relevant to Counts I, II & XXIII.

*5. Copy of the Vacancy Announcement, Position Description and Performance Standards used to fill the position and/or slot occupied by Jacqueline Carter.*
        *Response: OBJECTION: This request is not relevant and is not likely to lead to the discovery of relevant information. To the extent that an answer is required, this question refers to documents outside of the relevant time period. In addition, the Plaintiff did not apply for this position.*

If there are no Vacancy Announcement, Position Description and Performance Standards used to fill the position and/or slot occupied by Jacqueline Carter please state so. Otherwise, please provide the documents as this information is relevant because it will show whether Carter's position was advertised following her retirement, which is relevant to Count XXIII since Kline claims that she was assigned significantly diminished duties and that she was not promoted even though she did the same work as those who were promoted (or hired). Whether or not I applied for the position is irrelevant and remains to be seen as Hickman was hired <u>before</u> Carter retired so that his position (and slot) would have been different from the one occupied by Carter.

Performance Standards will show that Kline is the <u>only</u> employee that has a requirement based on the ability to have good relationships with other employees.

*6. Swipe records for Isaac Evans, Robert Coco, Jacqueline Carter, Shirley Sewell, Miriam Heard-Johnson, Cassandra Thompson, Anne Dixon and Philip Watson during the time period of 7/29/05 through 11/1/05.*
        *Response: OBJECTION: This request for documents is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is required, this request refers to documents outside of the relevant time period.*

The swipe records are relevant to Counts XIX, X, & XXIII "swipe" records and will show whether that Kline reported her leave as accurately or more accurately than white male and/or minority employees, whose swipe records were not scrutinized.

*7. Documentation of any and all communications between Davis and Margaret McElrath and/or Arlene Taylor.*
        *Response: See ROI, OPM EEO Case No. 2006008, Exhibit H, p. 6, 16.*

The response in the ROI does not contain the email from McElrath to Davis in response to his email. I have reason to believe there was a response and access to Davis' computer would allow me to confirm whether there was or was not a response(s).

*8. Documentation showing the floor plans of PMG work areas for the period from 10/2002-1/2007.*
    *Response: OBJECTION: This request is not relevant and will not lead to the discovery of relevant information. In addition, this request is being denied for reasons of security.*

This request is relevant because the floor plans should show that Shirley Sewell, Miriam Heard-Johnson and Issac Evans had superior office space to Kline even though they had less seniority and less tenure than Kline. The floor plans would also show that there was additional space available in the basement where other PMG employees were located. The floor plans would further show that Sewell had originally been situated in PMG and providing telephone support and support to walk in customers prior to the hiring of Kline.

I am not seeking floor plans for the entire building but only those limited areas that PMG occupied. As far as security goes, I was investigated and obtained a security clearance in order to work for OPM. Therefore, I should be able to have access to this data. Otherwise, please prepare this information for *in camera* review by the court.

*9. Documents indicating where other members of PMG have been tasked to cover PMG telephone lines.*
    *Response: See ROI, Exhibit H, p. 51, 77, 108.*

ROI 2006008, p. 51 does not address "telephone" coverage, p. 77 is the same as p. 51, p. 108 does not show that others have been "tasked" with the responsibility for answering the telephones, such as the May 24, 2005 Memorandum of Instruction to Kline tasking her with the responsibility for ensuring that the main PMG telephone line is answered. If no one else was officially "tasked" with this responsibility, please indicate as much.

12. Documentation from Dona Bland of OMB requesting that PMG review the "old and cold" regulations.
    Response: OBJECTION. This request is not responsive and will not lead to the discovery of relevant information. To the extent that a response is required, see the ROI, Exhibit H, p. 8.

This information is relevant at a minimum to Counts II & III since Davis claims that it was not Kline's idea to do a review of the "old and cold" regulations but Bland's idea. If there is no documentation showing that Bland suggested this idea and that the idea was then communicated to Kline, please indicate that there is no documentation.

*13. Documentation indicating when Kline was charged with primary responsibility for responding to the Publications database, working on the Visual Information System, Publications Inbox and FACA database.*
    *Response: See ROI, Exhibit H, p. 53, 56, 62, 67, 86, 110, 1379.*

I don't understand what the last document number refers to as Ex. H only goes up to p. 127. None of these documents show that Kline was charged with "*primary responsibility for responding to the Publications database, working on the Visual Information System, Publications Inbox and FACA database.*" If there are none, please indicate so.

*15. Documentation showing or indicating times when Kline failed to make or follow though on making changes to the Publications database or FACA database.*
        *Response: See ROI, Exhibit H, p. 25, 59, 63, 72, 74, 111-112.*

None of these documents address the FACA database. If there are no documents indicating times when I failed to respond to the FACA database, please indicate so.

*16. Documentation of communications to William M. Davis and/or Claudio A. Benedi concerning instances where people from the mailroom, print shop, and/or printing procurement section asked Davis and/or Benedi to keep Kline out of their work areas.*
        *Response: See, ROI, Affidavit of William M. Davis, Exhibit H, p. 9-12.*

This does not show "communications to Davis or Benedi" concerning instances where people from the mailroom, print shop, and/or printing procurement section asked Davis and/or Benedi to keep Kline out of their work areas. If there are no documents of "communications to Davis or Benedi" on this issue, please state so.

*17. Documentation concerning any request(s) to keep Kline out of the Director's suite or other OPM offices.*
        *Response: See Document Response 16.*

Again, this does not show "requests to Davis or Benedi" concerning instances where people from out of the Director's suite or other OPM offices asked Davis and/or Benedi to keep Kline out of their work areas. Davis claims that he was requested by numerous offices to keep Kline out of their offices but Davis has produced no documentary evidence showing when or why Davis was requested by certain offices to keep Kline out of those offices, such as the dates, times, and circumstances that caused these offices to request that Kline be kept out of those areas. If there are no documents or "requests to Davis or Benedi" on this issue, please state so.

*18. Documentation showing times when Kline exceeded her authority.*
        *Response: OBJECTION: This request is unclear as to what authority is being referred to.*

This request is related to the accusation in Kline's performance appraisal (see Counts II, III & XXII) that Kline exceeded her authority. If there is no documentation showing that Kline exceeded her authority as claimed, please indicate so.

19. Documentation of any errors or mistakes Kline made in reviewing or preparing regulatory packages.
        Response: See ROI, Exhibit H p. 27; 29, 33, 34-40, 50, 54-55, 60, 126; 95-102-6.

I do not understand "95-102-6". None of these documents indicate or reflect any errors or mistakes I made in reviewing or preparing "regulatory packages". If there are none, please indicate so.

*20. Documentation showing or indicating any problems encountered by Davis and/or Benedi as a result of and during Kline's trial telework period.*
      *Response: See Affidavit of Claudio Benedi, Exhibit I, p. 1-2, EEO Case No. 2006008 (July 6, 2006).*

This is not responsive. You have only referenced statements made by Benedi and Davis during an EEO investigation and have not provided documents showing or indicating problems they encountered *"during Kline's trial telework period."* Davis claims that numerous problems were encountered during Kline's 90-day telework trial period but has produced no documentation to support this claim, such as what problems were encountered, when they were encountered, how it affected the office, etc. If there were problems, there should be documentation of the problems. If there is no documentation, please indicate so.

