U.S. DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Valerie Kline <br> 83 E Street <br> Lothian, MD 20711 <br><br> Plaintiff <br><br> v. <br><br> Linda M. Springer, Director <br> U. S. Office of Personnel Management <br> 1900 E Street, N.W. <br> Washington, D.C. 20415 <br> Defendant | Case No. 1:07-cv-451 (JR) |

### RESPONSE TO DEFENDANT'S OPPOSITION TO "PLAINTIFF'S REQUEST FOR RULE 56(f) AND RULE 32 SANCTIONS"

On April 15, 2008, Kline requested that the Court deny *Defendant's Motion to Dismiss or for Summary Judgment or, in the Alternative, for a More Definite Statement* (the "Motion") pursuant to Rule 56(f) because Springer failed to adequately respond to *Plaintiff's First Set of Interrogatories and Repeat of Request for Production of Documents*. In the event the Court denies Kline's request to deny the Motion, Kline requested that the Court issue sanctions pursuant to Rule 37(b)(2) and (c)(1).

In response, Springer failed to timely file its opposition to the request for sanctions and failed to obtain leave from the Court to file its opposition out of time. LCvR 7 provides that an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion within 11 days and if the memorandum is not filed within the prescribed time, the Court shall treat the motion as conceded. Since Kline filed the motion for sanctions on April 15, 2008,

11 days would be April 26, 2008. Springer did not respond until Tuesday, April 29, 2008, or <u>14 days after the motion was filed</u>, which is three (3) days after the time mandated by the Court's rules. Therefore, the Court should treat Kline's motion for sanctions as conceded by Springer.

However, should the Court consider Springer's opposition, Kline requested sanctions because <u>Springer has failed to comply with Kline's Request for Documents, has refused to substantially produce the requested documents and has failed to adequately respond to Kline's interrogatories</u>. At most, Springer only produced a few token documents and made no valid objections to furnishing the other documents as reflected in Kline's March 26 & 27, 2008 letters to Springer's counsel. See Ex. 2, *Plaintiff's Request for Rule 56(F) and Rule 32 Sanctions*.

Moreover, Springer <u>falsely</u> accuses Kline of misrepresenting the facts. Kline accurately stated that Springer "failed to produce any documents". Kline's statement was factual because <u>no documents were produced</u> in its March 22, 2008 response as mandated by the Court. As stated in the request for sanctions, "Kline sent letters to Springer's counsel explaining (1) how the documents were relevant; (2) how the requested information was exempt under the Privacy Act; and (3) how Kline has been fully investigated and given a security clearance by OPM" so that security issues should not be a concern. In spite of Kline's further attempts to acquire the documents, Kline <u>accurately</u> stated in her request for sanctions that in response to those letters, Springer only produced a few token documents on April 11, 2008, which was 20 days after the Court's mandated date for producing the documents:

> "In response, <u>Springer produced only token documents</u> on April 11, 2008, <u>consisting of five (5) Position Descriptions requested under No. 4</u> but failed to produce the Vacancy Announcements and Performance Standards requested and also failed to produce the additional 29 documents requested by Kline. Moreover, Springer failed adequately answer the interrogatories." [Emphasis added.]

It is appalling that Springer would attach these <u>same</u> five (5) documents to her opposition to the request for sanctions in an attempt to claim that Kline misrepresented the facts when it is Springer who is misrepresenting the facts by accusing Kline of saying that Springer did not produce <u>any</u> documents at any time. Kline clearly stated that Springer produced the five (5) position descriptions although it should be noted that Springer only provided the latest position descriptions for the five (5) employees and <u>did not provide all the position descriptions</u> for these employees during 2002-2007, as requested. Therefore, even the production of these five (5) documents was deficient. This is important because during 2002-2003, Shirley Sewell was a GS-9 whereas she was later promoted to a GS-11 into a new position. Kline's opposition to the Motion states that Kline was assigned many of the duties that Sewell had been performing. Therefore, Sewell's earlier position description is needed to show this.

