## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VALERIE KLINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0451 (JR) |
| | ) | |
| LINDA M. SPRINGER, DIRECTOR, | ) | |
| U.S. Office of Personnel Management, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

### I. Introduction

At the March 12, 2008, motions' hearing, this Court granted defendant's motion for leave to file defendant's motion to dismiss or for summary judgment. Plaintiff was provided with 40 days in all to respond to defendant's motion. Thereafter, defendant was given 14 days to reply. The fourteenth day was May 2, 2008, and on that date defendant requested a one-day extension of time, which is presently pending before the Court.

Defendant herewith files defendant's reply to plaintiff's opposition and states as follows: In plaintiff's opposition to defendant's dispositive motion, plaintiff has failed to address defendant's statement of material facts not in dispute in the manner required by Local Rule LCvR 7(h). Accordingly, the Court may deem defendant's facts admitted for the purpose of its dispositive motion (II. Argument, Section A). Plaintiff has failed to establish that she was similarly-situated to any other employee in OPM's Publication Management Group ("PMG") for the purpose of supporting her discrimination claims (II. Argument, Section B). Plaintiff's claim involving the denial of telework is untimely (II. Argument, Section C). Plaintiff's claims are

not adverse personnel actions and those actions were legitimate nondiscriminatory/nonretaliatory actions, not pretext for discrimination or retaliation (II. Argument, Section D). Finally, plaintiff's hostile work environment/sexual harassment claim is without merit (II. Argument, Section E).

Indeed, a review of plaintiff's opposition shows that she has made no attempt to connect any of the massive amounts of records that she has appended to her brief with the arguments she makes. Defendant believes that the Court will quickly recognize that plaintiff apparently has been dissatisfied with her job from almost her first day at work. She has complained to the union, to her supervisors, and later to the OPM's EEO office. Suffice it to say that for a very long time, plaintiff's time at the office was spent pursuing her personal complaints against her supervisors, first with Union assistance and later in the EEO process.[1]

## II. ARGUMENT

### A. Defendant's Statement of Material Facts Should be Deemed Admitted.

Defendant has set forth nine facts in her Statement of Materials Not in Dispute. See Docket Entry ("R" or "Document") R 36, pp. 34-36. Instead of addressing each of these facts, plaintiff has filed her own Opposition to Statement of Material Facts in Dispute and a Statement of Genuine Issues to be Litigated. See R. 40-9. In this document, plaintiff provides five "Disputed Material Issues of Fact." These facts do not specifically address any of defendant's facts. Then, in Plaintiff's "Statement of Material Facts Not in Dispute," she raises additional

---

[1] Illustratively, one of the documents submitted by plaintiff identifies the fact that her supervisor discovered that she was spending an average of seven of her nine hours at work each work day, using the office computer to access the Internet for nonwork related reasons. See Plaintiff's Opposition, R. 40-6, p. 61 (draft proposed suspension). She does not deny the fact that she spent inordinate time on nonwork related Internet activities, but simply claims that there is no prohibition against it because she got her work done. Id. at pp. 64-67.

facts, none of which specifically address defendant's statement of facts and none that contain citations to supporting documents. Thus, plaintiff fails to satisfy the requirements of Local Rule LCvR 7(h).

> Local Rule LCvR 7(h):
>
> An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

LCvR 7(h). Because plaintiff's statement of genuine issues neither responds directly to the factual statements asserted in the motion nor provides record citations, it should be rejected and defendant's statement be deemed undisputed. Local Rule LCvR 56.1 leaves it to the District Court's discretion to decide whether to treat those facts as conceded. See Burke v. Gould, 286 F.3d 513 (D.C. Cir. 2002); Heasley v. D.C. General Hosp., 180 F. Supp. 2d 158, 163 (D.D.C. 2002); Trawick v. Hantman, 151 F. Supp. 2d 54, 58-59 (D.D.C. 2001).

Defendant's supported facts are sufficient, in and of themselves, to dispose of plaintiff's claims on the straightforward legal defenses defendant has asserted in its motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). On the other hand, and as noted above, plaintiff has failed altogether to connect the facts that she alleges to be material in her statements of fact to supporting material. Similarly, she fails to set forth in her memorandum of points and authorities in opposition to defendant's motion citations to the numerous documents she attaches to her filing. Instead, she relies almost exclusively on her self-serving complaint and her self-serving affidavit to establish her points. She leaves it to the Court to determine which facts

3

are supported by which document.[2]

    **B.  <u>Plaintiff Can Point to No Similarly-Situated Individuals Treated Differently</u>.**

    Plaintiff outlines her claims in her "statement of material facts" [R. 40-9, pp 1-10], and asserts, as noted above, without supporting citations, that

    (1) She was the only person assigned to telephone duty for PMG;

    (2) Her work performance was equal to or greater than minority and/or white male employees who received higher performance ratings;

    (3)  Jacqueline Carter was allowed to telework and she was not;

    (4) She was similarly-situated to Lara Rivera-Lopez and Jose Velaquez and they were treated better;

    (5) She was singled out to receive a defamatory email by her supervisor;

    (6) Her administrative rights to the Federal Register Management System ("FRMS") were taken away and given to minority and/or white male employees less qualified than her (she identifies Robert Coco);

    (7) Her office space was smaller than others;

    (8) She had no staff support unlike similarly-situated minorities;

    (9) She received a counseling letter and Mr. Coco did not but should have,

    (10) She had to take lunch during core hours but others did not;

    (11) She received a letter of reprimand but similarly-situated minority and white male employees did not;

---

    [2] In this reply, defendant has primarily referred to plaintiff's attachments and the transcripts of the witnesses that plaintiff deposed to show that plaintiff's complaint should be dismissed or summary judgment entered in defendant's behalf.

(12) Her "swipe" records were scrutinized but those of others were not; and

(13) Her leave was tampered with by her supervisor.

<u>See</u> R. 40-9, 1-46.  Thus, as plaintiff makes clear, she claims discrimination because it was, and is, her view that others in the PMG office, who were "similarly-situated" to her, were treated differently--and better – than she was.

A cursory review of the position descriptions attached to defendant's opposition to plaintiff's motion for sanctions, the deposition testimony of Jacqueline Carter, Shirley Sewell and Robert Coco [found herein at Attachments A-C], and portions of the Report of Investigation [found with defendant's opening brief and plaintiff's opposition] establishes that there were no similarly-situated PMG employees to Kline who were treated differently than she was.

A review of the grades and duties of the "comparators" identified by Ms. Kline in her statement of facts and the documents relied on by plaintiff show that, although Ms. Kline and the following employees had the same supervisors [Benedi and Davis], they were not similarly-situated to plaintiff:

Jacquline Carter was a PMG employee working on regulatory matters, but was a grade higher than Ms. Kline [at GS-13 level], and had a higher level of responsibility for regulatory work.  <u>See</u> Plaintiff's Opposition, R. 40-5, p. 17.  Ms. Carter reviewed Ms. Kline's regulatory work.  <u>See</u> Attachment A at p. 22, lines 18-22 and p. 23, lines 1-2-22; p. 39, lines 13-22.  Ms. Kline, a GS-12 employee, acted as her assistant on regulatory matters.  Plaintiff's Opposition at R. 40-5, p. 22.  In May of 2003, plaintiff's position description was rewritten so that she performed less regulatory work and worked on other assignments.  <u>See</u> Plaintiff's Opposition, R.

40-4, pp. 17-22 (*cf.* R 40-4, pp. 1-5.).[3]

Robert Coco was a PMG employee, but was also a grade higher [GS-13]. Plaintiff's Opposition, R. 40-5, p. 17. Ms. Kline assisted Mr. Coco, from about May 2003 when her position was revised. <u>See</u> Attachment A at p.23, lines 11-12; Attachment B at 21, lines 4-16; p. 25, lines 4-8; <u>See</u> also Plaintiff's Opposition, R. 40-5, p. 22. Mr. Coco worked in publication management and performed procurement and purchasing work that Ms. Kline did not do. <u>Id</u>. and Attachment B, p. 20, lines 10-15.

Shirley Sewell was a PMG employee, but was graded at the GS-8 level and later a GS-9. She also had different responsibilities. As a GS-8, Ms. Sewell was assigned to the resource center (library), "cataloguing, answering the phones, greeting customers, reshelving materials, research documents, logging in new material, library stuff." Attachment C, p. 9, lines 15-22, p. 10, lines 1-11. As a GS-9, Ms. Sewell was a printing procurement specialist. <u>Id</u>, p. 10-12; <u>See</u> <u>also</u> Plaintiff's Opposition, R. 40-5, p. 17.

Lara Rivera-Lopez was not a PMG employee. She was only detailed to the PMG and was a graphics person. Plaintiff did graphics work only occasionally. Attachment B at p. 15, lines 4-20.

Jose Velaquez was not a PMG employee. He was a GS-7 employee detailed temporarily to PMG for approximately one year following Ms. Rivera-Lopez. He also did graphics work. Attachment B at p. 15, lines 21-22 and p. 16, lines 1-4; Plaintiff's Opposition, R. 40, pp. 29-30.

---

[3] Any claims relating to a change in plaintiff's job assignments and duties in May 2003 are not before this Court. To the extent that plaintiff complains that her duties were changed based on discrimination or retaliation, these claims are untimely and should be dismissed, as she did not seek EEO counseling within 45 days of the effective date of the changed position description.

To the extent that plaintiff compares herself to others, such as Issac Evans, Miriam Johnson, Leon Brody, the Court is respectfully referred to R. 40-5, p. 17 of 80. This chart was provided by Ms. Kline as an attachment to her opposition. It shows that these individuals were not in the same position description and, therefore, did not perform the same functions as Ms. Kline. Mr. Evans was a Visual Information Specialist [Id]; Ms. Johnson was a Lead Printing Services Specialist [Id.]; and, Mr. Brody was a Librarian." Id.

**C. Plaintiff's Telework Claim in Untimely.**

Plaintiff claims that she sought EEO counseling concerning the denial of telework on or about October 27, 2005 and, therefore, she brought this claim to an EEO counselor's attention on a timely basis when she filed an administrative claim on December 3, 2005. See Plaintiff's Opposition at p. 3. She relies on a meeting that her union representative, Sherman Benton, had with her supervisors, Mr. Davis and Benedi, on about October 27, 2005, to establish this claim. However, this informal meeting was after a failed trial period of telework and a formal determination to discontinue it by Mr. Ronald Flom, Deputy Associate Director, Center for Contracting, Facilities, and Administrative Services. Plaintiff's Opposition, R. 40-4, p. 45. At most, this was "union" activity, not "EEO" activity by Ms. Kline.

Specifically, in the Spring of 2005, plaintiff was permitted a trial period in the agency's Telework Program after agreement was reached between management and the union as a result of a grievance filed on plaintiff's behalf. Her Union representative was notified by memorandum dated June 23, 2005, by Mr. Flom that the trial period agreement to allow plaintiff to participate in the Telework Program would be discontinued. Plaintiff received a copy of that notification from her supervisor, Bill Davis, on July 14, 2005. See Plaintiff's Opposition, R. 40-4, p. 47 of 82; See also p. 45 of 82. In order to have timely sought EEO counseling for this

7

denial, dated June 23, 2005, and received by her on July 14, 2005, Ms. Kline was required to

seek EEO counseling no later than October 12, 1995.  She was well aware of the requirements

for timely exhaustion and she did not seek counseling for this and other claims until November

17, 2005. Id., R. 40-2, p. 3 of 42.

To the extent that Ms. Kline now attempts to rely on an apparent informal meeting

between her supervisor, Bill Davis, and her Union representative, Sherman Benton, on about

October 26, 2005, and a one-line email communication, dated October 27, 2005, showing that

Mr. Davis did not think telework was appropriate [R. 40-4, p. 53 of 82], she should not be

permitted to do so.  Ms. Kline did not request telework in October 26, 2005, and was not denied

the right to telework on October 27, 2006. The only denial of telework in 2005 was that pursued

in the union grievance process and completed on June 23, 2005, with a denial by Mr. Flom. See

Plaintiff's Opposition, R. 40-4, p. 47 of 82; See also Id., p. 45 of 82.

With regard to the claim that she was denied telework in 2003 and received a counseling

memorandum in December 2003, she admits that she did not pursue these claims. Plaintiff's

Opposition at pp. 3-4. [4]

**D.  The Agency Had Legitimate Nondiscriminatory/Nonretaliatory Reasons for the Actions Taken that Were Not Pretext For Discrimination or Retaliation**.

Defendant continues to urge the Court to find that none of the actions complained of by

Ms. Kline were adverse personnel actions that support her discrimination and/or retaliation

---

[4]  The counseling memorandum and basis for it (cartoon with nudity sent to individuals in and outside of the PMG by email), is found at Plaintiff's Opposition, R. 40-6, pp. 71-74.  The inappropriate email was discovered by the Support/Help staff while monitoring the OPM E-mail system.  Because Ms. Kline sent the cartoon to persons outside of the office and because it was discovered through the agency's monitoring process, she was counseled.  The counseling memorandum is not before the Court for review, but is included in this discussion because plaintiff provides the cartoon in her attachments. Id.

claims before the Court.  So as to efficiently reply to plaintiff's numerous and lengthy filings, defendant will discuss the question of adverse action in this section as well as the legitimate nondiscriminatory/nonretaliatory actions that were not pretext for discrimination or retaliation. Defendant uses the claims outlined in "Plaintiff's Statement of Material Facts Not in Dispute" as the basis for this discussion See R. 40-9, commencing at p. 2.

