**U.S. DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| | | * | |
| Valerie Kline | | * | |
| | Kline | * | |
| | v. | * | Case No. 1:07-cv-451 (JR) |
| | | * | |
| Linda M. Springer, Director | | * | |
| | Defendant | * | |
| | | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY
TO DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

Plaintiff Valerie Kline requests leave to file this surreply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or for Summary Judgment (the "Reply"). Plaintiff respectfully submits that this surreply is necessary because Springer has raised <u>new</u> legal issues that were not raised in the Defendant's Motion to Dismiss or for Summary Judgment (the "Motion"). <u>See</u> *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of America,* 238 F.Supp.2d 270, 276-77 (D.D.C. 2002). A surreply is also necessary because Springer introduced factual new matter in support of its Motion. <u>See</u> *Alexander v. FBI*, 186 F.R.D. 71, 74 (D.D.C. 1998).

**<u>DISCUSSION</u>**

I.    **<u>The Motion does not dispute that Kline was similarly
situated to employees she was discriminated against.</u>**

In Defendant's Motion, Springer did not dispute that the discriminatory events give rise to an inference of discrimination or that Kline was not similarly situated to the employees she

was comparing.  Therefore, Kline reserved the right to respond in the event Springer raised this

issue in its Reply. See fn 3, p. 5, Memorandum Of Points And Authorities In Opposition To

Defendant Springer's Motion To Dismiss (the "Response").

In the Motion, Springer provides the standard for establishing a prima facie case of

Reverse Discrimination, which requires showing an inference of discrimination, such as by

showing that she was treated differently than similarly situated employees. However, <u>Springer</u>

<u>did not claim in the Motion that Kline failed to show that she was not similarly situated.</u>   (See

Docket Entry (DE) 22-2, pp. 13-14.)  <u>Springer only claimed that the discriminatory acts do not</u>

<u>amount to adverse actions.</u>  <u>Id.</u> at 3.  "None of the plaintiff's claims rise to the level of an <u>adverse</u>

<u>personnel action</u>, and this plaintiff cannot make a *prima facie* case of reverse discrimination

<u>based on them.</u>  [Emphasis added.]  Id. at 20.

Springer acknowledges, "[w]hile the plaintiff need not plead the elements of a prima

facie case in the pleadings, the plaintiff carries the burden of alleging a set of facts upon which

relief can be granted.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)."   Kline alleged facts

in the Third Amended Complaint and claimed that she was <u>similarly situated the employees she</u>

<u>was comparing to</u> (DE 37, ¶¶39, 40, 56, 62, ¶72, ¶78, ¶124) thereby establishing a prima facie

case of discrimination.  Because Springer didn't raise this issue in the Motion, Kline reserved the

right to respond to this issue in the event Springer raised the issue in the Reply.

Now that Springer has raised this new issue in the Reply, Kline can show that the

relevant aspects of her employment situation are or were nearly identical to the employees she

was comparing, such as Jacquline Carter, Robert Coco, Lara Rivera-Lopez, and Issac Evans,

because she was either performing the same relevant duties, was the same grade or in other ways

nearly identical to these employees.  <u>See</u> *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1

(D.D.C. 2000) ("A plaintiff must demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the employee being compared.")  Note that this standard does not say that the plaintiff must be identical but "nearly" identical to those of the employee being compared.

    a.   <u>Telework</u>

With respect to telework, Kline claims that she was similarly situated to Jacquline Carter. This can be shown by the fact that Stephen Hickman, the employee who assumed Carter's duties following Carter's retirement, has the same Position Description (DE 41-6) as Kline had when she began working for PMG (DE 40-4, pp. 1-5).  Hickman, GS-12, performs the same regulatory duties that Kline, GS-12, performed and the same duties that Carter, GS-13, performed.  In addition, Carter performed the regulatory duties as a GS-12 and was promoted to a GS-13 even though she performed "the same basic functions" (DE 40-4, pp. 10-11).  In Kline's new Position Description (DE 40-4, pp. 19-22), Kline <u>retained</u> the regulatory duties (Id. at 20) and continued to perform all of the same regulatory duties that she performed while working under her old Position Description.  Therefore, Kline submits that she can establish that she was similarly situated to Carter, who was allowed to telework.

Lara Rivera-Lopez, a Hispanic employee, was a GS-12 management analyst who <u>performed the same work that Kline performed</u>, such as graphic design, answering PMG telephone lines and assisting with walk-in customers, etc.  Kline claimed that Rivera-Lopez was allowed to telework while working for PMG while Kline was not. (DE 37, ¶¶ 60-62)  Kline requested a copy of the Position Description for Rivera-Lopez reflecting the duties she performed while detailed to PMG but <u>Springer failed to produce the document</u>.  Kline also

requested an address for Rivera-Lopez in order to depose her but Springer refused to provide the information.  Because Springer failed to respond to the discovery requests, Kline requests that the Court find that Kline is similarly situated to Rivera-Lopez.

> b.  Performance Appraisal, Offensive Email, Rescission of Administrative Rights.

In these subject claims, Kline compared herself to Carter and Coco.  Kline established that she is similarly situated to Carter is shown in paragraph a, *supra*.

Kline submits that she performs the same relevant duties that Coco performed as reflected in their respective position descriptions, which are virtually identical except Kline has the added duty of performing regulatory work. Coco's position description (DE 41-4, pp. 3-7) states that he "manages and maintains" various projects and Kline's position description (DE 40-4, pp. 19-22) states that she "assists in managing and maintaining" those same projects.  Coco's position description does not state that he manages Kline.  Rather, Kline performs the same work on the same projects as Coco because she is a back up to Coco by managing the projects when Coco is out of the office or not available.  In some cases, Kline has assumed full responsibility for performing duties that Coco had performed, such as the responding to the Publications Inbox whereby Coco now backs up Kline on this duty. (DE 40-3, ¶94)  Kline also assumed primary responsibility for answering the PMG telephone lines that Coco used to primarily answer. (DE 40-3, ¶ 75, 79) Therefore, Kline submits that she and Coco are similarly situated.

> c.  Office Space, Staff Support, Lunch Breaks, Formal Reprimand

Kline compared herself with Carter, Coco and Issac Evans on the subject claims.  That Kline is similarly situated to Carter and Coco is shown in paragraphs a and b, *supra*.

