## U.S. DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Valerie Kline | * |
| | * |
| | Kline |
| v. | * |
| | * |
| Linda M. Springer, Director | * |
| | Defendant * |
| | * |

Case No. 1:07-cv-451 (JR)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY
### TO DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Plaintiff Valerie Kline requests leave to file this surreply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or for Summary Judgment (the "Reply"). Plaintiff respectfully submits that this surreply is necessary because Springer has raised new legal issues that were not raised in the Defendant's Motion to Dismiss or for Summary Judgment (the "Motion"). See *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of America*, 238 F.Supp.2d 270, 276-77 (D.D.C. 2002). A surreply is also necessary because Springer introduced new factual matter in support of its Motion. See *Alexander v. FBI*, 186 F.R.D. 71, 74 (D.D.C. 1998).

### DISCUSSION

I. **The Motion does not dispute that Kline was similarly situated to employees she was discriminated against.**

In Defendant's Motion, Springer did not dispute that the discriminatory events give rise to an inference of discrimination or that Kline was not similarly situated to the employees she

was compared with. Therefore, Kline reserved the right to respond in the event Springer raised this issue in its Reply. See fn 3, p. 5, Memorandum Of Points And Authorities In Opposition To Defendant Springer's Motion To Dismiss (the "Opposition").

In the Motion, Springer provides the standard for establishing a prima facie case of Reverse Discrimination, which requires showing an inference of discrimination, such as by showing that she was treated differently than similarly situated employees. However, Springer did not claim in the Motion that Kline failed to show that she was not similarly situated to the employees she was compared with. (See Docket Entry (DE) 22-2, pp. 13-14.) Springer only claimed that the discriminatory acts do not amount to adverse actions. Id. at 3. "None of the plaintiff's claims rise to the level of an adverse personnel action, and this plaintiff cannot make a prima facie case of reverse discrimination based on them. [Emphasis added.] Id. at 20.

Springer acknowledges, "[w]hile the plaintiff need not plead the elements of a prima facie case in the pleadings, the plaintiff carries the burden of alleging a set of facts upon which relief can be granted. Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)." Since Kline alleged in the Third Amended Complaint that she was similarly situated the employees she was comparing to (DE 37, ¶¶39, 40, 56, 62, ¶72, ¶78, ¶124), and Springer did not dispute that fact until the Reply, this surreply is appropriate.

Now that Springer has raised this new issue in the Reply, Kline can show that the relevant aspects of her employment situation are or were nearly identical to the employees she was comparing, such as Jacquline Carter, Robert Coco, Lara Rivera-Lopez, and Issac Evans, because she was either performing the same relevant duties, was the same grade or in other ways nearly identical to these employees. See Waterhouse v. District of Columbia, 124 F. Supp. 2d 1 (D.D.C. 2000) ("A plaintiff must demonstrate that all of the relevant aspects of her employment

situation were nearly identical to those of the employee being compared.")  Note that this standard does not say that the plaintiff must be identical but "nearly" identical to those of the employee being compared.

      a.   <u>Telework</u>

With respect to telework, Kline claims that she was similarly situated to Jacquline Carter. This can be shown by the fact that Stephen Hickman, the employee who assumed Carter's duties following Carter's retirement, has the same Position Description (DE 41-6) as Kline had when she began working for PMG (DE 40-4, pp. 1-5).  Hickman, GS-12, performs the same regulatory duties that Kline, GS-12, performed and the same duties that Carter, GS-13, performed.  In addition, Carter performed the regulatory duties as a GS-12 and was promoted to a GS-13 even though she performed "the same basic functions" (DE 40-4, pp. 10-11).  In Kline's new Position Description (DE 40-4, pp. 19-22), Kline <u>retained</u> the regulatory duties (Id. at 20) and continued to perform all of the same regulatory duties that she performed while working under her old Position Description.  Therefore, Kline submits that she can establish that she was similarly situated to Carter.

Lara Rivera-Lopez, a Hispanic employee, was a GS-12 management analyst who <u>performed the same work that Kline performed</u>, such as graphic design, answering PMG telephone lines and assisting with walk-in customers, etc.  Kline claimed that Rivera-Lopez was allowed to telework while working for PMG while Kline was not. (DE 37, ¶¶ 60-62)  Kline requested a copy of the Position Description for Rivera-Lopez reflecting the duties she performed while detailed to PMG but <u>Springer failed to produce the document</u>.  Kline also requested an address for Rivera-Lopez in order to depose her but <u>Springer refused to provide the</u>

information.  Because Springer failed to respond to the discovery requests, Kline requests that the Court find that Kline is similarly situated to Rivera-Lopez.

      b.   Performance Appraisal, Offensive Email, Rescission of Administrative Rights.

In these subject claims, Kline compared herself to Carter and Coco.  Kline established that she is similarly situated to Carter in paragraph a, *supra*.

Kline submits that she performs the same relevant duties that Coco performed as reflected in their respective position descriptions, which are virtually identical except Kline has the added duty of performing regulatory work.  Coco's Position Description (DE 41-4, pp. 3-7) states that he "manages and maintains" various projects and Kline's position description (DE 40-4, pp. 19-22) states that she "assists in managing and maintaining" those same projects.  Coco's position description does not state that he manages Kline.  Rather, Kline performs the same work on the same projects as Coco because she is a back up to Coco by managing the projects when Coco is out of the office or not available.  In some cases, Kline has assumed full responsibility for performing duties that Coco had performed, such as the responding to the Publications Inbox whereby Coco now backs up Kline on this duty.  (DE 40-3, ¶94)  Kline also assumed primary responsibility for answering the PMG telephone lines that Coco used to primarily answer.  (DE 40-3, ¶ 75, 79) Therefore, Kline submits that she and Coco are similarly situated.

      c.   Office Space, Staff Support, Lunch Breaks, Formal Reprimand

Kline compared herself with Carter, Coco and Issac Evans on the subject claims.  That Kline is similarly situated to Carter and Coco is shown in paragraphs a and b, *supra*.

Kline claims that she was similarly situated to Issac Evans because they were both GS-12's at the time the discriminatory event occurred and that Kline performed graphics work similar to Evans.  Kline requested a copy of Evan's Position Description during the time when he was a GS-12 but Springer failed to produce it.  Kline did not request a sanction for failing to provide the document because at the time, whether Evans and Kline were similarly situated was not at issue.  However, Kline did produce evidence of numerous graphics projects she worked on to establish that she was similarly situated to Evans.  DE 40-3, ¶ 69 and DE 40-5, pp. 11-16.

Because Evans and Kline were similarly situated, Kline established a prima facie case by claiming that: (1) Evans was given superior office space over Kline who had seniority; Evan was not required to provide staff support to Kline when needed but Kline was required to provide Evans with staff support; Evans was not assigned to go to lunch at a specific time like Kline; and Evans did not have his swipe records scrutinized whereas Kline did, etc.

Kline also alleged discrimination because lower grade minority employees had superior office space to Kline, such as Shirley Sewell, GS-9/11.  DE 40-3, ¶ 202.  In this respect, Kline was not similarly situated to Sewell because Sewell was lower in grade but the discrimination is based on the fact that Kline had a greater need for the space than Sewell but Sewell was given better space over Kline.  Therefore, the discrimination is based on the plain meaning of the term, e.g., to make a difference in treatment or favor on a basis other than individual merit [or need].  See *Merriam-Webster's Online Dictionary*, 2002.  In this respect, not only was Kline treated less fairly or less favorably than similarly situated minority and white male employees, but also treated less fairly or less favorably than lower-grade minority employees.

In conclusion, Kline has established that all of the relevant aspects of her employment situation were nearly identical to those of the employees she was comparing to.  Nevertheless,

Kline requests that the Court find that Evans and Kline are similarly situated since Springer failed to produce Evan's GS-12 Position Description.

## II.    The Reply Adds New Facts or Claims with Respect to the Proffered Reasons for the Legitimate Non Discriminatory or Retaliatory for the Adverse Actions.

After Springer proffered in the Motion the nondiscriminatory reasons for the adverse actions, Kline had the burden of showing that the proffered reasons are pretextual, which Kline did in the Opposition.  DE 40, p. 26-44.  Now Springer provides additional reasons for the discriminatory acts in the Reply.  Therefore, a surreply is necessary to show that the additional proffered reasons are pretextual since the burden shifts back to the plaintiff.  Additionally, Springer disputes claims contain in the Third Amended Complaint there were previously undisputed.

### a.  Telework

The Motion did not deny that telework was a "benefit" but the Reply claims that telework is not an "entitlement or a benefit that flows automatically from the job".  DE 45, p. 9.  Kline submits that telework is a "benefit" of employment because telework was promised to Kline when she interviewed for her position.  Kline was told that if she accepted the position with PMG, she would be able to telework.  Because Kline relied on that promise in accepting the position over accepting a position with Dept. of Interior at a higher grade, it constituted a promised "benefit" of employment.  DE 37, ¶ 24.  Kline Accordingly, Kline suffered "objectively tangible harm" constituting an adverse action because the "benefit" of teleworking was a major consideration in deciding to accept the position with PMG.  At a minimum, telework

should be considered a "privilege" of employment.  See 42 U.S.C. § 2000e-2(a)(1) and *Turcios*

*v. United States Servs. Indus.*, 680 A.2d 1023 (D.C. Cir. 1996)

        Next, Springer proffers a statement from Ronald Flom giving the reasons for denying

Kline from teleworking beyond the trial period.  DE 45, p.9.   Since Kline did not report to Flom

and Flom did not oversee Kline's work while she was teleworking, Flom's statement is based on

hearsay from Kline's supervisors, William Davis and Claudio Benedi.  Kline requested

documents and interrogatories asking for specific details of what problems were encountered

while teleworking because neither Kline nor the Union were made aware of any problems.

Springer produced no evidence and gave no examples of dates and times of alleged incidents,

e.g., times when there was no one in the office to answer the telephones, assist walk in

customers, or what coordination problems were encountered, etc.

        In addition, Kline rarely had day-to-day work "assignments" in the non-regulatory area.

Kline submits that most of her day-to-day work assignments were regulatory ones.   It is

undisputed that these regulatory assignments are suitable for teleworking.  DE 40-5, pp 23.

Occasionally Davis would give Kline an assignment, such as researching all government printing

laws/regulations and instructed her to do it over the internet, which could have been performed

while teleworking (even though Kline submits this assignment was unreasonable).  Other day-to-

day projects Kline worked on was responding to the Publications Inbox, which could have been

done while teleworking since it was internet based; updating the Publication Database, which

could have been done while teleworking since it was internet based; and updating the online

Directory of Key Officials, which could have been done while teleworking since it was internet

based.

The only duty that possibly could not be performed while teleworking is assisting walk-in customers.  Kline submits that there were others in the office to assist with walk-in customers, such as Jose Velaquez, Issac Evans, Robert Coco and/or Jacquline Carter on days that Kline would have been teleworking.  Carter testified that she assisted with the non regulatory walk-in customers and non regulatory telephone callers.  Carter also testified that she had regulatory walk-in customers.  (DE 40-2, p. 38)  Therefore, Kline submits that a jury could find that the claim that Kline's position was not suitable for telework because she was needed to assist with walk-in customers is pretextual because there were others in the office to assist with walk-in customers and because Carter had walk-in customers in the regulatory work, which is undisputedly suitable for telework.

Springer also claims that Mary Moore and Doritha (sic) Elmore were not allowed to telework but Springer produced no evidence showing where they had formally requested telework and the reason it was denied.  Furthermore, Moore and Elmore were not similarly situated to Kline or Carter so whether they were allowed to telework or not is irrelevant.

