## U.S. DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 (JR) |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C. 20415 | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *  * * * * * * * * * * * * * * * * * * * * *

## KLINE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff, Valerie Kline, a GS-12 Management Analyst with the Publication Management Group ("PMG"), U.S. Office of Personnel Management ("OPM"), Washington, DC, since 2002, filed a complaint alleging reverse race and sex discrimination, hostile work environment, retaliation and retaliatory harassment. Defendant, Linda Springer, Director, U.S. Office of Personnel Management, filed a Motion to Dismiss and/or for Summary Judgment on February 1, 2008. Docket Entry (DE) 22. Kline filed a Third Amended Complaint on approximately March 20, 2008 (DE 37), and opposed the dispositive motion on April 18, 2008 (DE 40).

Based on Defendant's Answer to Second Amended Complaint and the responses to discovery requests, Kline submits there are no disputed issues of material fact or no evidence supporting an element essential to Springer's case in defense of the retaliation claims. Therefore, Kline submits that partial summary judgment is appropriate.

## II.    BACKGROUND

Following is an account of the factual background of the averred claims suitable for summary judgment.

a. <u>Count V</u> - On October 19, 2005, Plaintiff only received a "Fully Successful" performance evaluation together with derogatory comments instead of a higher earned rating in retaliation for engaging in protected activity.  DE 16, ¶¶ 79-85.  Plaintiff suffered a loss of a performance bonus and the derogatory comments on her appraisal that hindered her from obtaining other employment or promotions.  Kline sought informal EEO counseling on November 17, 2005. DE 16, ¶ 102.

b. <u>Count III</u> - Plaintiff received a Counseling Memorandum from her supervisor, Mr. Davis, on December 15, 2003, in retaliation for engaging in protected activity.  DE 16, ¶¶ 73-78. This claim was investigated by an EEO counselor when Kline initiated a formal sexual harassment claim (Count II) on December 28, 2005.  DE 23-2, pp. 4-5.

c. <u>Count VII</u> - Plaintiff was the subject of an offensive e-mail from her supervisor to her work contacts on about December 12, 2005 in retaliation, for filing an EEO complaint against her supervisors.  DE 16, ¶¶ 88-90, 93.  The e-mail was libelous because it inferred that Kline exceeded her authority and did not keep her supervisors informed in authorizing changes to the Federal Register Management System (FRMS), which was an attempt to negatively impact her working relationships.  DE 40-5, p. 24.  Kline added this claim to her November 30, 2005 claim.

d. <u>Count XII</u> - Plaintiff was denied suitable work space in December 2005 in retaliation for engaging in protected activity.  DE16, ¶¶ 106-126).  Plaintiff sought counseling for this claim on January 25, 2006. DE 36-2, pp. 50-54.

e. <u>Count XIV</u> - Plaintiff was denied staff support in retaliation for engaging in protected activity since she was expected to cover the office telephones on approximately February 2, 2006 while working under a strict deadline. Plaintiff sought counseling for this claim on January 25, 2006. DE 36-2, p. 2. Covering office phones is not part of Kline's Position Description or Performance Standards. DE 40-4, pp. 19-22, 71-74.

f. <u>Count XVI</u> - Kline's administrative rights to the FRMS were rescinded on December 22, 2005, in retaliation for engaging in protected activity. DE 16, ¶¶ 87-89, 94-95. Plaintiff sought counseling for this claim on January 25, 2005. Plaintiff's Position Description contains duties requiring plaintiff to develop state-of-the-art publishing systems such as the FRMS. DE 40-4, pp. 19-22,

g. <u>Count XVIII</u> - On January 31, 2006, Plaintiff was required to use her leave instead of being allowed to substitute her lunch break in lieu thereof in retaliation for engaging in protected activity where other employees are undisputedly allowed to take lunch breaks outside the cores hours in lieu of using leave. DE 16, ¶¶ 66-71. Plaintiff sought initial counseling for this claim on March 1, 2006. DE 36-2, pp. 42-45.

h. <u>Count XX</u> - Plaintiff was issued a letter of reprimand on February 2, 2006 in retaliation for engaging in protected activity when Kline's supervisor arbitrarily reviewed her "swipe" records and issued a written Letter of Reprimand for allegedly abusing her leave. DE 16, ¶¶ 151-162. Plaintiff sought EEO counseling on March 1, 2006. DE 36-2, pp. 42-45.

i. <u>Count XXI</u> - Plaintiff's supervisor tampered with her leave in retaliation for engaging in protected activity so that she was denied leave on January 10 and 21, 2006, and her leave was not corrected until after she filed an EEO complaint. DE 16, ¶¶ 163-165. Plaintiff sought EEO counseling for this claim March 1, 2006. DE 36-2, pp. 42-45.

III.     **Standard for Summary Judgment Review.**

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986) ("the inquiry involved in ruling on a motion for summary judgment. . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.")  *Id.* at 252.

In a Title VII discrimination case, the applicable analytical framework is the three-stage burden-shifting test set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  Under this test, the plaintiff must initially prove by a preponderance of the evidence a *prima facie* case of unlawful discrimination.  If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  If the employer makes this showing, the burden then returns to the plaintiff to show that the employer's reason is pretextual.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  The ultimate burden of persuasion remains at all times on the plaintiff to prove that the employer intentionally discriminated against her. *Burdine*, 450 U.S. at 253.

Accordingly, a summary judgment decision is appropriate when the undisputed facts show: (1) that plaintiff has established a *prima facie* case of discrimination, and (2) the defendant has failed to present probative evidence that their stated legitimate non-discriminatory reasons for its actions were not a pretext for discrimination.

Kline submits the preponderance of the evidence shows that Springer has failed to present probative evidence that the proffered reasons for the retaliatory actions are not pretextual.

### IV.    Kline established a prima facie case of retaliation.

Kline submits that she established a *prima facie* case of discrimination on the basis of retaliation pursuant to 42 U.S.C.S. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must *show* that "(1) [he or she] engaged in protected conduct under Title VII; (2) [he or she] suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity."  *Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003) (citing *White v. N.H. Dep't of Corr.,* 221 F.3d 254, 262 (1st Cir. 2000)); see also *Maramark v. Spellings*, 2007 U.S. App. LEXIS 22545 (D.D.C., 2007).

First, it is undisputed that Kline engaged in protected activity.  It is also undisputed that a causal connection exists between the adverse actions and the protected activity since the retaliatory actions took place shortly after the protected activity, as illustrated in Table 1, *infra*.  See *Davis v. District of Columbia*, 503 F. Supp. 2d 104 (D.D.C. 2007):

> Table 1.  Dates of Incidents Following Protected Activity
>
> 11/30/05 – First EEO action initiated
> 12/07/05 – Count IV – Poor Performance Appraisal (7 days later)
> 12/08/05 – Count VII – Offensive e-mails sent (8 days later)
> 12/21/05 – Count XII – Denial of Office Space (14 days later)
> 12/22/05 – Count XVI – Rescinded Adm. Rights (15 days later)
>
> 01/26/06 – Second EEO action initiated
> 01/31/06 – Count XVIII – Lunch break incident (5 days later)
> 02/01/06 – Count XX – Swipe / Reprimand (6 days later)
> 02/02/06 – Count XIV – Denial of Telephone Staff Support (7 days later)
> 02/02/06 – Count XXI –Leave Tampering (approx. 7 days later)

Finally, Kline submits she has suffered adverse employment actions in the retaliation claims.  Kline suffered "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact

could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); see also *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *Al-Mahdi v. D.C. Public Schools*, 2005 WL 3272075, 8-13 (D.C. Dis. Ct. 2005)(Robertson, J.).

Under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998), an employment action must have a *significant* adverse effect on the employee and whether an action is sufficiently adverse depends on how a given act affects a particular worker under *all* the circumstances. In addition, the standard for retaliation actions was modified in *Burlington N. and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 165 L. Ed. 2d 345 (2006), which holds:

> "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id* at 2415.

> "We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." Context matters." *Id* at 2415

> "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." [Emphasis added.] *Id.* at 2416.

Kline claimed that she suffered an adverse employment action in all the counts contained in the Complaint and submits that the acts are in fact adverse employment actions based on law and the objective "reasonable employee" standard mandated in *Burlington N., id*.

### 1.     Performance Appraisal.

It is undisputed that "[a] performance evaluation only rises to the level of being an adverse action when there is a direct causal link between the evaluation and tangible money, like a bonus such that 'a higher rating would . . . automatically mean [] a larger bonus.'" *Russell v. Principi,*

347 U.S. App. D.C. 222, (2001); *Douglas v. Jackson*, 2007 U.S. Dist. LEXIS 20412 (D.D.C. 2007).  Kline claimed that by only receiving a "Fully Successful" rating, she was <u>precluded from receiving an "automatic monetary bonus"</u>.  <u>See</u> *Douglas v. Jackson*, 2007 U.S. Dist. LEXIS 20412 (D.D.C. 2007).  DE 40-3, ¶ 53.

The evidence shows that Kline's office, the Publications Management Group (PMG), gives performance bonuses to its employees.  DE 40-3, ¶55; DE 40-4, pp. 75-82; DE 40-2, p. 21-22, 27, 29.  While Springer submitted a declaration by Ms. Janet Smith, who declared that <u>OPM</u> does not have a policy of giving automatic bonuses (DE 22-6), Springer <u>does not deny</u> that PMG has a practice of giving automatic monetary performance bonuses to its employees at the "Exceeds Fully Successful" level and above.

Each year, PMG budgets approximately 1.5-2% of its total salaries for performance awards.  DE 40-3, ¶55; DE 40-4, pp. 75-82.  Because it is PMG's practice to give its employees monetary bonuses based on their performance rating, it is "predictable", i.e. automatic, that PMG employees will receive a monetary bonus if they perform at the "Exceeds Fully Successful" level or above.  Because evidence shows that Kline performed at the "Outstanding" level and no legitimate reasons were proffered for not giving Kline an "Outstanding" rating, Kline was denied a performance bonus when she only received a "Fully Successful" rating.  Therefore, she suffered an adverse action.

In addition, an unwarranted negative job evaluation is also cited as an example of an adverse action:

> "[S]ee also *Wyatt v. City of Boston*, 35 F.3d at 15-16 (citing '<u>unwarranted negative job evaluations</u>' as an example of an adverse action.)" [Emphasis added.] *Johnson v. Dimario*, 14 F. Supp. 2d 107 (D.D.C. 1998).

Davis made numerous derogatory remarks on Kline's Performance Appraisal including:

"[Kline's] performance in Federal Register work & in assisting our senior analyst is acceptable.  She needs to be more self starting & to direct her attention to her duties assisting the senior analyst & supporting this office's mission."

"Publications inbox not kept up.  It was necessary to remind [Kline] on several occasions.  Publications database was not kept up except for a brief period."  [Emphasis added.]  DE 40-4, pp. 70-74;

These derogatory statements could prevent Kline from obtaining future employment or promotions because the rating is kept in Kline's Official Personnel Folder and employees are usually required to submit a recent performance appraisal when applying for Federal jobs.  DE 40-7, pp. 64-65.

"A plaintiff who … suffers no diminution in pay or benefits--does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown v. Brody*, 199 F.3d 446 at 457 (D.C. Cir. 1999) [Emphasis added.]

Thus, the poor performance appraisal coupled with the derogatory comments amounts to an adverse action because it will affect Kline's ability to obtain future employment and/or promotions as found in *Brown, id.*

Because Kline's poor evaluation precluded her from receiving a monetary bonus and contained derogatory comments that could affect Kline's ability to obtain future employment or promotions, Kline submits it was an adverse action consistent with *Russell*, *Id.*

### 2.    **Counseling Memorandum.**

Kline submits that the Counseling Memorandum was a disciplinary action because it goes into Kline's personnel file, as Springer admits.  DE 17, ¶ 78.  This could prevent Kline from obtaining future employment.  It also has the potential of affecting Kline's present employment

because it <u>serves as the foundation for future corrective action</u>.  See *Johnson v. Dimario*, 14 F. Supp. 2d 107 (D.D.C. 1998).  Thus, Kline submits that the Counseling Memorandum constituted an adverse employment action as found in *Brown. Id.,* and *Johnson, id.*

### 3.    Offensive E-mail.

It is undisputed that Davis sent an e-mail to Kline's professional work associate, Arlene Taylor, and Taylor's supervisor, Margaret McElrath, after Taylor visited Kline on official business pertaining to the FRMS.  DE 40-5, p. 24.  Courts have held that,

> "A <u>false accusation resulting in denial of tangible benefits</u> constitutes an adverse employment action and would deter a reasonable worker from engaging in protected activity."  [Emphasis added.] *Duplessis v. Golden State Foods*, 2007 U.S. Dist. LEXIS 27851 (W.D. Wash. 2007)

The e-mail <u>colloquially defamed Kline by way of inference and innuendo</u> because it claimed that Davis was unaware of changes being made to the FRMS even though the evidence shows Davis was notified of the changes on six (6) different occasions[1].  It also suggested that Kline had <u>exceeded her authority in authorizing changes</u> to the FRMS without his knowledge or approval[2].  Thus, this e-mail <u>undermined Kline's professional work relationships</u> with Taylor and McElrath.  This is significant since Kline's Performance Standards contain a provision for having good working relationships.  DE 40-4, p. 73.

---

[1] Kline submits there was a response to the e-mail and a reply to the response that would further prove the defamation.  Kline requested all of the e-mails between Davis and McElrath/Taylor but Springer failed to produce the documents.  <u>See</u> Kline's *Request for Rule 32 Sanctions*.

[2] Davis alleged in Kline's Performance Appraisal that she exceeds her authority but Kline requested documentation showing when and how Kline had exceeded her authority but Springer failed to produce any documentation.  <u>See</u> Kline's *Request for Rule 32 Sanctions*.

It also constituted an adverse action because Davis' act of sending the e-mails also amounted to "overbearing surveillance of the protesting employee's work performance", as found in *Rogers v. McCall*, 488 F. Supp. 689 (D.D.C. 1980). The e-mail stated in no uncertain terms that no changes were to be made to the FRMS unless he and/or Benedi approved them. DE 40-5, p. 24. This statement was offensive in the context that it implied that Kline did not keep him aware of the changes being made to the FRMS and insinuated that Kline had exceeded her authority by authorizing changes to the FRMS.

The standard for determining whether an action is adverse "in the context of 42 U.S.C.S. § 2000e-3(a) is whether a reasonable employee would have found the challenged action materially adverse and where it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N., Id.*

In this case, other employees in PMG are allowed visitors, including visits from Taylor, without offensive e-mails being sent to the visitor and their supervisors in response to those visits. But because Davis' complained when Taylor visited Kline instead of asking Kline about the visit and did not complain when Taylor visited other members of PMG, Kline submits that Davis' intent for sending the e-mail was to hinder Kline's working relationship with Taylor and McElrath.

In light of the requirement in Kline's Performance Standards for her to maintain effective working relationships, Kline submits a reasonable worker would find this e-mail materially adverse because it would dissuade a reasonable worker from engaging in protected activity as found *in Burlington N., Id.* Otherwise, their work associates and their supervisors will receive harassing e-mails that will ultimately discourage the visitors from having any contact with the worker, which the supervisor could then use to give the worker a poor performance rating for not maintaining good working relationships. Davis' intent to interfere with Kline's work relationships

by issuing the offensive e-mail is bolstered by his unsubstantiated accusations that he receives complaints about Kline to keep her out of other offices. The defamatory e-mail had <u>negative employment consequences</u> because shortly after this incident, <u>Kline's administrative rights to the FRMS were rescinded</u> .

Therefore, Kline submits that sending the offensive e-mail is actionable under Title VII <u>because it would deter a reasonable worker from engaging in protected activity</u>.

### 4.     <u>Rescission of Administrative Rights.</u>

It is undisputed that Kline had administrative rights to the FRMS and that her administrative rights were rescinded. DE 16, ¶94. Rescission of Kline's administrative rights was an adverse employment action because it significantly diminished her material duties and significantly reduced her job responsibilities.

"A tangible employment action constitutes a significant <u>change in employment status</u>, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Compare *Crady* v. *Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (C.A.7 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, <u>significantly diminished material responsibilities</u>, or other indices that might be unique to a particular situation"), with *Flaherty* v. *Gas Research Institute*, 31 F.3d 451, 456 (C.A.7 1994) (a "bruised ego" is not enough);" [Emphasis added.] *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.3d 446 (D.C. Cir. 1999).

Kline obtained administrative rights to the FRMS when the software was installed on her computer during development of the system in 2003 and had been exercising them until the date her rights were rescinded on December 22, 2005. Rescinding Kline's administrative rights was an adverse action because <u>it eliminated a significant material responsibility from Kline</u>. DE 16, ¶ 188; DE 40-4, pp. 19-22.

Kline's Position Description charges her with responsibility for "develop[ing] state-of-the-art publishing systems". DE 40-4, pp. 19-22. The FRMS is a state-of-the-art publishing system that was engineered by Kline[3]. DE 16, ¶¶ 86-87, Ex. 95. Thus, eliminating this responsibility from Kline significantly diminished her material responsibilities encompassed under her Position Description that could lead to a demotion because she would not be performing the duties necessary to maintain her GS-12 grade.

Kline submits that she should have been promoted to a GS-13 as a result of administering the FRMS (DE 40-3, ¶189) since lead responsibility for overseeing changes to FRMS was assigned to Coco, a GS-13, who admits he does not know very much about the FRMS. DE 40-2, p. 34. By rescinding her administrative rights, Kline was further precluded from receiving a promotion.

Thus, Kline submits that rescinding her administrative rights was an adverse action because it eliminated a significant material activity that would deter a reasonable employee from engaging in protected activity.

### 5.    Office Space.

It is undisputed that Kline performed regulatory work at least 50% of the time. DE 40-5, p. 22. PMG's regulatory work involves reviewing OPM's regulations for publication in the *Federal Register*. These regulations are either codified in the Code of Federal Regulations (CFR) or amend the regulations codified in the CFR. Reviewing regulations requires paying close attention to detail because it amends the CFR, which is agency law. Review is done for conformance with the *Federal Register Document Drafting Handbook*, and requires knowledge of Federal regulatory policies, laws, Executive Orders and interpretation of policy. DE 40-4, pp. 2-5, 19-22. Reviewing

---

[3]Davis and Benedi deny that Kline initiated and directed the development of the FRMS. Kline requested documents showing where she was assigned the project but Springer produced no documents. See Kline's *Request for Rule 32 Sanctions*. Kline produced evidence showing that she initiated the project.

regulations requires a lot of reading, cross referencing, cite checking, document preparation, coordination and editing.  DE 40-3, ¶ 123.  Since regulations are legal in nature, <u>a quiet environment is critical for performing an efficient and effective review</u>.  DE 40-3, ¶ 198.

Kline submits she was required to perform regulatory work under deplorable working <u>conditions</u> because she was required to answer telephones, assist visitors, and performing other clerical-type duties not encompassed by her Position Description while reviewing the regulations. Kline submits that <u>a reasonable employee would find it materially adverse to review regulations while constantly being interrupted from answering telephones, greeting visitors and performing clerical and staff support duties</u>.

Kline found it particularly challenging to work under these conditions since her cubicle, located in room 5H35, is in the center of the PMG offices where it is <u>the busiest and noisiest area of PMG</u> due to the high traffic coming into the area combined with activity from printing, copying, faxing, and graphics work.  Furthermore, many visitors to Davis and Benedi would stop by Kline's cubicle and ask Kline if they were available because Kline's cubicle is located right in front of their offices and does not have a door.

Denying Kline the quieter space constituted an adverse employment action because <u>having a suitable work environment was not a mere convenience but an urgent need</u> in order to properly perform her work.  Moreover, having suitable work space should be considered a <u>requirement</u> of employment, as opposed to a "benefit" but at the very least would have been <u>more advantageous for performing regulatory work</u>.

"A benefit of employment is defined as '<u>any advantage</u>, profit, privilege, gain, status, account, or interest (other than wages or salary . . . ).' <u>38 U.S.C. § 4303(2)</u>."[Emphasis added.] *Clegg v. Ark. Dep't of Corr.*, 101 Fair Empl. Prac. Cas. (BNA) 345, 496 F.3d 922 (8th Cir. 2007).

Being denied a suitable work environment is <u>similar to being "demoted"</u> since it creates an environment that is not conducive to properly performing one's work and would cause one not to work as effectively or efficiently, which would lead to a demotion.  And since Kline was denied suitable office space, it affected her working conditions and thereby affected a condition of her employment.  Kline submits that a reasonable worker would find it materially adverse to review regulations under the conditions Kline was required to review regulations and these conditions would dissuade them from complaining or assisting in complaints about discrimination. *Burlington N. Id*.  Otherwise, they could expect to work under despicable condition and never have better conditions.  Thus, Kline submits denial of suitable work space constituted an adverse action.

### 6.    <u>Staff Support.</u>

On February 2, 2003, Kline asked for staff support to cover the telephones because she was under a <u>strict deadline</u> to complete the Unified Agenda of Regulatory Actions and <u>urgently needed relief from the telephones</u>.  DE 40-3, ¶ 206.  However, <u>Davis refused to provide backup telephone support to Kline</u> and insisted that Kline cover the telephones in spite of her deadline.  DE 40-3, ¶ 207.  Kline submits that <u>failing to provide urgently needed staff support constituted an adverse employment action</u>.

"Plaintiff failed to establish an adverse employment action from the alleged <u>failure to provide adequate support staff</u> where the alleged failure was no 'more disruptive than a <u>mere inconvenience</u>' *See also Halloway v. Milwaukee County,* 180 F.3d 820, 826 (7th Cir. 1999)" *Isaac v. Sch. Bd. Miami-Dade County*, 2002 U.S. Dist. LEXIS 17972 (S.D. Fla., 2002) [Emphasis added.]; <u>see</u> also *Carmona v. Snow*, 2007 U.S. Dist. LEXIS 21080 (D.D.C. 2007).

In contrast to *Isaac*, *id*., Kline's need for support staff was not a mere inconvenience, <u>it was an urgent need</u>.  Reviewing the Unified Agenda of Regulatory Actions was an item that was

published in the *Federal Register* and since it was going to be published in the *Federal Register*, it was critical that it be correct and completed on time.  Since Kline was under pressure to meet a deadline, answering the telephones for the office made it extremely difficult to perform the task. DE 40-3, ¶208.  Thus, having staff support was an urgent, legitimate need and Kline submits that the denial of support was an adverse action.  It is undisputed that when Kline was working on the Unified Agenda with a strict deadline, she was told that there was no one available to cover the telephones (DE 16, ¶130) and it is undisputed that Kline's supervisor refused to have a new visual (graphics) detailee, Annette Gunter-Frye, assist with PMG telephones. DE 17, ¶131.

Kline submits that a reasonable worker would also find the challenged action materially adverse because it would dissuade a worker from engaging in protected activity.  *Burlington N. Id*. Otherwise, an employee could expect no staff support when urgently needed due to their EEO actions.

## 7. <u>Lunch Breaks</u>.

Springer claims that the "requirement that plaintiff have to eat lunch within the core hours" does "not affect the material responsibilities or benefits of [Kline's] job".  The standard mandated in *Burlington N.*, *id*., applies whereby "the significance of any given act of retaliation <u>will often depend upon the particular circumstances</u>." *Id.* at 2415.

> "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. Cf., *e.g*., *Washington, supra,* at 662 (finding flex-time schedule critical to employee with disabled child)*. Id.* at 2415

Kline claims that she was <u>required to take leave</u> instead of being able to take a lunch break falling outside the "core hours".  It is undisputed that similarly-situated white males and minority

females *are* allowed to take lunch breaks outside the core hours <u>without using their leave</u>.  DE 40-3, ¶213, DE 40-7, pp. 35-36.  While this might seem like a minor slight, to Kline it was significant since she <u>was rapidly depleting her leave due to her mother's failing health and needed to conserve leave</u> wherever possible so that she would have leave in the event of an emergency.  Thus, Kline submits that denying her the opportunity to take a lunch break outside the core hours so that she was prevented from conserving her leave for emergencies was an adverse action.

Kline further submits that OPM's policy of not allowing lunch breaks outside core hours is <u>discretionary</u> since Davis admittedly allows others to take breaks outside "core hours".  DE 40-3, ¶¶216, 217, DE 40-7, pp. 35-36.  The standard for determining an adverse action is whether it affects a term, condition or benefit of employment.  Since <u>leave is a benefit of employment, requiring Kline to use leave affected a benefit of her employment</u>. Therefore, requiring Kline to use leave in lieu of taking a lunch break outside the core hours qualifies as an adverse action.

## 8. <u>Formal Reprimand.</u>

It is undisputed that Kline was issued a Letter of Reprimand based on the alleged failure to properly report her leave.  The standard for determining if written reprimands are adverse actions is found in *Johnson v. Dimario, id.*

> "<u>The written reprimand which was placed in plaintiff's file was an "adverse action" sufficient to establish a *prima facie* case of retaliation</u>. See *Fowler v. Sunrise Carpet Indus., Inc.,* 911 F. Supp. 1560, 1582 (N.D. Ga. 1996) (holding that "written reprimands make the future loss of tangible benefits more likely. . . . [and] thus can be used to chill employees' statutorily . . . protected speech," <u>qualifying them as adverse actions</u>); see also *Wyatt v. City of Boston*, 35 F.3d at 15-16 (citing "unwarranted negative job evaluations" as an example of an adverse action.)" [Emphasis added.] *Johnson v. Dimario*, 14 F. Supp. 2d 107 (D.D.C. 1998).

> "Defendant admits that the written reprimand had the potential of affecting plaintiff's employment <u>because it could have served as the foundation for future corrective action</u>. [fn

omitted] See *Supp. Decl. of William T. Harris* P 4 (April 24, 1997)" *Mylett v. City of Corpus Christi*, 97 Fed. Appx. 473 (5th Cir. May 4, 2004), *Weigold v. ABC Appliance Co*., 105 Fed. Appx. 702 (6th Cir. 2004), *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir.1998) cited by <u>Rochon v. Gonzales</u>, 370 U.S. App. D.C. 74, 438 F.3d 1211 (D.C. Cir. 2006) and *Baloch v. Norton*, 355 F. Supp. 2d 246 (D.D.C. 2005).

Kline submits that issuing a formal reprimand *is* an adverse employment action because it is undisputed that it was <u>placed in Kline's personnel folder, which can hinder her ability to obtain future jobs and promotions</u>. DE 40-3, ¶ 237, DE 40-7, pp. 43-44, 64-65.

Moreover, Davis arbitrarily scrutinized Kline's swipe records, and only Kline's swipe records. DE 40-3, ¶¶ 223, 224, 253. It is undisputed that no other PMG employees' "swipe" records were reviewed during the time Davis was on leave recovering from surgery.  DE 40-7, p. 33-34. Monitoring Kline's "swipe" records for no valid reason, as discussed in paragraph IV, *infra,* was an "overbearing surveillance" of Kline and also constituted an adverse employment action as found in *Rogers v. McCall, Id.* In this respect, it was a <u>doubly adverse</u>.

The law of this jurisdiction holds that a written reprimand placed in an employee's file *is* an adverse action:

> "<u>The written reprimand which was placed in plaintiff's file was an "adverse action" sufficient to establish a *prima facie* case of retaliation</u>. See *Fowler v. Sunrise Carpet Indus*., *Inc.,* 911 F. Supp. 1560, 1582 (N.D. Ga. 1996) (holding that "written reprimands make the future loss of tangible benefits more likely. . . . [and] thus can be used to chill employees' statutorily . . . protected speech," <u>qualifying them as adverse actions</u>)  *Johnson v. Dimario*, 14 F. Supp. 2d 107 (D.D.C. 1998)

In addition, Kline submits that a reasonable worker would find the challenged action materially adverse and would dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. Id.* Otherwise, the employee could expect to have their "swipe" records monitored and reprimands issued when their leave wasn't reported exactly to the minute

that the "swipe" records show (even though employees do not have regular access to a print out of the swipes unlike time and attendance punch cards).

### 9.    __Leave Tampering.__

Courts have found that denying a leave request <u>can</u> amount to an adverse action.

> "At the same time, other courts have noted that <u>denial of leave request</u> could, in the appropriate circumstance, rise to a level of an adverse employment action. *VanDevander v. St. Mary's County Sheriff's Ofc.,* 2001 U.S. Dist. LEXIS 7080 [D. Md. 2001]; *Spriggs v. PSC*, 197 F. Supp. 2d [388,] 393-94 [D. Md. 2002]" *Scott-Brown v. Cohen,* 220 F. Supp. 2d 504 (D. Md., 2002), aff'd *Scott-Brown v. Cohen*, 54 Fed. Appx. 140, (4th Cir. Md. 2002). [Emphasis added]

The evidence shows that Davis altered Kline's leave sometime after November 23, 2005, and before December 7, 2005, which resulted in a loss of 36 hours of "Use or Lose" (U/L) Annual Leave (AL) and a loss of 98.5 hours of accrued Sick Leave (SL).  DE 40-3, ¶ 243, DE 40-7, p. 67. This action occurred shortly around the time Kline first filed an EEO action against Davis on November 30, 2005.  It is undisputed that Davis amended Kline's leave on Feb. 2, 2006, but did not correct the unauthorized alterations that had been previously made.  DE 40-7, p. 33.  As a result of the unwarranted changes, <u>Davis denied Kline the use of her SL on January 10, 2006, and January 21, 2006,</u> leave that she had rightly earned and was entitled to use.  DE 40-3, ¶¶ 248, 249. Thus, the denial of leave constituted an adverse action per *VanDevander, id.*

Kline further submits that a reasonable worker would find the challenged action materially adverse and would dissuade a reasonable worker from making or supporting a charge of discrimination.  *Burlington N. Id.*  Otherwise, the employee could expect to have their leave altered and tampered with so that they will not have leave when needed.

