U.S. DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 (JR) |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C.  20415 | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *   * * * * * * * * * * * * * * * * * * * * * *

**MOTION TO LIFT STAY OF DISCOVERY FOR LIMITED
PURPOSE TO DEPOSE AUTHOR OF OIG REPORT,
COMPEL PRODUCTION OF DOCUMENTS AND
REQUEST FOR HEARING**

On July 22, 2008, the Court issued a minute order denying plaintiff's motion for sanctions [39]; denying plaintiff's motion for partial summary judgment [53]; denying defendant's motion for leave to file surreply [57]; granting defendant's motion for leave to file OIG report under seal [58] and denying plaintiff's motion to strike [60]. In response to that minute order, Springer filed under seal a report written by the Office of Inspector General (OIG) concerning an investigation of Kline.

**<u>MOTION TO LIFT STAY OF DISCOVERY</u>**

Springer initially filed a redacted version of the OIG report with her Motion to File Surreply. Since surreply was denied, Kline questions Springer's motives for filing

the protracted version of the redacted OIG report under seal.  Because the OIG Report applies to no pleading in this case and pertains to a time period outside the relevant time period in this case, Kline submits that Agency counsel has filed the OIG Report in an attempt to prejudice the Court against Kline.

The OIG Report is unsworn and undated, although it is based on an email sent from someone outside the agency to egov@opm.gov sometime around April 3, 2006, and an interview by an OIG investigator that occurred on May 16, 2006.  Because all of the claims in this case are based on adverse actions that occurred on or before February 2, 2006, the OIG Report pertains to a time period outside the relevant time period in this case.  Therefore, there is no legitimate reason for filing this report other than to prejudice the Court against Kline.

Since the email complained about Kline and made accusations based on "no credible evidence", and because the OIG Report is based on a lot of hearsay and subjective opinion, justice requires that Kline be allowed to depose the author(s) of the OIG Report in order to clarify the discrepancies contained in the report, to discover the bases for the author's conclusions and/or to impeach the author's claims and allegations.  Kline also submits that there are a number of misstatements of fact, as well as unsubstantiated, unfounded and defamatory statements and allegations by the investigator that casts Kline in a false light.

No less important, Claudio Benedi, Kline's up-line supervisor that is the subject of a number of claims in this case, is good friends with a Policy Analyst who works in the Office of Inspector General and goes to lunch with Mr. Benedi virtually every day.

2

Accordingly, Kline requests that she be allowed to depose the author(s) of the OIG Report.

**MOTION TO COMPEL**

The Court also denied Kline's Request for Sanctions. Kline requested sanctions after she orally motioned the Court during the March 12, 2008 "emergency" hearing to compel Springer to produce documents pursuant to the Rule 26(a) discovery mandated by the Court at the November 15, 2007 Status Conference. <u>Because the Court directed Agency counsel to provide Kline the requested documents and because Springer failed to provide the requested documents,</u> Kline requests that <u>the Court again compel Springer to produce the requested documents</u> needed to establish the facts contained in Kline's opposition to the dispositive motion or indicate that there are no such documents[1].

Alternatively, Kline requests that the Court have a hearing on the issues.

**STATUS REPORT AND REQUEST FOR HEARING**

Kline also requests a hearing on a matter pertaining to <u>possible obstruction of justice</u>. Kline deposed Jacquline Carter on February 20, 2008. After obtaining the transcript of the deposition, <u>Kline discovered that key portions of Carter's testimony were omitted from the transcript</u>—testimony where Carter stated that she first started teleworking when OPM had a "pilot" telework program. Kline later learned that the pilot

---

[1] In Kline's Opposition to the dispositive motion, Kline placed numerous "blank" exhibits referencing the documents she was seeking in support of her opposition to the dispositive motion and asked the Court to establish the facts that would have been established had Springer produced the documents.

3

took place in 1990 and lasted for one year[2]. Carter testified that she did not obtain a Telework Agreement until she started teleworking <u>after</u> the "pilot" telework period—a Telework Agreement that Springer has failed to produce. <u>See</u> Carter Deposition, p. 15 line 22, where Kline submits that "it" refers to OPM's telework program following the pilot.

Section 359 of Public Law 106-346, enacted in October 23, 2000, required all Executive agencies to establish a policy under which eligible employees could participate in telecommuting to the maximum extent possible without diminished employee performance. OPM established its policy shortly thereafter in 2001, <u>the same year that Carter testified that her husband's health failed</u>. <u>See</u> Carter Deposition, p. 18, line 11, Attachment 2.