*21. Documentation between Benedi, Davis and Ronald Flom related to Kline's trial teleworking period.*
      *Response: See Affidavit of Claudio Benedi, Exhibit I, p. 2 (July 6, 2006); see also Affidavit of William M. Davis, EEO Case No. 2006015, Exhibit H, p.2.*

This is not responsive. You have not provided documents *"between Benedi, Davis and Ronald Flom related to Kline's trial teleworking period."* If there are none, please indicate so.

*22. Documentation showing or indicating the times PMG employees were assigned to lunch.*
      *Response: See ROI, Investigative Summary, p. 9; Affidavit of William M. Davis, Exhibit H, p. 1-2; OPM EEO Case No. 2006019, ROI, Exhibit H, p. 6; Affidavit of Claudio Benedi, Exhibit I, p. 6; Supplemental Affidavit of William M. Davis, EEO Case No. 2006019, p. 4.*

This is not responsive. This only shows statements made by Benedi and Davis during an EEO investigation and you have not provided documents showing or indicating *"times PMG employees were assigned to lunch."* Davis claimed that everyone on the 5th floor was assigned a specific lunch period but has produced no documentary evidence showing where individuals other than Kline were assigned a specific lunch period.
If there are no documents, please indicate so.

*23. Documentation related to the development of the Federal Register Management System (FRMS) online regulatory tracking system showing who initiated it, how it came about, and instructions to Kline concerning the FRMS.*

*Response: OBJECTION. This request is not relevant and will not lead to the discovery of relevant information.*

This is <u>extremely relevant</u> to Count XV & XVI concerning the rescinding of my administrative rights to the FRMS. If there is no documentation, please indicate so.

*24. Documentation showing the reasons for rescinding Kline's administrative rights to the FRMS.*
 *Response: See ROI, OPM EEO Case No. 2006015; Affidavit of William M. Davis, Exhibit G, Tab 2; Exhibit H, p. 2; Affidavit of Claudio Benedi, OPM EEO Case No. 2006015; Exhibit I, p. 1-2.*

This is not responsive. This only shows statements made by Benedi and Davis during an EEO investigation and you have not provided documents showing or indicating *"the reasons for rescinding Kline's administrative rights to the FRMS."* If there are no documents, please indicate so.

*25. Documentation showing the implementation of procedures for notifying PMG of publications approved by Office of Communications and Public Liaison for inclusion in the Publications Database.*
 *Response: OBJECTION: This request is not relevant and will not lead to the discovery of relevant information.*

This is relevant to Count II, III & XXII since I am claiming that it was my idea and Davis is claiming that it was OCPL. If as Davis claims it was a procedure implemented by OCPL, he should documentation reflecting same. If there is no documentation, please indicate so.

*26. Documentation showing any instances where Kline failed to assist Robert Coco.*
 *Response: Affidavit of William M. Davis, Exhibit H, p. 19.*

This is not responsive. This only shows statements made by Davis during an EEO investigation and you have not provided documents showing or indicating *"instances where Kline failed to assist Robert Coco."* If there are no documents, please indicate so.

*27. Documentation showing where Kline failed to properly report her leave for the pay period ending September 31, 2005.*
 *Response: See ROI, Exhibit A, p. 12-13; Tab C, Tab D, p. 14-15.*

Which ROI are you referring to? In ROI, 2006019, there are no pp. 14-15 under Tab D and Tab C is non responsive. In ROI, #2006019, *Exhibit A, p. 12-13* are not documents showing where Kline failed to properly report her leave but rather documentation alleging that Kline failed to properly report her leave. If there is no documentation *"showing where Kline failed to properly report her leave"*, please indicate so.

*28. Documentation showing instructions to PMG employees by Davis for reporting their leave or the proper procedure for employees to report their leave.*
  *Response: See ROI, Exhibit H, p. 6-13.*

Which ROI are you referring to?  In ROI Ex. H, p. 6-13 is non responsive.  It is testimony by Davis and not documents showing where Davis gave instructions to PMG employees on how to properly report their leave.  If there is no documentation, please indicate so.

*29. Documentation showing where Davis requested amendments or changes to Kline's leave during September 30, 2005 through June 30, 2006.*
  *Response: See ROT, Exhibit G, p.23; 33; Exhibit H, p. 18-31; Exhibit L, p.2.*

*30. During the depositions, the issue of performance bonuses came up. Shirley Sewell stated that she received a monetary bonus based on a "Special Act or Service Awards." Mr. Hanes attorney from the Dept. of Justice, requested copies from Ms. Sewell of her "Special Act of Service Awards" and/or certificates or other documentation of the awards. Jacqueline Carter and Robert Coco stated that they received monetary awards based on their performances as well. Therefore, please provide copies of all awards, certificates or other documentation of the accompanying monetary bonuses received by Sewell, Carter, Coco and any other PMG employees for the years 2002 through 2007.*
  *Response: OBJECTION: This request is not relevant and will not lead to the discovery of relevant information.*

These documents are extremely relevant to Count II, III, & XXII for showing that PMG has a practice of giving monetary bonuses to employees based on their performance ratings as alleged in the Third Amended Complaint.

ADDITIONAL DOCUMENT REQUEST

*Please provide electronic access to Jacqueline Carter's laptop that she used while teleworking and OPM email and electronic access to William Davis' computer and OPM email and electronic access to Claudio Benedi's computer and OPM email.*
  *Response: OBJECTION: This request is not relevant and will not lead to the discovery of relevant information. In addition, it objected to for reasons of security.*

This is extremely relevant as it will show when Carter performed telework at home because she was issued a laptop for teleworking.  As far as security goes, I was investigated and obtained a security clearance in order to work for OPM.  Therefore, I should have sufficient security clearance to be able to have access to this data.

You also failed to respond to the first paragraph of the "Additional Document Request".

  *"During the deposition of Robert Coco, he testified that he has responsibility for ordering all of equipment for the Publishing Management Group that is under $2500-3000 and that he keeps track of all of the credit card purchases and records of all supplies and items that he orders.  Please provide*

*documentation of all the equipment ordered for Jacquline Carter for her teleworking."*

Please respond or let me hear from you by Friday, March 28, 2008.  Otherwise, I will proceed with the request for sanctions.