Springer further misrepresents that Kline was able to respond to Defendant's Motion <u>without the requested documents</u> or without further response to the interrogatories. This statement is misleading because Kline's opposition to the Motion relies on the requested sanctions to support its opposition to the Motion. In this respect, Kline's reliance on the requested sanctions is necessary to oppose the Motion in the event the Court does not grant Kline's Rule 56(f) request to deny the Motion. Without the sanctions, Kline submits that the opposition to the Motion lacks the necessary evidence to support many of its claims pertaining to the various 23 counts of discrimination. Accordingly, Kline submits that she is <u>not</u> able to adequately respond to the Motion without the requested documents, without a sufficient response to the interrogatories, or in lieu thereof, <u>without the requested sanctions</u>.

Springer also misrepresents that Kline relies on Rule 32 to provide relief. While the title of Kline's motion for sanctions references Rule 32 of the Fed. Rules of Civ. Proc., <u>the body of</u>

3

Kline's motion specifically references Rule 37(c)(1) and 37(b)(2)(A), (B), (C), contrary to Springer's claim that "Plaintiff fails to rely on Fed. R. Civ. R. 37 in her opposition".

Kline did not file a *written* motion to compel the production of documents under Rule 37(a) because she orally requested that the Court compel the production of documents at the March 12, 2008 "emergency" hearing wherein the Court mandated that Springer produce the documents. Because Springer failed to comply with the Court's mandate with no valid excuse, Kline first requested the Rule 56(f) relief and alternatively requested sanctions pursuant to Rule 37(b) and (c)[1]. Accordingly, the Court should deny Springer's Motion or grant the requested

---

[1]**RULE 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions**

(b) FAILURE TO COMPLY WITH A COURT ORDER
\*\*\*\*\*
(2) Sanctions In the District Where the Action Is Pending.
(A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent — or a witness designated under Rule 30(b)(6) or 31(a)(4) — fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
  (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
  (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
  (iii) striking pleadings in whole or in part;
  (iv) staying further proceedings until the order is obeyed;
  (v) dismissing the action or proceeding in whole or in part;
  (vi) rendering a default judgment against the disobedient party; or
  (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
\*\*\*\*\*
(c) FAILURE TO DISCLOSE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.
(1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
  (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
  (B) may inform the jury of the party's failure; and
  (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).
(2) Failure to Admit. If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:
  (A) the request was held objectionable under Rule 36(a);
  (B) the admission sought was of no substantial importance;
  (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
  (D) there was other good reason for the failure to admit. [Emphasis added.]

sanctions should the Court agree that Springer's objections are without merit and are simply designed to frustrate Kline's attempt to establish her case.

Springer further claims that she responded to Kline's interrogatories by referring to the Report of Investigation ("ROI"). First, there are three (3) ROI's related to this case and Springer did not identify which ROI she was refering to. Kline attempted to figure out which ROI Springer was referring to and found that the information contained in the ROI's does not adequately respond to the interrogatories. Kline explained in detail to Springer's counsel how the objections to the document request were invalid and that many of the responses to the interrogatories were not responsive at which point Springer only produced the few token documents. See Ex. 2, *Plaintiff's Request for Rule 56(F) and Rule 32 Sanctions*.

For example, in the request for interrogatories, the following exchanges occurred:

> *1. Identify who was assigned responsibility for the regulatory work that Carter performed after her retirement, their grade and how the position was filled.*
> Springer's Response: OBJECTION: *This question is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is required, it is a request for information for a period occurring outside of the relevant time period. Finally, Plaintiff did not apply for this position.*
> Kline's Response: This relates to Count I and might show that Kline was similarly situated to Carter because she is similarly situated to the person who acquired Carter's duties. This is reasonably related to the claim in Count I. Please respond.