### 1. Telework (Plaintiff's ## 3-7, R. 40-9, pp. 2-3)

As stated above, plaintiff's EEO claims relating to the denial of telework are untimely and should be dismissed on that basis.  In addition, plaintiff was not similarly-situated to Jacqueline Carter, who was a GS-13 and could work independently, or Lara Rivera-Lopez, who was not an employee of PMG, but a detailee, who, before her detail, was teleworking.  The OPM guidelines for telework relied on by Ms. Kline, show that the Telework Program at OPM was voluntary.  "It is an option that may be used to assist in the effective and efficient accomplishment of agency business."  R. 40-4 at p. 15 of 82.  Thus, it was not an entitlement or a benefit that flows automatically from the job.

There were legitimate nondiscriminatory reasons for not permitting Ms. Kline to telework.  As the memorandum from Mr. Flom reflects, the trial period of telework provided to Ms. Kline was not successful from Management's perspective.  Plaintiff's Opposition,  R. 40-4, p. 47 of 82.  Specifically, Mr. Flom stated:

> I made this decision [to discontinue Ms. Kline's telework agreement] based on the fact that her day-to-day work assignments, coordination and assistance with other staff, and availability to customers are more conducive to be [sic] performed on-site.  This [sic] validated during the trial period and the lack of coverage in the office during Ms. Kline's telework days demonstrate that it is not in the best interests of this office to continue to offer teleworking for this position.

Id.  Plaintiff complains that this is pretext for discrimination and/or retaliation because Ms.

Carter teleworked and that plaintiff did the same work.  However, Ms. Kline had other assignments in December 2005 which required her to be in the office.  This was as a result of a change to her assignments in May of 2003, a change for which she did not seek timely EEO counseling.  See Plaintiff's Opposition, R. 40-4, pp. 17-22; See also Declaration of Claudio Benedi at Plaintiff's Opposition, R. 40-5, p. 65-66, specifically at p. 66.  The new assignments required that she be in the office to handle the daily work of PMG and to assist Mr. Coco.  Plaintiff's Opposition, R. 40-4, p. 47 of 82; R. 40-5, p. 23 of 80.  In addition, Mr. Benedi did not let other employees telework, such as Mary Moore or Doritha Elmore, "because the work they performed did not lend itself to telework.  Ms. Moore and Ms. Elmore are Black females."  Id., R. 40-5, p. 65.

In summary, Ms. Kline may not have liked the daily work of PMG, but that does not give rise to a finding of discrimination or retaliation.  As the agency had legitimate nondiscriminatory reasons for discontinuing plaintiff's trial period of telework in 2005, and/or not continuing it, Ms. Kline's untimely claim should be rejected.  Suffice it to say that the provisions of Title VII of the Civil Rights Act would be turned upside down if plaintiff were able to force the agency to provide her with an assignment that was not in the best interest of the agency.  As noted above, no other employee of PMG was performing the same duties as plaintiff at the time of the determination to discontinue plaintiff's trial period of telework.

## 2. Performance Appraisal Claim (Plaintiff's ## 8-21, R. 40-9, pp. 3-4)

Plaintiff asserts in her statement of facts that her work performance was equal to or greater than minority and/or white male employees who received higher performance ratings.  However, as noted above, she can point to no similarly-situated minority or white male employees who were treated differently than she.

Moreover, plaintiff appears to concede that a Fully Successful Performance Appraisal is not an adverse personnel action.  However, she urges that since it was "PMG's practice to give monetary bonuses for performance" at the "Exceeds Fully Successful" level, and above, she has established that by receiving a "Fully Successful" rating she was automatically denied a bonus and, therefore, suffered an adverse personal action. Plaintiff's Opposition at R. 40, p. 3 (#8), See also Id., p. 13 of 45.  A review of the record before the Court, and specifically, the deposition testimony of Robert Coco and Shirley Sewell does not support this conclusion.  Ms. Kline asked Mr. Coco the following question at his deposition: "Has it been the practice of PMG to issue monetary bonuses in the past five years based on appraisals?"  Attachment B, hereto, at p. 80, lines 21-22.  He responded as follows:

> I don't know what it's based on it, but some of it has happened, I know that. Sometimes they can put in for them if they want to.  It's up to the supervisors to make that decisions.  It's not automatic, however.

Id. at p. 81, lines 2-6. He added later, that it is "really up to the managers." Attachment B, p. 42, lines 13-15.

Ms. Sewell stated that she has received "[a] special act of service award" at times when her performance exceeded expectations. Attachment C, hereto, p. 42, lines 5-7.  She also noted that the "personnel office determines whether or not that special act of services was affixed to your performance. . . [the award] could be affixed to one particular accomplishment that was signed off by the director or our organization . . . ."  Id., p. 54, lines 7-17.  Defendant submits the record does not support a finding that a monetary award is automatic based on a particular rating.

Plaintiff's claim that she performed at a higher level than fully successful and, therefore, received a discriminatory/retaliatory rating is not supported by the record.  At most, plaintiff has provided only her own self-serving representations that the rating narrative by her supervisor,

Mr. Davis, was incorrect, discriminatory and retaliatory.

Ms. Kline sought unsuccessfully to support her position that her rating should have been higher than fully successful by the deposition testimony of Robert Coco amd Jacquline Carter, the two GS-13 employees with whom she worked.  Ms. Carter testified that she [Ms. Carter] had some input into Ms. Kline's rating and advised Mr. Davis that Ms. Kline performed at the "successful" level when working with her.  Attachment A, p. 27, lines 19-22.  Ms. Carter also made it clear that Ms. Kline "tried to overstep [her] authority."  Id., p. 52, line 6.  She added: "When I reviewed [Ms. Kline's] work, [she] were very argumentative."  Id. at lines 8-9.  Moreover, Ms. Carter noted that "a couple of regulatory packages" went out that shouldn't have gone out.  Id., p. 30, lines 12-19.  She testified that on one occasion "Ms. Kline sent a package that was published to the Federal register that hadn't been cleared and another when [Ms. Carter] caught a package that hadn't been cleared, twice, then we had to set up the system."  Id. at p. 31, lines 14-18.  This testimony makes clear that Ms. Kline's performance with regard to the work Ms. Carter reviewed was perhaps even less than "successful."

Mr. Coco, for whom Ms. Kline was supposed to do some work, was asked very little by Ms. Kline at his deposition about the work that she performed for him.  For instance, Ms. Kline asked him whether they worked closely together and whether she had ever refused to assist him.  His answers were "yes" and "I can't think of any time."  See Attachment B, hereto, p. 25, lines 4-17.  Ms. Kline also asked Mr. Coco whether she was ever remiss in responding to emails in the publications inbox.  His answer was "No."  Attachment B, p. 60, lines 7-10.  He also noted that she helped him with the information directory on the OPM website. Id., p. 60, lines 20-22; p. 61, lines 1-13.  Ms. Kline did some graphics work, "four or five years ago" before there was a graphics staff [id., p. 63, lines 6-13] and Ms. Kline's input to publishing was limited to the

12

database and inbox. Id., p. 75, lines 8-21.

Plaintiff chose not to take the depositions of her supervisor, i.e., William Davis,, although she clearly had the opportunity to do so.  Had she taken his deposition, the sworn facts found in his declaration relating to her fully successful performance appearing in the Report of Investigation would be reinforced. See Plaintiff's Opposition, R. 40-5, p. 19-25.  A review of Mr. Davis' detailed explanation of her performance during the rating period shows that on numerous occasions between November 4, 2004, and September 30, 2005, Ms. Kline was counseled about her performance and the need to improve if she wanted a higher rating.  See Id. at Plaintiff's Opposition at R. 40-5, pp. 19-80.  Ms. Kline refused to discuss her midyear review with Mr. Davis. Id. at p. 19-20.

Mr. Davis' declaration addressed Ms. Kline's rating point by point.  Specifically, as the declaration of Mr. Davis illustrates, Ms. Kline missed deadlines, failed to assist Mr. Coco, failed to answer the telephones or to assist with walk-in customers, failed to support PMG in routine tasks; failed to maintain good working relationships with supervisors, managers, fellow employees, customers, peers, and the general public, and failed to perform her regulatory work properly.  Id. at pp. 19 of 80.  Illustratively, Mr. Davis was asked to "keep [Ms. Kline] out of the Director's suite."[5]  Id. at p. 21.  Kline also sent at least one regulatory package to the Federal Register with errors before it was cleared for release.  See Attachment A at pp. 31, lines 14-22, p. 32, p. 33, lines 1-22.  This was confirmed by Ms. Carter's testimony. Attachment A, p. 31, lines 14-18.

---

[5]The "Director" refers of course to the Director of OPM.

13

### 3. **Offensive E-Mail** (## 22-23, R. 40-9, pp. 4-5).

As noted in defendant's opening brief, there was nothing offensive about Mr. Davis'

email to Ms. Arlene Taylor which stated:

> Arlene:
>
> Good afternoon!!!
>
> I happened to notice that you were in our office twice today for a good amount of
> time. I then discovered that there are changes being made to [Federal Register
> Management System] FRMS. What changes?
>
> The FRMS is the responsibility of PMG and as such no changes, other then
> technical should be made without explicit authorization from Claudio or me.
> Please let me know what the current issue is and how it will affect this office.

Plaintiff's Opposition, R. 40-5, p. 24 of 80. As Mr. Davis noted, he simply wanted to insure that

he, as the responsible official for FRMS, was apprised of the changes being made. Nothing

about this email rises to a level of an adverse action. Indeed, it is inocuous. This claim is clearly

without merit.

### 4. **Denial of Office Space** (## 27-28, R. 40-9, p. 6)

Plaintiff's claim concerning the denial of office space is also without merit. As Mr. Coco

described PMG office space at his deposition, the PMG employees, except the two supervisors

(Davis and Benedi), worked in cubicles, some bigger, some different shape. Attachment B at p.

68-69; See also Attachment A, p. 10, line 9-10. Ms. Kline went into the cubicle previously

occupied by Pete Jones. Pete Jones was the employee that Ms. Kline was hired to replace. See

Attachment A, p. 20, lines 10-21. For a brief period of time, PMG received temporary space

"across the hall" from the main office. Attachment B, p. 69, lines 1-8. That space was given to

the senior graphics person who was there for a short period of time. Id., see also p. 79, lines

15-22 (because of the equipment needed by the graphics person).  The space is now storage

space. <u>Id</u>., p. 69, lines 7-8.  If the space were to have been offered to other employees in the

cubicles, Mr. Coco and Ms. Carter, as GS-13 level employees, with seniority, would have been

entitled to it before Ms. Kline. Attachment B, pp. 78-79; <u>See</u> <u>also</u> Benedi Declaration at

Plaintiff's Opposition, R. 40-5, pp. 68-69.  To the extent that Ms. Kline argues that she was

forced to work in the busiest part of the office, Ms. Carter believed that her [Ms. Carter's]

cubicle was in the busiest part of the office, not Ms. Kline's.  Attachment A, pp. 71-72.

### 5.  <u>Rescission of Administrative Rights</u> (## 24-26, R. 40-9, pp. 5-6)

As noted above, Mr. Davis was responsible for the  Federal Register Management

System ("FRMS").  Attachment A, hereto, at pp. 45, lines 14-15.  Ms. Carter and Ms. Kline

worked on identifying fields for the system and for data entry. <u>Id</u>. at lines 3-4.  Arlene Taylor

developed the system. <u>Id</u>  It was not Ms. Carter or Ms. Kline's job to access the system by the

web and make changes. <u>Id</u>., lines 8-19.  Mr. Davis and Mr. Benedi assigned Ms. Carter and Ms.

Kline to only assist with the entry of data and the identification of the required fields.  <u>Id</u>. at p.

51.  Ms. Kline should not have given herself administrative rights as "she could make major

changes and alterations to the system that could be negative."  Plaintiff's Opposition, R. 40-5, p.

69 of 80.  Only Mr. Davis and Mr. Benedi had full administrative rights to the system.  When it

was discovered that Ms. Kline had assigned herself administrative rights, they were rescinded as

she should not have had those rights. <u>Id</u>. at p. 70 of 80.  Rescinding the rights had no impact on

Ms. Kline's ability to do her job. <u>Id</u>.  Accordingly, there was no material changes to Ms. Kline's

position by the rescission of the administrative rights to FRMS, which she had unilaterally given

to herself in the first place.  With regard to her claim that they were a "significant material

responsibility" that was given to a white male, i.e., Mr. Coco, as his deposition testimony shows,

Mr. Coco had very little, if anything, do to with the FRMS after the administrative rights were taken from Ms. Kline. Attachment B, p. 52. There is no evidence in the record that they involved a significant material responsibility for anyone in PMG, except the supervisors.