Kline claims that she was similarly situated to Issac Evans because they were both GS-12's at the time the discriminatory event occurred and that Kline performed graphics work similar to Evans. Kline requested a copy of Evan's Position Description during the time when he was a GS-12 but Springer failed to produce it. Kline did not request a sanction for failing to provide the document because at the time, whether Evans and Kline were similarly situated was not at issue. However, Kline did produce evidence of numerous graphics projects she had worked on. DE 40-3, ¶ 69 and DE 40-5, pp. 11-16.

Because Evans and Kline were similarly situated, Kline established a prima facie case by claiming that Evans was given superior office space over Kline who had seniority; was not required to provide staff support to Kline but Kline when needed but Kline was required to provide Evans with staff support; was not assigned to go to lunch at a specific time like Kline; and did not have his swipe records scrutinized whereas Kline did have hers scrutinized that led to the issuance of a formal reprimand.

Kline also alleged discrimination because lower grade minority employees had superior office space to Kline, such as Shirley Sewell, GS-9/11. DE 40-3, ¶ 202. In this respect, Kline was not similarly situated to Sewell because Sewell was lower in grade but the discrimination is based on the fact that Kline had a greater need for the space than Sewell but Sewell was given better space over Kline. Therefore, the discrimination is based on the plain meaning of the term, e.g., to make a difference in treatment or favor on a basis other than individual merit [or need]. See *Merriam-Webster's Online Dictionary*, 2002. In this respect, not only was Kline treated less fairly or less favorably than similarly situated minority and white male employees, but also treated less fairly or less favorably than lower-grade minority employees.

In conclusion, Kline has established that all of the relevant aspects of her employment situation were <u>nearly</u> identical to those of the employees she was comparing to.

**II.    <u>The Reply Adds New Facts or Claims with Respect to the Proffered Reasons for the Legitimate Non Discriminatory or Retaliatory for the Adverse Actions.</u>**

After Springer proffered in the Motion the nondiscriminatory reasons for the adverse actions, Kline had the burden of showing that the proffered reasons are pretextual, which Kline did in the Opposition.  DE 40, p. 26-44.  Now Springer provides additional reasons for the discriminatory acts in the Reply.  Therefore, a surreply is necessary to show that the additional proffered reasons are pretextual since the burden shifts back to the plaintiff.  Additionally, Springer disputes claims there were previously undisputed.

a.  <u>Telework</u>

The Motion did not deny that telework was a "benefit" but the Reply claims that telework is not an "entitlement or a benefit that flows automatically from the job".  DE 45, p. 9.  Kline submits that telework is a "benefit" of employment because telework was promised to Kline when she interviewed for her position.  Kline was told that if she accepted the position with PMG, she would be able to telework.  Because Kline relied on that promise in accepting the position over accepting a position with Dept. of Interior at a higher grade, it constituted a "benefit" of her employment.  DE 37, ¶ 24.  Kline Accordingly, Kline suffered "objectively tangible harm" constituting an adverse action because the "benefit" of teleworking was a major consideration in deciding to accept the position with PMG.  At a minimum, telework should be

considered a "privilege" of employment.  <u>See</u> 42 U.S.C. § 2000e-2(a)(1) and *Turcios v. United States Servs. Indus*., 680 A.2d 1023 (D.C. Cir. 1996)

Next, Springer proffers a statement from Ronald Flom giving the reasons for denying Kline from teleworking beyond the trial period. DE 45, p.9.   Since Kline did not report to Flom and Flom did not oversee Kline's work while she was teleworking, Flom's statement is based on <u>hearsay</u> from Kline's supervisors, William Davis and Claudio Benedi.  Kline requested documents and interrogatories asking for specific details of what problems were encountered while teleworking because neither Kline nor the Union were made aware of any problems. Springer produced <u>no evidence</u> and gave no examples of dates and times of alleged incidents where there was no one in the office to answer the telephones or assist walk in customers, or what coordination problems were encountered, etc.

In addition, Kline rarely had day-to-day work "assignments" in the non-regulatory area. Kline submits that most of her day-to-day work assignments were regulatory ones.   It is undisputed that these regulatory assignments are suitable for teleworking.  DE 40-5, pp 23. Occasionally Davis would give Kline an assignment, such as researching all government printing laws/regulations and instructed her to do it over the internet, which could have been performed while teleworking (even though Kline submits this assignment was unreasonable).  Other day-to-day projects Kline worked on was responding to the Publications Inbox, which could have been done while teleworking since it was internet based; updating the publication database, which could have been done while teleworking since it was internet based; and updating the online Directory of Key Officials, which could have been done while teleworking since it was internet based.

The only duty that possibly could not be performed while teleworking is assisting walk-in customers. Kline submits that there were others in the office to assist with walk-in customers, such as Jose Velaquez, Issac Evans, Robert Coco and/or Jacquline Carter on days that Kline would have been teleworking. Carter testified that she assisted with the non regulatory walk-in customers and non regulatory telephone callers. Carter also testified that she had regulatory walk-in customers. (DE 40-2, p. 38) Therefore, Kline submits that a jury could find that the claim that Kline's position was not suitable for telework because she was needed to assist with walk-in customers is pretextual because there were others in the office to assist with walk-in customers.

Springer also claims that Mary Moore and Doritha (sic) Elmore were not allowed to telework but Springer produced no evidence showing where they had formally requested telework. Furthermore, Moore and Elmore were not similarly situated to Kline or Carter so whether they were allowed to telework or not is irrelevant.

Therefore, Kline submits that a jury could find that the proffered reason for not allowing Kline to telework was pretextual.

b.  <u>Performance Appraisal</u>

Contrary to Springer's claim, Kline averred that her 2005 performance appraisal was an adverse action. DE 40, pp. 13-14. It constitutes an adverse action because being issued a "fully successful" appraisal instead of a higher, earned rating deprived her of a monetary bonus. Springer now points to statements in the depositions of Sewell and Coco concerning performance awards but fails to show the Court the following statement made by Carter:

```
10     Q   Did you ever receive a performance bonus?
11     A   Yes.
12     Q   Was it based on your performance rating?
13     A   Yes.
```

DE 40-2, p. 29.  Kline requested copies of the awards accompanying the bonuses

received by Carter, Coco and Sewell that should show if the bonus was based on their

performance rating but <u>Springer refused to provide the documents</u>.  Therefore, Kline requested

sanction no. 42 (DE 39, p. 7) in its request for sanctions finding that PMG awarded a monetary

performance bonus to employees who received an "Exceeds Fully Successful" performance

rating or above.  Kline also presented evidence of the bonus she received in 2003 based on her

performance (DE 40-4, p. 75) and evidence that PMG budgets for bonuses (DE 40-4, pp. 76-82).