Therefore, Kline submits that a jury could find that the additional proffered reason for not allowing Kline to telework was pretextual.

b.  <u>Performance Appraisal</u>

Contrary to Springer's claim, Kline averred that her 2005 Performance Appraisal was an adverse action.  DE 40, pp. 13-14.  It constitutes an adverse action because being issued a "fully successful" appraisal instead of a higher, earned rating deprived her of a monetary bonus.  Springer now points to statements in the depositions of Sewell and Coco concerning performance awards but fails to show the Court the following statement made by Carter:

```
10      Q    Did you ever receive a performance bonus?
11      A    Yes.
12      Q    Was it based on your performance rating?
13      A    Yes.
```

DE 40-2, p. 29.  Kline requested copies of the awards accompanying the bonuses received by Carter, Coco and Sewell that should show if the bonus was based on their performance rating but <u>Springer refused to provide the documents</u>.  Therefore, Kline requested sanction no. 42 (DE 39, p. 7) in its request for sanctions finding that PMG awarded a monetary performance bonus to employees who received an "Exceeds Fully Successful" performance rating or above.  Kline also presented evidence of the bonus she received in 2003 based on her "exceed fully successful" performance rating (DE 40-4, p. 75) and evidence that PMG budgets money for bonuses (DE 40-4, pp. 76-82).  Therefore, Kline's evidence that PMG has a practice of giving performance awards outweighs Springer's proffered testimony.

The newly proffered reason for showing that Kline did not perform at a level higher that "Fully Successful" is Carter's testimony that Kline erroneously sent a package to the Federal Significantly, Carter's testimony is unreliable and contradictory.  On p. 32, line 5, she testified that "Bob Coco would be the one to approve it."  Then on p. 32, lines 13-15, she claims that Kline approved the package for going to the *Federal Register*.  Then on p. 33, lines 10-11, she states that she doesn't remember who approved it. DE 45-2, p. 6 and Attachment, p. 4.  The evidence will show that the packages she was referring to were packages erroneously sent to the *Federal Register* in 2006, which was outside the relevant rating period.  The evidence will also show that these packages were sent to the *Federal Register* by Coco, not Kline, because her regulatory duties of sending packages to the *Federal Register* had been removed from her and given to Coco.  This issue is the subject of a proceeding pending before the Equal Employment Opportunity Commission.  <u>See</u> Attachment 2.

Springer states Kline misses deadlines but there is <u>no evidence</u> whatsoever that Kline missed any deadlines other than Davis' unsubstantiated claim.  As Springer points out p. 12 of the Reply,  Coco states that he could not think of any times that Kline failed to assist him. DE 45, p. 12.  Yet Springer tries to claim on p. 13 of the Reply that Kline "failed to assist Mr. Coco". DE 45, p. 13.   <u>There is no evidence of any dates, times or incidents</u> where Kline failed to answer telephones after she was tasked with the responsibility, or failed to assist walk-in customers, or failed to support PMG in routine tasks, or failed to maintain good relationships or failed to properly perform regulatory work.  Simply, there is no evidence whatsoever to support these unsubstantiated, bald-faced allegations.  However, Kline has provided extensive hard evidence that she met the criteria for receiving an "Outstanding" performance rating.  DE  39, ¶¶52-137, DE 40-5, pp. 1-80, DE 40-6, pp. 1-8.

Therefore, Kline submits that a jury could find that the proffered reasons for not giving Kline a higher rating and for making derogatory comments were pretextual.

c.   <u>Offensive E-Mail</u>

Springer newly claims the email Davis sent to Taylor and her supervisor, Margaret McElrath, is not offensive whereas before she only claimed that it "does not raise racially or sexually offensive material".  Kline believes the email was offensive because it defames Kline by way of innuendo and inference since it implies that Kline did not keep Davis informed of changes to the FRMS whereas <u>the evidence shows that he was informed on at least six (6) occasions</u>.  In addition, informing Taylor that "no changes, other than technical should be made without explicit authorization from Claudio or me" implies that Kline authorized changes that

should not have been authorized, in other words, an allegation that Kline exceeded her authority, which could damaging to Kline's working relationships with Taylor and McElrath

Taylor indicated to Kline that McElrath was going to respond to Davis' email. Kline requested a copy of the additional email but Springer refused to provide it. Therefore, Kline requested sanction no. 20 finding that Davis generated defamatory email to McElrath and Taylor. DE 39, p. 20.

Therefore, Kline submits that a jury could find that the proffered reason for sending the email was pretextual.

d. Denial of Office Space

Springer newly claims that Kline was hired to replace Pete Jones. This statement is patently false as the evidence shows that Kline was hired to perform regulatory work. DE 40-4, p. 1-5. Kline submits that Pete Jones did not perform regulatory work.

Springer also claims that the office space "across the hall" from the main office was given to the "senior graphics person" but at the time the space given to Issac Evans, the evidence shows that he had less seniority than Kline. DE 40-3, ¶200. The evidence shows that Evans was given the superior office space when he was hired as a GS-12 in October 2004 (DE 40-7, p. 27) and then promoted to a GS-13 in October 2005. DE 41-5, p. 1-6. Springer also newly states that Evans was there "for a short period of time" but does not dispute that Evans occupied the space for three (3) years from the time he began working for PMG in approximately 2004 until the time he left in approximately 2007. Benedi testified that Kline would have been third in line for the space after Coco and Carter. DE 40-5, p. 69. While other employees, such as Coco and/or Carter would have been entitled to the space over Kline, Kline was entitled to the space over

Evans, who would have been fourth in line.  But instead of furnishing the space to Kline, it was

furnished to Evans, a minority employee with less seniority than Kline and who was similarly

situated to Kline as shown in paragraph I. c, *supra*.

Springer now proffers that Carter stated that her office was the busiest area of PMG but

Carter later clarifies her statement that the whole office (PMG) was the busiest area and that her

area was only busy because she was located at the front door, which is away from the main open

work area of PMG.

```
17        Q   So it wasn't necessarily the busiest
18   other than because you were by the front door?
19        A   I would say the whole office was the
20   busiest.  I would say by me being at the front
21   door, that's where the busiest part started.
```

DE 41-5, p. 9.  Kline submits that Kline's office was in the busiest area because Kline's

cubicle is by the office copiers, printers, fax machines and work tables, which Carter's office was

not.

Nevertheless, Springer does not dispute that Kline's work of reviewing regulations

required her to have a quiet environment free from distractions.  Therefore, Kline submits that a

jury could find that the proffered reason for not giving Kline the office given to Evans was

pretextual.

e.   Rescission of Administrative Rights

Springer now claims that Taylor developed the FRMS and that Davis and Benedi merely

assigned Carter and Kline to assist with the entry of data and the identification of the required

fields to the FRMS.  DE 45, p. 15.  In her affidavit, Kline produced correspondence sent to

Benedi dated September 24, 2005, that shows Kline was responsible for initiating and directing

the development of the FRMS.  DE 40-7, pp. 2-6.  However, in the request for production of

documents, Springer produced no documentary evidence showing where Kline was "assigned to

assist with the entry of data and the identification of the required fields".  One would think that if

Kline had been assigned the project, there would be some sort of evidence reflecting this.  Yet

there are no emails or notes providing instruction on the assignment or asking for updates on the

project, etc.  The only evidence is Kline's September 24, 2005 memo to Benedi.  Kline also

requested that Springer provide an address for deposing Taylor and McElrath but Springer

refused to produce it.  Therefore, Kline requested sanction no. 21, finding that Kline was

responsible for initiating and directing the development of the FRMS.

Since the only documented evidence shows that Kline initiated and directed the

development of the FRMS, it is unreasonable for Springer to now proffer the reason that Kline

should not have had administrative rights to the system was because "she could make major

changes and alterations to the system that could be negative."  DE 45, p. 15.  In Kline's

Opposition, Kline explained that Benedi and Davis were designated as the "Point of Contact" for

the FRMS, which means that anyone inquiring about the system would need to contact them

about it.  Kline submits that Davis and Benedi did not use the system and did not have the

software on their computers that would give them "full administrative rights" to the system as

Springer claims in the Reply.

In addition, it does not compute that there was a risk that Kline would make major

negative changes to the FRMS since she was intimately familiar with it whereas they were not.

Kline submits that there was more of a risk that they would make major negative changes to the

system since they were unfamiliar with it.  Kline attempted to obtain the address of Taylor for

purposes of deposing her about the FRMS but Springer refused to provide it.  Therefore, this reason is pretextual.

Springer also claims that rescinding Kline's administrative rights had no impact on her ability to perform her job.  To the contrary, it eliminated a material responsibility would affect her ability to perform her job because if she does not perform in accordance with the duties contained in her Position Description, she could be demoted or removed from her position.

Springer does not dispute that Kline's Position Description charges her with responsibility for "develop[ing] state-of-the-art publishing systems".  DE 40-4, pp. 19-22.  Yet Springer tries to make the argument that rescinding her rights was not a material change to Kline's position.  But if Kline had been exercising administrative rights for approximately two (2) years, and Benedi was aware of those rights per the September 24, 2005 memo (DE 40-7, pp. 2-6) and the administrative rights were covered under her Position Description, it stands to reason that removing those rights was a significant change to Kline's material duties.

Hence, Kline submits that a jury could find that the proffered reason for rescinding Kline's administrative rights is pretextual.

f.  Lunch Required During Core Hours

Springer adds the new allegation that Kline was issued a letter of reprimand cautioning her about the "continuing abuse of the [lunch hour] policy" as a result of the incident occurring on January 31, 2006.  DE 45, p. 16.  Springer is confused because the reprimand was not based on the January 31, 2006 incident, but based on the review of scan records between July 29, 2005, to November 1, 2005.  Kline was issued a reprimand partly because she had taken a late lunch on September 22, 2005, that Coco authorized when he was acting for Davis while Davis was

recovering from surgery.  DE 40-7, pp. 43-44; DE 40, p. 41.  The reprimand, which is addressed *infra*, states nothing about a "continuing abuse of policy".  DE 40-7, pp. 43-44.  Furthermore, Kline adequately explained how she had not abused her leave but Davis refused to retract the reprimand.  DE 40-7, pp. 50-51.

At any rate, Springer claims that no one is allowed to take a lunch hour outside the core hours but the evidence shows that similarly situated employees are <u>privileged</u> to take lunch hours outside the core hours without using leave, i.e., Coco and Carter.  DE 40-7, p. 35-36.  Kline established in paragraphs I. a and b, *supra,* that she is similarly situated to Carter and Coco. Therefore, Kline submits that a jury could find that this proffered reason for denying Kline the <u>privilege</u> of taking lunch outside the core hours is pretextual.

g.  <u>Swipe/Reprimand</u>

Springer adds the proffered reason that Kline's "swipe" records were scrutinized from July 29, 2005, to November 1, 2005, when Davis was on leave recovering from surgery to determine whether she was abusing her leave and that management has a right to investigate suspected abuses of leave.  Kline submits that there was no valid reason for investigating Kline's leave during the time Davis was absent because he suspected her of abusing her leave on a day when he was present.  If he had observed Kline abusing leave, it stands to reason that he would have checked the "swipe" records for the particular day he allegedly observed her abusing her leave.  But instead, he obtained the "swipe" records for a different time, which shows that Davis was on a fishing expedition to try to find ways to harass Kline in retaliation for exercising her rights.  It was also discriminatory because it is undisputed that none of the other minority or white male employees leave records were scrutinized during the time Davis was on leave.

DE 40-7, p. 33. Thus, Kline submits that a jury could find that the proffered reason for scrutinizing the "swipe" records and issuing the reprimand was pretextual.

Springer erroneously adds that Kline can point to no adverse action with respect to the swipes/reprimand but Kline submits that issuing a formal reprimand *is* an adverse employment action because the evidence shows that the reprimand was <u>placed in Kline's official personnel file, which can hinder her ability to obtain future jobs and promotions</u>. DE 40-3, ¶237. A formal reprimand qualifies as an adverse action under *Burlington Northern & Santa Fe Ry. v. White,* 126 S. Ct. 2405 (2006):

> "In response to his allegation that the Letter of Reprimand violated Dr. Walker's rights under Title VII, the EPA argues that the Letter of Reprimand did not constitute "actionable adverse actions under Title VII." Def.'s Mem. at 7. This, however, is no longer the standard for retaliation claims. Under *Burlington Northern*, the Court finds that a formal letter of reprimand could be sufficient to dissuade an objectively reasonable employee from participating in EEO activities. Because it was to remain in Dr. Walker's official personnel file for two years, adding a level of severity to any future discipline that might occur in that time frame, it cannot be said that such a reprimand would be immaterial. *Walker v. Johnson*, 501 F. Supp. 2d 156 (D.C.D.C 2007) [fn omitted.]