## V.     **ARGUMENT**

In each of the following counts contained in the Third Amended Complaint (the "Compliant"), Kline submits that *no* legitimate non-discriminatory reasons were proffered by Defendant Springer for the retaliatory acts.  <u>See</u> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

### a.     **Count V – Performance Appraisal**

It is undisputed that Kline only received a "Fully Successful" rating on her Performance Appraisal and that the appraisal contained derogatory comments.  DE 40-4, pp. 70-74.  Kline submits that the derogatory comments are unsubstantiated and but for the retaliation, she met the criteria for receiving a higher rating of "Outstanding" based on the objective elements of her Performance Standards.  By meeting the "Outstanding" criteria, she was entitled to a monetary bonus since the evidence shows that PMG has a practice of awarding monetary bonuses to its employees based on their performance, as discussed *supra*.

### 1.  **Performance Element No. 1.**

Under Performance Element No. 1, in order to earn an "Outstanding", Kline needed to first meet the criteria for an "Exceeds Fully Successful" rating.  To obtain an "Exceeds Fully Successful" rating, the criteria was:  "takes initiative to perform staff studies/analysis of group procedures/operation.  Makes recommendations, after careful analysis, to supervisor for improvement in areas where incumbent has no direct responsibility."  DE 40-4, p. 71.  To receive an "Outstanding", she then needed to make "recommendations support[ing] major changes <u>which are implemented with in the Group</u>."  [Emphasis added.] DE 40-4, p. 71.

The evidence shows and Davis admits that Kline initiated and recommended using LEXIS/NEXIS over Westlaw, which was implemented in PMG and resulted in a savings of $9,400+/- per year to PMG. DE 40-5, p. 20. Although disputed, the evidence shows that Kline recommended the development of a procedure for adding new publications to the publications database. DE 40-5, p. 10. It is undisputed that both of these recommendations were implemented in PMG. DE 40-3, ¶ 64.

Although Davis refuses to acknowledge Kline's initiative, the evidence shows that Kline recommended a review of the "old and cold" regulations. DE 40-3, ¶ 62. Kline recommended the review be performed on a continuing basis after she performed the task and discovered a regulation that had been published in the *Federal Register* as "pending" in the Semiannual Unified Agenda since October 5, 1992, but had actually been finalized on December 29, 1992. This means the regulation had erroneously been published in the *Federal Register* as a pending OPM regulation for 13 years! DE 40-3, ¶ 61, DE 40-5 p. 1-3.

Davis proffered that this recommendation was not considered in her performance appraisal because he testified he was "unaware the practice was not being performed". DE 40-5, p. 20. Apparently Davis was unaware that the review was not being performed for 13 years yet he only started working for OPM in 2000. See Attachment 2, p. 13. More likely than not, he was unaware of the practice all together and not that he was unaware the practice was not being performed. It stands to reason then that Kline took initiative to perform the review. It also stands to reason that Kline's recommendation to regularly perform the review should have been implemented since it uncovered a regulation that had been erroneously reported in the *Federal Register* for 13 years.

Springer's proffered non-discriminatory reason for failing to give Kline an "Outstanding" performance rating was that Kline would have to make a "continuing effort" to initiate

studies/analysis.  Kline submits that this reason is pretextual since Kline's performance standards do not state that she must make a "continuing effort" to initiate studies/analysis.  The purpose of establishing standards is so the employee knows what is expected in terms of her performance so that the employee can work to achieve those expectations.  By stating that Kline must make a "continuing effort" to initiate studies/analysis, Davis <u>added</u> a subjective requirement to Kline's Performance Standards.  This not only imposed an unreasonable standard on Kline because she did not have the benefit of knowing what was expected of her in order achieve an "Outstanding" but it was a standard that was unachievable because requiring her to perform a function "continuously" means she would have no time to perform other duties. Thus, Davis' claim is pretextual.  Because Kline performed the duty regularly, Kline submits she earned an "Outstanding".

Since Kline met the objective criteria by initiating several studies/analysis of group procedures/operations and made recommendations that were implemented that resulted in a savings of thousands of dollars to PMG, Kline was entitled to receive the "Outstanding" rating based on the objective criteria contained in her standards.  In spite of these recommendations, Davis either discounted them, admitted they were not considered or they would not affect Kline's rating <u>even if</u> they were considered "because it falls under element #4".  DE 40-5, p. 20.  Well, he didn't consider her recommendations under element #4 either, as shown *infra*.  Therefore, Kline was not given any credit at all for her recommendations during the year.  Thus, giving Kline a poor rating when she met the objective standard for receiving an "Outstanding" is unreasonable and shows that Springer's reasons for issuing Kline a poor rating are pretextual.

Springer further proffered that Kline was not entitled to receive an "Outstanding" because she missed deadlines.  Ironically, Kline received a "Fully Successful" rating under this element, which required her to meet deadlines.  DE 40-4, p. 71.  In order to receive a "Fully Successful"

rating, Kline was required to "completes assignments in a timely manner".  Therefore, to give her a rating where she completes assignments on time is inconsistent and it is pretextual to state that Kline did not receive an "Outstanding" because she missed deadlines.

Specifically, Springer testified that Kline missed deadlines on the projects:  spreadsheet for salaries, available space for OPM Form 4150, analysis of current regulations & laws pertaining to printing, *Federal Register* survey of paper copy users, and *Federal Register* articles and deliveries to combine cost.  <u>There is no evidence showing where Kline was given deadlines on these projects</u>. The evidence Davis proffered to support his claim that Kline missed deadlines is found under Attachment 1:  (1) salaries spreadsheet (pp. 2-11); (2) OPM Form 4150 space availability (pp. 13-14); (3) review/analysis of laws and regulations on printing (no documents); (4) Federal Register Survey of paper copy users (pp. 16-19); (5) updating Publications database (pp. 21-22); and (6) Federal Register articles and deliveries (p. 16).  N<u>one of these documents indicate any deadlines</u> except for the Form 4150 where Davis informs Kline on Monday, February 28, 2005, that it was due on Friday, February 25, 2005.  In other words, he informed her of the deadline <u>after the project was "due"</u>.  DE 40-6, pp. 13-16.  Therefore, Davis' claim that Kline misses deadlines is unsupported by the evidence and there is <u>no</u> evidence that Kline failed to complete her assignments in a reasonable amount of time, as the appraisal reflects.

Kline was not assigned the project of *analyzing* the OPM Form 4150 and making revisions to it but merely <u>told to count the number of spaces on the form and report the number of spaces to Davi</u>s.  DE 40-6, pp. 15-16.  Davis instructed Kline to do the Form 4150 project *after* he refused to allow her to use the necessary software for performing the project.  *Id.*  Because Kline was unable to obtain the software on the date he instructed her to do the project, and because he refused to let her use a computer in the office that had the requisite software but insisted that she perform the

task by manually counting each space (DE 40-6, p. 20), Davis cannot legitimately claim that Kline missed the deadline.

Significantly, there is no support for including these projects in Kline's performance rating because these were clerical assignments not encompassed under Kline's Position Description. Preparing spreadsheets of PMG salaries is also a clerical assignment not covered under Kline's PD or Performance Standards since Davis was the one who managed the project and merely asked Kline to type the figures in the spreadsheet. DE 40-6, pp. 18-19.

Assigning Kline these menial tasks shows that Davis did not treat Kline as a professional but retaliated against her by either treating her as a low-level employee by not giving her assignments commensurate to her abilities or position. Or, he would give her unreasonable legal assignments that an attorney would even object to and then rate her performance based on these assignments not encompassed in her Performance Standards.

Davis assigned Kline the project of analyzing all the current government printing regulations and laws affecting PMG. Not only is this type of duty not covered under Kline's Position Description or Performance Standards, but Kline discussed the project with an attorney in OPM's Office of General Counsel, who informed Kline that he would not attempt such a project but would consult a legal expert in the field of printing. DE 40-3, ¶164, DE 40-6, pp. 36-53. Kline submits that since she is not an attorney, assigning Kline legal work and evaluating her performance based on this assignment was unreasonable.

Concerning the *Federal Register* survey of paper copy users**,** this was another project managed by Davis where he only used Kline in a clerical capacity to coordinate the project with Sheila Coates and Malcolm Fowlkes of the mailroom. DE 40-6, p. 21-34. For example, Davis

asked Kline to have Coates check on the status of the project.  Kline conveyed the message to

Coates as directed and when Coates failed to respond, Davis faulted Kline.  DE 40-6, p. 22-23.

Davis claims Kline missed a deadline for updating the publications database but it is

undisputed that the annual survey for updating the Publications Database was a project Robert

Coco had responsibility for but did not perform during the rating period.  DE 40-5, p. 21, DE 40-3,

¶ 71.  Kline could not possibly miss a deadline on a project that was never initiated.  Not only was

she was not responsible for initiating it, Coco who was responsible for initiating the survey but did

not initiate it during the rating period received an "Outstanding" Performance Appraisal.  DE 40-5,

p. 22.

It is undisputed that on her own initiative, Kline found some items on OPM's website that

could have potentially been added to the Publications database.  DE 40-5, p. 21.  She asked Coco

to review the items to let her know if he agreed that they should be added to the database but the

evidence shows that Coco failed to respond to Kline's request.  In spite of Coco's failure, Davis

faulted Kline for missing a deadline even though no deadline had been assigned to Kline.  DE 40-

5, p. 21.

The evidence also shows that the project of coordinating the delivery of regulatory

packages to the Federal Register Office with the delivery of the *Federal Registers* from the U.S.

Government Printing Office was never assigned to Kline.  The evidence shows that this was a

project Kline initiated.  DE 40-6, p. 35.  Even though Davis documents that he assigned the project

of reducing the *Federal Register* copies to Kline, this was a different project from coordinating

deliveries of the *Federal Register* copies and issuances.  Davis claims he told Kline to discuss this

project with Coates and report to him, but he does not reflect any deadline.

After discussing the project with Benedi and Coates in the Mailroom, Kline found that it would not work for practical purposes because the destination of the regulatory issuances was different from the origination point of the *Federal Registers*. DE 40-3, ¶159. Therefore, Kline did not pursue the project further. There is no evidence that she was assigned a deadline for this project. Thus, Kline submits the proffered reason that she missed deadlines is pretextual.

### 2. **Performance Element No. 2.**

Kline received a "Fully Successful" performance rating under Performance Element No. 2. DE 40-4, p. 72. In order to achieve an "Exceeds Fully Successful" rating, Kline needed to "assist in annual survey (publications database) and works with OPM offices to make sure that publication information is correct and is proactive in maintaining." As discussed *supra*, it is undisputed that the annual survey of the Publications database was <u>not</u> performed. DE 40-5, p. 21. It is also undisputed that Coco, who had responsibility for conducting the annual survey, received an "Outstanding" rating even though the survey was not performed. DE 40-3, ¶ 71. Therefore, it is unreasonable to fault Kline for failing to assist Coco in a project he did not perform.

Because Kline was proactive in maintaining the database, as discussed *infra*, she should have at least been rated "Exceeds Fully Successful" under this element. In order to receive an "Outstanding" on this element, Kline was required to "continuously search through the OPM Web site to find links to OPM publications and then work with OPM offices to add, revise, or delete publication information as appropriate." Kline regularly performed this function and it is undisputed that she identified numerous items on OPM's website that were added to the Publications Database. DE 40-5, p. 21. Therefore, she should have received an "Outstanding" under this element. Instead, Davis poorly rated her on this duty when Coco failed to follow

through with her after she requested Mr. Coco's input on some of the publications she identified

for adding to the Publications Database.  *Id*.

In the comment field under this element, Mr. Davis contradicted himself when he stated

that the Publications Inbox was not "kept up" because the criteria for the "Fully Successful" rating

that Kline received was that "systems are kept up".  DE 40-4, p. 27.  There is <u>no evidence</u> that the

Publications database was not kept up contrary to Davis' claim.  DE 40-3, ¶ 84.

In articulating his proffered reason for only issuing Kline "Fully Successful" under this

element, Davis stated that Kline "rarely offers her assistance" to Coco.  It is undisputed that Kline

assisted Coco whenever he requested her assistance.  DE 40-5, p. 20, DE 40-3, ¶ 128, DE 40-6, p.

6.  The evidence further shows that Kline assisted Coco whenever he requested her help and that

there were no times when Kline failed to assist Coco. DE 40-5. pp. 44, 46.   But by stating that

Kline was required to regularly "offer" her assistance to Coco, <u>Davis is again unreasonably and</u>

<u>subjectively adding requirements to her Performance Standards</u>.

Davis claimed that Kline rarely assisted with walk-in customers and that if Kline made

more of an effort to assist Coco, work would "gravitate toward her".  Kline submits that this reason

is not legitimate since her Performance Standards do not state that she is required to assist

customers or to seek work from Coco.  And, her Position Description states that she assists in

performing the same work that Coco performs.  DE 40-4, pp. 19-22.  Therefore, it is her

<u>supervisor's responsibility to assign</u> Kline work and not Kline's responsibility to seek out work

from other employees in the office, especially since Coco is not her supervisor.

 Moreover, the evidence shows that Kline was not allowed to work with PMG's customers,

except in a receptionist capacity, such as assisting customers who wanted a copy of OPM's

organization chart, or wanting a copy of a Printing Request Form, etc.  Kline submits that she is

not allowed to perform substantive work for customers, such as making covers for reports, signing off on printing requests, etc., whereby customers could come to Kline for their printing needs. DE 40-3, ¶ 20.

There is no evidence that Davis assigned Kline any duties related to work with PMG customers. The evidence shows that some of PMG's customers were even told <u>not</u> to work with Kline. DE 40-4, p. 27. If Kline had been assigned to work directly with PMG customers, Kline submits that then and only then would the customers "gravitate toward her" because they would have been accustomed to working with her on past projects. Therefore, giving Kline a poor rating based on not assisting walk-in customers is unreasonable and shows that Springer's reasons for issuing Kline a poor rating are pretextual.

Davis also attested that he has to "continually remind [Kline] to attend to the phone, publications In-Box and unsolicited faxes." DE 40-5, p. 20. The only evidence proffered by Davis in support of the allegations concerning the telephone is found in Attachment 1, pp 28-34. There are no documents "reminding Kline to attend to the phone" but rather e-mails informing Kline that he objects to the way she notifies him of calls on hold. Moreover, Kline's Performance Standards and Position Description do not include the *clerical* duties of answering the telephone or tending to unsolicited faxes that are ordinarily not performed by a GS-12 Management Analyst. There are no documents in support of reminders concerning faxes. The only evidence concerning reminders about the Publication inbox is found under Attachment 1, pp. 24-26. The dates of these "reminders" show that they were all issued <u>prior</u> to Davis assigning Kline primary responsibility for the Publications inbox.

Because Coco had primary responsibility for the Publications inbox at the time, Kline was only instructed to back up Coco when he was out of the office. Kline was given access to the

Publications inbox and instructed to check the inbox <u>while Mr. Coco was on vacation</u>.  DE 40-3, ¶ 89-93.  In those instances when Davis notified Kline that she needed to tend to the Publications Inbox, there is no evidence where Coco or Davis had notified Kline that Coco was going to be absent so that Kline did not know to tend to this duty until she was notified by Davis.  Id.  Therefore, it is unreasonable to hold that Kline was remiss in tending to the Publications inbox when she had not been notified of Coco's absences in the first place.  After Kline was assigned primary responsibility for responding to the Publications inbox e-mails instead of Coco, there were *no* instances where Kline was remiss in performing this task. DE 40-3, ¶ 94.

Moreover, Springer claims that the Publications inbox was ignored.  Kline submits that the Publications inbox was always "kept up".  Mr. Coco, who received an "Outstanding" rating, had primary responsibility for maintaining the Publications inbox.  If the Publications inbox had not been "kept up", it stands to reason that Coco should not have received an "Outstanding" rating since he had primary responsibility for the Publications inbox.

After Kline was assigned full responsibility for responding to the Publications inbox, Kline did not receive any notices from Davis of e-mails in the Publications inbox and her response time was equal to or better than Coco's response times.  DE 40-5, p. 46.

Davis claimed that Kline failed to perform FACA duties even though no FACA duties were ever assigned to Kline.  DE 40-5, p. 21.  Kline was never given any assignments requiring input into the FACA database.  Kline did accompany Coco to a couple of FACA meetings, which are held 2-3 times a year, but Kline was not allowed to go to the FACA meeting during the rating year because Coco was not able to go and Davis would not let Kline attend the meeting by herself.  DE 40-3, ¶ 82, DE 40-5, p. 31, Attachment 2, pp. 2-5.

Accordingly, Kline submits that the reasons for giving her a poor rating under this element are clearly pretextual.

### 3.  Performance Element No. 3.

It is undisputed that Kline received a "Minimally Successful" rating under Performance Element No. 3, "[d]evelops and maintains responsible working relationships with supervisors, managers, fellow employees, customers, peers, and the general public."  Davis claims that he received numerous complaints about Kline.  There is no evidence of any complaints against Kline other than Davis' claim.  When Kline asked Davis during her performance review about the complaints, such as who made them, why they were made and when they were made, Davis would not provide any information about the allegations.  He also never informed Kline of the complaints at the time they were allegedly made.  Finally, Kline requested interrogatories concerning who made the complaints and requested documents pertaining to the alleged complaints but Springer produced no evidence of any complaints against Kline or requests to keep her out of other PMG offices other than Davis' testimony that he received complaints.  See Attachment 3, pp. 6-7.

Mr. Davis further claims that he been asked by the Office of the Director to "keep [Kline] out of the Director's suite" yet Kline was never informed of any complaints raised by anyone from the Director's Office nor instructed not to go to the Director's Office.  To the contrary, the evidence shows the Director's Office requested Kline's participation on several committees – committees she was not allow her to participate in – and the Director's Office of Communications and Public Liaison even gave her compliments.  DE 40-3, ¶ 105, DE 40-5, pp. 50, 54-59.

Kline worked closely with the Office of Strategic Human Resources (SHRP) in reviewing their regulatory issuances.  SHRP requested that Kline be allowed to go on a detail to their office.

However, Davis and Benedi refused to allow her to go on the detail because of Kline's alleged "deplorable working relationships within PMG". DE 40-3, ¶112. It is unlikely that SHRP, whom Kline worked closely with on a regular basis, would have wanted Kline to work in their group if her working relationships with SHRP personnel had been "deplorable".

Furthermore, Benedi testified that he has a good working relationship with Kline. DE 40-5, p. 64, Attachment 2, p. 15. It is unlikely that Benedi would have testified that he has a good working relationship with Kline if her working relationships within PMG had been "deplorable".

Davis' claim that Kline exceeds her level of authority is without merit. There is no evidence that Kline ever exceeded her authority or where she was informed that she had exceeded her authority. DE 40-3, ¶108. The only evidence where it could possibly be inferred that Kline had exceeded her authority is in the e-mail he sent to Taylor where he stated that no changes to the FRMS were to be made without his or Benedi's approval, which insinuated that Kline had authorized changes without having the authority to authorize the changes, as discussed *infra*. Furthermore, Kline's Performance Standards and Position Description states that Kline works independently, which suggests that on projects she manages, she has the necessary level of authority to perform the work. The evidence shows that Kline initiated and managed the development of the FRMS. DE 40-3, ¶ 116, DE 40-4, pp. 19-22. Thus, Kline submits authorizing changes to the FRMS was within the scope of her work so that she was appropriately exercising her level of authority.

In order to receive an "Outstanding" under this element, Kline would have to,

> "In addition to Exceeds Fully Successful, has highly effective working relations within and outside office that enhance the office's ability to achieve its goal. Often goes the extra mile in support of staff members or outside staff to help achieve organizational goals. Is highly effective in dealing with and helping to resolve conflict within office, and as needed outside of office to help accomplish necessary work. Deals very effectively with external

stakeholders, in particular those who are very difficult to deal with. Is pro-active in sharing information with others inside and outside of office to enhance mutual understanding of work progress and goals. " DE 40-4, p. 73.

The evidence shows that Kline was proactive in trying to assist others but was discouraged from offering her assistance, such as the time when she offered to assist in removing a watermark from a publication. DE 40-3, ¶¶ 119-120. She also went the extra mile in initiating and spearheading the development and implementation of the FRMS, which aided other offices in keeping track of OPM regulations since the former archaic, hand-written tracking method was highly ineffective and cumbersome yet Davis and Benedi refuse to acknowledge Kline's efforts on this system. DE 40-4, pp. 19-22. They would only give Taylor the credit as the developer of the system, whom Kline worked closely with and had a highly effective working relationship with in the development of the system, even though the evidence shows it was Kline's initiative.

Kline continued to work on this system throughout the reporting period and, during the course of her work with Taylor, Davis sent offensive e-mails to Taylor and her supervisor, McElrath, when Taylor met with Kline on the FRMS. This is evidence that Davis sought to hinder, undermine and interfere with her working relationships. DE 40-5, p. 24.

Accordingly, the reasons for not giving Kline an "Outstanding" rating on this element when she met the criteria for receiving an "Outstanding" is pretextual.

### 4. Performance Element No. 4.

It is undisputed that Kline received an "Exceeds Fully Satisfactory" rating under Performance Element No. 4, "[a]ssist in coordinating and preparing OPM's regulatory Actions." Once the "Exceeds" level was met, in order to receive an "Outstanding", Kline needed to receive, "commendations received from OPM offices and other agencies". DE 40-4, p. 74.

The evidence shows that Kline received numerous commendations from OPM offices and other agencies, including the Director's Office. DE 40-6, p. 1-4, DE 40-5, p. 50. Davis testified that he was not aware of these commendations but that if had been aware of them, "either way they would most likely have had no impact on her rating". DE 40-5, p. 22. Why not? If receiving commendations meant Kline should have received an "Outstanding", they most certainly should have had an impact on her rating. This is evidence that Davis' reason for not giving Kline an "Outstanding" is pretextual because even though Kline met the criteria for an "Outstanding" rating, Davis would not give her an "Outstanding" rating because these commendations "would most likely have had no impact on her rating".

Davis claims he found errors in the regulatory packages. Ironically, Davis never reviewed Kline's regulatory packages. Davis admits he has <u>not</u> been trained in the proper procedures for processing regulatory actions and that Kline and Carter are the <u>only</u> ones that know the full requirements. <u>See</u> Attachment 2, p. 15. Davis produced <u>no</u> evidence where Kline made mistakes in performing regulatory work. In Kline's Request for Production of Documents (Attachment 6), Kline requested all documentation showing where Kline made errors in performing regulatory work. <u>See</u> Attachment 3, p. 13. In response, Springer referenced Report of Investigation (ROI) 2006008, pp. 27, 29, 33, 34-40, 50, 54-55, 60, 126, and 95-102-6 (sic). These are the <u>same</u> documents contained in Attachment 1, pp. 37, 36, 19, 5-10, 7, 17-18, 6, 28 respectively (except 95-102-6 (sic)). <u>None of these documents pertain to regulatory work</u>. Furthermore, the criterion for receiving an "Outstanding" does not state that Kline's must be error free but only that she receive commendations. Therefore, since Kline received commendations, Kline should have received an "Outstanding" and the reasons for not giving her an "Outstanding" are pretextual.

Since Kline met the criteria for an "Outstanding" under all four (4) critical elements, Kline submits that she should have received an overall performance rating of "Outstanding" along with the accompanying performance bonus.  Accordingly, the Court should rule for Kline on Summary Judgment by finding that the challenged action was in retaliation against Kline for engaging in protected activity.

>    **b.**    **<u>Count III – Counseling Memorandum</u>**

Kline established a *prima facie* case of sexual harassment by claiming that Davis intently stared at Kline's breasts when issuing a Counseling Memorandum in retaliation for filing Fair Labor Standards Act grievances against him.  It is undisputed that Kline was issued a Counseling Memorandum on December 15, 2003, for sending out an e-mail approximately seven (7) months earlier and that the memorandum was placed in Kline's official personnel file.  DE 17, ¶ 78.

The proffered reason for issuing Kline the Counseling Memorandum was that the e-mail contained "inappropriate" content but the evidence shows that Kline received the e-mail from Coco, a white male in PMG under Davis' supervision, who had also sent the e-mail to Davis, Benedi and other PMG staff members.  DE 40-6, p. 72-74.   Significantly, Coco testified that he did not receive a counseling memorandum.  <u>See</u> Attachment 2, p. 2.  Nor did Davis and/or Benedi advise anyone in the office that the e-mail sent to PMG staff was inappropriate.  If Davis' reason for issuing the Counseling Memorandum to Kline was legitimate, then <u>Coco should have also received a Counseling Memorandum for sending out the same e-mail containing the same "inappropriate" content</u>.  But since Coco did not receive one, Davis' reason for issuing Kline and only Kline a Counseling Memorandum is pretextual.

Accordingly, the Court should find that the adverse action was motivated by retaliation for engaging in protected activity because it would "dissuade a reasonable worker from making or supporting a charge of discrimination" as found in *Burlington N., Id*.  Otherwise, the worker could expect to be harassed with arbitrary disciplinary actions.

      c.        **<u>Count VII – E-mail</u>**

It is undisputed that on December 8, 2005, Davis sent an e-mail to Taylor and her supervisor, Margaret McElrath, about Taylor's visit to Kline.  Davis' proffered reason for sending the e-mail was that he was unaware of changes being made to the FRMS.   This reason is pretextual because the evidence shows that he had been made aware of the changes on at least six (6) occasions.

He also wrote that no changes should have been made to the FRMS unless authorized by himself or Benedi, which implied that Kline was not keeping him informed.  Because Kline was authorized to direct the development of the FRMS as shown in paragraph IV.5., *supra*, Davis' proffered reason for sending the e-mail is clearly pretextual.

Davis only needed to ask Kline *why* Taylor was visiting her instead of sending a defamatory e-mail to Taylor and McElrath.  If he was truly interested in what changes were being made to the FRMS, why didn't he ask his own staff, i.e. Carter or Kline, what changes were being made instead of going outside of PMG to another office?  The only reason was that he wanted to seize the moment to retaliate against Kline by trying to undermine her working relationships with Taylor and McElrath.

Another indication that the proffered reason is pretextual is that Davis claims he did not complain when Carter received visits from Taylor because Carter kept him informed of the nature

of her visits.  If this were true, he would have been aware of the changes being made to the FRMS since those changes had been developing over a 6 week period and Taylor had been interacting with Carter on the upgrade to the FRMS as well.  See Attachment 2, pp. 6-7 (Carter submitting her activity for the Federal Register Weekly report).

Accordingly, Kline submits the Court should hold that the proffered reason is pretextual and rule on Summary Judgment in Kline's favor by finding that the challenged action was in retaliation against Kline for engaging in protected activity.

### d.    Count V –  Office Space

It is undisputed that Kline performed regulatory work at least 50% of the time.  DE 40-5, p. 22.  As elaborated in paragraph IV.6., *supra*, reviewing regulations requires a quiet environment.  It is undisputed that PMG acquired possession of office space across the hall from its main location that was larger and quieter because it was a private office, which would have been ideal for reviewing regulations.  DE 17, ¶113, DE 40-5, p. 69.  It is undisputed that the newly hired, Issac Evans, a GS-12/1, black male, was given the space (DE 17, ¶¶114-115) even though Kline had requested the space.  DE 40-7, p. 25-26.

The proffered reason for not giving the space to Kline was because Benedi first claimed he did not have any space to give.  DE 40-5, p. 68.  This is pretextual because the evidence shows that Benedi told Kline it was "on loan" to PMG so that it is undisputed that PMG had "possession" of the space for its use.  DE 40-7, p. 26.  Benedi testified that if he had any space, "others would have gotten it first".  DE 17, ¶ 124.  This implies that Benedi would not objectively consider Kline's needs and would not give Kline the space regardless of whether she had a greater need and/or more seniority/tenure than others.

Benedi testified that if the offices had belonged to him, "I would have offered them to someone else with more seniority." DE 40-5, p. 68. It is undisputed that Kline had seniority over Evans when Evans was offered the said space. DE 17, ¶120. This shows that Benedi's reason for denying Kline the space was pretextual. In addition, other lower grade employees had better office space than Kline[4]. DE 40-3, ¶205.

Benedi also claimed that the space was only "for temporary use". DE 40-7, p. 26. Evans occupied the space for approximately three (3) years up until the time he left the agency and it is presently occupied by another GS-12 visual information specialist, Jina Kang, which proves that the proffered "temporary" reason for not giving the space to Kline was pretextual.

Davis testified that Evans was given the space because it was "the only space available when he was hired." See Attachment 2, p. 13. This reason is pretextual since Evans could have been assigned the space occupied by Kline and Kline placed in the space furnished to Evans.