Kline claims in her Third Amended Complaint that <u>Carter began teleworking around 2001 after her husband's health failed</u> but that <u>Kline was denied telework after her mother's health failed, which was discriminatory since both Carter and Kline performed regulatory work</u>. Therefore, Carter's testimony that she teleworked during OPM's pilot is significant[3].

Shortly after receiving the transcript, Kline requested a copy of the audio file taken during the deposition from Capital Reporting Company (CRC) but CRC refused to cooperatively produce the audio file. On May 2, 2008, Kline caused a subpoena issued by this Court to be served on CRC ordering Wayne Cohen, General Counsel for CRC, to

---

[2] <u>See</u> *Human Resource Handbook*, Chapter 368, ¶ 1-2, "In January 1990, the President's Council on Management Improvement (PCMI) approved a one year Federal Flexible Workplace Pilot Project. OPM implemented this pilot on October 1, 1990." Attachment 1.

[3] Springer also failed to produce the records for the dedicated telephone line and for the receipts and/or invoices for the equipment that was ordered for Carter's telework that Robert Coco testified he kept.

4

produce the audio file. Mr. Cohen vehemently objected to the subpoena claiming that it was not properly served, that no provisions were made for paying for the audio file and that the Court Reporter, Mary Warner, was not an employee of CRC but an independent contractor so that he could not require her to comply with the subpoena, etc.

After numerous communications with Mr. Cohen, he finally furnished the audio file for an advance payment of $50. When Kline received the file, it was corrupt and inaudible. Kline requested that she be allowed to review the audio file on Ms. Warner's laptop as requested in the subpoena. Sherry Brouchard of CRC arranged to bring Ms. Warner's laptop to Kline on June 30, 2008. However, Ms. Brouchard cancelled the meeting because she said that Ms. Warner hired an attorney.

On June 20, 2006, Philip J. Harvey, Ms. Warner's attorney, wrote to Kline stating that Kline could come to his office and review the file for a payment of $150. Kline responded by asking Mr. Harvey to send her another copy of the audio file because the file could have been corrupted when copying it onto a CD. Mr. Harvey responded in a June 30, 2008 letter stating that a "good copy" of the audio file "does not appear to exist". Kline wrote Mr. Harvey again and made a second request that he send her another copy of the file since CRC did not verify that the file was an exact copy of Ms. Warner's file. Kline also requested a copy of Ms. Warner's steno notes of the Carter deposition. Mr. Harvey failed to produce the requested audio and stated in a July 13, 2008 letter that he was going on vacation for two weeks but would talk to Ms. Warner when he returned. He also indicated that Kline was not entitled to Ms. Warner's steno notes since she personally had not been served with a subpoena.

On June 30, 2008, Kline wrote to Agency counsel about the missing testimony. Agency counsel responded on July 2, 2008, and requested a copy of the subpoena. Kline provided her with a copy of the subpoena on July 7, 2008. Agency counsel did not respond further except to now file a document in this Court casting aspersions on Kline.

In light of the potential obstruction of justice issues, Kline submits that Springer filed the OIG Report as a preemptive strike before Kline could raise the issue pertaining to the missing testimony. Nevertheless, Kline believes that a hearing is in order to determine exactly what has occurred in relation to the Carter transcript, and to give Ms. Warner, her attorney and the parties in this case an opportunity to present their submissions with respect to the Carter transcript.

Accordingly, Kline requests a hearing on this matter.

                                        Respectfully submitted,

                                        /s/

                                        Valerie Kline, pro se
                                        83 E Street
                                        Lothian, MD  20711
                                        (301) 509-2684

T H E O / Employee Information Center

Employees Main    Employee Info    Employee Benefits    Ethics    Jobs and Training

Team OPM    Community    Employees    References    Help Desk    Manager's Corner

Advanced Search    Directory    News Room

Go

# Human Resources Handbook

## Handbook Chapter 368

### Table of Contents

View and Print the Word Version of This Chapter

*SUBCHAPTER 1. GENERAL PROVISIONS*

1-1. General
1-2. Background
1-3. Reference

*SUBCHAPTER 2. OPM Policy*

2-1. Policy
2-2. Benefits
2-3. Guidance for Approving Request to Telecommute

*SUBCHAPTER 3. Procedures*

3-1. Requesting Approval to Telecommute
3-2. Time, Attendance and Pay
3-3. Documenting and Reporting Changes to Work Agreements
3-4. Use of Equipment