Regards,

Valerie Kline, *pro se*
(202) 606-1411

cc:  Jeffrey A. Taylor
U.S. Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Robin Richardson, Esq.
Office of the General Counsel
U.S. Office of Personnel Management
1900 E Street, NW.
Washington, D.C. 20415

March 27, 2008

**VIA FACSIMILE AND  EMAIL**

Claire M. Whitaker
Assistant U.S. Attorney
555 Fourth Street, NW.
Washington, D.C. 20530

     Re:  *Kline v. Springer*

Dear Ms. Whitaker:

I have reviewed your responses to the interrogatories.  Based on my review, I find that
the responses are not responsive and have requested that you respond again to the
interrogatories.  I would like a response by the by the end of this week.  If I do not
receive them, or if I do not hear from you, I will file a Motion to Compel and for Rule 32
Sanctions on Monday since I believe the interrogatories are relevant and should be
answered for the following reasons:

*1. Identify who was assigned responsibility for the regulatory work that Carter performed
after her retirement, their grade and how the position was filled.*
    *Response: OBJECTION: This question is not relevant and is not likely to lead to
the discovery of relevant information. To the extent that a response is required, it is a
request for information for a period occurring outside of the relevant time period.
Finally, Plaintiff did not apply for this position.*

This relates to Count I and might show that Kline was similarly situated to Carter because
she is similarly situated to the person who acquired Carter's duties.  This is reasonably
related to the claim in Count I.  Please respond.

*2. Identify any and all person(s) in PMG that was qualified to fill the position that Carter
occupied?*
    *Response: OBJECTION: Vague as to what position is being referenced. To the
extent that a response is required, if the question concerns the position which became
available after Carter retired, this request is not relevant and is not likely to lead to the
discovery of relevant information. It is a request for information during a period
occurring outside of the relevant time period. Finally, Plaintiff did not apply for this
position.*

Did Carter occupy more than one position in PMG?  If so, describe all of them and all of
the people who qualified for those positions.  This relates to Count I and might show that
Kline was similarly situated to Carter because Kline is similarly situated to the person
who acquired Carter's duties.  It is also relevant to Count I re: elimination of Kline
material responsibilities.  Please respond.

*3. Identify when Carter began teleworking and how many days per week that she teleworked.*
  *Response: See Deposition of Jacqueline Carter, pages 15, 16-18, 19, 22, 27, 67; see also Affidavit for William M. Davis, Report of Investigation (ROI), OPM EEO Case No. 2006008, p. 5.*

This is not responsive. Davis' affidavit does <u>not</u> state how many days per week Carter teleworked. Was it 2 days, 3 days? Did the days change? Please respond.

*4. Identify the function of the Resource Center, its location and dates of the locations approximately how many customers per day the Resource Center had, when it officially closed and any other information related to the closing of the Resource Center, such as studies, memoranda, etc.*
  *Response: OBJECTION: This question is not relevant and is not likely to lead to relevant information. To the extent that an answer is required, see Deposition of Shirley Sewell, pages, 7-10; 12-13; 15-19; 25-28; 30, 33-34; 50-51; Deposition of Jacqueline Carter, page 55; Deposition of Robert T. Coco, p. 65-68; 82-83.*

This is not responsive. This is relevant to Count I and might show that when the Resource Center closed, Sewell could have assumed the duties that Kline was assigned to do. The Sewell, Carter and Coco depositions do <u>not</u> state when the Resource Center officially closed. Please respond.

*5. Identify when Lara Rivera-Lopez worked for PMG, and whether she teleworked and how often, what her grade and duties were, including whether she primarily covered PMG's telephones or assisted walk-in customers.*
  *Response: OBJECTION: This question is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is required, Ms. Riviera-Lopez was not an employee of PMG. She was on detail to the PMG during the relevant time period. When she was detailed to PMG, Ms. Riviera-Lopez was already on a teleworking schedule approved by her sponsoring office. See also Deposition of Robert T. Coco, p. 15-16.*

This answer is not responsive and this question relates to Count I. When an employee is "detailed" to another office, the detail is activated by an SF-52, Request for Personnel Action. The SF-52 temporarily reassigns the employee so that they are no longer under the supervision or authority of their prior office. Since the employee is working for or assigned to the new office, a prior telework agreement would be inoperative. An SF-52 should be in the Official Personnel File of Lara Rivera-Lopez showing exactly when she was detailed and for how long. If there is no telework agreement for Rivera-Lopez from PMG, please indicate so. Please respond to the rest of the questions and please provide a copy of the SF-52 along with the PMG position description (or allow Kline access to same).

*6. Identify the grade and duties of Robert Coco, and whether he primarily covered PMG telephone lines, the individual whose telephone that the PMG line audibly rings assisted on, whether he assists and the extent of his assistance to walk-in customers?*
        *Response: See Deposition of Robert T. Coco, p. 1-24, 25-32.*

This is not responsive since Coco's deposition does not say whether the PMG telephone line audibly rang on his desk or not.  Please respond.

*7. Identify how the development of the Federal Register Management System (FRMS) came about, when it was put into production and all persons in PMG who were involved in the development of the FRMS and the extent of their involvement.*
        *Response: See Affidavit of Claudio A. Benedi, ROI, OPM EEO Case No. 2006015, Exhibit I, page 2 of 7, 3 of 7; See Affidavit of William M. Davis, ROI, OPM EEO Case No. 2006015, Exhibit H, pages 1-8; See Deposition of Jacqueline Carter, p. 44-51.*

This is not responsive as it does not state when the FRMS was put into production. Please respond by specifically <u>providing the dates</u> for the various stages of the FRMS development including when the project was allegedly assigned to Kline, when it went into production and the extent of involvement of those involved in the development of the project based on your knowledge.  If this was a project "assigned" to Kline there should be correspondence or records documenting this.  Please provide these documents, if any per Document Request 23.

*8. Identify how long had Kline been working with Arlene Taylor on the FRMS before Davis sent Taylor an email complaining about Taylor's visit to Kline?*
        *Response: Mr. Davis did not send an email to Arlene Taylor "complaining" about Taylor's visit to Kline. Mr. Davis sent an email to Arlene Taylor on December 8, 2005; the contents of the email concerned modifications to FRMS. The email is the best evidence of its contents. The email is located in the Affidavit of William Davis, ROI, EEO Case No. 2006008, Exhibit H., page 6 of 12.*

Let me rephrase.  <u>How long</u> had Kline been working with Arlene Taylor on the FRMS before Davis sent Taylor an email *inquiring* about Taylor's visit to Kline?  Please respond.

*9. Identify when Kline was assigned primary responsibility for answering PMG telephone lines and responding to the Publication inbox.*
        *Response: Mr. Coco, a GS-13 employee, had assumed the task of answering the general telephone lines for PMG. However, when he became too busy to handle this task, rather than let the phones ring, Ms. Kline was asked by Mr. Davis to help out and answer the phones. Ms. Kline was the lowest graded PMG employee in the immediate office and a grade lower than Mr. Coco. Of additional note, all PMG employees assisted in answering the telephones. See, Affidavit of William Davis, ROI, EEO Case No. 2006015, Exhibit H, p. 2 of 8; 6 of 8 see also, ROI, Exhibit H, P. 116, 119; see Deposition of Robert T. Coco, p. 8-11. OBJECTION to the last part of interrogatory 9.*

*Plaintiff would be in the best position to explain when she had primary responsibility for responding to the Publication inbox. To the extent that an answer is required, see Deposition of Robert T. Coco, p. 59-60; see also ROI, Exhibit H, p. 3, 118, 123-126.*

This is not responsive. Asking Kline to "help out" is not the same thing as assigning her with primary responsibility for answering the PMG telephone lines. The latter part of this interrogatory relates to Counts II, III, XXII, & XXIII. Since Coco was not Kline's supervisor he did not have authority to assign Kline with primary responsibility for responding to the Publications Inbox. If Kline was never officially assigned <u>primary responsibility</u> for responding to the Publications inbox by Davis, please indicate so.