As the Court can see, Springer refuses to comply with a relatively simple request. Interestingly, Springer claims that "Plaintiff did not apply for this position." To Kline's knowledge, Carter's position was never advertised following her retirement but was filled by an employee hired while Carter was still employed with PMG. Ironically, Springer refuses to produce the requested Vacancy Announcement for this position as requested in item no. 4 in its

5

request for production of documents[2]. Therefore, to say that Kline did not apply for Carter's position is truly bizarre since Kline was told that she was being hired to assume Carter's duties when Carter retired. In this respect, Kline did in fact "apply" for the position formerly occupied by Carter contrary to Springer's claim. While this is not an issue in this particular case, it nevertheless illustrates the degree of Springer's unreasonableness to the point of being absurd.

Because Kline claims that she was similarly situated to Carter and performing the same duties as Carter while Carter was employed with PMG, the fact that Carter's position was filled by another GS-12 employee *shows* that Kline was similarly situated to Carter since Kline submits that she is similarly situated to the person who is currently performing the duties that Carter performed.

As far as an objection based on events falling outside the relevant period, this is not a valid objection since Kline's Third Amended Complaint contains a hostile work environment claim whereby claims and events surrounding those claims are not time barred. Likewise, the date that Carter's position was filled has no bearing on whether Kline is similarly situated to the person who assumed Carter's position. Accordingly, Springer's objection to identifying the individual and producing the Vacancy Announcement because the information falls outside the relevant time period is unreasonable and shows bad faith.

---

[2] *4. Copies of the Position Description(s), Performance Standards and Vacancy Announcements for the following personnel while employed in PMG.*

   *Springer's Response: OBJECTION: to the request for the documents concerning Stephen Hickman, Lara Rivera-Lopez and Jose Velaquez on the grounds of relevancy. Hickman became employed after the relevant time period, and Rivera-Lopez and Velaquez were detailed to PMG from other offices. With regard to the remaining employees, see the ROT, Exhibit L, p. 1-4,6; Exhibit M, p. 1-13, 15; Exhibit N, p. 1.*

   Kline Response: Where are the *Position Description(s)* (PD), *Performance Standards and Vacancy Announcements for* Robert Coco, Issac Evans, Shirley Sewell, & Miriam Heard-Johnson that you do not object to? These are relevant to show that they were either higher grades performing the same duties or lower grades than Kline but where Kline was performing the clerical duties that Sewell performed, or that Evans was lower grade than Kline but Kline was tasked with performing the clerical duties of answering the telephone, and that Kline is the only employee that has a requirement based on the ability to have good relationships with other employees, etc. Also please include the accompanying SF-52s to the PD's. These documents are also need to show that Kline is or is not similarly situation to these employees.

*2. Identify any and all person(s) in PMG that was qualified to fill the position that Carter occupied?*
<u>Springer's Response</u>: OBJECTION: *Vague as to what position is being referenced. To the extent that a response is required, if the question concerns the position which became available after Carter retired, this request is not relevant and is not likely to lead to the discovery of relevant information. It is a request for information during a period occurring outside of the relevant time period. Finally, Plaintiff did not apply for this position.*
<u>Kline's Response</u>: Did Carter occupy more than one position in PMG? If so, describe all of them and all of the people who qualified for those positions. This relates to Count I and might show that Kline was similarly situated to Carter because Kline is similarly situated to the person who acquired Carter's duties. It is also relevant to Count I re: elimination of Kline material responsibilities. Please respond.

According to Carter's deposition, Carter began doing regulatory work in 1989 and was promoted into that position. To say that it is "vague" as to the position Carter occupied is unreasonable since <u>Carter only occupied one (1) position for the past 18 years prior to her retirement</u> and this case only refers to one (1) position occupied by Carter, i.e., the regulatory position. Again, by refusing to respond to the question, Springer shows bad faith by being unduly difficult and uncooperative.

*3. Identify when Carter began teleworking and how many days per week that she teleworked.*
<u>Springer's Response</u>: *See Deposition of Jacqueline Carter, pages 15, 16-18, 19, 22, 27, 67; see also Affidavit for William M. Davis, Report of Investigation (ROI), OPM EEO Case No. 2006008, p. 5.*
<u>Kline's Response</u>: This is not responsive. Davis' affidavit does <u>not</u> state how many days per week Carter teleworked. Was it 2 days, 3 days? Did the days change? Please respond.