Accordingly, Ms. Kline's claim that administrative rights to FRMS were taken away and given to minority and/or white male employees less qualified than her (she identifies Robert Coco), is an attempt to stretch a singular assignment in her job into a major duty.

### 6. <u>Lunch Required During Core Hours</u> (## 33-35, R. 40-9, pp. 7-8)

Ms. Kline was assigned to a lunch hour between 11:30 am and 12:30 pm. Plaintiff's Opposition, R. 40-7, p. 32 of 78. It appears that her claims here emanated from an incident on January 31, 2006, wherein Ms. Kline was cautioned by Letter of Reprimand about plaintiff's continuing abuse of the policy. Plaintiff's Opposition, R. 40-7, p. 32-33. Mr. Benedi wanted employees to have assigned lunch hours so that the office would be covered. R. 40-5, p. 66 of 80.

To the extent that plaintiff claims that she was treated discriminatorily or retaliatorily when she was not permitted to take lunch outside of the core hours and others were, defendant submits that there are no similarly-situated employees to Ms. Kline that were treated differently and that this was not an adverse personnel decision and there was a legitimate nondiscriminatory /nonretaliatory reason for requiring that the office be covered at all times during the lunch hours.

### 7. <u>Swipe/Reprimand,</u> (## 36-42, R. 40-9, p. 8)

Plaintiff claims that her "swipe" records were scrutinized to determine whether she was abusing her leave, but that the "swipe" records of others similarly-situated were not. As noted above, there are no other employees in PMG that were similarly-situated to plaintiff. Secondly, plaintiff can point to no adverse personnel action. Third, management has a right to investigate

16

suspected abuses of leave.  Plaintiff's Opposition, R 40-7, p. 33.

### 8.  <u>Leave Tampering</u> (## 43-46, R. 40-9, p. 9)

Ms. Kline's arguments regarding leave tampering are without merit.  The relevant Report

of Investigation demonstrates that Mr. Davis did not tamper Kline's annual or sick leave at any

time.  <u>See</u>, <u>e..g.</u>, Plaintiff's Opposition, R 40-7, p. 32-36; Plaintiff's Opposition, R 40-7 pp. 46-

49.  Because Ms. Kline came in late one day but left at her regular time, Mr. Davis reviewed her

relevant scan records to determine whether plaintiff was abusing her leave. Plaintiff's

Opposition, R 40-7, p. 32-36.  Consequently, on February 1, 2008, Mr. Davis issued Ms. Kline a

Letter of Reprimand regarding her time and attendance.  Plaintiff's Opposition, R 40-7, p. 32-36.

Ms. Kline requested to see the information that Mr. Davis relied upon, (<u>id</u>.), and on February 8,

2008, Employee Relations provided a detailed memorandum of the supporting information,

including copies of the relevant "swipe" records.  Plaintiff's Opposition, R 40-7 pp. 46-49.  Ms.

Kline provided specific information to Mr. Davis, and in response, Mr. Davis requested that her

leave records be amended based on this information that Ms. Kline provided.  Plaintiff's

Opposition, R 40-7, p. 32-36.  In early January 2006, there had been a ministerial recording error

by the timekeeper regarding the recording of Ms. Kline's Family Medical Leave.  Mr. Davis had

this error corrected.  Plaintiff's Opposition, R 40-7, p. 32-36.

### 9.  <u>Denial of Telephone Staff Support</u> (## 29-30, R. 40-9, pp. 6-7)

Plaintiff was assigned responsibility for covering PMG telephones on May 24, 2005,

which allegedly gave her diminished responsibilities.  Plaintiff's Opposition, R. 40, p. 20.  There

is no evidence in the record that she sought timely EEO counseling for this assignment.

Therefore, she cannot raise a timely claim before this Court that she suffered diminished

responsibilities as she has attempted to do.  <u>Id</u>.  In addition, plaintiff also attempts to raise a stale,

2003 event when she asked and did not receive staff support, as a claim in this case. Plaintiff's Opposition, R. 40, p. 21. As these claims are untimely, they should be dismissed with prejudice.

### E. **Plaintiff's Hostile Work Environment/Sexual Harassment Claims are Baseless**.

A prima facie case of hostile work environment harassment specifically requires a showing of conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986). To be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive . . . 'looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance.'" Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993)). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," and "isolated incidents (unless extremely serious) will not amount to" changes in terms and conditions. Faragher, 524 U.S. at 788.

Plaintiff has failed to allege conduct that would be sufficiently abusive to be actionable under Title VII. As the Court explained, the inquiry is whether the alleged conduct was such as to "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Harris v. Forklift Sys., Inc., 510 U.S. at 21.

Although plaintiff alleges that she suffered from sexual harassment, she has pointed to only two unsubstantiated occurrences, wherein she claims her supervisor, Mr. Davis, allegedly looked at her breasts. Plaintiff further alleges as a result of her lack of interest that Mr. Davis became overbearing in his surveillance of her, changed her lunch time, and prevented her from

taking an hour for lunch or from using flex time - "issues which were resolved through the negotiated grievance procedures." Plaintiff's Opposition at R. 40, p. 24. He also allegedly removed her from committees and stopped assigning her graphics work. Id. at p. 25. According to plaintiff, Mr. Davis began assigning her menial tasks that were insulting to her abilities and qualifications as a professional with a B.S. degree "not to mention her GS-12 grade level." Id. She sums it up by asserting "[b]ecause Davis did not treat other employees in this manner but gave them liberties that he denied to Kline, it is clear that Davis' actions were personal toward Kline, personal because she snubbed his advances." As noted above, the assignment of new duties in May 2003 is not a claim in this case.

Plaintiff also asserts that "'numerous retaliatory acts' were sufficiently severe because they constituted adverse employment actions. . . ." Id. at p. 26. Defendant maintains that none of the actions were adverse personnel actions. See supra. However, the test here is whether the actions affected her ability to do her job. She makes no claims that the alleged hostile work environment or sexual harassment interfered with her ability to work. She makes clear that the work she did after her assignments were changed in May 2003 was not challenging her abilities. As noted in at n. 1, plaintiff simply found nonwork activities to occupy seven of the nine hours she spent at the office.

## CONCLUSION

For the reasons set forth herein and in defendant's motion to dismiss or for summary judgment and defendant's opposition to plaintiff's motion for sanction with attachments, it is respectfully requested that defendant's dispositive motion be granted and this case dismissed, with prejudice.

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

# ATTACHMENT A

# DEPOSITION EXCERPTS JACQULINE CARTER

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA
--------------------------------x
VALERIE KLINE,                   :
            Plaintiff,       :
         v           : CASE NO:
                  : 1:07CV451
LINDA M. SPRINGER, and           :
US OFFICE OF PERSONNEL MANAGEMENT,:
         Defendants.     :
--------------------------------x

                   Washington, D.C.

              Tuesday, February 20, 2008

Deposition of:

           JACQULINE CARTER

called for oral examination by Plaintiff, pursuant

to Notice, at the Offices of Personnel Management,

1900 E Street, Northwest, Washington, D.C., before

Mary E. Warner of Capital Reporting, sworn by a

Notary Public in and for the District of Columbia,

beginning at 1:00 p.m.

## Capital Reporting Company

Page 10

1  other offices in PMG on the fifth floor?
2      A  I was in 5H35.
3      Q  And what was the approximate size of your
4  office?
5      A  I don't recall. I never measured it.
6      Q  Was it -- you're familiar with the office
7  space that Ms. Kline had, correct; was it a
8  similar size, larger?
9      A  It was a different shape.
10      Q  Different shape. Would you say it was
11  larger?
12      A  I would say so.
13      Q  How much larger, twice as large?
14      A  No.
15      Q  Okay. Do you know who's occupying that
16  space now?
17      A  Which space?
18      Q  That you used to occupy?
19      A  I haven't been here for a year so I don't
20  know who is in there now.
21      Q  Do you know Shirley Sewell?
22      A  Yes.

Page 11

1      Q  When she was located in the basement, did
2  you ever visit her office?
3      A  Before it was renovated?
4      Q  Yes.
5      A  Yes.
6      Q  Okay. Do you remember the approximate
7  size of her office?
8      A  No.
9      Q  Would you say it was larger than
10  Ms. Kline's?
11      A  It was a different shape. I don't
12  remember.
13      Q  Was it square, rectangle?
14      A  I don't remember the shape.
15      Q  You don't know if it was larger than
16  Ms. Kline's office?
17      A  No.
18      Q  Do you know Isaac Evans?
19      A  Yes.
20      Q  Where was his office in proximity to
21  yours?
22      A  Across the hall.

Page 12

1      Q  And what was the approximate size of his
2  office?
3      A  I have no idea.
4      Q  Would you say it was larger than
5  Ms. Kline's office?
6      A  Yes.
7      Q  Did Mr. Evans have an occasion to come
8  over to 5H35 and do any work in that area to your
9  recollection?
10      A  I didn't -- I mean, he came over to the
11  office. I don't know what he was doing.
12      Q  How often would you say he came over?
13      A  His supervisor was there, so he came
14  often.
15      Q  Did he use any of the equipment over
16  there, printers, that sort of thing?
17      A  Occasionally, yeah.
18      Q  How long did you perform the regulatory
19  work independently with no help?
20      A  From '89 until what? What are you
21  saying? '89 until what?
22      Q  How long did you do it independently,

Page 13

1  before you had help, assistance?
2      A  I don't quite understand the question.
3      Q  Okay. Let me rephrase. Did you have an
4  assistant prior to Ms. Kline when you were doing
5  the regulatory work? Did you have anyone helping
6  you?
7      A  There were other people in there doing
8  regulatory work and they retired and went to other
9  offices. Is that what you're asking? How long
10  was that between the time now or what?
11      Q  How about how long did you work
12  independently without any help, prior to
13  Ms. Kline?
14          MS. WHITAKER: Objection.
15          THE WITNESS: She objected.
16          MS. WHITAKER: You can answer, to the
17  extent that you can answer. Do you understand the
18  question?
19          THE WITNESS: How long did I do that
20  independently before you came?
21  BY MS. KLINE:
22      Q  Yes. Not "you," try saying "Ms. Kline."

**Capital Reporting Company**

Page 22

1      Q  So that she could handle certain things
2  in your absence?
3      A  Yes.
4      Q  While you were out teleworking, for
5  example?
6      A  No. not teleworking, but if I wasn't
7  there.
8      Q  What if there were walk in customers
9  while you were teleworking?
10      A  For me?
11      Q  Yeah.
12      A  They would tell them to call me.
13      Q  Did Ms. Kline in fact perform regulatory
14  work?
15      A  Yes.
16      Q  And what percentage of the time did she
17  perform the regulatory work?
18      A  When Ms. Kline first came. she did half.
19  because everything Ms. Kline did. I reviewed.
20      Q  When she first came, it was half.  What
21  about later?
22      A  Later on, when you say later. what do you

Page 23

1  mean?
2      Q  You said you indicated when she first
3  came?
4      A  When you first came you worked doing
5  regulatory work with me but your PD changed.
6      Q  After the PD was changed, what percentage
7  of regulatory work would you say Ms. Kline did
8  after that?
9      A  I don't recall what percentage.
10      Q  Approximately?
11      A  I guess I don't recall because basically
12  you went totally on Bob's side.
13      Q  Okay.  So like the first year after the
14  PD was changed, it was like almost zero percent
15  regulatory work, minimal?
16      A  Minimal.
17      Q  When did her regulatory pick back up or
18  did it pick back up?
19      A  It stayed minimal until '05.  In '05 you
20  weren't doing any of it.
21      Q  Was there a time when you became upset
22  that Ms. Kline wasn't able to help you perform

Page 24

1  more regulatory work?
2      A  I don't recall.
3      Q  Where you indicated to Mr. Benedi or
4  Mr. Davis that you wanted her to perform more
5  regulatory work?
6      A  I don't recall that.
7      Q  Was there ever a time when Ms. Kline
8  after her PD was changed when she performed a
9  substantial amount of regulatory work?
10      A  No. I don't remember that.  I'm not
11  saying it wasn't.  I don't remember that. once
12  your PD was changed.
13      Q  How about in 2005?
14      A  What part of 2005?
15      Q  The entire year.
16      A  You may have done noticing and posting.
17  you may have taken telephone calls. you may have
18  reviewed notices.
19      Q  What about regulations?
20      A  Regulations. you may have done some.  You
21  may have done some.
22      Q  Ms. Kline may have done some?