The newly proffered reason for showing that Kline did not perform at a level higher that

"Fully Successful" is Carter's testimony that Kline erroneously sent a package to the Federal

Register.  However, Carter did not state when this alleged incident occurred.  Carter testified:

```
0031
11     Q   And when do [sic] the new procedures start that
12     require [sic] Davis, Benedi or Coco to sign off on the
13     regulatory packages?
14     A   Once Ms. Kline sent a package that was
15     published to the Federal register that hadn't been
16     cleared and another when I caught a package that
17     hadn't been cleared, twice, then we had to set up
18     the system.
19     Q   When you said Ms. Kline sent it over, did
20     it go under her signature?
21     A   I don't know whose signature it was.
22     Q   How do you know that Ms. Kline sent it
0032
1      over, if you don't know whose signature submitted
2      it?
3      A   We had a form for sending stuff for
4      publishing, I think it was under your signature.
5      Bob Coco would be the one to approve it.
6      Q   So you're saying Bob Coco reviewed it?
7      A   No, I didn't say that.
8      Q   Or approved it?
9      A   I said Ms. Kline probably gave it to him,
10     and I don't recall all the procedures that we had
11     at the end.  And you sent it to the Federal
```

```
12   register, Ms. Kline sent it.  It was published.
13        Q   Who approved it for submission to the
14   Federal register?
15        A   I would say you would have approved it.
16        Q   Signed off on the paperwork?
17        A   I would say that you had to sign it.  I
18   think you signed off.
19        Q   So when a regulatory package was sent to
20   the Federal register, it went under a cover
21   letter, did it not?
22        A   I'm trying to remember.  I think it did.
0033
 1   All I remember, I was on vacation, I was checking
 2   in with the work and I discovered that this job
 3   had been published without the approval of OMB.  I
 4   called Bill Davis and from that that time,
 5   everything started rolling.
 6        Q   How do you know Ms. Kline sent it if you
 7   weren't there?
 8        A   Okay.  I can't remember how I remembered
 9   that you sent it because you were doing the
10   regulations at the time.  Who approved it and
11   signed off on it, I don't remember.  But you --
12        Q   You said earlier that Ms. Kline was doing
13   minimal --
14        A   There were two things happening.  Once a
15   job had been cleared by OMB, instead of sending --
16   it was an 07 or 01, I can't remember the numbers,
17   the 01 was sent, the 01 was approved and 07
18   wasn't.  Instead of sending the right one that was
19   approved, the wrong one was sent.
20        Q   And how do you know who sent that?
21        A   Because you were sending them.  And
22   knowing if your signature was there, I don't
0034
 1   remember.
```

DE 45-2, p. 6.  Carter's testimony is unreliable and contradictory.  First on p. 32, line 5,

she testified that "Bob Coco would be the one to approve it."  Then on p. 32, lines 13-15, she

claims that Kline approved it.   Then on p. 33, lines 10-11, she states that she doesn't remember

who approved it.  The evidence will show that the packages she was referring to were packages

erroneously sent to the *Federal Register* in 2006, which was outside the relevant rating period.

The evidence will also show that these packages were sent to the *Federal Register* by Coco, not

Kline, because her regulatory duties of sending packages to the *Federal Register* had been

removed from her and given to Coco.  This issue is the subject of a proceeding pending before the Equal Employment Opportunity Commission.

Springer states Kline misses deadlines but this is a disputed issue of material fact because there is <u>no evidence</u> whatsoever that Kline missed any deadlines other than Davis' unsubstantiated claim.  As Springer points out p. 12 of the Reply,  Coco states that he could not think of any times that Kline failed to assist him. DE 45, p. 12.   Yet Springer tries to claim on p. 13 of the Reply that Kline "failed to assist Mr. Coco". DE 45, p. 13.   <u>There is no evidence of any dates, times or incidents</u> where Kline failed to answer telephones after she was tasked with the responsibility, or failed to assist walk-in customers, or failed to support PMG in routine tasks, or failed to maintain good relationships or failed to perform regulatory work properly.  Simply, there is no evidence whatsoever to support these unsubstantiated, bald-faced allegations.  However, Kline has provided extensive hard evidence that she met the criteria for receiving an "Outstanding" performance rating.  DE  39, ¶¶52-137, DE 40-5, pp. 1-80, DE 40-6, pp. 1-8.

Therefore, Kline submits that a jury could find that the proffered reasons for not giving Kline a higher rating and for making derogatory comments were pretextual.

c.   <u>Offensive E-Mail</u>

Springer newly claims the email Davis sent to Taylor and her supervisor, Margaret McElrath, is not offensive whereas before she only claimed that it "does not raise racially or sexually offensive material".  Kline believes the email was offensive because it defames Kline by way of innuendo and inference since it implies that Kline did not keep Davis informed of changes to the FRMS whereas <u>the evidence shows that he was informed on at least six (6) occasions</u>.  In addition, informing Taylor that "no changes, other than technical should be made

without explicit authorization from Claudio or me" implies that Kline authorized changes that should not have been authorized, in other words, an allegation that Kline exceeded her authority, which could damaging to Kline's working relationships with Taylor and McElrath

Taylor indicated to Kline that her McElrath was going to respond to Davis' email. Kline requested a copy of the additional email but Springer refused to provide it. Therefore, Kline requested sanction no. 20 finding that Davis generated defamatory email to McElrath and Taylor. DE 39, p. 20.

Therefore, Kline submits that a jury could find that the proffered reason for sending the email was pretextual.

### d.  Denial of Office Space

Springer newly claims that Kline was hired to replace Pete Jones. This statement is patently false as the evidence shows that Kline was hired to perform regulatory work. DE 40-4, p. 1-5. Kline submits that Pete Jones did <u>not</u> perform regulatory work.