The Official Reprimand issued to Kline states that it will remain in her office personnel file for two (2) years. DE 40-7, p. 43. Thus, it constitutes an adverse action as claimed.

h. <u>Leave Tampering</u>

Springer proffers a new reason for explaining the leave tampering,

> "Because Ms. Kline came in late one day but left at her regular time, Mr. Davis reviewed her relevant scan records to determine whether plaintiff was abusing her leave. Consequently, on February 1, 2008, Mr. Davis issued Ms. Kline a Letter of Reprimand regarding her time and attendance. Ms. Kline requested to see the information that Mr. Davis relied upon, and on February 8, 2008, Employee Relations provided a detailed memorandum of the supporting information, including copies of the relevant "swipe" records. Ms. Kline provided specific information to Mr. Davis, and in response, Mr.

Davis requested that her leave records be amended based on this information that Ms. Kline provided. [Citations omitted.] DE 45, p. 17.

Davis reviewed Kline's swipe/scan records around December 8, 2005, for the period from July 29, 2005 to November 1, 2005, and issued the reprimand on February 1, 2006. The leave tampering occurred around November 25, 2005, prior to the review of the scan records on December 8, 2005, and prior to the issuance of the reprimand on February 1, 2006. Thus, to claim Davis amended Kline's leave based on the information obtained from her in response to the reprimand is false.

Springer also adds that the error in Kline's leave was due to a "ministerial error" that occurred in early January 2006, which was after the leave tampering in November 2005. This is an admission that the alleged ministerial error occurred approximately two (2) months after tampering with Kline's leave. But even if correction of the errors to Kline's leave was an oversight, Kline informed Davis of the errors early as January 9, 2006, (DE 40-7, p. 75) but he then denied her leave on January 10 and 21, 2006 (DE 43-3, ¶248, DE 40-7, p. 75) and failed to correct her leave until after she filed an EEO action against him on March 21, 2006. DE 40-7, 71. Therefore, Kline submits that a jury could find that the proffered reasons for tampering with Kline's leave are pretextual.

i.   Denial of Telephone Staff Support

Springer adds the argument that Kline filed a stale claim based on being assigned responsibility for covering PMG telephones on May 24, 2005. No where does the Third Amended Complaint contain a claim based on being assigned responsibility for covering PMG telephones other than a reference to the telephone duties as one of the significantly diminished

duties assigned to her as part of her retaliatory harassment claim.  Kline's claim under

Count XIV concerning the denial of staff support is that she was <u>denied staff support on</u>

<u>February 2, 2006</u>, when she urgently needed staff support because she was working on the

agency's Unified Agenda under a short deadline.  DE 37, p. 35.  Yet Springer claims that this

claim is a "stale" claim because it is based on an incident made in 2003.   The reference to being

required to cover the telephones on February 2, 2006, was to show that Davis would not give her

staff support when she asked him <u>to provide her with relief from the telephones</u> (DE 40-3, ¶¶

203-209), not that he had assigned her responsibility for the telephones.  Accordingly, Springer's

view that this claim is untimely is without merit.

Moreover, Springer proffers no legitimate reasons for denying Kline staff support and

Kline submits that a jury could find that denying Kline staff support was discriminatory based on

race and sex, and in retaliation for exercising her rights.

> j.    <u>Hostile Work Environment/Sexual Harassment Claims</u>

Springer adds that Kline resolved the issue of Davis' overbearing surveillance of her

through the negotiated grievance process and that the alleged conduct is not sufficiently abusive

to be actionable under Title VII.  While Kline stated that the Union resolved <u>some</u> of the issues,

i.e. having an hour for lunch, using flex time and accruing credit hours, like other employees

were allowed to do, Kline states numerous other acts constituting an overbearing surveillance

<u>that were not resolved through the Union's negotiated grievance process</u>, such as removing her

from committees, eliminating her graphics work, assigning her menial, clerical tasks and

secretarial duties, like tending to faxes, typing spreadsheets, delivering forms to the print shop,

picking up deliveries, scanning business cards, and using her as an assistant while he directed

projects rather than having Kline direct the projects and assigning her unreasonable projects.  DE 40, p. 24-25; DE 40-3, ¶¶138-146.

Oddly, Springer states, "[a]s noted above, the assignment of new duties in May 2003 is not a claim in this case" (DE 45, p. 19) but in the referenced preceding paragraph, she states,

> "[t]herefore, she cannot raise a timely claim before this Court that she suffered diminished responsibilities <u>as she has attempted to do.</u>  <u>Id</u>.  In addition, plaintiff also attempts to raise a stale, 2003 even when she asked and did not receive staff support, as a claim in this case.  Plaintiff's Opposition, R. 40, p. 21.  <u>As these claims are untimely</u> they should be dismissed with prejudice."  DE 45, p. 17-18.  [Emphasis added.]

Which is it?  Does or does not Springer believe that Kline based a claim on the assignment of new duties?  Springer is apparently confused because Kline did not base a claim on the diminution of duties but has shown that she was subjected to retaliatory harassment and a hostile work environment because, *inter alia*, Kline's material duties were gradually stripped from her and replaced with menial duties that were insulting to Kline's capabilities and level of intelligence and education.  DE 37, pp. 43-44.

Kline submits that these acts are actionable as a retaliatory harassment claim because they are sufficiently severe, i.e. adverse, and pervasive to the extent that they would "'detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.'  *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21" (as quoted by Springer).  Surely a jury could find that the diminished duties not encompassed under Kline's Position Description would keep Kline from advancing in her career.

These are not independent actions suitable for action under Title VII but comprise numerous acts that demonstrate a hostile work environment because the workplace is "permeated with discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). Kline's work environment was abusive due to Davis' overbearing surveillance of her, the diminution of material responsibilities, and affected her ability to perform her job or advance in her career as alleged by Kline (DE 37, ¶¶ 97, 127, 133, 139,140, 171; DE 40-3, ¶¶ 169, 203, 208, 227, 256; DE 40, p. 7) contrary to Springer's claim.

Springer claimed that "[Kline] makes no claims that the alleged hostile work environment affected her ability to do her job." To the contrary, Kline stated that the hostile work environment caused her to work under adverse conditions, was disturbing to her work environment, and induced fear, insecurity and inferiority due to threats to suspend her and threats to her security, etc. DE 37, ¶¶ 97, 127, 139, 140, 171; DE 40-3, ¶¶ 169, 203, 208, 227, 256; DE 40, p. 7. It is reasonable to conclude that these conditions affected Kline's ability to do her job and also affected her health and well being as alleged in the Third Amended Complaint. In addition, Kline stated that her duties were eliminated to the extent that she frequently had no work to perform, which surely would affect Kline's ability to perform work and threaten her ability to advance in her career.

III.    Statement of Material Facts.

Springer claims that Kline has failed to address defendant's statement of material facts not in dispute in the manner required by Local Rule LCvR 7(h). While Kline did controvert Springer's Statement of Material Facts, Kline overlooked the references to the parts of the record relied on to support the Opposition to the Statement of Material Facts. Therefore, Kline requests leave to file an Opposition of Statement of Material Facts correcting this oversight. It should be

noted that in Kline's Opposition, Kline extensively referred to Kline's Affidavit, which contained references to the parts in the record appended to Kline's Opposition to the Motion.

## CONCLUSON

The new issues and facts raised by Springer are either unsubstantiated or without merit. Therefore, to avoid injustice, Kline respectfully requests that the Court grant Kline leave to file this surreply and Opposition to Springer's Statement of Material Facts, deny Springer's Motion, allow Kline to continue discovery and set the case for a hearing on the issues.

Respectfully submitted,

/s/

Valerie Kline
83 E Street
Lothian, MD  20711
(301) 509-2684

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA

VALERIE KLINE,                    :
                    Plaintiff,   :
            v                     : CASE NO:
                                  : 1:07CV451
LINDA M. SPRINGER, and            :
US OFFICE OF PERSONNEL MANAGEMENT :
                    Defendants    :

Washington, D.C.

Friday, February 22, 2008

Deposition of:

ROBERT T. COCO

called for oral examination by Plaintiff, pursuant

to Notice, at the Offices of Personnel Management,

1900 E Street, Northwest, Washington, D.C., before

Mary E. Warner of Capital Reporting, sworn by a

Notary Public in and for the District of Columbia,

beginning at 9:50 a.m.

## Capital Reporting Company

Page 46

1    Q    Have you ever received an official

2    reprimand?

3    A    No.

4    Q    Do you remember when Mr. Davis was on

5    sick leave recovering from surgery around the time

6    of August 2005?

7    A    Yeah, I remember when he was sick.    I

8    forgot the exact dates.

9    Q    Were you acting in his absence?

10    A    Yes, sometimes.

11    Q    Did you perform any timekeeping duties in

12    his absence?

13    A    I think Claudio maintained most of the

14    timekeeping during his absence, if I remember

15    correctly.

16    Q    Ms. Sewell testified that there was an

17    approving official that signed off on time and

18    attendance in the database.    Are you able to do

19    that in their absence?

20    A    No.

21    Q    So Mr. Benedi does that?

22    A    Yeah.

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE THE DISTRICT OF COLUMBIA

----------------------------------x

VALERIE KLINE,                          :

              Plaintiff,        :

            v                    : CASE NO:

                        : 1:07CV451

LINDA M. SPRINGER, and                  :

US OFFICE OF PERSONNEL MANAGEMENT, :

             Defendants.        :

----------------------------------x

Washington, D.C.

Tuesday, February 20, 2008

Deposition of:

JACQULINE CARTER

called for oral examination by Plaintiff, pursuant
to Notice, at the Offices of Personnel Management,
1900 E Street, Northwest, Washington, D.C., before
Mary E. Warner of Capital Reporting, sworn by a
Notary Public in and for the District of Columbia,
beginning at 1:00 p.m.

**Capital Reporting Company**

Page 34

1    remember.

2        Q    So because of the -- let me see if I

3    understand this correctly, because some packages

4    were sent erroneously, this new procedure was

5    implemented?

6        A    After the second time, one was

7    implemented again, yes.

8        Q    Did Kline ever submit regulatory items to

9    OMB?

10        A    After I reviewed them, yes.

11        Q    Did Kline ever erroneously submit

12    regulatory items to OMB?

13        A    Not that I recall.

14        Q    Did you ever tell Kline to send a

15    regulation to OMB even though it had been cleared

16    by OMB?

17        A    Not that I recall.

18        MS. KLINE:    I believe you have a copy of

19    this document.

20    BY MS. KLINE:

21        Q    I want to show you this.

22        MS. WHITAKER:    Can I see it first?

OFFICE OF PERSONNEL MANAGEMENT
EQUAL EMPLOYMENT OPPORTUNITY CASE
IN THE MATTER OF

Valerie Kline,                                    )
                                                  )
    Complainant,                          )
                                                  )
                                                  )       OPM EEO CASE No. 2006034
    v.                                    )       Filed On: August 9, 2006
                                                  )
                                                  )
                                                  )
U. S. OFFICE OF PERSONNEL                         )
MANAGEMENT,                                       )
                                                  )
        Agency.                    )


# REPORT OF INVESTIGATION


Investigation Conducted by:


_Melba D. Vaughn_

**Melba D. Vaughn, Investigator**
**U. S. Office of Personnel Management**
**Center for Equal Employment Opportunity**


## OFFICIAL USE ONLY - THE INFORMATION IN THIS REPORT SHALL BE TREATED AS – PERSONAL AND CONFIDENTIAL

Access to, and usage of, this EEO complaint file is RESTRICTED by both the Freedom of Information Act and the Privacy Act to: (1) the Complainant (and his or her representative), and (2) government officials who must have access to the files to discharge their OFFICIAL duties. The file and its contents must be safeguarded. Willful violations of these requirements are subject to criminal penalties (5.U.S.C. 552(i)).