Kline submits that Evans had less need for the space than she did. DE 40-3, ¶200. Since most of the graphics reproduction equipment and printers are located in the area where Kline is situated, it made more sense for Evans to occupy her space and allow Kline to have the quieter space. Evans frequently worked in the PMG area meeting with Davis and Benedi, using the graphic printers and copier, working on the graphics table immediately in front of Kline's cubicle, showing that he did not need a quiet environment as much as Kline needed one. Moreover, Evans' activities added to the noise and disruptions suffered by Kline. In contrast, Kline used the printers, copiers and graphics table and met with Davis and Benedi far less than Evans because Benedi and Davis were not as involved with the regulatory work as they were with the graphics work. Id.

---

[4] Kline requested the floor plans for PMG office areas to show the size of the space occupied by other employees but Springer failed to produce the documents and failed to give the office dimensions in interrogatories. See Kline's *Request for Rule 32 Sanctions*.

Accordingly, the Court should find that denying Kline appropriate office space was pretextual and rule on Summary Judgment in Kline's favor by finding that the challenged action was in retaliation against Kline for engaging in protected activity.

### e.    Count VI – Telephones/Staff Support.

Kline claimed that her supervisor failed to provide her with staff support during a time when she urgently needed that support while working under a strict deadline on the Unified Agenda of Regulatory Actions, which is published in the *Federal Register*.

The proffered reason given to Kline for refusing to require other members of PMG staff, such as Gunter-Frye or Evans, to assist with the telephones while Kline worked on the Agenda was that "no one was available". DE 17, ¶¶ 130-131. Davis told Kline that Gunter-Frye was "busy working on something" but after Kline pointed out in her affidavit during the EEO investigation that Gunter-Frye's computer was broken and that she didn't have any work to do that particular day, Davis testified that Gunter-Frye "was unaware of the system". DE 17, ¶ 131. This reason is pretextual since the only "system" that Gunter-Frye would need to know in order to assist with the telephones is how to operate the intercom, which would take approximately 5 minutes to learn as there were only about six (6) employees in the immediate area on the intercom system. Since Gunter-Frye was detailed from another office within OPM, claiming that Gunter-Frye was unaware of the system as grounds for refusing to ask her to assist with the telephones is pretextual since OPM's telephone equipment is standard throughout OPM. Individual OPM program offices don't procure their own equipment but obtain their telephone equipment from OPM's Center for Contracts, Facilities and Administrative Services, who provides the equipment throughout the agency.

Since other detailees, such as Rivera-Lopez and Jose Velaquez, primarily covered PMG's telephone lines (DE 40-3, ¶ 75), its stands to reason that the new detailee, Gunter-Frey, would be asked to cover PMG telephone lines. But since Davis refused to impose on her when Kline urgently needed the support, Davis' reasons are without merit and show that the true motivating reason for denying Kline staff support was due to retaliation for engaging in protected activity.

Accordingly, the Court should rule on Summary Judgment in Kline's favor by finding that the challenged action was in retaliation against Kline for engaging in protected activity.

### f.        Count VII – Administrative rights rescinded.

It is undisputed that on December 22, 2005, Davis sent an e-mail instructing Taylor to rescind Kline's administrative rights to the FRMS. The only reason proffered for rescinding Kline's administrative rights to the FRMS was that Kline "should not have those rights". DE 40-5, p. 69. This reason is pretextual since the evidence shows that Kline initiated and directed the development of the FRMS. DE 40-3, ¶ 116, DE 40-7, pp. 2-6. Naturally Kline would acquire rights to a system that she was instrumental in developing. The evidence shows that Benedi was informed from the beginning of Kline being given the software for the FRMS. Id. If Kline was not supposed to have administrative rights to the FRMS, why was she authorized to develop the FRMS in the first place? If Kline was not supposed to have administrative rights, why wasn't any objection made to her having the software when she first notified Benedi that OCIO was going to give Kline the software that drove the FRMS? Since no objection was ever made to Kline acquiring the software that drove the FRMS, it stands to reason that the true motivating reason for rescinding Kline's administrative rights two (2) years later was due to retaliation against Kline for engaging in protected activity.

Accordingly, the Court should rule on Summary Judgment in Kline's favor by finding that the challenged action was in retaliation against Kline for engaging in protected activity.

      g.      **<u>Count VII – Lunch Hours</u>**.

The evidence shows that other members of PMG are allowed to take lunch breads outside the core hours without using leave but not Kline. Kline is required to use leave in lieu of her lunch break. DE 40-5, pp. 35-36. The proffered reason for the challenged action is that Davis claims that sometimes "[Carter] needs to do something during her assigned hour". Id. This is not a legitimate, non-discriminatory reason for allowing Carter to take lunch breaks outside the core hours since Kline might sometimes need to do something during the core lunch hours too, such as the time when she needed to review the high-priority, rush National Security Personnel System (NSPS) regulations. DE 40-3, ¶229, DE 40-7, pp. 52-53. But when Kline took a lunch break outside the core hours after she finished her review of the NSPS regulations, she was officially reprimanded even though she had approval from Coco, who was acting in Davis' absence at the time, and had a legitimate reason for working through her lunch break.

The only reason proffered as to why Coco is allowed take lunch breaks outside the core hours is because he "will sometimes accompany Mr. Benedi to lunch." This is not a legitimate, non-discriminatory reason because Benedi is the one who denied Kline the flexibility of taking a lunch break outside the core hours. When Benedi "checked with labor relations and was told that employees needed to take lunch during the core hours" (s<u>ee</u> Attachment 2, p.16), he didn't distinguish between the types of employees that must take a lunch break during the core hours, which means that <u>all</u> employees must adhere to this policy including Benedi. And because <u>all</u> employees must abide by this policy, Benedi and Davis cannot excuse themselves and some of

their employees from abiding by the policy and discriminately demand that others abide by it, which is admittedly their practice.

Accordingly, the Court should find that Springer failed to proffer a legitimate non-discriminatory reason for denying Kline the flexibility of taking a lunch break outside the core hours while allowing others the flexibility of taking a lunch break outside the core hours and that the true reason for denying Kline the flexibility was in retaliation for engaging in protected activity.

### h.     Count IX – Reprimand/Swipes.

It is undisputed that Kline was issued a Letter of Reprimand based on the alleged failure to properly report her leave.  DE 40-3, ¶ 222, DE 17, ¶ 151.  It is further undisputed that Davis was on leave during August 10, 2005, to October 1, 2005.  DE 17, 153.  It is also undisputed that Davis obtained only Kline's "swipe" records and did not obtain the "swipe" records of any other employees for the time that he had been on leave.  DE 17 ¶¶152,158.

The evidence does not show that Kline improperly reported her leave since Springer failed to produce any documents from Kline showing where she had "improperly reported her leave".  In Kline's Request for Production Documents (Attachment 6), she requested "documentation showing where Kline failed to properly report her leave for the pay period ending September 31, 2005."  Attachment 3, pp. 14-15.  In response, Springer referenced, "See ROI, Exhibit A, p. 12-13; Tab C, Tab D, p. 14-15."  Id.  A copy of these documents appears under Attachment 4, pp. 1-5.  As it can be seen, these documents do not show that Kline "improperly reported" her leave, other than Davis' accusations in the letter of reprimand that she improperly reported her leave.

The evidence does show that Kline reported her leave to Coco during the time Davis was on leave so that Coco was the one who improperly recorded her leave into the system. DE 40-3, ¶ 234. Coco admits Kline may have reported her leave to him. <u>See</u> Attachment 2, p. 4. The evidence further shows that Coco did not receive a reprimand for failing to properly report Kline's leave. DE 17, ¶157.

PMG allows Alternative Work Schedules for members of its staff. The evidence shows that Springer failed to establish a proper method for PMG employees to report their leave pursuant to OPM's Human Resources Handbook, Chapter 610, Subchapter 2, § 2-6, Time Accounting, where it states, "organizations using Alternative Work Schedules (AWS-described in subchapter 3 of this chapter), <u>must establish a time-accounting method</u> that provides affirmative evidence that each employee subject to the schedule has worked the proper number of hours in a biweekly pay period." [Emphasis added.] <u>See</u> Attachment 5, p. 4.

In Kline's Request for Production of Documents, Kline requested documentation showing the instructions to PMG employees for reporting their leave or the proper procedure for employees to report their leave. Attachment 3, p. 15. In response, Springer referenced "See ROI, Exhibit H, pp. 6-13." Id. A copy of these documents appears under Attachment 4, pp. 6-13. As it can be seen, <u>these documents do not contain any instructions on how employees are to report their leave,</u> much less "properly" report their leave. Absent a procedure for "properly" reporting leave, Kline could not have *improperly* reported it.

Davis also claimed that it is his responsibility to ensure that employees work 9 hours a day. OPM's policy is that employees work 40 hours a week and "may vary the amount of hours worked each day by working 7, 8, 9 or 10 hours, except that no more than one 10-hour day may be worked

in any one pay period."  See Attachment 5, p. 7, OPM Human Resources Handbook, Chapter 610 –

Hours of Duty, Subchapter 3, § 3-5., Default Alternative Work Schedule Policy.

It is also undisputed that Davis did not complain about Kline's arrival and departure times

prior to obtaining her swipe records.  DE 17, ¶159.  The only reason proffered by Davis for

obtaining Kline's swipe record and not obtaining the swipe records of any other employees was

that he "noticed one day that [Kline] came in late and left at her regular time."  DE 40-7, p. 33.

This is not a legitimate, non-discriminatory reason for scrutinizing Kline's "swipe" records since

Davis did not obtain the "swipe" records for the particular day that he allegedly observed Kline

arriving late.  If Davis had indeed noticed Kline arriving late one day, why didn't he obtain the

"swipe" records for *that* particular day and issue her a warning about her arrival and departure

times based on *that* particular day?  It doesn't stand to reason that he would pick some other time

period to scrutinize her arrival and departure times when he was not sure whether she had arrived

late during that time period instead of scrutinizing the time when he was allegedly sure that she

had arrived late.  But because Davis picked some *other* time period – a time when he was not sure

of her arrival and departure times – shows that he was on a fishing expedition to find issues with

Kline motivated by retaliation.

In addition, Kline sent correspondence to Davis showing him how she had not improperly

reported her leave because she had either been authorized by Coco to take a late lunch or she had

reported her leave to Coco who had failed to accurately record the leave in the system but Davis

refused to retract the reprimand.  DE 40-7, p. 50-55.  Kline also showed Davis that he had

erroneously charged her with four (4) hours of leave that she had not used and that he had failed to

take into consideration the days that she had worked over the required 9 hours.  If these factors had

been taken into consideration, it would have shown that Kline worked well over the 40 hours per

week required.  In spite of Kline's communications to Davis on this issue, Davis refused to retract the reprimand, which shows that he was motivated by retaliation rather than having a legitimate reason for the challenged action.

Accordingly the Court should find that the proffered reason is without merit and that the challenged action was due to retaliation.

### i.    Count X – Leave Tampering.

It is undisputed that Davis amended Kline's leave records on February 2, 2006, and March 16, 2006.  DE 40-7, p. 33.  The proffered reason given by Davis was, "I attempted to amend Ms. Kline's leave records based on some information she provided me." Id.  Davis further concedes, "I have authority to amend an employee's annual and sick leave based on the request obtained from Ms. Kline.  Ms. Kline provided to me a marked up copy of her leave indicating what leave should have been reported as Family Medical Leave." Id.  The evidence shows that the "information" provided to Davis, which he relied upon to make the amendments, was dated "early 10-05".   DE 40-3, p. 238, DE 40-7, p. 66.  Kline's leave was erroneously amended on pay period ending 11-26-2005, approximately (8) weeks after Davis received the alleged information from Kline.  It is unreasonable to hold that Davis based his amendments on information provided by Kline two (2) months prior to making the amendments.  Furthermore, it does not make sense to claim that the leave Kline indicated as FMLA leave was grounds to change her leave from annual to sick leave.  Since both annual and sick leave can be FMLA leave, reflecting whether Kline's leave was FMLA did not require a change in the amounts of the annual and/or sick leave but only that it was FMLA leave.

Davis further stated, "[u]nfortunately, the time keeper, Shirley Sewell, misunderstood my instructions to change." DE 40-7, p. 33. Davis claims that Sewell misunderstood his instructions but it is undisputed that Davis has ultimate authority for signing Kline's timecard authorizing the changes and it was his ultimate responsibility for the amendments to Kline's leave. DE 40-7, p. 33. Thus, Davis cannot blame the wrongful amendments on Sewell. Moreover, Sewell received an "Exceeds Fully Successful" performance rating and performance bonus. DE 40-2, pp. 26-27.

Even if correction of the errors to Kline's leave was an oversight, Kline informed Davis of the errors as early as January 9, 2006, (DE 40-7, p. 75) and after she informed him of the errors, he still denied her leave on January 10 and 21, 2006 (DE 43-3, ¶248, DE 40-7, p. 75) and failed to correct her leave until <u>after</u> she filed an EEO action against him on March 21, 2006. DE 40-7, 71.

"Once the error was discovered and brought to my attention by Ms. Kline in early January 2006, corrections were again made based upon her instructions to me." DE 40-7, p. 33. Kline's 1-18-2006 pay stub shows that Davis made some revisions to her leave but <u>it was still incorrect</u> because she should have had a balance of +6.5 hours of sick leave instead of the negative balance of -34.5. Kline's annual leave also showed an erroneous balance of 37 hours of "use or lose" leave instead of the correct amount of 0 hours of "use or lose". DE 40-7, p. 69. Kline informed Davis of the errors on February 2, 2006 (DE 40-3, ¶ 246, DE p. 50), and again on February 15, 2006 (DE 40-3, ¶247, DE 40-7, p. 74), and asked him to correct her leave but Davis refused because he stated he could not correct it until he had heard from Employee Relations. DE 40-7, p. 72. Kline contacted Caprice Miller of Employee Relations who informed her that <u>Employee Relations does not have the authority to make decisions as it related to employees.</u> [Emphasis added.] DE 40-7, p. 78, Attachment 2, pp 19-21. This shows that Davis' proffered reason for refusing to correct her leave was pretextual.

Significantly, Davis did not correct Kline's leave until the pay period ending April 1, 2006), which was the pay period immediately after the March 21, 2006 EEO complaint Kline filed against Davis for tampering with her leave.  DE 40-3, ¶ 255, Attachment 2, pp. 22-23.  This is evidence that Davis would not have amended her leave if Kline had not filed the EEO complaint against him.

Because the evidence shows that Davis failed to proffer a legitimate non-retaliatory reason for tampering with Kline's leave, failed to correct Kline's leave once the errors were made known and did not correct the leave until after an EEO action was initiated, the Court should find that the actual reason for tampering with Kline's leave was in retaliation against Kline for engaging in protected activity.  Accordingly, the Court should rule on Summary Judgment in Kline's favor on this claim.

## VI.    CONCLUSION

Kline established a *prima facie* case of retaliation and has shown that there are no disputed issues of material fact and/or no evidence supporting the elements essential to Springer's case in defense of the retaliation claims whereby Kline is entitled to judgment as a matter of law.

Accordingly, the Court should rule on summary judgment for Kline by finding that the challenged actions were in retaliation for engaging in protected activity.

Respectfully submitted,

/s/

Valerie Kline, *Pro Se*
83 E Street
Lothian, MD  20711
(301) 509-2684

# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

Valerie Kline                          *
83 E Street                            *
Lothian, MD 20711                      *
                                       *
                           Plaintiff   *
                                       *
                    v.                 *        Case No. 1:07-cv-451 JR
                                       *
Linda M. Springer, Director            *
U. S. Office of Personnel Management   *
1900 E Street, N.W.                    *
Washington, D.C.  20415                *
                          Defendant    *
                                       *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

For good cause shown, Plaintiff Valerie Kline's Motion for Summary Judgment is

hereby GRANTED.

_____
James Robertson
United States District Judge

Davis' exhibits pertaining to:

Salaries Spreadsheets

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Friday, April 22, 2005 10:18 AM |
| **To:** | Davis, William M |
| **Subject:** | WG tables |

I don't see them on OPM's Pay and Leave site.

*Valerie should have pursued as she did 5-2 and inserted the WG salary.*

EXHIBIT
PAGE ___09___ OF ___127___

5/11/2005

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Friday, April 22, 2005 2:57 PM |
| **To:** | Davis, William M |
| **Subject:** | Salaries for 2005 updated |

I have updated the subject chart as you requested with exception to the WG rate for Calvin. I sent you a note this morning informing you that I couldn't find the table for the WG rates but since I didn't hear back from you, I could not revise this field. I would be happy to insert the information once you furnish it to me when I return to the office on May 2.

EXHIBIT     H
PAGE_____70_OF_127

## Davis, William M

**From:** Kline, Valerie
**Sent:** Thursday, May 12, 2005 8:17 AM
**To:** Davis, William M
**Cc:** Benedi, Claudio A; Benton, Sherman W
**Subject:** RE: Salaries for 2005 updated

Bill,

I'm sorry you have had to wait for 2 days. As you know, Jackie was out on Tuesday and it was extremely busy. I was not even able to leave the office or a lunch break and had to eat at my desk because of urgent regulatory items. Then yesterday I didn't receive your email until a few minutes before you walked out the door.

I wish you wouldn't exhibit such a poor attitude. I am right next to your office. You can call me into your office <u>any time you want</u>. I really feel that you are <u>looking</u> for things to complain about, especially when it's something petty like this. You asked to see me 1 hr 15 min before I was scheduled to arrive for work; you have been very busy in meetings as well. You said before the budget isn't due but you just wanted to have it ready for the next budget call so I really don't see what the problem is.

I actually don't even see a need to respond to your email since I told you "I am available any time it's convenient for you." However, I am responding because I want to say that this type of attitude makes it difficult to work since it creates a hostile environment.

Valerie

> -----Original Message-----
> **From:** Davis, William M
> **Sent:** Thursday, May 12, 2005 6:29 AM
> **To:** Kline, Valerie
> **Subject:** RE: Salaries for 2005 updated
>
> Now, I have been waiting for 2 days.
>
> -----Original Message-----
> **From:** Kline, Valerie
> **Sent:** Wednesday, May 11, 2005 3:56 PM
> **To:** Davis, William M
> **Subject:** RE: Salaries for 2005 updated
>
> OK I just now received this email...I am available any time its convenient for you.
>
> -----Original Message-----
> **From:** Davis, William M
> **Sent:** Wednesday, May 11, 2005 2:35 PM
> **To:** Kline, Valerie
> **Subject:** FW: Salaries for 2005 updated

EXHIBIT H
PAGE ___68___ OF ___127___

5/12/2005

## Publishing Management Branch

FY 200X

| Employees | Grade/Series | Salaries | Bi-weekly Sal | 7 Pay Periods 1st QTR | 6 Pay Periods 2nd QTR | 7 Pay Periods 3rd QTR | 6 Pay Periods 4th QTR | Totals |
|---|---|---|---|---|---|---|---|---|
| Claudio | GS-340-15/7 | $ 120,280 | $ 4,626 | $ 32,383 | $ 27,757 | $ 32,383 | $ 27,757 | 120,280 |
| Jackie | GS-343-13/3 | $ 76,916 | $ 2,958 | 20,708 | 17,750 | 20,708 | 17,750 | 76,916 |
| Bob | GS-343-13/6/7 | $ 84,127 | $ 3,236 | 22,650 | 19,414 | 22,650 | 19,414 | 84,127 |
| Bill | GS-0342-14/10 | $ 110,775 | $ 4,261 | 29,824 | 25,563 | 29,824 | 25,563 | 110,775 |
| Leon | GS-1410-12/9 | $ 76,806 | $ 2,954 | 20,679 | 17,724 | 20,679 | 17,724 | 76,806 |
| Valerie | GS-343-12/04 | $ 66,701 | $ 2,565 | 17,958 | 15,393 | 17,958 | 15,393 | 66,701 |
| Vacant | GS-1654-12/5-1 | $ 68,722 | $ 2,643 | 18,502 | 15,859 | 18,502 | 15,859 | 68,722 |
| Miriam | GS-1654-11/2-4/5 | $ 52,279 | $ 2,011 | 14,075 | 12,064 | 14,075 | 12,064 | 52,279 |
| Vacant | GS-11/5 | $ 57,338 | $ 2,205 | 15,437 | 13,232 | 15,437 | 13,232 | 57,338 |
| Vacant | GS-11/5 | $ 57,338 | $ 2,205 | 15,437 | 13,232 | 15,437 | 13,232 | 57,338 |
| Shirley | GS-344-9/06 | $ 48,784 | $ 1,876 | 13,134 | 11,258 | 13,134 | 11,258 | 48,784 |
| *Sub.Total* | | $ 820,066 | $ 31,541 | 220,787 | 189,246 | 220,787 | 189,246 | 820,066 |
| 0% COLA | | | | | | | | |
| Sub Total | | | | $ 220,787 | $ 189,246 | $ 220,787 | $ 189,246 | 820,066 |
| 18% Benefits | | | | 39,742 | 34,064 | 39,742 | 34,064 | 147,612 |
| Sub Total | | | | $ 260,529 | $ 223,310 | $ 260,529 | $ 223,310 | 987,678 |
| 1.5% Promotions | | | | 3,908 | 3,350 | 3,908 | 3,350 | 14,515 |
| Sub Total. | | | | $ 264,437 | $ 226,660 | $ 264,437 | $ 226,660 | 982,193 |
| 2% Awards | | | | | | | | 19,644 |
| Grand Total | | $ 820,066 | $ 31,541 | $ 264,437 | $ 226,660 | $ 264,437 | $ 226,660 | $ 1,001,837 |

EXHIBIT
PAGE ___96___ OF ___127___

## Publishing Management Branch

FY 2005

| Employees | Grade/Series | Salaries | Bi-weekly | 1st QTR<br>7 Pay Periods | 2nd QTR<br>6 Pay Periods | 3rd QTR<br>7 Pay Periods | 4th QTR<br>6 Pay Periods | Totals |
|---|---|---|---|---|---|---|---|---|
| Claudio | GS-340-15/7 | $ 124,740 | $ 4,798 | $ 33,584 | $ 28,786 | $ 33,584 | $ 28,786 | $ 124,740 |
| Jackie | GS-343-13/4 | $ 82,259 | $ 3,164 | $ 22,147 | $ 18,983 | $ 22,147 | $ 18,983 | $ 82,259 |
| Bob | GS-343-13/7 | $ 89,736 | $ 3,451 | $ 24,160 | $ 20,708 | $ 24,160 | $ 20,708 | $ 89,736 |
| Bill | GS-0342-14/10 | $ 114,882 | $ 4,419 | $ 30,930 | $ 26,511 | $ 30,930 | $ 26,511 | $ 114,882 |
| Leon | GS-1410-12/9 | $ 79,652 | $ 3,064 | $ 21,445 | $ 18,381 | $ 21,445 | $ 18,381 | $ 79,652 |
| Valerie | GS-343-12/4 | $ 69,173 | $ 2,661 | $ 18,624 | $ 15,963 | $ 18,624 | $ 15,963 | $ 69,173 |
| Issac | GS-1664-12/1 | $ 62,886 | $ 2,419 | $ 16,931 | $ 14,512 | $ 16,931 | $ 14,512 | $ 62,886 |
| Miriam | GS-1654-12/21 | $ 62,886 | $ 2,419 | $ 16,931 | $ 14,512 | $ 16,931 | $ 14,512 | $ 62,886 |
| Vacant | GS-11/5 | $ 59,464 | $ 2,287 | $ 16,010 | $ 13,722 | $ 16,010 | $ 13,722 | $ 59,464 |
| Vacant | GS-11/5 | $ 59,464 | $ 2,287 | $ 16,010 | $ 13,722 | $ 16,010 | $ 13,722 | $ 59,464 |
| Shirley | GS-344-9/6 | $ 50,590 | $ 1,946 | $ 13,620 | $ 11,675 | $ 13,620 | $ 11,675 | $ 50,590 |
| **Sub Total** | | $ 855,732 | $ 32,913 | $ 230,389 | $ 197,477 | $ 230,389 | $ 197,477 | $ 855,732 |
| 0% COLA | | | | $ - | $ - | $ - | $ - | $ - |
| Sub Total | | | | $ 230,389 | $ 197,477 | $ 230,389 | $ 197,477 | $ 855,732 |
| 18% Benefits | | | | 41,470 | 35,546 | 41,470 | 35,546 | 154,032 |
| Sub Total | | | | $ 271,859 | $ 233,022 | $ 271,859 | $ 233,022 | $ 1,009,764 |
| 1.5% Promotions | | | | $ 4,078 | $ 3,495 | $ 4,078 | $ 3,495 | $ 15,146 |
| Sub Total | | | | $ 275,937 | $ 236,518 | $ 275,937 | $ 236,518 | $ 1,024,910 |
| 2% Awards | | | | | | | | 20,498 |
| Grand Total | | $ 855,732 | $ 32,913 | $ 275,937 | $ 236,518 | $ 275,937 | $ 236,518 | $ 1,045,408 |

EXHIBIT H

PAGE 95 OF 137

## Publishing Management Branch

| Employees | Grade/Series | Job Title | Salaries | Bi-weekly | 7 Pay Periods 1st QTR | 6 Pay Periods 2nd QTR | 7 Pay Periods 3rd QTR | 6 Pay Periods 4th QTR |
|---|---|---|---|---|---|---|---|---|
| Claudio | GS-340-15/7 | Program Manager | $ 124,740 | $ 4,798 | $ 33,584 | $ 28,786 | $ 33,584 | $ 28,786 |
| Jackie | GS-343-13/2 | Management Analy | $ 82,259 | $ 3,164 | $ 22,147 | $ 18,983 | $ 22,147 | $ 18,983 |
| Bob | GS-343-13/6 | Management Analy | $ 89,568 | $ 3,433 | $ 24,031 | $ 20,598 | $ 24,031 | $ 20,598 |
| Bill | GS-0342-14/10 | Support Service Sup | $ 114,882 | $ 4,419 | $ 30,930 | $ 26,511 | $ 30,930 | $ 26,511 |
| Leon | GS-1410-12/9 | Librarian | $ 79,652 | $ 3,064 | $ 21,445 | $ 18,381 | $ 21,445 | $ 18,381 |
| Valerie | GS-343-12-04 | | $ 69,173 | $ 2,661 | $ 18,624 | $ 15,963 | $ 18,624 | $ 15,963 |
| Issac | GS-1654-12/5 | | $ 62,886 | $ 2,419 | $ 16,931 | $ 14,512 | $ 16,931 | $ 14,512 |
| Miriam | GS-1654-11/2 | Printing Specialist | $ 62,886 | $ 2,419 | $ 16,931 | $ 14,512 | $ 16,931 | $ 14,512 |
| Vacant | GS-11/5 | Management Analy | $ 59,484 | $ 2,287 | $ 16,010 | $ 13,722 | $ 16,010 | $ 13,722 |
| Vacant | GS-11/5 | Printing Specialist | $ 59,484 | $ 2,287 | $ 16,010 | $ 13,722 | $ 16,010 | $ 13,722 |
| Shirley | GS-344-9/06 | Management Assis | $ 50,509 | $ 1,943 | $ 13,599 | $ 11,656 | $ 13,599 | $ 11,656 |
| *Sub Total* | | | $ 855,174 | $ 32,891 | $ 230,239 | $ 197,348 | $ 230,239 | $ 197,348 |
| 0% COLA | | | | | | | | |
| Sub Total | | | | | $ 230,239 | $ 197,348 | $ 230,239 | $ 197,348 |
| 18% Benefits | | | | | 41,443 | 35,523 | 41,443 | 35,523 |
| Sub Total | | | | | 271,682 | 232,870 | 271,682 | 232,870 |
| 1.5% Promotions | | | | | 4,075 | 3,493 | 4,075 | 3,493 |
| Sub Total | | | | | $ 275,757 | $ 236,364 | $ 275,757 | $ 236,364 |
| 2% Awards | | | | | | | | |
| Grand Total | | | $ 855,174 | $ 32,891 | $ 275,757 | $ 236,364 | $ 275,757 | $ 236,364 |

| Employees | Grade/Series | Salaries | Bi-weekly Sal | 8 Pay Periods 1st QTR | 6 Pay Periods 2nd QTR | 7 Pay Periods 3rd QTR | 6 Pay Periods 4th QTR | Totals |
|---|---|---|---|---|---|---|---|---|
| Sheila | GS-0343-14/4 | $ 62,397 | $ 2,400 | 16,799 | 14,399 | 16,799 | 14,399 | $ 62,397 |
| Calvin | WG-6907-6/5 | $ 37,877 | $ 1,457 | 10,198 | 8,741 | 10,198 | 8,741 | $ 37,877 |
| Roosevelt | GS-305-4/10.5 | $ 32,063 | $ 1,233 | 8,632 | 7,399 | 8,632 | 7,399 | $ 32,063 |
| Patrick | GS-305-4/10.5 | $ 39,378 | $ 1,515 | 10,602 | 9,087 | 10,602 | 9,087 | $ 39,378 |
| Malcolm | GS-305-6/00 | $ 44,470 | $ 1,710 | 11,973 | 10,262 | 11,973 | 10,262 | $ 44,470 |
| Dave | GS-2010-07/10-0/00 | $ 44,819 | $ 1,724 | 12,087 | 10,343 | 12,087 | 10,343 | $ 44,819 |
| Danny | GS-0350-4/00 | $ 34,924 | $ 1,343 | 9,403 | 8,059 | 9,403 | 8,059 | $ 34,924 |
| James | XP-4402-7/00 | $ 35,881 | $ 1,380 | 9,660 | 8,280 | 9,660 | 8,280 | $ 35,881 |
| Arn | | $ 20,406 | $ 785 | 5,494 | 4,709 | 5,494 | 4,709 | $ 20,406 |
| Monica T | GS-305-5/9 | $ 34,961 | $ 1,345 | 9,413 | 8,068 | 9,413 | 8,068 | $ 34,961 |
| Monica F | GS-305-4/8.9 | $ 30,419 | $ 1,170 | 8,190 | 7,020 | 8,190 | 7,020 | $ 30,419 |
| DeMarco | GS-305-4/4.5-5/2 | $ 27,954 | $ 1,075 | 7,526 | 6,451 | 7,526 | 6,451 | $ 27,954 |
| Barry | GS-305-4/8.5 | $ 31,241 | $ 1,202 | 8,411 | 7,209 | 8,411 | 7,209 | $ 31,241 |
| Willie | GS-305-4/10.5 | $ 32,063 | $ 1,233 | 8,632 | 7,399 | 8,632 | 7,399 | $ 32,063 |
| Delores | GS-305-4/10.5 | $ 32,063 | $ 1,233 | 8,632 | 7,399 | 8,632 | 7,399 | $ 32,063 |
| Sub Total | | $ 540,915 | $ 20,804 | 145,631 | 124,827 | 112,429 | 124,827 | $ 540,915 |
| 0% COLA | | | | - | - | - | - | - |
| Sub Total | | | | 145,631 | 124,827 | 112,429 | 124,827 | 540,915 |
| 18% Benefits | | | | 26,214 | 22,469 | 20,237 | 22,469 | 91,388 |
| Sub Total | | | | $ 171,845 | 147,295 | 132,666 | 147,295 | 632,303 |
| 1.5% Promotions | | | | | 2,209 | 1,990 | 2,209 | 6,409 |
| Sub Total | | | | $ 171,845 | 149,505 | 134,656 | 149,505 | 638,712 |
| 2% Awards | | | | | | | | 12,774 |
| Grand Total | | | | $ 171,845 | $ 149,505 | $ 134,656 | $ 149,505 | $ 651,486 |