APPENDIX A-1: ALTERNATE WORK SITE WORK AGREEMENT

- Disabilities
- Personal Identity Verification (PIV) Program
- Equal Employment Opportunity
- Human Resources
  - Employee Handbook
  - Human Resources Handbook
    - Chapter 250 Human Capital Accountability Policy
    - Chapter 335 Promotion and Internal Placement
    - Chapter 351 Reduction in Force
    - Chapter 362 Presidential Management Fellows Program
    - Chapter 368 Telecommuting
    - Chapter 430 Performance Management
    - Chapter 537 Repayment of Student Loans
    - Chapter 550 Compensatory Time Off For Travel
    - Chapter 610 Hours of Duty
    - Chapter 630 Absence and Leave

- Chapter 714 Reasonable Accommodation for Qualified Individuals with Disabilities
- Chapter 810 Injury Compensation
- Prohibited Personnel Practices and Whistleblower Protections
- Prohibited Personnel Practices
  - Telecommuting
  - Travel Policy

APPENDIX A-2: ALTERNATE WORK SITE WORK AGREEMENT INFO SHEET A

APPENDIX A-3: ALTERNATE WORK SITE WORK AGREEMENT INFO SHEET B

APPENDIX A-4: SUPERVISOR CHECKLIST

APPENDIX B: SAFETY CHECKLIST FOR THE HOME WORK SPACE

APPENDIX C: TELECOMMUTING FACILITY REIMBURSEMENT

APPENDIX C-1: WASHINGTON DC AREA TELECENTERS

APPENDIX C-2: TELECOMMUTING FACILITY REIMBURSEMENT INFORMATION SHEET

APPENDIX C-3: PAYING OFFICE INFORMATION SHEET

APPENDIX D: REQUEST TO TELECOMMUTE

## SUBCHAPTER 1. GENERAL PROVISIONS

To Top

### 1-1. General

This chapter provides guidance on the establishment, management and maintenance of telecommuting within the Office of Personnel Management. The telecommuting program allows OPM employees to work at alternative worksites as part of their regular tour of duty. This may include their homes, satellite telecommuting centers or other approved sites away from the office. Other common names for telecommuting include work-at-home, flexiplace, telework and homework.

### 1-2. Background

a. In January 1990, the President's Council on Management Improvement (PCMI) approved guidelines for a one year Federal Flexible Workplace Pilot Project. OPM implemented this pilot on October 1, 1990. The purpose of the pilot was to assess whether flexible workplace arrangements would assist OPM in recruiting, motivating and retaining workers, as well as reducing costs. Results of the pilot concluded that

flexiplace, or telecommuting, is a successful program that works well with employees who are proven performers and provides significant benefits to participating employees.

b. On July 11, 1994, President Clinton signed a directive calling on each executive department and agency "to establish a program to encourage and support the expansion of flexible family-friendly work arrangements including... telecommuting and satellite work locations."

c. The President's Management Council endorsed the National Telecommuting Initiative in January 1996. This initiative is a plan that set goals for significantly increasing the numbers of Federal employees who telecommute. The governmentwide goal was 60,000 Federal employees telecommuting in FY 1998 and 160,000 Federal telecommuters by FY 2002.

d. On June 21, 1996, President Clinton further directed all executive departments and agencies "to review their personnel practices and develop a plan of action to utilize the flexible policies already in place and, to the extent feasible, expand their ability to provide their employees... opportunities to telecommute."

### 1-3. References

The "Balancing Work and Family Demands Through Telecommuting" guide was issued by the Family Friendly Workplace Advocacy Office within the Office of Personnel Management in September 1995. The Guide provides basic guidelines for establishing a telecommuting program.

## SUBCHAPTER 2. OPM POLICY

 To Top

### 2-1. Policy

a. The Office of Personnel Management supports the full range of telecommuting options. All organizations will be covered by the provisions of this policy. OPM's telecommuting program is voluntary. It is an option that may be used to assist in the effective and efficient accomplishment of agency business.

b. Telecommuting as used in this chapter allows OPM employees to work at alternative worksites as part of their regular tour of duty, either at home or at a telecenter.

c. Telecommuting should not be confused with home-based, employee owned businesses or independent contracting or consulting arrangements in the home. In most cases, the employee's official duty station remains the telecommuters current traditional Federal office regardless of where the work is actually performed.

d. Employees approved to telecommute as a reasonable accommodation are not necessarily subject to all provisions of this chapter. The employee's "Alternative Worksite Work Agreement" will note the provisions of this chapter to which the employee must adhere.