*10. Identify the manner or ways that Kline assisted non-regulatory PMG walk-in customers, including whether she was allowed to sign off on the 4150 Printing Request Form, allowed to assist customers with their graphic design projects, make covers for customers' reports or documents?*
  *Response: OBJECTION. Plaintiff would be in the best position to identify the manner or ways that she assisted non-regulatory PMG walk-in customers. To the extent that an answer is required, with regard to the type of assistance that Ms. Kline provided to walk-in customers, she worked with the information delivery update on the data base; helped research questions when calls came in for publications, and she answered questions from the public or agencies doing research on questions and referring them to other offices. With regard to signing off on the 41 Printing Request Form, only the supervisors in the office—Mr. Benedi, Mr. Davis, were allowed to sign off on the 4150 Printing Request Forms. Ms. Kline was not asked to assist customers in making covers for reports, There was a graphics person in the office who performed that job about 98 percent of the time. See Deposition of Robert T. Coco, p. 16-18, 21-22, 23, 24.*

Clarification is needed. When you state *"she worked with the information delivery update on the data base"*, what database are you referring to? Are you saying customers would walk into PMG with requirements to change a database as opposed to emailing the changes or calling in the changes over the telephone? Since PMG was not open to the public, when you state, *"helped research questions when calls came in for publications, and she answered questions from the public or agencies doing research on questions and referring them to other offices"* are you referring to telephone calls? If so, this is not responsive as the interrogatory asks how Kline assisted "walk in" customers, not telephone callers. And since she was not allowed to assist customers with 4150s, report covers, <u>how did Kline assist "walk in" customers</u>? Please respond.

*11. Identify the kind of graphics work that Kline performed, how long she performed graphics work, and when and why she stopped performing graphics work?*
  *Response: OBJECTION. Plaintiff would be in the best position to answer this question. To the extent that an answer is required, Plaintiff may have occasionally done some graphics work during the relevant period (2002-2005), however, she did other work not related to the function nor at the direction of PMG on a voluntary basis. She*

*did not use the sophisticated graphic design programs. There was a graphics person who had the responsibility of doing the graphics work. That person did graphics work 98 percent of the time. Deposition of Robert T. Coco, p. 15, 21-22 63, 64.*

Clarification needed. When you state *"she did other work not related to the function nor at the direction of PMG on a voluntary basis"* what kind of "other" work and what "function" are you referring to?

Also, if Kline did not have "sophisticated graphic design programs" what sorts of graphic design programs are considered "sophisticated" that others had that Kline did not? Since Davis appears to "know" what kind of software Kline had, please identify the software Kline had that Davis believes is "unsophisticated".

*12. Identify when Kline was assigned responsibility for attending to unsolicited faxes and what that duty entailed?*

    *Response: OBJECTION. Plaintiff would be in the best position to answer this question. To the extent that an answer is required, see ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, page 2, 19. Plaintiff was asked to insure that the senders of unsolicited facsimiles were notified not to continue to send facsimiles to the PMG machine as this was a waste of resources and unproductive. The facsimile machine was located next to her and she was the likely person to take care of this task. Moreover, she was the lowest graded person in the immediate office.*

This is not responsive. The *"ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, page 2, 19"* does not state *"when Kline was assigned responsibility for attending to unsolicited faxes"* . When you say *"The facsimile machine was located next to her"*, please clarify what you mean. Was it located in her cubicle by her computer? If not, exactly where was it located? Please respond.

*13. Identify any formal or informal complaints made against Kline, who made them, when they were made and why they were made that were used when giving her a performance rating.*

    *Response: OBJECTION. Vague as to what performance rating is being referenced. To the extent that an answer is required, see ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, p. 1-13.*

This is not responsive. The complaint only refers to one (1) performance rating that was issued in 2005. The *"ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, p. 1-13"* does not give the details that are being requested here. <u>Please give the exact details of who complained, what behavior they were complaining about, when they complained, how Kline acted inappropriately, and why they complained.</u>

*14. Identify any office outside of PMG that expressed an interest in having Kline work for them on a detail and the outcome of that request.*

    *Response: OBJECTION. Defendant is without information or knowledge to respond to this request, except to say that one office did express an interest in having Ms.*

*Kline train its employees in PMG work, but this assignment was not approved. Although Mr. Davis remembers one inquiry, he does not remember which office express the interest.*

Is Benedi aware of any instances when other offices expressed interest in a detail of Kline to their office? Please respond.

*15. Identify the level of authority Kline had/has and whether she ever exceeded her level of authority and how and when she exceeded it.*
  *Response: OBJECTION. Vague. It is unclear what Plaintiff means by "level of authority." Ms. Kline always had to report to a supervisor.*

In ROI, 2006008, Exhibit H, p. 3, Davis testified that "I did rate Ms. Kline as "Fully Successful" or above for this element because I continually receive calls from offices within the Publications Management Group asking that I keep Ms. Kline out of their work areas. Additionally, we have been asked by the Office of the Director to keep her out of the Director's suite. These requests are based upon Ms. Kline's habit of attempting to exceed her level of authority." Apparently she must have some level of authority in order to exceed her level of authority as testified here by Davis. Again, explain when and how Kline exceeded her level of authority.

*16. Identify the grades/step and approximate size of the offices of or work spaces of Isaac Evans, Shirley Sewell, Stephen Hickman, Robert Coco, Jacqueline Carter, Valerie Kline and Miriam Heard?*
  *Response: OBJECTION to the information concerning Stephen Hickman because he was hired outside of the relevant time period. With regard to the remaining requests, see, ROI, Investigative Summary, OPM EEO Case No. 2006019, page 9 of 13; see also ROI, Investigative Summary, OPM EEO Case No. 2006008, page 12 of 17; Deposition of Shirley Sewell, pages 12-13; 32; 33, 48-49; see also, Deposition of Robert Coco, pages 68-73, 77-78; Deposition of Jacqueline Carter, p. 10, 11, 63-64; 65, 69-70; see also Affidavit of William M. Davis, ROI, OPM EEO Case No. 2006015, Exhibit H, page 2 of 8. Miriam Heard (Joimson) occupies a small cubicle in the basement that is the size of Shirley Sewell's.*

This is not responsive. Counts I & XI. Hickman's information is relevant because it might show that Kline was similarly situated to Carter who was succeeded by Hickman. The size of the office that Hickman occupies shows that he is a lower grade employee than Kline who occupies a larger and/or superior office than Kline, which is a fact reasonably related to Counts XXII & XI.