Carter testified that she teleworked, "<u>maybe</u> 1 or 2" days a week [emphasis added]. This is not a definite statement. Kline submits that when Kline first started working for PMG, Carter teleworked three (3) days a week. <u>See</u> Kline Affidavit, ¶ 7, to *Memorandum of Points and Authorities in Opposition to Defendant Springer's Motion to Dismiss*. Kline requested a copy of

Carter's executed Telework Agreement that should show exactly how many days per week she teleworked but <u>Springer refuses to supply the document</u>:

> *3. Executed telework agreement(s) for Jacqueline Carter, Lara Rivera-Lopez, Stephen Hickman and any other PMG employees authorized to telework.*
> <u>*Springer's Response*</u>*: OBJECTION: This document request is not relevant and is not likely to lead to the discovery of relevant information. In addition, it is objected to on the basis of privacy. To the extent that an answer is required, Jacqueline Carter is the only PMG employee besides the plaintiff that teleworked during the relevant time period. Stephen Hickman became employed after the relevant time period. Therefore, information concerning Mr. Hickman is not relevant. Lara Riviera-Lopez was detailed to the PMG from another office. Therefore, information concerning her is not relevant. With regard to Ms. Carter's telework, see Deposition of Jacqueline Carter, p. 15-18; 22-27.*
> <u>Kline's Response</u>:  Since I am not seeking privacy information, any privacy information can be redacted.  The executed telework agreements for Carter, Hickman and Rivera-Lopez are relevant because:  Carter's will show exactly when she began teleworking following the "pilot" telework period and whether it coincided with her husband's failing health; Hickman's will show whether he was allowed to telework when working less than one year for OPM; and if PMG has no executed telework agreement for Rivera-Lopez, please state that there is none because this will show that she was allowed to telework without an executed telework agreement.  This information is relevant to Count I because Kline was told that she could not telework based on 1) when her mother's health failed; 2) that she had no executed telework agreement; and 3) that it is OPM policy for employees to work for one year prior to teleworking.

Kline's opposition to the motion to dismiss states that Kline was told that Carter was allowed to telework because her husband had suffered several strokes and allowing her to telework enabled her to have more time to care for him.  See p. 4, *Memorandum of Points and Authorities in Opposition to Defendant Springer's Motion to Dismiss*, Kline Affidavit, ¶ 29, Ex. 18.  Accordingly, Carter's executed Telework Agreement is extremely relevant for purposes of establishing Kline's case because it will show exactly when Carter began teleworking, how many days per week she teleworked, and whether her telework coincided with her husband's failing health as Kline submits.

Carter testified that she had a dedicated telephone line installed in her house for telework. Coco testified that he ordered equipment for Carter and keeps the records of the orders. Kline requested copies or access to the documentation of the telephone installation and equipment orders[3], which would also show when Carter began telework, but <u>Springer refuses to produce the documents</u>. Coco also testified that he didn't remember ordering equipment for Carter's teleworking because it was approximately 6-7 years ago. Since the deposition was taken in 2008, this means Coco remembers Carter's beginning to telework around 2001, which coincides with the time that Carter testified that her husband became ill. See Carter Deposition, p. 17 and Coco Deposition, pp. 37-40, attached

This issue is at the very essence of the Count I claim, which is that Carter was allowed to telework when her husband's health failed but Kline was not allowed to telework when her mother's health failed. By refusing to produce the telework agreements, Springer is withholding evidence in violation of the Fed. Rules of Civ. Proc., Rule 26, Duty to Disclose, and should be sanctioned since this Court ordered Springer to produce documents pursuant to Rule 26(a) at the November 13, 2007 status conference, mandated that Springer to produce the documents pursuant to its March 12, 2008 "emergency" hearing and since Springer has no valid reasons for withholding the documents.