Page 25

1      A  Ms. Kline may have done some.
2      Q  Did Ms. Kline ever send regulatory
3  packages to the Federal register office under her
4  signature?
5      A  Probably when I wasn't there.
6      Q  Are you aware of approximately how many
7  packages she's sent?
8      A  No.
9      Q  And did she send notices or did she send
10  regulations or did she send both under her
11  signature?
12          MS. WHITAKER:  Objection. asked and
13  answered.
14          THE WITNESS:  I don't remember.
15  BY MS. KLINE:
16      Q  Okay.  What all was involved in
17  performing regulatory work?  Describe the process.
18      A  We reviewed, we processed, we corrected
19  all OPMs regulatory documents that went to the
20  Federal register.  We conferred with OMB. the desk
21  officers at OMB.  And we did the regulatory
22  agenda. which was a compilation of all of the

**Capital Reporting Company**

Page 26

1  regulations with the Regulatory Commission Service
2  center. We had to make sure that the regulatory
3  actions were in conformance with the Federal
4  registry requirements.
5  Q  When you say we, who did this?
6  A  Anybody that -- are you saying what did
7  you, Ms. Kline, and I do, or are you saying what
8  was required in the position?
9  Q  I asked you to describe the process and
10  you said "we" and I was asking you who "we" is.
11  A  Let's take "we" out. That was the
12  process.
13  Q  Now I'm asking who all performed this
14  regulatory work?
15  A  You performed it for awhile and I did the
16  rest.
17  Q  Did you ever indicate to anyone including
18  Ms. Kline that you thought Ms. Kline was capable
19  of assuming full responsibility for the regulatory
20  issuance program when you retired?
21  A  No. I never said that.
22  Q  Were you aware of Ms. Kline's desire to

Page 27

1  telework?
2  A  Yes. Ms. Kline told me.
3  Q  Is there any reason you know of why she
4  could not have teleworked on the days you were in
5  the office?
6  A  Ms. Kline had other duties, regulatory
7  work.
8  Q  But what about doing regulatory work?
9  A  That wasn't all of what Ms. Kline was
10  doing.
11  Q  But do you see any reason why she could
12  not have performed regulatory work while
13  teleworking?
14  A  Regulatory work while teleworking, yes.
15  Q  When Mr. Davis evaluated Kline's
16  performance on the regulatory work, did he consult
17  you about her work and how she was doing?
18  A  Yes.
19  Q  And what did you advise Mr. Davis
20  concerning Kline's work?
21  A  She was successful.
22  Q  Was your recommendation based on her

Page 28

1  performance standards or just on your opinion?
2  A  On my opinion.
3  Q  Who paid for the cost of printing a
4  regulation in the Federal register?
5  A  OPM.
6  Q  What office within OPM?
7  A  In the beginning PMD and then each
8  program office was responsible for their own
9  costs.
10  Q  So the program office paid the cost of
11  the publishing. Do you recall how much it cost to
12  publish an item in the Federal register?
13  A  No. I don't.
14  Q  Did you ever send a package to the
15  Federal register before it had been cleared by
16  OPM?
17  MS. WHITAKER: Objection, to the extent
18  it's relevant.
19  THE WITNESS: No. Ms. Kline did.
20  BY MS. KLINE:
21  Q  Did the Federal register office ever
22  recommend a change to a regulation before printing

Page 29

1  it in a Federal register?
2  A  Some cases.
3  Q  If so, how often?
4  A  I don't recall.
5  Q  Every regulation?
6  A  Not every.
7  Q  Every other?
8  A  Not every other.
9  Q  How often?
10  A  Maybe once or twice, when it was
11  significant changes, it didn't have anything to do
12  with what was written in the policy.
13  Q  Did you ever make a mistake in reviewing
14  a package that required reprinting in the Federal
15  register with the cost to PMG?
16  A  There was one that was published. we
17  don't know if it was my mistake or someone else's
18  mistake.
19  Q  Did Davis ever review a regulatory
20  package for submission to the Federal register?
21  A  Later on. yes.
22  Q  Did he know how to review?

**Capital Reporting Company**

| | Page 30 |
|---|---|
| 1 | A  I don't know what he was looking for. |
| 2 | Q  What about Benedi? |
| 3 | A  Same. |
| 4 | Q  Did he know how to review a package for |
| 5 | submission? |
| 6 | A  I don't know. |
| 7 | Q  What about Mr. Coco? |
| 8 | A  I don't know. |
| 9 | Q  Did you ever train any of them or teach |
| 10 | any of them how to review a regulatory package? |
| 11 | A  No, I only trained Ms. Kline. |
| 12 | Q  And did Davis, Benedi or Coco ever review |
| 13 | any of the regulatory work done by you or |
| 14 | Ms. Kline, and if so, to what extent? |
| 15 | A  Once a couple packages that shouldn't |
| 16 | have gone out, were published that shouldn't have |
| 17 | been published, they set up a system where they |
| 18 | had to look at each package before it went to the |
| 19 | Federal register for publication. |
| 20 | MS. KLINE:  I'm going to show her a |
| 21 | document.  I wanted to ask, Ms. Carter, is this |
| 22 | the system set up for review. |

| | Page 31 |
|---|---|
| 1 | MS. WHITAKER:  You don't have copies for |
| 2 | me? |
| 3 | MS. KLINE:  I could send you a copy of |
| 4 | that.  I could get you another one tomorrow. |
| 5 | BY MS. KLINE: |
| 6 | Q  Is that the system that was set up to |
| 7 | your recollection? |
| 8 | A  I can't recall if this is the same form |
| 9 | since I've been gone a year.  It looks like it. |
| 10 | It looks similar to it, I should say. |
| 11 | Q  And when do the new procedures start that |
| 12 | require Davis, Benedi or Coco to sign off on the |
| 13 | regulatory packages? |
| 14 | A  Once Ms. Kline sent a package that was |
| 15 | published to the Federal register that hadn't been |
| 16 | cleared and another when I caught a package that |
| 17 | hadn't been cleared, twice, then we had to set up |
| 18 | the system. |
| 19 | Q  When you said Ms. Kline sent it over, did |
| 20 | it go under her signature? |
| 21 | A  I don't know whose signature it was. |
| 22 | Q  How do you know that Ms. Kline sent it |

| | Page 32 |
|---|---|
| 1 | over, if you don't know whose signature submitted |
| 2 | it? |
| 3 | A  We had a form for sending stuff for |
| 4 | publishing, I think it was under your signature. |
| 5 | Bob Coco would be the one to approve it. |
| 6 | Q  So you're saying Bob Coco reviewed it? |
| 7 | A  No, I didn't say that. |
| 8 | Q  Or approved it? |
| 9 | A  I said Ms. Kline probably gave it to him, |
| 10 | and I don't recall all the procedures that we had |
| 11 | at the end.  And you sent it to the Federal |
| 12 | register, Ms. Kline sent it.  It was published. |
| 13 | Q  Who approved it for submission to the |
| 14 | Federal register? |
| 15 | A  I would say you would have approved it. |
| 16 | Q  Signed off on the paperwork? |
| 17 | A  I would say that you had to sign it.  I |
| 18 | think you signed off. |
| 19 | Q  So when a regulatory package was sent to |
| 20 | the Federal register, it went under a cover |
| 21 | letter, did it not? |
| 22 | A  I'm trying to remember.  I think it did. |

| | Page 33 |
|---|---|
| 1 | All I remember, I was on vacation, I was checking |
| 2 | in with the work and I discovered that this job |
| 3 | had been published without the approval of OMB.  I |
| 4 | called Bill Davis and from that that time, |
| 5 | everything started rolling. |
| 6 | Q  How do you know Ms. Kline sent it if you |
| 7 | weren't there? |
| 8 | A  Okay.  I can't remember how I remembered |
| 9 | that you sent it because you were doing the |
| 10 | regulations at the time.  Who approved it and |
| 11 | signed off on it, I don't remember.  But you -- |
| 12 | Q  You said earlier that Ms. Kline was doing |
| 13 | minimal -- |
| 14 | A  There were two things happening.  Once a |
| 15 | job had been cleared by OMB, instead of sending -- |
| 16 | it was an 07 or 01.  I can't remember the numbers, |
| 17 | the 01 was sent, the 01 was approved and 07 |
| 18 | wasn't.  Instead of sending the right one that was |
| 19 | approved, the wrong one was sent. |
| 20 | Q  And how do you know who sent that? |
| 21 | A  Because you were sending them.  And |
| 22 | knowing if your signature was there, I don't |

# Capital Reporting Company

12 (Pages 42 to 45)

Page 42

1    A  Yes.
2    Q  What time was that?
3    A  12:30 to 1:30.
4    Q  Who assigned that time to you?
5    A  Bill Davis.
6    Q  Did you ever tell Ms. Kline that you
7    could go to lunch whenever you wanted?
8    A  I don't remember.
9    Q  Were there times when you had to work
10   through your lunch break on a rushed project?
11   A  Yes.
12   Q  During these times did you take a lunch
13   break after you finished working on the project?
14   A  I sat at my desk and ate my lunch.  I
15   wouldn't say I took a lunch break, I just ate.
16   Q  Did you ever cover the office while
17   others were at lunch?
18   A  Yes, I was always there.
19   Q  When you were in the office, did you ever
20   assist with nonregulatory work?
21   A  Yeah, I may have answered the phone or
22   shown somebody where to go.

Page 43

1    Q  And in what ways did you assist the
2    telephone callers?
3    A  I would answer the phone and direct them
4    to the person that they were calling for.
5    Q  So most of the calls were calls for other
6    people?
7    A  Right.
8    Q  Did walk in customers ever ask you about
9    the nonregulatory publishing work?
10   A  Yes.
11   Q  And in what ways did you assist these
12   walk in customers?
13   A  It was a publication that I knew of.  I
14   would go on the computer and go under the
15   publication database and see when the publication
16   was available or if it was available.
17   Q  And what about other walk in customers?
18   A  Anything someone asked me to do, I did.
19   Q  Did anyone ever walk in printing
20   services, with printing work?
21   A  Yes.
22   Q  Did you ever assist them with the

Page 44

1    reproduction requirements, Xeroxing?
2    A  If they wanted to Xerox something we had,
3    I showed them how to use the machine or did it for
4    them.
5    Q  Do you know Arlene Taylor?
6    A  Yes.
7    Q  Would Taylor ever make social visits to
8    your office?
9    A  Yes, we were friends.
10   Q  Did you inform Davis each time that
11   Taylor met with you and the purpose of her visit?
12   A  I would inform Davis each time that we
13   worked on the FRMS, she just came to say hi, I
14   said hi, that was it.
15   Q  Did Davis ever complain to you about your
16   meeting with Taylor?
17   A  Nope.
18   Q  Who initiated the development of the
19   Federal register management system?
20   A  Claudio.
21   Q  I might remind you you're under oath.
22   A  I know, Claudio wanted a certain system.

Page 45

1    Q  What was the extent of your involvement
2    in the development of the FRMS?
3    A  You and I worked with what was needed for
4    the system.  Arlene Taylor developed the system.
5    Q  What was the extent of Coco's involvement
6    with the FRMS?
7    A  I don't really remember that.
8    Q  Was he involved at all?
9    A  He met with us in meetings but I don't
10   remember.
11   Q  Was that after the system had been put
12   into operation or during the development?
13   A  I don't remember.
14   Q  What was Davis' involvement?
15   A  He was the administrator.
16   Q  And was he involved in actually
17   developing the FRMS?
18   A  Arlene Taylor developed it.
19   Q  Was Davis involved?
20   A  He had input into it, yes.
21   Q  And what was the extent of Benedi's
22   involvement?

## Capital Reporting Company

Page 50

1    Tony.
2        Q  Tony who?
3        A  Tony who is the head of that office.
4        Q  Arlene's supervisor?
5        A  Yes.
6        Q  I'm talking about back when the FRMS was
7    first conceived, do you remember attending a
8    meeting down in the basement with Ty Anderson
9    along with Ms. Kline on the idea of a tracking
10   system?
11       A  You mean the Asian lady?
12       Q  Yes.
13       A  Vaguely.
14       Q  Why wasn't her office used to develop the
15   tracking system?
16       A  I don't know.
17       Q  You don't know?
18       A  I don't know.
19       Q  So you don't know why Taylor's office was
20   used instead?
21       A  It was Bill's decision.
22       Q  Now talking about the document management

Page 51

1    system, what was the extent of your involvement in
2    that?
3        A  What do you mean?  I entered data. I
4    received data.
5        Q  In the development of it?
6        A  No, I gave them what we need for the
7    fields, what was required.
8        Q  How did you come about being involved in
9    that?
10       A  Through Claudio and Bill.
11       Q  They assigned you to do that?
12       A  We both met with them.
13       Q  We both meaning?
14       A  Claudio, Bill and I.
15       Q  And what is your background in developing
16   electronic tracking systems?
17       A  None, I don't develop tracking systems.
18       Q  Okay.  How was your working relationship
19   with Kline?
20       A  In the beginning it was good, and later
21   on it was terrible.
22       Q  Okay.  And did you ever have any problems

Page 52

1    in your working relationship?
2        A  With you?  With Ms. Kline?
3        Q  Ms. Kline.
4        A  Yes.
5        Q  What type of problems did you have?
6        A  You tried to overstep my authority.
7        Q  Ms. Kline?
8        A  When I reviewed your work, you were very
9    argumentative.
10       Q  Did you ever have a falling out?
11       A  What's a falling out?
12       Q  Where you had a break down in your
13   relationship.
14       A  Well, I no longer -- I try to not talk to
15   you on anything outside of work.
16       Q  And why was that?
17       A  Because you took -- Ms. Kline took
18   everything differently.  And when we had EEO,
19   what's it called, reviews, anything I said in the
20   past, you brought it up.  I was very careful with
21   what I said to you, Ms. Kline.
22       Q  So your relationship changed after the

Page 53

1    EEO situation?
2        A  You would turn things around.  After the
3    EEO, it gradually changed as far as you and I
4    working together.
5        Q  Did Davis and Benedi ever ask you about
6    your relationship with Ms. Kline?
7        A  I don't recall.
8        Q  I'm going to show you another document.
9    This is part of the EEO investigation documents
10   and also submitted with the court.
11           MS. WHITAKER:  I've never seen this
12   before.
13           MS. KLINE:  It's in the EEO
14   investigation.
15           MS. WHITAKER:  How many more documents do
16   you have?  Is this a good time to take a break for
17   copying them?
18           MS. KLINE:  That's the last one.  I'm
19   almost done.
20   BY MS. KLINE:
21       Q  Do you recall receiving that e-mail?
22       A  Yes.