Springer also claims that the office space "across the hall" from the main office was given to the "senior graphics person" but at the time the space given to Issac Evans, the evidence shows that he had less seniority than Kline. DE 40-3, ¶200. The evidence shows that Evans was given the superior office space when he was hired as a GS-12 in October 2004 (DE 40-7, p. 27) and then promoted to a GS-13 in October 2005. DE 41-5, p. 1-6. Springer also newly states that Evans was there "for a short period of time" but does not dispute that <u>Evans occupied the space for three (3) years</u> from the time he began working for PMG in approximately 2004 until the time he left in approximately 2007. Benedi testified that Kline would have been third in line for the space after Coco and Carter. DE 40-5, p. 69. While other employees such as Coco and/or

Carter would have been entitled to the space over Kline, Kline was entitled to the space over

Evans, who would have been fourth in line.  But instead of furnishing the space to Kline, it was

furnished to Evans, a minority employee with less seniority than Kline and who was similarly

situated to Kline as shown in paragraph I. c., *supra*.

    Springer now proffers that Carter stated that her office was the busiest area of PMG but

Carter later clarifies her statement that the whole office (PMG) was the busiest area and that her

area was only busy because she was located at the front door, which is away from the main open

work area of PMG.

```
17      Q   So it wasn't necessarily the busiest
18   other than because you were by the front door?
19      A   I would say the whole office was the
20   busiest.  I would say by me being at the front
21   door, that's where the busiest part started.
```

DE 41-5, p. 9.  Kline submits that Kline's office was in the busiest area because Kline's

cubicle is by the office copiers, printers, fax machines and work tables, which Carter's office was

not.

    Nevertheless, Springer does not dispute that Kline's work of reviewing regulations

required her to have a quiet environment free from distractions.  Therefore, Kline submits that a

jury could find that the proffered reason for not giving Kline the office given to Evans was

pretextual.

    e.   <u>Rescission of Administrative Rights</u>

    Springer now claims that Taylor developed the FRMS and that Davis and Benedi merely

assigned Carter and Kline to assist with the entry of data and the identification of the required

fields to the FRMS.  DE 45, p. 15.  In her affidavit, Kline produced correspondence sent to

Benedi dated s, 2005, that shows Kline was responsible for initiating and directing the development of the FRMS.  DE 40-7, pp. 2-6.  However, in the request for production of documents, Springer produced no documentary evidence showing where Kline was "assigned to assist with the entry of data and the identification of the required fields".  One would think that if Kline had been assigned the project, there would be some sort of evidence reflecting this.  Yet there are not email providing instruction on the assignment or asking for updates on the projects, no notes, etc.  The only evidence is Kline's September 24, 2005 memo to Benedi.  Kline also requested that Springer provide an address for deposing Taylor but Springer refused to produce it.  Therefore, Kline requested sanction no. 21, finding that Kline was responsible for initiating and directing the development of the FRMS.

Since the only documented evidence shows that Kline initiated and directed the development of the FRMS, it is unreasonable for Springer to now proffer the reason that Kline should not have had administrative rights to the system was because "she could make major changes and alterations to the system that could be negative."  DE 45, p. 15.  In Kline's Opposition, Kline explained that Benedi and Davis were designated as the "Point of Contact" for the FRMS, which means that anyone inquiring about the system would need to contact them about it.  Kline submits that Davis and Benedi did not use the system and did not have the software on their computers that would give them "full administrative rights" to the system as Springer claims in the Reply.

In addition, it does not compute that there was a risk that Kline would make major negative changes to the FRMS since she was intimately familiar with it whereas they were not.  Kline submits that there was more of a risk that they would make major negative changes to the system since they were unfamiliar with it.  Kline attempted to obtain the address of Arlene

Taylor for purposes of deposing her about the FRMS but Springer refused to provide it. Therefore, this reason is pretextual.

Springer also claims now that rescinding Kline's administrative rights had no impact on her ability to perform her job.  To the contrary, it eliminated a material responsibility would affect her ability to perform her job because if she does not perform in accordance with the duties contained in her Position Description, she could be demoted or removed from her position.

Springer does not dispute that Kline's Position Description charges her with responsibility for "develop[ing] state-of-the-art publishing systems".  DE 40-4, pp. 19-22. Yet Springer tries to make the argument that rescinding her rights was not a material change to Kline's position.  But if Kline had been exercising administrative rights for approximately two (2) years, and Benedi was aware of those rights per the September 24, 2005 memo (DE 40-7, pp. 2-6) and the administrative rights were covered under her Position Description, it stands to reason that removing those rights was a significant change to Kline's material duties.

Hence, Kline submits that a jury could find that the proffered reason for rescinding Kline's administrative rights simply because she never should have had those rights is pretextual.

f.  Lunch Required During Core Hours

Springer adds the new allegation that Kline was issued a letter of reprimand cautioning her about the "continuing abuse of the [lunch hour] policy" as a result of the incident occurring on January 31, 2006.  DE 45, p. 16.  Springer is confused because the reprimand was not based on the January 31, 2006 incident, but rather, the reprimand was partly based on a late lunch taken by Kline on September 22, 2005, that Coco authorized when he was acting for Davis while Davis was recovering from surgery.  DE 40-7, pp. 43-44; DE 40, p. 41.  The reprimand, with is

addressed *infra*, states nothing about a "continuing abuse of policy". DE 40-7, pp. 43-44. Furthermore, Kline adequately explained how she had not abused her leave but Davis refused to retract the reprimand. DE 40-7, pp. 50-51.

At any rate, Springer claims that no one is allowed to take a lunch hour outside the core hours but the evidence shows that similarly situated employees are <u>privileged</u> to take lunch hours outside the core hours without using leave, i.e., Coco and Carter. DE 40-7, p. 35-36. Kline established in paragraphs I. a. and b., *supra,* that she is similarly situated to Carter and Coco. Therefore, Kline submits that a jury could find that this proffered reason for denying Kline the <u>privilege</u> of taking lunch outside the core hours is pretextual.

g.   <u>Swipe/Reprimand</u>

Springer adds the proffered reason that Kline's "swipe" records were scrutinized to determine whether she was abusing her leave and that management has a right to investigate suspected abuses of leave. Kline's swipe records were scrutinized for the time period that Davis was on leave. Kline submits that there was no logical reason for investigating Kline's leave during the time when Davis was on leave because he suspected her of abusing her leave on a day when he was not on leave. If he had observed Kline abusing leave, it stands to reason that he would have checked the "swipe" records on the particular day he allegedly observed her abusing her leave. But instead, he obtained the "swipe" records for a different time, which shows that Davis was on a fishing expedition to try to find ways to harass Kline in retaliation for exercising her rights. It was also discriminatory because it is undisputed that none of the other minority or white male employees leave records were scrutinized during the time Davis was on leave

recovering from surgery.  DE 40-7, p. 33.  Thus, Kline submits that a jury could find that the

proffered reason for scrutinizing the "swipe" records and issuing the reprimand was pretextual.