**UNITED STATES**
**OFFICE OF PERSONNEL MANAGEMENT**
**CENTER FOR EQUAL EMPLOYMENT OPPORTUNITY**

---

**REPORT OF INVESTIGATION**
**EEO COMPLAINT NUMBER 2006034**

---

**I.    COMPLAINT IDENTIFICATION:**

**DATE FILED:**                           **August 9, 2006**

**COMPLAINANT/ JOB TITLE:**       Kline, Valerie, GS-0343-12
                                                    Management Analyst
                                                    P.O. Box 321
                                                    Lothian, MD  20711

**REPRESENTATIVE INFORMATION:**    Not Represented

**Date(s) of Alleged Discrimination:**    June 20, 2006

---

**II.    ACCEPTED ISSUE(S) OF COMPLAINT:**

The acceptance letter to the Complainant, dated August 10, 2006, states that the following issues were accepted for investigation:  (Exhibit E)

> 1. Was Complainant discriminated against on the bases of her race(Caucasian), sex (female) or in retaliation for prior EEO activity when, on June 20, 2006, her work assignments were changed from professional in nature to clerical; and

> 2. Was Complainant discriminated against in retaliation for prior EEO activity when, on June 20, 2006, she was denied the return of work equipment previously in her possession?

---

### III.    DESCRIPTION OF INVESTIGATION:

**Investigator:**                              Melba D. Vaughn
                                              EEO Investigator
                                              Center for Equal Employment Opportunity
                                              U.S. Office of Personnel Management
                                              1900 E Street, NW Room 6460
                                              Washington, DC  20415

**Date Investigation Assigned:**     August 11, 2006

**Place of Investigation:**              U.S. Office of Personnel Management
                                              1900 E Street, NW
                                              Washington, DC  20415

**Dates of Investigation:**             August 11, 2006 – October 13, 2006

### IV.    REMEDY REQUESTED:

The Complainant's desired resolution is expressed in both her formal complaint and her affidavit as follows:  (Exhibits C & H)

1. Restoration of all professional duties and responsibilities;

2. Promotion to a GS-13;

3. Reissue of all equipment and software previously in her possession;

4. Award of $300,000 for damages for each discriminatory event, for a total of $600,000; and

5. Award of $50,000 for compensatory damages.

---

### V.    PROCEDURAL HISTORY:

According to the EEO Counselor's Report, the Complainant first contacted an EEO Counselor on July 5, 2006, alleging discrimination based on race (Caucasian), sex (female), and in retaliation for prior EEO activity when, on June 20, 2006, her work assignments were changed from professional in nature to clerical; and on June 20, 2006, she was denied the return of work equipment previously in her possession.  The Complainant received EEO counseling and was advised of her right to file a formal complaint in a Final Counseling Interview on August 2, 2006.  (Exhibits A & B)

The Complainant filed a formal complaint on August 9, 2006.

On August 10, 2006, the Chief, Center for Equal Employment Opportunity (CEEO) acknowledged and accepted the complaint. The CEEO assigned the complaint for investigation on August 11, 2006, and issued a Letter of Authority on August 15, 2006. (Exhibits C, D, E, & G)

---

## VI.    DESCRIPTION OF EXHIBITS:

Exhibit A:    EEO Counselor's Report, dated August 2, 2006

Exhibit B:    Notice of Final Counseling Interview, dated August 2, 2006

Exhibit C:    Formal Complaint of Discrimination, dated August 9, 2006

Exhibit D:    Letter of Acknowledgement, dated August 10, 2006

Exhibit E:    Letter of Acceptance, dated August 10, 2006

Exhibit F:    Transmittal of Investigative Report and Notice of Rights

Exhibit G:    Letter of Authorization signed by the Chief, Center for Equal Employment Opportunity, dated August 15, 2006

Exhibit H:    Affidavit of Valerie Kline (Complainant) dated, September 12, 2006 and Supplemental Affidavit dated October 26, 2006

  Tab 1 – Memorandum from Complainant to William Davis dated June 21, 2006, regarding office changes and issues

  Tab 2 – Performance Standards (page 4 of 4) and Position Description provided by the Complainant

  Tab 3 – Performance Standards (page 2 of 4) and Position Description provided by the Complainant

  Tab 4 – Excerpt provided by the Complainant from her Affidavit in OPM EEO Case No. 2006008, Exhibit G, pages 4 & 5, attesting to her ability to remove a watermark from a publication

  Tab 5 – Federal Register packages drafted by Complainant for Robert Coco's signature from June and August 2006

  Tab 6 – Freedom of Information Act response from Charlene Heermans, Human Resource Specialist to Complainant showing Issac Evans' promotion to GS-13 on December 25, 2005

Tab 7 – Letter from Ronald C. Flom, Associate Director Management Services Division to the Office of Management and Budget apologizing for the errant publishing of a proposed rule

Tab 8 – Email dated July 21, 2006, from Publications to OPM-FEDREGISTER@LISTSERV.OPM.GOV recalling a Notice of OPM Regulatory Change

Tab 9 – Excerpt from Complainant's Affidavit in OPM EEO Case No. 2006008, Exhibit G, pages 7 & 8, providing testimony she prevented Jacquline Carter from making mistakes with the Federal Register

Tab 10 – Federal Register: December 21, 2005, 70 FR 75745 showing a regulatory package sent in error

Tab 11 – Draft of a letter from the Publications Services Branch, dated August 24, 2006, for Robert Coco's signature containing a Federal Register Final Rule

Tab 12 – Email from Complainant to William Davis, dated August 30, 2006, regarding Federal Register Responsibility

Tab 13 – Email dated April 17, 2006, from Publications to OPM-FEDREGISTER@LISTSERV.OPM.GOV regarding a Notice of OPM Regulatory Change 2006-12, demonstrating incorrect graphics on a cover page

Tab 14 – Notice and Posting System, dated July 6, 2006, showing Complainant's ability to generate graphics in emails

Tab 15 – Memorandum from William Davis to Complainant dated, April 5, 2006, placing Complainant on Administrative Leave

Tab 16 – Notice and Posting System, dated August 25, 2006, showing the need for Adobe Photoshop software

Tab 17 – Drafts of Federal Register packages prepared by Complainant for submission under her own signature

Tab 18 – Payment records for medical expenses dated from February 28, 2006 through September 11, 2006

Exhibit I:     Affidavit of William M. Davis (Witness), Support Services Supervisor, dated September 25, 2006, and Supplemental Affidavits dated October 12, 19, and 24, 2006

Tab 1 – Memorandum of Instruction from William Davis to Complainant dated, May 24, 2005

Tab 2 – Federal Register Liaison/Certifying/Authorizing Officers Listing dated, June 22, 2006

Tab 3 – Email traffic soliciting additional Document Management System (DMS) licenses dated from April 21, 2006 through July 25, 2006

Exhibit J:     Affidavit of Claudio Benedi (Witness), Director, Publishing Management Group dated September 28, 2006

Exhibit K:     Affidavit of Robert Coco (Witness), Management Analyst dated September 19, 2006

Exhibit L:     Affidavit of Jacquline Carter (Witness), Management Analyst dated October 4, 2006

Exhibit M:     Affidavit of Derek Holt (Witness), Criminal Investigator dated October 10, 2006

Exhibit N:     Position Description for a GS-343-12, Management Analyst dated June 10, 2003, provided by the Office of Personnel Management's Human Resources Office

Exhibit O:     Complainant's FY2003, 2004, & 2005 Performance Appraisals provided by the Office of Personnel Management's Human Resources Office

Exhibit P:     Position Description for a GS-343-13, Management Analyst dated March 21, 2002, provided by the Office of Personnel Management's Human Resources Office

Exhibit Q:     FY2003, 2004, & 2005 Performance Appraisals for Robert T. Coco provided by the Office of Personnel Management's Human Resources Office

Exhibit R:     OPM EEO Case No. 2006024 Acceptance Letter dated May 19, 2006

Exhibit S:     Excerpt from the U.S. Office of Personnel Management, Operating Manual, Qualification Standards for General Schedule Positions retrieved from http://opm.gov/qualifications/SEC-IV/A/gs-admin.asp

---

## VII.    INVESTIGATIVE SUMMARY:

### BACKGROUND INFORMATION

The Complainant is a Management Analyst, GS-0343-12, assigned to the Publications Management Group since October 7, 2002.  On April 5, 2006, the Complainant's supervisor, William M. Davis (White, male), GS-0342-14, Support Services Supervisor placed the Complainant on Administrative Leave pending the results of an investigation by the Office of the Inspector General (OIG). (Exhibit H & Exhibit H, Tab 15)

According to the Complainant, when she returned to work on June 20, 2006, Mr. Davis refused to reissue equipment previously in her possession, and  informed her many of her previous duties were permanently transferred to Robert Coco (Caucasian, male), GS-0343-13, Management Analyst.   The Complainant also named her second level supervisor, Claudio Benedi (White, male), Director, Publishing Management Group, GS-0301-15 as a responsible management official for the accepted issues in this complaint.
(Exhibits C & H & Exhibit H, Tab 1)

### Issue 1: on June 20, 2006, her work assignments were changed from professional in nature to clerical

### A.    Complainant's Testimony

**Valerie Kline** hereinafter referred to as "Complainant" is assigned to OPM's Publications Management Group (PMG) as a Management Analyst, GS-0343-12, step 5.  The Complainant alleges Mr. Davis and Mr. Benedi changed her work assignments from professional in nature to clerical on June 20, 2006, based on her race, sex, and prior EEO activity.  (Exhibit H)

On June 20, 2006, the Complainant returned to work from Administrative Leave. On June 21, 2006, the Complainant provided a memo to Mr. Davis expressing her dissatisfaction with her "curtailed and/or' revised duties and responsibilities. For clarity, the Complainant describes "professional" assignments as duties requiring formal education and or specialized training, and "clerical" assignments as duties that do not require formal education or specialized training.  (Exhibit H & Exhibit H, Tab 1)

Since June 20, 2006, seven of the Complainant's professional assignments changed.  First, the Complainant has not sent any regulatory packages to the Federal Register under her name.  Prior to June 20, 2006, as a Federal Register liaison she had the authority to submit regulatory packages to the Federal Register, and she communicated with the Federal Register office to resolve publication issues or questions.  She said Mr. Coco is now the Federal Register

liaison in her stead.  Second, she has not reviewed any regulatory packages for the Director's approval.  Third, she shared responsibility for reviewing, tracking, and coordinating correspondence and emails from the Office of Management and Budget (OMB) with Jacquline Carter, (Black, female), GS-0343-13, Management Analyst, but not since June 20, 2006.  Fourth, since June 20, 2006, Mr. Coco ensures "Notice and Posting" (N&P) announcements are distributed instead of the Complainant.  Fifth, even though her performance standards and position description states one of her evaluative duties relates to designing, creating, and preparing visual information and graphic projects, she has not been tasked with those duties since her return from administrative leave.    Six, primary responsibility for the Federal Register Management System (FRMS) now lies with Mr. Coco versus the Complainant.  She said she provided data to the Office of Information Services to help develop the FRMS.  Lastly, her position as driver for OPM's Document Management System (DMS) was restored after she filed this complaint.  She specifically stated, not being a driver on DMS related to the elimination of her regulatory duties because regulatory packages flow through DMS.  (Exhibit H & Tab 17[1])

According to the Complainant, Mr. Davis gave the seven duties listed above to Mr. Coco because Mr. Coco functions as a "team leader."  She said she is the only employee Mr. Coco leads.  She believes Mr. Davis made Mr. Coco a team leader over her in order to remove her professional responsibilities and give her primary responsibility for answering the PMG telephone and responding to the Publications Inbox, as well as other clerical duties.   (Exhibit H)

The Complainant said prior to June 20, 2006, she merely assisted or backed up Mr. Coco in answering the PMG telephone lines, and in responding to the Publications Inbox.    Since June 20, 2006, Mr. Davis assigned her full responsibility for tending to both.  The following reflects clerical duties assigned to the Complainant and the date the assignment occurred:

- June 21, 2006, Mr. Benedi had her update the employee telephone listing.
- June 22, 2006, Mr. Coco had her prepare two regulatory packages for the Federal Register under his signature.
- June 28, 2006, Mr. Coco had her prepare one regulatory package for the Federal Register under his signature.
- August 15, 2006, Mr. Davis had her deliver jobs to the print shop.
- August 15, 2006, Mr. Coco had her obtain form numbers from the forms officer.
- August 15, 2006, Mr. Davis had her deliver Printing Request (OPM Form 4150) to the forms officer for signature.
- August 24, 2006, Mr. Davis had her prepare three regulatory packages for Mr. Coco's signature.