EXHIBIT
PAGE ___97___ OF ___127___

| FY 2004 | Totals |
|---|---|
| $ | 124,740 |
| $ | 82,259 |
| $ | 89,259 |
| $ | 114,882 |
| $ | 79,652 |
| $ | 69,173 |
| $ | 62,886 |
| $ | 62,886 |
| $ | 59,464 |
| $ | 50,509 |
| $ | 855,174 |
| $ | 855,174 |
| | 153,931 |
| $ | 1,009,105 |
| | 15,137 |
| $ | 1,024,242 |
| $ | 20,485 |
| $ | 1,044,727 |

EXHIBIT ___H___
PAGE ___99___ OF ___127___

Mail Management Branch

GS 342
Alel 13/5

| Employees | Grade/Series | Job Title | Salaries | Bi-weekly | 8 Pay Periods 1st QTR | 6 Pay Periods 2nd QTR | 7 Pay Periods 3rd QTR | 6 Pay Periods 4th QTR |
|---|---|---|---|---|---|---|---|---|
| Sheila | GS-0343-12/4 | Support Service Su | $ 69,173 | $ 2,661 | $ 18,624 | 15,963 | 18,624 | 15,963 |
| Calvin | WG-6907-6/5 | Warehouse Worker | $ 37,877 | $ 1,457 | 10,198 | 8,741 | 10,198 | 8,741 |
| Vacant | GS-305-4/5 | Mail Clerk | $ 28,990 | $ 1,115 | 7,805 | 6,690 | 7,805 | 6,690 |
| Vacant | GS-305-4/5 | Mail Processing Eq | $ 28,990 | $ 1,115 | 7,805 | 6,690 | 7,805 | 6,690 |
| Malcolm | GS-305-6/00 | Mail Assistant | $ 43,925 | $ 1,689 | 11,826 | 10,137 | 11,826 | 10,137 |
| Dave | GS-2010-07/10 | Supply Managemen | $ 46,088 | $ 1,773 | 12,408 | 10,636 | 12,408 | 10,636 |
| Danny | GS-0350-4/00 | Mail Processing Eq | $ 34,516 | $ 1,328 | 9,293 | 7,965 | 9,293 | 7,965 |
| James | GS-0305-5/10 | Mail Clerk | $ 37,211 | $ 1,431 | 10,018 | 8,587 | 10,018 | 8,587 |
| Monica T | GS-305-5/9 | Lead Mail Clerk | $ 36,257 | $ 1,395 | 9,762 | 8,367 | 9,762 | 8,367 |
| Monica F | GS-305-4/9 | Mail Clerk | $ 32,400 | $ 1,246 | 8,723 | 7,477 | 8,723 | 7,477 |
| DeMarco | GS-305-5/1 | Mail Clerk/Student I | $ 28,620 | $ 1,101 | 7,705 | 6,605 | 7,705 | 6,605 |
| Vacant | GS-305-4/5 | Mail Clerk | $ 28,990 | $ 1,115 | 7,805 | 6,690 | 7,805 | 6,690 |
| Vacant | GS-305-4/5 | Mail Clerk | $ 28,990 | $ 1,115 | 7,805 | 6,690 | 7,805 | 6,690 |
| Vacant | GS-305-4/5 | Mail Clerk | $ 28,990 | $ 1,115 | 7,805 | 6,690 | 7,805 | 6,690 |
| **Sub Total** | | | $ 511,017 | $ 19,655 | $ 137,582 | 117,927 | 106,461 | 117,927 |
| **0% COLA** | | | | | | | | |
| **Sub Total** | | | | | $ 137,582 | $ 117,927 | $ 106,461 | $ 117,927 |
| **18% Benefits** | | | | | 24,785 | 21,227 | 19,163 | 21,227 |
| **Sub Total** | | | | | $ 162,346 | 139,154 | 125,624 | 139,154 |
| **1.5% Promotions** | | | | | | 2,087 | 1,884 | 2,087 |
| **Sub Total** | | | | | | 141,241 | 127,508 | 141,241 |
| **2% Awards** | | | | | | | | |
| **Grand Total** | | | $ 511,017 | $ 19,655 | $ 162,346 | $ 141,241 | $ 127,508 | $ 141,241 |

| FY 2004 Totals | |
| --- | --- |
| $ | 69,173 |
| $ | 37,877 |
| $ | 28,990 |
| $ | 28,990 |
| $ | 43,925 |
| $ | 46,088 |
| $ | 34,516 |
| $ | 37,211 |
| $ | 36,257 |
| $ | 32,400 |
| $ | 28,620 |
| $ | 28,990 |
| $ | 28,990 |
| $ | 28,990 |
| $ | 511,017 |
| $ | 511,017 |
| $ | 86,381 |
| $ | 597,398 |
| $ | 6,059 |
| $ | 603,457 |
| $ | 12,069 |
| $ | 615,527 |

EXHIBIT ___H___
PAGE ___101___ OF _127_

Davis' exhibits pertaining to:

Form 4150 Printing Form

## Kline, Valerie

**From:** Davis, William M
**Sent:** Tuesday, March 01, 2005 9:14 AM
**To:** Kline, Valerie
**Subject:** RE:

As I said show me the problem.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Tuesday, March 01, 2005 9:11 AM
**To:** Davis, William M
**Subject:** RE:

I do need the full version to do the assignment. I explained the reason to in detail on the telephone with you last Thursday and even spoke to Bob about getting the software. He said he was going to order it. The full version shows the fields and the number of spaces in those fields. There were some fields that I could not tell how many spaces there were as the numbers would run endlessly. Isaac Evans in our office has the version and perhaps we can show you the difference in the two versions. My version does not have that capability. As an alternative, perhaps he will let me use his computer to do the assignment.

-----Original Message-----
**From:** Davis, William M
**Sent:** Tuesday, March 01, 2005 8:55 AM
**To:** Kline, Valerie
**Subject:** RE:

You do not need the full version. You have what you need on your PC. If still a problem show me.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Tuesday, March 01, 2005 8:23 AM
**To:** Davis, William M
**Subject:** RE:

Bill, I informed you that same day, Thursday, that in order to do the assignment I needed the full version of the Adobe Software. I talked to Bob about ordering it because he said he didn't have a version in the office. I'm not sure what he did after that. Do you know?

-----Original Message-----
**From:** Davis, William M
**Sent:** Monday, February 28, 2005 11:39 AM
**To:** Kline, Valerie
**Subject:** RE:

Per the email below, I am looking for the results of the sample review. It was

EXHIBIT
PAGE _102_ OF _127_

due Friday.

Status?

Bill

> -----Original Message-----
> **From:** Davis, William M
> **Sent:** Thursday, February 24, 2005 9:37 AM
> **To:** Kline, Valerie
> **Subject:** RE:
>
> You should already have it here as you view PDF's all the time.  Bring in the laptop and have it installed on it tomorrow.  Do the review of the form here tomorrow.  Have you gotten access to ROCIS and FRMS?
>
> If you cannot, and you do not have the software to do the other assignment, what work do you intend to accomplish today?
>
>> -----Original Message-----
>> **From:** Kline, Valerie
>> **Sent:** Thursday, February 24, 2005 9:30 AM
>> **To:** Davis, William M
>> **Subject:** RE:
>>
>> Bill,
>>
>> I would be happy to do this assignment but the help desk informed me that in order to do this, I would need the full version of Adobe Acrobat installed on my computer because it is not on Citrix.  I think I might even need to have it installed on my computer at work as well.  Do we have the full version for installing on my computer or do we need to order it?  Let me know if we have it and I will bring my laptop to work tomorrow for installing on it too.  Thanks.
>>
>>> -----Original Message-----
>>> **From:** Davis, William M
>>> **Sent:** Thursday, February 24, 2005 7:17 AM
>>> **To:** Kline, Valerie
>>> **Subject:**
>>>
>>> Valerie:
>>>
>>> I found yesterday that the space in each entry field is rather restricted.  Please check each entry box for the number of spaces fillable within each field.  Report to me the number of spaces available for each fillable block.
>>>
>>> Bill

EXHIBIT _____H_____
PAGE _103_ OF _131_

Davis' exhibits pertaining to:

Federal Register Survey
Of Paper Copies

For the record

December 6, 2004

Claudio informed me that the day I was off December 1, 2004, Valerie asked to meet with him.  She wanted to discuss with him an assignment I had given her on November 29 or 30.

The assignment was to reduce the number of Federal Register hard copies we receive in OPM on a daily basis and wind up in the trash.  Valerie asked if possible we could not combine delivery of FR articles with the pickup of the printed FR thus saving time and money.

I told her to gather the facts and talk with Sheila about combining the 2 pickups and deliveries and report her findings to me.

As of today she has not discussed her findings with me nor provided any report on progress even though she has met with Claudio who was not even aware of the assignment.

## Davis, William M

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Monday, January 10, 2005 8:59 AM |
| **To:** | Davis, William M |
| **Subject:** | RE: Federal Register |

I sent a note to her asking about it, forwarded your email as well, and she hasn't responded.  I will ask her again.

-----Original Message-----
**From:** Davis, William M
**Sent:** Monday, January 10, 2005 8:58 AM
**To:** Kline, Valerie
**Subject:** FW: Federal Register

I am still waiting for the progress report.  Status?

Thank you,

BIll

-----Original Message-----
**From:** Davis, William M
**Sent:** Tuesday, December 21, 2004 8:48 AM
**To:** Kline, Valerie
**Subject:** Federal Register

Valerie:

Please check on the status of Sheila's survey and approximate completion date.

Thanks,

Bill

*11 work days*

*X to follow-up until I asked*

*no initiative no concern for completion date.*

**EXHIBIT**
**PAGE** ___73_OF_ __127__

1/10/2005

## Davis, William M

**From:** Kline, Valerie
**Sent:** Thursday, January 13, 2005 10:32 AM
**To:** Davis, William M
**Cc:** Coates, Sheila R
**Subject:** Assessment of Federal Requirements

Bill,

Here is the draft email incorporating your revisions:

Your office is on our distribution list for receiving copies of the daily *Federal Register*. We are now in the process of reevaluating OPM's needs and requirements for receiving printed copies of the *Federal Register*, especially since the *Federal Register* is available online at no cost to the agency. By obtaining the electronic version, you have search capabilities and the ability to archive any issues that may contain information of interest to you and your office. Additionally, by using the electronic version, OPM would save the cost of printing, delivery and disposal of printed copies. Therefore, we would appreciate it if you would take a minute to answer the following questionnaire concerning your needs for receiving a printed copy of the *Federal Register* and return it to Malcolm Fowlkes, Mail Services Branch.

Do you have a need for the printed version of the Federal Register?  Yes___  No___
How many copies do you need? ____ copies
Please list the name(s) of the person(s) who need to receive a copy(ies) of the *Federal Register*, how many copies they need and where the copies should be delivered:

Example:
John Doe, 2 copies, Room 5H35, TRB

*Repeated errors*

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Tuesday, May 24, 2005 8:37 AM |
| **To:** | Kline, Valerie |
| **Cc:** | Fowlkes, Malcolm F |
| **Subject:** | Federal Register |

Valerie:

I am still seeing stacks of Federal Registers in the trash bins.  What is the status of our change?

Bill

*Failed to follow through.*

EXHIBIT A
PAGE 63 OF 127

Davis' exhibits pertaining to:

Publications Database

*assign 3-8*
*was due*
*3-8 / day late*

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Wednesday, March 09, 2005 4:39 PM |
| **To:** | Benedi, Claudio A; Davis, William M |
| **Subject:** | RE: This is what happened when I tried to add the new publication to the Publications database |

The publications database has been updated to include the newly approved publication. It took from 3:45p till 4:37pm to accomplish the task that I estimated an hour to do.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Wednesday, March 09, 2005 3:56 PM
**To:** Benedi, Claudio A; Davis, William M; Coco, Robert T
**Subject:** This is what happened when I tried to add the new publication to the Publications database

I tried to call the help desk and get no answer. I let it ring for 5 min and got no voice mail either. I will email them. As you can see this is going to take more than 5-10 min to resolve. I don't want to ask Bob for help because I might get called on that too but perhaps Bob can tell me if he's experiencing any problems in adding a new publication. I could modify existing ones but can not add.

EXHIBIT H
PAGE 106 OF 137

Davis, William **M**

**From:**    Coco, Robert T
**Sent:**    Thursday, May 19, 2005 5:14 PM
**To:**    Davis, William M
**Subject:**  FW: Publications Database

FYI – Obviously, Valerie did send me this but we haven't talked directly about it since.  I guess
we both sort of forgot about it.  Oh, well.  Anyway, I'll make a point of discussing them with her in
the next couple of days or so and decide whether they should go in the Database or not.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Monday, April 18, 2005 10:19 AM
**To:** Davis, William M; Coco, Robert T
**Subject:** Publications Database

Bill,

These are some other items I found that we might want to include in the publications database.  I
mentioned to Bob that I wanted to meet with him concerning these items.  He was very busy last week
but hopefully we will have a moment to this week.

Personal Property Management Handbook

Public Space and Room Reservations Guidelines

Accounting for Internal Use Software

Offset of Health Benefit Premiums

OPM's Management Control Program

Collection and Payment Advances

Financial Policy Issuances

Labor Cost System

Financial Information Bulletin

Role of Special Counsel (do we want Financial Policy Directives in our Pubs database?)

~~Family Emergency Guide~~ (done)

Veterans Employment

EXHIBIT __H__
PAGE __107__ OF __127__

5/20/2005

Davis' exhibits pertaining to:

Publications Inbox

## Davis, William M

**From:** Davis, William M
**Sent:** Tuesday, December 28, 2004 6:21 AM
**To:** Kline, Valerie
**Cc:** Benedi, Claudio A
**Subject:** Publications Inbox

Please direct your attention to the Publications Inbox. It has several emails dating back to December 23 that have not been replied to. I accidently caused 2 to show as read they are contained within the group of 9 that still show as unread. Handle asap.

This mail box, as I have stated previously, must be kept up to date.

EXHIBIT H
PAGE____74__OF_ 127

**Davis, William M**

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Tuesday, January 18, 2005 8:53 AM |
| **To:** | Davis, William M |
| **Subject:** | RE: |

Actually you're incorrect as I have been reading some email pertaining to the regulatory work—back and forth comments from OMB to the program office.  But I will take a look at the mailbox.  Is Bob coming in today?

> -----Original Message-----
> **From:** Davis, William M
> **Sent:** Tuesday, January 18, 2005 8:51 AM
> **To:** Kline, Valerie
> **Subject:**

You appear to not be busy.  Take care of the Publications inbox.

*1 1/2 Hours ?*

*Arrived at 7:30.  Had to remind Valerie again.*

EXHIBIT
PAGE  71  OF  171

1/18/2005

**Davis, William M**

**From:** Davis, William M
**Sent:** Tuesday, July 26, 2005 7:28 AM
**To:** Kline, Valerie

Since you are here so early clear the Publications in box as you should be doing every day.

*started at 7:00 sitting doing nothing*
*with 3 e mails in the Publications*
*in-box.*
*Had to remind again.*

*Supports question 15*

EXHIBIT
PAGE 043 OF 167

Davis' exhibits pertaining to:

Answering PMG telephones.

## Davis, William M

**From:**     Davis, William M
**Sent:**      Thursday, February 10, 2005 8:37 AM
**To:**        Kline, Valerie
**Subject:** RE: miriam is holding on #22

This is no way to let me know that someone is holding on the phone.  Either call me or pop your head in the ofiice.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Thursday, February 10, 2005 8:32 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

EXHIBIT     H
PAGE___75_OF_127

2/10/2005

## Davis, William M

**From:** Kline, Valerie
**Sent:** Wednesday, April 06, 2005 9:44 AM
**To:** Davis, William M
**Subject:** RE: miriam is holding on #22

Why don't you cut me some slack. She wanted to hold. You were on the phone. As soon as you were off the phone I notified you that she was holding. You told me you had already talked to her so obviously you saw my email and called her. You need to get off my case. Answering the phone is not one of my main duties. I do it to help out. If you find my help is inadequate, perhaps we need to hire a secretary.

-----Original Message-----
**From:** Davis, William M
**Sent:** Wednesday, April 06, 2005 9:41 AM
**To:** Kline, Valerie
**Subject:** RE: miriam is holding on #22

Just saw your email. As I have told you before this is not an acceptable method of telling anyone they have a phone call.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Wednesday, April 06, 2005 9:26 AM
**To:** Davis, William M
**Subject:** miriam is holding on #22

EXHIBIT
PAGE____71___OF_ 127

4/6/2005

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Friday, May 20, 2005 9:33 AM |
| **To:** | Miller, Caprice D |
| **Cc:** | Benedi, Claudio A; 'cab@benedi.net' |
| **Subject:** | V. KLine |

Caprice:

Good morning!!!

This is to confirm our conversation of this am.

Earlier this week I observed that the section phone was ringing as I was leaving the room. Valerie was at her desk and there was no one else in the office. By the time I reached the outer office door the phone had rung for the fourth time and gone to the answering machine. Upon my return, no more than 3 minutes later, I checked the answering machine and found that the phone had indeed not been answered and a message was there. I handled the message and thought nothing more of it.

This morning a very similar situation occurred. I was on my way out of the office and the phone started to ring. Valerie was again the only on in the office and was not on the phone. I stopped just outside of the door to see if she was going to answer it. It went to the fourth ring and then the answering machine. I immediately came back into the room and checked the answering machine, and again there was a message there which had just been left. I copied the message and took it to Valerie and asked her to take care of the call. I then asked her why she had not answered the phone. She stated "did you not get the message I left for you last week?" I said, what message. She said, the memo for the record that I gave to you and Claudio. I said yes I did, but what has that got to do with answering the phone. She stated that answering the phone is not in her PD and she is not going to do it. She will only answer the Regulatory phone not the general office phone. I informed her, as I have previously, that it is the responsibility of all in the office to answer the phone. She said again that it is not in her PD and that she is not going to answer it.

Thank you for your attention to this matter.

Respectfully,

Bill Davis

EXHIBIT H
PAGE 108 OF 127

For the record
May 20, 2005

As I left the room at 8:30 am the main line (1822) started to ring.  Valerie was the only
one left in the office.  I returned within 1 minute and there was a message on the
answering machine.  The message was left at 8:30.  Valerie did not answer the phone.
This is the 2nd time I have witnessed this.

EXHIBIT
PAGE 65    OF 127

Memo to the file
May 20, 2005

Just spoke to Valerie concerning the message that was left on the answering machine and her failure to answer the phone. She says she is not answering the phone anymore as it is not in her PD.

*This performance is unacceptable.*

*verbatto Valerie + copy*
*5-24-2005*

EXHIBIT H
PAGE 66 OF 127



**United States**
# Office of
# Personnel Management

Washington, DC 20415-0001

In Reply Refer To: **MAY 2 4 2005**    Your Reference:

MEMORANDUM FOR VALERIE KLINE
                  Management Analyst
                  Publishing Services Branch

FROM:          WILLIAM DAVIS
               Branch Chief
               Publishing Services Branch

SUBJECT:       Memorandum of Instruction

The Publishing Services Branch (PSB) is responsible for providing a wide range of services pertaining to printing and publication for the entire agency. In doing so, we all are responsible for developing and maintaining a good working relationship with our customers. Providing good customer service is vital in carrying out the mission of this office. For the PSB staff, it is imperative that we provide timely and accurate assistance to all callers. This ensures that this office achieves its mission of providing a wide range of publications/publishing services to our customers. To carry out this mission, you are tasked with ensuring that calls on the main office line are answered and adequate assistance is provided to all of our customers. In addition, you are to regularly check the office voice mail and provide assistance to the caller when possible or forward the customer to the appropriate specialist.

If you have any questions concerning these assignments please discuss them with me.

Please sign and date this memorandum. Your signature acknowledges your receipt.

_____          _5-24-05_____  _8:30am_
Signature                         Date

Page 1 of 1

## Davis, William M

| From: | Kline, Valerie |
|---|---|
| Sent: | Wednesday, May 25, 2005 2:32 PM |
| To: | Davis, William M; Benedi, Claudio A |
| Cc: | Benton, Sherman W |
| Subject: | Memo to the file |

With regard to your Memo to the File dated May 20, 2005, that you gave to me on May 24, 2005, I believe the date is a typo since I was telecommuting on 5/20/05. You asked me about a telephone call that that was left on the main telephone line on the morning of May 24, 2005. In response to your question, "why didn't you answer the telephone?" I asked you if you had read my Memo to the File re: *Comments on Progress Review Certification* dated May 17, /2005. You stated that you did not read it and I informed you that I addressed in that memo my intentions concerning answering the main telephone number. Your response to me was, "You will answer the telephone!" In response, I did not state that I would not answer the telephone but only that the responsibility was not in my position description or in my performance standards. You said that if we needed to, you would take it to task so I said "ok" and that I thought it was an issue that needed to be addressed. Following this discussion, I received your Memorandum of Instruction and I have been answering the telephones as you instructed.

EXHIBIT___H
PAGE___78__OF__/27.

Davis' miscellaneous exhibits

## Davis, William M

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Monday, June 27, 2005 1:11 PM |
| **To:** | Kline, Valerie |
| **Subject:** | RE: PMG WAR - 06242005 |

Please pare it down as Bob does.

Under Publishing - What is D&L?  Spell it out.
Delete Resource Center.
Printing procurement eliminate all but major items, like the last 2.
Mail Section this is all insignificant, delete it, and the same for the warehouse.
Keep the branch updates.

Bill


-----Original Message-----
**From:** Kline, Valerie
**Sent:** Monday, June 27, 2005 12:51 PM
**To:** Davis, William M
**Subject:** PMG WAR - 06242005

Attached is the WAR Report for week ending 6/24/05.


EXHIBIT  H
PAGE  91  OF  127

6/27/2005

Message

## Davis, William M

**From:** Davis, William M
**Sent:** Monday, June 27, 2005 1:20 PM
**To:** Kline, Valerie
**Subject:** FW: PMG WAR - 06242005

Also, where are the printing procurement items?

-----Original Message-----
**From:** Davis, William M
**Sent:** Monday, June 27, 2005 1:19 PM
**To:** Kline, Valerie
**Subject:** RE: PMG WAR - 06242005

D&L is still not spelled out.

    -----Original Message-----
    **From:** Kline, Valerie
    **Sent:** Monday, June 27, 2005 1:17 PM
    **To:** Davis, William M
    **Subject:** RE: PMG WAR - 06242005

    I did pare it down substantially and only left the things that Bob leaves. I thought I sent that one to you but if not, here it is.
    I spelled out the D&L.

        -----Original Message-----
        **From:** Davis, William M
        **Sent:** Monday, June 27, 2005 1:11 PM
        **To:** Kline, Valerie
        **Subject:** RE: PMG WAR - 06242005

        Please pare it down as Bob does.

        Under Publishing - What is D&L?  Spell it out.
        Delete Resource Center.
        Printing procurement eliminate all but major items, like the last 2.
        Mail Section this is all insignificant, delete it, and the same for the warehouse.
        Keep the branch updates.

        Bill


        -----Original Message-----
        **From:** Kline, Valerie
        **Sent:** Monday, June 27, 2005 12:51 PM
        **To:** Davis, William M
        **Subject:** PMG WAR - 06242005

        Attached is the WAR Report for week ending 6/24/05.

EXHIBIT
PAGE ___89___ OF ___127___

**'UBLICATIONS MANAGEMENT GROUP**

**Publishing Management Branch**
Worked on:
- Designed covers and printed copies of *Salary Tables for 2005.*
- Voting Rights manuals design process with HRPS staff and Omni Studio.
- Designed covers and printed copies of the *Physicians' Comparability Allowance Program Fiscal Year 2005 - Report to the Congress*
- CFC Best Practices D & L
- Financial Systems Modernization Project D&L
- EEO Policy revisions
- EEO Policy & PPP Policy print prep

**Federal Register**
Worked on:
- List of Pending regulatory actions at OMB.
- General Schedule Locality Pay Areas Proposed Rule
- January 2005 Pay Adjustments Notice Personnel Demonstration Project; Alternative Personnel Management System for the U.S. Department of Commerce Notice
- Cost of Living Allowances (Nonforeign Areas); COLA Rates Changes Proposed Rule
- 2004 Nonforeign Area Cost-of-Living Allowance Survey Report: Pacific and Washington, DC, Areas Notice
- 2002 and 2003 Nonforeign Area Cost-of-Living Allowance Survey Report: Revised Shelter Analyses Notice
- Prepared Fall 2005 Regulatory Plan and Unified Agenda of Federal Regulatory and Deregulatory Actions Memorandum for Ronald Flom and Mark Robbins signature

**Mail Management Branch Updates**

- **Vehicles:** Policy should be finalized NLT Fri, 24 Jun 05 (Pending)

- **Employees:** Paperwork submitted to employ two ICAP employees (Brenda Mitchell and Iristyne Beal) to work in the mail center with effective date of Mon, 27 Jun 05.

- **Training:** In the process of creating Mail Center training slides in Powerpoint to train new employees

EXHIBIT H
PAGE 90 OF 157

## PUBLICATIONS MANAGEMENT GROUP

**Publishing Management Branch**
Worked on:
- Designed covers and printed copies of *Salary Tables for 2005.*
- Continued updating of various parts of the THEO *Information Directory.*
- Voting Rights manuals design process with HRPS staff and Omni Studio.
- Designed covers and printed copies of the *Physicians' Comparability Allowance Program Fiscal Year 2005 - Report to the Congress*
- CFC Best Practices D & L
- Financial Systems Modernization Project D&L
- EEO Policy revisions
- EEO Policy & PPP Policy print prep

**Federal Register**
Worked on:
- List of Pending regulatory actions at OMB.
- General Schedule Locality Pay Areas Proposed Rule
- January 2005 Pay Adjustments Notice Personnel Demonstration Project; Alternative Personnel Management System for the U.S. Department of Commerce Notice
- Cost of Living Allowances (Nonforeign Areas); COLA Rates Changes Proposed Rule
- 2004 Nonforeign Area Cost-of-Living Allowance Survey Report: Pacific and Washington, DC, Areas Notice
- 2002 and 2003 Nonforeign Area Cost-of-Living Allowance Survey Report: Revised Shelter Analyses Notice
- Prepared Fall 2005 Regulatory Plan and Unified Agenda of Federal Regulatory and Deregulatory Actions Memorandum for Ronald Flom and Mark Robbins signatures

**Resource Center**
We assisted patrons with research/referral/legal/legislative/regulatory questions. There were no problems.

**Printing Procurement**
Worked on:
- Processed INV 43 for Investigations
- Processed orders for brown Kraft envelopes for Investigations
- Processed Letterhead with Ft. Meade address.
- We revised the printing request for the Federal Employees Family Preparedness Guide (DC) to increase the amount. This request was forwarded to the contractor after seeking approval from GPO. The contractor has the revision and will deliver on the 28th.
- Process the request for business cards. We received the agencies requested and prepared one compile list and forward them to GPO for printing.
- We completed and forwarded to GPO the term contract for business cards. We anticipate having that contract in place no later than July 29, 2005.

EXHIBIT ___H___
PAGE __92__ OF _127_

- After months of working with Margaret Barton with the U.S. Postal Exam, we finally sent the exam to the printers to print. The exam will deliver to 5 different testing centers throughout the United States. We can expect deliver no later than July 11, 2005 because testing will begin on July 18th.