### 2-2. Benefits

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE THE DISTRICT OF COLUMBIA

------------------------------------x

VALERIE KLINE,                       :

       Plaintiff,             :

    v                              : CASE NO:

                                                 : 1:07CV451

LINDA M. SPRINGER, and               :

US OFFICE OF PERSONNEL MANAGEMENT,   :

       Defendants.            :

------------------------------------x

                          Washington, D.C.

                  Tuesday, February 20, 2008

Deposition of:

               JACQULINE CARTER

called for oral examination by Plaintiff, pursuant to Notice, at the Offices of Personnel Management, 1900 E Street, Northwest, Washington, D.C., before Mary E. Warner of Capital Reporting, sworn by a Notary Public in and for the District of Columbia, beginning at 1:00 p.m.



Capital Reporting Company

Page 15

1  wanting assistance with their regulatory packages
2  over the phone?
3      A    All time.
4      Q    And were there others in the office that
5  answered the regulatory telephone line when you
6  were out of the office?
7      A    Yes.
8      Q    And who would that be?
9      A    Ms. Kline, 1973?
10     Q    Yes.  When did you start teleworking?
11          MS. WHITAKER:  Objection.
12          THE WITNESS:  In 2000, I was doing
13 telework.
14 BY MS. KLINE:
15     Q    When did you start doing that?
16     A    Around 2000, 1999.
17     Q    And why did you request telework?
18     A    Because my job, I had to do my work at
19 home.
20     Q    Did you have an executed telework
21 agreement?
22     A    When it became effective for OPM, yes.

1   Q   When was that?

2   A   I don't remember.

3   Q   And what reasons did you give for wanting

4   to telework?

5   A   Because I could, I could telework.

6   Q   And how many days a week did you

7   telework?

8   A   Maybe one or two, depending on what I had

9   to do.

10  Q   What was the pilot period?

11  A   Just our pilot period, they were talking

12  about it and they allowed me to do it.

13  Q   And how long was that for?

14  A   Until it became effective in OPM.

15  Q   And that was around '99 to 2000?

16  A   I'm not sure of the dates.

17  Q   Who covered the walk in customers while

18  you were teleworking?

19  A   Whoever was in the office.  I can't

20  remember who.  I know Robert Coco.  I don't

21  remember others, Shirley Sewell.

22  Q   And who answered the regulatory line when

```
1   you were teleworking?
2        A    It was transferred to my home phone.
3        Q    What government issued equipment did you
4   have for teleworking?
5        A    In the very beginning, I had a fax
6   machine; in the very beginning, yeah, a fax
7   machine.  I had my own equipment.  Eventually I
8   used some of theirs.
9        Q    What equipment was that?
10       A    What equipment was what?
11       Q    That you were using for teleworking.
12       A    OPM's?  A fax machine, a computer, that's
13  it.
14       Q    Did you have a dedicated telephone line
15  installed?
16       A    Yes.
17       Q    Was that installed by OPM?
18       A    Yes.
19       Q    Did you have a government issued cell
20  phone?
21       A    No.
22       Q    And I understand that your husband
```

Capital Reporting Company

Page 18

1  suffered several strokes. When did he suffer
2  those strokes approximately?
3      MS. WHITAKER: Objection, foundation and
4  privacy act. You do not have to give details of
5  your husband's condition, if you care not to.
6      THE WITNESS: I care not to.
7  BY MS. KLINE:
8    Q  Okay. I'm not asking for details about
9  his condition, just the time that he became ill,
10 when he suffered the strokes.
11   A  2001, I can't really remember the date.
12   Q  Okay. Was the reason you wanted to
13 telework primarily due to his condition?
14   A  I was already teleworking.
15   Q  Would you have continued to work at OPM
16 if you would not have been allowed to telework
17 after your husband became ill?
18   A  If he was really sick, I would probably
19 had to retire.
20   Q  If you had not been allowed to telework?
21   A  That's not what I said. Regardless of
22 whether I was teleworking or what, if he got

# U.S. DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Kline | * | |
| 83 E Street | * | |
| Lothian, MD 20711 | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Case No. 1:07-cv-451 (JR) |
| | * | |
| Linda M. Springer, Director | * | |
| U. S. Office of Personnel Management | * | |
| 1900 E Street, N.W. | * | |
| Washington, D.C. 20415 | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

For good cause shown, Plaintiff Valerie Kline's *Motion To Lift Stay Of Discovery For Limited Purpose To Depose Author Of OIG Report, Compel Production Of Documents And Request For Hearing* is hereby GRANTED.

_____
James Robertson
United States District Judge