The rest of the response is not responsive. None of the references you have indicated respond to the question concerning the approximate size of the offices occupied by the specified individuals. Please respond by providing the sizes of the office in dimensions based on feet and inches, i.e. 10' x 14'9".

*17. Describe in detail the Semiannual Unified Agenda of Regulatory Actions, its process, deadlines and strictness of the deadlines.*
  *Response: See http://www.reginfo.gov/public/do/eAgendaMain*

This is not responsive. This link does not provide the *"process, deadlines and strictness of the deadlines"* of the Unified Agenda. Perhaps the "Federal Register training manual" developed by Carter and requested under Document Request No. 1, will give this information if you will provide that. If it does not, please describe this process as requested. This relates to Count XIII.

*18. Identify the PMG telephone system and approximately how long it would take to train someone on the system.*
  *Response: OBJECTION: This question is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is require, information concerning the PMG telephone system may be found in the Deposition of Robert T. Coco, p. 8-13.*

This is not responsive. Coco's deposition does not describe PMG's telephone system. Davis stated that Annette Gunter-Frye did not know "the system". Please describe in detail what the system is and what it entails, i.e. # of telephone lines and number of employee extensions, ability to transfer calls, etc. Please respond.

*19. Identify all persons that have had their swipe records reviewed by PMG management, how often the swipe records are reviewed, and why the swipe records are reviewed.*
  *Response: OBJECTION: This question is not relevant and is unlikely to lead to the discovery of relevant information. Other employees had their swipe records reviewed when it was suspected that there was possible leave abuses.*

*21. Identify the race and gender of all the employees working for PMG and the dates they were hired.*
  *Response: OBJECTION: Overbroad as to the dates that they were hired. To the extent that a response is required, the race and gender of all employees working for PMG during the relevant time period, see Document Response 16.*

This is not responsive and Document Response 16 is not responsive. The race and gender of the employees working in the Mail room employees is relevant because the mail room was a part of PMG during the relevant time period and relevant for purposes of showing that PMG employs members of Kline's class at rates far below the numbers in the applicant pool, which is relevant for showing "reverse" race discrimination, as claimed. The date they were hired is relevant for this purpose as well. This information should be readily available from the employee's Office Personnel File. If the task is too burdensome, I will be happy to review those files and obtain the information if access will be provided. Please respond.

*22. Please supply the addresses that Isaac Evans, Annette Gunter-Frye, Lara Rivera-Lopez, Shirley Sewell, Robert Coco, Jacqueline Carter, Jose Velaquez and Arlene L. Taylor may be subpoenaed.*
        *Response: OBJECTION: Privacy.*

This objection is not valid. Under 5 U.S.C. § 552a(b)(7), an exception to the disclosure of the requested information applies. However, if you refuse to provide this information, I can ask the court to order you to provide it pursuant to 5 U.S.C. § 552a(b)(11). I am also requesting the address for Margaret McElrath. Please respond.

*23. Is it the practice of PMG or was it the practice of PMG for the years 2002-2007 to issue monetary performance bonuses to employees who received an Exceeds Fully Successful rating on their Performance Appraisal?*
        *Response: OBJECTION: This response is overbroad and requests information for a period outside of the relevant time period. To the extent that a response is required, see Deposition of Robert T. Coco, p. 81.*

This is not responsive. The time frame is relevant for purposes of establishing PMG's "practice" and is reasonably related to the Counts II, III, XXII and XXIII. Coco's Deposition does not indicate whether it is PMG's practice to issue monetary bonuses and he specifically stated that he does not know. Coco is not a supervisor who establishes the policy or practices of PMG. Please respond.

Please respond or let me hear from you by Friday, March 28, 2008. Otherwise, I will proceed with the request for sanctions.

Regards,

/ S /

Valerie Kline, *pro se*
(202) 606-1411

cc: Jeffrey A. Taylor
     U.S. Attorney
     950 Pennsylvania Avenue, NW
     Washington, DC 20530-0001

     Robin Richardson, Esq.
     Office of the General Counsel
     U.S. Office of Personnel Management
     1900 E Street, NW.
     Washington, D.C. 20415

Exhibit 3

# AFFIDAVIT OF VALERIE KLINE

1.    My name is Valerie Kline.

2.    I live in Lothian Maryland.

3.    I am employed by the Office of Personnel Management located at 1900 E St., N.W., Washington, DC  20415.

4.    I began working for the Office of Personnel Management on October 7, 2002, for the Publications Management Group, formerly known as the Publications Management Branch., performing only regulatory work.  (Ex. 1) I am currently a GS-12 step 6.

## **Telework**

5.    Documents showing when Jacquline Carter had a dedicated telephone line installed at her residence, records indicating when the equipment was ordered for her to use while teleworking, and her executed telework agreement are needed to show whether she began teleworking on a regular basis following her husband's strokes.  This will show that the reason for denying my telework request is pretextual.  *Sanction requested:*  A finding that Jacquline Carter began teleworking on a regular basis after her husband suffered several strokes.

6.    Either an executed telework request agreement for Lara Rivera-Lopez or an admission that there is no document is needed to show that she was allowed to telework without an executed telework agreement and to establish that the reason for denying my telework request without an executed telework agreement was pretextual.  *Sanction requested:*  A finding that PMG allowed Rivera-Lopez telework without an executed telework request agreement.

7.    Documentation showing problems encountered during my trial telework period, i.e. dates, incidents, etc., as opposed to a mere allegation of problems by my supervisors (or an admission that there is no documentation) is needed to establish that the reason for denying my telework request was pretextual. *Sanction requested:* A finding that no problems were encountered during Kline's trial telework period.

8.    Performance Standards for Carter and Position Description for Rivera-Lopez are needed to establish that I was similarly situated to Carter and Rivera-Lopez. *Sanction requested:* A finding that Kline was similarly-situated to Carter and Rivera-Lopez, who were allowed to telework.

9.    Position Descriptions for Rivera-Lopez and Jose Velaquez are needed to establish that the reason for denying my telework request was pretextual. *Sanction requested:* A finding that Lara Rivera-Lopez and Jose Velaquez answered PMG telephones and assisted with walk-in customers.

10.    Position Descriptions and SF-52's detailing Lara Rivera-Lopez and Jose Velaquez to PMG are needed to show that the reasons for denying my telework request are pretextual. *Sanction requested:* A finding that when an employee is detailed to a new office, the detail action is initiated by an SF-52, Request for Personnel Action, accompanied by a position description that assigns the employee to a new position for a specified period of time.

11.    Sewell's Position Descriptions as a GS-6 thru GS-9 are needed to establish that (1) Sewell performed the duties I was tasked with performing as a GS-12, and (2) the reason for denying my telework request was pretextual. *Sanction requested:*

A finding that as a GS-9 and/or below, Shirley Sewell was tasked with performing the clerical duties for PMG that Kline, as a GS-12, was tasked with performing when Kline's Position Description was changed on 6-10-2003.