As explained in detail in the letters to Springer's counsel, the responses to the interrogatories are inadequate, insufficient and non responsive. An explanation was also given as to why the documents are relevant and necessary, why the objections based on grounds of security is unreasonable and why the request is exempt under the Privacy Act and that any

---

[3] During the deposition of Robert Coco, he testified that he has responsibility for ordering all of equipment for the Publishing Management Group that is under $2500-3000 and that he keeps track of all of the credit card purchases and records of all supplies and items that he orders. Please provide documentation of all the equipment ordered for Jacquline Carter for her teleworking. Kline's *Request for Additional Documents*

9

private information can be redacted so that there is no excuse for not furnishing the documents. Therefore, the requested sanctions should be granted so that Kline can establish the facts supporting her opposition to the Motion because Springer refuses to supply the requested documents for no valid or legitimate reasons.

In the event the Court denies the Rule 56(f) request to deny the Motion, Kline submits that all of the documents requested in her request for documents are necessary for establishing Kline's opposition to the Motion as explained in the March 26 and 27, 2008 letters to Springer's counsel referenced above and in Kline's Affidavit in support of the request for sanctions. Rather than address each and every item herein, Kline requests a hearing on the motion for sanctions should the Court need additional input on the document requests and the interrogatories.

Respectfully submitted,

Valerie Kline, pro se
(301) 509-2684

```
              UNITED STATES DISTRICT COURT

            FOR THE THE DISTRICT OF COLUMBIA

-------------------------------------x
VALERIE KLINE,                       :
                Plaintiff,           :
         v                           : CASE NO:
                                     : 1:07CV451
LINDA M. SPRINGER, and               :
US OFFICE OF PERSONNEL MANAGEMENT,   :
                Defendants.          :
-------------------------------------x
```

ORIGINAL

Washington, D.C.

Tuesday, February 20, 2008

Deposition of:

JACQULINE CARTER

called for oral examination by Plaintiff, pursuant to Notice, at the Offices of Personnel Management, 1900 E Street, Northwest, Washington, D.C., before Mary E. Warner of Capital Reporting, sworn by a Notary Public in and for the District of Columbia, beginning at 1:00 p.m.

**Capital Reporting Company**

Page 17

```
1    you were teleworking?
2         A    It was transferred to my home phone.
3         Q    What government issued equipment did you
4    have for teleworking?
5         A    In the very beginning, I had a fax
6    machine; in the very beginning, yeah, a fax
7    machine. I had my own equipment. Eventually I
8    used some of theirs.
9         Q    What equipment was that?
10        A    What equipment was what?
11        Q    That you were using for teleworking.
12        A    OPM's? A fax machine, a computer, that's
13   it.
14        Q    Did you have a dedicated telephone line
15   installed?
16        A    Yes.
17        Q    Was that installed by OPM?
18        A    Yes.
19        Q    Did you have a government issued cell
20   phone?
21        A    No.
22        Q    And I understand that your husband
```

1  suffered several strokes. When did he suffer
2  those strokes approximately?
3         MS. WHITAKER: Objection, foundation and
4  privacy act. You do not have to give details of
5  your husband's condition, if you care not to.
6         THE WITNESS: I care not to.
7  BY MS. KLINE:
8      Q   Okay. I'm not asking for details about
9  his condition, just the time that he became ill,
10 when he suffered the strokes.
11     A   2001, I can't really remember the date.
12     Q   Okay. Was the reason you wanted to
13 telework primarily due to his condition?
14     A   I was already teleworking.
15     Q   Would you have continued to work at OPM
16 if you would not have been allowed to telework
17 after your husband became ill?
18     A   If he was really sick, I would probably
19 had to retire.
20     Q   If you had not been allowed to telework?
21     A   That's not what I said. Regardless of
22 whether I was teleworking or what, if he got

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA

---

VALERIE KLINE,                  :
          Plaintiff,            :
     v                          : CASE NO:
                                : 1:07CV451
LINDA M. SPRINGER, and          :
US OFFICE OF PERSONNEL MANAGEMENT:
          Defendants            :

---



Washington, D.C.