# Capital Reporting Company

Page 70

1   private, it had a door.
2       Q  Was it a cubicle?
3       A  No, it was -- no, it wasn't.
4       Q  So why wouldn't it be considered private?
5       A  I said I don't know what you call
6   private.
7       Q  Was it not your testimony --
8       A  It had a door.
9       Q  So it was a private office?
10      A  If that's what you call a private office.
11      Q  Was it similar in privacy to Mr. Davis
12  and Mr. Benedi?
13      A  Yes.
14      Q  As far as your office being in the
15  busiest part of the 5H35 office area, why was it
16  the busiest?
17      A  Because everybody came in, came past my
18  cubicle.
19      Q  But was that the busiest work area?
20      A  I don't understand your question.
21      Q  Well, was there not an area in 5H35 where
22  people did work, go to the Xerox machines, make

Page 71

1   copies?
2       A  Yes.
3       Q  That was in the center of 5H35, correct?
4       A  Sort of.
5       Q  Would not that be the busiest area?
6       A  I could hear conversation.
7       Q  But what was the busiest as far as
8   activity other than people coming in and out?
9       A  That's where everybody came, walked
10  through, they would have to speak to me. My
11  office is the busiest.
12      Q  Didn't most of the people that came in,
13  come in to see a particular person?
14      A  Yes.
15      Q  And were not a lot of these people
16  regular customers, they came into the office
17  frequently?
18      A  To see different people.
19      Q  Right. So a lot of them went past your
20  office, other than saying hi, went by your office,
21  correct?
22      A  A lot of them did. And a lot of them

Page 72

1   stopped and asked questions but they didn't know
2   who to come see.
3       Q  But the regulars, people that regularly
4   came --
5       A  What do you call regular?
6       Q  For example, some people from the office
7   of communication, like Susan Bryan might want to
8   come see Claudio.
9       A  If someone came in and knew where the
10  person sat, they would go to that office, yes.
11      Q  And there were regular customers that
12  came into PMG?
13      A  I had customers, everyone had customers.
14      Q  They didn't need to necessarily stop and
15  ask you for assistance?
16      A  If they knew where they were going, yes.
17      Q  So it wasn't necessarily the busiest
18  other than because you were by the front door?
19      A  I would say the whole office was the
20  busiest. I would say by me being at the front
21  door, that's where the busiest part started.
22      Q  When did Mr. Davis assign your lunch

Page 73

1   hour?
2       A  12:30 to 1:30.
3       Q  When did he assign that hour?
4       A  I don't recall.
5       Q  Did he assign it after he started working
6   there?
7       A  Yes, he was the one who assigned it.
8       Q  What was your lunch hour before?
9       A  12:30 to 1:30.
10      Q  So it didn't change?
11      A  Right.
12      Q  You don't recall when he actually
13  assigned you your lunch hour?
14      A  No.
15      Q  Do you recall Ms. Kline being involved in
16  committee work, working on committees?
17         MS. WHITAKER:  Objection, that's beyond
18  the scope of my questioning.
19  BY MS. KLINE:
20      Q  You can still answer.  Do you recall any
21  committees that Ms. Kline used to work on?
22      A  I recall what Ms. Kline told me.

# ATTACHMENT B

# DEPOSITION EXCERPTS
# ROBERT T. COCO

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA

VALERIE KLINE,                    :
                  Plaintiff,      :
          v                       : CASE NO:
                                  : 1:07CV451
LINDA M. SPRINGER, and            :
US OFFICE OF PERSONNEL MANAGEMENT:
                  Defendants      :
_____

                              Washington, D.C.

                          Friday, February 22, 2008

Deposition of:

          ROBERT T. COCO

called for oral examination by Plaintiff, pursuant

to Notice, at the Offices of Personnel Management,

1900 E Street, Northwest, Washington, D.C., before

Mary E. Warner of Capital Reporting, sworn by a

Notary Public in and for the District of Columbia,

beginning at 9:50 a.m.

898ce799-8711-44eb-9749-7f48a9e7cc12

# Capital Reporting Company

5 (Pages 14 to 17)

Page 14

1    THE WITNESS: I don't know.
2    MS. KLINE: Can you let me finish the
3    question before you raise an objection, please?
4    BY MS. KLINE:
5    Q  Have you ever needed staff support that
6    was denied to you by your supervisor such as at
7    times when you were working on a project and
8    needed someone to answer the telephone lines?
9    A  I don't know what that means.
10    Q  Have you ever been denied staff support?
11    A  Denied staff support?
12    Q  When you needed it?
13    MS. WHITAKER: Objection.
14    THE WITNESS: I don't know what that
15    means.
16    BY MS. KLINE:
17    Q  In other words, did you ever ask your
18    supervisor for assistance and it was denied?
19    MS. WHITAKER: Objection, overly broad.
20    THE WITNESS: I don't know. I don't
21    remember that specifically.
22    BY MS. KLINE:

Page 15

1    Q  You don't ever remember asking for staff
2    support and told that it was unavailable?
3    A  I don't recall that, no.
4    Q  Okay. Do you remember Laura Lopez?
5    A  Yes.
6    Q  She was detailed to PMG, right?
7    A  Yes. This was a few years ago now.
8    Q  Did she answer the telephones at all when
9    she was there, do you recall?
10    A  I don't recall whether she did or not.
11    Q  And what did she do while she was there?
12    A  She was a graphics person, graphics --
13    well, I guess visual information specialist is the
14    term of the art. She did some special graphics
15    projects for the office because we didn't have
16    anybody to do that.
17    Q  What about Ms. Kline, did she ever do any
18    graphics work?
19    A  I think Ms. Kline did occasionally some
20    graphics work.
21    Q  And what about Jose Valquez, do you know
22    who that was?

Page 16

1    A  When Laura left, Jose came in on a detail
2    for a while also to do graphic work.
3    Q  Laura was also a detail, right?
4    A  Yes.
5    Q  And Jose Valquez, do you know if he
6    answered the phones?
7    A  I don't know, possibly.
8    Q  Do you know Mr. Isaac Evans?
9    A  Yes.
10    Q  Did he have occasions to answer the
11    telephones?
12    A  Yes, he did.
13    Q  Do you assist with walk-in customers?
14    A  Yes.
15    Q  What kind of assistance do walk-in
16    customers usually need, what various types?
17    A  Things having to do with the functions of
18    the office, publishing, graphics, printing.
19    That's pretty broad, but that's what the office
20    does, someone who walks in there, that's what they
21    are usually there for, or for Federal Register
22    questions which are done by Jackie and now Steve

Page 17

1    in our office.
2    Q  And does everyone in the office assist
3    with walk-in customers?
4    A  Pretty much.
5    Q  So if a nonregulatory customer came, they
6    would be referred to anyone other than Ms. Carter
7    or Mr. Hickman?
8    A  Usually.
9    Q  And then the regulatory customers would
10    be referred to them?
11    A  Right.
12    Q  Anyone else help regulatory customers
13    other than Hickman or Carter?
14    A  Depends on what the question is. If it's
15    something general, possibly. If it's something
16    specific to a particular regulations as being
17    reviewed, it would go to them.
18    Q  Right. Is there anyone else that could
19    potentially assist them if Mr. Hickman was out,
20    for example?
21    A  Well, any one of us potentially could
22    help them. Me, Ms. Kline or Claudio or anyone

# Capital Reporting Company

Page 18

1  else in the office could potentially help that
2  person, depending upon what the question is.
3      Q  What sorts of questions, for example,
4  could Ms. Kline not assist someone, do you know?
5          MS. WHITAKER: Objection.
6          THE WITNESS: I have no idea.
7  BY MS. KLINE:
8      Q  And do others provide the same sort of
9  assistance to walk-in customers that you provide
10  to walk-in customers? Does everyone pretty much
11  assist walk-in customers?
12      A  Yes.
13      Q  And approximately how many walk-in
14  customers would you estimate that PMG has a day?
15      A  I have no idea.
16      Q  Approximately one a day at least?
17      A  At least.
18      Q  At least three or four a day?
19      A  I don't know. Valerie -- Ms. Kline.
20      Q  Can you just take --
21      A  Some days there may be two a day or maybe
22  15 a day, there's no general number. I mean --

Page 19

1      Q  I just wanted an idea.
2      A  Well, more than one, that's an idea.
3      Q  As many as 15?
4      A  Possible.
5      Q  And of those customers -- how many --
6  we're recording this. If you could refrain from
7  making those noises, that would be helpful.
8          Of those customers how many walk-in
9  customers would you estimate were for people
10  asking to speak to you?
11      A  I have no idea. Some of them -- some of
12  them ask for Claudio, some of them ask for
13  Valerie, some of them ask for any one of us, or
14  they may not ask for any one of us. They may ask
15  a general question and then one of those people I
16  already mentioned may have the answer, if
17  possible.
18      Q  That's helpful.
19      A  It's general, anybody. The office is
20  open for anybody to walk in so that the questions
21  can involve anything to do with the function of
22  the office.

Page 20

1      Q  Do you get at least one or two customers
2  a day seeking help from yourself?
3      A  Sure.
4      Q  Is there any work that you perform for
5  walk-in customers that Ms. Kline does not perform
6  or is not allowed to perform?
7      A  Not allowed to perform?
8      Q  Well, I'm assuming she wouldn't perform
9  them if she wasn't allowed to perform them.
10      A  I'm not aware of anything that she wasn't
11  allowed to perform, but I've been involved with
12  the procurement and purchasing which Ms. Kline has
13  nothing to do with. That certainly could be
14  something that Ms. Kline has nothing to do with
15  that people do come in my office on occasion.
16      Q  Does your position description state that
17  Ms. Kline is to give you -- be an assistant of
18  yours?
19      A  In the position description itself, I
20  have no idea. I don't think so.
21      Q  What about your performance standards?
22      A  I don't think so.

Page 21

1      Q  Is it your understanding that Ms. Kline
2  is supposed to offer you assistance or be of --
3      A  Not -- sometimes.
4      Q  It's your understanding that she
5  sometimes is supposed to offer you assistance?
6      A  Uh-huh. Sometimes she does help with
7  various functions in the office, and I sometimes
8  work with her on those functions.
9      Q  But you're not a supervisor over her?
10      A  I'm not a supervisor, no.
11      Q  She's not assigned to be your assistant?
12      A  Sometimes on certain projects she is
13  assigned as my assistant, to use your term,
14  unofficially. So she has work -- we have worked
15  together on projects over the years, various
16  projects in the office, and still do.
17      Q  Okay. Does Ms. Kline assist customers
18  with their publishing needs?
19      A  Sometimes.
20      Q  Is Ms. Kline allowed to assist customers
21  in making covers for reports?
22      A  No.