Springer erroneously adds that Kline can point to no adverse action with respect to the

swipes/reprimand but Kline submits that issuing a formal reprimand *is* an adverse employment

action because the evidence shows that the reprimand was <u>placed in Kline's official personnel</u>

<u>file, which can hinder her ability to obtain future jobs and promotions</u>.  DE 40-3, ¶237.  A formal

reprimand qualifies as an adverse action under *Burlington Northern & Santa Fe Ry. v. White,*

126 S. Ct. 2405 (2006):

> "In response to his allegation that the Letter of Reprimand violated Dr. Walker's
> rights under Title VII, the EPA argues that the Letter of Reprimand did not constitute
> "actionable adverse actions under Title VII." Def.'s Mem. at 7. This, however, is no
> longer the standard for retaliation claims. Under *Burlington Northern*, the Court finds that
> a formal letter of reprimand could be sufficient to dissuade an objectively reasonable
> employee from participating in EEO activities.  Because it was to remain in Dr. Walker's
> official personnel file for two years, adding a level of severity to any future discipline that
> might occur in that time frame, it cannot be said that such a reprimand would be
> immaterial. *Walker v. Johnson*, 501 F. Supp. 2d 156  (D.C.D.C 2007) [fn omitted.]

The Official Reprimand issued to Kline states that it will remain in her office personnel

file for two (2) years. DE 40-7, p. 43.  Thus, it constitutes an adverse action.

h.  <u>Leave Tampering</u>

Springer proffers a new reason for explaining the leave tampering,

> "Because Ms. Kline came in late one day but left at her regular time, Mr. Davis
> reviewed her relevant scan records to determine whether plaintiff was abusing her leave.
> Consequently, on February 1, 2008, Mr. Davis issued Ms. Kline a Letter of Reprimand
> regarding her time and attendance.  Ms. Kline requested to see the information that Mr.
> Davis relied upon, and on February 8, 2008, Employee Relations provided a detailed
> memorandum of the supporting information, including copies of the relevant "swipe"
> records. Ms. Kline provided specific information to Mr. Davis, and in response, Mr.

Davis requested that her leave records be amended based on this information that Ms. Kline provided. [Citations omitted.]

Davis reviewed Kline's swipe/scan records around December 8, 2005, for the period from July 2005 to October 2005 and issued the reprimand on February 1, 2006, regarding her time and attendance. The leave tampering occurred around November 25, 2005, <u>prior to the review of the scan records and prior to the issuance of the reprimand</u> in February 2006. Thus, to claim Davis amended Kline's leave based on the information obtained from her in response to the reprimand is false.

Springer also adds that the error in Kline's leave was due to a "ministerial error" that occurred in early January 2006, which was <u>after</u> the leave "error" in November 2005. This is an admission that the alleged ministerial error occurred approximately two (2) months after tampering with Kline's leave. But even if correction of the errors to Kline's leave was an oversight, Kline informed Davis of the errors early as January 9, 2006, (DE 40-7, p. 75) but he then denied her leave on January 10 and 21, 2006 (DE 43-3, ¶248, DE 40-7, p. 75) and failed to correct her leave until <u>after</u> she filed an EEO action against him on March 21, 2006. DE 40-7, 71. Therefore, Kline submits that a jury could find that the proffered reasons for tampering with Kline's leave are pretextual.

  i.  <u>Denial of Telephone Staff Support</u>

Springer adds the argument that Kline filed a stale claim based on being assigned responsibility for covering PMG telephones on May 24, 2005. No where does the Third Amended Complaint contain a claim based on being assigned responsibility for covering PMG telephones other than a reference to the telephone duties as one of the significantly diminished

duties assigned to her as part of her retaliatory harassment claim.  Kline's claim under

Count XIV concerning the denial of staff support is that she was <u>denied staff support on</u>

<u>February 2, 2006</u>, when she urgently needed staff support because she was working on the

agency's Unified Agenda under a short deadline.  DE 37, p. 35.  Yet Springer claims that this

claim is a "stale" claim because it is based on an incident made in 2003.   The reference to being

required to cover the telephones on February 2, 2006, was to show that Davis would not give her

staff support when she asked him <u>to provide her with relief from the telephones</u> (DE 40-3, ¶¶

203-209), not that he had assigned her responsibility for the telephones.  Accordingly, Springer's

view that this claim is untimely is without merit.

Moreover, Springer proffers no legitimate reasons for denying Kline staff support and

Kline submits that a jury could find that denying Kline staff support was discriminatory based on

race and sex, and in retaliation for exercising her rights.

j.   <u>Hostile Work Environment/Sexual Harassment Claims</u>

Springer adds that Kline resolved the issue of Davis' overbearing surveillance of her

through the negotiated grievance process and that the alleged conduct is not sufficiently abusive

to be actionable under Title VII.  While Kline stated that the Union resolved <u>some</u> of the issues,

i.e. having an hour for lunch, using flex time and accruing credit hours, like other employees

were allowed to do, Kline states numerous other acts constituting an overbearing surveillance

<u>that were not resolved through the Union's negotiated grievance process</u>, such as removing her

from committees, eliminating her graphics work, assigning her menial, clerical tasks and

secretarial duties, like tending to faxes, typing spreadsheets, delivering forms to the print shop,

picking up deliveries, scanning business cards, and using her as an assistant while he directed

projects rather than having Kline direct the projects and assigning her unreasonable projects. DE 40, p. 24-25; DE 40-3, ¶¶138-146.

Oddly, Springer states, "[a]s noted above, the assignment of new duties in May 2003 is not a claim in this case" (DE 45, p. 19) but in the paragraph preceding paragraph, Springer states,

> "[t]herefore, she cannot raise a timely claim before this Court that she suffered diminished responsibilities as she has attempted to do. Id. In addition, plaintiff also attempts to raise a stale, 2003 even when she asked and did not receive staff support, as a claim in this case. Plaintiff's Opposition, R. 40, p. 21. As these claims are untimely they should be dismissed with prejudice." DE 45, p. 17-18. [Emphasis added.]