---

[1] Exhibit H, Tab 17 is unsigned letters drafted by the Complainant to the Office of the Federal Register dated from December 2002 through August 2006.

- On unspecified dates she has had to monitor the fax machine and other types of clerical duties.

The Complainant said not performing her professional duties and receiving menial tasks has had a negative psychological impact on her and her morale. The Complainant says she feels demeaned and degraded because she is an educated, trained professional who is highly competent. She feels as though Mr. Davis and Mr. Benedi are retaliating against her for prior EEO activity, and treating her as if she is incompetent and inferior. (Exhibit H)

The Complainant said she is not aware of any other employee's work assignments changing. She believes her race, sex, and prior EEO activity were factors in Mr. Davis and Mr. Benedi's decision to change her assignments from professional in nature to that of clerical because she is more qualified to perform these duties than Mr. Coco. She said she had to train Mr. Coco on some of the regulatory work. The Complainant believes her visual information responsibilities were eliminated in order to promote Issac Evans[2] to a GS-13. (Exhibit H)

### B.    Witness Testimony

### William M. Davis, Support Services Supervisor (White male)

**William M. Davis** has been a Support Services Supervisor, GS-0342-14 since November 5, 2000, and a federal employee since January 21, 1971. His supervisor is Claudio Benedi. Mr. Davis is aware of the Complainant's prior EEO activity and his right to representation. (Exhibit I)

Mr. Davis testified the Complainant's position does not have a positive education requirement. He said her position description (PD) states she is to assist both of PMG's senior Management Analyst; one in performing regulatory duties and the other in performing various publication duties. He said the Complainant should perform her assignments independently, but she must obtain management's approval. According to Mr. Davis, the Complainant is currently working under a PD dated, May 14, 2003, which is different from the PD she was hired under. He said the Complainant's duties regarding regulatory matters, and the requirement to assist both senior Management Analysts has not changed. He affirmed he never told the Complainant she would assist Mr. Coco in an administrative capacity instead of assisting Ms. Carter on Regulatory Issuances. He informed the Complainant she would assist Ms. Carter on an as needed basis, and assist Mr. Coco more than she did in the past. Assisting Mr. Coco and Ms. Carter is not a new work assignment. (Exhibit I)

Prior to June 20, 2006, Mr. Davis said the Complainant reviewed regulatory packages for the Director's signature, but Ms. Carter gave the final review for all

---

[2] Issac Evans (Black male), was hired on September 20, 2004 as a GS-12, Visual Information Specialist. He was promoted to GS-13 by OPM on December 25, 2005. (Exhibit H, Tab 6 & I)

packages because of the repeated errors made by the Complainant. Ms. Carter assumed primary responsibility for reviewing regulatory packages in November 1989, and the Complainant has been and still is her backup since she was hired in November 2002. (Exhibit I)

Mr. Davis said the Complainant is still a contact liaison. He cancelled her authorization while she was on administrative leave, but reinstated it when she returned. An employee identified as a contact liaison may forward packages cleared for publication to the Federal Register, a duty the Complainant could perform prior to June 20, 2006. In the absence of Ms. Carter the Complainant also fielded questions and received updates on publication dates. In order to fill the gap during the Complainant's absence, Mr. Davis made Mr. Coco responsible for signing items for the Federal Register. Mr. Davis later decided to allow Mr. Coco to remain responsible so that Mr. Coco could become more familiar with the Federal Register processes and because Mr. Coco is a higher grade than the Complainant. Ms. Carter still signs items to the Federal Register because that duty is a major function of her PD. (Exhibit I & Exhibit I, Tab 2)

According to Mr. Davis, there is no correspondence from OMB for the Complainant to review, track, or coordinate—only emails. He said Ms. Carter has been responsible for reviewing, tracking, and coordinating emails from OMB to the OPM program offices long before he was hired. Mr. Davis said the Complainant rarely handles emails from OMB, but prior to June 20, 2006, she may have received an email from OMB when Ms. Carter was not available. (Exhibit I)

Prior to June 20, 2006, Mr. Davis said the Complainant and Mr. Coco shared the responsibility of distributing N&P announcements by email approximately four times a month. Sending the email is the N&P announcement's distribution process. Prior to April 2006, Mr. Davis said the Complainant and Mr. Coco agreed Mr. Coco would send the emails. (Exhibit I)

Mr. Davis said prior to June 20, 2006, the Complainant was not assigned duties that required graphic design, but she asked and volunteered to serve on several special projects outside of the office which required design at the lowest level. He said all this occurred prior to his office hiring Issac Evans, a Visual Information Specialist in September 2004. Mr. Davis said the Complainant's PD requires her to provide design for the Visual Information System found on the TV monitors on the ground and 1st floor of the building, which simply requires her to create and post slides designed using the PowerPoint program. (Exhibit I)

Mr. Davis said the Complainant's current duties as a driver on the Document Management System (DMS) are the same as they were prior to June 20, 2006. He pulled the Complainant's license in April 2006 for Mr. Coco's use because there were no other licenses available. Mr. Davis provided copies of email traffic identifying the PMG's efforts to obtain additional licenses. When additional

licenses became available in mid July the Complainant received one. Mr. Coco is responsible for processing correspondence for executive clearance into the DMS. When a document originator includes the PMG on its distribution list, the Complainant reviews and forwards the document to the next person in the routing sequence. (Exhibit I & Exhibit I, Tab 3)

According to Mr. Davis, the Complainant never had primary responsibility for the Federal Register Management System (FRMS). Mr. Davis and Mr. Benedi have shared primary responsibility for the FRMS at the program level since Mr. Benedi tasked the Complainant to coordinate on its creation. The Complainant and Ms. Carter provided the data for the FRMS. (Exhibit I)

Mr. Davis affirmed the Complainant is currently primarily responsible for answering the PMG telephone, and responding to the Publications Inbox. According to Mr. Davis, these assignments are not new—she performed them prior to June 20, 2006. He said she is supposed to assist Mr. Coco with the Publications Inbox, and in the past he had to instruct the Complainant to answer the phone. He tasked the Complainant with primary responsibility for the phone and the Publications inbox for several reasons. One, Mr. Coco was overwhelmed answering most of the phone calls. He said the Complainant has repeatedly stated Mr. Coco is overworked and needs help. Two, the Complainant had more free time than Mr. Coco. Three, Derek Holt of the Office of the Inspector General (OIG) informed him that the Complainant said she had no more than four hours of work a month. Finally, he saw an opportunity to correct an imbalance in workload assignments between Mr. Coco and the Complainant. (Exhibit I & Exhibit I, Tab 1)

Mr. Davis does not recall specific dates, but he does recall asking the Complainant to take materials to the print shop, and he recalls asking her to obtain the Forms Manager's approval on Printing Request. According to Mr. Davis, besides his self, Mr. Evans, Shirley Sewell (Black, female) and Miriam Johnson (Black, female), delivered jobs to the print shop. In the past, Mr. Davis said, Mr. Coco, Ms. Johnson, and Ms. Sewell obtained approval from the forms manager on Printing Request. (Exhibit I)

He affirmed he had the Complainant prepare three packages for the Federal Register for Mr. Coco's signature and submission on August 24, 2006. He said he had her prepare the packages because Ms. Carter was not in the office. He testified the Complainant and Ms. Carter are the only employees who know the procedures and requirements for preparing packages; therefore he has not asked anyone else to perform that task. (Exhibit I)

According to Mr. Davis, he charged Mr. Coco with the duties of a Team Leader on March 27, 2006. As a Team Leader, he assigns work, and monitors the progress of that work to a group of people, but a Team Leader is not a supervisor. Mr. Coco leads the Complainant, Cassandra Thompson (Black,

female), Philip Watson (Black, male), Ms. Sewell, and Ms. Johnson (Heard)[3]. (Exhibit I)

Mr. Davis testified the Complainant's duties were not changed. He said the Complainant's race, sex, and prior EEO activity were not factors in his decision to make her primarily responsible for answering the PMG phone or responding to the Publications Inbox. He does not recall the Complainant describing the impact of her work assignments on her. (Exhibit I)

**Claudio Benedi, Director, Publications Management Group (White male)**

**Claudio Benedi** has been the Director, Publications Management Group, GS-301-15 for about nine years, and employed with the federal government for 34 years. His supervisor is Kay Ely, a Senior Executive Servant. Mr. Benedi is the Complainant's second level supervisor and he is aware of her prior EEO activity and his right to representation. (Exhibit J)

Mr. Benedi testified the Complainant does not need a degree to perform her duties. Prior to June 20, 2006, he said the Complainant was an alternate contact liaison for the Federal Register, and primarily assisted Ms. Carter in reviewing regulatory packages. In the absence of Ms. Carter, Mr. Coco, and Mr. Davis she signed the cover letter to forward packages to the Federal Register for publication. Ms. Carter has been the contact Federal Liaison for the Federal Register for about 20 years, and responsible for reviewing packages for the Director's approval. (Exhibit J)

According to Mr. Benedi, within three weeks of the Complainant's return to work on June 20, 2006, two packages were sent to the Federal Register in error. As a result of these errors the PMG changed their process. Mr. Benedi said packages prepared for the Director's approval and OMB must have three signatures and one of those signatures must be either his or Mr. Davis'. He said one of the other signatures can be the Complainants, but Mr. Coco must review packages prepared by the Complainant prior to forwarding them. He also said packages prepared by Ms. Carter must have Mr. Coco's signature because he is a Team Leader. With the exception of the new process, the Complainant is still doing what she was hired to do. Her duties regarding regulatory matters and publications issues in general have not changed. (Exhibit J)

Mr. Benedi could not say with certainty whether or not the Complainant reviewed, tracked, and coordinated correspondence and emails from OMB to program offices. He said the process always has been that whoever sent the package to OMB usually is responsible for the package, but someone answering the phone could respond. (Exhibit J)

---

[3] Miriam Johnson's maiden name is Heard.