**Mail Management Branch**

## MAIL SERVICES SECTION

- 40 boxes CRIS cases and 65 lock boxes INV of Boyer's material was sorted and delivered daily to the offices within OPM.
- Processed 14,250 pieces of incoming mail
- 17,925 - pieces of outgoing mail was processed
- 1,674 pieces of mail was folded and inserted
- 287 pieces of accountable mail (Certified, Express, U8PS etc....) was logged in and delivered
- Addressed 1000 envelopes with the return addresses
- Picked-up mail from 6 PO Boxes at the Ben Franklin Post Office, and delivered mail to the White House Fellowship.

## ALEXANDRIA DISTRIBUTION CENTER

The following was Issued:
- 2 SD moving boxes to Property Management
- 1 SD copy paper WTC
- 2 SDs, 2 line items for WTC on another request
- 1 SD forms recycled for RI
- 2 EA Mo Ped file cabinets for RI on behalf of Property Management
- 1 EA Mo Ped file cabinet with a key on behalf of Property Management for another client on another request.

The following was Inventoried:
- 8 line items for WTC
- 1 line item obsoleted for RI
- 11 spreadsheets filed for Property Management on behalf of CIO
- 1 line item & source referral for Publications
- 2 line items for HRPS/PMIP
- 3 line items for Property Management
- 2 lilne items for Space Management

The following was received:
- 11 SD excess computer equipment from CIO on behalf of Property Management
- 1 SD forms for RI
- 4 SD forms for Investigations

Some Furniture items (See Services below)

ervices:

- ADC moved some office system furniture from the Mailroom, and returned to stock at ADC
- ADC picked up & stored a truckload of mostly class A furniture for Property Management
- ADC picked up & stored 3 pieces of office furniture on another request for Property Management

Misc.:

- Performed various warehouse & equipment maintenance, administrative, and accounting tasks.
- Updated Facilities about Fire Alarm testing performed at ADC this week. Alarm bell rang, but system maintenance items were noted on some other related system equipment, and the contractor will affect these soon, according to the building owner's representative. Also: Ron Peacock will get ADC fire extinguishers re-inspected soon.
- Received MHE contractor quotes regarding ADC equipment maintenance & repairs. ADC will await answers from management regarding possible new procurements before proceeding to spend the vendor credit balance on maintenance of existing equipment, or whether the approx. $1300 credit can be applied towards new items.
- ADC has requested 2 replacement desktop printers from CIO excess.

**BRANCH UPDATES:**

- **Vehicles:**  Policy should be finalized NLT Fri, 24 Jun 05  (Pending)

- **Employees:**  Paperwork submitted to employ two ICAP employees (Brenda Mitchell and Iristyne Beal) to work in the mail center  with effective date of Mon, 27 Jun 05.

- **Training:**  In the process of creating Mail Center training slides in Powerpoint to train new employees

EXHIBIT
PAGE___94_OF_127

Management and Chief Financial Officer
Center for Information Services
Network Management Center

# Business Case Exception Form (BCE)

| | |
|---|---|
| **1. Originator (POC):** Rosalind Wright | **2. POC Phone Number: 202-606-261** |
| **3. Office: Mail Services Branch, PMG/CCSAS/MSD** | **4. Date BCE Submitted: 7/1/05** |
| **5. Approving Supervisor Name :** William M. Davis | **6. Date BCE Expected (Priority):** High  7-8-05 |

**7. Detailed Description of Business Case Exception:**
   Provide: What is it that you need to do. Why and where. When do you need it?
   (Do not ask for a specific model or product; tell us what you need to accomplish)

The CDRW is required for development and updating of OPM Mail Policy in direct support of OMB Circular A-130, Internal Controls and Directives Management.  It is needed as soon as possible since the policy is currently being developed.
*This office will purchase the CDRW.*

**8. Impact if Request is Not Implemented:**

Any delays in development of the OPM Mail Policy will affect OPM's effectiveness and efficiency in providing mail services.

| | |
|---|---|
| **9. Estimated Cost of Project:** $200.00 | **10. Funded by:** *PMG* |

**Do Not Write Below This Line (*NMG Use Only*)**

| BCE Number: | Date Received: | ITPAD Number: | Remedy Number: |
|---|---|---|---|
| **BCE Technology Request Type:** | | **BCE Scope:** | |
| **Expected Purchase Date:** | | **Expected Delivery Date:** | |

BCE Assigned to:   CSB _____   NEB _____   NCB _____   Other _____

BCE Tracked By: _____

BCE Tested in TMO: _____

Approved:   CSB _____   NEB _____   NCB _____   Other _____

Rejected:   CSB _____   NEB _____   NCB _____   Other _____

Withdrawn By: _____

Approval By: _____

*Supports question 19*
*7-6-05*
*Informed O.K. failed to Root*

**Davis, William M**

| | |
|---|---|
| **From:** | Davis, William M |
| **Sent:** | Friday, April 08, 2005 12:43 PM |
| **To:** | Evans, Issac S.; Carter, Jacquline D; Kline, Valerie; Coco, Robert T |
| **Subject:** | Lunch time |

We seem to be miscommunicating.  We all have our lunch slots and should be adhereing to them as closely as possible.  The room was empty today when I returned from lunch early.

With 4 of us here this should not happen.

I appreciate your cooperation in ensuring that the office is covered.  If your assigned lunch time is a problem lets talk otherwise please stick to the schedule we have established.

Thank you,

Bill

*Valerie went at 12:30 instead of 11:30, Issac I have no idea. Bob & Bill went 5-10 mins. early and Jackie went on time. Sent to all as a reminder especially Valerie as this is a continuing problem.*

*Supports question 17*

EXHIBIT
PAGE____77___OF__127

4/8/2005

## Davis, William M

**From:** Davis, William M
**Sent:** Thursday, February 03, 2005 10:21 AM
**To:** Kline, Valerie
**Subject:** RE: Ann's Party

Permission is always needed. That way I know who will be here to attend to the office.

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Thursday, February 03, 2005 10:20 AM
**To:** Davis, William M
**Subject:** RE: Ann's Party

Didn't realize permission was needed since this is an "office" party.

-----Original Message-----
**From:** Davis, William M
**Sent:** Thursday, February 03, 2005 10:04 AM
**To:** Evans, Issac S.; Carter, Jacquline D; Kline, Valerie
**Cc:** Coco, Robert T
**Subject:** Ann's Party

It has come to my attention that each of you intends to attend the party for Ann. However, only one of you has informed me of your desire, thank you Mr. Coco.

We are in a transition period and need to be available for needs that may arise.

EXHIBIT
PAGE 107 OF 127

2/3/2005

**Capital Reporting Company**

ATTACHMENT 2

Page 1

UNITED STATES DISTRICT COURT
FOR THE THE DISTRICT OF COLUMBIA

VALERIE KLINE,                          :
                    Plaintiff,          :
           v                            : CASE NO:
                                        : 1:07CV451
LINDA M. SPRINGER, and                  :
US OFFICE OF PERSONNEL MANAGEMENT:
                    Defendants          :

ORIGINAL

Washington, D.C.

Friday, February 22, 2008

Deposition of:

ROBERT T. COCO

called for oral examination by Plaintiff, pursuant

to Notice, at the Offices of Personnel Management,

1900 E Street, Northwest, Washington, D.C., before

Mary E. Warner of Capital Reporting, sworn by a

Notary Public in and for the District of Columbia,

beginning at 9:50 a.m.

## Capital Reporting Company

Page 45

1           (Break taken from 10:30 to 10:31.)

2    BY MS. KLINE:

3        Q    Do you recall sending an e-mail to

4    various people in publishing that was a cartoon

5    called the electric birds?

6        A    No, I don't recall such an e-mail.

7        Q    Ms. Kline received an e-mail from you

8    called "The Electric Birds."  It was a cartoon of

9    some crows standing on an electric line, and when

10   the electricity went through the line, the birds

11   flashed.  You don't recall that?

12       A    Nope.

13            MS. WHITAKER:  Objection.

14   BY MS. KLINE:

15       Q    Did you receive a counseling memorandum

16   for sending out that e-mail?

17       A    Since I don't remember sending it, I

18   don't remember getting a counseling memo.

19            MS. WHITAKER:  Objection.

20   BY MS. KLINE:

21       Q    Have you ever received a counseling memo?

22       A    No.

## Capital Reporting Company

Page 46

1    Q    Have you ever received an official

2    reprimand?

3    A    No.

4    Q    Do you remember when Mr. Davis was on

5    sick leave recovering from surgery around the time

6    of August 2005?

7    A    Yeah, I remember when he was sick.    I

8    forgot the exact dates.

9    Q    Were you acting in his absence?

10    A    Yes, sometimes.

11    Q    Did you perform any timekeeping duties in

12    his absence?

13    A    I think Claudio maintained most of the

14    timekeeping during his absence, if I remember

15    correctly.

16    Q    Ms. Sewell testified that there was an

17    approving official that signed off on time and

18    attendance in the database.    Are you able to do

19    that in their absence?

20    A    No.

21    Q    So Mr. Benedi does that?

22    A    Yeah.

## Capital Reporting Company

1    Q    Did you keep track of any timekeeping for

2  any of the employees in the office during that

3  time?  When you were acting, did any employees

4  report to you about their time?

5    A    They may have.

6    Q    So what sort of timekeeping duties did

7  you perform?

8    A    Well, I think -- again, I'm just trying

9  to remember.  Sometimes people would say, I'm

10  going to -- if someone needed to take off, then I

11  gave it to Claudio for approval.  He maintained

12  the time, I believe.

13    Q    During this time did Ms. Kline ever

14  inform you that she was leaving the office to take

15  family leave to take care of her mother?

16    A    Possibly.  But I don't remember a

17  specific incident.  But it certainly could happen.

18    Q    I didn't ask you a specific date.

19    A    I know.

20    Q    Did she inform you of what type of leave

21  she was taking?

22    A    I don't know.

**Capital Reporting Company**

Page 48

1       Q    Whether it was sick or annual?

2       A    I don't remember.  Probably, but I don't

3   specifically -- again, specifically remember any

4   incident.

5       Q    But when you sent the information to

6   Mr. Benedi, you didn't indicate whether it was

7   sick or --

8       A    No.  I didn't say that.  I don't remember

9   any particular incident.  But if I did -- if

10  someone gave me, whether it was you or anyone

11  else, gave me something, I would have sent it to

12  him with the specific type of leave, if that's

13  what the situation was.

14      Q    So they would tell you what type of leave

15  they were using, and you would send it to

16  Mr. Benedi?

17      A    Hopefully, yes.  If it was done properly.

18      Q    During that time when Mr. Davis was

19  recovering in August of 2005 and you were acting,

20  did Ms. Kline ever ask you if she could take a

21  lunch break at the end of the day?

22      A    I don't recall.

**Capital Reporting Company**

Page 49

1    Q    So you wouldn't recall the reason that

2    she would give you?

3        A    I don't remember that happening.

4        Q    Do you remember Ms. Kline asking if she

5    could take a lunch break at the end of the day

6    after she had been working on the national

7    security personnel regulations?

8            MS. WHITAKER:    Objection.

9            THE WITNESS:    I don't remember that.

10   BY MS. KLINE:

11       Q    I thought that might trigger your memory.

12       A    No.  There's so much stuff going on, I

13   don't remember any particular event like that.

14       Q    Okay.  Do you ever have visits to your

15   office from people who come to see you on a

16   personal basis, other than work, to chat, friendly

17   visits?

18       A    I guess.  I don't know.  Sure.  Once in a

19   while.  Not often, but --

20       Q    Do your supervisors ever object to those

21   visits?

22       A    Not to my knowledge.

## Capital Reporting Company

Page 53

```
1       A    I don't know.

2       Q    What is the FACA database, F-A-C-A?

3       A    Federal Advisory Committee Act database.

4       Q    How often do you enter data into the FACA

5   database?

6            MS. WHITAKER:  Objection, lack of

7   foundation.

8            THE WITNESS:  Once or twice a year.

9   BY MS. KLINE:

10      Q    Does Ms. Kline have access to the FACA

11  database?

12      A    I don't think so.

13      Q    Have you ever trained Ms. Kline how to

14  input data into the FACA database?

15      A    I think --

16      Q    Trained as opposed to just showing her?

17      A    I don't really recall if that ever

18  happened or not.  There was some talk about it,

19  but I don't think we really implemented it.  One

20  thing it's so rarely used, so I don't really

21  recall that or not.  It's possible.

22      Q    Does Mr. Benedi have any duties
```

## Capital Reporting Company

Page 54

1    associated with the FACA database?

2        A    Yeah.  He's the committee management

3    chairperson for the Office of Personnel

4    Management.  I work as his assistant in that

5    function.  Again, you only have to deal with it a

6    couple times a year to do some updating.  So it's

7    a minor function in the office.  It's not -- it's

8    a minimal function that we do have to do a couple

9    times a year.

10       Q    And are you able to enter data and

11   approve it, or does Mr. Benedi have to?

12       A    As the committee management -- I can

13   enter data, but he's supposed to approve it.

14       Q    Have you ever asked Ms. Kline to enter

15   data into the FACA database?

16       A    I don't recall that.

17       Q    Do you attend FACA meetings?

18       A    Occasionally, not very often.

19       Q    Did Ms. Kline attend FACA meetings?

20       A    Ms. Kline attended one or two, four or

21   five years ago.  None of us have been going

22   anymore recently.  I've gone to one in the last

**Capital Reporting Company**

1    year.

2        Q    Well, for that function --

3        A    We still have to do the function once or

4    twice a year to update by law the database for the

5    agency, but the workload is so minimal, and we

6    just don't take the time to go to the meetings

7    because they are not fruitful for our function.

8        Q    Has Ms. Kline, do you know, ever attended

9    a FACA meeting by herself?

10       A    I don't think so.  I think she and I went

11   a couple of times.  And that's about it.

12       Q    What is the publications database?

13       A    What is it?  It's an on-line OPM website

14   database of publications where we maintain our

15   office.  And Valerie and I are the ones that have

16   access to it to update various publications of the

17   agency to make sure -- in that database is the

18   name of the publication, what office is

19   responsible for it, various fields and we try to

20   make -- we add -- and Valerie and I can update any

21   of the fields in that database to make sure

22   they're current.  We try to do an inventory of

**Capital Reporting Company**

Page 56

1    them every couple years to make sure they're

2    updated.  That's about it.

3         Q    You answered a lot of my questions.

4         A    Okay.  Well, just skip to the last one.

5         Q    Have you ever asked Ms. Kline to enter

6    data in the publications database when she refused

7    to do so?

8         A    Not to my knowledge.

9         Q    Do you recall Ms. Kline ever sending you

10   a list of publications for adding to the

11   publications database?

12        A    A list?

13        Q    Has she ever sent you a list of

14   recommended items for --

15        A    Yes.  Once in a while.

16        Q    Has she ever sent you a list that you

17   failed to get back to her in a timely manner?

18        A    I don't know.  I don't recall that.

19        Q    Did Ms. Kline ever suggest to you a

20   procedure to be developed for keeping track of

21   publications approved by the Office of

22   Communication so that they could be added to the

## Kline, Valerie

**From:**     Carter, Jacquline D
**Sent:**      Friday, December 09, 2005 4:42 PM
**To:**        Coco, Robert T; Kline, Valerie
**Subject:** Federal Register.doc

Attached is the Federal Register Weekly.

*Federal Register Weekly*

- The following item were prepared and sent to subscribers on Publishing Services Branch's new ListServ:

  -- Final rule titled *Veterans Recruitment Appointments—*

- Prepared and emailed the list of regulatory actions pending at OMB.

- Prepared and emailed the Advance Federal Register Notification List.

- Prepared and sent to the Federal Register for publication a Proposed rule titled *Examining System and Programs for Specific Positions and Examinations (Miscellaneous).*

- Continued updating and verifying information in FRMS in preparation for conversion to the new software;

- Researched and provided information to management staff and ORIA concerning OMB's non review of certain regulatory actions.

- Coordinated OPM's response to OMB's request for changes to a Final rule titled ***General Schedule Locality Pay Areas***

- Review Interim Rule titled *FEHB Coverage and Premiums for Active Duty Members of the Military.*

## AFFIDAVIT FOR WILLIAM M. DAVIS

Prior to making the following statement Melba D. Vaughn provided me a Letter of Authority identifying her as an EEO Investigator, assigned by the US Office of Personnel Management, Chief, Center for Equal Employment Opportunity. I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

*I am aware that the accepted issues in this complaint are Ms. Kline claims that, on the bases of her race (White), sex (Female), and in retaliation for previous EEO activity when allegedly:*

*1. from December 21, 2005 to February 21, 2006, she was denied a private office space;*

*2. from December 22, 2005 to February 21, 2006, the agency eliminated one of her job responsibilities by rescinding her administrative rights to the Federal Register Management System; and*

*3. from February 2, 2006 to February 21, 2006, she was required to cover the office telephone.*

My full name is William M. Davis. I am a White male. My position at the Office of Personnel Management is Support Services Supervisor, GS-0342-14 and I have been in that position since November 5, 2000. However, I have been employed with the Federal Government since January 21, 1971. My supervisor is a White male. His name is Claudio A. Benedi, Program Manager, GS-0340-15. I was made aware of my right to representation, but because I was acting within my job duties, I expect to be represented by someone in OPM's Office of General Counsel.

I have known Ms. Valerie Kline since I hired her in November 2002, and I have been her supervisor since I hired. I am aware of the fact that Ms. Kline has prior EEO activity because Ms. Laura George met with me to discuss some of Ms. Kline's concerns.

Ms. Kline asked for a private office via email, but I do not remember the date. I did not provide Ms. Kline private office space because there was none available. I have one employee under my supervision that has private office space. His name is Issac Evans (Black). Mr. Evans is a GS-13, Visual Information Specialist. The private office space that Mr. Evans works out of was the only space available when he was hired. No other employees have requested private office space.

Initials _C.O._  EXHIBIT _H_ PAGE _1_ OF _8_

Ms. Kline has stated that without private office space it's difficult for her to perform her duties. I told her that additional office space was not available and that the space occupied by Issac Evans is temporary space on loan from the director's office. It was one of three rooms we had on loan of which two have been taken back. Ms. Kline's race, sex, or prior EEO activity were not factors in her not having private office space. Shirley Sewell and Miriam Heard work out of cubicles in the Printing Procurement Section.

On December 22, 2005, I found out that Ms. Kline had administrative rights to the Federal Register Management System (FRMS). On that same day, I had her rights rescinded. Administrative authority duties are not contained in Ms. Kline's position description, and these duties are not performed by this organization. They are performed by the Center for Information Services & Chief Information Officer. Administrative rights to this system would allow the authorized individual to program the data base and grant access to other users. No other employees within Publishing Services Branch have administrative rights. Ms. Kline did not discuss with me, the impact of my decision to rescind her FRMS administrative rights. I did not consider Ms. Kline's race, sex, or prior EEO activity when I decided to have her FRMS administrative rights rescinded.

From February 2, 2006 to February 21, 2006, like everyone else within 5H35 and 5H36, Ms. Kline was required to cover the office phone. Robert Coco, GS-13, Management Analyst, White male; Jacqueline Carter, GS-13, Management Analyst, Black female; Issac Evans, GS-13, Visual Information Specialist, Black male; and Annette Fryegunter, GS-11, (Detailed to) Printing and Visual Arts Specialist, Black female all were required to cover the office phone. Ms. Kline has stated that she should not have to answer the phone as she is a professional not a secretary. Ms. Kline's race, sex, or prior EEO activity were not factors in my decision to have her cover the office phones.

I have read and agree to this statement consisting of two pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _William M. Davis_    Date: _6-15-2006_

William M. Davis

Investigators Signature: _Melba D. Vaughn_    Date: _6-15-2006_

Melba D. Vaughn

## SUPPLEMENTAL AFFIDAVIT FOR WILLIAM M. DAVIS

I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties. This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

1. You stated in your affidavit on August 24, 2006, you had Ms. Kline prepare three packages for Mr. Coco's signature because Mrs. Carter was not in the office. You then said you have not asked any other employee to prepare packages for the Federal Register because no other employees know the proper procedures and requirements for preparing packages... Please clarify that statement.

Since being employed at OPM, Ms. Kline has been trained by Mrs. Carter in the proper procedures for processing our regulatory actions. No other employees have been trained in these procedures and requirements. Therefore, Ms. Kline and Mrs. Carter are the only ones that know the full requirements.

2. Why did you issue Ms. Kline an IPAQ?

It was excess equipment that I was no longer using.

3. Did you provide Ms. Kline a reason for issuing her an IPAQ? If yes, what reason did you provide her?

Not to my recollection.

4. Why didn't you issue any other employee an IPAQ?

The IPAQ is not needed to perform the duties of our positions.

5. You provided a list of individuals identified as Federal Register Liaison/Certifying/Authorizing Officers, why is Ms. Kline included on that list?

Ms. Kline has always been included on this list except for the time she was placed on administrative leave. This list identifies those individuals within OPM authorized to contact the Federal Register. Signature authority for correspondence is not included in this liaison. Signature authority is determined within our office.

I have read and agree to this statement consisting of ~~two~~ one w.D pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page. I hereby affirm under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _William M. Davis_     Date: _10-24-2006_
                    William M. Davis

EXHIBIT     _I_
PAGE     _9 OF 30_

## AFFIDAVIT FOR CLAUDIO A. BENEDI

Prior to making the following statement Melba D. Vaughn provided me a Letter of Authority identifying her as an EEO Investigator, assigned by the US Office of Personnel Management, Chief, Center for Equal Employment Opportunity. I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

*I am aware that the accepted issues in this complaint are Ms. Kline claims that, on the bases of her race (White), sex (Female), and in retaliation for previous EEO activity when allegedly:*

*1.  on January 31, 2006, she was not allowed to take lunch outside core hours;*

*2.  on February 1, 2006, she was issued a Letter of Reprimand; and*

*3.  on February 2, 2006, and March 16, 2006, her supervisor allegedly tampered with her annual and sick leave.*

My full name is Claudio A. Benedi. I am a White male. My position at the Office of Personnel Management is Director, Publications Management Group, GS-301-15. I have been in that position for about eight or nine years. However, I have been employed with the Federal Government for 34 years. Up until about three weeks ago, Ronald C. Flom, Deputy Associate Director, Center for Contracting Facilities and Administrative Services was my supervisor. Kay Ely is my current supervisor. Mr. Flom and Ms. Ely appear to be Caucasian, Senior Executive Servants. I was made aware of my right to representation.

I have known Ms. Valerie Kline for about two or three years. We have a good working relationship. My relationship with Ms. Kline is not personal in the sense that we are social friends. I have been her second level supervisor since she was hired. I am aware of the fact that Ms. Kline has prior EEO activity because Ms. Laura George met with me to discuss some of Ms. Kline's concerns.

I do not recall Ms. Kline asking me for permission to take lunch outside of the core hours on January 31, 2006; however I did hear about it. Ms. Kline has asked on more than one occasion if she could take lunch outside of the core hours. I checked with the labor relations and was told that employees needed to take lunch during the core hours. In the past, Ms. Kline has worked through lunch and her supervisor has allowed her to leave early. I have not assigned Ms. Kline a specific time to take lunch, but I did ask Mr. Davis to coordinate lunch hours so that the office would be covered. In 1995 I disapproved Grace Butler's request to take lunch outside of the core hours.

AFFIDAVIT Claudio A. Benedi
OPM EEO Case No. 2006019

Initials _____                EXHIBIT ___I___
                                PAGE ___I___ OF __6__

Ms. Kline's race, sex, or prior EEO activity were not factors in my decision to have Mr. Davis coordinate employee lunch hours to ensure office coverage.

I have read and agree to this statement consisting of two pages. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _____ Date: 7/6/06
                      Claudio A. Benedi

Investigators Signature: _____ Date: 7/6/06
                           Melba D. Vaughn

AFFIDAVIT Claudio A. Benedi
OPM EEO Case No. 2006019

Initials _____ **EXHIBIT** ___I___
**PAGE** ___2___ OF ___6___

**SUPPLEMENTAL AFFIDAVIT FOR CLAUDION BENEDI**

I made this statement freely and voluntarily knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties. This statement is given in relation to a complaint of discrimination filed by Valerie Kline.

1. In your affidavit you recalled disapproving Grace Butler's request to take lunch outside of the core lunch hours in 1995, have you approved anyone's request to take lunch outside of the core lunch hours? If so, who, when, and why.

*NO.*

2. Have you ever allowed Ms. Carter to take lunch outside of the core lunch hours? If so, when and why.
No.

3. Have you ever allowed Mr. Coco to take lunch outside of the core lunch hours? If so, when and why.

No.

I have read and agree to this statement consisting of one page. I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the above statement is true, correct, and complete to the best of my knowledge and belief.

Witness Signature: _____ Date: 7/18/06
           Claudio Benedi

Investigators Signature: _____ Date: 7/18/06
           Melba D. Vaughn

## Kline, Valerie

**From:**   Miller, Caprice D
**Sent:**   Wednesday, February 15, 2006 10:42 AM
**To:**   Kline, Valerie
**Subject:** RE: Second Notice Concerning Leave

Please refer all questions to your supervisor.

Thank you,

Caprice D. Miller, Employee Relations Specialist
Talent Management Group

Phone: (202) 606-2063
Fax: (202) 606-1732

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Wednesday, February 15, 2006 9:05 AM
**To:** Miller, Caprice D
**Subject:** RE: Second Notice Concerning Leave

Caprice,

I did discuss this leave with Mr. Davis and he has informed me that he *cannot* take any action until he hears from 'Employee Relations' on this matter. Based upon what you are telling me, it appears that he is using this as an excuse to keep from amending my leave because, as you state, "Employee Relations does not have any authority to make decision as it relates to you or any other OPM employee".

*Valerie Kline*
*Publications Management Group*
*Regulatory Issuances*
*202-606-1973 - Rm. 5H35*

>        -----Original Message-----
>        **From:** Miller, Caprice D
>        **Sent:** Wednesday, February 15, 2006 9:01 AM
>        **To:** Kline, Valerie
>        **Subject:** RE: Second Notice Concerning Leave

Good Morning Valerie,

The role of the Employee Relations specialist is to serve and assist managers and supervisors. Therefore, I do not have the authority to make decision as it relates to you or any other OPM employee.

Another role of the ER specialist is to provide information to all OPM employees on procedures and policy that have been established to govern OPM employees.

If you have any questions about leave, please discuss that with your supervisor.

6/4/2008

Thank you,

Caprice D. Miller, Employee Relations Specialist
Talent Management Group

Phone: (202) 606-2063
Fax: (202) 606-1732

-----Original Message-----
**From:** Kline, Valerie
**Sent:** Wednesday, February 15, 2006 8:45 AM
**To:** Miller, Caprice D
**Subject:** FW: Second Notice Concerning Leave

Caprice,

Bill Davis informed me that he cannot amend my leave back to correctly reflect the leave I used until he hears from 'Employee Relations' because, as he puts it, "you got them involved so I have to wait to hear back from them."   Yet he amended the 4 hours of leave that he erroneously charged me on 9/15 and 9/16, which was reflected in the 2/2/06 memo to him.  What action does 'Employee Relation's need to take before my leave can be amended back to the way it was originally reported?

*Valerie Kline*
*Publications Management Group*
*Regulatory Issuances*
*202-606-1973 - Rm. 5H35*

-----Original Message-----
**From:** Davis, William M
**Sent:** Wednesday, February 15, 2006 8:33 AM
**To:** Kline, Valerie
**Subject:** RE: Second Notice Concerning Leave

Your prior memo is in employee relations awaiting action.

   -----Original Message-----
   **From:** Kline, Valerie
   **Sent:** Wednesday, February 15, 2006 8:29 AM
   **To:** Davis, William M
   **Subject:** Second Notice Concerning Leave


   Bill,

   This is the second notice informing you that the following leave of mine was changed from AL to SL without my knowledge or authorization. This leave should be amended as follows to reflect AL as originally reported.  Please make these amendments.