### Performance Appraisal Issues

12.   Documentation showing that I failed to cover PMG telephones after being tasked with the responsibility as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish that my performance rating was pretextual. *Sanction requested:* A finding that Kline did not fail to cover PMG telephones after being tasked with the primary responsibility for them on August 24, 2005.

13.   Documentation showing that I failed to perform duties pertaining to the FACA database after being tasked with the responsibility as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish that my performance rating was pretextual. *Sanction requested:* A finding that Kline did not fail to perform duties related to the FACA database.

14.   Documentation showing exactly when and how I exceeded my authority as opposed to a mere allegation that I exceeded my authority (or an admission that there is no documentation) as opposed to a mere allegation of same is needed to establish that Kline's performance rating was pretextual. *Sanction requested*: A finding that Kline never exceeded her authority during October 7, 2002 to January 1, 2007.

15.   Documentation showing that I failed to respond to the Publications Inbox after being tasked with the responsibility as opposed to a mere allegation of same (or

an admission that there is no documentation) is needed to establish that Kline's performance rating was pretextual. *Sanction requested:* A finding that Kline never failed to respond to the Publications Inbox after being tasked with primary responsibility for this duty.

16. Documentation showing that I failed to update or maintain the Publications database after being tasked with the responsibility as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish that my performance rating was pretextual. *Sanction requested:* A finding that Kline never failed to update or maintain the Publications database.

17. Coco's Performance Standards are needed to establish that the reason for giving me a poor performance rating was pretextual. *Sanction requested:* A finding that Coco was primarily responsible for the Publications Inbox.

18. Documentation showing specifically when and how I made mistakes or errors as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish that my performance rating was pretextual. *Sanction requested:* A finding that Kline never made mistakes or errors when performing regulatory work.

19. Documentation showing when and how I failed to meet deadlines as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish that my performance rating was pretextual. *Sanction requested:* A finding that Kline never missed deadlines on any of her work projects.

20.    Performance Standards for other PMG employees are needed to establish that I

am the only employee with a standard for having good relationships and is

discriminatory per se. *Sanction requested:* A finding that Kline is the <u>only</u>

employee in PMG that has a Performance Standard based on the ability to have

good relationships with other employees.

21.    Documentation showing who recommended a review of the "old and cold"

regulations as opposed to a mere allegation of who recommended the review (or

an admission that there is no documentation) is needed to establish that the reason

for giving me a poor performance appraisal was pretextual. *Sanction requested:*

A finding that Kline reviewed OPM's pending "old and cold" regulations at her

own initiative.

22.    Documentation showing who was instrumental for suggesting that a procedure for

having the Office of Communications and Public Liaison notify PMG of any

publications it approves for inclusion into the Publications database or a similar

procedure as opposed to a mere allegation of same (or an admission that there is

no documentation) is needed to refute my evidence that I suggested the procedure

and to establish that the reason for giving me a poor performance rating was

pretextual. Sanction requested: A finding that Kline suggested a procedure for

having the Office of Communications and Public Liaison notify PMG of any

publications it approves for inclusion into the Publications database.

23.    Documentation supporting the claim that my supervisor received complaints

about me as opposed to a mere allegation that people made complaints is needed

to show that there were in fact complaints and that the reason for giving me a poor

performance rating was pretextual. *Sanction requested:* A finding that no complaints were ever made against Kline by any PMG office or Director Springer's office.

### Defamatory Email

24.  Documentation showing additional emails between McElrath and Taylor and Davis is needed to show that the emails are defamatory. Addresses for subpoenaing Taylor and McElrath are needed to obtain depositions in absence of the documentation. This documentation is needed to show that issuing the emails was sufficiently adverse action under the circumstances. *Sanction requested:* A finding that Davis generated additional defamatory email to Margaret McElrath and Arlene Taylor.

### Rescinding Administrative Rights

25.  Documentation showing who initiated the development of the Federal Register Management System (FRMS) was my idea and that I initiated and directed the development of the FRMS as opposed to a mere allegation of same (or an admission that no documentation exists) is needed to establish that the FRMS was my idea, that I initiated and directed the development of the FRMS and that the reason for rescinding my administrative rights to the FRMS was pretextual. *Sanction requested:* A finding that Kline was responsible for initiating and directing the development of the FRMS.

### Lunch Hour Issues

26.  A lack of documentation showing that other employees were assigned a specific lunch hour as opposed to a mere allegation of same(or an admission that no

documentation exists) is needed to establish that I was the only employee assigned a specific lunch hour and that the reason for only assigning to me a specific lunch time was pretextual and discriminatory per se. *Sanction requested:* A finding that Kline was the only one on the 5th floor assigned a specific time for going to lunch and other PMG employees could go to lunch anytime they wanted.

### Letter of Reprimand Issues

27. Documentation showing that I failed to properly report my leave (or an admission that there is no documentation) is needed to establish that the reason for issuing me a letter of reprimand was pretextual. *Sanction requested:* A finding that Kline never failed to properly report her leave.

28. Documentation showing whether PMG has issued procedures to employees for reporting their leave (or an admission that there is no documentation) is needed to establish that the reason for issuing me the letter of reprimand was pretextual. *Sanction requested:* A finding that PMG has no instructions on how PMG employees are to properly report their leave.

29. Swipe records for other PMG employees are needed to establish that the reason for scrutinizing my swipe records was pretextual and discriminatory per se. *Sanction requested:* A finding that Kline reported her leave more accurately than white male and/or minority employees whose "swipe" records were not scrutinized during the timeframe of Letter of Reprimand to Kline.

### Leave Tampering Issues

30. Absence of documentation reflecting where I requested amendments to my leave as opposed to a mere allegation of same shows that the reason for amending my

leave was pretextual. *Sanction requested:* A finding that Kline never instructed Davis to make amendments to her annual and sick leave that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave on pay period ending 11-26-2005 and that Davis made these amendments without Kline's knowledge and/or authorization.

31.    Absence of documentation showing where Davis instructed Sewell to amend my leave establishes that Davis amended my leave and not Sewell. *Sanction requested:* A finding that Davis did not instruct Sewell to amend Kline's leave for pay period ending 11-26-2005 that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave but that Davis is the one who made the amendments to Kline's leave.

**Office Space Issues**

32.    Documentation showing that other PMG employees have superior office space than I do is needed to establish that the reason for giving me substandard office space is pretextual. *Sanction requested:* A finding that Issac Evans, Shirley Sewell, Miriam Heard-Johnson and Stephen Hickman have or had superior office space to Kline even though they had or have less seniority and less tenure than Kline.

**Hostile Work Environment Issues**

33.    A procedures manual allegedly developed by Carter as opposed to a mere allegation of same (or an admission that there is no documentation) and Carter's Performance Standards are needed to establish that I performed the same work as

Carter. *Sanction requested*: A finding that Kline performed the same type and kind of regulatory work as Jacquline Carter but PMG failed to promote Kline.