Friday, February 22, 2008

Deposition of:

ROBERT T. COCO

called for oral examination by Plaintiff, pursuant to Notice, at the Offices of Personnel Management, 1900 E Street, Northwest, Washington, D.C., before Mary E. Warner of Capital Reporting, sworn by a Notary Public in and for the District of Columbia, beginning at 9:50 a.m.

```
 1   telework?
 2       A   No.
 3       Q   Who orders the equipment for publishing?
 4   You mentioned earlier that --
 5       A   Mr. Benedi orders anything.  In terms of
 6   approves ordering and if it's within my
 7   contractual approval level, I can order equipment,
 8   but it's always approved by the supervisors.
 9       Q   Who actually does the ordering?
10       A   I do.
11       Q   As the purchasing agent?
12       A   If it's under a certain amount of money.
13   If it's not, it has to go to our contracting
14   office for purchasing.
15       Q   What is -- like a computer or a fax
16   machine, would that have to go to contracting, or
17   would that be --
18       A   Well, again, it depends upon the amount.
19   Right now it's a $3,000 limit on a credit card.
20   It used to be $2,500, they raised it last year to
21   $3,000.  So, again, to answer your question, it
22   depends.  If it was a $5,000 thing, I could not
```

Capital Reporting Company

Page 38

1  order it.

2      Q   Do you keep records of the equipment
3  you've ordered?

4      A   You say "equipment." I keep track of all
5  credit card charges that I do.

6      Q   You have records?

7      A   I have records for all supplies, paper.

8      Q   Or equipment?

9      A   Or equipment, if it's under that
10 threshold that I said.

11     Q   Okay. And what about -- do you have any
12 records of things that go to the contract group
13 for approval, if it's over the $3,000 limit?

14     A   Yeah. We rarely have -- we only used to
15 have one or two a year, if that. If that goes
16 over that. But, yes, you have to fill out --
17 there's a procedure or form that has to be
18 completed for them for approval that is used. In
19 fact, they just changed it, I understand. So,
20 yes, there's a procedure for things over $3,000.

21     Q   You know Jackie Carter, right?

22     A   Yes.

1   Q   And you realize that she teleworks,
2   correct?
3       MS. WHITAKER:  Objection, misrepresenting
4   the facts.
5   BY MS. KLINE:
6   Q   Did Jackie Carter telework, to your
7   knowledge?
8   A   Yes, she teleworks to my knowledge.
9   Q   Do you recall ordering any equipment for
10  her to telework?
11  A   No.
12  Q   Ms. Carter stated that she had a
13  facsimile machine.  Did you order that machine for
14  her to telework?
15  A   I may have.  It's years -- it's possible.
16  You're talking six or seven years ago or whatever
17  it was.  It's possible that if Claudio asked me to
18  order a fax machine for her, I did it.  I don't
19  specifically remember that.
20  Q   What about a computer?
21  A   No, because the computer, as my
22  understanding of someone's teleworking, the

Capital Reporting Company

Page 40

1  computer is given to them by the help desk.  I
2  have nothing to do with that.
3       Q   Okay.
4       A   Anything that was provided to our office,
5  I think -- I don't know about the fax -- is really
6  set up by the help desk that does that.  We would
7  not have anything to do with that.
8       Q   Ms. Carter testified that she had a
9  dedicated telephone line to her residence to use
10 for teleworking.  Did you place the order for
11 that?
12      A   No.  That would have been done through
13 our facilities office.  I would have had nothing
14 to do with that.  I have nothing to do with
15 telephones or anything of that nature.
16      Q   Other than the cell phones?
17      A   The cell phones, I pay the bills.  As far
18 as setting up and ordering something for someone's
19 house, that's outside of my purview.
20      Q   Who paid the bill for that?
21      A   I don't know.  I don't remember getting a
22 bill for her.  I think that's done separately.