# Capital Reporting Company

Page 22

1    Q  Why is that?
2    A  Because we have a graphics person in the
3  office who does that about 98 percent of the time.
4  Once in a while I have done that in the past, in
5  the recent past. We now have a new graphics
6  person who we hired last summer who now does that
7  as one of her primary functions to do those
8  covers.
9    Q  Before she was hired, I assume you're
10 referring to Jeanna Kane?
11   A  Uh-huh.
12   Q  Before she was hired, who made the
13 covers?
14   A  Usually -- very often I made the covers.
15   Q  Did Ms. Kline ever assist you in making
16 those covers?
17   A  I don't recall that. Usually it was me.
18   Q  Is Ms. Kline allowed to assist customers
19 in giving cost estimates for printing needs?
20   A  Most cost estimates are not done in our
21 office, they are done in our printing procurement
22 team in our basement that sends stuff out for

Page 23

1  printing. So usually the cost for external
2  printing, they do the estimate.
3       If it's just for something we're going to
4  do internally, pretty much anyone in the office
5  can do that, although it's primarily Jeanna or me.
6  And I think Ms. Kline has done that also in the
7  past.
8    Q  Is there a certain form for the internal
9  printing?
10   A  There is a form for both internal and
11 external printing.
12   Q  What form is that?
13   A  4150.
14   Q  Is someone required to sign off on that
15 form before a person can have a printing request?
16   A  Yes. Either two supervisors in the
17 office, Mr. Benedi, Mr. Davis, and now Ms. Lee,
18 are the only ones that can sign off on that form.
19   Q  Can you sign off on that form?
20   A  Only in an emergency basis, the other two
21 people aren't around, or if I'm acting for them
22 when they're on vacation or something of that

Page 24

1  nature. But usually, no.
2    Q  And does Ms. Kline assist you with
3  graphics or visual information projects anymore?
4    A  No.
5    Q  What kind of help is Ms. Kline allowed to
6  give customers?
7       MS. WHITAKER:  Objection to the form of
8  the question.
9  BY MS. KLINE:
10   Q  You can go ahead and answer.
11   A  I don't know what you mean by "what
12 kind."
13   Q  Do you know what type of assistance
14 Ms. Kline provides to customers?
15   A  She works with our database, she works
16 with our information delivery update. Those are
17 two of the main functions in terms of customers
18 walking in. Is that what you're asking me?
19   Q  Both.
20   A  Yeah. She also helps do research on
21 questions when calls come in for publications.
22 Phone lines, she answers questions from the public

Page 25

1  or agencies, doing research on questions and/or
2  referring them to other offices, which I do also
3  at times.
4    Q  Okay. So you and Ms. Kline work closely
5  together, like if she has a question that she
6  needs to consult with you about research on
7  projects?
8    A  Yes.
9    Q  Has Ms. Kline ever refused to assist you?
10   A  I can't think of any time.
11   Q  Okay. Have you ever requested Ms. Kline
12 to assist you with any customers or projects?
13   A  Yes.
14   Q  Has Ms. Kline ever offered to assist you
15 or asked you if you ever had anything for her to
16 do?
17   A  Yes. At times.
18   Q  Do you perform any regulatory work?
19   A  Very little.
20   Q  What sort of regulatory work or what kind
21 of regulatory work do you perform?
22   A  Well, if someone is not there, I have in

898ce799-8711-44eb-9749-7f48a9e7cc12

**Capital Reporting Company**

Page 42

1    work, yeah.
2        Q   Well, this is for the record.
3        A   Yes.
4        Q   Do your performance standards contain a
5    provision for your getting along with other
6    employees in the office or your supervisors or
7    people outside the office?
8        A   Getting along?
9        Q   Right.  Your ability to get along with
10   them or ability to have good relationships with
11   people?
12       A   I don't recall that.
13       Q   Did you receive a monetary bonus based on
14   your performance ratings?
15       A   Well, that's really up to the managers.
16       Q   No.  Did you receive a monetary bonus?
17       A   Yes.
18       Q   Okay.  How many -- in the last five
19   years, how many times did you receive a monetary
20   bonus?
21       A   Two or three times, I think.
22       Q   Was it based on your performance

Page 43

1    appraisal?
2        A   It was put in based on my performance
3    appraisal and approved, I think.
4        Q   When Mr. Davis evaluated Ms. Kline's
5    performance?  Did he consult with you about her
6    work performance?
7        A   He did on occasion.
8        Q   And what did you advise Mr. Davis
9    concerning Ms. Kline's performance?
10       A   I don't recall a specific one.  You're
11   going back five years in some cases.
12       Q   In the last five years?
13       A   Last year I don't think we had that
14   discussion.  A couple two, three years ago we did.
15       Q   What did you advise him about Ms. Kline's
16   performance?  Did you tell him what you thought
17   her performance rating should be?
18       A   No.  I think -- I don't really recall the
19   conversation because we're going back years.
20   Probably said something that she did the -- some
21   of the functions that she worked on she did
22   satisfactorily.  I did not recommend a specific

Page 44

1    rating.  That was not my function in my job to do
2    that.
3        Q   Okay.  Do you usually swipe your ID when
4    you enter the building?
5        A   Sometimes.  Well, all the time.  I keep
6    thinking, I don't swipe it physically.  I come in
7    by car.
8        Q   So you park in the building?
9        A   Yes.
10       Q   How about when you exit the building?
11       A   If you leave with the car, you don't
12   swipe.  If you leave through the doorway, you do
13   swipe.
14       Q   Have you ever had your swipe records
15   reviewed?
16       A   Not to my knowledge.
17       Q   Have any of your material
18   responsibilities covered under your position
19   description ever been removed from you in the last
20   five years?
21       A   Not to my knowledge.
22           MS. KLINE:  Can we stop for a minute?

Page 45

1        (Break taken from 10:30 to 10:31.)
2    BY MS. KLINE:
3        Q   Do you recall sending an e-mail to
4    various people in publishing that was a cartoon
5    called the electric birds?
6        A   No.  I don't recall such an e-mail.
7        Q   Ms. Kline received an e-mail from you
8    called "The Electric Birds."  It was a cartoon of
9    some crows standing on an electric line, and when
10   the electricity went through the line. the birds
11   flashed.  You don't recall that?
12       A   Nope.
13           MS. WHITAKER:  Objection.
14   BY MS. KLINE:
15       Q   Did you receive a counseling memorandum
16   for sending out that e-mail?
17       A   Since I don't remember sending it, I
18   don't remember getting a counseling memo.
19           MS. WHITAKER:  Objection.
20   BY MS. KLINE:
21       Q   Have you ever received a counseling memo?
22       A   No.

898ce799-8711-44eb-9749-7f48a9e7cc12

# Capital Reporting Company

Page 50

1   Q  Has your supervisor ever sent an e-mail
2   to the individuals that visited you inquiring
3   about the nature of their visit to you?
4   A  I have no idea.
5   Q  But to your knowledge, no?
6   A  I don't know.
7   Q  Have your duties ever been reassigned
8   pursuant to a request for personnel action?
9   A  No.
10   Q  Have you ever been a team leader?
11   A  Yes.
12   Q  When were you a team leader?  And what
13   duties did you perform as a team leader?
14   A  Well, I was a team leader for three or
15   four months last year, maybe a year and a half ago
16   now, and to just do some coordinating within the
17   branch of job functions, to try to streamline
18   things for Bill, but, however, it didn't involve
19   approving leave or anything like that.  It was
20   just strictly to coordinate function within the
21   office.
22   Q  Was this an official action or just like

Page 51

1   a project that you worked on?
2   A  I don't think it was an official action.
3   I don't remember an official.
4   Q  There was no SL-50, a change in your
5   duties?
6   A  No.  It was sort of collateral, you know,
7   to help streamline the office function a little
8   bit.
9   Q  And you didn't get a promotion during
10   this time?
11   A  No.  No, unfortunately.
12   Q  Did you ever assume regulatory
13   responsibilities that had been performed by
14   Ms. Kline?
15   A  I don't think so.  I don't remember --
16   unless it was an emergency situation, but not on
17   any regular basis.
18   Q  Did you ever ask Ms. Kline to prepare
19   regulatory actions for you to send to the Federal
20   Register?
21   A  Again, I think one or two times when
22   Jackie was out, I think Valerie did do a review

Page 52

1   and did some processing.
2   Q  Ms. Kline used to send packages to the
3   Federal Register under her signature?
4       MS. WHITAKER:  Objection.  But go ahead,
5   ask your question.
6       MS. KLINE:  Thank you.
7   BY MS. KLINE:
8   Q  Ms. Kline used to send packages to the
9   Federal Register under her signature, and then she
10   was told to send them under your signature.  Do
11   you recall sending packages under your signature?
12   A  I think it happened a few times.
13   Q  Are you familiar with the Federal
14   Register Management System known as the FRMS?
15   A  No.  Never worked on it.
16   Q  Do you have access to it?
17   A  No.
18   Q  Have you ever entered any data into it?
19   A  No.
20   Q  Do you know how to enter data?
21   A  No.
22   Q  Who initiated the FRMS?

Page 53

1   A  I don't know.
2   Q  What is the FACA database, F-A-C-A?
3   A  Federal Advisory Committee Act database.
4   Q  How often do you enter data into the FACA
5   database?
6       MS. WHITAKER:  Objection, lack of
7   foundation.
8       THE WITNESS:  Once or twice a year.
9   BY MS. KLINE:
10   Q  Does Ms. Kline have access to the FACA
11   database?
12   A  I don't think so.
13   Q  Have you ever trained Ms. Kline how to
14   input data into the FACA database?
15   A  I think --
16   Q  Trained as opposed to just showing her?
17   A  I don't really recall if that ever
18   happened or not.  There was some talk about it,
19   but I don't think we really implemented it.  One
20   thing it's so rarely used, so I don't really
21   recall that or not.  It's possible.
22   Q  Does Mr. Benedi have any duties

**Capital Reporting Company**

16 (Pages 58 to 61)

| Page 58 |
|---|

1  that's a new procedure, though. That's been going
2  on for a while.
3      Q  When was that procedure implemented?
4      A  I don't know, three or four years ago,
5  just guessing. I don't remember. Maybe longer
6  than that.
7      Q  Prior to that procedure, how did you find
8  out when a new publication had been approved?
9      A  Just --
10     Q  Did you stumble upon it --
11     A  Sometimes.
12     Q  -- perusing the Internet?
13     A  Sometimes. Other times because we've
14  printed something and we now know that's a live
15  publication because it's came through our office
16  for approval for printing. There's no one
17  procedure, I guess, is what I'm saying.
18     Q  If I could make a small request. Could
19  you let me finish my question, because I have a
20  transcript and so that we're not talking at the
21  same time? That would be helpful.
22     A  Sure.

| Page 59 |
|---|

1      Q  What is the publications inbox?
2      A  It's an e-mail on our -- that people can
3  send -- when I say people, either the public at
4  large or OPM people can send e-mails to an inbox
5  at publications at OPM.gov -- is that right --
6  sounds right. Where people can send questions to
7  that inbox that we can -- people in the office
8  have access to, to get requests usually about
9  publications. Sometimes it's about other stuff,
10  but it's supposed to be about -- to answer agency
11  questions about publications.
12     Q  And who has primary responsibility for
13  responding to the publications inbox?
14     A  I think Valerie does now.
15     Q  But do you ever have primary?
16     A  I've done it, too. The two of us are
17  primarily the two people who have done it for
18  years.
19     Q  Is the publication inbox one of the
20  duties in your position description or your
21  performance standards?
22     A  I don't think so. I don't believe it is.

| Page 60 |
|---|

1      Q  What about the publications database?
2      A  I think the publications database is in
3  there. I don't think the inbox is, however.
4      Q  What about your performance standards?
5      A  That's what I just said. I think the
6  database is, but I don't think the inbox is.
7      Q  Do you know if Ms. Kline has ever been
8  remiss in responding to the e-mails in the
9  publications inbox?
10     A  No.
11     Q  Approximately how many e-mails a day does
12  the publications inbox receive, do you know,
13  roughly?
14     A  Not a lot. At least one. A couple a day
15  maybe.
16     Q  A couple a day?
17     A  I'm just guessing. You might go a week
18  without getting one, and then another week you
19  might get 10 or 12, so it varies.
20     Q  Okay. What other projects does Ms. Kline
21  assist you or do you work together on besides the
22  publications inbox, publications database?

| Page 61 |
|---|

1      A  The information directory on our gov
2  website.
3      Q  That's the directory -- the official --
4      A  No. That's the information directory on
5  our gov website.
6      Q  The information -- what did Ms. Kline do
7  for you on the information directory?
8      A  She can update data in there. There's a
9  various list of things that we have access to
10  update.
11     Q  Is that similar to -- is that the OPM
12  directory, similar to the directory of key
13  officials?
14     A  There is an OPM organization chart of the
15  OPM website also, which is separate from the
16  information directory which is on our internal
17  website, which also we have access to make
18  correction and changes.
19     Q  And Ms. Kline has access to make
20  corrections to the organization chart?
21     A  I think so.
22     Q  And that's an electronic database?

Page 62

1    A  Yes.
2    Q  Is there a hard copy of the organization
3  chart?
4    A  Yes.
5    Q  Does Ms. Kline work on that at all?
6    A  No.
7    Q  And why not?
8    A  Why not?
9    Q  Right.  Why doesn't she assist you with
10  that project?
11   A  Because it currently sits on a graphics
12  program which only a couple of people in the
13  office have access to.
14   Q  What graphics program is that?
15   A  Adobe InDesign.
16   Q  Do you order the software for the office?
17   A  When approved by my boss, yes.
18   Q  Has Ms. Kline ever had any graphics
19  software?
20   A  I think she had Microsoft Publisher at
21  one time.  That's a program that we stopped using
22  for a number of years.

Page 63

1    Q  What about Photoshop?
2    A  Photoshop, we do use -- the graphics
3  people use Photoshop.  I don't use Photoshop.  I
4  have it on my computer.  I don't regularly use it.
5    Q  Does Ms. Kline have Photoshop?
6    A  She may have had it at one time.  I don't
7  know if she has it now or not.  Primarily it is
8  used by our graphics staff to do photo updates,
9  graphics projects.  I don't do that.
10   Q  You testified that Ms. Kline did do some
11  graphics work, did you not?
12   A  Using Microsoft Publisher primarily four
13  or five years ago.
14   Q  Is anyone else allowed to work on the
15  DKO, Directory of Key Officials?
16   A  No.  I'm pretty much the only one that
17  works on that.  Occasionally a couple of our
18  graphics staff have gotten more involved with that
19  in final prep.  As far as making changes and
20  corrections, I'm the only one that does that.
21   Q  Who were those staff members?
22   A  Isaac Evans, he helped me with it

Page 64

1  occasionally to finalize things and make tweaks on
2  it that I couldn't do.  Jeanna Kane now would help
3  me now if I needed her to.  We haven't put out one
4  since Isaac left, so right now it's me.
5    Q  When did Isaac leave?
6    A  Mid December of '07.
7    Q  Do you recall when Ms. Kane started?
8    A  She started last summer sometime.
9    Q  Have you ever implemented leave under the
10  Family Medical Leave Act?
11   A  Have I?  No.
12   Q  Have you ever had your leave altered or
13  amended that you were unaware of?
14   A  No.
15   Q  Have you ever had to obtain records from
16  the payroll office to confirm your leave?
17   A  No.
18   Q  Do you have any procedures or procedure
19  manual for your position?
20   A  No.
21   Q  How is your working relationship with
22  Ms. Kline?