Which is it? Does or does not Springer believe that Kline based a claim on the assignment of new duties? Springer is apparently confused because Kline did not base a claim on the diminution of duties but has shown that she was subjected to retaliatory harassment and a hostile work environment because, *inter alia*, Kline's material duties were gradually stripped from her and replaced with menial duties that were insulting to Kline's capabilities and level of intelligence and education. DE 37, pp. 43-44.

Kline submits that these acts are actionable as a retaliatory harassment claim because they are sufficiently severe, i.e. adverse, and pervasive to the extent that they would "'detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.' *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21" (as quoted by Springer). Surely a jury could find that the diminished duties not encompassed under the position description would keep Kline from advancing in her career.

These are not independent actions suitable for action under Title VII but comprise numerous acts that demonstrate a hostile work environment because the workplace is "permeated with discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."
*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).  Kline's work environment was abusive due to Davis' overbearing surveillance of her, the diminution of material responsibilities, and affected her ability to perform her job or advance in her career as alleged by Kline (DE 37, ¶¶ 97, 127, 133, 139,140, 171; DE 40-3, ¶¶ 169, 203, 208, 227, 256; DE 40, p. 7) contrary to Springer's claim.

Springer claimed that "[Kline] makes no claims that the alleged hostile work environment affected her ability to do her job."  To the contrary, Kline stated that the hostile work environment caused her to work under adverse conditions, was disturbing to her work environment, and induced fear, insecurity and inferiority due to threats to suspend her and threats to her security, etc.  DE 37, ¶¶ 97, 127, 139, 140, 171; DE 40-3, ¶¶ 169, 203, 208, 227, 256; DE 40, p. 7.  It is reasonable to conclude that these conditions affected Kline's ability to do her job and also affected her health and well being as alleged in the Third Amended Complaint.  In addition, Kline stated that her duties were eliminated to the extent that she frequently had no work to perform, which surely would affect Kline's ability to perform work and threaten her ability to advance in her career.

III.    Statement of Material Facts.

Springer claims that Kline has failed to address defendant's statement of material facts not in dispute in the manner required by Local Rule LCvR 7(h).  While Kline did controvert Springer's Statement of Material Facts, Kline overlooked the references to the parts of the record relied on to support the Opposition to the Statement of Material Facts.  Therefore, Kline requests leave to file an Opposition of Statement of Material Facts correcting this oversight.  It should be

noted that in Kline's Opposition, Kline extensively referred to Kline's Affidavit, which

contained references to the parts in the record appended to Kline's Opposition to the Motion.

### CONCLUSON

The new issues and facts raised by Springer are either unsubstantiated or without merit.

Therefore, to avoid injustice, Kline respectfully requests that the Court grant Kline leave to file

this surreply and Opposition to Springer's Statement of Material Facts, deny Springer's Motion,

allow Kline to continue discovery and set the case for a hearing on the issues.

Respectfully submitted,

/s/

Valerie Kline
83 E Street
Lothian, MD  20711
(301) 509-2684

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| | | * | |
| Valerie Kline | | * | |
| | Kline | * | |
| v. | | * | Case No. 1:07-cv-451 (JR) |
| | | * | |
| Linda M. Springer, Director | | * | |
| | Defendant | * | |
| | | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### AMENDED OPPOSITION TO STATEMENT OF MATERIAL FACTS IN DISPUTE AND STATEMENT OF GENUINE ISSUES TO BE LITIGATED

Kline requests leave to file this amended Opposition to Statement of Material Facts in Dispute and Statement of Genuine Issues to be Litigated (the "Opposition") in order to reflect references to the parts of the record relied upon in support of this Opposition and to address additional facts raised in the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or for Summary Judgment.

## I.  Disputed Material Issues of Fact

1.  Kline's office space was not conducive to reviewing regulations and hindered Kline's ability to perform her work (DE 37, ¶110, DE 40-3, ¶198, DE 40-7, p. 25); having more suitable work space and/or working conditions would have enhanced Kline's ability to perform her work (DE 40-7, p. 25); Kline had a greater need for the office space occupied by Issac Evans due to the nature of their respective work (DE 37, ¶115, DE 40-3, ¶200).

2.  Assigning Kline primary responsibility for answering the Publishing Management Group (PMG) (formerly known as the Publishing Management Branch) telephones was not part

of the responsibilities covered under Kline's Position Description or Performance

Standards (DE 40-4, p. 19-22); to hold Kline responsible for primarily answering PMG's

telephones hindered her ability to review regulations and perform her work, which

affected her ability to receive promotions and awards (DE 40-3, ¶203).

3. Kline's supervisor, William M. Davis, had a practice of staring at Kline's breasts, which

suggested he was interested in having more than a professional relationship with her (DE

40-3, ¶49, 178); Davis took reprisals against Kline on October 19, 2005, and December

15, 2003, for rebuffing his sexual advances and subjected Kline to a hostile work

environment (DE 40-3, ¶167).

4. Kline's work performance covered under her Performance Standards was equal to or

greater than minority and/or white male employees whose received higher performance

ratings (DE 40-3, ¶¶ 70, 131, 132, DE 40-6, p. 8).

5. After the health of Kline's mother failed, Kline requested telework through her Union

Representative on October 26, 2005, which was denied on October 27, 2005 (DE 40-3,

¶33, DE 40-4, p. 53).

6. Plaintiff disputes Defendant's Statement of Material Facts in Dispute, ¶¶ 1, 2, 4, 5, 6, 7,

8.

## II.    <u>PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

Some of the following material facts may be disputed depending on whether the Court grants

Kline's request for sanctions (DE 39) but submits that if Springer properly responded to the

request for documents and interrogatories, the facts would be undisputed.

**General**

1.      Kline is a member of a protected class (DE 37, p. 1);

2.      PMG employs white females at rates far less than the numbers in the applicant pool and

        the general population (DE 37, p.2);

**Telework**

3.      Jacquline Carter was allowed to telework 2-3 days per week after her husband suffered

        several strokes (DE 39, p.3); Kline's supervisor told her that she would be able to

        telework if she accepted the position with PMG (DE 40-5, p. 23); Davis used telework as

        an incentive to get Kline to accept the position with PMG (DE 40-3, ¶ 9, DE 40-5, p. 23);

        Kline was hired to solely perform regulatory work (DE 40-4, p. 1-5); regulatory work is

        suitable for telework (DE 40-5, p. 23); Kline was reassigned different duties, which

        reassignment was initiated three (3) days after she formally requested telework (DE 40-4,

        pp. 12-22); the reassigned duties were used justify denying Kline's telework (DE 40-5, p.