He said the Complainant never had responsibility for the N&P announcements. Mr. Coco has been responsible for N&P announcements since the nineties. She is a back up for Mr. Coco.  (Exhibit J)

Mr. Benedi said the Complainant may have worked on visual information and graphic projects about two or three years ago, but those duties stopped long before June 20, 2006.  He said the PMG hired a graphics person close to two years ago to perform these duties.  (Exhibit J)

Mr. Benedi said the Complainant had some involvement with DMS, but he could not recall if she was a driver.  (Exhibit J)

Prior to June 20, 2006, Mr. Benedi said the Complainant input data into the FRMS.  He said PMG currently uses Tracker instead of the FRMS.  He said both FRMS and Tracker are management tracking tools.  He said he, Ms. Carter, and the Complainant worked with programmers to develop FRMS, and ninety percent of the information put into FRMS transferred to Tracker.  (Exhibit J)

According to Mr. Benedi, he never told the Complainant she was to assist Mr. Coco instead of Ms. Carter.  Sometime during the summer, but prior to the Complainant's return from administrative leave, Mr. Davis appointed Mr. Coco as a Team Leader at Mr. Benedi's request.  As a Team Leader he assigns and directs the work of the Complainant, Ms. Carter, Mr. Watson, Ms. Heard, Ms. Sewell, and Casey Thompson.  (Exhibit J)

Mr. Benedi testified that Mr. Coco and Ms. Carter answer the phone more than the Complainant and that answering the PMG telephone is not the Complainant's primary responsibility.  (Exhibit J)

According to Mr. Benedi, prior to the Complainant going on administrative leave and since her return her responsibilities have included the Publications Inbox. He said Mr. Coco responds more to the inbox than the Complainant.  (Exhibit J)

Mr. Benedi said he does not assign the Complainant work directly—Mr. Davis does.  Mr. Benedi stated that Mr. Davis had the Complainant update the employee telephone information listing.  Mr. Benedi said besides him, Mr. Davis and Ms. Sewell have worked on the telephone listing.  (Exhibit J)

Mr. Benedi disagreed with the Complainant's allegation that her duties were changed from professional to clerical in nature.  He said her race, sex, and prior EEO activity were not factors to any decision or change he has implemented.  He said the Complainant did not speak to him about how her work assignments have affected her ability to do her job.  (Exhibit J)

**Robert Coco, Management Analyst (White male)**

**Robert Coco** has been a Management Analyst, GS-0343-13 since 1977, and in his current position for the past seven or eight years.   His supervisor is William Davis. Mr. Coco is aware of his right to representation.  (Exhibit K)

Mr. Coco has known the Complainant since she came to OPM.  He has never been involved in EEO activity, and he is not aware of the Complainant's prior EEO activity.  (Exhibit K)

Prior to June 20, 2006, Mr. Coco facilitated functions in Graphics Management, the Print Shop, and the Printing Procurement Unit, and he is a government purchase cardholder.   Mr. Coco affirmed he usually answered the PMG telephone line because the PMG lacked clerical support.  He also affirmed he usually responded to the Publications Inbox. Since June 20, 2006, Mr. Coco said Mr. Davis assigned the Complainant primary responsibility for the PMG telephone line and the Publications Inbox.  When necessary, Mr. Coco backed up Mr. Davis, Mr. Benedi, and Ms. Carter in each of their respective duties. (Exhibit K)

According to Mr. Coco, he became a Team Leader sometime between April 2006 and June 2006 because a regulation was printed without OMB's approval and some other problems in the office.  He is the "focal point" between the various units within the PMG and the Group Manager, Mr. Benedi.  He states Ms. Sewell and Ms. Johnson from the Print Shop, Casey Thompson and Philip Watson from the Printing Procurement unit, and Mr. Evans, Ms. Carter, and the Complainant from the PMG are to contact him with their issues, and he helps prioritize their work projects.  (Exhibit K)

Mr. Coco said Ms. Carter has primary responsibility for reviewing and coordinating regulatory packages for posting to the Federal Register.  Prior to June 20, 2006, other than backing up Ms. Carter in her absence, he had little involvement with regulatory matters.   He said the Complainant reviewed regulatory packages in the past, and since she returned he assigned her one or two packages to review.  Mr. Coco could not recall the titles of those packages. In the past, the Complainant could sign forms verifying the Director's approval to print a regulation in the Federal Register.  Since her return she can prepare packages for submission to the Federal Register, but she no longer has the authority to sign the required forms. As of June 20, 2006, the Complainant has prepared packages for Mr. Coco's signature. According to Mr. Coco, he only signs the documents for the Federal Register in Ms. Carter's absence. (Exhibit K)

Prior to June 20, 2006, Mr. Coco assigned the Complainant responsibility for updating the online OPM Publications Database.   He also tasked the Complainant with preparing the N&P emails and other required forms for his

signature prior to sending out rules and notices. Since June 20, 2006, the Complainant develops N&P emails with attachments of the printed document in HTML and PDF format for Mr. Coco's approval. N&P emails notify the public of published OPM regulations. (Exhibit K)

Mr. Coco said he does not know the Complainant's exact involvement with the FRMS before June 20, 2006. He said the FRMS was not used much. According to Mr. Coco, about a month ago, the PMG decided to use the FRMS more than they did in the past because of some problems. He said the FRMS is still not fully operational, but when it is he will use it more to track Federal Register packages. (Exhibit K)

Mr. Coco said he probably asked the Complainant to obtain form numbers from the forms officer, but he does not recall any specific dates. He said he obtained form numbers. He could not remember asking Mr. Evans to obtain form numbers. (Exhibit K)

### Jacquline Carter, Management Analyst (Black female)

**Jacquline Carter** has been a Management Analyst, GS-0343-13 since 1989, and employed with the federal government since 1966. Her supervisor is William Davis. Ms. Carter is aware of her right to representation. (Exhibit L)

Ms. Carter said she knows the Complainant because they have worked together since 2002. She has never been involved in EEO activity, and she is not aware of the Complainant's prior EEO activity. (Exhibit L)

She is the senior Management Analyst for the Federal Register and has been an alternate Federal Register Liaison for Mr. Benedi for years. She reviews documents for publication in the Federal Register ensuring they are in compliance with the Office of the Federal Register, OMB, and the Regulatory Information Service Center. Ms. Carter conducts negotiations between OMB and the different program offices. According to Ms. Carter, the Director approves all items for the Federal Register. Ms. Carter signs all the required documentation for submitting those items to the Federal Register. She said prior to June 20, 2006, the Complainant occasionally certified regulations and notices to the Federal Register for publication. Since June 20, 2006, she the Complainant has not had the opportunity to certify regulations and notices because either she or Mr. Coco, since becoming the Team Leader has certified the documents. Additionally, she does not know whether or not the Complainant can still certify regulations and notices to the Federal Register. Ms. Carter said since a Proposed rule was published erroneously, the PMG created a cover letter for internal purposes that require Mr. Benedi or Mr. Davis' signature. She does not know who was responsible for the error. (Exhibit L)

As far as reviewing packages, Ms. Carter said the Complainant reviewed packages whenever she assigned one to her. Ms. Carter would do the final review. She said the Complainant initially entered all of the regulations that had Regulatory Identification Numbers (RIN) into FRMS, which may give the appearance she processed or reviewed each one of them, which she did not. For clarity, every package is assigned a RIN, and that RIN stays with the package until it is final. Ms. Carter swore her [Ms. Carter] role has not changed, except she currently goes through Mr. Coco so he can assign packages to the Complainant to review. She said the Complainant has reviewed very few packages since June 20, 2006. She could not recall how often the Complainant reviewed packages prior to June 20, 2006. (Exhibit L)

Prior to June 20, 2006, Ms. Carter was responsible for reviewing, tracking, and coordinating correspondence and emails from OMB to the program offices pertaining to regulatory packages. She said OMB emails comments and changes to her and she occasionally courtesy copied the Complainant some of the comments and responses from both OMB and the program offices. Since Mr. Coco is the Team Leader, she courtesy copies him instead of the Complainant. (Exhibit L)

Prior to June 20, 2006, Ms. Carter said the Complainant uploaded items with RIN numbers into the FRMS that may be still in the system even though they may have already been published or finalized. Ms. Carter said she primarily used the DMS instead of FRMS, and opined the FRMS is a duplicate of the DMS. (Exhibit L)

Ms. Carter testified the Complainant primarily works with Mr. Coco since she returned to work on June 20, 2006. She is not sure of the Complainants role or what work she is requested to perform. She said the Complainant prepares the N&P documents for Mr. Coco's review. (Exhibit L)

Ms. Carter said she has not had to obtain form numbers from the forms officer on OPM Form 4150, Printing Request. (Exhibit L)

### Derek Holt, Criminal Investigator (African American male)

**Derek Holt** is a Criminal Investigator, GS-1811-12 at the Office of Personnel Management. He has been in that position for about two years. His supervisor is Jill Maroney. Mr. Holt is aware of his right to representation. (Exhibit M)

Mr. Holt swore he knows the Complainant and Mr. Davis because of an internal investigation that began in April 2006, and is still on going. According to Mr. Holt, he cannot discuss any conversations he may have had with the Complainant regarding her workload. Specifically, he stated he could not say whether or not the Complainant stated she worked no more than 4-hours a month. He is aware

of the Complainant's prior EEO activity because he provided testimony in one of the Complainant's previous complaints.  (Exhibit M)

## C.    *Comparative Data*

The table below reflects the comparisons between the Complainant and other employees with regard to changes in their work assignments approximately between April 2006 and June 20, 2006.

### *Comparative Data of Employees with Changed Work Assignments*

| Employee | Grade/Title | Race | Sex | Supervisor | Prior EEO Activity | Changed Work Assignments |
|---|---|---|---|---|---|---|
| **Valerie Kline,** Complainant | GS-12, Management Analyst | White | F | William Davis | Yes | Yes |
| Robert Coco | GS-13, Management Analyst | White | M | William Davis | No | Yes |
| Jacquline Carter | GS-13, Management Analyst | Black | F | William Davis | No | No |
| Issac Evans | GS-13, Visual Information Specialist | Black | M | William Davis | No | No |

(Exhibits H, I, K, & L)

Note: The Complainant is not aware of any other employee placed on Administrative Leave.  (Exhibit H)

## D.    *Record Evidence*

Letter from William M. Davis to the Complainant dated April 5, 2006, placing the Complainant on administrative leave pending the results of an investigation by the Office of the Inspector General.  (Exhibit H, Tab 15)

Memorandum from the Complainant to William Davis dated June 21, 2006, expressing her lack of understanding as to why her duties and responsibilities were curtailed or revised, and why equipment she previously had in her possession was not reissued.  (Exhibit H, Tab 1)

Management Analyst, GS-343-12, Contracting, Facilities & Administrative Services Group Publications Services Branch Position Description provided by the Office of Personnel Management's Human Resources office identifies the Complainant's major duties as: updating the Publications database; serving as

an alternate for ...reviewing...and clearing all OPM publications; serving as an alternate liaison with OMB; designing and maintaining the Video Information System; and assisting the regulatory team by providing editorial review and interpretation of policy. (Exhibit N)

Excerpt from the "*U.S. Office of Personnel Management, Operating Manual, Qualifications Standards for General Schedule Positions*" states occupational series GS-343 Management and Program Analyst does not have an education requirement. (Exhibit S, page 5)

"2006 Update, Federal Register Liaison/Certifying/Authorizing Officers" roster dated June 22, 2006, approved by Claudio Benedi identifies the Complainant as an alternate liaison and certifying official. (Exhibit I, Tab 2)

Email traffic from April 21, 2006 to July 25, 2006, indicating the need for additional Document Management System licenses for multiple users within OPM, including the Publications Management Group. (Exhibit I, Tab 3)

---

*Issue 2: on June 20, 2006, she was denied the return of work equipment previously in her possession*

*A.     Complainant's Testimony*

The Complainant stated prior to June 20, 2006, she possessed a cell phone, Adobe Photoshop software, a web cam, a DVD/CD burner, and an IPAQ. After she returned to work on June 20, 2006, Mr. Davis did not reissue her any of those items. According to the Complainant, Mr. Davis said she did not need any of them. She used the cell phone to contact Mr. Benedi, Mr. Coco, and Mr. Davis when needed. She believes it is ironic that she has primary responsibility for the PMG telephone and not does have a cell phone in order to page needed employees. She said Mr. Davis told her if she needed to contact him or Mr. Benedi, she could send them an email on their Blackberry. She said Mr. Coco does not have a Blackberry, and since June 20, 2006, she interrupted Mr. Benedi in order to contact Mr. Coco. (Exhibit H)

She used Adobe Photoshop to perform visual and graphics work since October 2002. She also used the software to create N&P announcements more easily. She stated Visual Information responsibilities are in her position description and performance standards. (Exhibit H)

The Complainant used the web cam to monitor people entering the office. It enabled her to see if the person entering the office was a visitor or a staff member. (Exhibit H)

She occasionally burned copies of CDs and DVDs and scanned records onto CDs for customers. She said she also used the burner to back up her files per IT security training. While on Administrative Leave, the Complainant received a new computer, and her previously issued computer remained in the OIG's possession. When she asked the OIG for the DVD/CD burner installed on her old computer, they informed her she needed her supervisor's approval. The Complainant relayed the information she received from the OIG to Mr. Davis, and made him aware of the PMG's entitlement to the equipment. She said Mr. Davis told her she did not need the DVD/CD burner and "shrugged off" her request for them back saying "it's only a couple hundred dollars." (Exhibit H)