           PPE 9/3/2005
              8/22/2005        1.0 AL
              8/24/2005        3.0 AL
              8/25/2005        1.0 AL
              8/29/2005        1.0 AL
              8/30/2005        2.0 AL

| | |
|---|---|
| 8/31/2005 | 1.0 AL |
| 9/01/2005 | 9.0 AL |

PPE 9/17/2005
| | |
|---|---|
| 9/13/2005 | 3.0 AL |

PPE 10/1/2005
| | |
|---|---|
| 9/19/2005 | 1.0 AL |
| 9/28/2005 | 3.0 AL |
| 9/29/2005 | 9.0 AL |
| 9/30/2005 | 9.0 AL |

*Valerie Kline*
*Publications Management Group*
*Regulatory Issuances*
*202-606-1973 - Rm. 5H35*

| **Office of Personnel Management** | **For Pay Period Ending** 03/18/2006 | **Net Pay** ▓▓▓▓ |
|---|---|---|
| **EARNINGS AND LEAVE STATEMENT** | **Pay Period #** 06 | **Pay Date** 03/29/2006 |

| **Name** KLINE,VALERIE | **Pay Plan/Grade/Step** GS    12    05 | **Annual Salary** ▓▓▓▓ | **Hourly Ra** ▓ |
|---|---|---|---|

| **Home Address** 83 E STREET LOTHIAN MD 20711 | **Pay Check Mailing Address** |
|---|---|

| **Your Pay Consists of** | **Current** | **YTD** | **Tax Information** | **Marital Status** | **Exemptions** | **Ad ditional Withholding** | **Current Wages** | **YTI Wag** |
|---|---|---|---|---|---|---|---|---|
| Gross | ▓▓ | ▓▓ | | | | | | |
| Total Deductions | | | Federal | ▓▓▓▓▓▓▓▓ | | | | |
| Net Pay | | | State - MD | | | | | |

## EARNINGS

| TYPE | RATE | ADJUSTED | ADJ HOURS | HOURS | CURRENT | Y' |
|---|---|---|---|---|---|---|
| Base Pay | | | | ▓▓▓ | ▓▓▓ | ▓▓ |
| Locality Pay | | | | | | |

## DEDUCTIONS

| TYPE | CURRENT | YTD | TYPE | CURRENT | Y1 |
|---|---|---|---|---|---|
| Federal Tax | ▓▓▓ | ▓▓ | State Tax | ▓▓▓ | ▓▓ |
| GLI Basic Employee | ▓▓▓ | ▓▓ | Medicare | ▓▓▓ | |
| OASDI | ▓▓▓ | ▓▓ | HBI | ▓▓▓ | |
| Retire Offset P83CSR Employee | | | Union Dues | | |
| Savings Allotments | ▓▓ | ▓▓ | | | |

## LEAVE

| TYPE | Begin Bal Lv Yr | Earned Current | Earned YTD | Used Current | Used YTD | Ending Bal |
|---|---|---|---|---|---|---|
| Compensatory Earned | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 |
| Credit Hours Earned | -3.50 | 0.00 | 0.00 | 0.00 | 0.00 | -3.50 |
| Annual Leave | 240.00 | 8.00 | 40.00 | 8.00 | 42.70 | 237.30 |
| Sick Leave | -28.50 | 4.00 | 20.00 | 0.00 | 1.00 | -9.50 |
| Family Leave | 0.00 | 0.00 | 0.00 | 18.00 | 263.00 | 0.00 |

**Annual Leave**

**Category:** 8                                    **Use or Lose Balance:** 165.30

## REMARKS

THIS REPORT CONTAINS INFORMATION SUBJECT TO THE PRIVACY ACT OF 1974 AS AMENDED

| **Office of Personnel Management** | | **For Pay Period Ending**<br>04/01/2006 | **Net Pay**<br>▓▓▓▓▓ |
|---|---|---|---|
| **Earnings and Leave Statement** | | **Pay Period #**<br>07 | **Pay Date**<br>04/12/2006 |
| **Name**<br>KLINE,VALERIE | **Pay Plan/Grade/Step**<br>GS   12   05 | **Annual Salary**<br>▓▓▓▓▓ | **Hourly Rate**<br>▓▓▓▓▓ |

**Home Address**
83 E STREET
LOTHIAN, MD 20711

**Pay Check Mailing Address**

| Your Pay Consists of | Current | YTD | Tax Information | Marital Status | Exemptions | Additional Withholding | Current Wages | YTD Wages |
|---|---|---|---|---|---|---|---|---|
| Gross | ▓▓▓ | ▓▓▓ | | | | | | |
| Total Deductions | ▓▓▓ | ▓▓▓ | Federal | | | | | |
| Net Pay | ▓▓▓ | ▓▓▓ | State   MD | | | | | |

## EARNINGS

| Type | Rate | Adjusted | ADJ Hours | Hours | Current | YTD |
|---|---|---|---|---|---|---|
| Base Pay | | | | ▓▓▓ | ▓▓▓ | ▓▓▓ |
| Locality Pay | | | | | | |

## DEDUCTIONS

| Type | Misc | Adjusted | Current | YTD | Type | Misc | Adjusted | Current | YTD |
|---|---|---|---|---|---|---|---|---|---|
| Federal Tax | | | ▓▓▓ | | State Tax | | | ▓▓▓ | |
| GLI Basic Employee | | | | | Medicare | | | ▓▓▓ | |
| OASDI | | | ▓▓▓ | | HBI | | | ▓▓▓ | |
| Retire Offset P83CSR Employee | | | | | Union Dues | | | | |
| Savings Allotments | | | | | | | | | |

## BENEFITS PAID BY GOVT.

| Type | Current | YTD | Type | | Current | YTD |
|---|---|---|---|---|---|---|

## LEAVE

| Type | Begin Bal Lv Current | Begin Bal Lv Yr | Earned Current | Earned YTD | Used Current | Used YTD | Ending Bal |
|---|---|---|---|---|---|---|---|
| Compensatory Earned | | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 |
| Credit Hours Earned | | -3.50 | 0.00 | 0.00 | 0.00 | 0.00 | -3.50 |
| Annual Leave | | 240.00 | 8.00 | 48.00 | 8.00 | 50.20 | 237.80 |
| Sick Leave | | -0.50 | 4.00 | 24.00 | 0.00 | 1.00 | 22.50 |
| Family Leave | | 0.00 | 0.00 | 0.00 | 18.00 | 253.00 | 0.00 |

**Annual Leave**

  Category:  8                                                                Use or Lose Balance: 157.80

## REMARKS

CHANGES MADE ON THE ELECTRONIC PAY AND LEAVE STATEMENT WEBSITE FOR "EFT" NET CHECK DEPOSIT INFORMATION...DO NOT UPDATE... BANKING INFORMATION FOR TRAVEL REIMBURSEMENT PAYMENTS. TO MAKE ANY CHANGES TO YOUR BANKING INFORMATION FOR TRAVEL REIMBURSEMENT PAYMENTS PLEASE CONTACT SHEILA GADD OF THE HEARTLAND FINANCE CENTER FINANCIAL OPERATIONS AND DISBURSEMENT DIVISION.  YOU MAY CONTACT SHEILA VIA EMAIL AT SHEILA.GADD@GSA.GOV OR BY PHONE AT 816-926-7532.  FOR FURTHER ASSISTANCE OR QUESTIONS YOU MAY ALSO CONTACT THE ACCOUNTS PAYABLE HELPDESK AT 816-926-7287.

THIS REPORT CONTAINS INFORMATION SUBJECT TO THE PRIVACY ACT OF 1974 AS AMENDED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VALERIE KLINE, | ) |
| | ) |
| Plaintiff | ) |
| | ) Case Number: 1:07-CV-451(JR) |
| v. | ) |
| | ) |
| LINDA M. SPRINGER, | ) |
| Director, U. S. Office of Personnel Management, | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REPEAT OF REQUEST FOR PRODUCTION OF DOCUMENTS (REVISED)

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure Defendant responds to Plaintiff's Interrogatories and Request for Production of Document as follows:

The information produced in Defendant's responses is based upon the Defendant's investigation to date and was provided by the Office of Personnel Management. By providing the following information in response to Plaintiff's discovery requests, the Defendant does not waive any privilege or other objection concerning production of further information regarding the matters addressed in Plaintiff's discovery requests or the Defendant's responses. The Defendant reserves the right to supplement these responses as necessary.

1

## GENERAL OBJECTION

Defendant submits these responses without conceding the relevance or materiality of the subject matter of any information which may be disclosed, and without prejudice to Defendant' s right to further object to the admissibility of any evidence regarding such information. Defendant reserves the right to object at such later time that any response given hereunder is protected by the attorney/client privilege, is attorney work product or trial preparation material, or that the disclosure of such information was inadvertent. Defendant expressly incorporates by reference this objection into each the specific responses to Plaintiffs interrogatories.

### Plaintiff's Interrogatories

1.    Identify who was assigned responsibility for the regulatory work that Carter performed after her retirement, their grade and how the position was filled.

   **Response:**    **OBJECTION:**   This question is not relevant and is not likely to lead to the discovery of relevant information.  To the extent that a response is required, it is a request for information for a period occurring outside of the relevant time period. Finally, Plaintiff did not apply for this position.

2.    Identify any and all person(s) in PMG that was qualified to fill the position that Carter occupied?

   **Response:**    **OBJECTION:** Vague as to what position is being referenced.  To the extent that a response is required, if the question concerns the position which became available after Carter retired, this request is not relevant and is not likely to lead to the discovery of relevant information.  It is a request for information during a period occurring outside of the relevant time period.  Finally, Plaintiff did not apply for this

2

position.

3.    Identify when Carter began teleworking and how many days per week that she

teleworked.

**Response:**    *See* Deposition of Jacqueline Carter, pages 15, 16-18, 19, 22, 27,

67; *see also* Affidavit for William M. Davis, Report of Investigation (ROI), OPM EEO

Case No. 2006008, p. 5.

4.    Identify the function of the Resource Center, its location and dates of the

locations approximately how many customers per day the Resource Center had, when it

officially closed and any other information related to the closing of the Resource Center,

such as studies, memoranda, etc.

**Response:**    **OBJECTION:**  This question is not relevant and is not likely to

lead to relevant information.  To the extent that an answer is required, *see* Deposition of

Shirley Sewell, pages, 7-10; 12-13; 15-19; 25-28; 30, 33-34; 50-51; Deposition of

Jacqueline Carter, page 55; Deposition of Robert T. Coco, p. 65-68; 82-83.

5.    Identify when Lara Riviera-Lopez worked for PMG, and whether she teleworked

and how often, what her grade and duties were, including whether she primarily covered

PMG's telephones or assisted walk-in customers.

**Response:**  **OBJECTION:**  This question is not relevant and is not likely to lead

to the discovery of relevant information.  To the extent that a response is required, Ms.

Riviera-Lopez was not an employee of PMG.  She was on detail to the PMG during the

relevant time period.  When she was detailed to PMG, Ms. Riviera-Lopez was already on

a teleworking schedule approved by her sponsoring office.  *See also* Deposition of Robert

T. Coco, p. 15-16.

3

6.      Identify the grade and duties of Robert Coco, and whether he primarily covered

PMG telephone lines, the individual whose telephone that the PMG line audibly rings

assisted on, whether he assists and the extent of his assistance to walk-in customers?

   **Response:**    *See* Deposition of Robert T. Coco, p. 1-24, 25-32.

7.      Identify how the development of the Federal Register Management System

(FRMS) came about, when it was put into production and all persons in PMG who were

involved in the development of the FRMS and the extent of their involvement.

   **Response:**    *See* Affidavit of Claudio A. Benedi, ROI, OPM EEO Case No.

2006015, Exhibit I, page 2 of 7, 3 of 7; *See* Affidavit of William M. Davis, ROI, OPM

EEO Case No. 2006015, Exhibit H, pages 1-8; *See* Deposition of Jacqueline Carter, p.

44-51.

8.      Identify how long had Kline been working with Arlene Taylor on the FRMS

before Davis sent Taylor an email complaining about Taylor's visit to Kline?

   **Response:**  Mr. Davis did not send an email to Arlene Taylor "complaining"

about Taylor's visit to Kline.  Mr. Davis sent an email to Arlene Taylor on December 8,

2005; the contents of the email concerned modifications to FRMS.  The email is the best

evidence of its contents.  The email is located in the Affidavit of William Davis, ROI,

EEO Case No. 2006008, Exhibit H., page 6 of 12.

9.      Identify when Kline was assigned primary responsibility for answering PMG

telephone lines and responding to the Publication inbox.

   **Response:**  Mr. Coco, a GS-13 employee, had assumed the task of answering the

general telephone lines for PMG.  However, when he became too busy to handle this

task, rather than let the phones ring, Ms. Kline was asked by Mr. Davis to help out and

4

answer the phones.  Ms. Kline was the lowest graded PMG employee in the immediate

office and a grade lower than Mr. Coco.  Of additional note, all PMG employees assisted

in answering the telephones.  *See*, Affidavit of William Davis, ROI, EEO Case No.

2006015, Exhibit H, p. 2 of 8; 6 of 8 *see also*, ROI, Exhibit H, P. 116, 119; *see*

Deposition of Robert T. Coco, p. 8-11.  **OBJECTION** to the last part of interrogatory 9.

Plaintiff would be in the best position to explain when she had primary responsibility for

responding to the Publication inbox.  To the extent that an answer is required, *see*

Deposition of Robert T. Coco, p. 59-60; *see also* ROI, Exhibit H, p. 3, 118, 123-126.

10.     Identify the manner or ways that Kline assisted non-regulatory PMG walk-in

customers, including whether she was allowed to sign off on the 4150 Printing Request

Form, allowed to assist customers with their graphic design projects, make covers for

customers' reports or documents?

**Response:**     **OBJECTION.**  Plaintiff would be in the best position to identify

the manner or ways that she assisted non-regulatory PMG walk-in customers.  To the

extent that an answer is required, with regard to the type of assistance that Ms. Kline

provided to walk-in customers, she worked with the information delivery update on the

data base; helped research questions when calls came in for publications, and she

answered questions from the public or agencies doing research on questions and/or

referring them to other offices.  With regard to signing off on the 4140 Printing Request

Form, only the supervisors in the office—Mr. Benedi, Mr. Davis, were allowed to sign

off on the 4150 Printing Request Forms.  Ms. Kline was not asked to assist customers in

making covers for reports,  There was a graphics person in the office who performed that

job about 98 percent of the time.  See Deposition of Robert T. Coco, p. 16-18, 21-22, 23,

5

24.

11.    Identify the kind of graphics work that Kline performed, how long she performed graphics work, and when and why she stopped performing graphics work?

   **Response:**    **OBJECTION.**  Plaintiff would be in the best position to answer this question.  To the extent that an answer is required, Plaintiff may have occasionally done some graphics work during the relevant period (2002-2005), however, she did other work not related to the function nor at the direction of PMG on a voluntary basis.  She did not use the sophisticated graphic design programs.  There was a graphics person who had the responsibility of doing the graphics work.  That person did graphics work 98 percent of the time.  Deposition of Robert T. Coco, p. 15, 21-22 63, 64.

12.    Identify when Kline was assigned responsibility for attending to unsolicited faxes and what that duty entailed?

   **Response:**    **OBJECTION.**   Plaintiff would be in the best position to answer this question.  To the extent that an answer is required, *see* ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, page 2, 19.  Plaintiff was asked to insure that the senders of unsolicited facsimiles were notified not to continue to send facsimiles to the PMG machine as this was a waste of resources and unproductive.  The facsimile machine was located next to her and she was the likely person to take care of this task.  Moreover, she was the lowest graded person in the immediate office.

13.    Identify any formal or informal complaints made against Kline, who made them, when they were made and why they were made that were used when giving her a performance rating.

   **Response:**    **OBJECTION.**  Vague as to what performance rating is being

6

referenced.  To the extent that an answer is required, *see* ROI, Affidavit of William M. Davis, OPM EEO Case No. 200608, Exhibit H, p. 1-13.

14.    Identify any office outside of PMG that expressed an interest in having Kline work for them on a detail and the outcome of that request.

**Response:**    **OBJECTION.**  Defendant is without information or knowledge to respond to this request, except to say that one office did express an interest in having Ms. Kline train its employees in PMG work, but this assignment was not approved. Although Mr. Davis remembers one inquiry, he does not remember which office express the interest.

15.    Identify the level of authority Kline had/has and whether she ever exceeded her level of authority and how and when she exceeded it.

**Response:**    **OBJECTION**.  Vague.  It is unclear what Plaintiff means by "level of authority." Ms. Kline always had to report to a supervisor.

16.    Identify the grades/step and approximate size of the offices of or work spaces of Isaac Evans, Shirley Sewell, Stephen Hickman, Robert Coco, Jacqueline Carter, Valerie Kline and Miriam Heard?

**Response:**    **OBJECTION** to the information concerning Stephen Hickman because he was hired outside of the relevant time period.  With regard to the remaining requests, see, ROI, Investigative Summary, OPM EEO Case No. 2006019, page 9 of 13; *see also* ROI, Investigative Summary, OPM EEO Case No. 2006008, page 12 of 17; Deposition of Shirley Sewell, pages 12-13; 32; 33, 48-49; *see also*, Deposition of Robert Coco, pages 68-73, 77-78; Deposition of Jacqueline Carter, p. 10, 11, 63-64; 65, 69-70; *see also* Affidavit of William M. Davis, ROI, OPM EEO Case No. 2006015, Exhibit H, page 2 of 8.  Miriam Heard (Johnson) occupies a small cubicle in the basement that is the

size of Shirley Sewell's.

17.    Describe in detail the Semiannual Unified Agenda of Regulatory Actions, its process, deadlines and strictness of the deadlines.

    **Response:**    *See* http://www.reginfo.gov/public/do/eAgendaMain.

18.    Identify the PMG telephone system and approximately how long it would take to train someone on the system.

    **Response:**    **OBJECTION:** This question is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is require, information concerning the PMG telephone system may be found in the Deposition of Robert T. Coco, p. 8-13.

19.    Identify all persons that have had their swipe records reviewed by PMG management, how often the swipe records are reviewed, and why the swipe records are reviewed.

    **Response:**    **OBJECTION:** This question is not relevant and is unlikely to lead to the discovery of relevant information. Other employees had their swipe records reviewed when it was suspected that there was possible leave abuses.

20.    Identify all persons who acted for Davis when he was absent from the office and who was acting for him when he was recovering from surgery?

    **Response:**    **OBJECTION:** The first part of this question is vague and overbroad. To the extent that the second part of the questions refers to 2005 when Davis was recovering from surgery, Mr. Coco primarily acted in his absence. See Deposition of Robert T. Coco, p. 46.

21.    Identify the race and gender of all the employees working for PMG and the dates

they were hired.

      **Response:**    **OBJECTION:** Overbroad as to the dates that they were hired.  To

the extent that a response is required, the race and gender of all employees working for

PMG during the relevant time period, see Document Response 16.

22.     Please supply the addresses that Isaac Evans, Annette Gunter-Frye, Lara Rivera-

Lopez, Shirley Sewell, Robert Coco, Jacqueline Carter, Jose Velaquez and Arlene L.

Taylor may be subpoenaed.

      **Response:**    **OBJECTION:** Privacy.

23.     Is it the practice of PMG or was it the practice of PMG for the years 2002-2007 to

issue monetary performance bonuses to employees who received an Exceeds Fully

Successful rating on their Performance Appraisal?

      **Response:**    **OBJECTION:** This response is overbroad and requests

information for a period outside of the relevant time period.  To the extent that a response

is required, see Deposition of Robert T. Coco, p. 81.

## <u>REQUEST FOR DOCUMENTS</u>

1.     Copy of the Federal Register training manual developed by Jacqueline Carter

while working as a re-employed annuitant from approximately November 6, 2006, to

February 20, 2007.

      **Response:**    **OBJECTION:** This request is for information that is outside of

the relevant time period.  Moreover, it is not relevant to this case and is not likely to lead

the discovery of information that is relevant to this case.

2.     Documentation showing or indicating the sex, age, race, grade and number of

Federal employees working in PMG, including the mailroom.

9

**Response:**    **OBJECTION:** To the request for documentation about mailroom employees because it is not relevant and is not likely to lead to the discovery of relevant information. With regard to the first part of the request, see ROI, Investigative Summary, OPM EEO Case No. 2006008, page 12.

3.    Executed telework agreement(s) for Jacqueline Carter, Lara Rivera-Lopez, Stephen Hickman and any other PMG employees authorized to telework.

**Response:**    **OBJECTION:** This document request is not relevant and is not likely to lead to the discovery of relevant information. In addition, it is objected to on the basis of privacy. To the extent that an answer is required, Jacqueline Carter is the only PMG employee besides the plaintiff that teleworked during the relevant time period. Stephen Hickman became employed after the relevant time period. Therefore, information concerning Mr. Hickman is not relevant. Lara Riviera-Lopez was detailed to the PMG from another office. Therefore, information concerning her is not relevant. With regard to Ms. Carter's telework, see Deposition of Jacqueline Carter, p. 15-18; 22-27.

4.    Copies of the Position Description(s), Performance Standards and Vacancy Announcements for the following personnel while employed in PMG.

**Response: OBJECTION:** to the request for the documents concerning Stephen Hickman, Lara Rivera-Lopez and Jose Velaquez on the grounds of relevancy. Hickman became employed after the relevant time period, and Rivera-Lopez and Velaquez were detailed to PMG from other offices. With regard to the remaining employees, see the ROI, Exhibit L, p. 1-4, 6; Exhibit M, p. 1-13, 15; Exhibit N, p. 1.

5.    Copy of the Vacancy Announcement, Position Description and Performance

Standards used to fill the position and/or slot occupied by Jacqueline Carter.

**Response: OBJECTION:** This request is not relevant and is not likely to lead to the discovery of relevant information. To the extent that an answer is required, this question refers to documents outside of the relevant time period. In addition, the Plaintiff did not apply for this position.

6.    Swipe records for Isaac Evans, Robert Coco, Jacqueline Carter, Shirley Sewell, Miriam Heard-Johnson, Cassandra Thompson, Anne Dixon and Philip Watson during the time period of 7/29/05 through 11/1/05.

**Response: OBJECTION:** This request for documents is not relevant and is not likely to lead to the discovery of relevant information. To the extent that a response is required, this request refers to documents outside of the relevant time period.

7.    Documentation of any and all communications between Davis and Margaret McElrath and/or Arlene Taylor.

**Response:** See ROI, OPM EEO Case No. 2006008, Exhibit H, p. 6, 16.

8.    Documentation showing the floor plans of PMG work areas for the period from 10/2002-1/2007.

**Response:    OBJECTION:** This request is not relevant and will not lead to the discovery of relevant information. In addition, this request is being denied for reasons of security.

9.    Documents indicating where other members of PMG have been tasked to cover PMG telephone lines.

**Response:** See ROI, Exhibit H, p. 51, 77, 108.

10.    Documentation of instances when Kline failed to assist walk-in customers and/or

telephone calls. See ROI, Exhibit H, p. 42-43, 58, 65-66, 75, 81-82; *see also* ROI

Investigative Summary, OPM EEO Case No. 2006015, p. 12.

11.     Documentation indicating when Kline was charged with primary responsibility

for assisting walk-in customers of PMG.

     **Response:**     To the best of our knowledge, there are no documents that are

responsive to this request.

12.     Documentation from Dona Bland of OMB requesting that PMG review the "old

and cold" regulations.

     **Response:     OBJECTION.** This request is not responsive and will not lead to

the discovery of relevant information.  To the extent that a response is required, see the

ROI, Exhibit H, p. 8.

13.     Documentation indicating when Kline was charged with primary responsibility

for responding to the Publications database, working on the Visual Information System,

Publications Inbox and FACA database.

     **Response:**     See ROI, Exhibit H, p. 53, 56, 62, 67, 86, 110, 1379.

14.     Documentation informing Kline that Robert T. Coco was going to be on leave and

to respond to the Publications database while Coco was on leave.

     **Response:**     To the best of defendant's knowledge, there are no emails

or other transmittals that are responsive to this request.  However, Ms. Kline's position

description establishes that she was to assist Mr. Coco.

15.     Documentation showing or indicating times when Kline failed to make or follow

though on making changes to the Publications database or FACA database.

     **Response:** See ROI, Exhibit H, p. 25, 59, 63, 72, 74, 111-112.

16.    Documentation of communications to William M. Davis and/or Claudio A. Benedi concerning instances where people from the mailroom, print shop, and/or printing procurement section asked Davis and/or Benedi to keep Kline out of their work areas.

   **Response:**  See, ROI, Affidavit of William M. Davis, Exhibit H, p. 9-12.

17.    Documentation concerning any request(s) to keep Kline out of the Director's suite or other OPM offices.

   **Response:**  See Document Response 16.

18.    Documentation showing times when Kline exceeded her authority.

   **Response:  OBJECTION:**  This request is unclear as to what authority is being referred to.

19.    Documentation of any errors or mistakes Kline made in reviewing or preparing regulatory packages.

   **Response:**     See ROI, Exhibit H p. 27; 29, 33, 34-40, 50, 54-55, 60, 126; 95-102-6.

20.    Documentation showing or indicating any problems encountered by Davis and/or Benedi as a result of and during Kline's trial telework period.

   **Response:**     See Affidavit of Claudio Benedi, Exhibit I, p. 1-2, EEO Case No. 2006008 (July 6, 2006).

21.    Documentation between Benedi, Davis and Ronald Flom related to Kline's trial teleworking period.

   Response:  See Affidavit of Claudio Benedi, Exhibit I, p. 2 (July 6, 2006); *see also* Affidavit of William M. Davis, EEO Case No. 2006015, Exhibit H, p. 2.

22.    Documentation showing or indicating the times PMG employees were assigned to

13

lunch.

      Response:     See ROI, Investigative Summary, p. 9; Affidavit of William M.

Davis, Exhibit H, p. 1-2; OPM EEO Case No. 2006019, ROI, Exhibit H, p. 6; Affidavit

of Claudio Benedi, Exhibit I, p. 6; Supplemental Affidavit of William M. Davis, EEO

Case No. 2006019, p. 4.

23.    Documentation related to the development of the Federal Register Management

System (FRMS) online regulatory tracking system showing who initiated it, how it came

about, and instructions to Kline concerning the FRMS.

      **Response:**    **OBJECTION.** This request is not relevant and will not lead to the

discovery of relevant information.

24.    Documentation showing the reasons for rescinding Kline's administrative rights

to the FRMS.

      **Response:**    See ROI, OPM EEO Case No. 2006015; Affidavit of William M.

Davis, Exhibit G, Tab 2; Exhibit H, p. 2; Affidavit of Claudio Benedi, OPM EEO Case

No. 2006015; Exhibit I, p. 1-2.

25.    Documentation showing the implementation of procedures for notifying PMG of

publications approved by Office of Communications and Public Liaison for inclusion in

the Publications Database.

      **Response: OBJECTION**: This request is not relevant and will not lead to the

discovery of relevant information.

26.    Documentation showing any instances where Kline failed to assist Robert Coco.

      **Response:**    Affidavit of William M. Davis, Exhibit H, p. 19.

27.    Documentation showing where Kline failed to properly report her leave for the

pay period ending September 31, 2005.

    **Response:**    See ROI, Exhibit A, p. 12-13; Tab C, Tab D, p. 14-15.

28.    Documentation showing instructions to PMG employees by Davis for reporting their leave or the proper procedure for employees to report their leave.

    **Response:**    See ROI, Exhibit H, p. 6-13.

29.    Documentation showing where Davis requested amendments or changes to Kline's leave during September 30, 2005 through June 30, 2006.

    **Response:**    See ROI, Exhibit G, p. 23; 33; Exhibit H, p. 18-31; Exhibit L, p. 2.

30.    During the depositions, the issue of performance bonuses came up. Shirley Sewell stated that she received a monetary bonus based on a "Special Act or Service Awards." Mr. Hanes[sic], attorney from the Dept. of Justice, requested copies from Ms. Sewell of her "Special Act of Service Awards" and/or certificates or other documentation of the awards. Jacqueline Carter and Robert Coco stated that they received monetary awards based on their performances as well. Therefore, please provide copies of all awards, certificates or other documentation of the accompanying monetary bonuses received by Sewell, Carter, Coco and any other PMG employees for the years 2002 through 2007.

    **Response: OBJECTION:** This request is not relevant and will not lead to the discovery of relevant information.

## ADDITIONAL DOCUMENT REQUEST

    Please provide electronic access to Jacqueline Carter's laptop that she used while teleworking and OPM email and electronic access to William Davis' computer and OPM email and electronic access to Claudio Benedi's computer and OPM email.

15

**Response: OBJECTION:** This request is not relevant and will not lead to the discovery of relevant information. In addition, it objected to for reasons of security.


## VERIFICATION OF INTERROGATORY RESPONSES:

The undersigned, under penalty of perjury, 28 U.S.C. § 1746, declares that I have read the responses to plaintiff's interrogatories that I have carefully considered the answers to the interrogatories and that they are true, complete and correct to my personal knowledge, information and belief.

WILLIAM DAVIS

**AS TO OBJECTIONS**:

Respectfully submitted,

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

17

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing responses was served on plaintiff by courier mail (FEDEX) to:

VALERIE KLINE
83 E Street
Lothian, MD 20711

on this 24th day of March, 2008.