34.  Documentation showing that all members of PMG were required to answer the telephones as opposed to a mere allegation of same (or an admission that there is no documentation) is needed to establish discrimination per se and that I was assigned significantly diminished material responsibilities. *Sanction requested:* A finding that Kline was the only PMG employee formally tasked with primarily answering PMG telephone lines.

**Interrogatories**

35.  Int. #1.   A response identifying who was assigned responsibility for the regulatory work that Carter performed after her retirement, their grade and how the position was filled is needed to show that I was similarly situated to Carter because I am similarly situated to the person who acquired Carter's position following her retirement. This question is reasonably related to the claim in Count I. *Sanction requested:* A finding that Kline is similarly situated to Jacquline Carter.

36.  Int. #4.   A response identify the function of the Resource Center, its location and dates of the locations when it officially closed and any other information related to the closing of the Resource Center, such as studies, memoranda, etc., is needed for showing that when the Resource Center closed, Sewell could have continued performing or assumed the clerical duties that were assigned to me. The Sewell, Carter and Coco depositions do <u>not</u> state when the Resource Center officially closed. This question is relevant to Count I. *Sanction requested:* A finding that

Shirley Sewell could have continued performing or assumed the clerical duties that were assigned to Kline.

37.  Int. #5.   A response identifying when Lara Rivera-Lopez worked for PMG, and whether she teleworked and how often, what her grade and duties were, including whether she primarily covered PMG's telephones or assisted walk-in customer is needed to show that Rivera-Lopez performed the same work that I performed and was allowed to telework without an executed telework agreement.  Her detail should have been activated by an SF-52, Request for Personnel Action and position description that temporarily reassigned her so that she was no longer under the supervision or authority of her prior office.  This question relates to Count I.

*Sanction requested:*  A finding that Lara Rivera-Lopez answered telephones and assisted with walk-in customers and was allowed to telework without an executed telework agreement.

38.  Int. #7.   A response identifying how the development of the Federal Register Management System (FRMS) came about, when it was put into production and all persons in PMG who were involved in the development of the FRMS and the extent of their involvement is needed to show that I am "self starting" contrary to William Davis' claim, and that I did not give myself administrative rights but that I acquired the rights due to the fact that I initiated and directed the development of the FRMS.

*Sanction requested:*  A finding that Kline acquired administrative rights to the Federal Register Management system as a result of being the one who initiated and directed the development of the system.

39. Int. #8.  A response identifying how long had Kline been working with Arlene Taylor on the FRMS before Davis sent Taylor an email inquiring about Taylor's visit to Kline is needed to show that sending an email to Taylor and her supervisor, Margaret McElrath was unreasonable and constituted an overbearing surveillance of me. *Sanction requested:* A finding that sending an email to Taylor and her supervisor, Margaret McElrath was unreasonable and constituted an overbearing surveillance of Kline.

40. Int. #9.  A response identifying when I was assigned primary responsibility for answering PMG telephone lines and responding to the Publication inbox is needed to show that I performed the duties without issue once I was assigned primary responsibility for the duties. *Sanction requested:* A finding that Kline performed the duties of responding to the publications Inbox and answered the PMG telephone lines without issue once she was assigned primary responsibility for the duties.

41. Int. #10.  Clarification concerning the manner or ways that I was expected to assist non-regulatory PMG walk-in customers because the response I received pertains to how I was to assist telephone callers or input information into a database, which was usually obtained from emails or telephone calls and not from walk-in customers.  This information is needed to show that I was not allowed to work with walk-in customers other than in a clerical capacity. *Sanction requested:* A finding that Kline was not allowed to assist walk-in customers other than in a clerical capacity.

42. Int. #13.  A response identify any formal or informal complaints made against me, who made them, when they were made and why they were made that were used for

giving me a poor performance rating is needed to show that there were in fact <u>no</u> complaints against me since I was never made aware of any complaints at the time they were allegedly made. *Sanction requested:* A finding that no formal or informal complaints from offices within or outside PMG have ever been made against Kline during October 7, 2002 to January 1, 2007.

43.  Int. #15.  A response identifying the level of authority I had and how and when I exceeded it was necessary to show whether I actually exceeded my level of authority and that was used to justify giving me a poor performance appraisal as I am not aware of any instances when I exceeded my level of authority. *Sanction requested:* A finding that Kline never exceeded her level of authority.

44.  Int. #16.  A response identifying the grades/step and approximate size of the offices of or work spaces of Isaac Evans, Shirley Sewell, Stephen Hickman, Robert Coco, Jacqueline Carter, Valerie Kline and Miriam Heard are needed to establish that I have smaller and inferior work space that my coworkers who are at a lower grade and/or have less tenure than I do and also to show that the coworkers that I was similarly situate to have larger and better office space. *Sanction requested:* A finding that PMG employees at lower grades and less tenure have superior office space than Kline.

45.  Int. #17.  A description of the Semiannual Unified Agenda of Regulatory Actions (the "Agenda") process, its deadlines and strictness of the deadlines is needed to establish that I had a legitimate need for support staff while I was working on the Agenda. *Sanction requested:* A finding that Kline needed support staff while working on the Semiannual Unified Agenda of Regulatory Actions.

46.    Int. #18.  A response identifying the PMG telephone system and approximately

how long it would take to train someone on the system is needed to show that there

was no legitimate reason for not requiring Annette Gunter-Frye to provide backup

telephone support to me while I was working on the Semiannual Unified Agenda of

Regulatory Actions. *Sanction requested:*  A finding that Annette Gunter-Frye could

have provided backup telephone support to Kline while she was working on the

Semiannual Unified Agenda of Regulatory Actions.

47.    Int. #19.  A response identifying all persons that have had their swipe records

reviewed by PMG management, how often the swipe records are reviewed, and

why the swipe records are reviewed are necessary to show that other employees'

swipe records were never scrutinized and that scrutinizing my swipe records was

discriminatory and an overbearing surveillance of me. *Sanction requested:*  A

finding that PMG did not scrutinize any employees swipe records other than Kline's

during the period from October 7, 2002 to January 1, 2007.

48.    Int. #22.  The addresses for subpoenaing Isaac Evans, Annette Gunter-Frye, Lara

Rivera-Lopez, Jose Velaquez, Margaret McElrath and Arlene L. Taylor for

depositions are needed to establish facts or refute disputed issues of fact in this case,

such as lunch hours, emails sent and received, etc. *Sanction requested:*  A Court

Order pursuant to 5 U.S.C.§ 552a(b)(11) that the addresses for Isaac Evans, Annette

Gunter-Frye, Lara Rivera-Lopez, Jose Velaquez, Margaret McElrath and Arlene L.

Taylor be provided to Kline.