Page 65

1    A  It's fine.
2    Q  Have you ever had any problems in your
3  working relationship?
4    A  Have I had?  No.
5    Q  Were you involved in the relocation of
6  the resource center from the fifth floor to the
7  basement?
8    A  No.
9    Q  Do you recall when the resource center
10  was moved to the basement?
11   A  Three or four years ago.  I couldn't tell
12  you when, but something like that.  That's just a
13  guesstimate, maybe longer, I don't know.  Time
14  flies.
15   Q  Before that, the resource center was
16  located on the fifth floor, correct?
17   A  Yes.
18   Q  Do you know how long it was on the fifth
19  floor?
20   A  Years, decades, probably since the
21  building was built, '62, before we all were here.
22   Q  As soon as OPM moved in?

# Capital Reporting Company

18 (Pages 66 to 69)

Page 66

1     A  I believe so. I mean, I wasn't here back
2  then. When I came on board in 1977, that's where
3  the library as it was called then, was on the
4  fifth floor.
5     Q  So it was probably there back when the
6  Civil Service Commission was --
7     A  Yeah, yeah. Definitely.
8     Q  Why was the resource center moved to the
9  basement? Do you have any knowledge of that?
10     A  Well, I think other offices in the agency
11  who have bigger clout than we do decided they
12  wanted the space. It was a space issue.
13     Q  And the resource center, a lot of the
14  materials converted over to electronics, did it
15  not, so that there was less need for people to
16  do --
17     A  Well, it was a lot of reasons. We lost
18  staff. At one time the library had a lot of
19  staff, going back years and years, decades ago.
20  Through RIFs and reorganization, it started
21  going -- dwindled down to basically two people at
22  one point and actually down to one at one point.

Page 67

1           And so in the mid '90s a lot of the books
2  the stuff in the fully functional library were
3  given away -- or other agencies or archives or
4  whatever. So the need for the space got
5  constricted more and more and more, and then the
6  space was needed by the director's office.
7           So they found a room in the basement and
8  put it down there, the remnants of the old
9  library, which they renamed the resource center.
10     Q  And is the resource center still open?
11     A  No. It's closed. We can get into it if
12  we need to.
13     Q  When did it close?
14     A  Last fall of '07.
15     Q  And it closed when Leon Broady retired,
16  did it not?
17     A  Basically. That was the year before. It
18  was still sort of open. People could go in there
19  if we needed to. Right now we can still go in
20  there. If we need to, we can swipe our ID badge
21  to get in there, if someone needs to. It doesn't
22  happen -- it's rare now, but we can get into it if

Page 68

1  we have to. But it's technically closed.
2     Q  And are there any plans of totally
3  eliminating that space, do you know?
4     A  There was, but that seems to be on hold
5  now. So I haven't heard anything recently on that
6  issue.
7     Q  So your office is located on the fifth
8  floor, correct?
9     A  Yes.
10     Q  5H35?
11     A  Yes.
12     Q  The resource center used to be located in
13  proximity to publishing, correct?
14     A  Next door, yes. Going back years, right.
15     Q  And you work in a cubicle or an office?
16     A  Cubicles.
17     Q  And do you know the size of your cubicle?
18     A  No.
19     Q  In the last two years or three years, who
20  all in publishing has had private offices?
21     A  The only people that have private offices
22  are the two supervisors and, for a brief period, a

Page 69

1  small -- relatively short period of time we got
2  some extra space across the hall from our main
3  office, and there was a private office there for
4  senior graphics person who was there for about, I
5  don't know, maybe a year and a half, two years,
6  before he left.
7           And now there's -- that space is now
8  storage space until and if we replace his
9  position. That's my understanding. That space is
10  technically not ours.
11     Q  So Mr. Evans occupied that space, and
12  that was a private office?
13     A  Yes.
14     Q  Do you have any idea of the size of that
15  office?
16     A  No, not offhand.
17     Q  Is your office bigger than Ms. Kline's
18  space?
19     A  Yes, it is.
20     Q  Is your office approximately the same
21  size as Ms. Carter's space was?
22     A  Yes.

898ce799-8711-44eb-9749-7f48a9e7cc12

# Capital Reporting Company

20 (Pages 74 to 77)

| Page 74 | Page 76 |
|---|---|

**Page 74**

1  the moment.

2      Plus there's another printer directly in

3  front of the supervisor's office. One of those

4  printers is in front of his office, but it's not

5  in front of the other people's office.

6      Q  Okay. In terms of customers coming to

7  the fifth floor, what percent would you say were

8  nonpublishing versus -- which would be the

9  regulatory versus the publishing?

10     MS. WHITAKER: Objection, I believe

11  that's been asked and answered.

12     THE WITNESS: I don't know.

13  BY MS. KLINE:

14     Q  Would you say that one out of five were

15  regulatory or five out of ten were publishing?

16     A  It's primarily publishing, but it's not

17  something I've ever focused on in terms of

18  percentage of people walking in the office. It's

19  whoever walks in the office we deal with, whether

20  it's regulatory or publishing or other.

21     Q  Most of it you would say is publishing?

22     MS. WHITAKER: Objection.

**Page 75**

1      THE WITNESS: Probably.

2      MS. KLINE: I have no further questions.

3      MS. WHITAKER: I'd like to go off the

4  record for a few moments if I could.

5      (Break taken from 11:01 to 11:09.)

6      EXAMINATION BY COUNSEL FOR DEFENDANTS

7  BY MS. WHITAKER:

8      Q  I'm just going to ask some questions to

9  clarify some of the testimony, Mr. Coco. It seems

10  to me, and I may be confused a little bit, your

11  latter testimony indicated that Ms. Kline did

12  assist you in various aspects of publications. Is

13  that the situation now?

14     A  On a couple, yeah.

15     Q  I just have a note that it says,

16  Ms. Kline doesn't do publishing anymore, and I

17  didn't put it into context. So it may have been a

18  specific question.

19     A  In the broadest sense, she helps with the

20  database and the inbox, that's part of the

21  publishing.

22     Q  Now, you were asked a few questions about

**Page 76**

1  the inbox. And I think one of the questions was,

2  was it in your duties, either in your performance

3  standards or your PD, your position description,

4  do you have -- or do you know in your position

5  description is there a statement that says, other

6  duties as assigned, or something to that effect?

7      A  I think so, but I'd have to go look at it

8  again.

9      Q  Is it your understanding that you --

10     A  I think there is something in there,

11  other publishing group-related matters, something

12  like that, some general wording.

13     Q  And some of these items that have been

14  discussed that would not be specifically in your

15  performance standards, would fall under that?

16     A  Collateral duty or something, yeah.

17     Q  These would clearly be those kind of

18  activities?

19     A  Yeah. They're not significant things,

20  but they are things we need to do.

21     Q  And with regard to the questions

22  Ms. Kline asked that related to getting along with

**Page 77**

1  people, is there or is the collateral, that

2  general collateral duty requirement in most

3  position descriptions, although I'm not sure

4  whether it was in yours, I assume it is, getting

5  along with people, a teamwork aspect in your

6  position description?

7      A  I think so, but I just don't want to say

8  yes or no to that because I haven't looked at it

9  in a while. So there may be.

10     Q  You were asked a question about getting

11  an award based on your performance appraisal. Is

12  it your understanding that you're automatically

13  entitled to a performance appraisal award?

14     A  No.

15     Q  Who makes the determination?

16     A  That's the manager's, supervisor's.

17     Q  And is it your understanding they have to

18  actually put you in for an award?

19     A  Yes. I think that's how it works.

20  Nothing is automatic.

21     Q  And you were asked some questions about

22  the space that Mr. Evans occupied, the only other,

898ce799-8711-44eb-9749-7f48a9e7cc12

Page 78

1  quote, office space, everybody else was in
2  cubicles, including you and Ms. Carter and
3  Ms. Kline?
4     A  Right.
5     Q  And that space was across the hall?
6     A  Right.
7     Q  And you indicated it was somebody else's
8  space?
9     A  Right. Director's space. They loaned it
10 to us.
11    Q  If that space were to become part of
12 PMG -- is that the --
13    A  Yeah.
14    Q  The operation, the office we're talking
15 about?
16    A  Right.
17    Q  Now, three other people -- at least at
18 the time that's at issue in this case which was
19 roughly 2003 to the end of 2005, there were three
20 individuals who I am sure had cubicles in PMG
21 fifth floor area. That would be Ms. Carter,
22 yourself and Ms. Kline?

Page 79

1     A  Uh-huh.
2     Q  And you and Ms. Carter were GS-13,
3  correct?
4     A  Uh-huh.
5     Q  Ms. Kline was a 12?
6     A  Uh-huh.
7     Q  If that space became available, would you
8  be entitled to it before Ms. Kline, if you so
9  chose to go across the hall?
10    A  Probably. I don't know if it would be
11 offered.
12    Q  Why is that?
13    A  Well, if they hire another person for
14 that job, they probably would give that person,
15 the senior graphics person, that space because of
16 the amount of equipment, the printers, all that
17 are residing in that office for that person.
18       And that was one of the reasons, I
19 think -- again, I wasn't involved in that
20 decision -- for Isaac to go into that office
21 because of all of the printers and collateral
22 equipment that the graphics function requires.

Page 80

1     Q  And is it safe to say that it would make
2  more sense for the others to be together, the
3  others meaning you and Ms. Carter and Ms. Kline?
4     A  Yeah.
5     Q  And indeed Ms. Kline did perform
6  functions that you reviewed?
7     A  Right.
8     Q  And functions that Ms. Carter reviewed?
9     A  That's correct.
10       MS. WHITAKER: I don't have any further
11 questions.
12       MS. KLINE: I have a couple follow-up.
13       THE WITNESS: Sure.
14       EXAMINATION BY PLAINTIFF
15 BY MS. KLINE:
16    Q  What was your grade when you were put in
17 the office that you're in now, the cubicle? What
18 was your grade when you first started occupying
19 that space?
20    A  Probably a 12, I think.
21    Q  Has it been the practice of PMG to issue
22 monetary bonuses in the past five years based on

Page 81

1  appraisals?
2     A  I don't know what it's based on it, but
3  some of it has happened, I know that. Sometimes
4  they can put in for them if they want to. It's up
5  to the supervisors to make that decision. It's
6  not automatic, however.
7     Q  Right. But that wasn't my question. My
8  question is: Has it been the practice of PMG to
9  give its employees --
10    A  Sometimes.
11    Q  -- awards based on their performance
12 appraisals?
13    A  Sometimes that has happened, I think.
14    Q  Sometimes. Has that been the general
15 practice in the past few years?
16    A  I don't know. I think I've answered the
17 question as sometimes.
18    Q  But sometimes it's not done?
19    A  I guess. I don't know. I'm not involved
20 in that decision or process.
21    Q  But I'm asking, has it been the practice
22 for you to receive a monetary award?

# ATTACHMENT C

# DEPOSITION EXCERPTS
# SHIRLEY SEWELL

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE THE DISTRICT OF COLUMBIA

---

VALERIE KLINE,                          :

            Plaintiff,       :

      v                          : CASE NO:

                              : 1:07CV451

LINDA M. SPRINGER, and                  :

US OFFICE OF PERSONNEL MANAGEMENT:

            Defendants       :

---

Washington, D.C.

Thursday, February 21, 2007

Deposition of:

SHIRLEY E. SEWELL

called for oral examination by Plaintiff, pursuant
to Notice, at the Offices of Personnel Management,
1900 E Street, Northwest, Washington, D.C., before
Mary E. Warner of Capital Reporting, sworn by a
Notary Public in and for the District of Columbia,
beginning at 9:30 a.m.