        23); Kline's reassigned duties had been performed by a lower grade employee, Shirley

        Sewell (DE 39, pp.4, 7, DE 40-4, pp. 55, 58); after her reassignment, Kline performed

        regulatory work at least 50% of the time (DE 40-5, p. 22); telework was denied to Kline

        other than during a 90-day trial period (DE 40-4, p. 53); and no problems were

        encountered during the trial telework period (DE 39, p. 3).

4.      Jacquline Carter, Lara Rivera-Lopez and Jose Velaquez assisted with answering PMG

        telephones and assisting walk-in customers (DE 39, p. 3, DE 40-2, pp. 37-38).

5.      Kline was similarly situated to Carter and Rivera-Lopez (DE 39, p. 3).

6.      Rivera-Lopez was allowed to telework without an executed telework agreement (DE 39, p. 3).

7.      Kline was not allowed to assist walk-in customers other than in a clerical capacity (DE 40-3, p 3).

## Performance Appraisal

8.      The PMG has a practice of awarding its employees monetary bonuses based on their performance rating (DE 39, p. 7, DE 40-4, pp. 75-82, DE 40-2, pp. 21-22, 26-26, 29); PMG has a practice of giving performance bonuses to employees who receive "Exceeds Fully Successful" or "Outstanding" performance ratings (Id.).

9.      Carter received an overall "Outstanding" rating even though she made "mistakes" in performing regulatory work (DE 40-3, ¶131, DE 40, p. 8); Kline did not make mistakes performing regulatory work but only received an overall "Fully Successful" rating (DE 39, p. 4).

10.     Kline would have received a monetary bonus if she had received either an "Exceeds Fully Successful" or "Outstanding" performance rating (DE 39, p. 7, DE 40-2, p. 21-22, 26-27, 29, 37, DE 40-4, pp. 75-82).

11.     Kline did not fail to cover PMG telephones after being tasked with the primary responsibility for them on May 24, 2005 (DE 40-3, ¶ 80, DE 39, p. 4).

12.     Kline did not fail to perform duties related to the FACA database (DE 39, p. 4, DE 40-3, ¶ 82).

13.     Kline never exceeded her authority during October 7, 2002 to January 1, 2007 (DE 39, p. 4, DE 40-3, ¶ 108).

14.     Robert Coco was primarily responsible for the Publications Inbox until Kline was

        assigned primary responsibility on June 20, 2006 (DE 40-3, ¶ 89, DE 40-5, p. 43).

15.     Kline never failed to respond to the Publications Inbox after being tasked with primary

        responsibility for the Publications Inbox (DE 40-3, ¶ 94, DE 39, p. 4).

16.     Kline never failed to update or maintain the Publications database (DE 40-3, ¶¶ 83-84,

        DE 40-5, p. 30, DE 39, p. 4).

17.     Kline never missed deadlines on any of her work projects (DE 39, p. 4, DE 40-3, ¶ 81)

18.     Kline is the <u>only</u> employee in PMG that has a Performance Standard based on the ability

        to have good relationships with other employees (DE 39, p. 4).

19.     Kline reviewed OPM's pending "old and cold" regulations at her own initiative (DE 39,

        p. 4).

20.     Kline suggested a procedure for having the Office of Communications and Public Liaison

        notify PMG of any publications it approves for inclusion into the Publications database

        (DE 40-3, ¶64, 83, DE 40-5, p. 10, DE 39, p. 5).

21.     No complaints were ever made against Kline by any PMG office or Director Springer's

        office (DE 40-3, ¶ 101, DE 39, ¶ 37).

**<u>Defamatory Email</u>**

22.     Email sent to Arlene Taylor and Margaret McElrath inquiring as to why Taylor was

        visiting Kline concerning changes being made to the FRMS implied that Kline did not

        keep her supervisor informed of changes being made to the FRMS and that Kline had

        exceeded her authority in allowing changes to the FRMS (DE 39, ¶ 10, DE 40-3, ¶ 182,

        DE 40-5, p. 24); the email affected Kline's ability to receive awards and promotions

because it undermined Kline's ability to maintain good and effective working

relationships Taylor and McElrath, as required by her performance standards (DE 40-4,

p. 73, DE 40-5, p. 24); the email was defamatory (DE 39, p. 5).

23.    Kline had informed Davis of the changes being made to the FRMS that Davis claimed he

was unaware of in the email to Taylor and McElrath (DE 40-3, ¶183, DE 40-6, p. 75-81).

## Administrative Rights

24.    Regulatory work was and is a material duty in Kline's Position Description and

Performance Standards (DE 40-4, pp. 20, 74); the regulatory work required tracking of

the regulations; Kline sought permission and was authorized by Claudio Benedi to

develop the an electronic web-based tracking system for regulations (DE 40-3, ¶ 190);

Kline initiated the Federal Register Management System (FRMS) for tracking regulations

and directed its development (DE 40-7, p. 2-6); Kline  presently has access to the FRMS

(Id.); Kline acquired administrative rights to the FRMS because she directed the

development of the system (Id.); Benedi was aware that Kline  was going to have the

software that drove the FRMS on her computer and made no objections to Kline having

the software on her computer; Kline was never the official "administrator" of the FRMS

even though she had administrative rights to the system (Id.); Benedi and Davis were the

official "administrators" even though they did not have administrative "rights" to the

system (Id.); "administrative rights" is a term of art for someone who has the software

that drives the FRMS and can work on the program itself as well as give users access to

the system; Kline's administrative responsibilities for FRMS were taken from her and

given to minority and/or white male employees less qualified than Kline in administering the FRMS (DE 40-3, ¶¶ 186, 189).

25.    Coco is less experienced and less qualified in overseeing changes to the FRMS than Kline (DE 40-2, p. 34).

26.    Kline had administrative rights to the FRMS for approximately 2 years before the rights were rescinded (DE 40-3, ¶ 186-188, DE 40-7, pp. 1-6, DE 40-7, p. 1).

**Office Space**

27.    The office space Kline sought to occupy, room 5H36C, was "on loan" to PMG whereby PMG had possession of the office (DE 40-5. pp. 68-69, DE 40-3, ¶¶ 199-200); Kline sought to occupy the space in order to seek a more conducive work environment for reviewing regulations (DE 40-7, pp. 26, 28, DE 40-5, p. 69); Issac Evans had less seniority and less tenure than Kline but was assigned the space instead of Kline (DE 40-7, p. 27, DE 40-5, p. 69); Evans occupied the office for approximately three (3) years (DE 40-3, ¶200-201).