The IPAQ is a type of handheld computer the Complainant used to calculate, and generate documents and spreadsheets. She does not remember Mr. Davis or Mr. Benedi giving her a specific reason for issuing her an IPAQ. She said the IPAQ used to belong to Mr. Davis. She considered the IPAQ a job perk—not an item for job use. The Complainant admits the IPAQ is either misplaced or stolen. She does not know if any other employee has an IPAQ. (Exhibit H)

The Complainant believes Mr. Benedi and Mr. Davis retaliated against her when they decided not to reissue her equipment she previously possessed. She said other minorities have cell phones, Adobe Photoshop software, and CD burners to make their work easier. (Exhibit H)

## B.    *Witness Testimony*

### *William M. Davis, Support Services Supervisor (White male)*

Mr. Davis affirmed the Complainant possessed a cell phone, Adobe Photoshop software, a DVD/CD burner, a web cam, and an IPAQ prior to June 20, 2006. He said he did not reissue these items to the Complainant because she no longer needs them to perform the duties of her position, or the Complainant did not use the items for their intended purpose. According to Mr. Davis, not having these items has no affect on the Complainant's ability to perform the duties of her position. (Exhibit I)

The Complainant had a cell phone so she could contact her co-workers and her co-workers could contact her both during and not during work hours. He said the Complainant rarely contacted anyone in the office, and she did not carry the phone home, making it impossible to contact her after hours. Mr. Davis said she has a list of cell phone numbers to use to contact her co-workers. He said she can email him and Mr. Benedi if she can't reach them on the cell phone. Additionally, he said the PMG is saving monthly on cell phone usage. (Exhibit I)

He issued the Adobe Photoshop software prior to hiring a full time Visual Information Specialist so the Complainant could perform volunteer work on special projects outside the PMG. He said the Complainant's need for the

software stopped sometime in 2003 when a Visual Information Specialist was detailed to the PMG. (Exhibit I)

Mr. Davis issued the Complainant a DVD/CD burner to copy CDs. He said the Visual Information Specialist is responsible for burning CDs. He said if the Complainant needs to replicate a DVD or CD there is a DVD/CD burner available for her use. She can back her files up on her personal file on the "H" drive or on the office file on the "P" drive. (Exhibit I)

He issued the web cam so the Complainant could conduct video conferences—not monitor office activity. He said the Complainant did not conduct any video conferences. (Exhibit I)

Mr. Davis issued the IPAQ to the Complainant to track meetings and transfer files. He said he had not seen the Complainant bring the IPAQ to the office for at least a year. (Exhibit I)

Mr. Davis stated, Mr. Evans, Mr. Coco, and Ms. Johnson have cell phones because oftentimes they are out of their respective offices in other areas of the building, and to contact them in the evenings and while they are on leave. (Exhibit I)

Mr. Evans has Adobe Photoshop to perform the duties of his position, and Mr. Coco has the software to backup Mr. Evans when he is on leave. Mr. Coco and Mr. Evans have CD burners to perform their duties not DVD burners. (Exhibit I)

Mr. Davis said he did not issue any other employee a web cam or an IPAQ. He gave the Complainant the IPAQ because it was excess equipment he no longer used. Mr. Davis does not recall providing the Complainant a reason for issuing her an IPAQ. He said there is no position in the PMG that requires an employee to have an IPAQ to perform their duties. (Exhibit I)

Mr. Davis said the Complainant did not describe how not having the equipment she previously had affected her ability to do her job. He said the Complainant's race, sex, or prior EEO activity were not factors in his decision not to reissue her cell phone, Adobe Photoshop software, a web cam, a DVD/CD burner, or an IPAQ. Mr. Davis said he would issue the Complainant any equipment she needed if she provided a business case. (Exhibit I)

### Claudio Benedi, Director, Publications Management Group (White male)

Prior to June 20, 2006, Mr. Benedi testified the Complainant had a Nextel radio phone, Adobe Photoshop software, a web cam, and an IPAQ. He did not know if she had a DVD/CD burner prior to June 20, 2006. The Complainant used the radio phone like a walkie-talkie, and in case of an emergency she used the cell phone feature. She was not reissued a phone. Besides Mr. Benedi, Mr. Davis,

Mr. Coco, Ms. Heard, and Rosalyn Wright currently have radio phones to contact each other.  (Exhibit J)

Mr. Benedi assumed the Complainant currently does not have Adobe Photoshop software because the Complainant raised the issue in this complaint.  She does not need the software to do her job.  Mr. Benedi said he and Mr. Coco have the software to open images and files associated with the program, and Mr. Evans has the software because it is an integral part of his job.  (Exhibit J)

He said the Complainant had a web cam to try video teleconferencing, which did not work out.  He said the OIG's investigation of the Complainant revealed she used the camera to post pictures of herself on websites.  Mr. Benedi is the only person that has a web camera on their desktop.  (Exhibit J)

According to Mr. Benedi, the Complainant does not need a DVD or CD to perform her day-to-day job.  He said besides his self, Mr. Coco and Mr. Evans have DVD/CD burners on their desktop.  Everyone else has access to a DVD/CD burner.  (Exhibit J)

Because the Complainant made no practical use of the IPAQ,  Mr.  Benedi  said she was not reissued one.  Mr. Benedi said he did not believe anyone else has an IPAQ.  (Exhibit J)

Mr. Benedi testified the Complainant's race, sex, or prior EEO activity did not factor into his decision not to reissue her Nextel radio phone, web cam, IPAQ, DVD/CD burner, or the Adobe Photoshop software.   Additionally, he said the Complainant did not describe the impact on her ability to do her job without these items.  (Exhibit J)

### Robert Coco, Management Analyst (White male)

Mr. Coco has a walkie-talkie like cell phone to reach people in different locations in the building.  Mr. Benedi, Mr. Davis, and Mr. Evans have cell phones.  Ms. Carter and Ms. Johnson may have a cell phone.  (Exhibit K)

Mr. Coco affirmed he does not have a web cam or an IPAQ.  He is not aware of any employee who has a web cam.   He said Mr. Benedi and Mr. Davis' Blackberry is a type of IPAQ.  (Exhibit K)

Besides his self, Mr. Coco said Mr. Evans, Mr. Benedi, and Mr. Davis have Adobe Photoshop software on their desktops.  He said Mr. Evans needs the software to do his job, and Mr. Benedi, Mr. Davis, and his self have the software to read files with .ai, .psd, and .indd extensions.  (Exhibit K)

Mr. Coco's DVD/CD burner was reinstalled onto his new desktop.  He said uses it occasionally when working with graphic files from private contractors.  He said

Mr. Benedi, Mr. Davis, and Mr. Evans have DVD/CD burners on their desktops. Ms. Johnson and Ms. Sewell have a stand alone DVD/CD burner.  (Exhibit K)

### Jacquline Carter, Management Analyst (Black female)

Ms. Carter swore she does not have an OPM cell phone, an IPAQ, a web cam, or Adobe Photoshop software.  She thinks she may have had a DVD/CD burner before she received a new computer.  Other than Mr. Benedi, Mr. Davis, and Mr. Coco having cell phones, she is not aware of the equipment other employees may have.  (Exhibit L)

### C.    Comparative Data

The table below reflects the comparisons between the Complainant and other employees with regard to equipment.

### Comparative Data of Employees with Issued Equipment

| Employee | Grade/Title | Race | Sex | Rater | Prior EEO Activity | Cell Phone | Adobe Soft-ware | DVD/CD Burner | IPAQ |
|---|---|---|---|---|---|---|---|---|---|
| **Valerie Kline**, Complainant | GS-12, Management Analyst | White | F | William Davis | Yes | No | No | No | No |
| Robert Coco | GS-13, Management Analyst | White | M | William Davis | No | Yes | Yes | Yes | No |
| Jacquline Carter | GS-13, Management Analyst | Black | F | William Davis | No | No | No | Not Sure | No |
| Issac Evans | GS-13, Visual Information Specialist | Black | M | William Davis | No | Yes | Yes | Yes - Testimony from Robert Coco | No |
| William Davis | GS-14, Support Services Supervisor | White | M | Claudio Benedi | No | Yes | Yes- Testimony from Robert Coco | Yes - Testimony from Robert Coco | No |
| Claudio Benedi | GS-15, Director, Publications Management Group | White | M | Kay Ely | No | Yes | Yes | Yes | No |
| Miriam Johnson | Grade/Title - Unknown, Print Shop | Black | F | William Davis | No | Yes | No | No | No |

(Exhibits H, I, J, K, & L)

Note: Mr. Benedi is the only employee who has a web camera.  (Exhibit J, K, L)

## VIII.   COMPENSATORY DAMAGES

The Complainant testifies she is seeking $650,000 in compensatory and punitive damages.  She states the discriminatory acts caused her a great deal of stress, anxiety, consternation, worry, and mental/emotional pain and suffering, and "lowered her resistance to disease as she came down with the flu…"   The Complainant stated she's receiving psychological treatment, and treatment for Lyme disease as a result of the treatment of Mr. Davis and Mr. Benedi.  The Complainant provided an itemized statement of healthcare received from February 28, 2006 through September 11, 2006.  (Exhibit H, Tab 18)

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| Valerie Kline | | * | |
| | | * | |
| | Kline | * | |
| | v. | * | Case No. 1:07-cv-451 (JR) |
| | | * | |
| Linda M. Springer, Director | | * | |
| | Defendant | * | |
| | | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**AMENDED OPPOSITION TO STATEMENT**
**OF MATERIAL FACTS IN DISPUTE**

Kline requests leave to file this amended Opposition to Statement of Material Facts in

Dispute and Statement of Genuine Issues to be Litigated (the "Opposition") in order to reflect

references to the parts of the record relied upon in support of this Opposition and to address

additional facts raised in the Defendant's Reply to Plaintiff's Opposition to

Defendant's Motion to Dismiss or for Summary Judgment.

**I.  Disputed Material Issues of Fact**

1. Kline's office space was not conducive to reviewing regulations and hindered Kline's

   ability to perform her work (DE 37, ¶110, DE 40-3, ¶198, DE 40-7, p. 25); having more

   suitable work space and/or working conditions would have enhanced Kline's ability to

   perform her work (DE 40-7, p. 25); Kline had a greater need for the office space occupied

   by Issac Evans due to the nature of their respective work (DE 37, ¶115, DE 40-3, ¶200).

2. Assigning Kline primary responsibility for answering the Publishing Management Group

   (PMG) (formerly known as the Publishing Management Branch) telephones was not part

of the responsibilities covered under Kline's Position Description or Performance

Standards (DE 40-4, p. 19-22); to hold Kline responsible for primarily answering PMG's

telephones hindered her ability to review regulations and perform her work, which

affected her ability to receive promotions and awards (DE 40-3, ¶203).

3.  Kline's supervisor, William M. Davis, had a practice of staring at Kline's breasts, which

suggested he was interested in having more than a professional relationship with her (DE

40-3, ¶49, 178); Davis took reprisals against Kline on October 19, 2005, and December

15, 2003, for rebuffing his sexual advances and subjected Kline to a hostile work

environment (DE 40-3, ¶167).

4.  Kline's work performance covered under her Performance Standards was equal to or

greater than minority and/or white male employees whose received higher performance

ratings (DE 40-3, ¶¶ 70, 131, 132, DE 40-6, p. 8).

5.  After the health of Kline's mother failed, Kline requested telework through her Union

Representative on October 26, 2005, which was denied on October 27, 2005 (DE 40-3,

¶33, DE 40-4, p. 53).

6.  Plaintiff disputes Defendant's Statement of Material Facts in Dispute, ¶¶ 1, 2, 4, 5, 6, 7,

8.

## II.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Some of the following material facts may be disputed depending on whether the Court grants

Kline's request for sanctions (DE 39) but submits that if Springer properly responded to the

request for documents and interrogatories, the facts would be undisputed.