CLAIRE WHITAKER
Assistant United States Attorney
555 Fourth Street, N.W.
Room E4204
Washington, D.C. 20530
(202)514-7137

*Witness Testimony – William M. Davis, Support Services Supervisor (White male)*

Mr. Davis testified he did not tamper with the Complainant's annual or sick leave at any time. He said on February 2, 2006 and March 16, 2006, he attempted to amend the Complainant's leave records based on some information she provided him. He said her request to have her leave amended gave him the authority to do so. Mr. Davis said the Complainant provided him a marked up copy of an Electronic Time and Attendance Management System printout indicating what leave should have been reported as Family Medical Leave. Shirley Sewell (Black, female), Management Assistant, GS-0344-09, misunderstood his instructions. According to Mr. Davis, in early January 2006, the Complainant discovered Ms. Sewell's error and notified him. He said he made the corrections. (Exhibit H, Tabs 3, 4, 5, & 6)

### Record Evidence

On October 5, 2005, the Complainant submitted an Electronic Time and Attendance Management System printout to William M. Davis that identified discrepancies in her leave. (Exhibit H, Tab 3)

On an unspecified date Mr. Davis asked Ms. Sewell to amend the dates identified on the Electronic Time and Attendance Management System printout the Complainant provided to him as Family Medical Leave Act (FMLA). (Exhibit H, Tab 4)

Electronic Time and Attendance Management System printout dated January 25, 2006, shows the discrepancies to the Complainant's leave were converted to SL instead of FMLA. (Exhibit H, Tab 5)

Electronic Time and Attendance Management System printout dated June 15, 2006, shows the discrepancies identified by the Complainant have been corrected. (Exhibit H, Tab 6)

---

## VIII.   COMPENSATORY DAMAGES

The Complainant testifies she is seeking $900,000 in compensatory and punitive damages. She stated she has not received any monetary rewards for her performance, and she has had to use LWOP. She states the discriminatory acts caused her a great deal of stress, anxiety, worry, physical distress, and mental/emotional pain and suffering, and triggered Lyme disease she believes was either dormant or contracted due to her low resistance. She said her mental and physical well-being, "which lowered her resistance to illness as she came down with the flu..." She is receiving treatment for Lyme disease by her general physician since February 28, 2006. She states she has received counseling

through OPM's Employee Assistance Program.  The Complainant testified the stress associated with these acts of discrimination caused her to have an eating disorder.  She said she obtained counseling from nutritionist for approximately a year or more at the approximate cost of $150.00 a week.  The Complainant stated she did not have any formal medical reports relative to the claimed injuries, pre-existing conditions, concurrent conditions, or subsequent conditions. (Exhibit G)

The Complainant provided an itemized statement of healthcare, dated April 17, 2006, for care received from February 28, 2006 through April 17, 2006.  (Exhibit G, Tab 7)



United States
# Office of
# Personnel Management

Washington, DC 20415

FEB 1 2006

MEMORANDUM FOR     VALERIE KLINE
                   Management Analyst
                   Publishing Services Branch

FROM:              WILLIAM DAVIS
                   Chief
                   Publishing Services Branch

SUBJECT            Official Reprimand

This memorandum is to officially reprimand you for your failure to accurately report
your time and attendance. This action is considered as a disciplinary action.

For the time period below, you reported 80 hours of paid time each 2-week pay period.
However, not including approved annual and/or sick leave requests, you did not work all
of the time that you reported. The table below highlights the discrepancies between what
you reported and the time you were actually in a working status:

| Date | Arrival Time | Correct Time of Departure (A) | Actual Time of Departure (B) | Difference between Columns A and B |
|------|------|------|------|------|
| 7/29/05 | 7:46 am | 4:16 pm | 3:59 pm | 16 minutes |
| 9/22/05 | 6:35 am | 4:00 pm | 3:01 pm | 59 minutes |
| 9/23/05 | 6:59 am | 3:30 pm | 12:15 pm | 3 hours, 15 minutes |
| 10/19/05 | 7:52 am | 5:22 pm | 5:02 pm | 20 minutes |
| 10/25/05 | 8:25 am | 5:55 pm | 5:40 pm | 15 minutes |
| Totals | | | | 5 hours and 5 minutes |

*Bob approved because I was work on NSPS and he was in meeting thru lunch*

You have inaccurately reported 5 hours and 5 minutes, as time that you worked when,
you were not in a working status.

You reported that you worked for a full 8 hours and/or 9 hours, when you had not worked
a full 8 and/or 9 hours. During a five month period, you left work on occasion at least 15
minutes before the end of your work day. Due to your failure to accurately report your

*lunch hour — grievance / document*

EXHIBIT
PAGE    2 OF   13

CON 114243
FEBRUARY 2004

## Crosbie, Judette

| | |
|---|---|
| **From:** | Kline, Valerie |
| **Sent:** | Wednesday, March 15, 2006 10:25 AM |
| **To:** | Crosbie, Judette |
| **Subject:** | FW: AL instead of SL |

Judette,

As requested.

*Valerie Kline*
*Publications Management Group*
*Regulatory Issuances*
*202-606-1973 - Rm. 5H35*

-----Original Message-----
**From:** Davis, William M
**Sent:** Tuesday, February 21, 2006 2:06 PM
**To:** Kline, Valerie
**Subject:** RE:

If you wish to discuss come back.

    -----Original Message-----
    **From:** Kline, Valerie
    **Sent:** Tuesday, February 21, 2006 2:02 PM
    **To:** Davis, William M
    **Subject:** RE:

    I dispute that I have no SL so I am requesting SL and if you charge me AL, when the dispute is resolved I
    should be credited with this SL.

    *Valerie Kline*
    *Publications Management Group*
    *Regulatory Issuances*
    *202-606-1973 - Rm. 5H35*

        -----Original Message-----
        **From:** Davis, William M
        **Sent:** Tuesday, February 21, 2006 1:58 PM
        **To:** Kline, Valerie
        **Subject:** RE:

        OOOps!!  You stilll have no SL that will have to be AL.

            -----Original Message-----
            **From:** Kline, Valerie
            **Sent:** Tuesday, February 21, 2006 1:54 PM
            **To:** Davis, William M

**EXHIBIT** A
**PAGE** 14 **OF** 15

TAB 1

Message                                                                          Page 2 of 2

**Subject:**

Bill,

I just talked to my mother and she says she needs me to take her to the doctor on Monday.
Therefore, rather than take my AWS on Tuesday, I will need to keep it for Monday and I will
need to take SL for Tuesday as I have a doctor's appt. Thanks.

*Valerie Kline*
*Publications Management Group*
*Regulatory Issuances*
*202-606-1973 - Rm. 5H35*

EXHIBIT
PAGE _____ 15 OF _____ 15

4/3/2006

1                                                                                    Page 1 of 5

## Vaughn, Melba

**From:**  Davis, William M
**Sent:**  Monday, May 01, 2006 3:49 PM
**To:**  Vaughn, Melba
**Subject:** Interrogatory Questions #3- Davis W-2 5-1-06.doc

1. What is your full name?
   My name is William M. Davis.
2. What is your race?
   My race is white.
3. What is your sex?
   My sex is male.
4. What is your position, including grade and series?
   Support Services Supervisor, GS-342-14.
5. How long have you been in that position?
   I have been in this position since November 5, 2000.
6. Who is your supervisor? (Include position title, grade, race, sex)
   My supervisor is Claudio A. Benedi, he is a white male and is a Program
   Manager under the GS-340 series, grade 15.
7. How long have you been employed by the federal government?
   I have been employed with the federal government since
   January 21, 1971.
8. Do you have a representative?  If yes, please provide his or her name, phone
   number, and address.
   Not at this time but I expect to be represented by OPM's Office of the General
   Counsel if necessary in the future.
9. Do you know Valerie Kline?  If so, how long and what is the nature of your
   relationship?
   Yes, I do know Valerie Kline.  I have known Ms. Kline since I hired her in
   November 2002.
10. How long have you been Ms. Kline's supervisor?
    I have been Ms. Kline's supervisor since November 2002.
11. Are you aware of Ms. Kline's prior EEO activity?  If yes, how and when did you
    become aware?
    Yes, I am aware of Ms. Kline's EEO activity.  I was made aware of this activity
    when Mrs. Laura George met with me to discuss some of Ms. Kline's concerns.

### ISSUE # 1 – on January 31, 2006, she was not allowed to take lunch outside core hours

12. On or about January 31, 2006, did Ms. Kline ask for permission to take lunch
    outside core hours?  If yes, did you allow her to take lunch outside core hours?

    I do not remember this being an issue.  First, I was on leave the day in question
    and second Ms. Kline has been informed of OPM policy on this matter as
    negotiated by AFGE, local 32 in the Collective Bargaining Agreement.

EXHIBIT ___H___
PAGE ___6___ OF ___31___

7/10/2006

1

13. If you did not allow Ms. Kline to take lunch outside core hours on or about January 31, 2006, please explain your reason(s).

I was not in the office.

14. Have you assigned a specific timeframe for Ms. Kline to take lunch? If yes, what date did you set the time frame and what is her scheduled time to have lunch?

Yes, Ms. Kline has been assigned 11:30 to 12:30. This was established about 1 ½ to 2 years ago. I do not remember the exact date.

15. Do you have any employees under your supervision that have been allowed to take lunch outside core hours? If yes, please provide the following information for each person:

- Name, grade, title
- Sex
- Race
- Whether or not he or she has prior EEO activity
- Reason he or she was allowed to take lunch outside core hours
- When he or she was allowed to take lunch outside core hours

I do not remember any specific approvals being given, however, I have had to remind employees, other than and including Ms. Kline, of their assigned time period and the affect to our office if all do not comply.

16. Have you disapproved of any other employee's request to have lunch outside core hours? If yes, please provide the following information for each person:

- Name, grade, title
- Sex
- Race
- Whether or not he or she has prior EEO activity
- Reason he or she was not allowed to take lunch outside core hours
- When he or she was not allowed to take lunch outside core hours

Do not remember any other employees requesting.

17. Has Ms. Kline described the impact of your decision not to allow her to take lunch outside core hours? If yes, please state specifically what she told you and your response.

No, I do not remember Ms. Kline describing any impact to me.

18. Was Ms. Kline's race and sex factors in your decision not to allow her to take lunch outside core hours?

Decision was not made by me as I was not in the office the day in question.

EXHIBIT _____*H*_____
PAGE____*7*___OF___*31*___

7/10/2006

19. Was Ms. Kline's prior EEO activity a factor in your decision not to allow her to take lunch outside core hours?

Decision was not made by me as I was not in the office the day in question.

20. Do you have any additional comments?

I have no further comments.

**ISSUE # 2 – on February 1, 2006, she was issued a Letter of Reprimand**

21. Ms. Kline alleges she pointed out some discrepancies with information you provided in the Letter of Reprimand; If this is a true statement, please provide the following information for each discrepancy:

   ➢ State the discrepancy
   ➢ If the discrepancy was corrected and when it was corrected
   ➢ If the discrepancy was not corrected, why
   ➢ Was Ms. Kline notified of your action regarding this discrepancy? If so, how did she respond?

Ms. Kline submitted to me, with carbon copies to Caprice Miller and my Manager, Claudio A. Benedi. I consulted with Caprice Miller in regards to the memorandum from Ms. Kline. Ms. Kline requested to see the information relied upon and was referred to Caprice Miller. Therefore, I was advised that a second response was not necessary.

22. Were there any other employees issued a Letter of Reprimand for the same reason(s)? If yes, who and when (Include name, grade, title, race, sex, and state if he or she has any prior EEO activity.

No other letters of reprimand have been issued.

23. Has Ms. Kline described the impact of your decision to issue her a Letter of Reprimand? If yes, please state specifically what she told you and your response.

Yes, Ms. Kline stated in an email, "Accordingly, I feel that your failure to discuss this with me and to take all things into consideration before taking "disciplinary action" against me was retaliation against me for the EEO and Union actions I have filed against you as well as intentional infliction of emotional pain and suffering."

24. Was Ms. Kline's race and sex factors in your decision to issue her a Letter of Reprimand?

No, Ms. Kline's race or sex was not a factor in issuing the letter of reprimand.

25. Was Ms. Kline's prior EEO activity a factor in your decision to issue her a Letter of Reprimand?

No, Ms. Kline's prior EEO activity was not a factor in issuing the letter of reprimand.

EXHIBIT _____ H
PAGE _____ 8 OF 31

26. Has the Letter of Reprimand been removed from Ms. Kline's OPF? If not, explain your reason or reasons for not removing it.

No, the letter of reprimand has not been removed. The facts in the letter of reprimand were valid and, therefore, the letter will stay in her OPF.

27. Do you have any additional comments?

No, I have no further comments on this issue.

**ISSUE # 3 – on February 2, 2006, and March 16, 2006, her supervisor allegedly tampered with her annual and sick leave**

28. On February 2, 2006, Ms. Kline alleges you tampered with her annual and sick leave, how do you respond to this allegation?

Ms. Kline was not charged any leave for February 2, 2006.

29. On March 16, 2006, Ms. Kline alleges you tampered with her annual and sick leave, how do you respond to this allegation?

Ms. Kline was not charged leave for March 16, 2006.

30. Has Ms. Kline informed you that you may have made a mistake in documenting her annual and sick leave for February 2, 2006 and March 16, 2006? If yes, please state specifically what she told you and your response.

I can find no record of Ms. Kline being charged any leave for February 2, 2006 or March 16, 2006.

31. Was Ms. Kline's race and sex factors in your decision to document Ms. Kline's annual and sick leave the way you did?

No, Ms. Kline's race nor sex were factors in my decision.

32. Was Ms. Kline's prior EEO activity a factor in your decision to document Ms. Kline's annual and sick leave the way you did?

No, Ms. Kline's prior EEO activity was not a factor in my decision.

33. Has the problem(s) been corrected? If yes, when?

There were no problems to fix since Ms. Kline was not charged leave for these days.

34. Was Ms. Kline notified of the corrections? If yes, how and when did she become aware of the corrections?

No, Ms. Kline was not notified since there were no corrections to be made.

EXHIBIT _H_
PAGE _9_ OF _31_

35. Do you have any additional comments?

No, I have no further comments.

EXHIBIT ___H___
PAGE ___10 OF 81___

1.  What is your full name?
2.  What is your race?
3.  What is your sex?
4.  What is your position, including grade and series?
5.  How long have you been in that position?
6.  Who is your supervisor? (Include position title, grade, race, sex)
7.  How long have you been employed by the federal government?
8.  Do you have a representative?
9.  Do you know Valerie Kline? If so, how long and what is the nature of your relationship?
10. How long have you been Ms. Kline's supervisor?
11. Are you aware of Ms. Kline's prior EEO activity? If yes, how and when did you become aware?

**ISSUE # 1 – on January 31, 2006, she was not allowed to take lunch outside core hours**

12. On or about January 31, 2006, did Ms. Kline ask for permission to take lunch outside core hours? If yes, did you allow her to take lunch outside core hours?
13. If you did not allow Ms. Kline to take lunch outside core hours on or about January 31, 2006, please explain your reason(s).
14. Have you assigned a specific timeframe for Ms. Kline to take lunch? If yes, what date did you set the time frame and what is her scheduled time to have lunch?
15. Do you have any employees under your supervision that have been allowed to take lunch outside core hours? If yes, please provide the following information for each person:

  - Name, grade, title
  - Sex
  - Race
  - Whether or not he or she has prior EEO activity
  - Reason he or she was allowed to take lunch outside core hours
  - When he or she was allowed to take lunch outside core hours

16. Have you disapproved of any other employee's request to have lunch outside core hours? If yes, please provide the following information for each person:

  - Name, grade, title
  - Sex
  - Race
  - Whether or not he or she has prior EEO activity

- Reason he or she was not allowed to take lunch outside core hours
- When he or she was not allowed to take lunch outside core hours

17. Has Ms. Kline described the impact of your decision not to allow her to take lunch outside core hours? If yes, please state specifically what she told you and your response.
18. Was Ms. Kline's race and sex factors in your decision not to allow her to take lunch outside core hours?
19. Was Ms. Kline's prior EEO activity a factor in your decision not to allow her to take lunch outside core hours?
20. Do you have any additional comments?

**ISSUE # 2 – on February 1, 2006, she was issued a Letter of Reprimand**

21. Ms. Kline alleges she pointed out some discrepancies with information you provided in the Letter of Reprimand; If this is a true statement, please provide the following information for each discrepancy:

   ➢ State the discrepancy
   ➢ If the discrepancy was corrected and when it was corrected
   ➢ If the discrepancy was not corrected, why
   ➢ Was Ms. Kline notified of your action regarding this discrepancy? If so, how did she respond?

22. Were there any other employees issued a Letter of Reprimand for the same reason(s)? If yes, who and when (Include name, grade, title, race, sex, and state if he or she has any prior EEO activity.
23. Has Ms. Kline described the impact of your decision to issue her a Letter of Reprimand? If yes, please state specifically what she told you and your response.
24. Was Ms. Kline's race and sex factors in your decision to issue her a Letter of Reprimand?
25. Was Ms. Kline's prior EEO activity a factor in your decision to issue her a Letter of Reprimand?
26. Has the Letter of Reprimand been removed from Ms. Kline's OPF? If not, explain your reason or reasons for not removing it.
27. Do you have any additional comments?

**ISSUE # 3 – on February 2, 2006, and March 16, 2006, her supervisor allegedly tampered with her annual and sick leave**

EXHIBIT    H
PAGE    12  OF   31

28. On February 2, 2006, Ms. Kline alleges you tampered with her annual and sick leave, how do you respond to this allegation?

29. On March 16, 2006, Ms. Kline alleges you tampered with her annual and sick leave, how do you respond to this allegation?

30. Has Ms. Kline informed you that you may have made a mistake in documenting her annual and sick leave for February 2, 2006 and March 16, 2006? If yes, please state specifically what she told you and your response.

31. Was Ms. Kline's race and sex factors in your decision to document Ms. Kline's annual and sick leave the way you did?

32. Was Ms. Kline's prior EEO activity a factor in your decision to document Ms. Kline's annual and sick leave the way you did?

33. Has the problem(s) been corrected? If yes, when?

34. Was Ms. Kline notified of the corrections? If yes, how and when did she become aware of the corrections?

35. Do you have any additional comments?

**EXHIBIT** _H_
**PAGE** _13_ **OF** _31_



Team OPM    Community    Employees    References    Jobs and Training    Help Desk    Directory    News Room

Employee Info    Employee Benefits    Ethics    Manager's Corner

Advanced Search    [Go]

Employees Main

○ Disabilities

▲ Personal Identity Verification (PIV) Program

○ Equal Employment Opportunity

▼ Human Resources

◇ Employee Handbook

▼ Human Resources Handbook

◇ Chapter 250 Human Capital Accountability Policy

◇ Chapter 335 Promotion and Internal Placement

◇ Chapter 351 Reduction in Force

◇ Chapter 362 Presidential Management Fellows Program

◇ Chapter 368 Telecommuting

◇ Chapter 430 Performance Management

◇ Chapter 537 Repayment of Student Loans

◇ Chapter 550 Compensatory Time Off For Travel

↗ Chapter 610 Hours of Duty

◇ Chapter 630 Absence and Leave

# Human Resources Handbook

## Chapter 610 - Hours of Duty

### Table of Contents

*SUBCHAPTER 1. AUTHORITIES AND RESPONSIBILITIES*

1-1. Coverage
1-2. Authority and References
1-3. Policy
1-4. Program Responsibilities

*SUBCHAPTER 2. OPM POLICIES AND PROCEDURES*

2-1. Workweek
2-2. Evening Hours
2-3. Overtime
2-4. Lunch Period
2-5. Rest Periods
2-6. Time Accounting

*SUBCHAPTER 3. ALTERNATIVE WORK SCHEDULES*

3-1. Authority
3-2. OPM-Wide Policy
3-3. Coverage
3-4. Authorities and Responsibilities
3-5. Default Alternative Work Schedule Policy

*SUBCHAPTER 4. TELECOMMUTING*

4-1 OPM-Wide Policy
4-2 References
4-3 Coverage

*SUBCHAPTER 5. SPECIAL TOURS FOR EDUCATIONAL PURPOSES*

- Chapter 714 Reasonable Accommodation for Qualified Individuals with Disabilities
- Chapter 810 Injury Compensation
- Prohibited Personnel Practices and Whistleblower Protections
- Prohibited Personnel Practices

○ Telecommuting

○ Travel Policy

*SUBCHAPTER 6. GROUP DISMISSAL OR SUSPENSION OF ACTIVITIES*
6-1. Administrative Dismissals
6-2. Emergency Dismissals

*APPENDIX A: Daily Attendance Log*

*APPENDIX B: Flexible Work Schedule Options*

## SUBCHAPTER 1. AUTHORITIES AND RESPONSIBILITIES

### 1-1. Coverage

This chapter contains the basic requirements governing hours of duty for Office of Personnel Management employees. This chapter should be used in conjunction with any applicable labor agreements.

### 1-2. Authority and References

a. This chapter is based upon and conforms to the requirements and policy set forth in 5 U.S.C. chapter 61, 5 CFR part 610, and the United States Office of Personnel Management Handbook on Alternative Work Schedules.

b. This chapter supplements policies and requirements contained in the references cited in (a) above. It is not self-contained, and must be read with the references cited.

c. Other authorities relating to hours of duty may also be found in the agency's Delegations of Authority. (See OPM Human Resources Handbook Chapter 100 for Delegations of Authority.)

### 1-3. Policy

Human Resources Handbook Chapter 610 sets forth policy relating to but not limited to "hours of duty." Hours of duty refers to employee schedules, workweeks, emergency dismissals, emergencies before the workday begins, holidays, rest periods, overtime, etc. The policy in this chapter is only used to clarify policy already in the CFR and the U.S.C. or to specify policy where agencies have discretion.

### 1-4. Program Responsibilities

a. Associate Directors and Heads of Other Offices are responsible for implementing the provisions contained in this chapter, including re-delegation of relevant authorities, as appropriate and consistent with the re-delegation

restrictions contained in the Delegations of Authority.

b. The Director of the Office of Human Resources and EEO is responsible for issuing OPM policy and providing advice and assistance to managers and supervisors agency-wide regarding the interpretation of Federal and OPM personnel policy.

 ⬅ To Top ⬆

## SUBCHAPTER 2. OPM POLICES AND PROCEDURES

### 2-1. Workweek

a. For pay and leave purposes, OPM observes an administrative workweek which coincides with the calendar week.

b. The basic workweek for full-time employees is five 8-hour (plus a lunch period) days, Monday through Friday within the published business hours for the Agency. At the time of this writing, published business hours are 8:15 a.m. - 4:45 p.m.

### 2-2. Evening Hours

a. Night shift hours are set as necessary by operating officials, but shall be approved by Associate Directors, Heads of Other Offices, or their designated operating officials. Although State and local statutes do not apply to the Federal Government as an employer, OPM will abide by these provisions where they contribute to the health, welfare, or safety of employees. Supervisors will exercise due regard for the safety of employees who may be required to work alone, or in small groups after normal duty hours.

b. Establishment of night shifts will be subject to the availability of funds for night differential pay.

### 2-3. Overtime

Overtime work may be authorized by Associate Directors and Heads of Other Offices, or their designated operating officials. See Office of Personnel Managements Human Resources Handbook Chapter 550 for detailed instructions on overtime work.

### 2-4. Lunch Period

The lunch period is 30 minutes. After no more than six hours of duty a 30 minute meal break must be taken. Where a longer period for lunch is allowed, the length of the workday will be increased by the amount of time the

lunch period exceeds 30 minutes. Lunch periods are uncompensated breaks from work.

**2-5. Rest Periods**

a. Associate Directors and Heads of Other Offices may designate certain duties as monotonous, repetitive, or arduous, and employees doing such duties may be permitted to take rest periods. Rest periods may be given for other types of work when warranted by work cycles or physical conditions in work areas. Rest periods count towards hours of work.

b. Employees may not take more than two rest periods for a total of 20 minutes per day in any 8-hour workday unless otherwise provided for in applicable labor agreements. Rest periods will not immediately precede or be a continuation of lunch, and will not be granted immediately after the beginning of the workday or immediately prior to quitting time.

**2-6. Time Accounting**

Supervisors must reasonably be able to certify from personal knowledge that an employee is entitled to pay for his or her basic work requirement. Additionally, organizations using Alternative Work Schedules (AWS–described in subchapter 3 of this chapter), must establish a time-accounting method that provides affirmative evidence that each employee subject to the schedule has worked the proper number of hours in a biweekly pay period. Supervisors may require their employees to sign in/out using whatever method is appropriate for the work environment. If applicable, see Appendix A for a sample seriatim sign-in/sign-out sheet which may be used. Managers and supervisors are reminded to consult existing labor agreements for additional requirements. Additional timekeeping requirements are required by the payroll system.



**NOTE:** According to 5 CFR part 610, subpart D, an agency that authorizes a flexible work schedule or compressed work schedule under this subpart shall establish a time-accounting method that will provide affirmative evidence that each employee subject to the schedule has worked the proper number of hours in a biweekly pay period.

**SUBCHAPTER 3. ALTERNATIVE WORK SCHEDULES**

**3-1. Authority**

Flexible and compressed work schedules (jointly referred to as alternative work schedules or AWS) are authorized by the Office of Personnel Management Handbook on Alternative Work Schedules, the Federal Employees Flexible and Compressed Work Schedules Act of 1985 as codified in 5 U.S.C. 6120-6133 and in regulations contained in 5 CFR, part 610, subpart D.

### 3-2. OPM-Wide Policy

a. Flexible and compressed work schedules have the potential to enable managers and supervisors to meet their program goals while, at the same time, allowing employees to be more flexible in scheduling their activities. In comparison, flexible work schedules allow more flexibility than compressed work schedules. Compressed work schedules only allow employees to complete the basic work requirement under a fixed schedule established by the Agency. Flexible work schedules, in general, allow employees to complete the basic work requirement during all hours and days for which flexible and core hours have been designated.

b. Each service or office has been tasked to form a council to partner flexible schedule policies, including alternative work schedules, appropriate for use within their service or office. This is to help ensure that differences in culture are taken into account as workplace partnership initiatives are undertaken. Under this policy, Associate Directors and Heads of Other Offices should work with their councils to select and implement the most appropriate schedule or schedules within their organization.

For more information on maxiflex, credit hours and other alternative work schedule flexibilities, organizations need to contact the Office of Human Resources and EEO. OHREEO is available to assist organizations in designing an alternative work schedules policy which is reflective of their individual cultures. In addition, a copy of these policies must be maintained by OHREEO.

**NOTE:** Section 3-5 discusses the AWS policy which organizations have been using and may continue to use if they decide to not partner an individual policy. However, if an organization has established its own AWS policy, the organizations policy supersedes the Default AWS policy.

### 3-3. Coverage

All employees of the Office of Personnel Management (OPM) are eligible to participate in the agency-wide alternative work schedules program, unless prohibited by operational or individual considerations. Agency officials must also consider any labor

relations obligations or agreements. Any employee who does not have a fixed schedule is considered a participant in the AWS program.

### 3-4. Authorities and Responsibilities

a. The Director of OPM retains the authority to disapprove participation in AWS for an entire Service or Office. Associate Directors and Heads of Other Offices who believe that AWS should not be implemented within their organization will consult with

managers and advise and receive comments from the exclusive union representative (if appropriate). They must then submit a written request to the Director outlining the operational reason(s) why AWS should not be

implemented.

b. Associate Directors and Heads of Other Offices are delegated the following authorities in addition to authorities outlined in Delegations of Authority:

1) Authority to disapprove participation in AWS for organizational segments or groups of employees assigned to identifiable functions within their organizations. Disapprovals shall be made only when operational considerations prevent either full or partial use of AWS. Disapprovals must be in writing, outlining the operational reasons involved, and a copy sent to the Director of the Office of Human Resources and EEO.

2) Authority for overall administration of AWS within their organization, including the following:

-developing a Flexible Work Schedule Policy for their organization consistent with the policies and procedures contained in this subchapter; and

-ensuring that AWS does not interfere with mission accomplishment.

c. Management officials are responsible for ensuring that sufficient numbers and kinds of personnel are present and working to carry out operations in an efficient, effective, and economical manner. This includes, where appropriate, ensuring office coverage during normal business hours; providing for unforeseen emergencies; and ensuring service to the public, Federal agencies, and other parts of the Agency. In making these determinations and in exercising their delegated authorities, management officials will be guided by the following:

-restrictions or denials of the use of AWS will be imposed only upon the smallest possible work unit of employees and restrictions or denials should be imposed only when administratively necessary, i.e., employee participation adversely impacts upon work or service.

-Managers should additionally consider any alternative measures, if available, to resolve the conflict between the needs of the organization and desires of affected employees.

**3-5. Default Alternative Work Schedule Policy**

Alternative Work Schedule programs offer organizations flexibility in partnering work schedules to meet program and customer service goals while, at the same time, allowing employees to be more flexible in scheduling their activities. Below is the current AWS policy, originally negotiated between AFGE Local 32 and the Office of Personnel Management, which organizations may continue to be covered under if they choose not to partner their own alternative work schedule policy.

a. Tour of Duty The range of hours during which an employee may be authorized to work is the employee's tour

of duty. Those hours are 7:00 a.m. to 6:00 p.m., Monday through Friday.

1) Employees may vary the amount of hours worked each day by working 7, 8, 9, or 10 hours, except that no more than one 10-hour day may be worked in any one pay period.

2) Employees may take one day off per pay period, provided that necessary coverage will not be jeopardized.

3) For those employees taking a day off, the following information shall be provided to supervisors no less than three working days prior to the beginning of the pay period in which the day off will be taken.

- Which day will not be worked.

- Which day or days will be worked less than 9 hours.

4) For those employees who choose not to have a day off, the following schedule will be provided to supervisors no less than three working days prior to the beginning of the next pay period.

- Which day or days will be worked less than 8 hours.

- Anticipated arrival times in order to assure appropriate coverage. These anticipated times may be changed during any pay period, subject to supervisory approval.

- Based on the schedule, the supervisor may indicate to employees at any time before or during the pay period that for coverage reasons they must adhere to the schedule. Employees not so informed may deviate from this schedule within the flexible bands as far as arrival and departure times are concerned. See Appendix B for one type of Flexible Work Schedule Options form.

5) In making schedule adjustments to accommodate coverage and operational requirements, the use of volunteers, or other voluntary methods, shall be the preferred means of resolving conflicts. If such means do not serve to provide a resolution, other methods may be adopted which are fair and equitable to the employees involved.