49.    Int. #23.  A response indicating whether it is the practice of PMG or was it the

practice of PMG to issue monetary performance bonuses to employees who

received an Exceeds Fully Successful rating or above on their Performance

Appraisal during the time frame from October 7, 2002 to January 1, 2007, is needed

to show that it was PMG's practice to issue monetary bonuses based on their

performance ratings. *Sanction requested:* A finding that during the time frame

from October 7, 2002 to January 1, 2007, PMG awarded a monetary performance

bonus to employees who received an Exceeds Fully Successful rating or above on

their performance ratings

I affirm under penalty of perjury that this affidavit consisting of 14 pages is true and

correct to the best of my knowledge and belief.

_Valerie Kline_
Valerie Kline

_April 15, 2008_
Date

# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

Valerie Kline                  *
83 E Street                  *
Lothian, MD 20711        *
                           *
                Plaintiff *
                           *
          v.           *      Case No. 1:07-cv-451 (JR)
                           *
Linda M. Springer, Director     *
U. S. Office of Personnel Management   *
1900 E Street, N.W.         *
Washington, D.C.  20415      *
                Defendant *
                           *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

For good cause shown, Defendant's *Motion to Dismiss or for Summary Judgment or, in the Alternative, for a More Definite Statement* is denied.

_____
Judge

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

Valerie Kline                              *
83 E Street                                *
Lothian, MD 20711                          *
                                           *
                              Plaintiff    *
                                           *
                   v.                      *        Case No. 1:07-cv-451 (JR)
                                           *
Linda M. Springer, Director                *
U. S. Office of Personnel Management       *
1900 E Street, N.W.                        *
Washington, D.C.  20415                    *
                              Defendant    *
                                           *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORDER

For good cause shown, Plaintiff's request for Rule 32 Sanctions of the Fed. Rules

of Civ. Proc. is granted.  The following the designated facts shall be taken to be

established for the purposes of establishing the facts in this case in accordance with

Kline's claims in obtaining the order; and Springer shall not be allowed to support or

oppose the designated claims or defenses, and is prohibited from introducing any

evidence with regard to the following:

1.      A finding that Jacquline Carter began teleworking on a regular basis after her

        husband suffered several strokes.

2.      A finding that PMG allowed Rivera-Lopez telework without an executed telework

        request agreement.

3.      A finding that no problems were encountered during Kline's trial telework period.

4.  A finding that Kline was similarly-situated to Carter and Rivera-Lopez, who were allowed to telework.

5.  A finding that Lara Rivera-Lopez and Jose Velaquez answered PMG telephones and assisted with walk-in customers.

6.  A finding that when an employee is detailed to a new office, the detail action is initiated by an SF-52, Request for Personnel Action, accompanied by a position description that assigns the employee to a new position for a specified period of time.

7.  A finding that as a GS-9 and/or below, Shirley Sewell was tasked with performing the clerical duties for PMG that Kline, as a GS-12, was tasked with performing when Kline's Position Description was changed on 6-10-2003.

8.  A finding that Kline did not fail to cover PMG telephones after being tasked with the primary responsibility for them on August 24, 2005.

9.  A finding that Kline did not fail to perform duties related to the FACA database.

10. A finding that Kline never exceeded her authority during October 7, 2002 to January 1, 2007.

11. A finding that Kline never failed to respond to the Publications Inbox after being tasked with primary responsibility for this duty.

12. A finding that Kline never failed to update or maintain the Publications database.

13. A finding that Coco was primarily responsible for the Publications Inbox.

14. A finding that Kline never made mistakes or errors when performing regulatory work.

15. A finding that Kline never missed deadlines on any of her work projects.

16.     A finding that Kline is the <u>only</u> employee in PMG that has a Performance Standard based on the ability to have good relationships with other employees.

17.     A finding that Kline reviewed OPM's pending "old and cold" regulations at her own initiative.

18.     A finding that Kline suggested a procedure for having the Office of Communications and Public Liaison notify PMG of any publications it approves for inclusion into the Publications database.

19.     A finding that no complaints were ever made against Kline by any PMG office or Director Springer's office.

20.     A finding that Davis generated additional defamatory email to Margaret McElrath and Arlene Taylor.

21.     A finding that Kline was responsible for initiating and directing the development of the FRMS.

22.     A finding that Kline was the only one on the 5th floor assigned a specific time for going to lunch and other PMG employees could go to lunch anytime they wanted.

23.     A finding that Kline never failed to properly report her leave.

24.     A finding that PMG has no instructions on how PMG employees are to properly report their leave.

25.     A finding that Kline reported her leave more accurately than white male and/or minority employees whose "swipe" records were not scrutinized during the timeframe of Letter of Reprimand to Kline.

26.     A finding that Kline never instructed Davis to make amendments to her annual and sick leave that resulted in a loss of 36 hours of "Use or Lose" Annual Leave

and a loss of 98.5 hours of accrued Sick Leave on pay period ending 11-26-2005 and that Davis made these amendments without Kline's knowledge and/or authorization.

27.    A finding that Davis did not instruct Sewell to amend Kline's leave for pay period ending 11-26-2005 that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave but that Davis is the one who made the amendments to Kline's leave.

28.    A finding that Issac Evans, Shirley Sewell, Miriam Heard-Johnson and Stephen Hickman have or had superior office space to Kline even though they had or have less seniority and less tenure than Kline.

29.    A finding that Kline performed the same type and kind of regulatory work as Jacquline Carter but PMG failed to promote Kline.

30.    A finding that Kline was the only PMG employee formally tasked with primarily answering PMG telephone lines.

31.    A finding that Shirley Sewell could have continued performing or assumed the clerical duties that were assigned to Kline.

32.    A finding that Lara Rivera-Lopez answered telephones and assisted with walk-in customers and was allowed to telework without an executed telework agreement.

33.    A finding that Kline acquired administrative rights to the Federal Register Management system as a result of being the one who initiated and directed the development of the system.

34.    A finding that sending an email to Arlene Taylor and her supervisor, Margaret McElrath was unreasonable and constituted an overbearing surveillance of Kline.

35.   A finding that Kline performed the duties of responding to the publications Inbox and answered the PMG telephone lines without issue once she was assigned primary responsibility for the duties.

36.   A finding that Kline was not allowed to assist walk-in customers other than in a clerical capacity.

37.   A finding that no formal or informal complaints from offices within or outside PMG have ever been made against Kline during October 7, 2002 to January 1, 2007.

38.   A finding that Kline needed support staff while working on the Semiannual Unified Agenda of Regulatory Actions.

39.   A finding that Annette Gunter-Frye could have provided backup telephone support to Kline while she was working on the Semiannual Unified Agenda of Regulatory Actions.

40.   A finding that PMG did not scrutinize any employees swipe records other than Kline's during the period from October 7, 2002 to January 1, 2007.

41.   A Court Order pursuant to 5 U.S.C.§ 552a(b)(11) that the addresses for Isaac Evans, Annette Gunter-Frye, Lara Rivera-Lopez, Jose Velaquez, Margaret McElrath and Arlene L. Taylor be provided to Kline.

42.   A finding that during the time frame from October 7, 2002 to January 1, 2007, PMG awarded a monetary performance bonus to employees who received an Exceeds Fully Successful rating or above on their performance ratings

_____
Judge