# Capital Reporting Company

Page 6

1  grade -- let me say -- hold on a second.  When did
2  you leave facilities and where did you go from
3  there?
4      A  I left facilities and went to publishing
5  services.
6      Q  And when was that?
7      A  After the RIF.
8      Q  So when was the RIF, do you recall?
9      A  It was in the '80s.  I can't remember the
10 actual date, the timeframe.
11     Q  Was it the late '80s, early '80s?
12     A  Late.
13     Q  And how long was that RIF?  Did you come
14 back to work right away or --
15     A  I never actually was RIFed to the
16 streets.  I RIFed into publishing.  I was the
17 facilities employee.  I RIFed into the publishing.
18     Q  Explain how that worked.
19     A  I don't know the logistics, it was
20 processed through personnel.
21     Q  So you were being RIFed from facilities
22 but they found a place for you so that you didn't

Page 7

1  need to be RIFed?
2      A  Correct.
3      Q  Okay.  And that's when you came to
4  publishing services?
5      A  Yes.
6      Q  And what was your grade when you came to
7  publishing services?
8      A  A four.
9      Q  You were still a GS-4?
10     A  Yes.
11     Q  Okay.  And when you came to publishing
12 services, what did you do?
13     A  Clerk.
14     Q  And what section were you in?  I know
15 there's several sections in publishing, there's
16 the regulatory and then there's the nonregulatory
17 and there was the resource center or were you like
18 an assistant to a supervisor like a secretary or
19 clerk?
20     A  I RIFed into the printing procurement
21 section.
22     Q  And how long were you in that section?

Page 8

1      A  Less than a year.
2      Q  Okay.  And then after that, where did you
3  go?
4      A  The office of executive resources.
5      Q  Were you permanently employed by them?
6  Was that a reassignment?
7      A  It was a vacancy I applied for and was
8  accepted.
9      Q  Okay.  And what was your grade then?
10     A  A six.
11     Q  So you got a promotion when you went to
12 the office of executive services?
13     A  It may seem to be a promotion but because
14 of the RIF, I was downgraded, so accepting the
15 position in the office of executive resources, it
16 was steps to put me back to the grade I was before
17 I was RIF.
18     Q  I see.
19     A  Yes, I can say it was a promotion.
20     Q  And how long were you with them?
21     A  Maybe two years, I'm guessing.
22     Q  Two years.  And where did you go after

Page 9

1  that?
2      A  Back into the publishing branch.
3      Q  So the office of executive services was
4  still within OPM, correct?
5      A  Yes.
6      Q  Then you left and you came back to
7  publishing services?
8      A  Yes.
9      Q  And do you know approximately what date
10 that was?
11     A  Not offhand.
12     Q  Okay.  But you were in executive services
13 for about two years?
14     A  (Nods head.)
15     Q  And when you came back to publishing
16 services what section were you in?
17     A  The resource center.
18     Q  And what did you do for the resource
19 center?
20     A  Cataloguing, answering the phones,
21 greeted customers, reshelving materials,
22 researching documents, logging in new material,

3  (Pages 6 to 9)

# Capital Reporting Company

Page 10

| | |
|---|---|
| 1 | library stuff. |
| 2 | Q  Okay.  And what was your grade when you |
| 3 | started working for the resource center? |
| 4 | A  A six. |
| 5 | Q  Six.  And were you ever promoted while |
| 6 | you were in the resource center? |
| 7 | A  Yes. |
| 8 | Q  What were you promoted to? |
| 9 | A  It was a six/seven/eight slot. |
| 10 | Q  And so you were ultimately promoted to |
| 11 | and eight? |
| 12 | A  (Nods head.) |
| 13 | Q  Do you know approximately when? |
| 14 | A  I don't know offhand. |
| 15 | Q  And you were in school too during this |
| 16 | time, were you not?  When did you start -- |
| 17 | A  Yes, in 2000. |
| 18 | Q  In 2000 you started college? |
| 19 | A  Yes. |
| 20 | Q  Have you graduated from college? |
| 21 | A  Yes. |
| 22 | Q  When did you graduate? |

Page 11

| | |
|---|---|
| 1 | A  Last year. |
| 2 | Q  So 2007? |
| 3 | A  Yes. |
| 4 | Q  And what kind of degree did you get? |
| 5 | A  Management development. |
| 6 | Q  Is that a Bachelor's Degree? |
| 7 | A  Associates. |
| 8 | Q  An associates degree.  Okay.  What is |
| 9 | your grade now? |
| 10 | A  GS-11. |
| 11 | Q  11.  So when did you get promoted from |
| 12 | the eight to a nine? |
| 13 | MR. HAYNES:  Lack of foundation that she |
| 14 | was ever a GS-9, objection. |
| 15 | BY MS. KLINE: |
| 16 | Q  Okay.  Did you go straight from an eight |
| 17 | to an 11? |
| 18 | A  No. |
| 19 | Q  So were you ever promoted to a GS-9? |
| 20 | A  Yes. |
| 21 | Q  And when was that?  Was that with the |
| 22 | resource center? |

Page 12

| | |
|---|---|
| 1 | A  When I accept the position as the |
| 2 | printing procurement specialist. |
| 3 | Q  Okay.  And is that when you left the |
| 4 | resource center and then started working for |
| 5 | printing procurement? |
| 6 | A  Yes. |
| 7 | Q  So GS-9? |
| 8 | A  Yes. |
| 9 | Q  And when was that approximately? |
| 10 | A  I'm not sure of the dates. |
| 11 | Q  Was it before or after the resource |
| 12 | center moved to the basement? |
| 13 | A  After. |
| 14 | Q  And when you were with the resource |
| 15 | center, where was it located? |
| 16 | A  It was located on the fifth floor and it |
| 17 | relocated to the basement. |
| 18 | Q  Okay.  When it was on the fifth floor, |
| 19 | did you have another office besides sitting out in |
| 20 | the resource center?  Explain where you sat, where |
| 21 | your desk was and if you had more than one. |
| 22 | A  My physical desk was stationed in the |

Page 13

| | |
|---|---|
| 1 | resource center.  I had a desk located in the |
| 2 | printing -- the publishing office adjacent to the |
| 3 | resource center. |
| 4 | Q  So the publishing services part was |
| 5 | adjacent to the resource center and there was a |
| 6 | door that you could go through to go back and |
| 7 | forth? |
| 8 | A  Yes. |
| 9 | Q  So you had an office in the publish |
| 10 | services part and a desk in the resource center, |
| 11 | is that correct? |
| 12 | A  Yes. |
| 13 | Q  And did you occupy any other space in the |
| 14 | publishing services, such as after Ms. Kline was |
| 15 | hired? |
| 16 | A  I'm not following you. |
| 17 | Q  Okay.  Let me see if I can put it this |
| 18 | way.  Where did you sit before Ms. Kline was |
| 19 | hired? |
| 20 | I'm going to bespeaking about Ms. Kline |
| 21 | in the third person, myself.  You can, too, that |
| 22 | would be helpful since it's going to be on record. |

Page 42

1  special act. I don't know if that was
2  performance, but it was a special act of service.
3     Q  Did you receive any monetary bonus?
4     A  Yes.
5     Q  Okay. And every year that you got the
6  exceeds, did you get a monetary bonus?
7     A  A special act of service award, yes.
8     Q  Okay. Do you know if your performance
9  standards contain a provision for getting along
10 with other employees in the office or your
11 supervisors?
12    A  There may be a conduct clause in there
13 but I can't recall.
14    Q  Now, when you enter the building, do you
15 swipe your ID?
16    A  Yes.
17    Q  And which entrance do you come in?
18    A  20th Street garage entrance.
19    Q  So you park in the garage?
20    A  Yes.
21    Q  Okay. Are you in a car pool?
22    A  Yes.

Page 43

1     Q  Does everyone swipe their ID when you
2  come in?
3     A  I'm the only one that brings the vehicle
4  in the building.
5     Q  And what about when you leave, do you
6  swipe when you leave the building?
7     A  No.
8     Q  Okay. Did you ever have material
9  responsibilities under your position description
10 removed from you?
11    A  Such as?
12    Q  Was there ever a duty that you had that
13 was taken away from you and given to someone else
14 so that you were for longer required to perform
15 that duty?
16    A  No.
17    Q  Okay. Did you ever receive an official
18 reprimand?
19    A  No.
20    Q  Did you ever receive a counseling
21 memorandum?
22    A  No.

Page 44

1     Q  Have you ever had your swipe records
2  reviewed?
3     A  Not that I know of.
4     Q  Have you ever taken a lunch break outside
5  the core hours for any reason?
6     A  Yes.
7     Q  And do you remember when or why or the
8  occasion?
9     A  I don't know exactly when but if we have
10 an office Christmas party, occasionally we stay
11 out past the core hours or sometimes if we had a
12 press inspection or something, we might be longer
13 for lunch, you know, take a later lunch or
14 something like that.
15    Q  Now you performed time and attendance
16 duties for PMG, correct?
17    A  Yes.
18    Q  Have you ever implemented leave under the
19 Family Medical Leave Act?
20    A  Yes.
21    Q  Did you ever have your leave
22 significantly altered or amended that required you

Page 45

1  to obtain records from the payroll to sort it all
2  out?
3     MR. HAYNES: I object. I think that
4  question is confusing but if the witness
5  understands, you can go ahead and answer.
6     MS. KLINE: She does T and A.
7     THE WITNESS: You're asking me my
8  particular time or -- for --
9  BY MS. KLINE:
10    Q  Did Mr. Davis ever ask you to amend
11 Ms. Kline's leave to account for FMLA leave?
12    A  Yes.
13    Q  When he asked you to do this, did he
14 instruct you to change all of her FMLA leave to
15 sick leave, do you recall?
16    A  I don't remember.
17    Q  When he asked you to amend her leave,
18 what did he say? How did he ask you to amend?
19    A  Normally through e-mail and then it was
20 processed.
21    Q  What are the various codes for FMLA, sick
22 leave and annual leave? Do you know the codes

# Capital Reporting Company

|   | Page 54 |
|---|---|
| 1 | for but it was based on your performance? |
| 2 | A  I have no knowledge of -- I mean, how |
| 3 | that -- |
| 4 | Q  You don't know what you did to get the |
| 5 | special act award or was it just everything that |
| 6 | you did, your performance overall? |
| 7 | A  See, I can't say it was a fixed -- you |
| 8 | asked me was it affixed to my performance whether |
| 9 | or not I got an outstanding or exceeding. The |
| 10 | personnel office determines whether or not that |
| 11 | special act of services was affixed to your |
| 12 | performance. When I get my rating, we give the |
| 13 | rating. It's where we I guess tell what our |
| 14 | accomplishments was. So it could be affixed to |
| 15 | one particular accomplishment that was signed off |
| 16 | by the director of our organization or something |
| 17 | like that. I can't say it was a host of |
| 18 | performances. |
| 19 | Q  Did you get a certificate when you got |
| 20 | this special act -- |
| 21 | A  This year we did. |
| 22 | Q  One year I received an exceeds fully |

|   | Page 55 |
|---|---|
| 1 | successful rating and I got a certificate for -- |
| 2 | it sounds similar to this but I thought if you had |
| 3 | a document, maybe I could get that from you. |
| 4 | A  The special act of service award? |
| 5 | Q  Right, that might reflect whether or |
| 6 | not -- |
| 7 | A  Of mine? |
| 8 | Q  If you have those, that might reflect |
| 9 | whether it's tied to your performance appraisal or |
| 10 | not? |
| 11 | A  I can look. |
| 12 | Q  Okay. |
| 13 | A  Sometimes we get certificates. A lot of |
| 14 | times we didn't get certificates. |
| 15 | Q  So when you didn't get a certificate, |
| 16 | when did you get the monetary bonus, was it |
| 17 | shortly after you received the appraisal, was it |
| 18 | six months before or -- |
| 19 | A  Well, our appraisals was processed in |
| 20 | October/November. And we normally would get an |
| 21 | award at the end of the year. So I can't really |
| 22 | say. |

|   | Page 56 |
|---|---|
| 1 | Q  Right after you had your appraisal done? |
| 2 | MR. HAYNES:  I'm going to object, we need |
| 3 | to clarify whether it's the fiscal year or the |
| 4 | calendar year. |
| 5 | BY MS. KLINE: |
| 6 | Q  Are you talking about the appraisal |
| 7 | period? |
| 8 | MR. HAYNES:  And/or the award? |
| 9 | BY MS. KLINE: |
| 10 | Q  Do you know whether the appraisal was for |
| 11 | the fiscal year or calender year? |
| 12 | A  Fiscal year. |
| 13 | Q  And was the special act of service award, |
| 14 | was that based on the fiscal year, too? |
| 15 | A  I don't know. It could be. |
| 16 | Q  If you wouldn't mind, I would like to get |
| 17 | a copy of the award, if I may? |
| 18 | A  Of my certificates? |
| 19 | Q  Yes.  That way that might clear up some |
| 20 | of the confusion. |
| 21 | MS. KLINE:  Thank you. |
| 22 | MR. HAYNES:  No further questions here. |

|   | Page 57 |
|---|---|
| 1 | I thank the witness for coming.  We would like her |
| 2 | to read and sign the deposition, please. |
| 3 | MS. KLINE:  She'll transcribe your |
| 4 | deposition and then give you a copy of it and you |
| 5 | can look it over and make -- you can't change your |
| 6 | testimony but if you see like a typo or if she |
| 7 | misunderstood one of your words or something, then |
| 8 | you can correct it, but he would like you to sign |
| 9 | it to certify that is your testimony. |
| 10 | (Whereupon, at 10:47 a.m., the |
| 11 | Deposition of SHIRLEY E. SEWELL |
| 12 | was concluded.) |
| 13 | * * * * * * |

**(866) 448-DEPO**
**www.capitalreportingcompany.com**          (C) 2008