28.    Issac Evans, Shirley Sewell, Miriam Heard-Johnson and Stephen Hickman occupy or occupied superior offices/cubicles than Kline even though they had or have less seniority and less tenure than Kline (DE 40-3, ¶202).

**Staff Support**

29.    Similarly-situated minority employees were not required to furnish staff support to Kline when Kline needed staff support (DE 40-3, ¶206-208); Kline was in need of support staff while working on the Semiannual Unified Agenda of Regulatory Actions (Id.); Annette

Gunter-Frye and Issac Evans could have provided backup telephone support to Kline
while she was working on the Semiannual Unified Agenda of Regulatory Actions (<u>Id</u>.);
Davis refused to impose on Issac Evans or Annette Gunter-Frye to answer telephone
when Kline requested relief from covering the phones while working under a strict
deadline on the agency's Unified Agenda of Regulatory Actions (<u>Id</u>.); Kline was required
to furnish staff support to PMG even though she was working under a strict deadline on
the agency's Unified Agenda of Regulatory Actions (<u>Id</u>.).

30.     Kline was the only PMG employee formally tasked with primarily answering PMG
telephone lines (DE 39, ¶30); Shirley Sewell could have continued performing or
assumed the clerical duties that were assigned to Kline (DE 40-3, ¶¶ 39-46, DE 39, ¶31).

## Counseling Memorandum

31.     The December 15, 2003 "Counseling Memorandum" was placed in Kline 's official
personnel folder and thereby affected Kline's work record and ability to seek promotions
and alternate employment (DE 17, pp. 6-7).

32.     Kline was issued a Counseling Memorandum for forwarding an email to a friend that had
been sent to her by Robert Coco, who sent the email to other PMG staff members,
including Davis and Benedi, without receiving disciplinary action (DE 40-6, pp. 73-74).

## Lunch Hours

33.     Minority and white male employees are allowed to take lunch breaks outside the core
hours but Kline is not afforded the same privilege (DE 40-7, p. 35-36); Kline was denied
the preferential and special treatment for lunch breaks that similarly-situated minority and

white male employees were afforded (DE 40-3, ¶213, DE 40-7, p. 37); Kline was the only employee assigned to go to lunch at a specific time within the core hours (DE 39, ¶ 22).

34.    Shortly after Kline was hired, she was tasked with covering the office while the rest of the PMG employees on the 5th floor went to lunch (DE 40-7, p. 32).

35.    Kline was the only one on the 5th floor assigned a specific time for going to lunch and other PMG employees could go to lunch anytime they wanted (DE 39, ¶22).

**<u>Letter of Reprimand</u>**

36.    The February 1, 2006 Official Reprimand was placed in Kline 's official personal folder and thereby affected Kline's work record and ability to receive awards, promotions and alternate employment (DE 40-7, p. 43).

37.    Kline did not fail to properly report her leave as accused in the Letter of Reprimand (DE 40-7, p. 50-53, DE 39, ¶ 23).

38.    Kline notified Coco of the time she left on September 23, 2005, but Coco did not accurately record her leave into the T&A system (DE 40-3, ¶ 234).

39.    Similarly-situated white male employees were not issued formal reprimands for failing to properly report leave (DE 40-3, ¶235, Coco Deposition, p. 46, Attachment 1).

40.    Minority and white male employees did not have their swipe records monitored during the time that Davis was on leave recovering from surgery (DE 40-7, p. 33); Kline was the only employee whose swipe records were reviewed by Davis during the time that he was on leave recovering from surgery (<u>Id</u>.).

41.    PMG has no instructions on how PMG employees are to properly report their leave (DE 39, ¶ 24).

42.    Kline reported her leave more accurately than white male and/or minority employees whose "swipe" records were not scrutinized during the timeframe of Letter of Reprimand to Kline (DE 39, ¶25).

**<u>Leave Tampering</u>**

43.    Without the knowledge or authorization of Kline, Davis wrongfully amended Kline's sick leave that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5 hours of accrued Sick Leave on pay period ending 11-26-2005 (DE 40-3, ¶239, DE 40-7, pp. 66-71); Davis did not instruct Sewell to amend Kline's leave for pay period ending 11-26-2005 (DE 39, ¶27).

44.    Davis did not properly correct Kline's leave until after she filed an EEO complaint about the leave tampering (DE 40-7, pp. 67-78, DE 43-3, ¶ 2385-255).

45.    Davis denied Kline the use of sick leave on January 10, 2005, and January 21, 2005, even though Kline had earned and accrued sufficient sick leave for these days (DE 43-3, ¶ 248, DE 40-7, pp. 75-76).

46.    Davis erroneously charged Kline with 4 hours of leave on September 15, 2005, and September 16, 2005, that she had not used (DE 40-7, p. 54).

Respectfully submitted,

/s/

Valerie Kline, pro se
(301) 509-2684

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA

VALERIE KLINE,                          :
                    Plaintiff,          :
          v                             :  CASE NO:
                                        :  1:07CV451
LINDA M. SPRINGER, and                  :
US OFFICE OF PERSONNEL MANAGEMENT:
                    Defendants          :

Washington, D.C.

Friday, February 22, 2008

Deposition of:

ROBERT T. COCO

called for oral examination by Plaintiff, pursuant

to Notice, at the Offices of Personnel Management,

1900 E Street, Northwest, Washington, D.C., before

Mary E. Warner of Capital Reporting, sworn by a

Notary Public in and for the District of Columbia,

beginning at 9:50 a.m.

## Capital Reporting Company

Page 46

1      Q    Have you ever received an official

2   reprimand?

3      A    No.

4      Q    Do you remember when Mr. Davis was on

5   sick leave recovering from surgery around the time

6   of August 2005?

7      A    Yeah, I remember when he was sick.  I

8   forgot the exact dates.

9      Q    Were you acting in his absence?

10      A    Yes, sometimes.

11      Q    Did you perform any timekeeping duties in

12   his absence?

13      A    I think Claudio maintained most of the

14   timekeeping during his absence, if I remember

15   correctly.

16      Q    Ms. Sewell testified that there was an

17   approving official that signed off on time and

18   attendance in the database.  Are you able to do

19   that in their absence?

20      A    No.

21      Q    So Mr. Benedi does that?

22      A    Yeah.