**General**

1.      Kline is a member of a protected class (DE 37, p. 1);

2.      PMG employs white females at rates far less than the numbers in the applicant pool and

the general population (DE 37, p.2);

**Telework**

3.      Jacquline Carter was allowed to telework 2-3 days per week after her husband suffered

several strokes (DE 39, p.3); Kline's supervisor told her that she would be able to

telework if she accepted the position with PMG (DE 40-5, p. 23); Davis used telework as

an incentive to get Kline to accept the position with PMG (DE 40-3, ¶ 9, DE 40-5, p. 23);

Kline was hired to solely perform regulatory work (DE 40-4, p. 1-5); regulatory work is

suitable for telework (DE 40-5, p. 23); Kline was reassigned different duties, which

reassignment was initiated three (3) days after she formally requested telework (DE 40-4,

pp. 12-22); the reassigned duties were used justify denying Kline's telework (DE 40-5, p.

23); Kline's reassigned duties had been performed by a lower grade employee, Shirley

Sewell (DE 39, pp.4, 7, DE 40-4, pp. 55, 58); after her reassignment, Kline performed

regulatory work at least 50% of the time (DE 40-5, p. 22); telework was denied to Kline

other than during a 90-day trial period (DE 40-4, p. 53); and no problems were

encountered during the trial telework period (DE 39, p. 3).

4.      Jacquline Carter, Lara Rivera-Lopez and Jose Velaquez assisted with answering PMG

telephones and assisting walk-in customers (DE 39, p. 3, DE 40-2, pp. 37-38).

5.      Kline was similarly situated to Carter and Rivera-Lopez (DE 39, p. 3).

6.      Rivera-Lopez was allowed to telework without an executed telework agreement (DE 39, p. 3).

7.      Kline was not allowed to assist walk-in customers other than in a clerical capacity (DE 40-3, p 3).

**Performance Appraisal**

8.      The PMG has a practice of awarding its employees monetary bonuses based on their performance rating (DE 39, p. 7, DE 40-4, pp. 75-82, DE 40-2, pp. 21-22, 26-26, 29); PMG has a practice of giving performance bonuses to employees who receive "Exceeds Fully Successful" or "Outstanding" performance ratings (Id.).

9.      Carter received an overall "Outstanding" rating even though she made "mistakes" in performing regulatory work (DE 40-3, ¶131, DE 40, p. 8); Kline did not make mistakes performing regulatory work but only received an overall "Fully Successful" rating (DE 39, p. 4).

10.     Kline would have received a monetary bonus if she had received either an "Exceeds Fully Successful" or "Outstanding" performance rating (DE 39, p. 7, DE 40-2, p. 21-22, 26-27, 29, 37, DE 40-4, pp. 75-82).

11.     Kline did not fail to cover PMG telephones after being tasked with the primary responsibility for them on May 24, 2005 (DE 40-3, ¶ 80, DE 39, p. 4).

12.     Kline did not fail to perform duties related to the FACA database (DE 39, p. 4, DE 40-3, ¶ 82).

13.     Kline never exceeded her authority during October 7, 2002 to January 1, 2007 (DE 39, p. 4, DE 40-3, ¶ 108).

14. Robert Coco was primarily responsible for the Publications Inbox until Kline was assigned primary responsibility on June 20, 2006 (DE 40-3, ¶ 89, DE 40-5, p. 43).

15. Kline never failed to respond to the Publications Inbox after being tasked with primary responsibility for the Publications Inbox (DE 40-3, ¶ 94, DE 39, p. 4).

16. Kline never failed to update or maintain the Publications database (DE 40-3, ¶¶ 83-84, DE 40-5, p. 30, DE 39, p. 4).

17. Kline never missed deadlines on any of her work projects (DE 39, p. 4, DE 40-3, ¶ 81)

18. Kline is the <u>only</u> employee in PMG that has a Performance Standard based on the ability to have good relationships with other employees (DE 39, p. 4).

19. Kline reviewed OPM's pending "old and cold" regulations at her own initiative (DE 39, p. 4).

20. Kline suggested a procedure for having the Office of Communications and Public Liaison notify PMG of any publications it approves for inclusion into the Publications database (DE 40-3, ¶64, 83, DE 40-5, p. 10, DE 39, p. 5).

21. No complaints were ever made against Kline by any PMG office or Director Springer's office (DE 40-3, ¶ 101, DE 39, ¶ 37).

**<u>Defamatory Email</u>**

22. Email sent to Arlene Taylor and Margaret McElrath inquiring as to why Taylor was visiting Kline concerning changes being made to the FRMS implied that Kline did not keep her supervisor informed of changes being made to the FRMS and that Kline had exceeded her authority in allowing changes to the FRMS (DE 39, ¶ 10, DE 40-3, ¶ 182, DE 40-5, p. 24); the email affected Kline's ability to receive awards and promotions

because it undermined Kline's ability to maintain good and effective working

relationships Taylor and McElrath, as required by her performance standards (DE 40-4,

p. 73, DE 40-5, p. 24); the email was defamatory (DE 39, p. 5).

23.    Kline had informed Davis of the changes being made to the FRMS that Davis claimed he

was unaware of in the email to Taylor and McElrath (DE 40-3, ¶183, DE 40-6, p. 75-81).

**<u>Administrative Rights</u>**

24.    Regulatory work was and is a material duty in Kline's Position Description and

Performance Standards (DE 40-4, pp. 20, 74); the regulatory work required tracking of

the regulations; Kline sought permission and was authorized by Claudio Benedi to

develop the an electronic web-based tracking system for regulations (DE 40-3, ¶ 190);

Kline initiated the Federal Register Management System (FRMS) for tracking regulations

and directed its development (DE 40-7, p. 2-6); Kline  presently has access to the FRMS

(<u>Id</u>.); Kline acquired administrative rights to the FRMS because she directed the

development of the system (<u>Id</u>.); Benedi was aware that Kline  was going to have the

software that drove the FRMS on her computer and made no objections to Kline having

the software on her computer; Kline was never the official "administrator" of the FRMS

even though she had administrative rights to the system (<u>Id</u>.); Benedi and Davis were the

official "administrators" even though they did not have administrative "rights" to the

system (<u>Id</u>.); "administrative rights" is a term of art for someone who has the software

that drives the FRMS and can work on the program itself as well as give users access to

the system; Kline's administrative responsibilities for FRMS were taken from her and

given to minority and/or white male employees less qualified than Kline in administering the FRMS (DE 40-3, ¶¶ 186, 189).

25. Coco is less experienced and less qualified in overseeing changes to the FRMS than Kline (DE 40-2, p. 34).

26. Kline had administrative rights to the FRMS for approximately 2 years before the rights were rescinded (DE 40-3, ¶ 186-188, DE 40-7, pp. 1-6, DE 40-7, p. 1).

**Office Space**

27. The office space Kline sought to occupy, room 5H36C, was "on loan" to PMG whereby PMG had possession of the office (DE 40-5. pp. 68-69, DE 40-3, ¶¶ 199-200); Kline sought to occupy the space in order to seek a more conducive work environment for reviewing regulations (DE 40-7, pp. 26, 28, DE 40-5, p. 69); Issac Evans had less seniority and less tenure than Kline but was assigned the space instead of Kline (DE 40-7, p. 27, DE 40-5, p. 69); Evans occupied the office for approximately three (3) years (DE 40-3, ¶200-201).

28. Issac Evans, Shirley Sewell, Miriam Heard-Johnson and Stephen Hickman occupy or occupied superior offices/cubicles than Kline even though they had or have less seniority and less tenure than Kline (DE 40-3, ¶202).

**Staff Support**

29. Similarly-situated minority employees were not required to furnish staff support to Kline when Kline needed staff support (DE 40-3, ¶206-208); Kline was in need of support staff while working on the Semiannual Unified Agenda of Regulatory Actions (Id.); Annette

Gunter-Frye and Issac Evans could have provided backup telephone support to Kline while she was working on the Semiannual Unified Agenda of Regulatory Actions (Id.); Davis refused to impose on Issac Evans or Annette Gunter-Frye to answer telephone when Kline requested relief from covering the phones while working under a strict deadline on the agency's Unified Agenda of Regulatory Actions (Id.); Kline was required to furnish staff support to PMG even though she was working under a strict deadline on the agency's Unified Agenda of Regulatory Actions (Id.).

30.     Kline was the only PMG employee formally tasked with primarily answering PMG telephone lines (DE 39, ¶30); Shirley Sewell could have continued performing or assumed the clerical duties that were assigned to Kline (DE 40-3, ¶¶ 39-46, DE 39, ¶31).

**Counseling Memorandum**

31.     The December 15, 2003 "Counseling Memorandum" was placed in Kline 's official personnel folder and thereby affected Kline's work record and ability to seek promotions and alternate employment (DE 17, pp. 6-7).

32.     Kline was issued a Counseling Memorandum for forwarding an email to a friend that had been sent to her by Robert Coco, who sent the email to other PMG staff members, including Davis and Benedi, without receiving disciplinary action (DE 40-6, pp. 73-74).

**Lunch Hours**

33.     Minority and white male employees are allowed to take lunch breaks outside the core hours but Kline is not afforded the same privilege (DE 40-7, p. 35-36); Kline was denied the preferential and special treatment for lunch breaks that similarly-situated minority and

white male employees were afforded (DE 40-3, ¶213, DE 40-7, p. 37); Kline was the only employee assigned to go to lunch at a specific time within the core hours (DE 39, ¶ 22).

34.    Shortly after Kline was hired, she was tasked with covering the office while the rest of the PMG employees on the 5th floor went to lunch (DE 40-7, p. 32).

35.    Kline was the only one on the 5th floor assigned a specific time for going to lunch and other PMG employees could go to lunch anytime they wanted (DE 39, ¶22).

**<u>Letter of Reprimand</u>**

36.    The February 1, 2006 Official Reprimand was placed in Kline 's official personal folder and thereby affected Kline's work record and ability to receive awards, promotions and alternate employment (DE 40-7, p. 43).

37.    Kline did not fail to properly report her leave as accused in the Letter of Reprimand (DE 40-7, p. 50-53, DE 39, ¶ 23).

38.    Kline notified Coco of the time she left on September 23, 2005, but Coco did not accurately record her leave into the T&A system (DE 40-3, ¶ 234).

39.    Similarly-situated white male employees were not issued formal reprimands for failing to properly report leave (DE 40-3, ¶235, Coco Deposition, p. 46, Attachment 1).

40.    Minority and white male employees did not have their swipe records monitored during the time that Davis was on leave recovering from surgery (DE 40-7, p. 33); Kline was the only employee whose swipe records were reviewed by Davis during the time that he was on leave recovering from surgery (<u>Id</u>.).

41.     PMG has no instructions on how PMG employees are to properly report their leave
        (DE 39, ¶ 24).

42.     Kline reported her leave more accurately than white male and/or minority employees
        whose "swipe" records were not scrutinized during the timeframe of Letter of Reprimand
        to Kline (DE 39, ¶25).

**<u>Leave Tampering</u>**

43.     Without the knowledge or authorization of Kline, Davis wrongfully amended Kline's sick
        leave that resulted in a loss of 36 hours of "Use or Lose" Annual Leave and a loss of 98.5
        hours of accrued Sick Leave on pay period ending 11-26-2005 (DE 40-3, ¶239, DE 40-7,
        pp. 66-71); Davis did not instruct Sewell to amend Kline's leave for pay period ending
        11-26-2005 (DE 39, ¶27).

44.     Davis did not properly correct Kline's leave until after she filed an EEO complaint about
        the leave tampering (DE 40-7, pp. 67-78, DE 43-3, ¶ 2385-255).

45.     Davis denied Kline the use of sick leave on January 10, 2005, and January 21, 2005, even
        though Kline had earned and accrued sufficient sick leave for these days (DE 43-3, ¶ 248,
        DE 40-7, pp. 75-76).

46.     Davis erroneously charged Kline with 4 hours of leave on September 15, 2005, and
        September 16, 2005, that she had not used (DE 40-7, p. 54).

                                    Respectfully submitted,

                                           /s/


                                    Valerie Kline, pro se
                                    (301) 509-2684