6) The supervisor will determine in advance all coverage requirements necessary. Such determinations shall be subject to the grievance procedure.

b. Core Time

1) Core times are the hours when all full-time employees except those on approved leave must be on duty.

2) Core time will be from 9:30 a.m. to 11:30 a.m. and from 1:30 p.m. to 3:30 p.m., Monday through Friday. Core times will be adhered to on all days employees report for duty.

c.  Time of Arrival

Employees may vary the time of arrival and departure between the hours of 7:00 a.m. and 9:30 a.m. each morning, and from 3:30 p.m. to 6:00 p.m. each evening subject to the provisions under Core Time.

d.  Basic Work Requirements

The basic work requirement for full-time employees is 80 hours in a biweekly pay period; for part-time employees the basic work requirement is the number of days and hours as determined by the appointment. Overtime hours are not counted as part of the basic work requirement.

e.  Overtime Hours

Overtime will be paid for work performed in excess of the number of regularly scheduled hours in a day ( if 8 or more) or 80 hours in a biweekly pay period when such overtime has been ordered and approved by the supervisor. Premium pay for overtime is not authorized beyond 8 hours for employees scheduled to work 9- or 10- hour days under an AWS schedule ( 5 U.S. C. Chapter 6128).

f.  Compensatory Time Off

An employee may request compensatory time off in lieu of overtime pay as provided by current law and regulation.

g.  Sign in/ Sign out

Organizations using alternative work schedules must establish a time-accounting method that provides affirmative evidence that each employee subject to the schedule has worked the proper number of hours in a biweekly pay period. Supervisors may require their employees to sign in/out using whatever method is appropriate for the work environment. If applicable, see Appendix A for one form of a seriatim sign-in/sign-out sheet. Managers and supervisors are reminded to consult existing labor agreements for additional requirements.

h.  Leave

Time off during an employee's basic work requirement will be charged to the appropriate leave category (including compensatory time off, if applicable), or to excused absence. (Eight hours or the number of hours that is pre-scheduled may be charged for a given day.)

### i. Excused Absence

When emergency excused absences are authorized, in accordance with provisions in this chapter, because of hazardous weather or other similar emergencies, the amount of excused absence will be based on normal, predominant, and variable patterns of arrival, each of which is explained below.

1) Normal Pattern of Arrival - Most employees tend to arrive within five to ten minutes of the same time each day. Therefore, the normal pattern which has been established should be used as the reference point. For example, if an employee has maintained a virtually constant pattern of arrival at 7:30 a.m. and because of hazardous driving conditions arrives at 8:30 a.m. that morning, it would be appropriate to grant one hour of excused absence.

2) Predominant Pattern of Arrival - If an employee maintains a schedule in which one particular arrival time predominates, e.g., the employee generally arrives at 7:30 a.m. four out of five days, this arrival time should be used in determining the amount of excused absence which should be granted.

3) Variable Pattern of Arrival - Where there is a considerable variance in an employee's daily arrival time, so that there is no discernible pattern, the mathematical average of the employee's arrival time should be figured for the previous 10 days during which the employee worked, and this average arrival time used as the reference point in determining how much, if any, excused absence should be granted.

### j. Holidays

1) A full-time employee is entitled to 8 hours pay for any day on which OPM is closed for a legal public holiday. Full-time employees under flexible work schedules should schedule themselves for 72 hours of work in a pay period in which a holiday occurs.

If an employee's day off falls on a holiday, the employee may change his or day off, with supervisory approval, or the employee may take the A in lieu of@ holiday as his or her day off. The work day immediately preceding the holiday is designated as the A in lieu of@ holiday. However, if the holiday nonworkday is a Sunday, the next workday becomes the A in lieu of@ holiday.

2) If a holiday occurs on a day within a part-time employee's scheduled tour of duty (including those days on which flexible hours are scheduled) the employee is entitled to basic pay for the number of hours which the employee is scheduled to work for that day. If a part-time employee does not have a typical schedule, the employee may be paid the average of the number of hours worked in prior weeks on days corresponding to the holiday .

### k. Reassignments.

An employee reassigned will be covered by the flexible work schedule policies of the new organization.

I. Exceptions.

Associate Directors and Heads of Other Offices may exempt employees or groups of employees from AWS when in their judgment:

-operational considerations prevent either full or partial use of this plan;

-employees require continuing supervision because of disciplinary or performance related considerations;

-the continuation of the program would substantially disrupt the Agency in carrying out its functions; or

-the Agency is incurring additional costs because of its participation in the program.

m. Schedule Adjustments for Travel/Training/Jury Duty. Unless specified to the contrary in advance by the supervisor, employees on temporary assignment for work or for training will observe the work schedule of the organization to which assigned. Normally, while on travel or jury duty, employees will revert to a standard 8-hour day, 40-hour week. When a pay period is interrupted by training, travel, or detail into an organization that is not participating in this program, management is responsible for seeing that the employee's 2-week pay period is adjusted to ensure that the employee works 80 hours in a biweekly pay period.

  To Top

## SUBCHAPTER 4. TELECOMMUTING

### 4-1. OPM Wide Policy

Telecommuting allows employees the opportunity to work away from the office for part of the scheduled workweek. The alternative worksite can include the employee's home or a telecommuting center. As with Alternative Work Schedules (AWS), each service or office has been tasked to form a council to partner telecommuting alternatives appropriate for use within their service or office. This is to help ensure that differences in culture are taken into account as workplace partnership initiatives are undertaken. Under this policy, Associate Directors and Heads of Other Offices work with their organizations to select the most appropriate policy to be implemented.

### 4-2. References

Chapter 368 of the Human Resources Handbook provides guidance on the agency telecommuting policy. However the policy has not been released at this time. If your service or office would like advice or assistance in partnering a telecommuting program, you may contact the Office of Human Resources and EEO.

**4-3. Coverage**

Employees in organizations with a partnered telecommuting policy will be covered by that policy. Organizations that do not have a telecommuting policy but wish to use telecommuting on an intermittent basis for compelling reasons must receive approval from the Associate Director or Head of Other Office. The Associate Director or Head of Office has the authority to decide what is a compelling reason and whether a specific case is determined to have compelling reason.

 To Top

## SUBCHAPTER 5. SPECIAL TOURS FOR EDUCATIONAL PURPOSES

a. Part 610 of 5 CFR permits the Office of Personnel Management to authorize a special 40 hour tour of duty to permit an employee to take courses at a college, university or other educational institution, provided the following:

  1) the course(s) taken are not training under the Government Employees Training Act, 5 U.S.C. 4101 et seq.;

  2) the rearrangement of the employee's tour of duty will not appreciably interfere with the accomplishment of his or her regularly assigned duties;

  3) no additional costs for personal services will be incurred in connection with the special tour of duty; and

  4) completion of the course(s) will equip the employee for more effective work at OPM.

b. A special tour of duty for this purpose does not entitle an employee to premium pay for any Sunday, night or holiday hours worked. The workweek must be no less than 40 hours; otherwise the employee must be on a part-time schedule or take leave.

c. Associate Directors and Heads of Other Offices may approve special tours of duty under 5 CFR part 610. Work hours must be reported to the payroll office.

To Top

## SUBCHAPTER 6. GROUP DISMISSAL OR SUSPENSION OF ACTIVITIES

**6-1. Administrative Dismissals**

a. The Director may excuse OPM employees, either en masse or in selected groups, to attend ceremonies or parades in honor of foreign or other visiting dignitaries. Necessary arrangements will be coordinated by the Director of the Office of Human Resources and EEO.

b. When administrative dismissals are authorized under conditions outlined in paragraph (a) above, excused absence is normally granted to the employees involved. An excused absence may not be authorized for an employee on sick or annual leave, or leave without pay, at the time of a group dismissal. For additional information on leave matters, see Human Resources Handbook Chapter 630, Absence and Leave (formerly known as OPM Personnel Manual Chapter 630).

## 6-2. Emergency Dismissal

a. An Emergency Situation is one which may prevent employees in significant numbers from reporting for work, or may necessitate the closing of Federal activities in whole or in part. The emergency situation must be general rather than personal in scope and impact. It may be caused by such developments as heavy snow or severe icing conditions, floods, earthquakes, hurricanes, or other natural disasters; air pollution; massive power failure; major fires; or serious interruptions to public transportation caused by such incidents as strikes of local transit employees or mass demonstrations. Usually, significant emergency situations, of the scope and impact reflected in these guidelines, will be the subject of a public declaration of emergency or disaster by appropriate State or local authorities. It is emphasized that the health and safety of employees in these emergency situations are a matter of prime concern to the government.

b. Emergencies during normal work hours:

1) When the Director of OPM has authorized an emergency dismissal in the **Washington, DC area**, the Agency will revert to an Adjusted work dismissal@ policy. An Aadjusted work dismissal@ policy permits employees to leave work early relative to their normal departure times. For example, if a 3-hour early dismissal is authorized, employees who would normally leave work at 5:00 p.m. would be authorized to leave at 2:00 p.m.

2) Associate Directors may authorize group dismissals in their **Field Offices** located outside of the Washington, DC Metropolitan Area. They should be guided closely by the advisories on highway, traffic and weather conditions provided by local authorities. Wherever possible, dismissals of field employees should be coordinated with local Federal Executive Boards and Federal Executive Associations. If early dismissal is necessary in a field office, the Associate Director's office for those individuals should immediately contact the Office of the Director.

3) Leave charges in the event of suspension of activities during working hours depend upon whether the employee is on duty, scheduled to report for work, or on leave at the time of dismissal.

-All employees on duty at the time of the dismissal will be granted excused absence for the remainder of the workday, even if the employee was scheduled to take leave later in

6/4/2008

the day.

-Supervisors should exempt individuals from authorized dismissal times only to avoid hardships (e.g., younger children are released early from school and no alternative forms of child care are available to the employee).

-When an employee leaves after receiving official word of the pending dismissal but before the time set for his or her authorized dismissal (with supervisory approval) in a situation not involving a hardship, supervisors may charge leave for the period remaining before the employee's authorized departure time. Employees leaving before official word of the pending dismissal time is received will be charged leave or AWOL (absence without leave), as appropriate, for the rest of the workday.

-Employees scheduled to return from leave during the period of the dismissal will be charged leave up until the time they were scheduled to return to duty after which any continuing absence would be treated as excused absence.

-Employees on leave for the day will be charged leave for the entire day.

-Employees failing to report to work as scheduled before the dismissal will be charged annual leave, sick leave, LWOP, or AWOL, as appropriate, for the entire workday.

c. Emergencies before the workday begins:

1) On occasion an emergency situation may develop during non-working hours which necessitates subsequent suspension of Federal activities. When this happens, employees in the **Washington, DC area** will be notified by means of radio and television announcements.

OPM will provide one of the following announcements to the media when an emergency develops before the workday begins:

-Federal agencies are open; employees are expected to report to work on time.

-Federal agencies are operating under an **unscheduled leave policy** (formerly referred to as liberal leave); employees may take leave without prior approval.

-Federal agencies are operating under an **adjusted home departure policy** (replaces the delayed arrival policy). Employees are requested to leave home () hour(s) later than

their normal departure time.

-Federal agencies are operating under an **adjusted home departure policy/unscheduled leave policy.** Employees are requested to leave home () hour(s) later than their normal departure time, and employees may take leave without prior approval.

-Federal agencies are closed. Employees designated as Aemergency employees@ are expected to report for work on time.

*Unscheduled Leave Policy*

OPM's unscheduled leave policy is to avoid family or personal hardships that may arise from hazardous weather. When OPM issues a notice that unscheduled leave is in effect, it means that the Agency will open on time, but employees not designated as Aemergency@ may take annual leave or leave without pay (LWOP) without prior approval. (Examples of when unscheduled leave may be of benefit are schools are closed and a parent has no alternative form of child care available or when snow has not been cleared from side roads to make them passable.) Employees wishing to receive leave under the unscheduled leave policy should call their office to report that they will be on leave. Employees who are unsure if they are considered Aemergency@ personnel should consult their supervisor.

*Adjusted Home Departure Policy*

An Aadjusted home departure@ policy permits employees to leave their home later than their normal departure times. For example, if the media announces that an Aadjusted home departure@ policy is in effect and employees should delay their normal departure time for 2 hours, employees who normally leave for work at 7:00 a.m. would delay departure until 9:00 a.m. Non-emergency employees who arrive late will be excused without loss of pay or charge to leave. The "adjusted home departure" policy replaces the "delayed arrival policy".

2) Associate Directors will annually provide their **Field Office** employees with emergency dismissal procedures developed with local Federal Executive Boards and Federal Executive Associations.

3) If weather conditions are such that transportation is generally slowed, first-line supervisors may excuse short periods of tardiness not in excess of two hours without charge to annual leave. Tardiness in excess of two hours may also be charged to excused absence because of unavoidable delay resulting from emergency situations in cases which are personally reviewed and authorized by an Associate Director or Head of Other Office. Consideration of factors such as distance, availability and mode of transportation, the success of other employees in similar situations and efforts of the employee to get to work will be used in determining the amount of excused absence to grant employees who experience commuting delays.

4) When the Agency is closed for the entire workday, employees who are on leave approved before the

closure also must be granted excused absence. However, employees on LWOP, military leave, on suspension, or in a non-pay status on the workday before and after the closure are not entitled to excused absence and should remain in their current status. Employees on an alternative work schedule (AWS) whose AWS day off is the same workday on which a Federal activity is closed are not entitled to another AWS day off Ain lieu of@ the workday on which the Federal activity was closed. Furthermore, there is no basis to grant an excused absence to such an employee on the AWS day off.

d. **Emergency Employees** are those who occupy jobs vital to public health, safety, welfare, national defense, or the operation of essential facilities or functions. Those employees may, because of their essential duties, be required to be present on the job regardless of any general dismissal authorization.

The Office of Human Resources and EEO will annually call for the designation of emergency employees from the Services and Offices for emergency purposes. Associate Directors are responsible for the designation of emergency employees within their field offices.

These employees will be given written notification that they will be expected to continue on or report to duty regardless of weather conditions or any public announcement of dismissal or suspension of activities.

Under special circumstances, Associate Directors and Heads of Other Offices may retain individual employees to finish work which cannot reasonably be delayed (i.e., a one-time event requiring the presence on the job of employees whose presence is not otherwise required during a general dismissal). The age, health, and personal circumstances of the employees concerned should be considered in deciding whether to have them remain to complete unfinished work. Oral notification may be used.

e. Suspension of work procedures for employees on shift work will be determined by the appropriate Associate Director or Head of Other Office. These employees will be notified annually of their emergency dismissal procedures.

f. A telecommuting employee may or may not be affected by an emergency which requires the regular office to close. The agency should not excuse a telecommuting employee unless he or she cannot perform work because the regular office is closed. When both the regular office and the alternative work site are affected by a widespread emergency (e.g., an earthquake, floods or snow results in school closings and the employee has no other form of child care available), the agency should grant the telecommuting employee excused absences as appropriate. When an emergency affects only the alternative work site ( there is a power failure caused by inclement weather or the power company) for a major portion of the workday, the agency can require the telecommuting employee to report to the regular office, approve annual leave or leave without pay, or authorize an excused absence.

 To Top

**APPENDIX A - Daily Attendance Log**

DATE _____, 200___

A SEPARATE ENTRY IS REQUIRED WHEN REPORTING TO WORK, UPON DEPARTING AT THE END OF
THE DAY AND UPON DEPARTING FROM AND RETURNING FROM MIDDAY FLEX OR LEAVE TAKEN
DURING THE DAY

SIGNATURE        TIME    LEGEND

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

**LEGEND:**

| | |
|---|---|
| A = Arrive | R = Return |
| D = Depart | RF = Return from midday flex |
| DF = depart for midday flex | RA = return from annual leave |
| DA = Depart for annual leave | RS = Return from sick leave |
| DO = Depart for other leave | RO = Return from other leave |

 To Top

## APPENDIX B - Flexible Work Schedule Options

This form is designed to inform a supervisor of an employee's flexible work schedule so that the supervisor may make necessary work load arrangements and plans. You must convey your work schedule to your supervisor at least three work days prior to the beginning of the pay period. All schedules are subject to supervisory approval.

**Employee's Name Date Pay Period Begins**

### 5-4/9 Work Schedule

The employee generally works 5 days one week, and 4 days the other week, a total of 9 days each pay period with one day off. Employees may schedule one day off per pay period, one 10 hour day per pay period, and 7 to 10 hours per work day.

If taking a day off:        Date of day off

Date(s) of day(s) worked less than nine hours

If not taking a day off:    Date(s) of day(s) worked less than eight hours

Arrival time: Anticipated daily arrival time

 To Top

OPM.gov    |    Help    |    Feedback

**U.S. DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | EEOC No. 570-2006-00610X. |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C. 20415 | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**REQUEST FOR PRODUCTION OF DOCUMENTS**
**AND INTERROGATORIES**

Please provide copies of or access to for the purpose of copying any and all of the documents indicated below that have not already been provided in the relevant EEO investigations for the period of time from January 1, 2002, to present, including hand-written or type-written notes, emails, correspondence, letters, memos, etc., by June 14, 2008, to Valerie Kline at 1900 E Street, NW., Washington, DC 20415. Any references to the Publications Management Group (PMG) include and pertain to any previous titles of that same office, such as Publications Management Branch, and include any branches or sections under the PMG. Please indicate on the document the corresponding paragraph and if no documents exist, please indicate that there are no responsive

The following instructions apply to this request for production of documents and the request for interrogatories:

1. These interrogatories are continuing so as to require the filing of subsequent answers promptly in the event that Defendants, by or through any of their agents, counsels or other representatives, learn additional facts relevant to any answers not set forth in their answers to these Interrogatories or discover that any information given in an answer or answers is erroneous.

2. Each interrogatory is to be answered separately and as completely as possible. The fact that investigation is continuing or that discovery is not complete does not excuse failure to answer each interrogatory as fully as possible. The omission of any name, fact, or other item of information from an answer shall be deemed a representation that such name, fact, or other item is not known to Defendant, his agents, counsel, or other representatives at the time the answers to these Interrogatories are served upon Plaintiff.

3. For each and every answer to these Interrogatories:

a. Identify each and every person who participated in supplying information and/or drafting your response or any part thereof;

b. If the answer to any of these Interrogatories was made by referring to or reviewing any documents, identify each and every document referred to or reviewed and the Interrogatory or Interrogatories in connection with which they were used and supply the document.

4. As used in these Interrogatories the singular shall be deemed to include the plural, the plural to include the singular, and words in the masculine, feminine, or neuter shall include each of the other genders as necessary to make the Interrogatory inclusive rather than exclusive.

5. Where an Interrogatory contains a general question or questions, followed by a specific question or questions, the specific question or questions are to be read and interpreted as requesting additional information, not as limiting the general question or questions.

6. With respect to each Interrogatory, identify each and every document prepared by, or in the possession, custody, or control of you or any of your officers, agents, or employees that relates to or refers to the subject matter of the Interrogatory in question and supply the document.

7. Whenever information is requested in one of the following Interrogatories or subparts thereof that you previously furnished in answer to another Interrogatory herein, such information need not be restated.  It will be sufficient for you to identify the previous answer containing the information requested.

8. Whenever an Interrogatory calls for information that is not available to you in the form requested but which is available in another

form or can be obtained at least in part from other data in your possession, so state and either (i) supply the information requested in the form in which it is available or (ii) supply the data from which the information requested can be obtained.

9. If you claim a privilege with respect to information pertaining to any document that you are asked to identify or describe in these Interrogatories, furnish a list signed by counsel giving the following information with respect to each such document:

  a. The title of the document;

  b. The nature of the document, e.g., interoffice memorandum, correspondence, report, etc.

  c. The identity of the sender and the identity of the recipient(s) of the document;

  d. A statement of the basis upon which the privilege is claimed and a summary of the subject matter of the document in sufficient detail to permit the Court to rule on the propriety of the claim of privilege; and

  e. The paragraph number of the Interrogatory to which the document is responsive or otherwise pertains.

10. Interrogatories calling for numerical or chronological information shall be deemed, to the extent that precise figures or dates are not known, to call for estimates. In each instance that an estimate is given, identify it as such together with the source of information upon which you base the estimate.

11. In answering these Interrogatories every source of information to which you have access should be consulted, regardless of whether the source is within your immediate possession or control. All documents or other information in the possession of experts or consultants should be consulted.

12. All interrogatories relate to the time frame between October 7, 2002 to present unless otherwise indicated.

## Request for Production of Documents

Please produce the following documents:

1.  Copy of all unredacted email(s) and responses thereto accusing Kline of attempting to purchase weapons and/or ammunition over the internet or other accusations and complaints received against Kline.
2.  Copy of the Office of Inspector General (OIG) investigative report clearing Kline to return to work. (If the investigation is ongoing, please provide a copy of the preliminary report that was used as the basis having Kline return to work following being placed on administrative leave.)
3.  Resume of Stephen Hickman used in applying for his present position with PMG (redact any personal information like social security numbers, birth date, etc).
4.  Vacancy Announcement # 06-444-SMO.
5.  Performance Standards for Stephen Hickman during the rating period 10/1/2005 to 9/30/2006.
6.  Copy of the "draft" *Federal Register* training manual developed by Jacquline Carter from November 6, 2006, to February 20, 2007.
7.  Correspondence to Raymond Mosley during the period 10/1/2005 to 9/30/2006 designating the *Federal Register* liaisons, and certifying and authorizing officials since October 31, 2006.
8.  Documentation of incidents or complaints received about Kline during the rating period 10/1/2005 to 9/30/2006.
9.  Documentation of dates and times Kline failed to assist Coco during the rating period 10/1/2005 to 9/30/2006.
10. Documentation of dates and times Kline failed to assist Carter during the rating period 10/1/2005 to 9/30/2006.
11. Documents of dates and times or emails sent to Kline during the rating period 10/1/2005 to 9/30/2006 reminding her to tend to the Publications Inbox.
12. Copy of the "wrong DDS" and reflecting "wrong date for completion" used by Kline in working on the Unified Agenda during the rating period 10/1/2005 to 9/30/2006.
13. Copy of email sent erroneously "from personal email rather than regulatory" during the rating period 10/1/2005 to 9/30/2006.
14. Copy of Notice and Postings sent out later than they should have been sent out during the rating period 10/1/2005 to 9/30/2006.
15. Copy of instructions or procedures in place during the rating period 10/1/2005 to 9/30/2006 for properly sending out Notice and Postings.

16. Documentation during the rating period 10/1/2005 to 9/30/2006 indicating communications to William M. Davis and/or Claudio A. Benedi concerning instances where people from the mailroom, print shop, and/or printing procurement section asked Davis and/or Benedi to keep Kline out of their work areas or complained about Kline.

17. Documentation showing the assignment of the "Lexis Nexis" special purpose study to Kline by Davis that he refers to in his Attachment to Kline's 2006 Mid-year review.

18. Documentation indicating the sex, age, race, grade and number of federal employees working in or detailed to PMG, including the mailroom, during 2006-2007.

19. Copies of the performance appraisals for Robert Coco, Jacquline Carter, Issac Evans, Shirley Sewell, Miriam Johnson and Stephen Hickman for the year 10/1/2005-9/30/2006.

20. Copy of performance awards that Robert Coco, Jacquline Carter, Issac Evans, Shirley Sewell, Miriam Johnson and Stephen Hickman received for the year 10/1/2005-9/30/2006.

21. The Vacancy Announcement used to fill Jacquline Carter's position following her retirement.

22. The documents obtained by OIG in conducting the "criminal investigation" or other investigations of Kline.

23. The testimony of Derek Holt that he claims he provided in a "previous complaint" when testifying under EEO Investigation No. 2006034. See Ex. M, p. 1 of 3.

24. Any counseling memoranda or formal reprimands that were issued to Kline as a result of the criminal investigation.

25. Provide Form 1479 and Position Description(s) for Stephen D. Hickman for his position at the Office of the Federal Register.

26. Provide Form 1479 and Position Description(s) for Pete Jones for his position with the Publications Management Group.

27. Provide all the documents you intend to present at the hearing before the EEOC that have not yet been produced.

Note: If the OIG claims the Law Enforcement Investigatory Privilege with regard to any document request or interrogatories, please provide in support of the privilege: "(1) a formal claim of privilege by the head of the department having control over the requested information, i.e. Director Springer; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case,* 272 U.S. App. D.C. 314, 856 F.2d 268, 271 (D.C. Cir. 1988)

## Request for Interrogatories

1. Did anyone from OPM engage in any conversations with the sender of the March 29, 2006 email accusing Kline of attempting to purchase weapons and ammunition over the internet? If so, please provide details of those conversations.

2. Please describe what happened to the equipment that was removed from Kline's possession immediately following her return from Administrative Leave, including the Photoshop software, DVD/CD writer, webcam, and cell phone.

3. Following the return of Kline after she had been cleared of any wrongdoing by the OIG, explain why were her duties and/or responsibilities changed, such as having Coco assign all regulatory work to Kline, submitting packages to the Federal Register under Coco's signature instead of under Kline's signature as she had been doing and no longer having Kline review regulatory packages?

4. Following the return of Kline after she had been cleared of any wrongdoing by the OIG, why wasn't her equipment returned to her, such as the Adobe Photoshop software, DVD/CD writer, webcam, and cell phone.

5. Identify the person(s) in PMG who were capable of performing a review of regulatory issuances for conformance with the Federal Register Document Drafting Handbook and certifying for publication in the *Federal Register*?

6. Why wasn't Kline assigned responsibility for performing the regulatory work when Carter retired?

7. Why were Kline's regulatory duties not restored to her following her return from Administrative Leave?

8. Describe the degree of Robert Coco's involvement in the regulatory work?

9. Did Coco ever have responsibility for reviewing OPM regulations for conformity to the document Drafting Handbook for publication in the Federal Register? If so, provide the position description and SF-50s reflecting when he performed this duty.

10. Was Coco ever an OMB liaison whereby he submitted regulations to OMB for review and facilitated the review of regulations between OMB and OPM regulation writers?

11. Describe the procedure by which Coco submitted regulations to the *Federal Register* for publication after Kline returned from Administrative Leave?

12.   Did Coco ever meet with the regulation writers to go over their regulations after reviewing them in order to instruct them on what revisions to make on the regulations?

13.   Is it the practice of PMG or was it the practice of PMG for any of the rating years 2002 through 2007 to issue monetary performance bonuses to employees who received an Exceeds Fully Successful rating or above on their Performance Appraisal?

14.   Identify the age, race, and gender of all the employees working for PMG (including the mail room) and the dates they were hired during the period 2006-2007.

15.   Describe the dates and times of any complaints or incidents made about Kline by OPM employees and who made them.

16.   Explain why purchasing weapons and ammunition via the internet would be considered "criminal activity" and/or a "serious allegation" that would prompt an investigation by the OIG that justified placing Kline on Administrative Leave and/or justifies keeping Kline on an "ongoing" investigation?

17.   Identify the individual that filled Jacquline Carter's position after she retired.

18.   Who was the individual who made the decision to conduct the "criminal investigation" of Kline?

19.   What was the criminal act that Kline was accused of committing that prompted the "criminal investigation"?

20.   If there was/were no criminal act(s), what were the grounds for initiating a "criminal investigation" of Kline?

21.   After clearing Kline to return to work, what are the grounds for keeping the alleged "criminal investigation" ongoing?

22.   Identify the dates, race and gender of any other OPM employees that have been investigated by the OIG based on an anonymous complaint with no evidence and the nature of the allegations against the individuals, i.e. accused of fraud, accused of stealing government equipment, etc. and whether the investigations are still ongoing.

23.   What oral conversations or written communications did the OIG have with any individuals outside of OPM concerning the alleged allegations against Kline?

24.   Other than hearsay, was there any evidence in support of the anonymous e-mail's allegations against Kline prior to placing Kline on administrative leave pending a criminal investigation of her?  If so, please provide a copy of or describe the evidence.

25.   Describe with particularity the incident involving two (2) mailroom employees one of which was Sheila Coates, who used a government-issued credit card for personal use in paying for a hotel room including what actions were taken as a result of the

incident.  This incident may or may not have occurred prior to 2002.  The exact date is unknown.

26. If any Request for Admissions is denied, please explain with particularity the reasons why it is denied.

In addition, please reschedule the following OPM employees or former employees for deposing on July 1, 2008:

William Davis – 9 am
Claudio Benedi – 10 am
Vince Norbert – 11 am
Derek Holt – 11:30 am
Jill Maroney – 12 noon

Issac Evans – 1:30 pm
Jacquline Carter – 2:00pm
Stephen Hickman – 2:30pm
Miriam Johnson –3 pm
Sheila Coates – 3:30 pm
Caprice Miller – 4 pm
Monica Payton – 4:30 pm

I would also like to depose the following on July 2, 2008:

Linda Springer 9 am
Ronald Flom – 9:30 am
Kay Ely – 10 am
Pete Jones – 10:30 am
Robert Coco – 11 am

Regards,

Valerie Kline

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Request for Production of Documents And

Interrogatories and the Request for Admissions was sent via email and first class mail on

May 27, 2008 to:

Elizabeth Ghauri
Agency Representative
Office of Personnel Management
1900 E Street, NW.
Washington, DC  20415

_____

Valerie Kline